**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **ENVIRONMENT TEXAS** | § | |
| **CITIZEN LOBBY, INC., AND** | § | |
| **SIERRA CLUB** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION  4:10:CV:4969** |
| | § | |
| **EXXON MOBIL** | § | |
| **CORPORATION,** | § | |
| **EXXONMOBIL CHEMICAL** | § | |
| **COMPANY, AND** | § | |
| **EXXONMOBIL REFINING AND** | § | |
| **SUPPLY COMPANY** | § | |

**DEFENDANTS EXXON MOBIL CORPORATION, EXXONMOBIL CHEMICAL CO., AND EXXONMOBIL REFINING AND SUPPLY CO.'S MOTION TO DISMISS**

Defendants Exxon Mobil Corporation, ExxonMobil Chemical Company and ExxonMobil Refining and Supply Company (collectively, "ExxonMobil") move to dismiss Plaintiffs Environment Texas Citizen Lobby, Inc. and Sierra Club's Complaint. This Court lacks subject matter jurisdiction over the Plaintiffs' claims, and Plaintiffs have failed to state a claim for which relief can be granted. As a result, Plaintiffs' claims against ExxonMobil should be dismissed under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

### I.    Summary of Issues

Plaintiffs bring this action under the citizen suit provision of the federal Clean Air Act ("CAA" or "Act"). 42 U.S.C. § 7604(a)(1). Such suits are

only appropriate where the state and federal environmental agencies have failed to exercise their enforcement responsibilities.  Here, Plaintiffs' claims are essentially downloads from two public databases:  (1) ExxonMobil's reports to TCEQ of upsets, maintenance activities, startups and shutdowns, regulated by TCEQ under a statutory program tailored to such events, and (2) ExxonMobil's reports to TCEQ of events that were "indications of noncompliance" with the requirements of ExxonMobil's Title V operating permits.  The State of Texas, through the Texas Commission on Environmental Quality ("TCEQ"), and the federal government, through the U.S. Environmental Protection Agency ("EPA"), have actively and effectively enforced, and continue to enforce, the CAA and related state and federal regulations that govern these claims.  By simply cataloging the many reports that have been filed, Plaintiffs have failed to state a cause of action under the CAA.

This Court lacks jurisdiction over Plaintiffs' claims because: (1) There is no room for a private attorney general action in light of the exhaustive regulatory and enforcement actions of the agencies charged with enforcing the statute; (2) Plaintiffs' claims have been mooted and are barred by *res judicata* by their resolution in the agency regulatory process; (3) ExxonMobil is subject to a Consent Decree entered in an EPA enforcement action, which addresses the rules and regulations Plaintiffs raise here, that is still in full force and effect;

(4) Plaintiffs' claims of purely intermittent or sporadic issues are not actionable under the citizen suit provision; and (5) Plaintiffs have not met their burden for establishing Article III standing.

In fact, plaintiffs' complaint with over 600 pages of attachments allegedly identifying various violations, would seem to contemplate a new, expanded use of the citizen suit provision of the CAA.  Rather than identifying any actual, ongoing violations, the complaint essentially asks this Court to undertake comprehensive oversight over the regulatory process.

## II.    Legal Standards

The burden of establishing federal jurisdiction rests on the party seeking the federal forum.  *Howery v. Allstate Ins. Co.*, 243 F.3d 912, 919 (5th Cir. 2001).

In considering a motion to dismiss under Rule 12(b)(1) of the Federal Rules of Civil Procedure, the Court is not confined to the pleadings and may examine other evidence in the record that is relevant to its jurisdiction.  *Aguilar v. U.S. Immigration & Customs Enforcement Div. of Dep't of Homeland Sec.*, 510 F.3d 1, 8 (1st Cir. 2007).  Rule 12(b)(1) motions may present either a facial or factual challenge to the court's subject matter jurisdiction.  *Citizens for Clean Power v. Indian River Power, LLC*, 636 Fed. Supp. 2d 35, 358 (D. Del. 2009).  Where the moving party presents a factual challenge, the court need not confine its

consideration to the allegations of the complaint, nor accept those allegations as true.  *Id.* (citing *Mortensen v. First Fed. Sav. & Loan*, 549 F.2d 884, 891 (3rd Cir. 1977)).[1]

      The Court should dismiss a complaint pursuant to Rule 12(b)(6) if the plaintiff has not provided both fair notice of the nature of the claim and plausible factual allegations to support the claim.  *See Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-50 (2009) (stating that plausibility is "a context-specific task that requires the reviewing court to draw on its judicial experiences and common sense").  The plaintiffs' claims must "make relief plausible, not merely conceivable, when taken as true."  *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 186 (5th Cir. 2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)).  Furthermore, the court should "not strain to find inferences favorable to the plaintiff."  *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008).[2]

---

[1]    In making a factual determination regarding subject matter jurisdiction under Rule 12(b)(1), which does not implicate the merits of a plaintiff's cause of action, the district court has substantial authority to "weigh the evidence and satisfy itself as to the existence of its power to hear the case."  *Fan v. Brewer*, C.A. No. H-08-3524, 2009 WL 1743824, at * 4 (S.D. Tex. June 17, 2009) (internal citation omitted).  The court has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve jurisdictional facts.  In such instances, a court's reference to evidence outside the pleadings does not convert the motion to dismiss to a Rule 56 motion for summary judgment.  *Id.*  ExxonMobil suggests that this Court can grant the motion to dismiss on the failure of the pleadings alone, or if the Court is inclined, the parties may submit a discovery and briefing schedule to prepare for a threshold factual determination, either by hearing or written submission, on this jurisdictional question.

