UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

_____

ENVIRONMENT TEXAS CITIZEN
LOBBY, INC., and SIERRA CLUB,

               Plaintiffs,              Civil Action No. 4:10-cv-4969

    v.

EXXONMOBIL CORPORATION,
EXXONMOBIL CHEMICAL COMPANY,
and EXXONMOBIL REFINING AND
SUPPLY COMPANY,

               Defendants.
_____

## PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO DISMISS

Plaintiffs submit this brief in opposition to the motion to dismiss ("MTD")

filed by Defendants (collectively, "Exxon").

## SUMMARY

This is a case to address violations of the Clean Air Act ("CAA" or "the

Act") that have been ongoing at Exxon's Baytown Complex for years, and that will

not be abated without action from this Court to enforce the Act.  Although Exxon

raises a veritable kitchen sink full of arguments in its motion to dismiss, none

warrants dismissal of this action.

Properly viewed, the single jurisdictional issue before the Court is whether Plaintiffs' case presents an Article III case or controversy:  that is, whether Plaintiffs have alleged sufficient facts to establish Article III standing to sue to enforce repeated, ongoing violations of the Act.  As the detailed allegations in the complaint make clear, Plaintiffs' members who live and work near the Baytown Complex are suffering serious ongoing injuries, those injuries are fairly traceable to Exxon's illegal air emissions, and a court order that causes Exxon to reduce those emissions in the future would redress those injuries.  This satisfies the criteria for Article III standing at this stage of the litigation.  <u>Friends of the Earth v. Laidlaw Envtl. Sers., Inc.</u>, 528 U.S. 167, 180-186 (2000).

In an attempt to avoid the Court's jurisdiction, however, Exxon argues that it is not "in violation" of the CAA because, claims Exxon, each one of the thousands of illegal air emissions alleged in the Complaint, which inarguably constitute recurring violations of specified emission standards, stems from a wholly unique event.  According to Exxon, every event that caused a violation was unrelated to any of the others, and unrelated to any of the future violations of the CAA standards that Exxon concedes will occur.  This is a merits argument that goes to the strength of Plaintiffs' CAA claims, and not an issue of Article III jurisdiction.  Moreover, it is factually, logically, and legally wrong.

Exxon also argues that this motion should be dismissed because the federal and state governments have taken enforcement actions with regard to some of Exxon's violations - the U.S. Environmental Protection Agency ("EPA") with a largely-concluded lawsuit involving the Baytown refinery (but not the olefins or chemical plants), and the Texas Commission on Environmental Quality ("TCEQ") with various investigations and agreed orders.  Although Exxon characterizes this point as jurisdictional, it is not.  Rather, both the "diligent prosecution" defense and *res judicata* arguments raised by Exxon are affirmative defenses that must be addressed in the merits phase of the litigation.  In any event, these defenses are without merit because, among a number of other reasons, the government's oversight has utterly failed to stop Exxon's violations.

Congress placed a citizen enforcement provision in the CAA precisely to address situations such as this one:  where government efforts have not been sufficient to bring a violator into sustained compliance.  As noted recently by the Seventh Circuit:

> Congress…chose not to place absolute faith in state and federal agencies.  It provided for citizen suits to enable affected citizens to push for vigorous law enforcement even when government agencies are more inclined to compromise or go slowly.  The plaintiffs in this case are doing nothing more than exercising the rights that Congress gave them to protect their own health and safety.

<u>Adkins v. VIM Recycling, Inc.</u>, 2011 U.S. App. LEXIS 9046, at **48-49 (7th Cir. May 3, 2011) (construing similar citizen enforcement provision of the federal Resource Conservation and Recovery Act ["RCRA"]).

## FACTUAL AND LEGAL BACKGROUD

Exxon's Baytown Complex consists of an oil refinery, chemical plant, and olefins plant.  Complaint ¶ 1.  The Baytown Complex emits more pollutants into the air than any other industrial complex in Harris County.  Complaint ¶ 1.  The types of pollutants the Baytown Complex emits are known to cause a variety of problems:  for example, some are carcinogenic, some cause and aggravate respiratory and other illnesses, and some contribute to the formation of ground-level ozone, a major component of smog.  Complaint ¶ 2.

The oil refinery, chemical plant, and olefins plant are subject to separate operating permits issued under Title V of the CAA, 42 U.S.C. §§ 7661-7661f ("Title V permits").  Complaint ¶ 23.  Exxon reports any violations of these permits to TCEQ, on the State of Texas Environmental Electronic Reporting System ("STEERS Reports") and on Texas Operating Permit Deviation Report Forms ("Deviation Reports"), both of which are required by law.  Complaint ¶ 24.

Plaintiff environmental groups allege Exxon has violated, and will continue to violate, numerous provisions in the Complex's Title V permits.  The violations

are self-reported by Exxon in its STEERS Reports and Deviation Reports.[1]  See

Friends of the Earth v. Potomac Elec. Power, 419 F. Supp. 528, 533 (D. D.C.

1976) (CAA liability established by defendant's own records showing violations);

United States v. Aluminum Co. of Am., 824 F. Supp. 640, 648-649 (E.D. Tex.

1993) (under Clean Water Act ["CWA"], required reports by discharger "are

'virtually unassailable' as admissions that the violations reflected in the reports

occurred") (citations omitted).  Thousands of CAA violations were reported over

the statute of limitations period (five years from the commencement of the action,

plus 60 days to account for the statutorily-required pre-suit notice period), resulting

in the emission of over eight million pounds of pollutants emitted into the air.

Complaint ¶ 2.  The alleged violations are divided, by type, into seven different

counts in the complaint.

> **1.  Count I: Unlawful Upsets.**  The Title V permit for the refinery states:

> This permit does not authorize upset emissions, emissions from maintenance
> activities that occur as a result of upsets, or any unscheduled/unplanned
> emissions associated with an upset.  Upset emissions are not authorized,
> including situations where that upset is within the flexible permit cap or an
> individual emission limit.

Ex. 1 to this brief (excerpt of permit).[2]  Exxon reports upset-related emissions on

---

[1] Information from past STEERS Reports is compiled in tables and attached as Complaint Exs. 1
(Table 1-3) and 3-5.  Available Deviation Reports are attached as Exs. 2 and 6 to the Complaint.

[2] The permit is a public record and central to the Complaint, and thus can be considered.  In re
Title Ins. Antitrust Case, 702 F. Supp. 2d 840, 885 (N.D. Ohio 2010) (public records integral to a
complaint can be considered in a Rule 12(b)(1) motion that mounts a facial attack); Columbia

its STEERS Reports.  Complaint ¶¶ 24, 27.  Since October 14, 2005 (the statute of limitations period), the refinery has reported approximately 200 upsets.[3]  The most recent upset occurred just four days ago, resulting in the emission of more than 2,000 pounds - over one ton - of volatile organic compounds ("VOCs").[4]

   2.  **Count II: Exceedances of Hourly Emission Limits.**  The Title V permits for the three plants in the Baytown Complex are "flexible permits", meaning they set plant-wide emission caps for each air pollutant as opposed to setting separate limits for each of the many individual emission sources within each plant.

