UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ENVIRONMENT TEXAS CITIZEN LOBBY, INC. *and* SIERRA CLUB, | § § § § | |
| *Plaintiffs,* | § § | |
| v. | § § | CIVIL ACTION NO. 4:10-cv-4969 |
| EXXON MOBIL CORPORATION, *et al.,* | § § § | |
| *Defendants.* | § § | JUDGE DAVID HITTNER |

## THE EXXONMOBIL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

TO THE HONORABLE JUDGE OF THIS COURT:

Defendants Exxon Mobil Corporation ("ExxonMobil"), ExxonMobil Chemical Company, and ExxonMobil Refining and Supply Company (collectively, "the ExxonMobil Defendants") move for summary judgment, pursuant to FED. R. CIV. P. 56, on the claims of Plaintiffs Sierra Club and Environment Texas Citizen Lobby, Inc. ("ETCL") (collectively, "Plaintiffs"). In support of the motion, the ExxonMobil Defendants would show as follows:

## INTRODUCTION AND SUMMARY OF MOTION

Plaintiffs – two environmental advocacy groups – request that the Court impose liability, penalties, and injunctive relief on the ExxonMobil Defendants

under the citizen suit provision of the federal Clean Air Act ("CAA" or "the Act"). The ExxonMobil Defendants operate a refinery, olefins plant, and chemical plant located in Baytown, Texas (the "Baytown Complex").

Plaintiffs base part of their "citizen suit" claims on actual or anticipated air emissions from the Baytown Complex that the ExxonMobil Defendants were required to self-report to the Texas Commission on Environmental Quality ("TCEQ") – within prescribed time periods – as part of TCEQ's federally approved enforcement of the CAA in Texas. This motion refers to these events as "reportable events."

On top of this requested relief, Plaintiffs also ask that the Court impose liability, penalties, and injunctive relief under the Act's citizen suit provision for events at the Baytown Complex that did *not* involve emissions significant enough to warrant a post-event report within 24 hours to TCEQ. For these events involving emissions below a regulatory "reportable" threshold, the ExxonMobil Defendants were required by TCEQ's federally approved rules to keep records. This motion refers to these events as "recordable events." Plaintiffs seek to impose citizen suit liability for such recordable events that the ExxonMobil self-reported to TCEQ in semi-annual filings, known as "Title V deviation reports."

Finally, Plaintiffs request that the Court impose such liability under the CAA's citizen suit provision for *each and every entry* contained within various

"Title V deviation reports" that the ExxonMobil Defendants supplied to TCEQ during the time period covered by Plaintiffs' complaint – even if those events did not involve reportable *or* recordable emissions.

Plaintiffs' complaint is based solely on these self-reports that the ExxonMobil Defendants made to their environmental regulators.  Plaintiffs also include in their complaint a general description of publicly available air quality permits relating to the Baytown Complex.   Plaintiffs include environmental advocacy language.  They include allegations that Plaintiffs intended to support their claims of standing to pursue "citizen suit" remedies for these self-reported incidents.   However, the complaint does *not* contain any factual allegations or information relating to the actual operation and maintenance of the Baytown Complex.  The complaint contains scant factual allegations or information (in two of 88 paragraphs) relating to what the public environmental agencies who received these self-reports – under the regulatory system that created and required them – have *done* with them, in their primary role of CAA implementation.

The complaint likewise does *not* contain any factual allegations or information concerning what actions the Baytown Complex has taken – in compliance with the regulatory effort undertaken by agencies charged with CAA implementation and enforcement – to correct or deal with the conditions that led to any particular self-report.   Instead, the complaint is an effort – which the

3

ExxonMobil Defendants respectfully contend is misguided, for a number of reasons – by Plaintiffs to play "gotcha" based on the ExxonMobil Defendants' compliance with the regulatory self-reporting system under which they operate, without any meaningful examination of the underlying facts, circumstances, and outcomes of *any* of the self-reports.   In the process, Plaintiffs either ignore or attempt to dismiss in an overly cursory way the primary and active enforcement efforts by government regulators, with respect to the very events and Title V deviations raised by Plaintiffs in their complaint.   Plaintiffs ignore or disparage these enforcement efforts by public agency regulators for the reason that these efforts by regulators obviate their ability to raise citizen suit claims.

The parties have engaged in a discovery process that has included the production of over 211,000 pages of documents from the ExxonMobil Defendants and over 72,000 pages of documents from Plaintiffs; the depositions of 23 party, non-party, and expert witnesses; and the designation and exchange of reports from 13 retained expert witnesses.

Following the conclusion of this discovery, the ExxonMobil Defendants move for summary judgment on the following grounds, each of which is dispositive of all or a significant part of the Plaintiffs' citizen suit claims.

**GROUND ONE**:  This ground deals with the fundamental issue of whether Plaintiffs' claims are even properly raised under the citizen suit provision they

4

invoke. As a matter of law, there is no genuine issue of material fact that each of the reportable events, recordable events, and Title V deviations at the Baytown Complex for which Plaintiffs seek to impose liability, penalties, and injunctive relief has been subject to an active regulatory oversight and enforcement process. This oversight and enforcement process includes TCEQ, as the Texas air pollution control agency dedicated to enforcement of the CAA in Texas. The oversight and enforcement process also includes the United States Environmental Protection Agency ("EPA"), as the federal agency that oversees the Act's implementation in Texas generally and, when it deems necessary, the Act's implementation and enforcement with respect to the Baytown Complex.

Plaintiffs recognize by their own definition of their claims that each of these events and Title V deviations are reported to public agency regulators. Plaintiffs nonetheless seek to impose their own theories of CAA liability and remedies on those self-reported events and Title V deviations, regardless of whether they are the subject of such things as:

- Comprehensive regulations, guidelines, and rules enacted by the EPA and TCEQ that govern the events and Title V deviations in this case.

- Individual review and investigation of reportable events by trained agency personnel, who apply methodologies and criteria to determine the appropriate action.

- Enforcement actions by state or federal regulators based on investigation of events.

- Decisions by regulators in their discretion *not* to seek enforcement actions with respect to events.

- Agreements between the ExxonMobil Defendants and these regulators – such as through a consent decree or administrative order – on resolution of environmental issues, both as to individual events and long-term efforts to reduce events and their air emissions.

- Regulations and proclamations that provide affirmative defenses against CAA penalties for specified events – as determined by TCEQ – including for events arising out of actions taken by the ExxonMobil Defendants in response to Hurricane Ike in 2008.

By their claims in this case, Plaintiffs ask this Court to layer "citizen suit" penalties and injunctive obligations on top of – and in contravention of – the results achieved through regulators' active imposition of CAA enforcement to the Baytown Complex.

As many federal courts have recognized, the type of second-guessing of the regulatory and enforcement process and its outcomes that is proposed by Plaintiffs in this case does not fall within the scope of the citizen suit provision of the CAA. The particular type of citizen relief sought by Plaintiffs in this case is shown through the developed summary judgment record to involve not only *second-guessing* by Plaintiffs of primary agency regulation and enforcement, but also efforts by Plaintiffs to *ignore* that primary agency regulation and enforcement.

The Court can determine, as a preliminary matter, whether Plaintiffs' citizen suit claims are appropriately brought to this Court. The ExxonMobil Defendants respectfully submit that the Court can make a determination prior to trial – as a

6

matter of law, based on the summary judgment record – that Plaintiffs' claims do not fall within the ambit and scope of the CAA's citizen suit provision. The Court can make the determination that the summary judgment record demonstrates beyond any genuine issue of material fact that federal and state agencies have not abdicated their statutory roles to enforce the Act's requirements to the Baytown Complex, but instead are actively pursuing those statutory roles in a formalized, active, and consistent manner.

Ground One, if granted, would be dispositive on all of Plaintiffs' claims. Should the Court not grant this summary judgment motion on these grounds, the ExxonMobil Defendants also present the following grounds that, if granted, would resolve a significant portion of Plaintiffs' claims, and thus streamline the issues to be resolved at a trial.

**GROUND TWO**: Plaintiffs have failed to adduce evidence that reportable events, recordable events, or Title V deviations for which they seek citizen suit recovery have been "repeated" within the meaning of the Act. Such a showing is a necessary predicate to a citizen suit of this type, and as such it is Plaintiffs' burden to make. In obvious recognition of this burden, one of the Plaintiffs' expert witnesses purports to opine that events listed in attachments to his reports resulted from common causes at the Baytown Complex. With respect to events and deviations not listed in this witness's reports, there is no evidence that those events

7

and deviations are "repeated" under the Act.  As a matter of no-evidence summary judgment, the Court can properly dismiss these claims for which Plaintiffs have not and cannot adduce summary judgment evidence.

**GROUND THREE**:  As a matter of law and the summary judgment record, a portion of the incidents that the ExxonMobil Defendants initially submitted to TCEQ as reportable events were ultimately determined – by the ExxonMobil Defendants and TCEQ – *not* to constitute reportable *or* recordable events, or Title V deviations.  These incidents did not involve the Baytown Complex operating outside the boundaries of any emission limitations in applicable permits or rules. As a matter of law, there is an absence of any evidence that these incidents represent violations of the Act.  This would be true whether a public agency brought enforcement action on these incidents, or whether – as here – a private entity such as the environmental advocacy groups in this case seek to do under the Act's citizen suit provision.

**GROUND FOUR:**  As a matter of law and the summary judgment record, for various of the reportable events, ExxonMobil was required to pay penalties and/or implement corrective actions under an active consent decree between ExxonMobil (and a subsidiary, ExxonMobil Oil Corporation) and the EPA. Plaintiffs' claims on these events are barred by the "diligent prosecution" provision of the CAA and by principles of *res judicata*.

8

**GROUND FIVE**:  As a matter of law and the summary judgment record, various of the self-reported events are subject to proclamations made by the Texas Governor, and a related TCEQ directive, that excused compliance with environmental regulations during a specific time period when Texas industry, including the Baytown Complex, sought to respond to Hurricane Ike.  The Governor's executive order and the related TCEQ directive provide a legal bar to Plaintiffs' efforts to impose citizen suit liability for events that occurred during the disaster preparation and response efforts.  These events are likewise subject to a statutory "Act of God" defense that bars Plaintiffs' claims.

**GROUND SIX**:  As a matter of law and the summary judgment record, various of the self-reported events resulted in TCEQ initiating enforcement actions, and issuing notices of enforcement, notices of violation, and/or enforcement orders.  The enforcement orders required one or more of the ExxonMobil Defendants to pay penalties, and to take corrective action to remedy the situation that caused a particular event or to document corrective actions that one or more of the ExxonMobil Defendants had already proactively taken as remedies.  Plaintiffs' efforts to second-guess TCEQ's enforcement actions and the penalties and corrective actions required through those orders are likewise not cognizable under the Act's citizen suit provision.

579.00026./502252.v1

**GROUND SEVEN**:  As a matter of law and the summary judgment record, a portion of the reportable events are the subject of an affirmative defense set out in the federally approved regulations through which the CAA program has been implemented in Texas.   For these events, the summary judgment record demonstrates that TCEQ determined, explicitly or implicitly, that the affirmative defense applies.   Plaintiffs' efforts to second-guess the affirmative defense regulations and their implementation by TCEQ and to seek penalties for the events found to meet the affirmative defense criteria are not properly raised under the Act's citizen suit provision.

**GROUND EIGHT:**   A large number of Plaintiffs' claims relate to recordable events and "Title V deviations."  A "Title V deviation" is any indication of non-compliance with any term of a facility's CAA operating permit, issued by TCEQ under Title V of the Act.  A Title V deviation may concern an incident that involved a reportable or recordable emissions event, but any particular Title V deviation may not involve any emissions *at all*.  Plaintiffs append all entries listed in the Baytown Complex's Title V deviation reports to their complaint without regard to whether or not they involved emissions.  Plaintiffs also include all entries relating to recordable events.  As a matter of law and the summary judgment record, neither ETCL nor Sierra Club can demonstrate nor present any evidence to support organizational standing to challenge events that by definition did not

579.00026./502252.v1

involve emissions at all. In addition, neither ETCL nor Sierra Club can or has presented evidence that any event involving a "recordable" quantity of emissions could or did pose an adverse impact on any of their members.

## SUMMARY JUDGMENT RECORD

**A.    CAA Implementation and Enforcement in Texas**

*1.    Who Implements and Enforces the Act?*

Although the CAA is a federal statute, 42 U.S.C. § 7401 *et seq.*, the Act's implementation and enforcement are accomplished through the combined resources of the EPA and the corresponding state agency – called by the Act the state's "air pollution control agency." The Act requires each state to create a State Implementation Plan ("SIP") to implement national ambient air quality standards ("NAAQS"). *See id.* § 7410.

Each SIP must include "enforceable emissions limitations and other control measures, means and techniques as may be necessary or appropriate" to meet the CAA's requirements. *Id.* § 7410(a)(2)(A). Each state must also include permitting and enforcement programs in its SIP to assure that the NAAQS are achieved and maintained. *See id.* § 7410(a)(2)(C), (I), (J). Once the EPA approves a state's SIP, the state has primary responsibility for assuring air quality through that SIP. *See id.* § 7407(a).

579.00026./502252.v1

Over the years since Congress adopted the CAA in 1970, Texas has submitted, and the EPA has approved, a number of rules and other regulatory activities, including Texas's permitting and enforcement programs. *See* 40 C.F.R. § 52.2270 (relating to EPA-approved regulations in the Texas SIP). Primary responsibility for implementation and enforcement of the NAAQS in Texas is thus vested in the TCEQ, which is the agency that develops, implements, and enforces the State's SIP. *See* **Ex. 1** (Sadlier Dep.) 15:10–21, 21:5–22:24 & exs. 2, 6; *see also* 30 TEX. ADMIN. CODE § 1.1, *et seq.*

2.    *How is the Act Implemented and Enforced?*

As part of the Act's implementation in Texas, the TCEQ issues permits for construction of new or modified sources of air emissions in the State. *See* 30 TEX. ADMIN. CODE § 116.10 *et seq.* This type of permit is called a new source review ("NSR") preconstruction permit. TCEQ also issues operating permits to facilities that are sources of air emissions in the State under Title V of the CAA. *See id.* § 122.120. This type of permit is called an operating or "Title V" permit.