[2]    In considering a motion to dismiss under Rule 12(b)(6), a district court may not consider materials outside the complaint, with one limited exception.  A court may consider documents attached to a motion to dismiss provided that the documents "are referred to in the plaintiff's complaint and are central to the [plaintiff's] claims. . . .  [A] court does not transform a motion to dismiss into one for summary judgment by considering documents attached to a defendant's motion to dismiss that are central

### III.    Factual and Legal Background

#### A.    ExxonMobil Baytown

The ExxonMobil Baytown Complex is comprised of the Baytown Refinery, the Baytown Chemical Plant and the Baytown Olefins Plant.  Each plant is part of an integrated manufacturing complex.  The Complex has been part of the community since 1919, and today employs approximately 2,400 people.

Since 2000, ExxonMobil has invested more than $700 million in emission controls and monitoring devices to enhance its compliance with TCEQ and EPA regulations and orders.  As a result of aggressive efforts and diligence by ExxonMobil, emissions have declined and air quality has improved.  For example, Baytown has:

- Achieved a 75% reduction in combined benzene, toluene, ethylbenzene, and xylene air emissions between 1990 and 2008.

- Achieved a 60% reduction in nitrogen oxide air emissions between 2000 and 2008.

- Achieved a 50% reduction in volatile organic compound air emissions between 2000 and 2008.

- Achieved a 63% reduction in hydrocarbon flaring between January 2003 and November 2009.

- Achieved a 57% reduction in reportable air events between January 2003 and November 2009.

---

to the plaintiff's claim but were left out of the complaint."  *Columbia Hosp. v. Legend Asset Mgmt. Corp.*, 3:03-CV-3040G, 2004 WL 769253, at * 2 (N.D. Tex. Apr. 9, 2004) (citations omitted).

Over the same time period, the Houston region has made strong, sustained improvements in air quality.[3]

## B.  Legal Background

### 1.  Regulation of Air Emissions Under the Clean Air Act

Under the CAA, the federal government sets standards to protect national air quality, and each state implements those standards through a State Implementation Plan ("SIP").   42 U.S.C. § 7410.   Texas has a robust SIP comprised of comprehensive rules regulating stationary sources of air emissions such as ExxonMobil Baytown.

#### a.  Air Quality Permits

Under the SIP, Texas issues two types of air quality permits that contain limits and conditions on the operation of facilities.  *See, e.g.*, 30 TEX. ADMIN. CODE §§ 116.110, 116.710.  The first is a new source review ("NSR") preconstruction permit issued under 30 Texas Administrative Code Chapter 116 (referred to as "NSR Permits").  The second is an operating permit issued under 30 Texas Administrative Code Chapter 122, implementing Title V of the CAA (known as "Title V Permits").  *See, e.g.*, 30 TEX. ADMIN. CODE § 122.120.

---

[3]    See TCEQ, Texas Air Quality Successes, available at http://www.tceq.texas.gov/implementation /air/airsuccess.

**b.   Emissions Event Rules**

Unplanned air emissions at a refinery and other plants typically occur when operations are disrupted (known as "upsets") and gas has to be released to prevent a dangerous over-pressure of equipment.  Because these emissions by their very nature are unpredictable, TCEQ does not incorporate them into the NSR permits it issues.  Instead, Texas has a comprehensive set of rules that describe what refineries and other plants are to do when an upset occurs.  Events are reported and analyzed to determine what steps may be taken to prevent upsets and to mitigate emissions when they occur.  In addition to upsets, these rules regulate emissions during planned and unplanned maintenance, startup, and shutdown activities.  *See* 30 TEX. ADMIN. CODE §§ 101.201-101.222 (known as the "Emissions Event Rules").  The Emissions Event Rules are incorporated into ExxonMobil's Title V Permits.

Under the Emissions Event Rules, sources such as ExxonMobil self-report upsets and other emissions events through the TCEQ's electronic reporting system within 24 hours of the event.  *See* 30 TEX. ADMIN. CODE §§ 101.201, 101.211.[4]

With the report in hand, TCEQ undertakes to investigate the cause of the event.  *See* TEX. HEALTH & SAFETY CODE §§ 382.0215-0216, 382.022.  By

---

[4]     These reports are typically referred to as "STEERS Reports."  STEERS is an acronym for "State of Texas Environmental Electronic Reporting System."

mandate of the Texas legislature, TCEQ is charged with investigating and centrally tracking each reported event.  *Id.* § 382.0215(d).  TCEQ determines whether the event was "excessive," either alone or in combination with other events.  30 TEX. ADMIN. CODE § 101.222(a).  If the event is deemed "excessive," the TCEQ orders a corrective action.  TEX. HEALTH & SAFETY CODE §§ 382.0216; 30 TEX. ADMIN. CODE § 101.223.  If the investigation reveals that prompt action was taken to achieve compliance, and the event satisfies other stringent criteria in the rule, TCEQ will refrain from assessing a civil penalty.  *Id.* § 101.222(b).