   Since October 14, 2005, each of the plants has repeatedly violated its emission caps for various pollutants.[5]  All three plants have violated emission caps after the date the Complaint was filed.[6]

Hosp. v. Legend Asset Mgmt. Corp., 2004 U.S. Dist. LEXIS 14890, at *8 (N.D. Tex. April 9, 2004) (cited by Exxon) (documents central to a complaint can be considered in a Rule 12(b)(6) motion).  Exxon attaches documents from TCEQ's public file on Exxon, and Plaintiffs will do the same (along with EPA documents).  See, also, Adkins v. VIM Recycling, 2011 U.S. App. LEXIS 9046, at *26-27.

[3] Complaint Exs. 1 (Table 1) and 3; and Ex. 2 to this brief (post-Complaint STEERS Reports).

[4] Ex. 2 to this brief.

[5] The approximate number of emission cap violations at the refinery include: ammonia – 24 violations; carbon monoxide ("CO") - 108; hydrogen sulfide ("H2S") - 116; nitrogen oxides ("NOx") - 90; opacity - 32; sulfur dioxide ("SO2") - 104; volatile organic compounds ("VOCs") - 104.  The approximate number of emission cap violations at the olefins plant include:  CO - 26; H2S - 2; NOx - 24; opacity - 12; SO2 -2; VOCs - 56.  The approximate number of emission cap violations at the chemical plant include:  CO - 11; H2S - 7; NOx - 19; SO2 - 8; VOCs - 34; hydrogen cyanide - 3; carbonyl sulfide - 7.  These numbers are taken from Exxon's STEERS Reports, Complaint Exs. 1 (Tables1-3) and 3-5; Ex. 2 to this brief.

[6] Ex. 2 to this brief (post-Complaint STEERS Reports).

   **3.  Count III: Exceedances of the HRVOC Limit.**  The Title V permits, incorporating a state rule, set forth a 1,200 lb/hr limit on highly reactive VOCs (chemicals that have a very high propensity to form ozone).  Since October 14, 2005, the "HRVOC" limit has been violated at least 9 times at the refinery, 24 times at the olefins plant, and twice at the chemical plant.[7]

   **4.  Count IV: Smoking Flares.**  The Title V permits prohibit flares from smoking for more than five minutes in any two consecutive hours.  Complaint ¶ 35.  Since October 14, 2005, this standard has been violated at least 4 times at the refinery, 7 times at the olefins plant, and 4 times at the chemical plant.[8]

   **5.  Count V: Flare Pilot Flame Outages.**  The Title V permits prohibit flare pilot flames from being extinguished.  Complaint ¶ 38.  Since October 14, 2005, this standard has been violated at least 6 times at the refinery, 5 times at the olefins plant, and 3 times at the chemical plant.[9]

   **6.  Count VI: Fugitive Emissions.**  The Title V permits prohibit fugitive emissions (emissions that do not exit from a stack or vent).  Complaint ¶ 41.  This

---

[7] These violations are reflected in STEERS Reports and Deviation Reports.

[8] These are reflected in STEERS Reports and Deviation Reports.  They include opacity violations (opacity measures the thickness of smoke).

[9] These are reflected in STEERS Reports and Deviation Reports.  The Complaint also alleges that the smoking flares and flare pilot flame outages violate EPA regulations.  Complaint ¶¶35-36, 38-39.

standard has been violated hundreds of times at each plant.[10]

   **7.  Count VII: Violations Reported in Deviation Reports.**  The Deviation

Reports document a significant number of violations at all three plants, in

categories that include (with number of violations in parentheses):  open-ended

lines (unsealed piping) (1,273); leaks and mechanical failures (114); tank failures

(35); reporting/recording keeping violations (171); and monitoring failures (532).[11]

   Section 304 of the Act, 42 U.S.C. § 7604, known as the Act's "citizen suit

provision," authorizes citizens to bring suit in federal court to enforce the Act,

including Title V permits.  The CAA provides:

> any person may commence a civil action on his own behalf - (1) against any
> person…who is alleged to have violated (if there is evidence that the alleged
> violation has been repeated) or to be in violation of (A) an emission standard
> or limitation under this chapter…

Id., § 7604(a)(1).  An "emission standard or limitation" is defined to include any

"standard, limitation, or schedule established under any permit issued pursuant to

subchapter [title] V of this chapter…"  Id., § 7604(f)(4).  The statute confers

"jurisdiction" on the district courts "to enforce such an emission standard or

limitation" in such suits through the issuance of injunctive relief and the imposition

---

[10] These are reflected in STEERS Reports and Deviation Reports, Complaint Exs. 1 (Tables 1-3) and 2-5, and include "open ended lines".

[11] These numbers include multi-day violations and multiple violations reported as one "deviation".

of civil penalties.[12]  Id., § 7604(a).  The CAA citizen suit provision "reflected a

deliberate choice by Congress to widen citizen access to the courts, as a

supplemental and effective assurance that the Act would be implemented and

enforced."  Natural Resources Defense Council v. Train, 510 F.2d 692, 700 (D.C.

Cir. 1974).  See, also, Envt. Conservation Org. ("ECO") v. City of Dallas, 529 F.3d

519, 526 (5th Cir. 2008) (citizen suit provision is "a critical component of the

CWA's enforcement scheme, as it permits citizens to abate pollution when the

government cannot or will not command compliance") (citation and internal

quotations omitted).

    Plaintiffs have members who live and work close to the Baytown Complex.

Complaint ¶¶ 4, 75.  As set forth in detail below, at 31-33, as a direct result of the

Exxon's violations of the Act, Plaintiffs' members breathe harmful pollutants, get

sick, and are adversely affected in other ways in their day-to-day lives.

    Plaintiffs allege that government enforcement actions have not stopped the

Baytown Complex's violations.  Complaint ¶¶ 87-88.  Indeed, violations have

occurred at all three plants since the filing of the Complaint.[13]  In its motion, *Exxon*

*does not deny that it will violate its Title V permit limits in the future.*  Nor could it,

since for the purposes of its motion Exxon does not dispute the extensive violations

---

[12] The CAA authorizes civil penalties of up to $37,500 per day for each violation of the Act.  42
U.S.C. §§ 7413(b) and (e), 7604(a) and (g); 28 U.S.C. § 2461, and 40 C.F.R. § 19.4.

[13] Ex. 2 to this brief (post-Complaint STEERS Reports).

data attached to the Complaint, and those data demonstrate years of persistent violations with no sign of abatement.

## ARGUMENT

## I.   THIS COURT HAS ARTICLE III JURISDICTION OVER PLAINTIFFS' CLAIMS.

In Sections A (pages 11-18) and D (pages 23-26) of its motion, Exxon argues this Court lacks subject matter jurisdiction because, in Exxon's view, each of its violations is "resolved" by TCEQ after it happens and there is no connection between its extensive history of past violations and its future propensity to violate. This argument is fundamentally flawed, both legally and factually.

### A.   Exxon's Argument Is Not About Mootness.

Exxon claims that its thousands of violations were caused by separate events, unrelated in any meaningful sense either to any of the others or to the future illegal air emissions that Exxon concedes will occur. Whenever an unlawful emission occurs, Exxon asserts, it is "promptly reported and corrected." MTD 13. Exxon claims that, as a result, this case is moot and the Court has no jurisdiction.