The Baytown Complex, like all refinery and chemical plant operations, has highly complex systems and operations.[1] These systems and operations include

---

[1]The uncontroverted summary judgment evidence is that the Baytown Complex is the largest integrated petroleum and petrochemical complex in the United States. The Complex covers nearly 3,400 acres along the Houston Ship Channel. The facility produces approximately 13.5 billion pounds of petrochemical products each year. The Complex contains, among other

vessels, pipes, and other equipment that contain pressurized gas as part of normal operations.   Unplanned air emissions at a refinery or chemical plant can occur when normal operations are disrupted by a mechanical or electrical failure or human error, and gases have to be released to prevent a dangerous over-pressurization of equipment.   These gases can be released through such mechanisms as release valves and flares, and such releases result in air emissions. *See* **Ex. 2** (Kovacs Aff.) ¶ 4.   These situations are known as "upsets" if they result in emissions that are not authorized by an applicable permit or rule.   An "upset" is "[a]n unplanned and unavoidable breakdown or excursion of a process or operation that results in unauthorized emissions."   30 TEX. ADMIN. CODE § 101.1(109).

In addition, there are times when parts of the Baytown Complex must be shut down for maintenance to be conducted, and afterwards those parts of the Complex must be re-started.   Such maintenance, startup, and shutdown activities ("MSS") can also result in emissions.   TCEQ rules define unscheduled MSS that result in unauthorized emissions, along with upsets, as "emissions events."   An "emissions event" is "[a]ny upset event or unscheduled maintenance, startup, or shutdown activity, from a common cause that results in unauthorized emissions of

---

equipment, approximately one million valves and thousands of miles of piping.  *E.g.*, **Ex. 3** (Doc. # EOMCS 00165250); *see also* **Ex. 20** (Rice Aff.) ¶ 3.

13

air contaminants from one or more emissions points at a regulated entity." *Id.* § 101.1(28).

Because emissions events are by definition unforeseen and unanticipated departures from normal operations, TCEQ does not incorporate them into the NSR or operating permits it issues. Instead, the State of Texas has a comprehensive set of rules that describe what refineries and chemical plants are to do when an emissions event occurs. *See id.* §§ 101.201-101.222 (known as the "Event Rules"). An emissions event must be reported to TCEQ if the emissions of any pollutant during the event exceed a reportable quantity for that pollutant. *See id.* § 101.1(87). In addition to emissions events, during most of the time period covered by the Plaintiffs' complaint, the Event Rules regulated scheduled MSS events and emissions resulting from them.[2]

---

[2]In late 2005, the rules were amended such that such that by January 5, 2007, a permit amendment application was required for scheduled MSS activities at the Baytown Refinery that were not already authorized under the refinery's NSR permits. By January 5, 2009, similar permit amendment applications were necessary for scheduled MSS activities at the Baytown Olefins Plant and Baytown Chemical Plant that were not already authorized under those facilities' NSR permits. TCEQ issued MSS permit amendments for the Refinery, Olefins Plant, and Chemical Plant on June 3, 2010, May 16, 2011, and June 16, 2011, respectively. Since those dates, scheduled MSS activities at the Baytown Complex that comply with those amended permits have been authorized by the Baytown Complex's NSR and Title V permits. **Ex. 2** (Kovacs Aff.) ¶ 3.

3.    *Self-Reporting Process*

The Event Rules also set out the self-reporting process that the Baytown Complex follows in reporting emissions events to TCEQ as the state air pollution agency.[3]   First, the Texas Administrative Code defines "reportable emissions event" as "[a]ny emissions event that in any 24-hour period, results in unauthorized emissions from any emissions point equal to or in excess of the reportable quantity."   30 TEX. ADMIN. CODE § 101.1(87).   The rules governing emissions events require:

> As soon as practicable, but not later than 24 hours after the discovery of an emissions event, the owner or operator of a regulated entity shall:
> > (A) determine if the event is a reportable emissions event; and
> > (B) notify the commission office for the region in which the regulated entity is located, and all appropriate local air pollution control agencies with jurisdiction, if the emissions event is reportable.

30 TEX. ADMIN. CODE § 101.201(a)(1).   These rules also require that the Baytown Complex maintain records of these reportable events.   *See id.* § 101.201(b).

Likewise, these rules require that the Baytown Complex submit a report to TCEQ at least 10 days, or as soon as practicable, before a scheduled MSS that is expected to cause unauthorized emissions that equal or exceed a reportable quantity in any 24-hour period.   30 TEX. ADMIN. CODE § 101.211(a).   These rules

---

[3]These reports are typically referred to as "STEERS Reports."   STEERS is an acronym for "State of Texas Environmental Electronic Reporting System."

579.00026/502252.v1

also require that the Baytown Complex maintain records of such reportable events. 30 TEX. ADMIN. CODE §§ 101.201(b) and 101.211(b).

Through notice-and-comment administrative rulemaking, TCEQ sets these reportable quantity standards ("RQs") as part of its mission of protecting human health, and it updates the RQs as appropriate in response to changing scientific information. *See, e.g.*, 27 Tex. Reg. 8499, 8512–14 (Sept. 6, 2002) (among other changes, reducing the RQ for five chemicals from 5,000 pounds to 100 pounds). "The list of RQs, which is the basis of episodic emission reporting, is established using criteria for the protection of health and the prevention of nuisances . . . ." 27 Tex. Reg. at 8514.

Second, regulated entities must also keep records of "recordable" emissions events, 30 TEX. ADMIN. CODE § 101.201(b), which are emissions events that "d[o] not result in an unauthorized emission from any emissions point equal to or in excess of the reportable quantity." 30 TEX. ADMIN. CODE § 101.1(71). Any recordable event that represents a Title V deviation must be included in a semi-annual Title V deviation report. *Id.* § 122.145(2)(A).

Third, when operations of a facility deviate from a term or condition set out in the facility's operating permit (which also incorporates its NSR permits), 42 U.S.C. §§ 7661–7661f, the facility's operator must "report, in writing, . . . all instances of deviations, the probable cause of the deviations, and any corrective

16

actions or preventative measures taken for each emission unit addressed in the permit." 30 TEX. ADMIN. CODE § 122.145(2)(A).  Regulated entities must submit these reports, known as "Title V deviation reports," to TCEQ every six months. *See id.* § 122.145(2)(B); *see also* 30 TEX. ADMIN. CODE § 122.10(5) (defining "deviation").

### 4.    *TCEQ Oversight and Review of Self-Reports on Reportable Events*

In the case of a reportable event, with the report in hand, TCEQ undertakes to investigate the cause of the event.  *See* TEX. HEALTH & SAFETY CODE §§ 382.0215-0216, 382.022.  By mandate of the Texas Legislature, TCEQ is charged with investigating and centrally tracking each reported event. *See id.* § 382.0215(d).

TCEQ has approximately 500 investigators, who perform about 100,000 compliance investigations annually, including approximately 20,000 onsite investigations each year.  *See* **Ex. 1** (Sadlier Dep.) 28:13–29:16.  TCEQ has an office based in Houston, with trained investigators who have gained familiarity with the Baytown Complex and its operation.  *See id.* 29:21-30:9; *see also* **Ex. 4** (Carman Dep.) 11:24-12:1 (Plaintiffs' corporate representative acknowledges that TCEQ has regional office in Houston).

In evaluating a reportable event, TCEQ first determines whether the event was "excessive," either alone or in combination with other events.  *See* 30 TEX.

ADMIN. CODE § 101.222(a).  If TCEQ deems an event to be excessive, the TCEQ

orders a corrective action.  *See* TEX. HEALTH & SAFETY CODE §§ 382.0216; *see*

*also* 30 TEX. ADMIN. CODE § 101.223.  If the TCEQ does not deem an event

excessive, and if its investigation reveals that the operator took prompt action to

achieve compliance and met other stringent criteria set out in affirmative defense

provisions of the rules, TCEQ refrains from assessing a civil penalty.  *See* 30 TEX.

ADMIN. CODE §§ 101.222(b), (c), (d), (e).

    For events that are not subject to the regulatory affirmative defense, TCEQ

also employs what it calls "Enforcement Initiation Criteria" ("EIC"), which

provide direction to TCEQ investigators in the exercise of enforcement discretion.

These criteria provide consistency and predictability to the enforcement process:

"Any notion that the agency applies its enforcement authority in an inconsistent

manner is easily rebutted . . . .  The EIC tells the investigator how to operate, what

to do with the violation observed."  **Ex. 1** (Sadlier Dep.) 85:19–25; *see also* **Ex. 5**

(Civins Dep.) 6:9-15 & ex. 1 at 10 ("TCEQ routinely applies its EIC and penalty

policy in enforcement matters throughout the State, including as regards the

Baytown Complex.").

    If TCEQ concludes that enforcement is warranted, it will impose a penalty in

accordance with its penalty policy and/or order the plant to take appropriate

corrective actions if it has not already done so.  The enforcement process begins

18

with TCEQ issuing either a notice of violation or a notice of enforcement, depending on how TCEQ characterizes the event under its EIC. *See* **Ex. 1** (Sadlier Dep.) 54:24-57:21. For each notice of violation, the owner or operator must implement a corrective action that addresses the cause of the event at issue. Under the EIC, if the operator takes the corrective action within the timeframe specified in the notice of violation, TCEQ will not pursue formal enforcement action. For each notice of enforcement, unless TCEQ withdraws the notice as unjustified, TCEQ requires that the owner or operator implement appropriate corrective actions, and pay an administrative penalty for the event. *See* TEX. WATER CODE §§ 7.051-.075. These remedies are embodied in an administrative enforcement order. *See* **Ex. 1** (Sadlier Dep.) 97:9-98:5.

The summary judgment record shows that in the 2005 fiscal year alone, TCEQ issued 1,157 administrative enforcement orders, twenty percent of which related to air quality. *See id.* 72:16-73:1, 75:21-76:6 & ex. 7. In 2009, TCEQ issued approximately 1,750 orders. *See id.* ex. 14. In 2011, TCEQ issued more than 1,600 enforcement orders as part of its environmental compliance programs, including 300 under the CAA. *See id.* 54:1–19 & ex. 8. Every one of these orders included a penalty. *See id.* 54:1–19.

5.  *State Agency Review of Recordable Events and Title V Deviations*

As indicated above, state regulations impose requirements that certain recordable events and other Title V deviations be self-reported by an operator to TCEQ on a semi-annual basis.

In the case of recordable events – events that do not involve unauthorized emissions of a reportable quantity of an air pollutant – these events are captured in the operator's internal records in accordance with the Event Rules.  These internal records must be made available to TCEQ or EPA investigators in the event of an agency inspection of the operator's facility, or when otherwise requested.  *See* 30 TEX. ADMIN. CODE § 101.201(b) ("Final records must be maintained on-site for a minimum of five years and be made readily available to commission staff or personnel of any air pollution program with jurisdiction.").

Even though recordable events and other Title V deviations that are not reportable events do not involve the unauthorized emissions of a reportable quantity of any air contaminant, TCEQ maintains the jurisdiction and discretion to take enforcement action with respect to them should it determine, for example, that the recorded data reflects a trend of non-compliance that mandates such action. *See* **Ex. 1** (Sadlier Dep.) 66:6–67:9.

When reviewing recordable events, the TCEQ looks for systemic problems and recurring patterns.  *See id*. at 66:6–23.  This requires the TCEQ to "go much

20

deeper" than the number of events, asking questions such as "where that emission came from, why that emission occurred, why the company did not mitigate that event, [and] whether there was any offsite or onsite impact." *Id.* at 66:24–67:9.

### 6.    *Federal Agency Involvement in CAA Enforcement*

In addition to the TCEQ's oversight and enforcement of the CAA, the EPA also monitors TCEQ's implementation and enforcement and takes action in its own right when it deems necessary. Quarterly, the TCEQ meets with the EPA for the EPA to review the TCEQ's investigations and enforcement of the CAA. *See* **Ex. 1** (Sadlier Dep.) 30:15–33:25. If the EPA ever believes that the TCEQ has failed to address adequately a violation or to assess an appropriate penalty, the EPA retains the jurisdiction to "over-file" and pursue enforcement for the same violation. *See id.* 36:16–37:10 & ex. 2; *see also* **Ex. 5** (Civins Dep.) 86:1–16. TCEQ and the EPA have an "enforcement memorandum of understanding" that sets out the explicit pooling of resources between TCEQ, as the state air pollution control agency, and the EPA. **Ex. 1** (Sadlier Dep.) 21:19-22:24 & ex. 2. This MOU explicitly allows EPA enforcement of the CAA, when it deems such enforcement necessary, in the State of Texas. *See id.* 22:25-23:12.

There is no evidence that the EPA has ever felt compelled to "over-file" with respect to any of the numerous investigative and enforcement actions taken by TCEQ regarding the reportable events, recordable events, or Title V deviations

21

identified in the complaint. *See, e.g.*, *id.* 36:12-37:10. The EPA conducts periodic reviews of TCEQ's enforcement program. *See id.* 30:15-31:14. These periodic reviews have resulted in such EPA findings as:

- "TCEQ does a good job in identifying significant non-compliance and high priority violations."

- "TCEQ enforcement actions are of a high quality. Penalty documentation is good ...."

- "TCEQ met its enforcement related commitments."