Once TCEQ concludes its investigation, it will order the plant to take corrective actions, issue penalties, or sometimes both.  If TCEQ determines that a permit limit or applicable regulation has been violated, it issues either a Notice of Violation or a Notice of Enforcement.  For each Notice of Violation, the owner or operator must implement a corrective action that addresses the cause of the violation.  When issuing a Notice of Enforcement, TCEQ requires that the owner or operator implement corrective actions, and may also seek an administrative penalty for the violation.  *See* TEX. WATER CODE §§ 7.051-.075.  The state's regulatory process is not in dispute in this case—Plaintiffs merely assert that the penalties assessed were not sufficient.  Compl. ¶ 87.

## 2.    EPA Consent Decree

The EPA may regulate sources of air emissions independently of state agencies such as TCEQ.  That happened in this case, so there are in fact multiple layers of regulation that impact air emissions at ExxonMobil Baytown.  In 2005, EPA filed an enforcement action in the Northern District of Illinois for alleged violations of the CAA at several of ExxonMobil's refineries throughout the United States, including the Baytown Refinery.  *United States v. Exxon Mobil Corp.*, No. 1:05-cv-05809 (N.D. Ill. Dec. 13, 2005).  This action resulted in a Consent Decree that remains in effect today.  (Attached as Exhibit 1.)  While somewhat broader in scope, the Consent Decree addresses the same standards and regulations that Plaintiffs seek to enforce in this action.  The Consent Decree imposed civil penalties for past violations, required capital improvements, required emissions reductions, and established a separate program requiring corrective actions for emissions events involving flaring.  Under the Consent Decree, ExxonMobil must report twice a year to EPA and pay stipulated penalties for violations of the decree. The Plaintiffs acknowledge that the air emissions they complain of are regulated under the Consent Decree—they merely assert that EPA's remedies were not broad enough.  Compl. ¶ 88.  Importantly, the Consent Decree also ordered deep reductions of sulfur dioxide and other pollutants, which is exactly what the

Plaintiffs are asking that this Court do—without explaining how the EPA actions are inadequate.

## IV.   Argument

Plaintiffs bring this action under the "citizen suit" provision of the CAA.  42 U.S.C. § 7604(a)(1).  The Act allows for an action against "any person" "who is alleged to have violated (if there is evidence that the alleged violation has been repeated) or to be in violation of (A) an emission standard or limitation under the chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation."  *Id.*

Citizen suits under the Act, however, are only appropriate to fill a limited, interstitial role in enforcement.  Citizens are to supplement, not supplant state and federal enforcement.  Citizen suits are proper "only if the Federal, State and local agencies fail to exercise their enforcement responsibility."  *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 60 (1987).[5]

---

[5]    The court in *Gwaltney* offers a hypothetical that illustrates the danger of citizens intruding on the primary role of government enforcement:

> Suppose that the Administrator identified a violator of the Act and issued a compliance order under § 309(a).  Suppose further that the Administrator agreed not to assess or otherwise seek civil penalties on the condition that the violator take some extreme corrective action, such as to install particularly effective, but expensive machinery, that it otherwise would not be obliged to take.  **If citizens could file suit, months or years later, in order to seek the civil penalties that the Administrator chose to forgo, then the Administrator's discretion to enforce the Act in the public interest would be curtailed considerably.   The same might be said of the discretion of state enforcement authorities.**

*Gwaltney*, 484 U.S. at 60-61 (emphasis added).

TCEQ and EPA have exercised, and continue to exercise, their enforcement responsibilities in a manner that has resolved any actual controversy from the events underlying Plaintiffs' claims.  The Plaintiffs' lawsuit is nothing more than a recitation of ExxonMobil's extensive self-reports in compliance with regulations governing its air emissions.  These reports are maintained on the TCEQ website, which plaintiffs presumably used to generate the lists of alleged violations appended to their Complaint, and are but the first step in a comprehensive regulatory and enforcement process, with which Baytown complies.  There is no role, interstitial or otherwise, for Plaintiffs' suit to play in enforcing the CAA at ExxonMobil Baytown.

### A.   Plaintiffs Lack Standing Because their Claims Are Moot.

The Court lacks subject matter jurisdiction because TCEQ's comprehensive regulatory program has rendered Plaintiffs' claims moot.  Plaintiffs acknowledge that TCEQ is pursuing enforcement against ExxonMobil, but would have this Court step in to assess higher penalties.  Compl. ¶ 87.