Although Exxon characterizes its jurisdictional argument as being about mootness, it is not. Mootness becomes an issue only when *post-complaint* events are said to eliminate an actual controversy before the court. Ctr. for Individual Freedom v. Carmouche, 449 F.3d 655, 661 (5th Cir. 2006); ECO, 529 F.3d at 527 (mootness is caused by "circumstances that eliminate[] actual controversy after the

commencement of a lawsuit"). Exxon is arguing, instead, that *pre-complaint* events deprive this Court of jurisdiction.

Further, Exxon is really making an "anti-mootness" argument. Exxon is necessarily suggesting that its violations are inevitable – that all the company can do is *react* to violations (and "fix" them) after they occur. This perfectly captures the culture of non-compliance at Exxon that the CAA does not allow. The fact is, Exxon *can* proactively take steps to prevent future violations, and this Court can fashion relief that will compel the company to do so.[14] Not only is this precisely the type of situation for which the Act's citizen enforcement provision was designed, but, as discussed below, the company is wrong to suggest that this Court lacks jurisdiction.

### B.     TCEQ's Investigations And Corrective Orders Have Not Stopped Exxon's Violations, And Do Not Strip This Court of Jurisdiction.

Pointing to the fact that TCEQ has investigated and issued administrative orders with regard to some of the company's violations, Exxon argues that "TCEQ's comprehensive regulatory program" deprives this Court of jurisdiction. MTD at 11. The Fifth Circuit has already rejected such an argument, in a case not cited by Exxon.

---

[14] Indeed, this Court entered a consent decree in 2009 imposing such proactive relief measures, for the same types of CAA violations, in the case of Environment Texas Citizen Lobby, Inc. and Sierra Club v. Shell Oil Co., 4:08-cv-00070 (Hittner, J.) (docket # 33, June 16, 2009). This Court can take judicial notice of its own docket.

In Texans United for a Safe Econ. Educ. Fund v. Crown Cent. Petroleum Corp. ("Crown Petroleum"), 207 F.3d 789, 791 (5th Cir. 2000), plaintiffs, as here, alleged that a refinery was illegally emitting harmful quantities of air pollutants during intermittent "process upsets."  Crown Petroleum, like Exxon here, argued that administrative action by TCEQ's predecessor agency deprived the federal courts of Article III jurisdiction over the case.  The agency in Crown Petroleum had issued a comprehensive order assessing nearly $1.1 million in penalties, and directed the company to retain independent expert consultants to evaluate the causes of the violations and recommend remedial action.  Id.  Crown argued the court lacked Article III jurisdiction because the agency had "already obtained all necessary relief," and the court could do nothing to redress the plaintiffs' injuries. Id., at 793.  The Fifth Circuit disagreed, and held that the district court had jurisdiction.  Finding that Crown had not "demonstrated that it has achieved compliance with the federal emission limits" in question, the Fifth Circuit reasoned that both injunctive relief and civil penalties could redress the plaintiffs' injuries. Id., at 794.  The citizen plaintiffs' enforcement suit, the court noted, "is based on the premise that the [administrative order] does not go far enough to ensure that Crown will not violate federal emissions standards in the future," a position both

supported by the continuance of violations there, id., and identical to Plaintiffs'

position here.[15]

### C.   Courts Have Jurisdiction Over Citizen Suit Complaints That Contain Good Faith Allegations of Ongoing Violations.

The Complaint alleges that Exxon has repeatedly violated a variety of Title

V permit provisions and will continue to violate these provisions in the future.[16]

Exxon argues that this is not sufficient to make out a case that the company is "in

violation" of these provisions within the meaning of the CAA citizen suit

provision.  See MTD at 23 ("[I]t is meaningless for Plaintiffs…to assert…that

---

[15] ECO v. City of Dallas, cited by Exxon, holds that a later-filed *judicial* consent decree by the government can moot a citizen suit if it ends the violations at issue. 529 F.3d at 523, 528.  That case involved a level of agency enforcement so stringent and comprehensive (much more than what TCEQ has taken with regard to Exxon) that plaintiffs could not show a "realistic prospect that the CWA violations…[would] continue."  Id., at 529.  The government consent decree there required the city "to correct the planning, staffing, monitoring, and compliance deficiencies that resulted in the violations alleged in ECO's suit" and imposed a substantial penalty.  Id., at 529-30.  Compare Louisiana Envt. Action Network v. Sun Drilling Products Corp., 716 F. Supp. 2d 476, 481 (E.D. La. 2010) (holding that ECO does not apply where "the violations were continuing despite the compliance order").  Black Warrior River Keeper v. Cherokee Mining, LLC, 63 F. Supp. 2d 983 (N.D. Ala. 2009), also cited by Exxon, held that a later-filed administrative action mooted a CWA citizen suit because the defendant had not violated in over a year and a half afterward.  Here, no administrative action (let alone a post-Complaint one) has stopped Exxon's violations.

[16] Complaint ¶¶ 2 (violations of permits over past five years resulted in emission of eight million pounds of pollutants); 7 (violations are caused by "longstanding systemic problems," such as "equipment failures and malfunctions, operational problems, electrical problems, [and] poor record keeping," and "[a]bsent an appropriate order from this Court, Defendants will continue to violate the Act as described in Counts I through VII"); 24 ("Defendants will continue to file STEERS Reports and Deviation Reports that identify violations of the CAA after the filing of this Complaint"); 27 (permit ban on upsets "repeatedly" violated); 29 (lbs/hr emission limits "repeatedly" violated); 33 (HRVOC Rule "repeatedly" violated); 36 (ban on smoking flares "repeatedly" violated); 39 (ban on flare pilot flame outages "repeatedly" violated); 41 (ban on fugitive emissions "repeatedly" violated); 44 (Complaint Ex. 6 lists repeated violations reflected in Deviation Reports).  Exxon does not, and cannot, deny that many emission standards have been "repeatedly" violated.

Baytown has experienced emissions and will continue to do so"). The Supreme

Court disagrees. In construing identical language in the CWA's citizen suit

provision, the Court ruled that:

> [t]he most natural reading of 'to be in violation' is a requirement that citizen plaintiffs allege a state of either continuous or intermittent violation – that is, *a reasonable likelihood that a past polluter will continue to pollute in the future*.

Gwaltney of Smithfield v. Chesapeake Bay Foundation, 484 U.S. 49, 57 (1987)

(emphasis added).

At the pleading stage, good faith *allegations* of future violations are

sufficient. Gwaltney, 484 U.S. at 64; Glazer v. Am. Ecology Envtl. Services, 894

F. Supp. 1029, 1037-1038 (E.D. Tex. 1995) (applying Gwaltney to CAA). *Proof*

of those violations is not required to gain jurisdiction in a citizen suit. Steel Co. v.