**Ex. 5** (Civins Dep.) 6:12-15 & ex. 1 at pp. 11-12.

However, the EPA's ability and willingness in its own right to enforce the Act's requirements to the Baytown Complex as needed is evident in this summary judgment record, through an enforcement action the EPA filed in 2005, in the Northern District of Illinois. The EPA brought this enforcement action for alleged violations of the CAA at several ExxonMobil refineries throughout the United States, including the refinery at the Baytown Complex. *See United States v. Exxon Mobil Corp.,* No. 1:05-cv-05809 (N.D. Ill. Dec. 13, 2005). This action resulted in a consent decree between one of the ExxonMobil Defendants and the EPA that remains in effect today. *See* **Ex. 6** (Consent Decree); *see also* **Ex. 20** (Rice Aff.) ¶ 6. The Consent Decree imposed civil penalties for past violations, required capital improvements, required emissions reductions, and established a corrective action program for events involving flaring of certain types of gases that would occur

22

after the entry of the Consent Decree.  For example, the Consent Decree requires the operator of the Baytown Refinery to implement programs that:

- Reduce emissions of nitrogen oxide ("$NO_x$") at fluidized catalytic cracking units;

- Reduce emissions of sulfur dioxide ("$SO_2$") from fluidized catalytic cracking units;

- Reduce emissions of particulate matter from fluidized catalytic cracking units;

- Reduce carbon monoxide emissions from fluidized catalytic cracking units;

- Reduce $SO_2$ emissions from heaters, boilers, and other fuel combustion devices;

- Eliminate and/or reduce fuel oil combustion except during periods of natural gas curtailment;

- Install air pollution control devices to minimize emissions from flares; and

- Implement supplemental environmental projects to identify and quantify fugitive emissions of volatile organic compounds ("VOCs") and reduce diesel emissions.

**Ex. 6** (Consent Decree) pp. 17-132.

Under the Consent Decree, ExxonMobil must also report twice a year to the EPA and pay stipulated penalties for certain violations of the decree.  *See id.* pp. 138-39; 143-67.

**B.    CAA Implementation and Enforcement for the Baytown Complex**

The Consent Decree is but one example of a summary judgment record that demonstrates the absence of a genuine issue of material fact that during the time period at issue in this case, implementation of CAA requirements by federal and state authorities, with respect to the Baytown Complex, has been comprehensive and active.  Other examples include the following:

**TCEQ's Review and Investigation of Reportable Events:**    TCEQ examined and investigated each of the 24-hour self-reports from the Baytown Complex, in TCEQ's capacity as the federally recognized air pollution control agency for the State of Texas.  *See* TEX. HEALTH & SAFETY CODE §§ 382.0215-0216, 382.022; *see also* **Ex. 1** (Sadlier Dep.) 51:14–52:23.  Plaintiffs do not contend that the Baytown Complex ever failed to self-report any reportable event to TCEQ.  *See* **Ex. 4** (Carman Dep.) 116:12–17.  Thus, by definition, each of the reportable events that Plaintiffs raise in the case has been subjected to TCEQ oversight and investigation.

**TCEQ's Review and Oversight of Recordable Events and Title V Deviation Reports:**  It is likewise undisputed that all of the recordable events and Title V deviations at issue in Plaintiffs' complaint were recorded and reported to TCEQ (as part of the Title V deviation reports) and were thus subject to TCEQ's

oversight and review.  *See* **Ex. 2** (Kovacs Aff.) ¶¶ 4 & 5; *see also* **Ex. 4** (Carman Dep.) 124:20-126:6.

**Exercise of Responsible Agency Discretion in Enforcement:**   TCEQ brought enforcement under its EIC for events and Title V deviations that Plaintiffs list in their complaint, by issuing notices of violations and notices of enforcement. TCEQ exercised its enforcement discretion under its EIC not to take action with respect to others.   During the approximately five-year period covered by the complaint, TCEQ issued over 130 notices of violation and notices of enforcement with respect to the Baytown Complex.  *See* **Ex. 2** (Kovacs Aff.) ¶ 4.

**Exercise of TCEQ Enforcement Power Through Enforcement Orders:** When TCEQ deemed it appropriate, using its EIC and penalty policy, the agency assessed penalties, and either imposed requirements that the ExxonMobil Defendants conduct future corrective actions, or required that the ExxonMobil Defendants fully document corrective actions they had already taken.   TCEQ entered enforcement orders with respect to 85 events at the Baytown Complex that occurred during the approximately five-year period covered by the complaint. Each enforcement order assessed penalties, and either imposed requirements that the ExxonMobil Defendants conduct future corrective actions, or required that the ExxonMobil Defendants fully document corrective actions they had already taken. *See* **Ex. 2** (Kovacs Aff.) ¶ 10.

25

**Exercise of EPA Enforcement Power:** As indicated above, the EPA exercised its own enforcement power for many of the reportable events through the Consent Decree, and it monitored and reviewed TCEQ's enforcement program as it related to the Baytown Complex, during the time period covered by Plaintiffs' complaint. *See* **Ex. 6** (Consent Decree); *see also* **Ex. 1** (Sadlier Dep.) 34:17–38:20; **Ex. 5** (Civins Dep.) 6:9-15 & ex. 1 at 5–6.

**Planning and Implementing "Model" Compliance:** In 2012, TCEQ entered an enforcement order relating to the Baytown Complex that TCEQ representatives described as a "model" arrangement for corporate CAA compliance. *See* **Ex. 1** (Sadlier Dep.) 99:18-100:13 & ex. 10; *see also* **Ex. 2** (Kovacs Aff.) ¶ 13. Under the 2012 order, ExxonMobil must pay stipulated penalties for future reportable events, with certain limited exceptions, regardless of whether the ExxonMobil Defendants can demonstrate that the affirmative defense criteria apply. *See* **Ex. 1** (Sadlier Dep.) 104:12-105:5 & ex. 10 at pp. 5-6. The agreed order also requires the ExxonMobil Defendants to implement future projects that further reduce emissions, including from emissions events and MSS activities, that exceed the standards imposed by the basic CAA regulatory scheme, such as:

- The installation of computer applications to provide real-time monitoring, identification, diagnostics and online guidance/management of operations;

579.00026./502252.v1

- The installation of additional instrumentation and development of tools and procedures to more effectively monitor and troubleshoot the Fuels North Flare System at the Baytown Refinery;

- The development, implementation and use of high-fidelity process training simulators at the Baytown Olefins Plant to ultimately reduce the frequency and severity of emissions events; and

- The establishment of a program of enhanced fugitive components monitoring and repair at the Baytown Complex, using infrared imaging technology to locate potential leaks of volatile organic compounds and highly reactive volatile organic compounds.

*See id*. at pp. 8-10.

In approving the order, the TCEQ noted the Baytown Complex's

positive trend of reductions in actual emissions, including unauthorized emissions associated with emissions events and scheduled MSS activities, from Baytown Complex. From 2000 to 2010, ExxonMobil has reported a 60 percent reduction in aggregate emissions of VOC [volatile organic compounds], HRVOC [highly reactive volatile organic compounds], CO [carbon monoxide], $SO_2$ [sulfur dioxide] and $NO_x$ [nitrogen oxides] from the Baytown Complex. Over that same time period, reported emissions of VOC from the Baytown Complex have dropped by 44 percent, reported emissions of CO have dropped by 76 percent, and reported emissions of $NO_x$ have dropped by 63 percent.

*Id*. at p. 3.

The enforcement order also memorializes the relevant history of TCEQ enforcement with respect to the Baytown Complex:

ExxonMobil has emitted air contaminants resulting from emissions events and MSS activities in the course of its operations. The TCEQ has investigated and taken appropriate enforcement to resolve violations in accordance with the Texas SIP and agency policy for Baytown Complex emissions events and MSS activities.

27

> The Baytown Complex sources are governed by federal operating permits issued by the Executive Director under 30 TEX. ADMIN. CODE Chapter 122.   Under the federal operating permit program, ExxonMobil is required to report "all instances of deviations" in accordance with 30 TEX. ADMIN. CODE § 122.145.   For those deviations reported under FOP Nos. O-1229, O-1553, O2269, O-2270 and O-1278 and reviewed by the TCEQ, the TCEQ has taken appropriate enforcement to resolve violations in accordance with agency policy.

*Id.* at pp. 2-3.

During the public meeting on the approval of the enforcement order, TCEQ representatives commented that the order expedites benefits to the environment and demonstrates the ExxonMobil Defendants' "commitment to environmental excellence." **Ex. 2** (Kovacs Aff.) ¶ 13.

There is no evidence that Plaintiffs or anyone else objected to the TCEQ administrative order setting forth these provisions and representations, during the public notice period that by law precedes entry of any such administrative order. As Plaintiffs' representative, Neil Carman, testified:

Q.    Were you aware of this proposed agreed order before it was entered?

A.    No.

Q.    Are you generally aware that the TCEQ publishes notice of its intent to take up enforcement orders?

A.    Yes, I am aware the agency posts it on its website and it posts notice in the Texas Register.

**Ex. 4** (Carman Dep.) 144:9-16; *see also id.* 144:24-145:11.

## C.     Plaintiffs' "Citizen Suit" Claims

The suit before this Court is obviously not brought by the EPA, TCEQ, or any other public agency.  Under the requirements of the CAA, Plaintiffs provided their required pre-suit notice to the EPA and TCEQ, among other government agencies and officials, and received no response from those agencies or officials, much less support for their claims.  *See* **Ex. 4** (Carman Dep.) 147:1-148:2.

Plaintiffs are two environmental advocacy groups who unabashedly take the position that the public agency regulators who implement and enforce the CAA in Texas are inadequate and ineffective.  They disagree with the level of CAA oversight and enforcement that has occurred with respect to the Baytown Complex. They disagree with regulations that both the EPA and TCEQ have promulgated to implement the CAA's requirements.  Without even examining what maintenance is done at the Baytown Complex, and what process improvements at the Baytown Complex have been made over time, Plaintiffs believe that they can seek CAA citizen suit relief based on the formulaic and simplistic concept that because self-reports at the Baytown Complex occur, without knowing what the public agency regulators are doing and have done, the regulators have abdicated their CAA responsibilities with respect to the Baytown Complex.

579.00026./502252.v1

Following this "logic," Plaintiffs seek to use the citizen suit provision of the CAA to impose their philosophy of the Act by employing a "scattershot" strategy that involves little more than taking the more than 1400 events and Title V deviations included in the public self-reports that the ExxonMobil Defendants made to TCEQ over an approximate five-year period and asserting that all of the events and Title V deviations constitute CAA violations for which the Court should impose additional CAA penalties and injunctive relief.

The corporate representative for Plaintiffs, Dr. Neil Carman, discussed the Plaintiffs' strategy in turning the ExxonMobil Defendants' CAA self-reporting into their citizen suit complaint:

> Q.    [W]ith respect to all of the claimed exceedances of applicable emission caps that are listed in the attachments to the Plaintiffs' complaints, you understand that each and every one of those claimed exceedances results from a self-report by the Baytown Complex, correct?
>
> A.    Yes.
>
> Q.    [W]ith respect to any of the so-called upset emissions, that is emissions events or scheduled MSS activities, that each one of those events that's listed in the attachments to the Plaintiffs' complaint in the case comes from a self-report from the Baytown Complex, correct?
>
> A.    Yes.

**Ex. 4** (Carman Dep.) 115:21–116:11.

579.00026./502252.v1

Consistent with the philosophy of disregarding enforcement of the CAA by authorized regulators, *see* Complaint ¶¶ 87-88, Plaintiffs seek their own citizen suit remedies for these events and Title V deviations without regard to whether the EPA and/or TCEQ has reviewed and investigated them and taken enforcement action on them, when the results of these reviews and investigation mandate such action. The Plaintiffs' corporate representative, Neil Carman, is a former state air pollution inspector with the TCEQ's predecessor agency, the Texas Air Control Board. *See* **Ex. 4** (Carman Dep.) 17:9–13, 90:3–91:10. Based on his background and experience, Dr. Carman recognizes that when an event results in an emissions limit being exceeded by more than a reportable quantity at the Baytown Complex, a report is sent to TCEQ, and TCEQ reviews it:

> Q.    [W]hen the facility reports an exceedance of an applicable emissions cap to the STEER[s] system, is that report reviewed by TCEQ personnel?
>
> A.    Yes.

*Id.* at 116:18–21. However, Dr. Carman also states plainly that for purposes of their citizen suit claims, Plaintiffs do not care whether TCEQ has investigated the events raised in the citizen suit claims:

> Q.    Do you believe that the TCEQ investigative processes are inadequate?
>
> A.    Yes.

31

*Id.* at 13:4–6.   Dr. Carman states on behalf of Plaintiffs that TCEQ conducts

inadequate investigations by "rely[ing] upon the [emissions] estimates provided by

the company personnel" which are "not based typically on real-time monitoring of

what's in the air."   *Id.* at 46:7–13.   Dr. Carman is not aware of any regulatory

agency in the country that does what Dr. Carman describes as "real-time

monitoring" – as opposed to industry-standard methods of estimating emissions –

but Plaintiffs "believe that's something that should be happening."   *Id.* at 128:25–

129:9.

Plaintiffs also disregard whether TCEQ has taken enforcement action,

assessed penalties, and/or ordered corrective actions based on the events for which

Plaintiffs also seek remedies under the citizen suit provision of the Act:

> Q.    [I]t's the Plaintiffs' position . . . that even if the TCEQ has
> taken some form of administrative action that we've talked about
> today, that Plaintiffs are nonetheless seeking some sort of remedy for
> that event under the Clean Air Act, correct?
>
> A.    Yes.

*Id.* 83:23–84:7.   If TCEQ imposed penalties for an event, not surprisingly Plaintiffs

second-guess the amounts of those penalties.   *See id.* 108:24–109:5 ("I've been

very critical of the agency in not, you know, issuing large enough penalties to deter

future violations of a similar type as were issued in that enforcement action."); *see*

*also id.* 130:17–19 (stating that "maybe the penalties have not been adequate to

deter future violations").

32

Likewise, if TCEQ imposes a corrective action in response to an event, or concurs with a corrective action that the ExxonMobil Defendants have already taken, Plaintiffs second-guess that as well.

> Q.   So you . . . doubt the efficacy . . . of the corrective measure that TCEQ has deemed appropriate, correct?
>
> A.   Yes.
>
> Q.   And you question the validity of the decisions that TCEQ has made in that regard, correct?
>
> A.   Yes.

*Id.* at 107:8–14.  Indeed, Dr. Carman could not identify a single corrective action taken at the Baytown Complex that he would consider effective. *See id.* at 131:18–132:13.

Plaintiffs seek their own citizen suit remedies without regard to whether the events were subject to the proclamations issued by the Texas Governor, and related state agency guidance, suspending application of state regulations as Texas industry prepared for and responded to the onset of natural disaster.