The Fifth Circuit has recognized that administrative action can moot a citizen plaintiff's claims.  In *Environmental Conservation Organization v. City of Dallas*, 529 F.3d 519 (5th Cir. 2008) ("*ECO*"), plaintiffs sued the City of Dallas for violations of the Clean Water Act.  After citizens gave notice of their intent to sue,  EPA issued a notice of violation to the City on similar grounds.  The City and

EPA entered into an administrative settlement requiring the City to pay civil penalties and take corrective actions.

The Fifth Circuit found that EPA's enforcement and settlement with the City mooted the plaintiffs' claims, adopting a standard set by the Second and Eighth Circuit Courts of Appeal. The court stated that where cessation is compelled by government enforcement, citizen's claims are moot unless "the citizen-suit plaintiff proves that there is a realistic prospect that the violations alleged in its complaint will continue notwithstanding the consent decree." *Id*. at 528 (internal parentheses omitted) (citing *Comfort Lake Ass'n v. Dresel Contracting, Inc.*, 138 F.3d 351, 354-55 (8th Cir. 1998); *Atl. States Legal Found., Inc. v. Eastman Kodak Co.*, 933 F.2d 124, 127 (2d Cir. 1991). The court noted that if it applied the traditional mootness standard urged by the plaintiff:

> [W]e would effectively cede primary enforcement authority under the CWA to citizens acting in the role of private attorneys general. Such ceding would discourage defendants in a citizen [suit] from entering a consent decree with federal or state enforcement agencies, because defendants would remain exposed to duplicative penalties.

*ECO*, 529 F.3d at 528 (citing *Gwaltney*, 484 U.S. at 60-61). Similarly here, TCEQ has assessed a corrective action or a penalty, and in many cases both, against ExxonMobil for the emissions events and other matters listed in the Complaint.

While TCEQ's enforcement decisions have not all been embodied in a judicial consent decree, they are no less effective in resolving Plaintiffs' claims. In

12

*Black Warrior Riverkeeper, Inc. v. Cherokee Mining*, the U.S. District Court for the Northern District of Alabama found that administrative enforcement mooted citizen plaintiff's claims, noting, "[i]t is of little consequence that a court did not enter the instant [state administrative] consent order that punished [defendant's] violations and that put remedies in place."  637 Fed. Supp. 2d 983, 988-89 (N.D. Ala. 2009) (citing *ECO*, 529 F.3d at 528).

The Plaintiffs have mischaracterized the nature of the emissions events of which they complain.  These are not a series of continuous air emissions that follow one to another, connected in time, duration, cause, or impact.  By their very nature, each emissions event is a stand-alone event.  The event is typically brought about by a mechanical or process interruption that is promptly reported and corrected.

Under the governing SIP, TCEQ does not include these emissions in air permits, but instead regulates them through the Emissions Event Rules.  An examination of just a sample of the events underlying Plaintiffs' counts demonstrates that each event is a single, stand-alone event that has gone through TCEQ's thorough and effective process for reporting, analysis, and corrective action.  The following discussion is merely illustrative and in no way exhaustive of TCEQ's resolution of the events underlying Plaintiffs' claims.  As the Court will see, in the analytical framework of *ECO*, each of the events is moot since each is a

discrete event, it was investigated, and the regulator has issued a final decision as to how to regulate that event.

### 1.     August 15, 2007

In Count Two, Plaintiffs cite an event that occurred on August 15, 2007,[6] when a portion of the Chemical Plant was damaged due to a lightning strike. This caused the Plant to flare gas for a total of 42 minutes.  As soon as the damage was identified, the system was bypassed, flaring ended, and replacements were installed.  There is nothing at all "continuous" about the event.  Moreover, TCEQ has already resolved this event; the investigation report is attached as Exhibit 2.

In its investigation, TCEQ determined, not surprisingly, that the cause of the event was a power disruption caused by lightning.  Ex. 2 at 2.  TCEQ's investigation report shows that ExxonMobil promptly took corrective actions to minimize emissions.   TCEQ determined "that this emissions event met the demonstration criteria necessary to present an affirmative defense for the unauthorized emissions that resulted from this incident" and that, consequently, there were "[n]o violations" associated with the event.  *Id*. at 5.

### 2.     April 22, 2008 and April 29, 2008

In Count Three, Plaintiffs cite an event that took place at the Baytown Refinery on April 29, 2008,[7] and allege that during this event there were

---

[6]       Ex. 1 to Complaint, Table 3, p. 6, STEERS NO. 95950.
[7]       Ex. 1 to Complaint, Table 1, p. 39-42, STEERS No. 107090.

exceedances of permit limits on highly reactive volatile organic compounds.  This was a stand-alone event that lasted for four hours.  It was caused by a third-party contractor piercing a power cable, which resulted in disruptions at multiple units. Ex. 3 at 2.  TCEQ has investigated and resolved this event.  In addition to confirming that ExxonMobil instituted corrective actions by modifying its procedures and training in response to this event, TCEQ also assessed an administrative penalty of $30,000 for this event and another event that took place at the Refinery on April 22, 2008.[8]  ExxonMobil has paid this penalty and complied with all other aspects of the Agreed Order, fully resolving both the April 29, 2008 and April 22, 2008 events.  Ex. 3 at 9.