Citizens for a Better Env't, 523 U.S. 83, 91-92 (1998) (there is no "expansive

principle that a statute saying 'the district court shall have jurisdiction to remedy

violations [in specified ways]' renders the existence of a violation necessary for

subject matter jurisdiction"); id., at 91 (the federal courts had Article III

jurisdiction in Gwaltney because the plaintiff had "alleged" ongoing violations).[17]

---

[17] In subsequent decisions, both the Supreme Court and the Fifth Circuit have made clear that the question of whether a particular claim is actionable under a federal remedial statute is not an issue of subject matter jurisdiction unless it is clearly delineated as such in the statute. See, Morrison v. National Australia Bank Ltd., 130 S. Ct. 2869, 2876-77 (2010) (Securities and Exchange Act); Arbaugh v. Y & H Corp., 5476 U.S. 500 (2006) (Civil Rights Act); Star Tran v. Occupational Safety & Health Review Comm., 290 Fed. Appx. 656, 663-64 (5th Cir. 2008) (Occupational Safety and Health Act). Like the statutory provisions at issue in those cases, and

Rather, allegations of ongoing violations must ultimately be proven at summary judgment or trial, and all circuits to address the issue, including the Fifth, hold that this may be done either

> (1) by proving violations that continue on or after the date the complaint is filed, or (2) by adducing evidence from which a reasonable trier of fact could find a continuing likelihood of recurrence in intermittent or sporadic violations.

Carr v. Alta Verde Indus., Inc., 931 F.2d 1055, 1062 (5th Cir. 1991) (cite omitted).

Accordingly, Exxon's argument that all of its illegal emissions "are separate events," and thus "are not actionable under the CAA," MTD at 24, is a red herring with respect to jurisdiction.  As long as Plaintiffs allege an ongoing violation of a *standard*, that claim can be adjudicated by the court (even if those violations are alleged to be merely "intermittent" or "sporadic").  Here, Plaintiffs allege frequent violations of each emissions standard at issue, and that violations of those same standards will continue after the filing of the complaint (which indeed has already happened).  Compare Berry v. Farmland Industries, 114 Fed. Supp. 2d 1150, 1154-55 (D. Kan. 2000) (cited by Exxon) (reporting violations claim dismissed where defendant had filed the required reports before suit and plaintiffs provided no credible evidence – over a year after filing suit – that defendant would fail to file

---

like the citizen suit provision of the Emergency Planning and Community Right to Know Act at issue in Steel Co., the CAA citizen suit provision does not condition its grant of jurisdiction upon proof of the elements of the underlying cause of action.  See, 42 U.S.C. § 7604(a) ("The district courts shall have jurisdiction…to enforce such an emission standard or limitation").

such reports in future); Satterfield v. J. M. Huber Corp., 888 F. Supp. 2d. 1561,

1565 (N.D. Ga. 1994) (cited by Exxon) (claims dismissed because plaintiff only

alleged (a) operating without a permit, when defendant in fact had obtained the

permit, and (b) violations of a permit no longer in effect).

### D.   The Record Strongly Supports Plaintiffs' Allegations Of Ongoing Violations.

In any event, the record belies Exxon's claim that its myriad violations all

stem from unrelated, "stand-alone" events.  Plaintiffs not only allege discrete sets

of numerous violations of each standard at issue (see footnote 5, supra) and offer

proof that post-complaint violations of many of those standards have already

occurred (Ex. 2 hereto), but they also allege that Exxon's violations stem from a

set of common causes:  "longstanding systemic problems," such as "equipment

failures and malfunctions, operational problems, electrical problems, [and] poor

record keeping," that keep the Baytown Complex in a state of non-compliance.

Complaint ¶ 7.

Exxon attempts to present a picture of random occurrences by selecting five

incidents to analyze as "examples."  MTD at 14-18.  This hardly stands as a

rebuttal to the thousands of violations detailed in the record attached to the

Complaint.  Cf. Huang v. Attorney General of U.S., 620 F.3d 372, 388 (3d Cir.

2010) (agency may not "cherry pick a few pieces of evidence" and ignore contrary

facts in coming to a decision).  Moreover, even the five examples selected by

Exxon demonstrate recurring problems that could be addressed through enhanced planning, maintenance, training, and other preventative measures:

- Exxon doubtless hopes that illegal emissions caused by a lightning strike (August 15, 2007, MTD at 14) will be viewed as a freak event.  But lightning is a well-known problem for chemical plants, especially in the Houston area.  EPA has issued a bulletin on the topic (Ex. 3 hereto) expressly identifying the Texas Gulf Coast as an area with "high frequencies" of "cloud-to-ground lightning," and outlining measures that can be taken to minimize the effect of lightning on environmental compliance. The measures include protection of control systems, which in fact were disrupted in the incident in question.  Lightning has caused emission violations on at least three occasions at the Baytown Complex (Ex. 4 hereto).

- The April 29, 2008, and October 6, 2006, events (MTD 14-15) that caused emissions were preventable, and could have been avoided had proper "training" and "work procedures" been in place.  MTD 15.  A TCEQ investigation report on the October 6 incident, which appears not to have been attached by Exxon to its motion, states, "The unauthorized emissions are part of a frequent or recurring pattern indicative of inadequate design, operation, or maintenance." Ex. 5 hereto.  According to Deviation Reports, there are over 100 violations (including multi-day and multi-unit violations) that could have been prevented by better operating guidelines.  Investigation reports also show such violations (Ex. 6 hereto provides three examples).

- Again, the August 29, 2006, event could have been prevented if "operating guidelines" had been written correctly.  MTD 16.

- Leaks, such as the one that caused a violation on June 20, 2007, are a recurring problem.  See, p. 7,  supra.

That violations at the Baytown Complex stem from identifiable, common causes is also apparent when one examines the physical sources of emission violations:  for example, compressor failures have been responsible for approximately 54 separate upset events and permit deviations (resulting in

violations of multiple pollutant limits), and the regenerative thermal oxidizer has been the source of approximately 22 such incidents.  Also, certain process units are particularly beset with repeated problems resulting in violations.[18]

## II.  THE 2005 EPA CONSENT DECREE DOES NOT BAR THIS CASE UNDER THE "DILIGENT PROSECUTION" DEFENSE.

Exxon argues the Court lacks subject matter jurisdiction because this case is barred under the CAA "diligent prosecution" defense, which precludes a citizen suit to the extent that EPA or the state "has commenced and is diligently prosecuting a civil action in a court of the United States or a State to require compliance with the standard, limitation, or order" at issue in the citizen suit.  42 U.S.C. § 7604(b)(1)(B).  For many reasons, Exxon is wrong.

First, the Fifth Circuit has expressly held, in a case not cited by Exxon, that a diligent prosecution defense is not jurisdictional.  Cox v. City of Dallas, 256 F.3d 281, 303-304, n.40 (5th Cir. 2001) (construing same defense under the Resource Conservation and Recovery Act ["RCRA"] citizen suit provision).  See, also,

---

[18] The following is a breakdown of the approximate number of upset events and deviations attributable to various process units since October 14, 2005, according to the STEERS Report and Deviation Report data attached to the Complaint and to this brief:

a.  At the refinery:  Booster Station 4 – 18 incidents; Flexicoker Unit - 18; Fluid Catalytic Cracking Unit 2 ("FCCU 2") - 24; FCCU 3 - 38; Hydrocracker - 23; Catalytic Light Ends Unit - 10; GoFiner Unit - 9; Delayed Coking Unit - 11; Flare Gas Recovery Unit - 5; Sulfur Conversion Unit - 27; Oil Movements (tanks) - 36.

b.  At the olefins plant:  Cold Ends Unit - 30; Butadiene Unit - 9; Isoprene, Benzene, Naphtha Unit - 4.

c.  At the chemical plant:  Butyl Polymers Unit - 33; Polypropylene Unit - 11; Synthesis Gas Unit - 6.