> Q.   Dr. Carman, do you also understand that certain of the emission events and scheduled MSS activities that are listed among the attachments to the Plaintiffs' complaint in the case were related to start-up or shut-down activities that related to Hurricane Ike?
>
> A.   Yes.
>
> Q.   And it is Plaintiffs' position that Clean Air Act remedies are appropriate with respect to those events, correct?

A.      Yes.

. . .

Q.      Dr. Carman, do you recall from any source that response the governor of the state of Texas made to give instructions and guidance to operators of industrial facilities in the state of Texas with respect to preparing for Hurricane Ike?

A.      No.

*Id.* at 102:18–103:3, 104:14–21.

Plaintiffs seek their own citizen suit remedies without regard to whether the events are subject to corrective action requirements and/or stipulated penalties under the Consent Decree between EPA and ExxonMobil and one of its subsidiaries, and whether the events have been reported to the EPA pursuant to that federal court order.

Q.      [Y]ou understand that there is a consent decree that was entered into between the United States Environmental Protection Agency and the ExxonMobil Defendants concerning certain refinery activities in the case, correct?

A.      Yes.

Q.      Have you read that consent decree?

A.      Not recently.

. . .

Q.      You heard your lawyer just say that you believe -- that he believes that none of the events that are listed in the tables attached to the complaint are covered by the consent decree. . . . Did you hear him say that?

34

> A.    Yes.
>
> . . .
>
> Q.    Do you agree with that?
>
> A.    Yes.

*Id.* at 79:7–14, 81:16–82:4.  In their complaint, Plaintiffs acknowledge that some of the events they complain about are regulated under the Consent Decree – they merely assert that the EPA's remedies under the Consent Decree are not broad enough.  *See* Complaint ¶ 88.

Plaintiffs' utter disregard for TCEQ and EPA regulatory and enforcement actions is also made apparent by the fact that the expert witnesses that Plaintiffs have retained to provide "opinions" regarding operations and maintenance practices at the Baytown Complex did not look at all at what these regulators *have actually done* to enforce the CAA requirements at the Complex.  For example, Plaintiffs' proffered "expert" on the use of flares, Dr. Ranajit Sahu, testified as follows:

> Q.    No.  I understand you may have looked at multiple reports.  But did you ever look at -- to see at the end of the day how that report, that incident, was resolved at the administrative level?
>
> A.    Not as a systematic way.  I mean, if that information is there for a particular incident that I looked at in detail, it was that way.  I didn't look at in every instance of how each one got resolved finally.

Q.     Did you recall any resolutions with respect to any of the
STEERS reported incidents that you reviewed?

A.     Well, I seemed to recall that there were discussions.   You
know, the TCEQ would come out and do a site visit maybe six to
eight weeks after just to understand what the company had come up
with from a root cause standpoint and whether they agreed with it or
not.  And I seem to recall that type of discussion in the reports.  But I
was focused on that technical analysis.  I didn't really look into any
kind of legal or administrative resolution beyond that.

**Ex. 7** (Sahu Dep.) 130:20-131:13.

The ExxonMobil Defendants have attempted through discovery to curb

Plaintiffs' scattershot approach to the case.   The ExxonMobil Defendants have

endeavored to have the Plaintiffs focus their case on specific events and Title V

deviations for which they can demonstrate an absence of regulatory oversight,

review, and enforcement.   Plaintiffs have not done so.   The ExxonMobil

Defendants served Plaintiffs with requests for admissions, and Plaintiffs have

admitted to facts that lay part of the foundation for this motion.  Plaintiffs in fact

readily admit that many of the events and incidents on which they seek CAA

remedies have already been the subject of TCEQ investigations, decisions, and

enforcement orders with penalties and corrective actions.  *See* **Ex. 8** (Plaintiffs'

responses to requests for admission).   These responses to the ExxonMobil

Defendants' requests for admission are just one further example of this first issue

that underlies this motion:  Although Plaintiffs may recognize that there has been

regulatory action and oversight exercised with respect to events and incidents for

which they also seek "citizen suit" enforcement, they disregard – and, more directly, second-guess – that regulatory action and oversight.

## GROUNDS FOR SUMMARY JUDGMENT AND AUTHORITIES

**GROUND ONE: As a matter of law, Plaintiffs cannot use the citizen suit provision of the CAA to second-guess the results of the application of the CAA by TCEQ and the EPA to the operations of the Baytown Complex.**

*A.     Language and purpose of the citizen suit provision of the CAA*

Plaintiffs invoke the "citizen suit" provision of the CAA:

> [A]ny person may commence a civil action on his own behalf--
> (1) against any person . . . who is alleged to have violated (if there is evidence that the alleged violation has been repeated) or to be in violation of (A) an emission standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation.

42 U.S.C. § 7604(a)(1).

"Citizen suit" provisions are included not just in the CAA but also in several other federal environmental statutes. Under each of these statutes, including the CAA, the primary responsibility for enforcing these statutes remains not with citizens but instead with the agency charged by law with enforcement. Plaintiffs, perhaps inadvertently, refer in their complaint to the existence of "primary regulatory mechanisms" involving the EPA and TCEQ. Complaint ¶ 20. Underneath these "primary regulatory mechanisms," citizen suits play a "limited and interstitial role" in the enforcement regime. *Citizens Legal Envt'l Action*

37

*Network, Inc. v. Premium Standard Farms, Inc.*, 97-6073-CV-SJ-6, 2000 WL 220464 (W.D. Mo. Feb. 23, 2000).

As the Supreme Court has stated, "the citizen suit is meant to supplement rather than to supplant government action." *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found.*, 484 U.S. 49, 60 (1987). The Fifth Circuit has mandated that citizen suits "should not be intrusive." *Louisiana Envt'l Action Network v. City of Baton Rouge*, 677 F.3d 737, 740 (5th Cir. 2012) (internal quotation marks omitted); *E.P.A. v. City of Green Forest*, 921 F.2d 1394, 1402 (8th Cir. 1990) (the Clean Water Act's citizen-suit provision "was not intended to enable citizens to commandeer the federal enforcement machinery").

Intrusive citizen suits that fail to defer to agency judgments can undermine agencies' enforcement strategies. *See Karr v. Hefner*, 475 F.3d 1197–98 (10th Cir. 2007). In one of its decisions, the Supreme Court provided an example:

> Suppose that the Administrator identified a violator of the Act and issued a compliance order under § 309(a). Suppose further that the Administrator agreed not to assess or otherwise seek civil penalties on the condition that the violator take some extreme corrective action, such as to install particularly effective but expensive machinery, that it otherwise would not be obliged to take. If citizens could file suit, months or years later, in order to seek the civil penalties that the Administrator chose to forgo, then the Administrator's discretion to enforce the Act in the public interest would be curtailed considerably. The same might be said of the discretion of state enforcement authorities. Respondents' interpretation of the scope of the citizen suit would change the nature of the citizens' role from interstitial to potentially intrusive. We cannot agree that Congress intended such a result.

*Gwaltney of Smithfield,* 484 U.S. at 60–61; *see also Supporters to Oppose Pollution, Inc. v. Heritage Group*, 973 F.2d 1320, 1324 (7th Cir. 1992) ("An Administrator unable to make concessions is unable to obtain them."). The Fifth Circuit has ruled similarly in a case involving a citizen suit brought under the Clean Water Act ("CWA"), holding that if the Court adopted the plaintiffs' suggestions that they could bring claims over and above enforcement by a regulatory agency:

> [W]e would effectively cede primary enforcement authority under the CWA to citizens acting in the role of private attorneys general. Such ceding would discourage defendants in a citizen [suit] from entering a consent decree with federal or state enforcement agencies, because defendants would remain exposed to duplicative penalties.

*Envt'l Conservation Org. v. City of Dallas*, 529 F.3d 519, 528 (5th Cir 2008) (citing *Gwaltney of Smithfield*, 484 U.S. at 60-61) (hereinafter "*ECO*").

B.    *The nature of regulations*

Environmental regulators face an increasingly difficult challenge, balancing environmental protection against economic development in light of continuously updated research. Congress often leaves complex decisions about the application of statutes in specific circumstances to agencies, "thinking that those with great expertise and charged with responsibility for administering the provision would be in a better position to do so." *Chevron, U.S.A., Inc. v. Natural Resources Defense*

*Council, Inc.*, 467 U.S. 837, 865 (1984).  At his deposition, Plaintiffs' own expert

witness Dr. Sahu provided an explanation of regulation in a democracy:

> [H]ow technical information gets fed into the regulatory process is a very complex issue . . . .  [I]t is naïve to presume that just because there is updated technical information that one can suppose the regulations will snap to and include that update. . . .
>
> Regulations whether they're new or updated do not work that way in a participatory democracy.  We don't have a dictatorship by fiat who can do that even if that could work.  So, in our process information gets updated.  And when regulations catch up or don't is a whole separate process.

**Ex. 7** (Sahu Dep.) at 73:13–25.

As Dr. Sahu himself describes, a participatory democracy requires balancing

concerns.  Regulations are changed not by fiat or by a position taken by a

particular group (such as the environmental advocacy groups in this case), but only

after a deliberative process involving public debate, discussion, and balance.  John

Sadlier, former Deputy Director for the Office of Compliance and Enforcement of

the TCEQ, explained that with respect to CAA implementation and enforcement in

Texas:

> A.   . . .  The environmental community would tell me the regulations were too soft.  The industry folks would tell me that the regulations were too hard.
>
> When we did hear from the general public, which was rare, they were often confused.
>
> These groups, the environmental groups and the industry groups, always lined up exactly as you thought they would.
>
> Q.   . . . What was TCEQ's perspective?

A.    We feel that our regulations are necessary and appropriate and we feel that our enforcement process, as I've said all day, is consistent and appropriate also.

**Ex. 1** (Sadlier Dep.) 254:20–255:12.

C.    *Plaintiffs' claims seek to "second-guess" enforcement by the agencies*

Under the uncontroverted facts of this case, the pervasive regulation and active enforcement by TCEQ and the EPA with respect to the Baytown Complex establishes that these self-reported events and Title V deviations do not fall within the scope of the citizen suit provision.  As Plaintiffs indicate in their pleadings, and as their corporate representative acknowledged at deposition, this suit is an attempt to second-guess the TCEQ's regulatory decisions.  *See* **Ex. 4** (Carman Dep.) 139:2–5 ("I know there's many enforcement orders by the agency that, you know, do list corrective measures that a plant is allegedly taking."); *see also id*. 133:8–9 ("[T]here's a need for more aggressive enforcement").

For example, for some reportable events, the TCEQ assesses penalties and takes other forms of enforcement actions.  For other reportable events, the TCEQ determines that no penalty or enforcement is warranted.  But what is undisputed is that the TCEQ investigates every such event.

Q.    And what happens when a STEERS report for one or more of these types of events gets put into the system?  What happens to it?

A.    Then agency staff, the investigative staff, will review those emissions reports.

41

Q.     Does every STEERS report get reviewed?

A.     It does.

I will skip ahead just a little bit.  The reason we do that is we have a statutory requirement to determine whether an emission event is deemed excessive, as defined by law.

In order to determine whether an emission event is "excessive," *we have to look at every single report and we do*.

. . .

Q.     And are decisions then made by TCEQ staff with respect to each and every one of those STEERS reports that get filed?

A.     Yes.  Decisions are made based on our review.

**Ex. 1** (Sadlier Dep.) 51:14–52:23 (emphasis added).

However, in bringing these claims to this Court, Plaintiffs disregard the

TCEQ's investigations and enforcement actions:

Q.     [I]t's the Plaintiffs' position . . . that even if the TCEQ has taken some form of administrative action that we've talked about today, that Plaintiffs are nonetheless seeking some sort of remedy for that event under the Clean Air Act, correct?

A.     Yes.

**Ex. 4** (Carman Dep.) 83:23–84:7.

Likewise, Plaintiffs seek to impose citizen suit remedies for recordable

events that are inconsistent with the judgments that the state air pollution agency

has made in enacting reportable quantity standards ("RQs") that help to determine

whether an emissions event is reportable or merely recordable.  Even with

recordable events, however, TCEQ requires reporting of these recordable events

42

and exercises enforcement discretion over them.  Plaintiffs merely assert that they would exercise that enforcement discretion differently.

Plaintiffs' disagreement with and second-guessing of decisions made by TCEQ and the EPA does not mean that those regulators are not doing their jobs, and specifically does not mean that a citizen suit is warranted.  *See Glazer v. Am. Ecology Envtl. Services Corp.*, 894 F. Supp. 1029, 1034 (E.D. Tex. 1995) ("a citizen suit is proper when the state and federal authorities have declined to utilize their enforcement authority"); *see also Clean Air Council v. Sunoco, Inc. (R&M)*, CIV.A. 02-1553 GMS, 2003 WL 1785879 (D. Del. Apr. 2, 2003) (noting that the Clean Air Act "ensure[s] that the role of citizens remains secondary" and stating: "Settling with a violator is within a government agency's discretion, even if citizens might have preferred more stringent terms than those determined by the government to be appropriate.").  The exercise of discretion is not an abdication of enforcement authority.  Rather, a public agency authority's exercise of discretion in enforcement necessarily requires that the authority charged with CAA enforcement *not* to abdicate its authority.

In this case, Plaintiffs' claims do not only fall outside the scope of the citizen suit provision, but enforcement actions by the TCEQ in fact have rendered moot the citizen suit claims based on the events at the Baytown Complex.  For example, TCEQ has entered an administrative order that relates directly to how TCEQ has

and will regulate past and future events and incidents at the Baytown Complex. **Ex. 1** (Sadlier Dep.) 99:18-100:13 & ex. 10.

If public agency regulators impose a remedy, Plaintiffs bear the burden "to show a realistic prospect that the . . . violations alleged in [the] citizen suit will continue notwithstanding the [agency action]." *ECO*, 529 F.3d at 529; *see also Black Warrior Riverkeeper, Inc. v. Cherokee Mining, LLC*, 637 F. Supp. 2d 983, 988 (N.D. Ala. 2009) ("An [administrative] order, if it provides meaningful relief of the sort being sought by the citizen, can and does preempt the citizen suit."); *Ohio Valley Environmental Coalition, Inc. v. Hobet Min., LLC*, 723 F. Supp. 2d 886, 909 (S.D.W. Va. 2010) ("The question the Court must therefore resolve is whether the state enforcement proceeding has caused the violations alleged in the citizen suit to cease without any likelihood of recurrence – has eliminated the basis for the citizen suit.") (internal quotation marks omitted).