### 3.    October 6, 2006

In Count Four, Plaintiffs cite an event that took place on October 6, 2006 at the Baytown Olefins Plant[9] causing visible emissions.  The event lasted 5 hours, and was caused by an overfill of an oil reservoir, which resulted in a compressor trip.  The event is not on-going.  Moreover, TCEQ conducted an investigation of this event, issued a notice of enforcement, and ultimately resolved the event through an agreed order.  In addition to verifying that ExxonMobil took corrective actions, including revising work procedures to ensure that the cause of

---

[8]      Plaintiffs allege that this April 22, 2008 event should be reviewed by the Court under Count One. Ex. 1 to Complaint, Table 1, at p. 42-43, STEERS No. 106703.
[9]      Ex. 1 to Complaint, Nov. 30, 2009 notice of intent letter at p. 8, STEERS No. 82332.

the event would not recur, TCEQ assessed an $8,200 administrative penalty against ExxonMobil.  Ex. 4 at 1.

### 4.    August 29, 2006

In Count Five, Plaintiffs cite an event that took place at the Baytown Refinery on August 29, 2006.[10]  The event lasted 1 hour and 37 minutes and was caused by damage to a flare tip.  Here again, the event is not ongoing, has no connection whatsoever to any of the events discussed above, and TCEQ has investigated and resolved the event.  TCEQ determined that the emissions event resulted in a violation of the Refinery's permit requirement that flares be operated with a flame present at all times.  TCEQ required ExxonMobil to craft a corrective action to prevent future emissions events from the same cause.  Ex. 5 at 9. Consequently, ExxonMobil agreed to integrate a supplemental natural gas injection process into its operating guidelines and order a new flare tip.  In a follow-up investigation that took place in July of 2007, TCEQ determined that ExxonMobil had taken these required actions, which "resolved the violation."  *Id*. at 3.

### 5.    June 20, 2007

In Count Six, Plaintiffs cite events which they allege involved "unauthorized" fugitive emissions[11] at the Baytown Complex.  Aside from the fact

---

[10]      Ex. 1 to Complaint, Nov. 30, 2009 notice of intent letter at p. 8, STEERS No. 80937.
[11]      The term "fugitive emissions" describes any gaseous or particulate emissions "entering the atmosphere that could not reasonably pass through a stack, chimney, vent, or other functionally equivalent opening designed to direct or control its flow."  30 TEX. ADMIN. CODE § 101.1(39).

that Plaintiffs fundamentally misconstrue ExxonMobil's permits, which fully contemplate and authorize fugitive emissions, TCEQ has also resolved the events underlying this Count.   For example, Plaintiffs complain of an event at the Chemical Plant that took place on June 20, 2007.[12]   A pump on the polypropylene unit developed a seal leak.   The leak lasted for 45 minutes until it was detected. The seal was fixed and the leak stopped.   There is no on-going violation and no connection whatsoever to events which caused the other emissions discussed above.   In its investigation, TCEQ determined that the emissions were caused by "a sudden, unavoidable breakdown of equipment or process;" "that this emission event met the demonstration criteria necessary to present an affirmative defense for the unauthorized emissions that resulted from this incident;" and that, consequently, there were "[n]o violations" associated with the event.   Ex. 6 at 5.

In all, the Plaintiffs cite approximately 319 separate emission events.[13] These are not an unbroken string of events that are all connected by a single cause. The Plaintiffs would have this Court ignore the TCEQ's statutory response, and independently test if there was in fact a permit violation, whether the agency's penalty or corrective action was sufficient, and whether there are affirmative defenses that preclude the finding of a violation.

---

[12]    See Ex. 1 to Complaint, Table 3, p. 6, STEERS No. 92944.
[13]    A tally of the tables attached to Plaintiffs' complaint yields approximately 421 discrete alleged events.  Of these, only 319 are alleged to have taken place within the five-year limitations period.  *See* 28 U.S.C. § 2462.

The regulatory history of the events cited by Plaintiffs demonstrate that TCEQ is diligently exercising its enforcement responsibilities. TCEQ's investigations, its findings, and its administrative penalties have mooted Plaintiffs' claims. Plaintiffs are in effect asking this Court to impose yet another layer of regulation on top of the TCEQ regulations without any basis.

This court should dismiss Plaintiffs' claims because Plaintiffs have not shown that "[a] private attorney general" is needed here. *ECO*, 529 F.3d at 531. Nor have they shown why this Court should take on the role of managing the process of reporting, analyzing, and correcting the operations at ExxonMobil's Baytown Complex.

The flaws in this "private attorney general's" action are aptly illustrated by the relief sought: an order compelling ExxonMobil to comply with the law and its permits. Compl. at 28. To the extent Plaintiffs are asking that the Court order ExxonMobil to comply with TCEQ regulations, that determination has already been made by TCEQ. If the Plaintiffs are going to ask the Court to second-guess those decisions, then the Plaintiffs must allege as to each event the failure of TCEQ to enforce the permit and the actions that the Court should order in addition to what TCEQ has already ordered. Plaintiffs have failed to state the legal basis for this court overhaul of the state regulatory process.