Adkins, 2011 U.S App. LEXIS 9046, at *17-18 (same, noting that "the Supreme Court has repeatedly reminded the lower courts of the narrow scope of truly jurisdictional rules").[19]  Thus, Exxon cannot assert the defense in a Rule 12(b)(1) motion.

Even if Exxon now tried to convert the diligent prosecution argument into a Rule 12(b)(6) motion (to which Plaintiffs would object), the case still could not be dismissed.  Because Plaintiffs have alleged specific facts to demonstrate that the defense does not apply, Exxon cannot contend that Plaintiffs failed to state a claim.  Complaint ¶ 88 (alleging, *inter alia*, that EPA's 2005 consent decree:  has not abated violations; addresses different standards and violations; has largely expired; did not impose penalties for violations at issue in case at bar; and, by its own terms, limits its scope and preclusive effect).  Thus, the diligent prosecution defense can only be resolved as part of the merits of this case.

Second, applying the diligent prosecution defense here would be illogical, since it would afford a greater preclusive effect to the EPA consent decree than the decree itself provides.  The decree states: "Except as specifically provided by this Consent Decree, nothing in this Consent Decree shall relieve ExxonMobil of its obligation to comply with all applicable federal, state and local laws and

---

[19] Exxon cites instead to diligent prosecution cases from the Fourth Circuit, which (unlike the Fifth Circuit) treats the diligent prosecution defense as jurisdictional.  Piney Run Pres. Ass'n v. County Comm'rs of Carroll County, 523 F.3d 453, 456 (4th Cir. 2008) (CWA); Envtl. Integrity Project v. Mirant Corp., 2007 U.S. Dist. LEXIS 1219 (D. Md. Jan. 3, 2007) (CAA).

regulations, permits, and administrative orders, including, but not limited to, more stringent standards."  Consent Decree ¶ 256.  The decree also provides that it does not exempt Exxon from permit provisions governing startups, shutdowns, or malfunctions – all at issue in the instant case.  Consent Decree ¶ 259.

Third, the EPA consent decree applies only to the Baytown refinery, and can have no preclusive effect on Plaintiffs' suit to restrain violations at the Baytown olefins and chemical plants.[20]

Fourth, as set forth below, even if the Court were to adjudicate the diligent prosecution defense now, it must be rejected because Exxon cannot prove its elements.

### A.    EPA Is Not Now "Prosecuting" A Case Against Exxon.

42 U.S.C. § 7604(b)(1)(B) bars suits only if EPA "*is* diligently prosecuting a civil action…" (emphasis added).[21]  Accordingly, government enforcement actions that are long since resolved do not trigger the "diligent prosecution" bar.  <u>Citizens</u>

---

[20] Consent Decree (MTD Ex. 1) p. 1 (first whereas clause), and ¶¶ 4 ("The provisions of the Consent Decree shall apply to the Covered *Refineries*") and 10(j) ("'Covered Refineries' shall mean the following *petroleum refineries*") (emphasis added).  The EPA suit, filed in U.S. District Court in Illinois, covered seven Exxon refineries in five states.

[21] <u>See, also</u>, H.R. Conf. Rep. No. 91-1783 at 56 (1970) (CAA Conference Report), <u>reprinted in</u> 1970 U.S.C.C.A.N. 5374, 5388 (citizen suit is barred if "abatement action is pending and is being diligently pursued").  As the Supreme Court has stated, "Congress' use of a verb tense is significant in construing statutes."  <u>United States v. Wilson</u>, 503 U.S. 329, 333 (1992).  The Dictionary Act, 1 U.S.C. § 1, provides, "[i]n determining the meaning of any Act of Congress, unless the context indicates otherwise…words used in the present tense include the future as well as the present."  "By implication, then, the Dictionary Act instructs that the present tense generally does not include the past."  <u>Carr v. United States</u>, 130 S.Ct. 2229, 2236 (2010).

for a Better Env't-Cal v. Union Oil Co., 83 F.3d 1111, 1118 (9th Cir. 1996) (state

action no longer being "prosecuted" within the meaning of CWA provision once

consent order was issued); Pub. Interest Research Group of New Jersey, Inc. v.

GAF Corp., 770 F. Supp. 943, 949 (D. N.J. 1991) (same).  Here, EPA resolved its

case against the Baytown refinery five years before Plaintiffs filed this suit, and

most of the requirements of the resultant consent decree have long since expired.[22]

## B.   EPA Did Not Seek To Enforce The Same Standards As Plaintiffs.

The CAA diligent prosecution defense does not apply where the government

does not seek to enforce the same standards or limitations that the citizen suit

plaintiffs seek to enforce.  Glazer, 894 F. Supp. at 1035; Maryland Waste Coalition

v. SCM Corp., 616 F. Supp. 1474, 1483 (D. Md. 1985); see, Adkins, 2011 U.S.

App. LEXIS 9046, at **30-31 (same for RCRA); Frilling v. Village of Anna, 924

F. Supp. 821, 836-837 (S.D. Ohio 1996) (same for CWA); Conn. Fund for the

Envt. v. Contract Plating Co., 631 F. Supp. 1291, 1294 (cited by Exxon).  Where

an emission source is subject to multiple standards or limitations, EPA

enforcement against one of the standards or limitations does not bar citizen

enforcement of the others.  Md. Waste, 616 F. Supp. at 1483; see, generally,

---

[22] Many of the decree's requirements for the Baytown refinery were to be implemented by the December 2005 entry date or within a year thereafter, e.g., Consent Decree ¶¶ 16, 24(b), 32, 34, 39, 43(b)-(d), 59 (and Appendices C &D), 63, and 65(a), while many others were required to be implemented in later years, but before the filing of the instant lawsuit in December 2010, e.g., id. ¶¶ 16(c), 34, 43(a)-(c), 47, and 50.

American Corn Growers Assoc. v. EPA, 291 F.3d 1, 11 (D.C. Cir. 2002) (noting "many instances" in which Congress provided for "overlapping regulation" under the CAA).

The complaint in the EPA case (Ex. 7 hereto) shows EPA did not enforce the standards at issue here.  EPA did not sue to enforce the Baytown refinery's Title V permit, and neither the EPA complaint nor the resultant consent decree even mentions that permit's provisions regarding upsets, hourly emission rates, the HRVOC Rule, or fugitive emissions.  Rather, EPA sued to enforce national standards applicable to all refineries, EPA Complaint ¶ 2, and to enforce the provisions of permits issued to Exxon refineries in Illinois and Montana.  EPA Complaint ¶¶ 143(b) and 153(a); EPA Consent Decree Appendices I, J, and L. EPA's action did result in a later tightening of certain limits in the Baytown refinery's Title V permit, but those limits are not at issue here.[23]

Since the entry of the 2005 consent decree, EPA has continued to make it clear that it is not enforcing the Baytown refinery's Title V permit.  Rather, the agency *objects* to "flexible permits" such as the one issued by TCEQ to the Baytown refinery, and is seeking the issuance of new permits for Texas flexible permit holders.  Ex. 8  hereto.  Indeed, EPA's disinterest in enforcing the provisions of flexible permits is one of the reasons a citizen suit is needed here.

---

[23] And even if they were, the fact of their origination as requirements of the consent decree would not bar Plaintiffs from enforcing them as Title V permit requirements.