A citizen suit under a federal environmental law such as the CAA may be appropriate where the citizen can show – unlike in this case – that an agency responsible for enforcing that law has *abdicated* its responsibilities. *See, e.g., Dodge v. Mirant Mid-Atlantic, LLC*, 732 F. Supp. 2d 578, 585 (D. Md. 2010) (asking whether the "state has engaged in a pattern of conduct in its prosecution of the defendant that could be considered dilatory, collusive or otherwise in bad faith.") (quoting *Envt'l Integrity Project v. Mirant Corp.*, No. 06-2249, 2007 WL

44

62619, at *1 (D. Md. Jan. 3, 2007)).   However, an agency's determination not to enforce the law in the manner advocated by the citizen does not allow the citizen to supplant the agency's exercise of enforcement discretion.   *See, e.g., Black Warrior Riverkeeper,* 637 F. Supp. 2d at 988-89 (holding that "[i]t is of little consequence that a court did not enter the instant consent order that punished [defendant's] violations and that put remedies in place") (citing *ECO,* 529 F.3d at 528); *see also Gwaltney of Smithfield,* 484 U.S. at 61 (holding that citizens cannot file suit "in order to seek the civil penalties that the [EPA] chose to forgo").

Here, the summary judgment record shows a rigorous, active enforcement with respect to the Baytown Complex by the regulators charged with implementation and enforcement of the Act in a very complex area subject to a special regulatory regime.   Enforcement by public agencies involves investigation of the ExxonMobil Defendants' self-reported events and Title V deviations and making appropriate enforcement decisions – to take enforcement action, or not to take enforcement action.   Plaintiffs simply disagree with the results.   *See also, e.g.,* **Ex. 4** (Carman Dep.) 152:15–17 ("I know there have been large reductions in nitrogen oxides.   There need to be additional reductions made."); *see also id.* at 152:24–153:2 ("[R]eduction should be – should have been quicker in the 1990s, so they've been delayed, affected public health, and they still need more reductions.").

45

A prime example of Plaintiffs' second-guessing occurs in the TCEQ's administration of a regulatory affirmative defense to reportable events. The TCEQ regulations provide that if an operator can prove the affirmative defense criteria (discussed in detail below, in Ground Seven of this motion) have been met for an event, then TCEQ will not impose penalties for that event. As a part of their claims, Plaintiffs' second-guess TCEQ's decisions on the applicability of the affirmative defense to events identified in Plaintiffs' complaint. At deposition, Plaintiffs' corporate representative was wholly unaware of whether TCEQ found that events listed in Plaintiffs' complaint were subject to the regulatory affirmative defense, and thus not subject to a penalty. *See* **Ex. 4** (Carman Dep.) 100:21-101:1. For his part, Plaintiffs' proffered "expert" on plant operations and maintenance, Keith Bowers, second-guesses TCEQ's affirmative defense decisions in no uncertain terms:

> Q.  Yes, sir.  My question is:  Do you believe it would be an egregious error -- is this an egregious error that would be particular to Dr. [Chris] Buehler [an expert designated by the ExxonMobil Defendants] or would any person who found an affirmative defense based on these facts commit an egregious error?

> A.  I believe in my professional opinion that to find that these events satisfied the 14 simultaneous requirements [of the affirmative defense] would be a travesty of justice and not in conformance of the law as published by TCEQ. I cannot regulate TCEQ or dictate what they do. I can say that it appears they have not followed their own published requirements and policies.

> Q.  Yes, sir.

579.00026./502252.v1

A.   And that's what I'm saying, if you allege or Dr. Buehler alleges, an affirmative defense was granted for this.  Okay.  I reviewed the facts and says shouldn't have been considered because it doesn't meet the 14 requirements under the statutes.

**Ex. 9** (Bowers Dep.) at 274:16- 275:8.

Congress did not create the citizen suit provision to be a platform for environmental advocacy groups such as Plaintiffs to second-guess enforcement decisions by public agency regulators charged with implementing the Act. Congress set up an enforcement system that does not permit Plaintiffs to do what they are unmistakably doing in this case:  disagreeing with, and second-guessing, the CAA enforcement that -- beyond any genuine issue of material fact – occurred during the time period relevant to the complaint, and that continues to occur with respect to the Baytown Complex.

Environmental advocacy groups and environmental regulators have different concerns.  The TCEQ does not have a mission to eliminate economic activity that results in emissions.   John Sadlier explained: "The programs developed and implemented by TCEQ were designed to . . . protect precious human and natural resources *consistent with sustainable economic development*."   **Ex. 1** (Sadlier Dep.) 80:17–20 & ex. 9 (emphasis added).  This means that "regulations should not be so severe as to have a negative effect on economic development." *Id.* 81:5–7.  In contrast, the Sierra Club wants to "control human population numbers and

seek a balance that serves all life forms," **Ex. 3** (Carman Dep.) 20:13–21:16 & ex. 1, and "to use all lawful means" as part of its mission to "protect the wild places of the earth," *see also id.* 18:14–21 & ex. 1.

The regulators' CAA enforcement regime, unlike that advocated by Plaintiffs, is grounded in a realistic assessment of environmental risks and expectations:

> These facilities – any facility large or small, so long as there are humans working at that facility, we are going to have occasional hiccups where they will fall outside the boundaries of compliance with whatever regulation they're subject to.
>
> The ExxonMobil, Total and Chevrons of the world, their facilities are so large and so complex that what we see from those facilities and what we expect to see are violations that are often attributable to mechanical failure.
>
> So yes, as certain as the sun will rise in the East, we expect to see emission events reported by facilities like ExxonMobil, Total and Chevron.
>
> . . .
>
> [I]t's a nice dream to think that someone can be compliant 100 percent of the time.
>
> But I can tell you the TCEQ enforcement staff, TCEQ permitting staff don't expect it. We hope for it. We work every day to ensure that's the case, but as I've mentioned previously, with the complex nature of these facilities and the fact that we have humans working at these facilities, you're not going to achieve 100 percent compliance no matter how much TCEQ would like that to be the case.

**Ex. 1** (Sadlier Dep.) 255:24–257:5. All human and mechanical error cannot be prevented, and as federal and state regulators recognize, so long as facilities permitted to operate under the CAA do operate, emissions events and Title V deviations will occur. *See id.*; *see also* **Ex. 10** (Olson Dep.) 13 & ex. 3 at 7-8.

579.00026./502252.v1

Plaintiffs' claims, in contrast, "advocate for" such things as "a standard of zero fugitive emissions," **Ex. 4** (Carman Dep.) 124:13–19, and are based on the facile and ungrounded conclusion that "[t]he large number of violations and enforcement orders indicates that [the TCEQ's enforcement is] not working." *Id.* 133:4–6. As a matter of common sense, Plaintiffs' proffered standard of perfect and constant compliance with the terms of NSR and operating permits and environmental rules created by the EPA and TCEQ is *not* the expectation of the CAA regulatory framework established under the Act. The very regulators who established the self-reporting system that Plaintiffs use as the basis for their claims do not expect such perfect and constant compliance with the permits and rules.

In addition to being based on a second-guessing of enforcement actions and decisions made by TCEQ and the EPA, Plaintiffs' claims are based on a second-guessing of the very regulations that govern CAA enforcement and application of those regulations to the Baytown Complex. For example, the ExxonMobil Defendants calculate their flare emission rates based on calculations that follow the guidelines set out in federal and state regulations and guidelines. *See* **Ex. 19** (May Dep.) 6:13-7:9 and ex. 1 at 5. These regulations and guidelines set out a factor for an operator's use in calculating the percentage of the organic and other compounds in a waste gas stream sent to a flare that will be destroyed by the flare. This percentage set out in regulation and guidance is 98 percent of the pollutants,

49

provided that the flare operates at specified levels of heat content and exit velocity from the flare. *See* 40 C.F.R. § 60.18.

Part of Plaintiffs' CAA claims relate to the use of flares at the Baytown Complex. In making these flare claims, both Plaintiffs' representative Dr. Carman and their retained expert witness Dr. Sahu disagree with agency regulations and guidelines that establish the 98 percent destruction efficiency. *See* **Ex. 4** (Carman Dep.) 53:85–54:15; *see also* **Ex. 7** (Sahu Dep.) 200:24-201:20. Plaintiffs assert that the regulations governing estimation of emissions should be different than those currently in place:

> Q.    So you're in effect advocating for a higher standard, correct?
>
> A.    A more accurate standard.

**Ex. 4** (Carman Dep.) 58:4–6. For his part, Dr. Sahu states:

> Q:    So, sitting here today, Dr. Sahu, you believe that our current Federal and State regulations do not reflect the best and most current scientific knowledge regarding the operation of flares and resulting flare emissions, correct?
>
> A:    That would be correct.
>
> Q:    Okay. And there are certain things that, you know, in your view, you would want to change about those regulations and guidelines, correct?
>
> A:    Well, simply fold them into our current understanding of flares. And one caveat I'm going to mention is you kind of smushed Federal and State regulations. I will say this TCEQ regulations in the manner we talked – you know, they do try to take it a step beyond requiring some verification before you use those factors that are in the Federal

50

regulations. So, here, not only is the analysis deficient because the underlying Federal regulations may not be current. I think they're deficient simply because they don't even conform to the current TCEQ regulations that are required. So, it's on both counts.

**Ex. 7** (Sahu Dep.) 200:24-201:20.

Plaintiffs' disagreement with this regulation on flaring is only one of the many situations in which their own views on the Act's implementation differ from regulations promulgated by both the EPA and TCEQ. *See, e.g.,* **Ex. 4** (Carman Dep.) 155:20–23 (testifying that TCEQ's effects screening level for hydrogen sulfide is not adequately protective); *see also id.* 158:15–21 (testifying that TCEQ's effects screening level standards for benzene "should be a lower limit").

As a matter of law, based on the summary judgment record, Plaintiffs' lawsuit is inconsistent with both the underlying regulations that govern CAA enforcement and implementation and the enforcement strategies implemented by both TCEQ and the EPA. If recognizing Plaintiffs' claims involves applying regulations differently than how they are applied every day in the actual regulatory environment, then by definition Plaintiffs' case is an intrusive, not an interstitial, lawsuit. The TCEQ seeks consistency and predictability in its enforcement of the regulations, and such consistency and predictability is critical. *See* **Ex. 1** (Sadlier Dep.) 83:19–23 ("From the enforcement perspective, the regulations should be clear, understandable, written in a manner that can be consistently applied, consistently interpreted not only by the agency staff, but by the regulated

51

community that's subject to those regulations."). Consistency of enforcement

provides benefits to all parties in the enforcement process, particularly the TCEQ:

> Q.     Is there value to the agency in having that type of a consistent process in enforcement?
>
> A.     Absolutely. It helps us in many ways, but it certainly helps in conversations like the one we are having today.
>       Any notion that the agency applies its enforcement authority in an inconsistent manner is easily rebutted with the documents . . . . The EIC tells the investigator how to operate, what to do with the violations observed.
>       The commission's penalty policy is really a how-to in terms of how the enforcement process will go forward in terms of what penalty would be appropriate for whatever violation was observed by the investigator.

*Id.* at 85:14–86:4; *see also id.* at 87:6–8 ("It really has gotten easier for us to

operate as these, you know, processes and practices were developed over the

years.").

As recognized in *Gwaltney of Smithfield*, the ability of public agencies to

exercise discretion and compromise in their enforcement of environmental law –

and the ability of regulated entities to rely on those compromises – pays public

benefits. *See Gwaltney of Smithfield*, 484 U.S. at 60–61. As an example of this

principle, in its agreed order with the ExxonMobil Defendants in 2012, the TCEQ

received more than it could have compelled:

> The whole order, from my perspective, is good for the environment and good for the general public.
>       The order -- what Exxon has agreed to do is to spend $20 million, I believe -- at least at the time I negotiated we were at $20

million -- on things that are not required under the current law or current regulations.

To go above and beyond what I could, or the executive director of the commission, could require ExxonMobil to do.

These are dollars that were not budgeted and otherwise would not be spent on these projects that will improve possibly operation at the plant, improve training of plant personnel. And the result of that will be less emission events down the road, much better environment for not only plant personnel but those people that live outside the gate that are affected or could be affected by any emissions from the plan.

**Ex. 1** (Sadlier Dep.) 107:21–108:14; *see also id.* 99:18–111:5 (discussing the 2012 agreed order between TCEQ and the ExxonMobil Defendants).

As the Supreme Court indicated in *Gwaltney of Smithfield*, permitting Plaintiffs to proceed with this citizen suit would curtail "the discretion of state enforcement authorities considerably," *Gwaltney of Smithfield*, 484 U.S. at 60–61, depriving the TCEQ of a valuable tool that, as John Sadlier described, has been used effectively in the public interest. If companies like the ExxonMobil Defendants are subjected to inconsistent regulatory and enforcement standards as between the government regulators to whom they self-report and different standards sought to be imposed by private attorneys general such as Plaintiffs aspire to be, the regulatory system will not work effectively. *See Supporters to Oppose Pollution, Inc. v. Heritage Group*, 973 F.2d 1320, 1324 (7th Cir. 1992). If Plaintiffs had their way, they would use citizen suit claims to undermine and countermand agreements that the ExxonMobil Defendants reached with their public agency regulators. The courts have recognized that such use of citizen suit

579.00026./502252.v1

claims would only discourage regulated entities from reaching those agreements in the first place.   As the Ninth Circuit recognized in a similar situation, "The penalties are not [Plaintiffs'] hammer to wield.   The penalties are the [state regulator's] hammer." *Pakootas v. Teck Cominco Metals, Ltd.*, 646 F.3d 1214, 1221 (9th Cir. 2011).

Plaintiffs disagree with the enforcement decisions TCEQ and the EPA made with respect to the events and Title V deviations identified in Plaintiffs' complaint. Despite Plaintiffs' protestations, primary authority for enforcing and applying the Act to those events and Title V deviations rests with that state and that federal agency.   Accordingly, there is no proper basis for Plaintiffs to seek to impose citizen suit remedies for the self-reported events and incidents relating to the Baytown Complex that have indisputably been the subject of oversight and enforcement by the appropriate primary regulatory agencies.