**B.    EPA's Consent Decree Is a Diligent Prosecution Barring this Action.**

The Court further lacks subject matter jurisdiction because EPA "has commenced and is diligently prosecuting" a civil action against the defendant.  42 U.S.C. § 7604(b).  Here, ExxonMobil is subject to a Consent Decree stemming from a civil action brought by EPA that compels compliance with the same standards that Plaintiffs seek to enforce.  *United States v. Exxon Mobil Corp.*, No. 1:05-cv-05809 (N.D. Ill. Dec. 13, 2005).   Consequently, this Court lacks jurisdiction over Plaintiffs' claims.  *See Piney Run Pres. Ass'n v. County Comm'rs of Carroll County*, 523 F.3d 453, 460 (4th Cir. 2008) (affirming dismissal for lack of jurisdiction because consent decree from a prior state enforcement action was a diligent prosecution barring citizen suit); *Envtl. Integrity Project v. Mirant Corp.*, No. JFM-06-2279, 2007 WL 62619, at *1 (D. Md. Jan. 3, 2007) (dismissing claims where state diligently prosecuted a civil action to require compliance with standards sought to be enforced by citizen plaintiffs).  A plaintiff's unhappiness with a state or federal prosecution and settlement does not overcome the diligent prosecution presumption.  *Id.*

**1.    Consent Decree Addresses Standards Plaintiffs Seek to Enforce**

A comparison of the Consent Decree to Plaintiffs' claims shows that the standards and regulations that Plaintiffs seek to enforce here are addressed by

the decree.  The Plaintiffs complain that this Court should take actions—albeit not specified—to lower emissions of pollutants such as sulfur dioxide, nitrogen oxide, and carbon monoxide.   Compl. ¶¶ 47, 49.   The Consent Decree, however, specifically requires ExxonMobil to take actions to reduce emissions of nitrogen oxide, Consent Decree ¶ 16, sulfur dioxide, *id.* ¶ 23, and carbon monoxide, *id.* ¶ 39.   Further, the Consent Decree resolved, among other things, requirements under the New Source Review ("NSR") and Prevention of Significant Deterioration ("PSD") programs.  These are the programs that require ExxonMobil to obtain permits that Plaintiffs allege have been violated in this action.  *See* Compl. ¶ 22.  As an additional level of regulation beyond the TCEQ Emissions Event Rules, the Consent Decree further requires ExxonMobil to report semiannually to EPA on its flaring associated with emissions events and other activities, and to demonstrate effective measures to minimize recurrence.  *See* Consent Decree ¶¶ 78-94, attached as Exhibit 1.  In addition to assessing a $7.7 million civil penalty, the Consent Decree requires ExxonMobil to undertake specified capital improvements, modify the terms of its state air permits to reduce emissions of many of the pollutants of which Plaintiffs complain, report to EPA on its progress with the requirements of the decree, and pay stipulated penalties for future violations of the decree. *Id.* ¶¶ 162; 47; 141-146; 161; 82; 165-213.

### 2.      Examples of Consent Decree Resolution

EPA's prosecution is diligent and on-going.  In Count One, Plaintiffs complain of various upsets that took place at the Baytown Refinery.  For example, Plaintiffs point to two emissions events—on January 2, 2010,[14] and on March 2, 2010[15]—as events that this Court should resolve, but EPA is already actively enforcing these alleged violations under the Consent Decree.

ExxonMobil reported these events to EPA as required by the Consent Decree.  EPA informed ExxonMobil on January 4, 2011 that it would not assess a stipulated penalty for the event that took place on January 2, 2010 because the root cause of the event was a first-time occurrence.  Ex. 7.  For the March 2, 2010 event, however, EPA has assessed a penalty of $12,720 for the event.  *Id*.  These actions illustrate how EPA's prosecution of ExxonMobil bars Plaintiffs' claims—it is on-going and is enforcing the same standards Plaintiffs seek to enforce in this action.

The Plaintiffs acknowledge the Consent Decree, but suggest that it does not reach far enough.  Compl. at ¶ 88.  The CAA does not allow citizen plaintiffs to maintain an action simply because they are dissatisfied with the scope or terms of a consent decree or other government settlement.  The choice to settle with a violator remains within a government agency's discretion, even if citizens

---

[14]      *See* Ex. 3 to Complaint, at p. 13, STEERS No. 134686.
[15]      *See* Ex. 3 to Complaint, at p. 12, STEERS No. 136526.

might have preferred more stringent terms than those determined by the government to be appropriate. *Citizens for Clean Power*, 636 Fed. Supp. 2d at 357; *see Conn. Fund for Env't v. Contract Plating Co.*, 631 Fed. Supp. 1291, 1294 (D. Conn. 1986) ("The mere fact that the settlement reached in the state action was less burdensome . . . than the remedy sought in the [citizen suit] is not sufficient in itself to overcome the presumption that the state action was diligently prosecuted.").