**C.  Even If EPA Were Currently Enforcing The Same Standards As Plaintiffs, EPA's Prosecution Is Not "Diligent" As To Those Standards.**

EPA's enforcement cannot be viewed as diligent with respect to the violations at issue in the case at bar because those violations have continued apace since the consent decree was entered.[24]  For instance, the refinery has had approximately 200 upsets, 600 violations of hourly emission limits (resulting in millions of pounds of illegal pollution), and emissions of over 100,000 pounds of highly reactive volatile organic compounds in violation of the HRVOC Rule. Complaint Ex. 1 (Table 1).  In fact, the Baytown refinery's upset record has been getting worse:  the refinery had more upsets in the year before the Complaint was filed than it had in any of the three prior years. Complaint Ex.1 (Table 1).

As the Seventh Circuit reasoned in rejecting a similar diligent prosecution defense in a CWA case, either there are "lingering problems" the consent decree has "failed to resolve," or the violations alleged by Plaintiffs are unrelated to those addressed by the consent decree.  Friends of Milwaukee's Rivers v. Milwaukee Met. Sewerage Dist. ("FMR"), 382 F.3d 743, 752-753 (7th Cir. 2004); see, id., at 760 (diligent prosecution analysis should look to whether the government enforcement action is capable of requiring compliance and calculated to do so); St.

---

[24] And EPA did not promise otherwise in entering into the decree; the decree provides that EPA does not "warrant or aver in any manner" that even Exxon's "complete compliance" with the terms of the decree "will result in future compliance with the provisions of the Clean Air Act and/or corresponding state or local laws."  Consent Decree ¶ 260.

Bernard Citizens for Envtl. Quality, Inc. v. Chalmette Ref., L.L.C., 500 F. Supp. 2d 592, 605-606 (E.D. La. 2007) (adopting FMR approach in CAA case); see, also, Atl. States Legal Found. v. Kodak, 933 F.2d 124, 127 (2d Cir. 1991) (prior enforcement action has no preclusive effect where violations have continued or have a reasonable prospect of continuing).  Compare Citizens for Clean Power v. Indian River Power, 636 F. Supp. 2d 351, 358 (D. Del. 2009) (cited by Exxon) (diligent prosecution where consent order required shut down of two units and operation of two other units in "full compliance" with limits).[25]

## III.  THIS CASE CANNOT BE DISMISSED UNDER *RES JUDICATA*.

Exxon argues that EPA's consent decree and TCEQ's enforcement "resolutions" are *res judicata* and bar Plaintiffs' claims.  While Exxon characterizes *res judicata* as jurisdictional, MTD, at 2, it is not.  Fed. R. Civ. P. 8(c); ExxonMobil Corp. v. Saudi Basic Indus. Corp., 544 U.S. 280, 282 (2005).

### A.  *Res Judicata* Is Inapt For A Motion To Dismiss.

The Fifth Circuit has stated, "generally, a res judicata contention cannot be brought in a motion to dismiss; it must be pleaded as an affirmative defense."  Test Masters Educ. Servs. v. Singh, 428 F.3d 559, 570, n.2 (5th Cir. 2005).  There are

---

[25] Piney Run, on which Exxon relies, is not like the case at bar.  There, a state judicial consent decree had been filed only a month before the citizen suit notice, and it addressed the same violations.  523 F.3d at 457-59.  Here, in contrast, the Court has ample evidence that the five year-old EPA action does not focus on the violations alleged in the instant citizen suit and will not solve the problems at the heart of those violations.

two exceptions:  "when a successful affirmative defense appears on the face of the pleadings," or "when the trial court treats a Rule 12(b)(6) motion based on res judicata as a motion for summary judgment."  <u>Limon v. Berryco Barge Lines, L.L.C.</u>, 2011 U.S. Dist. LEXIS 24832, at **13-14 (S.D. Tex. Mar. 11, 2011).  Neither exception applies here.

First, Plaintiffs specifically pleaded facts to defeat a *res judicata* defense.  Complaint ¶¶ 87 (alleging, *inter alia*, TCEQ actions were not brought in court, orders and penalties have failed to stop ongoing violations, and TCEQ deputy director admitted agency's limited fines are incapable of changing behavior of large corporations), 88 (<u>see</u>, <u>supra</u>, at 19 for description of allegations relating to EPA consent decree).

Second, even if Exxon's *res judicata* argument were treated as a Rule 12(b)(6) motion instead of a Rule 12(b)(1) motion, it would be inappropriate to convert it into a summary judgment motion.  Exxon's argument rests on a number of factual assertions, which is not atypical when *res judicata* is raised as an issue.[26]  However, Exxon did not submit evidence to support its assertions, let alone

---

[26] <u>See, generally</u>, <u>Friends of Milwaukee Rivers ("FMR II") v. Milwaukee Metro. Sewerage Dist.</u>, 536 F.3d 603, 607 (7th Cir. 2009); <u>St. Bernard's Citizens</u>, 500 F. Supp. 2d at 607; <u>Cosgrove v. Kansas Dep't of Soc. & Rehabilitation Services</u>, 332 Fed. Appx. 463, 467 (10th Cir. 2009) (unpublished).

demonstrate they are undisputed.[27]

In any event, "[r]es judicata...is an affirmative defense, Fed. R. Civ. P. 8(c)," Howard v. Green, 555 F.3d 178, 181 (8th Cir. 1977), and the "party seeking to assert that an issue was already adjudicated upon bears the burden of proving that contention." In re Braniff Airways, 783 F.2d 1283, 1289 (5th Cir. 1986) (cites omitted). As set forth below, Exxon has not met its burden.

**B.    The EPA Consent Decree Does Not Bar This Case Under The Doctrine Of Res Judicata.**

Where a common law principle such as *res judicata* is well established, "the courts may take it as a given that Congress has legislated with an expectation that the principle will apply *except 'when a statutory purpose to the contrary is evident.'*" Astoria Fed. Sav. & Loan Ass'n v. Solimino, 501 U.S. 104, 108 (1991) (citation omitted; emphasis added); United States v. Manning Coal Corp., 977 F.2d 117, 121 (4th Cir. 1992), as amended Jan. 20, 1993 (*res judicata* is common law that can be changed by Congress); Thiebaut v. Colo. Springs Utils., 2007 U.S. Dist. LEXIS 63963, at **11-14 (D. Colo. Aug. 29, 2007) (Congress can limit application of *res judicata*). Congress legislated as to the effect of prior-filed EPA

---

[27] For instance, Exxon's claim that "there is no role for Plaintiffs to play" (MTD at 22) requires evidence on whether Exxon is still violating. Exxon's claim that "As reflected in the TCEQ records of enforcement, each of these [violation] events is a single event, each was reported, investigated by TCEQ and action has been taken by TCEQ in the form of corrective actions, penalties, or both" (MTD, at 23) requires the TCEQ records to be put in evidence, requires evidence that TCEQ in fact did investigate every violation, and requires proof that each event was a "single" stand-alone event.

enforcement lawsuits in 42 U.S.C. § 7604(b)(1)(B), the "diligent prosecution" provision discussed above. *Res judicata* cannot be applied in a manner that would give greater preclusive effect than provided by Congress in the diligent prosecution provision. To do otherwise would render 42 U.S.C. § 7604(b)(1)(B) meaningless. Since, as discussed, Exxon has not proven its diligent prosecution defense, it cannot prevail on its (functionally identical) *res judicata* defense.