This fundamental point is dispositive of all of Plaintiffs' claims.   In addition to this over-arching bar to Plaintiffs' claims, other legal principles bar various categories of Plaintiffs' claims.   These legal bars to various categories of Plaintiffs' claims are set out in Grounds Two through Eight below.

579.00026./502252.v1

**GROUND TWO: As a matter of no-evidence summary judgment, Plaintiffs have not adduced any evidence that any of the claimed violations have been "repeated," other than proffered "expert" testimony on a limited number of claimed violations.**

As indicated above, Plaintiffs have listed reportable events, recordable events, and Title V deviations in the schedules attached to their complaint. Under the Act, a citizen suit is not appropriate for every claimed violation of the Act. Instead, by the plain language of the statute, a citizen suit may be brought only against a person:

> who is alleged to have violated (if there is *evidence* that the alleged violation has been *repeated*) or to be in violation of (A) an emission standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation.

42 U.S.C. § 7604(a)(1) (emphasis added).

First, Plaintiffs do not claim any violation of an order issued by the EPA or TCEQ, as is referred to in subpart (B) in the block quote above. As indicated above, Plaintiffs in fact disregard all such orders, as part of their claims.

Second, Plaintiffs have not presented, and will not present, any evidence that the ExxonMobil Defendants are currently in violation of an emission standard or limitation, as is referred to in subpart (A) in the block quote above. Instead, Plaintiffs' claims are based on alleged historical violations of the Act at the Baytown Complex.

As a result, Plaintiffs' sole recourse under the citizen suit provision of the Act is for claims of historical reportable events, recordable events, or other Title V deviations that they can show to have been "repeated." Accordingly, Plaintiffs use the word "repeatedly" throughout the counts of their complaint. *See* Complaint ¶¶ 27, 29, 33, 36, 39, 41.

Plaintiffs have the burden of adducing evidence that alleged historical violations have been repeated. *See, e.g., Satterfield v. J.M. Huber Corp.*, 888 F. Supp. 1561, 1564-65 (N.D. Ga. 1994). Single completed violations are not ongoing or repeated. *See, e.g., City of Yakima v. Surface Transp. Bd.*, 46 F. Supp.2d 1092, 1099 (E.D. Wash. 1999). Instead, a citizen suit plaintiff must adduce proof that claimed violations resulted from "the same inadequately corrected source of trouble." *Anderson v. Farmland Indus.*, 70 F. Supp. 2d 1218, 1229 (D. Kan. 1999) (citing *National Resources Defense Council, Inc. v. Texaco Refining & Marketing, Inc.*, 2 F.3d 493, 499 (3d Cir. 1993)). Different equipment and operational failures corrected by distinct engineering solutions are not recurring violations. *See Chesapeake Bay Found. v. Gwaltney*, 890 F.2d 690, 698 (4th Cir. 1989).

As indicated above, Plaintiffs' claims do not delve into the details of the precise equipment or process involved in a particular event or Title V deviation, or the details of the engineering solutions applied to those events and deviations.

However, by their dogged insistence on raising in this case over 1400 self-reported events and entries in Title V deviation reports, Plaintiffs placed on themselves the burden of showing, among other things, that each of those claimed violations is "repeated" to the level of detail required by the statute and applicable case law. Failure by a "citizen suit" plaintiff to meet this burden of showing that claimed historical violations are "repeated" bars that claim, as a matter of law. *See Satterfield*, 888 F. Supp. at 1564-65.

In an effort to meet this burden, Plaintiffs have proffered an "expert" (Mr. Keith Bowers) to testify in this case on, among other things, the claimed repetitive nature of the root causes of certain events at the Baytown Complex. Plaintiffs' counsel put together charts of such events that they gave to Mr. Bowers and another proffered expert, Dr. Sahu, to review. *See* **Ex. 9** (Bowers Dep.) 124:20-125:3 & ex. 1, attachments B-C; *see also* **Ex. 7** (Sahu Dep.) 125:5-127:14 & ex. 9. These charts contain only a subset of the events that Plaintiffs list as reportable events in the schedules attached to their complaint. The charts do not include any items that Plaintiffs list in the schedules to their complaint as recordable events or other Title V deviations. Based on these charts prepared by Plaintiffs' counsel, and his claimed review of the documentation underlying the events listed in the charts,

579.00026./502252.v1

Mr. Bowers is apparently prepared to testify that the events listed in these charts resulted from "repeated" root causes.[4]

The events specifically identified in the charts attached to Mr. Bowers' initial report in the case, and that Mr. Bowers referenced or discussed in one or both of his reports in the case, are listed in **Exhibit 11** to this motion. The expert designation cutoff imposed by the Court in its Rule 16 Scheduling Order has long passed, and so no further supplementation of Plaintiffs' expert reports can or would be warranted.

Whatever the ultimate evidentiary value of Mr. Bowers' opinions may or may not have to the Court, for purposes of summary judgment Plaintiffs have adduced <u>no</u> evidence – other than Mr. Bowers' opinings on a limited number of events – that any of the recordable events, reportable events, or other entries in Title V deviation reports are "repeated" within the meaning of the citizen suit provision of the Act. Accordingly, the Court may properly grant summary judgment as to all events and Title V deviations listed in the schedules attached to the complaint, other than those listed in **Exhibit 11** to this motion, because of

---

[4] The ExxonMobil Defendants have filed a *Daubert* motion to exclude Mr. Bowers' testimony. This point on their motion for summary judgment contains the assumption – which the Court may determine to be incorrect – that Mr. Bowers is competent to testify on this or any other aspect of the case. Should the Court grant the *Daubert* motion, the ExxonMobil Defendants move for summary judgment on grounds that Plaintiffs have failed to adduce evidence that any of the events or Title V deviations are "repeated" within the meaning of the citizen suit provision.

Plaintiffs' failure to meet the evidentiary burden imposed on them by the Act's citizen suit provision. *See* FED. R. CIV. P. 56(e) (non-moving party bears burden to "set forth facts showing that there is a genuine issue for trial"); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (finding "no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials negating the opponent's claim"); *Armstrong v. Am. Home Shield Corp.*, 333 F.3d 566, 568 (5th Cir. 2003) (holding that moving party may meet its burden by simply "pointing to an absence of evidence to support the nonmoving party's case").

**GROUND THREE:  As a matter of law and the summary judgment record, Plaintiffs cannot receive relief based on incidents that were determined not to constitute reportable events or recordable events and thus did not violate the CAA.**

In their zeal to inflate the number of alleged violations in the case, Plaintiffs have swept into the schedules attached to their complaint incidents that the ExxonMobil Defendants initially reported under the 24-hour post-event rule (for emissions events) or the 10-day prior notice rule (for scheduled MSS), but that were later determined – by the ExxonMobil Defendants and TCEQ – not to involve exceedances of emissions limits in operating or NSR permits or rules.  A list of these events, as indicated by their "STEERS" numbers or "TCEQ tracking numbers," is attached at **Exhibit 12**.

579.00026./502252.v1

Based on the uncontroverted summary judgment record, none of the events listed in **Exhibit 12** involved any exceedance of any emissions limit in an operating or NSR permit or rule. *See* **Ex. 2** (Kovacs Aff.) ¶ 7.   The events listed in **Exhibit 12** fall into the following categories:

- Incidents that the ExxonMobil Defendants initially reported as reportable events, but were later determined not to exceed any emissions limits in permits or rules;

- A single incident for which the ExxonMobil Defendants submitted two different reports, such that one of the reports was duplicative (with the duplicative report included in **Exhibit 12**);

- Incidents that the ExxonMobil Defendants reported as reportable events, but that were later determined not to meet the definition of "emissions event" or "scheduled MSS."

**Ex. 2** (Kovacs Aff.) at ¶ 7.

In short, none of the incidents listed in **Exhibit 12** involved an exceedance of "an emissions standard or limitation" as defined by the Act.   42 U.S.C. § 7604(a), (f).   The ExxonMobil Defendants' decision to self-report these incidents was ultimately revealed to be a conservative but unnecessary approach. Accordingly, none of the incidents can even be characterized as a potential CAA violation, much less a violation of "an emission standard or limitation."   As stated above, citizen suits are only permissible if the plaintiff can establish a violation of either (1) an emission standard or limitation or (2) an order issued by the EPA or the State with respect to such a standard or limitation.   *See* 42 U.S.C. § 7604(a)(1).

60

Plaintiffs bear the burden in this case of demonstrating that a particular event involved an exceedance of an emission standard or limitation.  Failure to meet this burden on summary judgment can and should result in entry of a no-evidence summary judgment. FED. R. CIV. P. 56(e); *see also Celotex Corp.*, 477 U.S. at 323; *Armstrong*, 333 F.3d at 568.

The inclusion of these incidents in the Complaint demonstrates the fundamental infirmity in Plaintiffs' approach to the case.  Plaintiffs have sought to include in their Complaint – and to present to the Court for trial – every incident that ExxonMobil ever reported to the TCEQ or the EPA over the approximate five-year span of this case.  Plaintiffs did not undertake any effort to verify whether each of such incidents actually involved an exceedance of an emissions standard or limitation.  Even when they were put on notice of this problem with their claims, Plaintiffs took no action to amend their schedules or otherwise limit their claims. Instead, the Court should do it for them, as a matter of law, by granting summary judgment as to the incidents listed in **Exhibit 12** for which no evidence of an exceedance of an emissions standard or limitation exists.

**GROUND FOUR:  As a matter of law and the summary judgment record, the "diligent prosecution" provision of the CAA and principles of *res judicata* preclude Plaintiffs from receiving relief based on events which are the subject of an active consent decree between the ExxonMobil Defendants and the EPA.**

This Court should also grant summary judgment on Plaintiff's claims concerning events for which ExxonMobil has already taken corrective action

61

and/or paid stipulated penalties pursuant to the terms of the Consent Decree. Under both the plain language of the CAA and principles of *res judicata*, Plaintiffs cannot seek to relitigate claims that have been resolved pursuant to the terms of that federal court order.

## A.   Diligent Prosecution Bar

Under the Act, no private citizen can bring claims regarding alleged violations for which the EPA or the state "has commenced" and "is diligently prosecuting" a court action.   42 U.S.C. § 7604(b)(1)(B).   This is exactly what Plaintiffs are attempting to do with regard to a number of events at the Baytown Complex that have already been "diligently prosecuted" by the EPA.

When this suit was filed on December 13, 2010, the EPA had already commenced and was diligently prosecuting a civil action in federal court that, in part, concerned releases at the ExxonMobil Baytown Refinery.   The EPA's prosecution resulted in the federal court's entry of the Consent Decree discussed above.   *See* **Ex. 6** (Consent Decree).   As part of the EPA's prosecution of those claims, the Consent Decree has been amended three times: on June 1, 2006; November 13, 2007; and December 17, 2008.   *See* **Exs. 6A, 6B, 6C** (three Consent Decree amendments); *see also* **Ex. 20** (Rice Aff.) at ¶¶ 7-9.

The Consent Decree, a 277-page document, contains detailed and extensive relief designed to reduce emissions at a number of ExxonMobil facilities, including

the Baytown Refinery.   The Consent Decree requires, among other things, (i) a

$7.7 million civil penalty against ExxonMobil and its subsidiary ExxonMobil Oil

Corporation; (ii) that ExxonMobil and its subsidiary undertake specified capital

improvements; and (iii) that ExxonMobil and its subsidiary amend applicable NSR

permits to reduce emissions for many of the same pollutants of which Plaintiffs

complain.  *See* **Ex. 6** (Consent Decree) pp. 1-2, 17-81, 120, 139.

Not surprisingly, given that the Consent Decree was negotiated by the EPA

to reduce emissions, the decree addresses many of the same issues raised by

Plaintiffs in this action.   For example, the Consent Decree addresses alleged

violations of requirements under the New Source Review ("NSR") and Prevention

of Significant Deterioration ("PSD") programs.  *See* **Ex. 6** (Consent Decree) pp. 1-

2.   Plaintiffs allege in this action that ExxonMobil violated its NSR and PSD

permits that were issued under those NSR and PSD program requirements.  *See*

Complaint ¶¶ 22, 26-30.  Further, Plaintiffs assert claims concerning emissions of

sulfur dioxide ("$SO_2$"), nitrogen oxide ("$NO_x$"), and carbon monoxide ("CO"), and

request that this Court take actions that Plaintiffs claim would decrease emissions

of those pollutants.  *See* Complaint ¶¶ 46, 49, 53, 58, and 64-74.  The Consent

Decree specifically requires ExxonMobil to take specified actions to reduce

emissions of these same pollutants.   *See* **Ex. 6** (Consent Decree) ¶¶ 23-24, 60

($SO_2$); ¶¶ 45-47 ($NO_x$); ¶¶ 39-40 (CO).

Pursuant to the requirements imposed by the Consent Decree, the EPA has already diligently prosecuted CAA remedies with respect to a number of the events raised by Plaintiffs in their Complaint.  Events for which Plaintiffs seek citizen suit relief that the EPA has already diligently prosecuted pursuant to the terms of the Consent Decree are set forth in **Exhibit 13** to this motion.  *See* **Ex. 2** (Kovacs Aff.) ¶ 11.  For each of these events, ExxonMobil was subjected to the Consent Decree's requirements to pay a stipulated penalty and/or to comply with detailed corrective action requirements.    These requirements mandated that ExxonMobil:  (i) investigate and analyze each event to determine its root cause; (ii) determine interim and/or long term corrective actions to decrease the likelihood that the event's root cause will recur; (iii) implement those corrective actions; and (iv) submit reports to the EPA at least semi-annually to describe the investigation and analysis that ExxonMobil conducted, the corrective actions implemented, and other information specified in the Consent Decree.  *See* **Ex. 6** (Consent Decree) ¶¶ 78-94, 162, 47, 141-146, 161, 82, and 165-213.