    C.    **EPA's Consent Decree and TCEQ's Enforcement Resolutions Are Res Judicata and Bar Plaintiffs' Claims.**

In *EPA v. City of Green Forest*, the court found that citizen claims against a city were properly dismissed on the basis of *res judicata* because of a consent decree entered in an EPA enforcement action. 921 F.2d 1394, 1404 (8th Cir. 1990). "The EPA is charged with enforcing the [CAA] on behalf of all citizens. Since citizens suing under the [CAA] are cast in the role of private attorneys general, as a practical matter there was little left to be done after the EPA stepped in and negotiated a consent decree." *Id*. Similarly, in light of EPA's Consent Decree with ExxonMobil, there is no role for Plaintiffs to play as private attorneys general, and the Court should dismiss their claims. *See also Alaska Sport Fishing Ass'n v. Exxon Corp.*, 34 F.3d 769, 773-74 (9th Cir. 1994) (affirming dismissal of plaintiffs' class action complaint under doctrine of *res judicata* in Clean Water Act case); *St. Bernard Citizens for Envtl. Quality, Inc. v. Chalmette*

*Refining*, 500 Fed. Supp. 2d 592, 610 (E.D. La. 2007) (dismissing CAA citizen suit claims that had been addressed by EPA consent decree).

Further, under Texas law, TCEQ's enforcement decisions are also properly given *res judicata* effect. *See R.R. Comm'n v. Phillips*, 364 S.W. 2d 408, 410 (Tex. App.—Austin 1963, no writ); *Friedrich Air Conditioning & Refrigeration Co. v. Bexar Appraisal Dist.*, 762 S.W.2d 763, 770 (Tex. App.—San Antonio 1988, no writ). *Cf. Ford Motor Co. v. Metro Ford Truck Sales, Inc.*, No. 05-02-00245, 2002 WL 31296626, at *4 (Tex. App.—Dallas Oct. 14, 2002, pet. denied) (not designated for publication) (finding that decision of the Texas Motor Vehicle Board barred plaintiff's claims on collateral estoppel grounds). As reflected in the TCEQ records of enforcement, each of these events is a single event, each was reported, investigated by TCEQ and action has been taken by TCEQ in the form of corrective actions, penalties, or both. Thus, TCEQ has adjudicated each of the emissions events cited by Plaintiffs.

### D.   The Events Underlying Plaintiffs' Claims Have Not Been Repeated and are Not On-Going.

ExxonMobil Baytown is a large industrial facility with thousands of pumps and valves, miles of pipeline, and acres of storage tanks. A failure or leak at any point in this complex site can result in an emission. It is meaningless for Plaintiffs simply to assert, therefore, that Baytown has experienced emissions and will continue to do so unless this Court substitutes its regulation for that of EPA

and TCEQ.  The emissions that have occurred are individual events.  They have been addressed by TCEQ and EPA within their respective regulatory frameworks. Accordingly, they are not actionable under the CAA.  42 U.S.C. § 7401(a); *Cf. Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998).

### 1.    Alleged Past Violations Have Been Corrected

In *Satterfield v. J.M. Huber Corp.*, the court examined the CAA's requirement that plaintiffs bring suit on past violations that have been repeated and found that the alleged repeat violations must be of the same type.  888 Fed. Supp. 1561, 1564-65 (N.D. Ga. 1994).  "The court does not believe that one type of violation and then another different type of violation of the permit can be interpreted as fulfilling the statute."  *Id*. at 1565.  Notably, the court went on to conclude that "the requirement that the violation be repeated indicates that ***the courts will not allow citizens to file suits based on violations that have been corrected*.**  *Id.* (emphasis added).

The logic of *Satterfield*, therefore, defeats a citizen suit such as this one where the alleged past violations have been corrected, TCEQ has compelled ExxonMobil to institute measures to prevent recurrence, and there is no allegation that the corrective action was inadequate.

### 2.   ExxonMobil Was Not "In Violation" When This Action Was Commenced

Additionally, Plaintiffs' claims should be dismissed because ExxonMobil was not committing on-going violations at the time Plaintiffs filed suit.  Since the Complaint deals with discrete emissions events, many several years old, Plaintiffs have not pled facts that demonstrate that ExxonMobil is "in violation" of the Act at the present time.  *Chesapeake Bay Found., Inc. v. Gwaltney of Smithfield, Ltd*, 844 F.2d 170, 171-72 (4th Cir. 1988).   Standing must be analyzed at the time suit is filed.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 571 n.5 (1992).  Consequently, Plaintiffs' standing cannot be predicated on alleged violations that may occur after the date the complaint was filed.

In *Berry v. Farmland Industries*, 114 Fed. Supp. 2d 1150 (D. Kan. 2000), CAA citizen suit plaintiffs pointed to defendant's "history of curing its [alleged violations] only when faced with a citizen-enforcement suit or administrative enforcement . . . ."  The court found, however,  that a "past pattern of intermittent violations and subsequent corrections . . . would not allow a reasonable fact finder to find that *future* violations were imminent when the complaint was filed."  *Id*. at 1155 (emphasis in original).  The court dismissed the claims at issue because plaintiffs lacked standing.  *Id*.