Moreover, it is clear *res judicata* does not apply on its own terms.

The test for res judicata has four elements: (1) the parties are identical or in privity; (2) the judgment in the prior action was rendered by a court of competent jurisdiction; (3) the prior action was concluded by a final judgment on the merits; and (4) the same claim or cause of action was involved in both actions.

Petro-Hunt, L.L.C. v. United States, 365 F.3d 385, 395 (5th Cir. 2004). Three of these elements are missing here.

**1. Privity.** EPA would be in privity with Plaintiffs only if it had adequately represented their interests in the earlier enforcement action. Meza v. Gen. Battery Corp., 908 F.2d 1262, 1266 (5th Cir. 1990). In the citizen suit context, some courts have expressly used a "diligent prosecution" analysis to determine privity, looking at whether a government consent decree was either "capable of requiring compliance" with the Act or "calculated to do so." FMR I, 382 F.3d at 759 (CWA); Chalmette Ref., 500 F. Supp. 2d at 605-606 (CAA); cf. Alaska Sport Fishing Ass'n v. Exxon Corp., 34 F.3d 769, 773 (9th Cir. 1994) (in

27

CWA and CERCLA citizen suit, earlier government action had already obtained damages plaintiffs sought).  One court looked to whether violations "are in fact continuing" after a government settlement, or whether a "realistic prospect of continuing violations exists" despite the settlement.  Atl. States Legal Found., 933 F.2d at 127.[28]  By either of these criteria, EPA is not in privity with Plaintiffs because EPA sued to enforce standards and limitations different from the ones at issue in the case at bar, and because the agency's action has not abated the violations alleged in Plaintiffs' complaint.

2. **Judgment on the merits**.  The violations alleged by Plaintiffs all occurred (all except for two months' worth) after the entry of the EPA consent decree and thus could not have been adjudicated on the merits in the previous action.  Chesapeake Bay Found., Inc. v. Bethlehem Steel Corp., 652 F. Supp. 620, 629 (D. Md. 1987) (stipulated penalties for future violations in consent decree were not adjudications and therefore had no *res judicata* effect on citizen suit concerning those violations).

3. **Same claim or cause of action**.  The same claim or cause of action is not involved in both cases.  Compare  City of Green Forest, 921 F.2d at 1403 (plaintiff conceded his CWA claims were the same as EPA's).  First, as discussed above,

---

[28] As noted by the Chalmette court, the Eighth Circuit, in United States v. City of Green Forest, Ark., 921 F.2d 1394, 1404 (8th Cir. 1990), decided privity "without engaging in a substantive analysis of the decree or its potential impact on future violations."  500 F. Supp. at 604.

Plaintiffs bring this action to enforce standards and limitations not addressed in EPA's action.  Second, the violations at issue here all (but two months' worth) occurred after the EPA consent decree was filed.  Lawlor v. Nat'l Screen Serv. Corp., 349 U.S. 322, 328-329 (1955) (prior judgment "cannot be given the effect of extinguishing claims which did not even then exist," otherwise it would confer "partial immunity from civil liability for future violations"); Dawkins v. Nabisco, Inc., 549 F.2d 396-397 (5th Cir. 1977) (same); Bayview Hunters Point v. Metro. Transp. Comm'n, 177 F. Supp. 2d 1011, 1024 (N.D. Cal. 2001), rev'd on other grounds, 366 F.3d 692 (9th Cir. 2004) (applying Lawlor to CAA citizen suit).

### C.   Administrative Res Judicata Does Not Bar This Case.

Although Exxon also argues for administrative *res judicata* based on TCEQs investigations and orders, Congress expressed its clear intention in the CAA to give no preclusive affect whatsoever to administrative actions.  The plain text of the Act requires a state to act "in a court" in order to bar subsequent citizen suits. 42 U.S.C. § 7604(b)(1)(B), and the Fifth Circuit held in Crown Petroleum that administrative actions do not trigger that statutory bar.  207 F.3d at 794-795.  This ruling would be meaningless if the same administrative actions could nonetheless bar citizen suits under the guise of *res judicata*.

That citizen suits are allowed even when there is prior administrative enforcement is also reflected in the CAA penalty provision, 42 U.S.C. §

7413(e)(1), which provides that one of the criteria a court must consider in

determining the amount of a penalty in a citizen suit is "payment by the violator of

penalties previously assessed *for the same violation*" (emphasis added).  And if

TCEQ penalties imposed on Exxon do not strip the Court of jurisdiction, then

TCEQ decisions *not* to take enforcement action against Exxon could certainly not

deprive the Court of jurisdiction.

   Further, Exxon has not even made the case that TCEQ's actions were of the

type that could otherwise have *res judicata* effect under Texas law.  Although

Exxon has not delineated which TCEQ's "actions" it claims should be given

preclusive effect, it appears that many of them were decisions <u>not</u> to take

enforcement action, and that the remainder were not the type of quasi-judicial

adjudicatory proceedings to which the *res judicata* doctrine can be applied.[29]

---

[29] Federal courts accord state agency orders no greater preclusive effect than state courts would grant them, <u>United States v. Texas</u>, 158 F.3d 299, 304 (5th Cir. 1998).  Here, even when TCEQ did issue orders to Exxon, it did not act in a judicial capacity and resolve disputed issues of fact. <u>Igal v. Brightstar Info. Tech. Group, Inc.</u>, 250 S.W.3d 78, 86-87 (Tex. 2008).  It appears any past enforcement action was by "Agreed Order."  There is no indication there were any hearings, witness testimony, application of the rules and standards of evidence, or other common trappings of meaningful adjudication.  <u>Id.</u>, at 81; <u>Turnage v. JPI Multifamily, Inc.</u>, 64 S.W.3d 614, 620-621 (Tex. App. - Houston [1st Dist.] 2001).  <u>Cf.</u> <u>Cianci v.M. Till, Inc.</u>, 34 S.W.3d 327, 330-331 (Tex. App. - Eastland 2000) (no collateral estoppel where defendant waived right to hearing and accepted agency findings and conclusions without admitting violation); <u>State v. Aguilar</u>, 947 S.W.2d 257, 259-260 (Tex. Crim. App. 1997) (no collateral estoppel from hearing, without showing states' representation by counsel, witness testimony, cross-examination, and extent of evidence submitted).  TCEQ's Agreed Orders were not rendered by a court of competent jurisdiction, since TCEQ did not conduct adversary proceedings.  <u>See</u>, <u>Gonzalez v. State Bar of Texas</u>, 904 S.W.2d 823, 830-831 (Tex. App. - San Antonio, 1995).