Plaintiffs acknowledge the Consent Decree; they simply assert that the EPA should have sought different relief.  *See* Complaint ¶ 88; *see also* **Ex. 4** (Carman Dep.) 86:22-87:10.  However, the CAA does not allow citizens to relitigate claims simply because they do not like the manner in which the primary agency regulator pled them, or because they are unhappy with how those claims prosecuted by the

primary agency regulator were resolved.  It was well within the EPA's sound discretion to negotiate the Consent Decree in a manner to address events such as those listed in **Exhibit 13**, even if Plaintiffs might have preferred that it impose different conditions on ExxonMobil.  *See, e.g., Piney Run Pres. Ass'n v. County Comm'rs of Carroll County*, 523 F.3d 453, 460 (4th Cir. 2008) (affirming dismissal for lack of jurisdiction because consent decree from a prior state enforcement action was a diligent prosecution barring citizen suit); *see also Envtl. Integrity Project v. Mirant Corp.*, No. JFM-06-2279, 2007 WL 62619, at *1 (D. Md. Jan. 3, 2007) (dismissing claims where state diligently prosecuted a civil action to require compliance with standards sought to be enforced by citizen plaintiffs); *Citizens for Clean Power v. Indian River Power, LLC*, 636 F. Supp. 2d 351, 357 (D. Del. 2009); *see Connecticut Fund for Env't v. Contract Plating Co.*, 631 F. Supp. 1291, 1294 (D. Conn. 1986) ("The mere fact that the settlement reached in the state action was less burdensome . . . than the remedy sought in the [citizen suit] is not sufficient in itself to overcome the presumption that the state action was diligently prosecuted.").

In short, the EPA has already diligently prosecuted ExxonMobil for the events identified in **Exhibit 13**.  Accordingly, this Court lacks subject matter jurisdiction over those events, and Plaintiffs' allegations concerning those claims should be dismissed pursuant to 42 U.S.C. § 7604(b)(1)(B).

579.00026./502252.v1

**B.**     *Res Judicata* **Bar**

The Court may also properly grant summary judgment on Plaintiffs' claims concerning the events in **Exhibit 13** pursuant to the doctrine of *res judicata*. Federal law clearly permits the application of *res judicata* in CAA citizen suits, when the asserted claims have previously been adjudicated in a court action.  *See St. Bernard Citizens for Environmental Quality, Inc. v. Chalmette Refining*, LLC, 500 F. Supp. 2d 592, 602-03 (E.D. La. 2007).  For the reasons set forth below, and because Plaintiffs seek remedies under the Act for events that have already been resolved pursuant to the terms of the Consent Decree, *res judicata* is appropriate.

The elements of *res judicata* are as follows:

1. The parties are identical or in privity;

2. The judgment in the prior action was rendered by a court of competent jurisdiction;

3. The prior action was concluded by a final judgment on the merits; and

4. The same claim or cause of action was involved in both actions.

*See, e.g.*, *Petro-Hunt, LLC v. United States*, 365 F.3d 385, 395 (5th Cir. 2004).  In this action, as set forth below, each of these elements is met.

*1.     Identity of parties*

When the EPA brings suit to enforce the terms of the CAA, it does so on behalf of the citizens of the affected state or states.  *See Chalmette Refining*, 500 F.

579.00026./502252.v1

Supp. 2d at 603–04.  This is known as the *parens patriae* doctrine, which grants a state standing to sue on behalf of its citizens.  *See id*. at 603.  In a *parens patriae* suit, the state asserts a sovereign interest (such as the general health and well-being of its residents) and is deemed to represent all of its citizens in the action.  *See id.* at 604.  As the Court in *Chalmette Refining* noted: "When either a state or federal government asserts *parens patriae* authority, courts have held that 'it can bind the citizens of a state as privies for *res judicata* purposes.'"  *Id.; see also City of New York v. Baretta USA Corp.*, 315 F. Supp. 2d 256, 265 (E.D. N.Y. 2004) (citing several cases, including two Supreme Court decisions).  More specific to this case, courts have concluded that "once a state represents all of its citizens in a *parens patriae* suit, that Consent Decree or Final Judgment entered in such a suit is conclusive upon those citizens and is binding upon their rights."  *United States v. Olin Corp.*, 606 F. Supp. 1301, 1304 (N.D. Ala. 1985).  Thus, Plaintiffs in this action, who bring suit as the EPA's surrogate under the CAA, stand in privity with the EPA with regard to the Consent Decree.

Some courts have required that before *res judicata* could be applied in a citizen suit, "diligent prosecution" should be shown in the prior action.  *See generally Chalmette Refining*, 500 F. Supp. 2d at 604–06.  Although the ExxonMobil Defendants do not concede the need to show diligent prosecution to establish the elements of *res judicata,* the issue is moot in this case.  As set forth

67

above, as a matter of summary judgment evidence the 2005 Consent Decree was and is the result of a diligent prosecution by the EPA. The first prong of *res judicata* is therefore met.

2.    *Court of competent jurisdiction*

The Consent Decree was entered by the United States District Court for the Northern District of Illinois, a court of competent jurisdiction. Though not essential for *res judicata* purposes, it is worth noting that the federal court retains jurisdiction over the Consent Decree for the purpose of enforcing its provisions. *See* **Ex. 6** (Consent Decree) ¶ 235. Element two of *res judicata* is therefore satisfied.

3.    *The Consent Decree was a final judgment on the merits*

There also can be no dispute that the Consent Decree was a final judgment on the merits. Consent decrees, which are approved and entered by a court, are final judgments. *See Chalmette Refining,* 500 F. Supp. 2d at 608.

4.    *The same claim was involved*

Finally, as to those events for which ExxonMobil was required by the Consent Decree to undertake corrective actions and/or pay stipulated penalties, the same claim or cause of action was involved in the EPA lawsuit as is involved here. The Fifth Circuit uses a transactional test to determine whether two cases involve the same claim or cause of action. *See Grynberg v. BP P.L.C. d/b/a BP Corp.*

*North America et al.*, 2012 WL 1343624, *17 (S.D. Tex. March 27, 2012) (Hittner,

J.).   Under the transactional test, *res judicata* "…bars the litigation of claims that

either have been litigated or should have been raised in an earlier suit."   *Duffie v.*

*United States*, 600 F.3d 362-372 (5th Cir. 2010).   Thus, when a prior judgment

concerns a particular claim (such as an event of the type listed in **Exhibit 13**), that

judgment's preclusive effect extends both to asserted violations and to all claims

that could have been asserted in connection with that event.   *Res judicata* does not

depend on what causes of action (or violations) were actually pled.   As long as the

violations alleged in the subsequent matter relate to the events at issue in the prior

action, the fourth element of *res judicata* is satisfied.   *See Grynberg*, 2012 WL

134624 at *17-18.

   As a consequence, with regard to the events identified in **Exhibit 13**, the

summary judgment evidence demonstrates that Plaintiffs' claims are barred as a

matter of law.

**GROUND FIVE:  As a matter of law and the summary judgment record, Plaintiffs cannot receive relief based on events that are subject to the Governor's Hurricane Ike proclamation, a related TCEQ directive, and a statutory affirmative defense.**

   On September 13, 2008, Hurricane Ike made landfall near Galveston, Texas.

Ike, a Category 2 hurricane, had a devastating and widely anticipated impact on the

upper Texas coast, including Baytown.   In anticipation of Hurricane Ike's landfall,

the Texas Governor issued proclamations declaring "…that Hurricane Ike poses a

threat of imminent disaster along the Texas coast." **Ex. 1** (Sadlier Dep.) 60:4-65:21 & exs. 3 & 5 (Governor's proclamations dated September 8, 2008 and September 12, 2008). In those proclamations, as part of the state's efforts to minimize any impediment to hurricane preparations, Governor Perry suspended "…all rules and regulations that may inhibit or prevent prompt response to this threat…for the duration of the state of disaster." *Id.* at 61:1-61:16 & exs. 3 & 5. Following the September 8, 2008 proclamation, and in response to Hurricane Ike's imminent landfall, ExxonMobil implemented a planned process to shut down operations at the Baytown Complex as part of its response to the threat posed by that hurricane. *See* **Ex. 2** (Kovacs Aff.) ¶ 9.

After the storm made landfall, the TCEQ issued its own regulatory guidance, in part to assist in the resumption of refinery operations to minimize fuel disruptions caused by the hurricane. On September 15, 2008, two days after the storm made landfall, the TCEQ informed the regulated community that all TCEQ rules and regulations were suspended for "…all reasonable actions necessary and prudent to facilitate, maintain, or restore fuel production and/or distribution, within the State of Texas, directly related to HURRICANE IKE." **Ex. 1** (Sadlier Dep.) 61:24-62:25 & ex. 4. In its guidance, the TCEQ cited Governor Perry's proclamations and also noted that events related to Hurricane Ike were exempt from enforcement by statute:

> Texas law provides for a defense against an enforcement action where the regulated entity can establish that the violation was caused solely by an act of God, war, strike, riot, or other catastrophe.  Tex. Water Code § 7.251.

*Id.*

On October 7, 2008, the Texas Governor issued his final proclamation related to Hurricane Ike.  That proclamation noted that Ike made landfall on September 13 "…causing substantial destruction in South and East Texas."  **Ex. 1** (Sadlier Dep.) 63:8-21 & ex. 5.  The proclamation further noted that Hurricane Ike "…continues to create a state of disaster to the people in the State of Texas."  *Id.* Consequently, Governor Perry's October 7, 2008 proclamation extended his earlier proclamations, suspending "…all rules and regulations that may inhibit or prevent prompt response" to the hurricane through November 6, 2008.  *Id.*

On September 15, 2008, following the TCEQ's regulatory guidance and well within the timeframe covered by the Governor's proclamations, ExxonMobil began to re-start operations at the Baytown Complex. *See* **Ex. 2** (Kovacs Aff.) ¶ 9.

A number of the events Plaintiffs assert as violations in this case were experienced during the shutdown process for operations at the Complex as Ike approached, or during the process of re-starting operations following the hurricane's landfall.  A list of these events, including the relevant STEERS number or Title V deviation number, is set out in **Exhibit 14** to this motion.  *See* **Ex. 2** (Kovacs Aff.) ¶ 9.

71

The Court can and should grant summary judgment on Plaintiffs' claims in connection with these events for multiple reasons. First, the summary judgment record demonstrates that each of these events occurred between September 8 and November 6, 2008, and related either to shutting down the Baytown Complex as the hurricane approached or to resuming operations following Ike's landfall. *See* **Ex. 2** (Kovacs Aff.) ¶ 9. As such, these events were all covered by the Governor's proclamations and/or the TCEQ guidance discussed above. The ExxonMobil Defendants faced no enforcement action or penalties for any of these events from the TCEQ, as all applicable regulations had been suspended. Plaintiffs in this citizen suit cannot seek to punish ExxonMobil for actions it was authorized to take. Simply put, ExxonMobil cannot face liability under the CAA for events that both the TCEQ and the State of Texas explicitly allowed. Following the authorities set out above, Plaintiffs cannot use the citizen suit provision to attempt an end-run around decisions made by a state agency as the primary regulators and enforcers of the CAA.

Additionally, and as stated in TCEQ's September 15, 2008 regulatory guidance, Texas law exempts ExxonMobil and the regulated community from liability under the CAA for events caused by hurricanes and other acts of God. Section 7.251 of the Texas Water Code is titled "Act of God" and provides as follows:

> If a person can establish that an event that would otherwise be a violation of a statute within the commission's jurisdiction or a rule adopted or an order or a permit issued under such a statute was caused solely by an act of God, war, strike, riot, or other catastrophe, the event is not a violation of that statute, rule, order, or permit.

As an uncontroverted matter of summary judgment evidence, each of the events listed in **Exhibit 14** was caused by ExxonMobil's preparation for or response to Hurricane Ike.  As such, each is covered by this "act of God" statute.  This statute provides a legal bar to Plaintiffs' CAA claims with respect to the events listed in **Exhibit 14**.

In sum, the events enumerated in **Exhibit 14**, which were caused by Hurricane Ike and were exempt from liability by the Governor's Proclamations, the TCEQ's Regulatory Guidance, and TEX. WATER CODE § 7.251, cannot provide the basis for citizen suit liability.  Such suits are only permissible as to events for which the plaintiff can establish a violation of either (1) an emission standard or limitation or (2) an order issued by the EPA or the State with respect to such a standard or limitation.  42 U.S.C. § 7604(a)(1).  With respect to these events, there cannot be any such violation, as a matter of law, because the events occurred in connection with activities exempted from being a violation of an emissions standard or limitation.  For the reasons listed above, including the authorities that provide that citizen suit jurisdiction does not extend to second-guessing of primary enforcement agency decisions, the Court should grant summary judgment denying

Plaintiffs' efforts to impose citizen suit liability for events that regulators explicitly determined not to involve violations.

**GROUND SIX:   As a matter of law and the summary judgment record, Plaintiffs cannot receive relief based on events for which the TCEQ conducted state enforcement actions.**

As discussed above, the TCEQ maintains an active enforcement regime of environmental regulations.   Plaintiffs' complaint includes numerous events for which the TCEQ initiated enforcement actions, issued enforcement orders, assessed penalties, and required corrective actions.   These events are listed by STEERS number or Title V deviation number, in **Exhibit 15** to this motion.   *See* **Ex. 2** (Kovacs Aff.) ¶ 10.   For 31 of these 85 events, Plaintiffs concede that "TCEQ issued an agreed administrative order . . . and assessed an administrative penalty with respect to this event."   **Ex. 8** (Plaintiffs' responses to requests for admission) at responses 209–293.

The summary judgment evidence that each of the events listed in **Exhibit 15** has been subject to a TCEQ enforcement action cannot be controverted.   As indicated above, none of Plaintiffs' experts, or their corporate representative, even looked at the issue of how many of the self-reports had led to TCEQ enforcement actions.

Once again, this issue relates to Plaintiffs' efforts to second-guess primary agency regulator decisions on these self-reported events.   When TCEQ takes

enforcement action, it determines the appropriate CAA remedy.  Plaintiffs' cannot use the citizen suit provision to second-guess these agency determinations.