This Court should similarly dismiss Plaintiffs' claims because Plaintiffs did not allege facts showing that ExxonMobil was "in violation" of the Act at the time suit was brought.

### E.   Plaintiffs Do Not Satisfy Constitutional Standing Pleading Requirements.

In addition to the deficiencies outlined above, Plaintiffs' claims should be dismissed because Plaintiffs have not met their burden for establishing basic Article III standing.

The Supreme Court held in *Lujan v. Defenders of Wildlife* that the U.S. Constitution requires three criteria to be satisfied for a party to have standing:

> First, the plaintiff must have suffered an "injury in fact"-an invasion of a legally protected interest which is (a) concrete and particularized and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'" Second, there must be a causal connection between the injury and the conduct complained of-the injury has to be "fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court." Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

504 U.S. 555, 560-61 (1992) (citations omitted; alterations in original). In this case, Plaintiffs have not alleged concrete and particularized injuries to their organizations that are actual, imminent, and fairly traceable to ExxonMobil that this Court can redress. Instead, Plaintiffs seek to rely on alleged injuries to their purported members in order to establish standing and hence the court's jurisdiction over these claims.

An association has standing *to bring suit on* behalf *of its members* when

> (1)  *its members would otherwise have standing to sue in their own right*,
> (2)  the interests at stake are germane to the organization's purpose, and
> (3)  neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 169 (U.S. 2000) (emphasis added) (citing *Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 343 (1977)).  As the United States Supreme Court has stated, the purpose of the requirement that an association show that its members have standing to initiate a proceeding on their own behalf "is simply to weed out plaintiffs who try to bring cases, which could not otherwise be brought, by manufacturing allegations of standing that lack any real foundation."  *New York State Club Ass'n v. City of New York*, 487 U.S. 1, 9 (1988).

Plaintiffs' jurisdictional allegations are insufficient.  Plaintiffs have failed to identify even one specific member who has or may sustain an injury in fact due to ExxonMobil's operations, relying instead on generalized allegations on behalf of nameless members who purportedly live and work close to the Baytown Complex.

The Court of Appeals for the District of Columbia Circuit in *Sierra Club v. EPA* found that Sierra Club lacked standing to challenge an environmental

rulemaking by EPA because it had not established an injury in fact to its members. 292 F.3d 895 (D.C. Cir. 2000).  The court held insufficient an averment in the Sierra Club's brief that members "live, work, and recreate in communities adversely affected" by the facilities that would be impacted by the rule.  *Id.* at 898-99.   Similarly here, Plaintiffs' litany of speculative injuries suffered by its purported members are too generalized and conjectural.   Because Plaintiffs' allegations fail to satisfy the three-pronged test for organizational standing, their claims should be dismissed.

### F.    Environment Texas Lacks Standing Because it Has No Members.

Plaintiff Environment Texas Citizen Lobby, Inc., ("Environment Texas") lacks standing because it is a corporation with no members.  Despite its assertions in the Complaint at paragraph 9, Section Six of Environment Texas's Certificate of Formation, on file with the Texas Secretary of State, expressly states that "[t]his Corporation shall have no members."  Ex. 8.  A corporation that has represented to the Secretary of State that it will have no members cannot, as a matter of law, fulfill the first prong of the associational standing requirement. Here, according to its own corporate formation documents, it appears that Environment Texas lacks the first and most basic requirement for associational standing, and so its claims should be dismissed.

## V.     Conclusion

Plaintiffs' claims should be dismissed because the Court lacks jurisdiction in this action.  Plaintiffs' claims have been, or are being, resolved by the state and federal agencies charged with the primary enforcement role of the CAA.  EPA's Consent Decree is a diligent prosecution bar to Plaintiffs' claims.  Additionally, the events underlying Plaintiffs' claims are not on-going, and have not been repeated.  Further, Plaintiffs have not alleged the elements of standing required by the Constitution.  Consequently, this Court should dismiss Plaintiffs' claims pursuant to Rule 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.

Respectfully submitted,

By:    /s/ J. Gregory Copeland
       J. Gregory Copeland
       State Bar No. 04798500
       BAKER BOTTS L.L.P.
       910 Louisiana Street
       Houston, Texas 77002
       713.229.1301
       713.229.2701 (Fax)
       greg.copeland@bakerbotts.com

       ATTORNEYS FOR DEFENDANTS EXXON
       MOBIL CORPORATION, EXXONMOBIL
       CHEMICAL COMPANY, AND
       EXXONMOBIL REFINING AND SUPPLY
       COMPANY

OF COUNSEL:

BAKER BOTTS L.L.P.
Tynan Buthod
State Bar No. 03513500
Kathleen E. Weir
State Bar No. 24056508
One Shell Plaza
910 Louisiana Street
Houston, Texas 77002
713.229.1234
713.229.1522 (Fax)
ty.buthod@bakerbotts.com
kathleen.weir@bakerbotts.com

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that a true and correct copy of the foregoing was sent to all counsel of record on this 7th day of March, 2011 through the Court's electronic filing system.

/s/ Kathleen Weir
Kathleen Weir