IV.   **PLAINTIFFS HAVE ADEQUATELY PLEADED INJURY.**

A.   **Plaintiffs' Members Need Not Be Named In The Complaint.**

Exxon argues this case should be dismissed because the Complaint does not identify Plaintiffs' members injured by Exxon.  MTD 27.  As a matter of law, there is no requirement "that a party suing as a representative must specifically name the individual on whose behalf the suit is brought" to establish standing.  Doe v. Stincer, 175 F.3d 879, 884 (11th Cir. 1999); Church of Scientology of Cal. v. Caares, 638 F.2d 1272, 1277 (5th Cir. 1981), construing Cong. of Racial Equal. v. Douglas, 318 F.2d 95 (5th Cir. 1963) (organization allowed to assert the rights of its members even though "the pleadings did not specifically seek relief on behalf of its members"); Cabrini-Green Local Advisory Council v. Chicago Housing Authority, 1997 U.S. Dist. LEXIS 625, at **29-32 (N.D. Ill. Jan. 21, 1997) (same). In any event, Plaintiffs have already provided the names and addresses of injured members in their Rule 26(a)(1) initial disclosure (attached hereto as Ex. 9 hereto).

B.   **The Allegations Of Injury Are Sufficiently Detailed.**

Exxon also argues that the allegations of injury to members "are too generalized and conjectural."  MTD 28.  However, as the D.C. Circuit held in the very case cited by Exxon on this point:

> At the pleading stage, "general factual allegations of injury resulting from the defendant's conduct may suffice," and the court "presum[es] that general allegations embrace the specific facts that are necessary to support the claim."

Sierra Club v. EPA, 292 F.3d 895, 899-890 (D.C. Cir. 2002) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992)); Steel Co., 523 U.S. at 104 (same); Womack v. Nissan North America, Inc., 550 F. Supp. 2d 630, 635 (E.D. Tex. 2007) (same).

Here, Plaintiffs' allegations of members' injuries are far more specific than required and are hardly conjectural.  Over fourteen pages (more than 40 paragraphs) of the Complaint are related to injuries traceable to Exxon's alleged violations.  Complaint ¶¶ 2-6, 8-10, 45-85.[30]  Plaintiffs also provide detail on the specific pollutants the Complex has illegally released, Complaint ¶¶ 49-51, the specific amounts of those pollutants released by the Complex, ¶¶ 53-54, and the specific adverse effects caused by those pollutants, ¶¶ 55, 58-61, 64-74 (which are consistent with the types of injuries Plaintiffs' members suffer, ¶¶76-77, 79-85).

---

[30] The Complaint alleges Plaintiffs have members who "live and work in the neighborhoods near the Baytown Complex."  Complaint ¶ 75.  Some "live just blocks away; some can see the Baytown Complex from their yards."  Complaint ¶ 75.  Plaintiffs' members "breathe illegal emissions from the Baytown Complex."  Complaint ¶ 75.  They see haze and plumes of smoke coming from the Complex.  Complaint ¶ 76.  They smell rotten egg, burning tire, and chemical odors emanating from the Complex, which get stronger closer to the Complex.  Complaint ¶ 77.  Plaintiffs' members who live and work near the Complex "suffer from chest congestion, bronchitis, asthma, headaches, sneezing, coughing, itchy and watering eyes, and fatigue," symptoms which "typically lessen or disappear when" they "go on vacation" or visit out of the area.  Complaint ¶ 79.  Furthermore, "Plaintiffs members and their families have had to restrict their outdoor activities as a result of air pollution from the Baytown Complex.  Air pollution has bothered Plaintiffs' members inside their houses, as well."  Complaint ¶ 81.  Members worry about "an increased risk of cancer or reproductive harms as a result of the Baytown Complex's illegal air pollution."  Complaint ¶ 82.  They also worry that equipment breakdowns and operator errors increase the likelihood of an explosion at the Complex.  Complaint ¶ 84.  They want to breathe as little pollution from the Complex (or ozone created by the Complex's pollution) as possible.  Complaint ¶¶ 47, 83.

Taken as true for purposes of this motion, these allegations are clearly sufficient to establish standing.  Sierra Club v. TVA, 430 F.3d 1337, 1345 (11th Cir. 2005) (standing where member was "frightened" to breathe air pollution, refrained from outdoor activities, and saw pollution); Crown Petroleum, 207 F.3d at 792-794 (members smelled sulfurous odors associated with defendant's air pollution); Ass'n of Irritated Residents v. C&R Vanderham Dairy, 2007 U.S. Dist. LEXIS 70890, at **35-37 (E.D. Cal. Sept. 24, 2007) (members saw haze, and emissions contributed to ozone which members breathed); Sierra Club v. Johnson, 500 F. Supp. 936, 940 (N.D. Ill. 2007) (allegation that members' health and use of air is impaired by facility sufficient to defeat motion to dismiss).

## C.     Associational Standing Is Not Decided By, Or Dependent Upon, State Corporate Law.

Exxon argues that because Environment Texas' Certificate of Formation states it shall have no members, the group cannot have associational standing.  As a matter of law, Exxon is wrong.

The Fifth Circuit, in a case not cited by Exxon, held that an incorporated group need not have "members" as defined under state corporate law to have associational standing to bring a citizen suit.  Friends of the Earth ("FOE"), Inc. v. Chevron Chemical Co., 129 F.3d 826 (5th Cir. 1997); see, Hunt v. Washington State Apple Advertising Comm'n, 432 U.S. 333, 341-345 (1977) (apple advertising commission had standing to assert the interests of individual apple

33

growers even though the apple growers were not its members).  For associational

standing, what matters is whether there is "a sufficient nexus" between an

organization and its members, Church of Scientology, 638 F.2d at 1279, a fact

which is not challenged by Exxon.[31]  In FOE, the fact that persons who used the

Texas waterways in question had joined the environmental group as "members"

and voluntarily associated to further the purpose of the organization was more

important than whether the group had members pursuant to corporate law.  129

F.3d at 828-829.  Environment Texas is entitled to make a showing of "sufficient

nexus" here.[32]

---

[31] Here, Environment Texas alleges it "advocates for clean air…on behalf of approximately 5,000 citizen members," Complaint ¶ 9, and that it brings this lawsuit "on behalf of [its] individual members who are adversely affected by the Baytown Complex's excess emissions," Complaint ¶ 8.

[32] Plaintiffs also note that since Exxon does not challenge Sierra Club's standing on this basis, this Court need not consider this issue with respect to Environment Texas.  See, Clinton v. City of New York, 524 U.S. 417, 431 (1998).

## <u>CONCLUSION</u>

For the reasons above, Exxon's motion to dismiss should be denied.

Respectfully submitted,

Dated:  May 6, 2011

<u>/s/ Philip H. Hilder</u>
Philip H. Hilder
State Bar No. 09620050
Southern District of Texas Bar No. 2474
Hilder & Associates, P.C.
819 Lovett Blvd.
Houston, Texas  77006-3905
(713) 655-9111 (phone)
(713) 655-9112 (fax)
ATTORNEY-IN-CHARGE
FOR PLAINTIFFS

Counsel for Plaintiffs

<u>/s/ David A. Nicholas</u>
S.D. Tex. Bar No. 89667
20 Whitney Road
Newton, Massachusetts  02460
(617) 964-1548 (phone)
(617) 663-6233

Joshua R. Kratka
S.D. Tex. Bar No. 962922
Bracha Y. Etengoff (*pro hac vice*)
National Environmental Law Center
44 Winter Street, 4th Floor
Boston, Massachusetts  02108
(617) 747-4333 (phone)
(617) 292-8057 (fax)

Charles C. Caldart
(*pro hac vice* motion to be filed)
National Environmental Law Center
1402 Third Ave., Suite 715
Seattle, Washington 98101
(206) 568-2853
(206) 568-2858