As indicated above in Ground One, Plaintiffs cannot use the citizen suit provision to second-guess TCEQ's enforcement decisions.  In addition, as also indicated above in Ground One, enforcement actions by the TCEQ render the citizen suit claims based on the same events moot.  To avoid the mootness bar, Plaintiffs bear the burden "to show a realistic prospect that the . . . violations alleged in [the] citizen suit will continue notwithstanding the [agency action]." *ECO*, 529 F.3d at 529; *see also Black Warrior Riverkeeper,* 637 F. Supp. 2d at 988; *Ohio Valley Environmental Coalition,* 723 F. Supp. 2d at 909.  Plaintiffs have not and cannot adduce evidence to overcome the presumption that their claims on these events are moot.

**GROUND SEVEN:  As a matter of law and the summary judgment record, Plaintiffs cannot seek penalties for events that the TCEQ determined to be subject to a regulatory affirmative defense.**

TCEQ air regulations provide an affirmative defense, which applies to "all claims in enforcement actions brought for these events, other than claims for administrative technical orders and actions for injunctive relief."  30 TEX. ADMIN. CODE 101.222(b).  To satisfy the affirmative defense against such enforcement actions, the owner or operator must prove, *inter alia*:

579 00026./502252.v1

(2) the unauthorized emissions were caused by a sudden, unavoidable breakdown of equipment or process, beyond the control of the owner or operator;

(3) the unauthorized emissions did not stem from any activity or event that could have been foreseen and avoided or planned for, and could not have been avoided by better operation and maintenance practices or technically feasible design consistent with good engineering practice;

(4) the air pollution control equipment or processes were maintained and operated in a manner consistent with good practice for minimizing emissions and reducing the number of emissions events;

(5) prompt action was taken to achieve compliance once the operator knew or should have known that applicable emission limitations were being exceeded, and any necessary repairs were made as expeditiously as practicable;

(6) the amount and duration of the unauthorized emissions and any bypass of pollution control equipment were minimized and all possible steps were taken to minimize the impact of the unauthorized emissions on ambient air quality; . . . .

30 TEX. ADMIN. CODE § 101.222(b).   A similar affirmative defense applies to emissions from unscheduled MSS that TCEQ determines not to be excessive, *see id.* 101.222(c), as well as to excess opacity events, *see id.* § 101.222(d), and opacity events resulting from unscheduled MSS, *see id.* § 101.222(e).[5]

When a regulated entity submits a STEERS report for an event, it can indicate that it believes that the affirmative defense conditions are met.  *See* **Ex. 2**

---

[5]An excess opacity event occurs when an opacity reading during an upset is equal to or exceeds 15 additional percentage points above an applicable opacity limit, averaged over a six-minute period. 30 TEX. ADMIN. CODE § 101.1.

579.00026./502252.v1

(Kovacs Aff.) ¶ 8; *see also* **Ex. 1** (Sadlier Dep.) 58:17-58:22.  TCEQ evaluates the affirmative defense claim.  *See* **Ex. 1** (Sadlier Dep.) 58:23-60:3.  Following this evaluation, the TCEQ may respond with an explicit agreement that the affirmative defense applies.  *See* **Ex. 2** (Kovacs Aff.) ¶ 8.  On other occasions, the TCEQ does not explicitly confirm application of the affirmative defense, but implicitly confirms its application by deciding not to assess a penalty.  *See id.*

Included among the items raised in Plaintiffs' Complaint are events on which the summary judgment record shows TCEQ explicitly or implicitly determined the affirmative defense applied.  These events are enumerated in **Exhibit 16** to this motion.  *See* **Ex. 2** (Kovacs Aff.) ¶ 8.  For 97 of the events listed in **Exhibit 16**, Plaintiffs acknowledge that "TCEQ exercised its enforcement discretion pursuant to 30 Tex. Admin. Code sec. 101.222 and did not assess an administrative penalty."  **Ex. 8** (Plaintiffs responses to requests for admission) at responses 20–132.

According to Plaintiffs' representative Neil Carman, when he was with the predecessor agency to TCEQ, he would make an independent assessment of whether the affirmative defense criteria were met.  *See* **Ex. 4** (Carman Dep.) 96:10-99:5.  Just as when Dr. Carman was with TCEQ's predecessor agency, TCEQ made that independent determination during the time period at issue in this case. *See* **Ex. 1** (Sadlier Dep.) 58:17-59:24.

579.00026./502252.v1

As indicated above, Plaintiffs' flat disagreement with the decisions by the appropriate state air pollution control agency to find that the affirmative defense applied such that enforcement through penalties was not warranted does not provide them with an avenue to pursue an inconsistent result through a citizen suit claim. As with Plaintiffs' claims generally, as discussed in the authorities cited in Ground One, Plaintiffs cannot properly raise such claims under the citizen suit provision.

**GROUND EIGHT:  As a matter of law and the summary judgment record, Plaintiffs lack standing to assert claims based on recordable events or other Title V deviations.**

In addition to reportable and non-reportable emissions events, Plaintiffs' complaint includes entries in Title V deviation reports that did not involve emissions at all. For example, on May 22, 2009, a "deviation" occurred at the Baytown Refinery that involved a failure to properly record the start and end times of operation during testing and maintenance. *See* **Ex. 2** (Kovacs Aff.) ¶ 12. This incident was included in a Title V deviation report, because recording the start and end time of operation during testing and maintenance is a requirement of a refinery permit. *See id.* Plaintiffs have not adduced evidence, pursuant to their burden of proof, that entries in the cited Title V deviation reports that were not recordable events even involved emissions. FED. R. CIV. P. 56(e); *see also Celotex Corp.*, 477 U.S. at 323; *Armstrong*, 333 F.3d at 568.

78

Plaintiffs' complaint also includes entries in Title V deviation reports that involved recordable emissions. Plaintiffs have not presented and cannot present credible evidence to raise a genuine issue of material fact that any of these recordable events involved emissions of substances and quantities to cause even a potential health impact. This is Plaintiffs' burden to bear. *Id.*

Contrary to showing a potential health impact, the summary judgment record indicates that none of the recordable events scheduled by Plaintiffs as part of their complaint could have resulted in adverse health or welfare effects or to a condition of air pollution. **Ex. 17** (Cabe Dep.) 10:23-11:23 & ex. 2 at 13, 18 (supplemental report); **Ex. 18** (Fraiser Dep.) 14:17-15:3 & ex. 3 at 9-16 (supplemental report).

Although the CAA's citizen suit provision conceivably encompasses claims for violations of a "permit term or condition," Plaintiffs must nonetheless demonstrate that they possess Article III standing to pursue any such claimed violations in a citizen suit. For any listed Title V deviation that does not involve an air emission, Plaintiffs have not and cannot do so. For any entry for an event that involved recordable but not reportable amounts of emissions, Plaintiffs have not and cannot do so.

The constitutional minimum of standing requires (1) concrete and particularized injury in fact, (2) a causal connection between the injury and the conduct complained of, and (3) likelihood that a favorable decision would redress

the injury. *See, e.g.*, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–561 (1992). "The relevant showing for purposes of Article III standing, however, is not injury to the environment but injury to the plaintiff." *Friends of the Earth, Inc. v. Laidlaw Envt'l Services (TOC), Inc.*, 528 U.S. 167, 181 (2000); *see also City of Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983) (finding no standing to challenge a practice due to "the speculative nature of [the] claim that [the plaintiff] will again experience injury as the result of that practice even if continued"). Civil penalties paid to the government satisfy the redressability requirement in limited circumstances—"To the extent that [civil penalties] encourage defendants to discontinue current violations and deter them from committing future ones, they afford redress to citizen plaintiffs who are injured or threatened with injury as a consequence of ongoing unlawful conduct." *Friends of the Earth*, 528 U.S. at 186.

The Supreme Court specifically addressed citizen suit standing in *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102–110 (1998). The plaintiffs in that case sued under the citizen suit provisions of the Emergency Planning and Community Right–To–Know Act of 1986 (EPCRA), over the defendant's failure to file hazardous chemical inventory and toxic chemical release forms. *See id.* at 86–87. After receiving notice, the defendant filed the overdue forms. *See id.* The Court noted that even deprivation of EPCRA-mandated information constituted sufficient injury for Article III, the injury was not redressable. *See id.* at 105.

"None of the specific items of relief sought ... would serve to reimburse respondent for losses caused by the late reporting,  or to eliminate any effects of that late reporting upon respondent." *Id.* at 105–06.   Penalties paid to the government do not make wholly past injuries redressable.   *See id.* at 106. Injunctive relief was unavailable because the plaintiffs did not allege "continuing violation or the imminence of a future violation." *Id.* at 108.

Like the plaintiffs in the *Steel Co.* case, Plaintiffs lack standing to pursue claims over these permit deviations that did not involve emissions.  For those Title V deviations that did not involve emissions, and for events that involved recordable quantities of emissions, as a matter of law Plaintiffs cannot demonstrate that they have suffered any injuries, nor would any such injuries be redressed by the relief sought in this suit.  The necessary Article III showing of "injury to the plaintiff" has not been met. *Friends of the Earth*, 528 U.S. at 181.  As a matter of law, Plaintiffs have not and cannot meet their burden of showing standing.

## SUMMARY JUDGMENT EVIDENCE

The summary judgment evidence discussed in this motion is submitted to the Court in the form of a contemporaneously filed appendix that contains the following exhibits:

**Exhibit 1**:  Condensed transcript of deposition testimony of John Sadlier, taken June 25, 2012, along with copies of exhibits cited in motion.

81

**Exhibit 2**:     Affidavit of Jeff Kovacs, dated August 3, 2012.

**Exhibit 3**:     ExxonMobil Baytown Fun Facts (Doc. # EOMCS 0016520).

**Exhibit 4**:     Condensed transcript of deposition testimony of Neil Carman, taken June 22, 2012, along with copies of exhibits cited in motion.

**Exhibit 5**:     Condensed transcript of deposition testimony of Jeff Civins, taken June 26, 2012, along with copies of exhibits cited in motion.

**Exhibit 6**:     2005 Consent Decree between the EPA and ExxonMobil and its subsidiary ExxonMobil Oil Corporation.

**Exhibit 6A**:  June 1, 2006 amendment to Consent Decree.

**Exhibit 6B**:  November 13, 2007 amendment to Consent Decree.

**Exhibit 6C**:  December 17, 2008 amendment to Consent Decree.

**Exhibit 7**:     Condensed transcript of deposition testimony of Ranjanit Sahu, taken May 30, 2012, along with copies of exhibits cited in motion.

**Exhibit 8**:     Plaintiffs' responses to the ExxonMobil Defendants' requests for admission, dated July 13, 2012.

**Exhibit 9**:     Condensed transcript of deposition testimony of Keith Bowers, taken June 11, 2012, along with copies of exhibits cited in motion.

**Exhibit 9A**: Expert Report of Keith Bowers, entitled *Opinion of Keith Bowers*, dated March 16, 2012.

**Exhibit 9B**: Curriculum Vitae of Keith Bowers.

579.00026./502252.v1

**Exhibit 9C:** Document entitled *Keith E. Bowers Work Time Record* (Doc. # ETSC072451-ETSC072452), which was produced by Plaintiffs on June 5, 2012.

**Exhibit 10**: Condensed transcript of deposition testimony of Karen Olson, taken June 18, 2012, along with copies of exhibits cited in motion.

**Exhibit 11**: List of events referenced in Mr. Bowers' initial report or its attachments.

**Exhibit 12**: List of incidents initially reported but later determined not to have unauthorized emissions.

**Exhibit 13**: List of events subject to Consent Decree requirements to pay stipulated penalties and/or to comply with corrective action requirements.

**Exhibit 14**: List of events subject to Governor's proclamations and related TCEQ directive regarding Hurricane Ike.

**Exhibit 15**: List of events for which TCEQ initiated and completed enforcement requiring penalties and corrective actions.

**Exhibit 16**: List of events for which TCEQ determined affirmative defense applied.

**Exhibit 17**: Condensed transcript of deposition of David Cabe, taken June 19, 2012, along with copies of exhibits cited in motion.

579.00026./502252.v1

**Exhibit 18**: Condensed transcript of deposition of Lucy Fraiser, taken June 20, 2012, along with copies of exhibits cited in motion.

**Exhibit 19**: Condensed transcript of deposition of Phillip May, taken June 15, 2012, along with copies of exhibits cited in motion.

**Exhibit 20:** Affidavit of Bryon Rice, dated August 10, 2012.

As the appendix contains materials designated by one or more parties as confidential discovery material under the terms of the Court's Confidentiality Order, the appendix is being filed under seal.

## CONCLUSION AND PRAYER

WHEREFORE, PREMISES CONSIDERED, the ExxonMobil Defendants respectfully request that following the Court's consideration of the matters presented by this motion, the Court grant summary judgment as requested above, and also request all other relief to which they may show themselves justly entitled.

579.00026./502252.v1

Respectfully submitted,

**BECK, REDDEN & SECREST, L.L.P.**

By:   */s/ Eric J.R. Nichols*
Eric J.R. Nichols
State Bar No. 14994900
S.D. Tex. No. 13066
515 Congress Avenue, Suite 1750
Austin, Texas  78701
Tel:  (512) 708-1000
Fax:  (512) 708-1002
Email:  enichols@brsfirm.com

**ATTORNEY-IN-CHARGE
FOR DEFENDANTS**

OF COUNSEL:

BECK, REDDEN & SECREST, L.L.P.
Fields Alexander
State Bar No. 00783528
S.D. Tex. I.D. No. 16427
falexander@brsfirm.com
S.D. Tex. I.D. No. 21606
jgolub@brsfirm.com
Brad Coffey
State Bar No. 24026484
S.D. Tex. I.D. No. 28187
bcoffey@brsfirm.com
Bryon A. Rice
State Bar No. 24065970
S.D. Tex. I.D.  No. 1118643
brice@brsfirm.com
1221 McKinney, Suite 4500
Houston, Texas 77010-2010
Tel:  (713) 951-3700
Fax:  (713) 951-3720

579.00026./502252.v1

## <u>CERTIFICATE OF SERVICE</u>

A true and correct copy of the foregoing pleading was served on all counsel of record through the Court's ECF system and in compliance with the Federal Rules of Civil Procedure on this 10th day of August, 2012.

*/s/ Brad Coffey*
Brad Coffey

579.00026./502252.v1