UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

_____

ENVIRONMENT TEXAS CITIZEN
LOBBY, INC., and SIERRA CLUB,

                    Plaintiffs,                    Civil Action No. 4:10-cv-4969

      v.

EXXONMOBIL CORPORATION,
et al.,

                    Defendants.

_____

**PLAINTIFFS' RESPONSE TO THE EXXONMOBIL DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

## SUMMARY

The Exxon Defendants' ("Exxon") eight grounds for summary judgment in

their Motion for Summary Judgment ("Exxon Mot.") are unavailing:

Ground I.  The major thrust of Exxon's motion is that citizens cannot

second-guess the government's oversight of air polluters under the Clean Air Act

("CAA" or "Act").  Exxon unsuccessfully made this same argument in its Motion

to Dismiss (Docket Entry [10]).  It should be rejected again.  Congress expressly

authorized affected citizens to sue violators of the Act.  42 U.S.C. § 7604.

Congress provided only a limited bar to citizen suits:  a case is precluded when the

government sues, in court, to enforce the same violations at issue in the citizen suit.

An administrative (non-judicial) enforcement action does not bar a CAA citizen suit. Texans United for a Safe Econ. Fund v. Crown Cent. Petroleum Corp. ("Crown Petroleum"), 207 F.3d 789, 791, 794-795 (5th Cir. 2000) (not cited by Exxon). Exxon's extensive discussion of the Texas Commission on Environmental Quality's ("TCEQ") supposed active oversight and enforcement of the Baytown Complex is irrelevant as to the issue of liability: TCEQ has never sued Exxon in court and thus its enforcement activity (or absence of it) does not preclude this suit.

Exxon also argues this case is moot. This is clearly not true, since Exxon continues to regularly violate its permits – as it did just three days ago at the refinery. Declaration of David A. Nicholas in Support of Plaintiffs' Response to the ExxonMobil Defendants' Motion for Summary Judgment ("Nicholas Resp. Dec") Exh. 1 (attaching records of violations occurring since July 4, 2012).[1]

Ground II. Plaintiffs are not, as Exxon suggests, suing for purely historical violations. The Complaint alleges, and Plaintiffs have filed evidence in connection with their own summary judgment motion to prove, that Exxon has violated its permit limits both before and after the Complaint was filed. Under settled law, this establishes that Exxon is "in violation" of the CAA. Carr v. Alta Verde Indus., Inc., 931 F.2d 1055, 1062 (5th Cir. 1991). Plaintiffs are not required to prove that violations had the same cause (though for many violations that is also the case).

---

[1] Due to the volume of exhibits, Plaintiffs are not attaching them to this brief.

Ground III.  Exxon's claim that 20 emission events did not involve unauthorized emissions is not supported by admissible evidence.

Ground IV.  42 U.S.C. § 7604(b)(1)(B) precludes a citizen suit concerning violations for which the United States Environmental Protection Agency ("EPA") or the state "has commenced and is diligently prosecuting a civil action in a court of the United States or a State to require compliance with the standard, limitation, or order" at issue in the citizen suit.  But a 2005 consent decree between EPA and Exxon ("Consent Decree") does not bar this case under that provision because:  the Consent Decree itself does not provide for preclusive effect; the EPA suit has long been over; the EPA action did not seek to enforce the same standards or limitations that Plaintiffs seek to enforce; and Exxon committed thousands of violations after the Consent Decree was entered, and is still regularly violating.  (This is briefed in Plaintiffs' motion for summary judgment.)  For these same reasons, the Consent Decree does not have a res judicata effect.  Both of these arguments were already rejected in Exxon's motion to dismiss.

Ground V.  While in some circumstances air pollution laws and regulations were relaxed during Hurricane Ike and its aftermath, Exxon does not provide admissible evidence that those circumstances apply here.  In addition, Exxon does not provide admissible evidence to prove an "act of God defense."  Hurricanes are

a known, predictable threat and petrochemical plants are supposed to have adequate hurricane preparedness plans to minimize emissions.

Ground VI.  Ground VI is a repeat of Ground I and is similarly meritless.

Ground VII.  A state affirmative defense to penalties for emission event violations is inapplicable for violations that occurred from June 30, 2006, until January 10, 2010, because the defense was not in the Texas state implementation plan.  (This is briefed in Plaintiffs' summary judgment motion.)  Moreover, Exxon does not submit admissible evidence to establish that the affirmative defense criteria were ever met.

Ground VIII.  Plaintiffs have standing to sue for violations involving pollutant releases that fall below "reportable quantity" thresholds; they implicate the same health and safety concerns (such as explosions) as larger emission events. Plaintiffs also have a direct stake in enforcing all emission standards and limitations in Exxon's air permits because they all, even if indirectly, concern the control of emissions.

Exxon repeatedly refers to the "summary judgment record."  But Exxon did not file a complete record with the Court, omitting the voluminous documentation of its violations – the "self-reports" submitted to TCEQ.  These indisputably prove thousands of violations of the CAA.  Plaintiffs submitted these documents, and other relevant documents, to the Court in connection with Plaintiffs' Motion for

Partial Summary Judgment on Liability ("PMSJ"); they incorporate that record by reference here.[2]  Exxon's failure to submit a full record allows it to take liberties in mischaracterizing the true nature of its poor CAA performance.

## STATEMENT OF FACTS

### I.     FACTS IN EXXON'S MOTION THAT ARE UNDISPUTED.

The parties agree on the following facts.  These facts preclude summary judgment for Exxon and support summary judgment for Plaintiffs.

Exxon owns and operates a refinery, chemical plant and olefins plant in Baytown, Texas.  Exxon Mot. 2; Answer (Docket Entry [37]) ¶ 11.  The Complex is subject to federal operating permits issued ("FOPs") under Title V of the federal Clean Air Act, 42 U.S.C. § 7661, et. seq.  Affidavit of Jeff Kovacs (Docket Entry [91-10]) ¶ 2 (Mr. Kovacs is an Exxon employee who submitted an affidavit in support of Exxon's summary judgment motion); Answer ¶ 23.

Emissions from "upsets" and "maintenance, startup, and shutdown activities" ("MSS") not authorized by a federal operating permit are "emission events" as defined by 30 Tex. Admin. Code § 101.1(28).  Exxon Mot. 13-14. Upsets can be caused by, among other things, mechanical failure, electrical failure, and human error.  Exxon Mot. 13.  During some upsets, gases must be released to

---

[2] These include STEERS Reports of reportable emission events, Recordable Emission Event Lists generated by Exxon, and Deviation Reports.  Plaintiffs will not burden the Court by resubmitting the record already before it on PMSJ.

prevent a "dangerous over-pressurization of equipment," and air emissions result.
Id.  TCEQ requires Exxon to self-report emission events involving "reportable
quantities" of pollutants to the agency via the State of Texas Environmental
Electronic Reporting System ("STEERS").  Exxon Mot. 15-16; 30 Tex. Admin.
Code § 101.201(a)(1).  Emission events involving releases of pollutants below
reportable quantities must be recorded by Exxon, though not reported on STEERS,
and are called "recordable events."  Exxon Mot. 2.  All violations of FOPs are
required to be reported on "deviation reports" that are submitted to TCEQ every
six months.  Exxon Mot. 2, 16-17; see Exxon Mot. 10 ("A 'Title V deviation' is
any indication of non-compliance with any term of a facility's CAA operating
permit, issued by TCEQ under title V of the Act").

Plaintiffs believe that the public agency regulators who enforce the CAA in
Texas are inadequate and ineffective with respect to enforcement of the Complex's
federal operating permits.  Exxon Mot. 29.

Exxon and Plaintiffs agree that "[u]nder the requirements of the CAA,
Plaintiffs provided their required pre-suit notice to the EPA and TCEQ."  Exxon
Mot. 29.

## II.   FACTS AND EVIDENCE IN EXXON'S MOTION THAT ARE DISPUTED, OMITTED, OR INADMISSIBLE.

In addition to several factual disputes that are discussed later, in the
argument section:

### A.    <u>Exxon Does Not Disclose The Full Range Of Its Violations.</u>

Exxon suggests that Plaintiffs seek liability for violations involving "more than 1400 events and Title V deviations…over an approximately five-year period." Exxon Mot. 30.  As discussed below, Plaintiffs' claims include violations occurring *after* the date the Complaint was filed, though Exxon does not account for that.  As set out in Plaintiffs' motion for summary judgment, Plaintiffs claim Exxon is liable for roughly 25,000 days of violations (emission events usually entail violations of more than one emission limit, which are counted separately for CAA violations purposes).  PMSJ 15-21.

Violations have continued apace at the Complex since the Complaint was filed on December 13, 2010.  Based on information available to Plaintiffs:

- From the filing of the Complaint (December 13, 2010) through July 4, 2012 (the most recent Steers Report filed with Plaintiffs' summary judgment motion), there have been 55 reportable emission events at the Complex;
- From the filing of the Complaint through the fall of 2011, there have been 366 recordable emission events at the Complex;
- Since the Complaint was filed, there have been 84 permit deviations reported in the Complex's Deviation Reports.[3]

In the five years before the Complaint in this case was filed, reportable emission events alone involved the release of over seven million pounds of pollutants.  During the seven and one-half months since the Complaint was filed,

---

[3] These figures are based on the records submitted with Plaintiffs' summary judgment motion. Plaintiffs have thus far not obtained updated Recordable Emission Event Lists or the most recent Deviation Reports; these figures will increase once these documents are obtained.

reportable emission events alone involved the release of over 440,000 lbs. of pollutants.[4]  And three days ago, Exxon reported a large refinery emission event that is apparently still ongoing.  Nicholas Resp. Dec. Exh. 1.

Moreover, Exxon makes no mention of the types of pollutants it emits during violations, which include, among other things, hazardous air pollutants, carcinogens, respiratory irritants, and ozone-forming chemicals.  PMSJ 21-25.

### B. Exxon Does Not Establish That Every Self-Reported Violation Was Reviewed Or Subject To An Enforcement Decision By TCEQ.

Exxon states, "there is no genuine issue of material fact that each of the reportable events, recordable events, and Title V deviations at the Baytown Complex for which Plaintiffs seek to impose liability, penalties and injunctive relief has been subject to an active regulatory oversight and enforcement process." Exxon Motion 5.  As a matter of law, administrative "oversight" and administrative "enforcement processes" do not preclude a citizen suit, e.g., Crown Petroleum, 207 F.3d at 794-795, and thus Exxon's extensive discussion of TCEQ's role thus is not "material" – it is simply irrelevant.

In any event, "subject to" is an ambiguous phrase.  If Exxon means that every self-reported violation *in theory* could have been the subject of TCEQ oversight or a TCEQ enforcement process, Plaintiffs agree.  If Exxon means that

---

[4] These totals were calculated by adding up the pollutant releases reported on the STEERS reports submitted with Plaintiffs' Motion for Partial Summary Judgment.

TCEQ in fact *did* exercise regulatory oversight or apply its enforcement process to every one of Exxon's self-reported violations, Exxon has failed to establish such factual assertions with admissible, undisputed evidence.  Moreover, evidence Exxon failed to disclose shows that regulatory oversight and enforcement were in fact *not* exercised in some instances.

## 1.    There Is No Admissible Evidence That TCEQ Has "Examined And Investigated" Every STEERS Report.

Exxon states that "TCEQ examined and investigated each of the 24-hour self-reports [STEERS Reports] from the Baytown Complex."  Exxon Mot. 24.  To support this assertion, Exxon cites to the deposition testimony of John Sadlier, a former deputy director of TCEQ's Office of Compliance and Enforcement, who testified that TCEQ reviews every STEERS Report submitted to the agency.  Id. (citing Sadlier Dep. 51:14-52:13).[5]  But review of a written report is not an investigation.  Further, Mr. Sadlier's testimony on this matter is inadmissible under Fed. R. Evid. 602 because there is no evidence that Mr. Sadlier has personal knowledge of whether TCEQ staff has "examined and investigated" each Exxon STEERS Report.  Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."); see also Fed. R. Civ. P. 56(c) ("A party may object

---

[5] The Sadlier deposition transcript is attached in Exxon Mot. Exh. 1.  Exxon filed it under seal, even though it was not designated confidential.  Exxon filed many exhibits under seal even though they are not designated confidential.

that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence"); 2010 Advisory Comm. Note to Rule 56(c)(2) (no need to make a separate motion to strike).  In fact, Mr. Sadlier testified that he was *not* familiar with the Baytown Complex's history of emission events (Sadlier Dep. 147:6-8), never performed a formal record review of the Complex (Sadlier Dep. 206:19-22), and never participated in an investigation of an emission event at the Complex (Sadlier Dep. 206:12-18).

Exxon must be put to its proof.  It cannot simply be assumed that TCEQ staff had time to review every STEERS Report, no matter what TCEQ's obligations or good intentions might have been.  There are 460,000 entities regulated by TCEQ state-wide.  Sadlier Dep. 215:19-21; 248:7-10.  TCEQ regulates gas stations, dry cleaners, landfills, refineries, chemical plants, tank farms, storage treatment plants, power plants, and other facilities.  Sadlier Dep. 248:24-249:19.  Thousands of emission events are reported each year in TCEQ Region 12, the region that covers Baytown and the Houston area, alone.  Sadlier Dep. 250:20-24.

But TCEQ has only 500 investigators for the entire state.  Sadlier Dep. 19-21.  "Most" of the investigators' time is spent not on inspecting and investigating, but rather on "compliance assistance," which is "ensuring that [a] regulated entity is aware of what [the] requirements are."  Sadlier 91:2-11.  Mr. Sadlier testified

that TCEQ could benefit from more funding and more staff.  Sadlier 251:3-7.  He

testified that "it's very difficult with [so] many major air sources within the

Houston regional office to accomplish" the number of inspections set as a goal by

EPA.  Sadlier Dep. 251:22-252:8; see also Sadlier 263:2-6 (TCEQ has not met an

EPA-set goal of inspecting 80% of major air pollution sources).[6]

     Exxon tries to give the impression that TCEQ is under an obligation to

investigate all self-reported violations.  Exxon Mot. 24.  There is no such

requirement.  In fact, the relevant statute provides that the TCEQ executive

director is *not* obligated to investigate:  he "may" make or require investigations of

air pollution violations.  Texas Health & Safety Code § 382.022.  The Texas Gov't

Code, § 311.016(1), provides that, in statutes, the word "'[m]ay' creates

discretionary authority or grants permission or a power."

## 2. There Is No Evidence That TCEQ Has Reviewed Every Recordable Emission Event And Every Permit Deviation.

     Exxon submits no evidence that TCEQ even reviews, much less acts on,

every recordable emission event and every permit deviation reported in a Deviation

Report.  The most Exxon says in its motion is that these records "must be made

---

[6] Exxon suggests that Sierra Club's Neil Carman agrees TCEQ reviews all STEERS Reports. Exxon Mot. 31.  Clearly, he would have no personal knowledge of this.  In any event, Dr. Carman testified he believed the TCEQ investigative processes are inadequate.  Exxon Mot. 31.

available to TCEQ or EPA" if the agencies inspect the Complex or otherwise

request the information.  Exxon Mot. 20.

**B.** **Exxon Does Not Establish That There Is Any "Consistency"**
**To TCEQ's Enforcement Process.**

Exxon asserts, "the summary judgment record demonstrates" that agencies

are "pursuing" their enforcement roles in a "consistent manner."  Exxon Mot. 7.  In

this regard, Exxon states that TCEQ employs "Enforcement Initiation Criteria"

("EIC"), "which provides consistency and predictability to the enforcement

process."  Exxon Mot. 18.  Exxon fails to inform the Court that the EIC itself has

been amended thirteen times since it was first developed in 1996.  Sadlier Dep.

55:20-21.  The EIC General Instructions expressly state that the EIC "is intended

only as staff guidance.  The information is not intended, and cannot be relied on, to

create any rights, substantive or procedural, on the part of any person or entity.

The TCEQ reserves the right to modify these procedures at any time without public

notice."  Exxon Mot. Exh. 1.  Moreover, the EIC relates only to the *initiation* of

enforcement; the *outcome* of any enforcement action "really is up to the

commission."  Sadlier Dep. 240:4-7.  See also id. at 254:10-14 (it is within "the

TCEQ's discretion to fine or not fine and address the violations in the way that the

ultimate decision makers, the commission in [these] cases, sees fit").[7]

---

[7] Exxon cites to the expert report and deposition transcript of one of its experts, Jeff Civins, who states, "TCEQ routinely applies its EIC penalty policy in enforcement matters throughout the

The fact is, enforcement strategies and philosophies change as the Commissioners of TCEQ change.  As an example, TCEQ at one time imposed multiple penalties for emission events involving exceedances of multiple permit limits.  Sadlier Dep. 181:18-184:1.[8]  When new Commissioners were appointed they changed that policy, imposing only the penalty for a single violation no matter how many limits were exceeded.  Sadlier Dep. 185:14-187:23.  As another example, it formerly was TCEQ's practice to regularly issue penalties for recordable emission events along with high priority violations.  Sadlier Dep. 141:20-142:1.  Again, the Commission changed that policy and now penalizes recordable emission events less often.  Sadlier Dep. 142:2-13.

Further, there is no evidence that TCEQ considers this lawsuit, or earlier suits Plaintiffs brought against Shell Oil Company for violations at its Deer Park refinery and Chevron Phillips Chemical Company for violations at its Cedar Bayou

---

State, including as regards the Baytown Complex."  But Mr. Civins also testified he had never read TCEQ's Enforcement Initiation Criteria before being given it by Exxon's litigation counsel in this case.  Deposition of Jeff Civins ("Civins Dep.," Nicholas Resp. Dec. Exh. 2) 34:13-35:2.  Plaintiffs have filed a motion to exclude the testimony of Mr. Civins, who is a partner at Haynes and Boone, a law firm that regularly does work for Exxon.  Civins Dep. 8:7-9, 8:12-13, 8:21-23, 9:17-19 and 10:23-11:2.  See also Haynes and Boones Martindale Hubbell listing, available on LEXIS, at  Marhub TX 16437451 (firm lists Exxon first under "representative clients").

[8] This is called "speciation."  Sadlier Dep. 181:18-182:15.  TCEQ applied speciation in enforcement actions when "the penalty from application of the penalty policy didn't seem appropriate, seemed inordinately low…"  Sadlier Dep. 182:18-183:2.

chemical plant,[9] to be inconsistent with TCEQ enforcement activities.  John Sadlier

testified that to his knowledge, no one at TCEQ has told Plaintiffs they are

hindering TCEQ enforcement activities (Sadlier Dep. 247:21-25) or that they

should not file these types of lawsuits (Sadlier Dep. 247:16-20), even though, as

Exxon itself points out, TCEQ was aware of these suits (Exxon Mot. 29; Sadlier

Dep. 245:9-20).[10]

Also in regard to its assertion of consistency in TCEQ enforcement

activities, Exxon states, "[f]or each notice of enforcement" issued by TCEQ,

"TCEQ requires that the owner or operator implement appropriate corrections, and

pay an administrative penalty for the event."  Exxon Mot. 19.  Exxon cites Tex.

Water Code §§ 7.051-0.75 as the basis for this statement.  These Texas Water

Code Provisions (which are not actually limited to water violations) say nothing of

the sort with regard to air violations; no particular action need be taken by TCEQ

once it issues a notice of enforcement for such violations.  Further, the Texas

Water Code provides that TCEQ "may" assess penalties for violations (Tex. Water

Code §§ 7.051 and 7.073(1)), may "remit" (cancel) any penalties it decides to

---

[9] See Envt. Texas Citizen Lobby, Inc. and Sierra Club v. Chevron Phillips Chemical Co., C.A.
4:09-cv-2662 (S.D. Tex.); Envt. Texas Citizen Lobby, Inc. v. Shell Oil Co., et al., 4:08-cv-00070
(S.D. Tex.).

[10] Exxon also argues that Sierra Club's interest is different from TCEQ's because Sierra Club
"wants to 'control human population numbers and seek a balance that serves all life forms.'"
Exxon Mot. 48.  Exxon knows this is not the policy of the Sierra Club.  Exxon fails to tell the
Court that this quote is from a 20-year old document that the Sierra Club board *did not formally
adopt*.  Deposition of Neil Carman ("Carman Dep.") 20:20-21:4, attached Exxon Mot. Exh. 4.

assess (id. at § 7.067), and "may" order the violator to take corrective action (id. at § 7.073(2)).  As noted above, "may" means TCEQ has discretion, but is not obligated, to take an action.  Texas Gov't Code § 311.016(1).[11]

### C.   The February 2012 Agreed Order Between Exxon And TCEQ Is An Exercise Of Non-Enforcement.

Exxon discusses a February 2012 TCEQ Agreed Order ("2012 Agreed Order" or "Order") and, using the words of Mr. Sadlier, characterizes it as "a 'model' arrangement for corporate CAA compliance."  Exxon Mot. 26.[12]  Exxon fails to fully disclose the terms of the Order, or explain the circumstances of its negotiation.  The 2012 Agreed Order is in fact a guarantee of non-enforcement.

The 2012 Agreed Order was not issued in response to a violation.  Exxon went to TCEQ and asked to enter into an agreed order.  Sadlier Dep. 227:9-23.[13] Exxon created the first draft of the Order and provided it to TCEQ.  Sadlier Dep. 229:15-17.  The emission events referred to in the 2012 Agreed Order (ostensibly the violations covered by the Order) did not occur until *after* most of the terms of the Order were negotiated.  Sadlier Dep.  231:23-232:1.  The 2012 Agreed Order

---

[11] By contrast, the Texas Water Code *does* mandate that TCEQ require corrective action for certain solid waste releases.  Tex. Water Code § 7.031 ("The commission *shall* require corrective action for a release of hazardous waste…from a solid waste management unit…") (emphasis added).  See Tex. Govt. Code § 311.016(2) (the word "'[s]hall' imposes a duty").

[12] The Order is attached in Exxon Mot. Exh. 1.  Docket Entry [91-9].

[13] Mr. Sadlier has personal knowledge of the negotiation of the Agreed Order up to the point of his retirement.  Sadlier Dep. 225:11-20.

covers only two emission events, both of which occurred at the refinery.  2012 Agreed Order ¶¶ 9, 10.

The 2012 Agreed Order does not require Exxon to reduce the frequency of emission events.  Nor does it require Exxon to reduce the quantity of pollutants released during emission events by any particular amount.  To the contrary, Exxon and TCEQ have struck a deal in which "future reportable events, with certain limited exceptions, *are authorized* at all three plants in the Complex in exchange for money, a pre-set fee.  In Paragraph 3 of section III of the 2012 Agreed Order, Exxon and TCEQ agreed to a sliding scale "stipulated penalty" structure, whereby Exxon pays between $7,000 and $25,000 per emission event.  TCEQ agrees that, upon such payment, it will exercise its enforcement discretion by treating these emission events *as though they were not violations*:

> 5.  Emissions and reporting violations to which Paragraph 3 apply shall not
>> a.  be the subject of a notice of violation; or
>> b.  be treated as violations under 30 Tex. Admin. Code Chapter 60.

2012 Agreed Order § III.5.

This purported conversion of unauthorized emission events to "authorized" emissions provides significant benefits to Exxon.  Exxon gains an artificially enhanced compliance history for the Baytown Complex.  This is valuable to Exxon because (1) a history of notices of violations ("NOVs") and other enforcement

actions increases the amount of a penalty when TCEQ does take an enforcement action (Sadlier Dep. 169:7-18, 194:19-195:25, 195:23-25), (2) Exxon can report to the public and to its shareholders that it has reduced the frequency of its violations, and (3) a poor compliance history draws a higher level of scrutiny from TCEQ when a facility applies for a new permit, or seeks to amend an existing permit (Sadlier Dep. 154:8-25). Exxon is currently applying for a new permit to expand the Baytown Olefins Plant. Nicholas Resp. Dec. Exh. 3.

Having a pre-set fee schedule for future emission events also creates a significant benefit for Exxon, and a corresponding threat to its neighbors. Such cost certainty will enable Exxon, if it chooses, to perform a pure cost-benefit analysis when deciding whether to upgrade its equipment or operating procedures to prevent unauthorized emissions and comply with its permits.

Mr. Sadlier, the head of TCEQ's Office of Compliance and Enforcement who was a lead negotiator of the 2012 Agreed Order, admitted the Order's stipulated penalties will not spur compliance. Mr. Sadlier testified, "for a large multinational corporation, it's my personal and professional opinion, I don't think compliance is motivated by our penalties." Sadlier 190:20-22. See also id. at 191:19-24 (the penalty "number is not what – is not what compels a Total or a Chevron or ExxonMobil to do the right thing"). In Mr. Sadlier's opinion it is the "negative publicity" of an enforcement action, and the resources that the company

17

must spend "negotiating and settling" an enforcement action, that can affect the behavior of large corporations.  Sadlier Dep. 190:6-12, 191:25-193:11.  The 2012 Agreed Order, however, serves to insulate Exxon both from negative publicity and from having to deal with TCEQ enforcement actions, and allows the company to simply pay money for the privilege of unlawfully emitting harmful pollutants.[14]

Further, the "Environmental Improvement Projects" required by the 2012 Agreed Order are not designed to achieve any particular reduction in either the frequency of emission events or the quantity of pollutants released during emission events.  On this score, the Order states only that pollutant reductions from the projects would be "at the Baytown Complex, including emissions from emission events and MSS activities."  2012 Agreed Order § III.12; see also id. at § III.10. The Order provides that these reductions could be from anywhere in the Complex, not necessarily from locations which have emission events:  "Identification of the Baytown Complex facilities that will be used to satisfy this emissions reduction requirement rests solely with ExxonMobil."  Id.

Worse, the specified "reduction" is a phantom reduction.  The Order states that the projects will, by February 2017, result in a reduction of 126 tons of volatile organic compounds from a "baseline emission rate" (the baseline is the average of

---

[14] The stipulated penalty provision of the Order does not apply to "emission events that have adversely impacted human health and the environment."  Order § II.3.C.  For these events, then, the status quo remains – TCEQ may or may not take enforcement action.

annual VOC emissions reported in Exxon's 2006-2010 Emissions Inventory).

2012 Agreed Order § III.10. This approach does not ensure *any* improvement over

recent years' emissions, since one high-emission year can skew the baseline.  A

discussion of the practical consequence of the 126-ton VOC reduction is in the

Conf. Resp.  The Order also states, "ExxonMobil estimates that the Ordered

Environmental Improvement Projects will achieve corresponding reductions of"

HRVOCs, CO, SO2, and NOx, and Exxon will "track and report on the

corresponding reductions."  But "corresponding" is not defined; reductions could

be in any (or no) amount.  In any event, Exxon submits no admissible evidence to

prove that the projects will indeed result in a reduction of 126 tons of VOCs.

Lastly, the 2012 Agreed Order says nothing about recordable emission

events or any other permit violations (such as hourly emission limit violations,

smoking flares, etc.) beyond reportable emission events.  The various violations

listed in Deviation Reports over the years are not addressed.

### D. The 2005 Consent Decree With EPA Does Not Address The Violations At Issue In This Case.

Exxon entered into a consent decree with EPA in 2005.  The Consent Decree

relates only to the Baytown Refinery, not the Baytown Chemical or Olefins Plants.

Exxon states in its motion that the Consent Decree addresses some of the violations

at issue in this case because:  (1) the Consent Decree addresses alleged violations

of requirements under the New Source Review ("NSR") and Prevention of

Significant Deterioration ("PSD") programs, and Plaintiffs allege violations of permits issued under the NSR and PSD programs, and (2) Plaintiffs assert claims concerning emissions of SO2, NOx and CO, and the Consent Decree requires Exxon to take specified actions to reduce emissions of these same pollutants. Exxon Mot. 63.

Exxon fails to inform the Court that EPA *did not* sue Exxon to enforce the Baytown refinery's federal operating permit (as Plaintiffs do) and that neither the EPA complaint nor the resultant consent decree even mentions that permit's provisions regarding upsets, hourly emission rates, the HRVOC Rule, or fugitive emissions. Rather, EPA sued to enforce national regulatory standards applicable to all refineries (EPA Complaint ¶ 2), and to enforce provisions of particular permits issued to Exxon refineries only in Illinois and Montana (EPA Complaint ¶¶ 143(b) and 153(a); Consent Decree Appendices I, J, and L).[15]

In fact, instead of enforcing the Baytown refinery's permit, EPA has taken the opposite tack:  EPA considers Exxon's federal operating permits, which incorporate Texas "flexible permits," to be invalid, a position rejected only last month by the Fifth Circuit.  See Texas v. United States Envtl. Prot. Agency, 2012 U.S. App. LEXIS 16898, at *2, 8-10 (5th Cir. Aug. 13, 2012).

---

[15] A copy of the Complaint in that case is attached as Nicholas Resp. Dec. Exh. 4.  Exxon attached a copy of the Consent Decree as Exh. 6 to its summary judgment motion.

Nonetheless, Exxon states that each of the emission events listed in its

Exhibit 13 "was subjected to the Consent Decree's requirements to pay a stipulated

penalty and/or to comply with detailed corrective action requirements."  Exxon

Mot. 64.  Not only is this assertion inconsistent with the fact that EPA did not sue

to address these violations, but Exxon provides no explanation or detail to support

its purported veracity.  Rather, the entire basis for this assertion is set forth in the

Kovacs Affidavit at ¶ 11:

> The category of events set forth in MSJ Exhibit 13, includes 83 events that
> were self-reported to TCEQ and the local air pollution control agency by the
> Baytown Complex and for which the ExxonMobil Defendants were required
> to pay penalties and/or implement corrective actions pursuant to the terms of
> a 2005 consent decree between the ExxonMobil Defendants and the United
> States Environmental Protection Agency.

This testimony is inadmissible under Fed. R. Evid. 602; Elizarraras v. Bank of El

Paso, 631 F.2d 366, 374 (5th Cir. 1980) (party introducing evidence bears burden

to show that witness has personal knowledge of the matter testified).  Exxon

introduced no evidence to support a finding that Mr. Kovacs personally knows the

emission events listed in Exhibit 13 were penalized or triggered implementation of

corrective actions under the Consent Decree.  Mr. Kovacs states that his

"environmental responsibilities focus on state and federal air permitting and

reporting the release of air emissions at the Baytown Complex."  Kovacs Aff. ¶ 2.

But he testified at his deposition that federal operating permits – the subject of this

lawsuit – are not within his purview (Deposition of Jeff Kovacs ("Kovacs Dep.")

22:6-8, attached as Nicholas Resp. Dec. Exh. 5), and that he deals directly with U.S. EPA only "on rare occasions" (Kovacs Dep. 24:9-11).

There is no evidence Mr. Kovacs has even read the Consent Decree. There is no evidence Mr. Kovacs has talked with anyone about the Consent Decree. There is no explanation of how anyone chose emission events for inclusion in Exhibit 13. Exxon submits no documents relating to any of the events listed in Exhibit 13, nor even refers to any such documents. Because "this is not an instance where one can infer personal knowledge from the testimony itself" and there is no other basis to establish personal knowledge, Mr. Kovacs' testimony about the consent decree and Exhibit 13 to Exxon's Motion are inadmissible. Elizarraras, 631 F.2d at 374.[16]

### E.   Exxon Does Not Substantiate Its Affirmative Defense Claims.

Texas Health and Safety Code § 382.0216(f) provides that TCEQ "may establish an affirmative defense to a commission enforcement action" relating to

---

[16] Mr. Kovacs also states, "Each of the statements set forth in this Affidavit is true and correct based on my personal knowledge and/or based on information obtained from the records of the ExxonMobil Defendants and/or obtained from persons affiliated with the ExxonMobil Defendants." Kovacs Aff. ¶ 2. There is no way of knowing which parts of the affidavit Mr. Kovacs purports to base on personal knowledge, and which parts are based on records or information from other persons. If Mr. Kovacs bases his affidavit on statements from TCEQ, that would be hearsay and render his testimony inadmissible. Fed. R. Evid. 602; United States v. Quezada, 754 F.2d 1190, 1195 (5th Cir. 1985). With respect to Exxon Mot. Exh. 13, even if Mr. Kovacs looked at documents or talked with "persons affiliated" with Exxon (whatever that means) about the Consent Decree and the information in Exh. 13 (Plaintiffs stress there is no indication he did), Exxon does not even attempt to establish the admissibility of those records or hearsay statements which would form the basis of his personal knowledge.

unauthorized emission events, as long as TCEQ includes certain minimum criteria in the defense.  TCEQ promulgated such an affirmative defense, in 30 Tex. Admin. Code § 101.222(b) and (c).  All of the listed criteria must be met in order to qualify for the defense.  Id.  While the defense relieves the violator of having to pay a penalty to TCEQ, it does not operate as a defense to any claim for injunctive relief. Id.

Exxon claims the affirmative defense applies to the emission events listed in Exxon Mot. Exh. 16.  The basis for Exhibit 16 is Kovacs Aff. ¶ 8, which states that Exxon marked a box on STEERS Reports to claim the defense, provided information to TCEQ to support its claim, and then "TCEQ agreed (either explicitly or implicitly) with the ExxonMobil Defendants' [affirmative defense] claim and agreed that the affirmative defense applied for all of the events listed…" Exxon submits no documents, deposition testimony, or expert evidence to establish that the affirmative defense was in fact applicable; Exxon solely relies on Mr. Kovacs' assertion that TCEQ agreed explicitly or implicitly that it was.

Exhibit 16 is inadmissible under Fed. R. Evid. 602 (lack of personal knowledge).  Mr. Kovacs does not explain how he knows TCEQ agreed with Exxon about each of Exxon's affirmative defense claims.  He does not identify any TCEQ personnel he talked with and does not say he reviewed any documents from TCEQ (let alone attach any TCEQ records relating to his assertion).  If he bases ¶ 8

of his affidavit and Exhibit 16 on statements from TCEQ (which is impossible to tell), that would be hearsay, which would render ¶ 8 inadmissible under Fed. R. Evid. 602. Quezada, 754 F.2d at 1195 (quoting the Advisory Committee Notes to Rule 602, court stated Fed. R. Evid. 602 prevents a witness "from testifying to the subject matter of [a] hearsay statement, as he has no personal knowledge of it"); Saavedra v. Richard, 2011 U.S. Dist. LEXIS 21334, at *8 (S.D. Tex. March 3, 2011) (summary judgment affidavits cannot be vague or based on inadmissible hearsay); Hilgraeve, Inc. v. Symantec Corp., 271 F. Supp. 2d 964, 974 (E.D. Mich. 2003) (conclusory statement with no supporting evidence cited is inadmissible under Rule 602).[17]

Plaintiffs pointed out in their Responses and Objections to ExxonMobil Corporation's First Request for Admissions to Plaintiffs ("RFA Resp.", Exxon Mot. Exh. 8) that TCEQ *rejected* some of the affirmative defense claims for events listed in Exhibit 16; Plaintiffs even identified specific documents proving TCEQ rejected the defense.[18]  And Plaintiffs simply have no idea why other emission events made it onto Exhibit 16, even after making a reasonable inquiry.[19]  Thus, it

---

[17] The Court in Hilgraeve stated, "Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter, rather it requires affidavits that cite specific facts establishing the existence of the truth of the matter asserted."  Id. (cite omitted).

[18] See RFA Resp. 55c (emission event ["EE"] 85528); 80b (EE 126586); 103b (EE 110831); 104b (EE 112693); 128b (EE 110320).

[19] See RFA Resp. 23 (EE 69821); 24 (EE 69852); 25 (EE 69880); 56 (EE 85962); 63 (EE 95782); 82 (EE 134227); 86 (EE 135717); 88 (EE 136676); 98 (EE 146940); 99 (EE 68364).

is important for Exxon to submit admissible evidence regarding its assertion that TCEQ affirmed the validity of the affirmative defense for all Exh. 16 events.

There is no evidence that TCEQ's review of affirmative defense claims involves a sufficient level of scrutiny such that TCEQ can fairly be characterized as "implicitly determining" *anything*.[20]  It is not TCEQ's practice to always investigate affirmative defense claims.  It is not standard procedure to conduct interviews, on-site inspections, or record reviews in connection with affirmative defense claims.  Rather, it is TCEQ's general practice to simply look at a STEERS Report form to see whether, on its face, it correctly asserts the affirmative defense.  Mr. Sadlier testified that TCEQ's review of the affirmative defense claim "is largely a comparison of what's reported to the statutory threshold for an affirmative defense."  Sadlier Dep. 59:18-24.

The lack of a penalty is not an "implicit" validation of an affirmative defense claim because, as Mr. Sadlier testified, there are "many reasons" for TCEQ "to fine or not fine"; it is up to the TCEQ commissioners as the "ultimate decision makers" to exercise their discretion as they "see[] fit."  Sadlier Dep. 254:2-14.

The lack of scrutiny TCEQ gives to Exxon's affirmative defense claims is a problem for Exxon:  evidence developed in discovery reveals Exxon itself does not

---

[20] There is no evidence that TCEQ even reviews each of Exxon's affirmative defense claims. Such claims are asserted in STEERS Reports.  Kovacs Dep. 81:16-82:8.  Because there is no admissible evidence that TCEQ reviews every Exxon STEERS Report, there is no evidence that TCEQ reviewed all of Exxon's affirmative defense claims.

have the information to validly assert the defense.  One affirmative defense criterion is that the emissions released not be adverse to human health or interfere with the normal use of property.  30 Tex. Admin. Code § 101.222(11).[21]  Yet in deciding whether to assert the affirmative defense, Exxon does not check its own log of citizen complaints to determine whether any neighbors were affected by an emission event.[22]  Nor is there evidence that personnel in the Environment Section of the Safety, Security, Health and Environment Department, who are responsible for preparing STEERS Reports and asserting the affirmative defense (Kovacs Dep. 60:23-61:19, 82:1-8), even know the *potential* adverse effects of the pollutants Exxon releases.  Mr. Kovacs, an Environment Section supervisor who has prepared and reviewed STEERS Reports (Kovacs Dep. 49:20-24, 88:6-17), testified he does

---

[21] The affirmative defense requires a showing that the emission event did not "cause or contribute to…a condition of air pollution."  30 Tex. Admin. Code 101.222(b)(11) and (c)(11) "Air pollution" is defined by statute:

> "Air pollution" means the presence in the atmosphere of one or more air contaminants or combination of air contaminants in such concentration and of such duration that:
>
> > (A) are or may tend to be injurious to or to adversely affect human health or welfare, animal life, vegetation or property; or
> >
> > (B) interfere with the normal use or enjoyment of animal life, vegetation, or property.

Texas Health & Safety Code, §382.003(3).

[22] Neighbor complaints are handled only by the Exxon *public affairs group*, who have nothing to do with STEERS reporting or the affirmative defense.  Kovacs Dep. 164:23-165:13. Mr. Kovacs, an Environment Section supervisor, testified that *he had never seen the citizen complaint log before preparing for his deposition in this case.*  Kovacs Dep. 164:2-20.

not know the potential effects that the chemical compounds emitted by the

Baytown Complex might have on public health.  Kovacs Dep. 38:2-39:7.[23]

### F.   Miscellaneous Misstatements, Omissions, And Inadmissible Statements.

*Emission events that are supposedly not really emission events.*  Exhibit 12

to Exxon's motion is a list of emission events that, Exxon asserts, are not really

emission events and thus not violations.  The sole basis for this list is Kovacs Aff.

¶ 7:  "TCEQ agreed with the ExxonMobil Defendants' determination (either

explicitly or implicitly) that the events listed in this category were not actually

events, and thus were not violations of any regulatory requirements."  This

statement is inadmissible under Fed. R. Civ. P. 602 for lack of personal

knowledge.  Mr. Kovacs does not explain how he knows TCEQ agrees with Exxon

about these events.  He does not identify any TCEQ personnel he talked with and

does not say he reviewed any documents (let alone attach any documents) to back

up his assertion.  If he bases ¶ 7 of his affidavit and Exhibit 12 to the motion on

statements from TCEQ, they would be hearsay and inadmissible under Fed. R.

---

[23] Consistent with this testimony, Mr. Kovacs testified he does not "specifically know" the health effects of hydrogen sulfide, sulfur dioxide, nitrogen dioxide, or propylene (Kovacs Dep. 211:10-20, 212:23-24), and could not "specifically recall" the health effects of ethylene, carbon monoxide, propane, hydrogen chloride, butane, hydrogen cyanide, or ammonia (Kovacs Dep. 214:8-215:6, 216:3-7, 217:13-218:5).  See also Kovacs Dep. 36:5-38:1 (testifying that he had no information on whether *anyone* in the Environment Section knew the potential effects of pollutants emitted by the Complex); 87:7-14 (general practice of Environment Section is to not consult with anyone outside the Environmental Section in deciding whether to assert the affirmative defense); Conf. Resp. 1 (testimony of Gary Robbins of the Environment Section).

Evid. 602.  Quezada, 754 F.2d at 1195; Saavedra v. Richard, 2011 U.S. Dist.

LEXIS 21334, at *8 (summary judgment affidavits cannot be vague or based on

inadmissible hearsay).[24]

   *Penalties for emission events.*  Exxon asserts, "TCEQ entered enforcement

orders with respect to 85 events at the Baytown Complex that occurred during the

approximately five-year period covered by the complaint.  Each enforcement order

assessed penalties, and either imposed requirements that the ExxonMobil

Defendants conduct future corrective actions, or required that the ExxonMobil

Defendants fully document corrective actions they had already taken."  Exxon

Mot. 25, 74.

   As Exxon acknowledges in its motion, Plaintiffs were able to confirm that

only 31 of those 85 emission events were the subject of agreed orders that imposed

penalties.  Exxon Mot. 74.  Plaintiffs were unable to find evidence that the other 54

emission events were subject to penalties (or that Exxon in fact paid penalties for

them).  Mr. Kovacs' statement that TCEQ "issued enforcement orders that imposed

penalties against" Exxon is hearsay, and cannot form the basis of his personal

---

[24] Plaintiffs do not contest that five STEERS Reports were retracted (emission events 123132, 116762, 87460, 83412, and 82452) and one was a duplicate (emission event 77618).

knowledge under Fed. R. Evid. 602.  Exxon submits no TCEQ records relating to these purported penalties.[25]

*Dr. Ranajit Sahu's expert opinion.*  Exxon criticizes Plaintiffs' expert Dr. Ranajit Sahu for not having looked at any actions TCEQ and EPA have taken to enforce the CAA at the Complex.  Exxon Mot. 35.  Exxon fails to inform the Court that such a review would not have been within the scope of his opinion.  Dr. Sahu intends to testify that (a) the amounts of pollutants actually emitted from flares during both reportable and recordable emission events are likely much greater than Exxon's reported estimates (Report of Dr. Ranajit Sahu ("Sahu Report," attached as Nicholas Resp. Dec. Exh. 10) at 16-26), and (b) that both EPA and TCEQ are considering changes to the regulations upon which Exxon relies in formulating these estimates, in order to increase the pollution control efficiency of flares (and thereby bring industry estimates of flare emissions closer to actual flare emissions) (id. at 14; Deposition of Dr. Ranajit Sahu 62:25-73:5 (Exxon Mot. Exh. 7)).  The purpose of Dr. Sahu's testimony is to demonstrate the seriousness of Exxon's violations.

*Non-responsiveness of Exxon and government agencies to Plaintiffs' complaints.*  Exxon suggests regulatory agencies are responsive to environmental

---

[25] Plaintiffs note that draft (as opposed to final) administrative orders are not reliable indicators of whether a penalty has been assessed for any particular emission event.  For example, drafts of the 2012 Agreed Order referred to emission events that ultimately were not even the subject of the final order.  Sadlier Dep. 231:6-232:1.

concerns in the Baytown area, but the company fails to disclose or refute contrary evidence.  For example, until recently, Sierra Club member Shae Cottar lived across the street from the Complex.  Declaration of Shae Cottar ("Cottar Dec.") ¶ 1 (submitted with Plaintiffs' summary judgment motion).[26]  He often calls TCEQ to complain about the Complex's emissions, but usually gets no response, or a delayed response (usually days).  He called Exxon to complain but got the runaround and was eventually put in touch with customer service.  Cottar ¶¶ 4, 5, 6, 8, 10; Cottar Dep. 83:21-87:7; 88:6-23 (Nicholas Resp. Dec. Exh. 11).  Similarly, Neil Carman of the Sierra Club testified that he used to submit objections to agreed orders TCEQ entered into with violators, "but basically quit because the agency wasn't listening."  Carman Dep. 146:2-13.

## ARGUMENT

## I.    GROUND ONE IS MERITLESS BECAUSE ADMINISTRATIVE ENFORCEMENT ACTIONS DO NOT PRECLUDE CAA CITIZEN SUITS.

Exxon argues that this case should be dismissed because it seeks to "second-guess TCEQ's regulatory decisions."  Exxon Mot. 41 (and discussion at pp. 37-54).  More particularly, Exxon argues that this case should be dismissed because Plaintiffs allegedly "disregard TCEQ's investigations and enforcement actions"

---

[26] The Cottar Dec. is Docket Entry [75-15].  Plaintiffs have just learned that Mr. Cottar has moved to another home in Baytown.  It is Plaintiffs' understanding this move occurred after Plaintiffs filed their summary judgment motion.  Plaintiffs will file supplemental information on this as appropriate.

(Exxon Mot. 42; see also id. at 47), base their claims on a "second-guessing of the very regulations that govern CAA enforcement and application of those regulations to the Baytown Complex" (Exxon Mot. 49), and undercut the "consistency and predictability" of TCEQ enforcement (Exxon Mot. 51). Plaintiffs' claims therefore "fall outside the scope of the citizen suit provision," Exxon contends. (Exxon Mot. 43). These arguments are without substance.

Exxon cites no statutory provisions to support its argument that this case falls outside the scope of the citizen suit provision. This is because the plain language of the CAA authorizes this case. In section 304(a) of the Act, 42 U.S.C. § 7604(a), Congress authorized citizens to directly sue CAA violators. Congress expressly provided only two bars to commencing a citizen suit. Id. ("*Except as provided in subsection (b) of this section*, any person may commence a civil action on his own behalf" to enforce the Act) (emphasis added).

One bar to commencing a citizen suit is that, except under limited exceptions, a suit cannot be brought until 60 days after citizens provide notice of intent to sue to the violator, EPA, and the state. 42 U.S.C. § 7604(b)(1)(A).

The other bar is that suit cannot be brought if EPA or a state "has commenced and is diligently prosecuting a civil action in a court of the United States or State to require compliance with the standard, limitation or order" that citizens seek to enforce. Id. at § 7604(b)(1)(B) (the "prior enforcement bar"). The

Fifth Circuit has held that only a prior enforcement action *in court*, and not a prior *administrative* enforcement action, can bar a CAA citizen suit.  Crown Petroleum, 207 F.3d at 791, 794-795 (not cited by Exxon).  See also WildEarth Guardians v. Lamar Util. Bd., 2012 U.S. Dist. LEXIS 43307, at *3-4, 6-7 (D. Colo. March 29, 2012) (CAA citizen suit not precluded by administrative agency action); St. Bernard Citizens for Envtl. Quality, Inc. v. Chalmette Ref., L.L.C., 399 F. Supp. 2d 726, 740 (E.D. La. 2005) (in CAA citizen suit, "ongoing administrative enforcement action does not warrant denial of summary judgment in plaintiffs' favor").  Had Congress wanted to preclude citizen suits in the face of administrative enforcement it could easily have done so, as it did in the Clean Water Act.  33 U.S.C. § 1319(g)(6)(B) (prior administrative penalty action bars a citizen suit for penalties).[27]

Neither of the bars to a citizen suit applies in this case.  In its motion for summary judgment, Exxon admits that Plaintiffs gave the requisite pre-suit notice. Exxon Mot. 29.  And in a response to a request for admission, Exxon admitted that the State of Texas has never commenced a suit in court against Exxon to enforce federal or state air pollution laws, regulations, or permits at the Baytown Complex. ExxonMobil's Objections and Responses to Plaintiffs' Requests for Admissions

---

[27] Congress certainly had an opportunity to enact an administrative enforcement bar:  it amended the CAA in 1990, when the administrative enforcement bar in the CWA already existed, but did not amend the citizen suit provision in this regard.

No. 18 (attached as Nicholas Resp. Dec. Exh. 6).  Accordingly, since EPA's lawsuit against the Baytown refinery was resolved seven years ago, there is nothing to bar this suit.

Nonetheless, Exxon discusses at length the idea that enforcement of the CAA lies in the first place with government.  As noted above, Congress indeed structured the Act that way by barring citizen suits where the government has already sued and is diligently prosecuting in court to enforce the violations citizens seek to enforce, and by providing a 60-day waiting period before citizens can sue so that the government always has an opportunity to sue first.  But beyond those specific restrictions, Congress did not intend to bar citizen suits.  As the Second Circuit stated in Friends of the Earth v. Consol. Rail Co., 768 F.2d 57, 63 (2d Cir. 1985), a case cited by the Crown Petroleum court construing the prior enforcement bar of the Clean Water Act ("CWA"), "[h]ad Congress wished to impose [a] broader prohibition on citizen suits…it could easily have done so.  It did not."

The fact is, "Congress…chose not to place absolute faith in state and federal agencies.  It provided for citizen suits to enable affected citizens to push for vigorous law enforcement even when government agencies are more inclined to compromise or go slowly."  Adkins at 644 F.3d 483, 501 (7th Cir. 2011) (construing citizen suit provision in the Resource Conservation and Recovery Act ("RCRA")).  As one court stated in construing the limited statutory bar to CWA

citizen suits, it could "easily imagine that Congress, realizing that state enforcement agencies can be susceptible to regulatory 'capture' by the industries they regulate, might have feared that state agencies might consent to inappropriately lax compliance agreements".  Citizens for a Better Envt.-California v. Union Oil Co. of California, 861 F. Supp. 889, 907 (N.D. Cal. 1994).

In lieu of arguments based on CAA statutory provisions, Exxon makes policy arguments.  Exxon argues that this suit should not go forward because it allegedly disrupts the balance between health protection and economics that Congress intended EPA and the states to set.  Exxon Mot. 39-40, 47.  This is preposterous.  Congress and the agencies *do* strike this balance by setting regulatory standards, and it is this very balance (as embodied in regulations and permits) that Plaintiffs seek to enforce here.  Plaintiffs are not "second-guessing" the agencies' standard-setting policies but rather are helping to implement them.[28]

Exxon also complains that Plaintiffs are motivated by a belief that government enforcement has been inadequate.  Exxon Mot. 42, 45.  This is tantamount to a tautology:  citizens would of course not bring their own suits unless they felt the agencies' enforcement was inadequate.  And Congress would

---

[28] Exxon emphasizes that Dr. Sahu believes flaring regulations should be strengthened.  This is a red herring.  In this suit Plaintiffs are seeking to enforce Exxon's current permits, not to modify them.  Dr. Sahu's testimony relates to the scientific fact of undercounting of flare emissions (which goes to the actual magnitude of the pollution caused by Exxon's violations, which in turns gets factored into deciding the scope of injunctive relief and the amount of a penalty).

not have provided for citizen enforcement suits if it did not believe that agency

enforcement would sometimes be lacking.

Exxon's "second-guessing" argument (Exxon uses that phrase 19 times in its

motion) was expressly rejected recently by the Seventh Circuit in a case brought

under the citizen suit provisions of RCRA.  That court held it is not enough to

argue, as Exxon does here, that a citizen suit should be barred on the ground that a

state "has acted to achieve its own environmental goals by designing a regulatory

regime to develop, control and preserve the environment on a statewide basis, and

that the plaintiffs' suit would require the district court to second-guess" a state's

"application of" environmental laws.  Adkins v. VIM Recycling, Inc., 644 F.3d

483, 504 (7th Cir. 2011) (rejecting abstention argument).

Similarly, the Ninth Circuit, in rejecting an argument that the prior

enforcement bar should be applied to a situation not specified in the CWA citizen

suit provision, squarely disposed of Exxon's attempt to essentially rewrite the

statutory scheme to conform to its own policy preferences.  See Exxon Mot. 37-39.

The Court in Washington Public Interest Research Group v. Pendleton Woolen

Mills, 11 F.3d 883, 886 (9th Cir. 1993), stated:

> …[Defendant] argues that Congress intended the EPA to have control over
> the course of enforcement proceedings under the Act, and intended the EPA
> to be able to pursue compliance actions free from citizens who seek penalties
> that the EPA thinks are not yet warranted.  In its support, [Defendant] cites
> statements by the Supreme Court regarding the balance Congress intended to
> create between EPA enforcement discretion and citizen suits…[i.e.], the

35

> Supreme Court stated that "the citizen suit is meant to supplement not supplant governmental action" and expressed concern that EPA be able to maintain its enforcement discretion. Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, 484 U.S. 49, 60-61 [parallel cites omitted] (1987) (holding that citizen suits can address only *ongoing* violations and stating hypothetically that the EPA's discretion would be hampered if citizens could file penalty suits months or years after the EPA had decided to forego penalties).
>
> However, general arguments about congressional intent and the EPA's need for discretion cannot persuade us to abandon the clear language that Congress used when it drafted the statute. "The most persuasive evidence of …[congressional] intent is the words selected by Congress." [Cite omitted], not a court's sense of the general role of citizen suits in the enforcement of the Act. Gwaltney itself stresses that "the language of the statute itself" should be the first place we turn to in our analysis. 484 U.S. at 56.

(Emphasis in original). In other words, the Clean Air Act's citizen suit provision *itself* delineates how, and under what conditions, citizen suits properly "supplement" agency enforcement; when citizens bring enforcement suits in accordance with this provision, they are not "supplanting" the government's role.[29]

And obviously, if Exxon's argument were correct, Crown Petroleum, 207 F.3d 789, could not have been decided as it was. In Crown Petroleum, environmental groups (including Sierra Club) sued a refinery for violating its

---

[29] Indeed, the Supreme Court explicitly tied its "supplement/supplant" observation in Gwaltney to the statutory prior enforcement bar in the Clean Water Act: "The bar on citizen suits when government enforcement action is under way suggests that the citizen suit is meant to supplement rather than to supplant government action." Gwaltney, 484 U.S. at 60. Moreover, the proper interpretation of the CWA's prior enforcement bar was not an issue before the Court in Gwaltney. Rather, Gwaltney addresses the issue of whether the Clean Water Act's citizen suit provision – which, like the CAA provision, authorizes citizen enforcement suits only where the defendant is "in violation" of a regulatory standard or permit condition – authorizes suits to enforce a standard or condition that the defendant is no longer violating.

operating permits and other regulatory requirements.  TCEQ's predecessor agency, the Texas Natural Resource Conservation Commission ("TNRCC"), had already taken an administrative enforcement action before the groups sued, entering into an Agreed Order with Crown that required the company to pay a $110,000 penalty and to implement measures to comply with the law (including installation of over $17,000,000 worth of equipment).  Id. at 791.  Before the groups amended their complaint, TNRCC entered into another Agreed Order "that required Crown, *inter alia*, to pay penalties of $1,055,425 and retain two independent expert consultants to review the operations of the entire plant, evaluate the causes of historic violations, and to recommend to the TNRCC additional remedial actions that Crown should take."  Id.

The district court granted summary judgment for Crown, ruling that the groups "failed to identify any deficiency in" the relief contained in the Agreed Orders.  Texans United For A Safe Econ. Educ. Fund v. Crown Cent. Petroleum Corp., 1998 U.S. Dist. LEXIS 16146, at *6 (S.D. Tex. August 3, 1998).  The district court based its dismissal on the CAA's prior enforcement bar, 42 U.S.C. § 7604(b)(1)(B), which, as discussed above, bars citizen suits  if the state is diligently prosecuting "a civil action in a court of the United States or a State" to require compliance with the regulatory standard or permit condition at issue.  Id. at *3-8.  The Fifth Circuit reversed, holding that § 7604(b)(1)(B) does not bar citizen

37

suits when an enforcement action is administrative instead of filed in court. Id. at 795. If Exxon's argument – that a citizen suit must be dismissed if it "second-guesses" administrative enforcement action – were correct, then the Crown Petroleum plaintiffs' claims would have been dismissed. But they were not; and any other result would have contradicted the express language of the statute. See also Louisiana Envtl. Action Network v. City of Baton Rouge, 677 F.3d 737 (5th Cir. 2012) (citizens' claims not dismissed even though alleged violations were covered by defendant's pre-complaint consent decree with EPA and Louisiana).

In sum, it is Exxon that is second-guessing Congress's policy choices. The company does not like that it can still be sued by citizens after it cuts deals with TCEQ. But that is what the CAA allows where administrative, and not judicial, enforcement (or lack thereof) is taken by an agency. Exxon's policy concerns "are more properly addressed to Congress." Moosa v. Immigration and Naturalization Serv., 171 F.3d 994, 1009 (5th Cir. 1999).

The cases cited by Exxon do not require a different result. Three of these cases dismissed citizen suits under a statutory prior enforcement bar where the prior agency action had been brought *in court* for the same violations alleged by the citizens; administrative enforcement was not involved. Supporters to Oppose Pollution, Inc. v. Heritage Group, 973 F.2d 1320 (7th Cir. 1992) (RCRA suit) [30];

---

[30] RCRA's prior enforcement bar is at 42 U.S.C. § 6972(b)(1)(B) and (b)(2)(B).

<u>Dodge v. Mirant Mid-Atlantic, LLC</u>, 732 F. Supp. 2d 578 (D. Md. 2010) (CAA

suit); <u>Clean Air Act Council v. Sunoco, Inc. (R&M)</u>, 2003 U.S. Dist. LEXIS 5346

(D. Del. April 2, 2003) (CAA suit); <u>see also</u> <u>Glazer v. Am. Ecology Envtl. Serv.</u>

<u>Corp.</u>, 894 F. Supp. 1029 (E.D. Tex. 1995) (on a motion to dismiss a CAA citizen

suit, court deferred deciding whether earlier agency lawsuit precluded citizen suit).

Another case dismissed a Comprehensive Environmental Response,

Compensation, and Liability Act ("CERCLA") citizen suit because it was barred

by a provision unique to CERCLA:  42 U.S.C. § 9613(h), which bars challenges to

a CERCLA "removal or remedial action" already underway.  <u>Pakootas v. Teck</u>

<u>Cominco Metals</u>, 646 F.3d 1214 (9th Cir. 2011).

  Other cases cited by Exxon dismissed citizen suits on mootness grounds,

<u>Envtl. Conservation Org. ["ECO"] v. City of Dallas</u>, 529 F.3d 519 (5th Cir. 2008)

(CWA case); <u>Karr v. Hefner</u>, 475 F.3d 1192 (10th Cir. 2007) (CWA); <u>Black</u>

<u>Warrior Riverkeeper, Inc. v. Cherokee Mining, LLC</u>, 637 F. Supp. 2d 983 (N.D.

Ala. 2009) (CWA), or denied requests to dismiss citizen suits on mootness

grounds, <u>Louisiana Envtl. Action Network v. City of Baton Rouge</u>, 677 F.3d 737

(5th Cir. 2012) (CWA); <u>Ohio Valley Envtl. Coal., Inc. v. Hobet Mining, LLC</u>, 723

F. Supp. 2d 886 (S.D. W.Va.  2010) (CWA).  But this case is not moot.  Mootness

becomes an issue only when post-complaint events are found to have eliminated an

actual controversy before the court.  <u>Baton Rouge</u>, 677 F.3d at 744-745 (pre-

complaint consent decree did not render moot citizens' claims for violations covered by decree); ECO, 529 F.3d at 527 (mootness is caused by "circumstances that eliminate[] actual controversy after the commencement of a lawsuit").  Here, as discussed below, Exxon has been steadily violating its permits after the Complaint in this case was filed in December 2010.  In fact, Exxon filed a STEERS Report for unauthorized emissions at the Baytown Refinery just three days ago.  Nicholas Resp. Dec. Exh. 1.  The 2012 Agreed Order has not halted the violations and, as discussed above, is not even designed to do so.

Far from claiming that it will never violate again, Exxon takes the position that it is not required to maintain compliance with its permits.  Exxon maintains that "perfect and constant compliance" with its "permits and environmental rules created by EPA and TCEQ is *not* the expectation of the CAA regulatory framework under the Act."  Exxon Mot. 49 (emphasis added).  Of course, this is not true.  Title V of the CAA, which establishes the federal operating permit program, unequivocally states that "it shall be unlawful for any person to violate any requirement of a permit issued under this subchapter..."  42 U.S.C. § 7661a(a).  TCEQ regulations state (in relevant part) that unless otherwise specified, the following terms "become terms and conditions of each permit":  (1) the permit holder "shall comply with all terms and conditions codified in the permit," and (2) "[i]t shall not be a defense in an enforcement action that it would have been

necessary to halt or reduce the permitted activity in order to comply with the

permit terms and conditions of the permit."  30 Tex. Admin. Code § 122.143(4).

## II.    GROUND II IS MERITLESS BECAUSE THE EVIDENCE PROVES EXXON IS "IN VIOLATION" OF ITS PERMITS.

The CAA citizen suit provides any person may bring a civil action

against any person…who is alleged *to have violated (if there is evidence that the alleged violation has been repeated)* or *to be in violation of* (A) an emission standard or limitation under this chapter…

42 U.S.C. § 7604(a)(1) (emphasis added).  Thus, the CAA citizen suit provision

allows for suits over purely historical violations of standards that are no longer

being violated ("alleged to *have violated*"), so long as they were "repeated."  The

citizen suit provision also allows for suits over violations of standards that the

defendant continues to violate (alleged "to be *in violation*").  In the <u>Gwaltney</u> case,

in construing identical "to be in violation" language in the CWA's citizen suit

provision, the Supreme Court ruled:

[t]he most natural reading of 'to be in violation' is a requirement that citizen plaintiffs allege a state of either continuous or intermittent violation – that is, *a reasonable likelihood that a past polluter will continue to pollute in the future*.

<u>Gwaltney</u>, 484 U.S. at 57 (emphasis added).

Exxon asserts that Plaintiffs' claims are based on purely historical violations

of the Act at the Baytown Complex.  Exxon Mot. 55; <u>see also</u> Exxon Mot. 56

("Plaintiffs' sole recourse under the citizen suit provision of the Act is for claims

of historical reportable events, recordable events, or other Title V permit deviations that they can show to have been 'repeated.'").  This is false.  Plaintiffs' Complaint alleges that Exxon is "in violation" – *i.e.*, violations will continue:

> Defendants' violations of the Act are set forth in Counts I through VII, below.  The violations alleged have a variety of underlying causes.  These include, but are not limited to, equipment failures and malfunctions, operational problems, electrical problems, inadequate maintenance, poor record keeping, and other longstanding systemic problems.  Plaintiffs are unaware of any actions by the Defendants that have solved, or will solve, these problems, or that will otherwise eliminate similar violations of the Act, in the future.  Absent an appropriate order from this Court, *Defendants will continue to violate the Act as described in Counts I through VII*.

Complaint (Docket Entry [1] ¶ 7) (emphasis added); see also Complaint ¶ 24 ("Defendants will continue to file STEERS Reports and Deviation Reports that identify violations of the CAA after the filing of this Complaint"); ¶ 85 ("Plaintiffs have members who are worried that in the future they will breathe illegal emissions from the Baytown Complex, and that future illegal emissions will result in the formation of dangerous ozone, create serious health problems, and interfere with their ability to carry on ordinary activities"); ¶ 87 ("Any actions taken under or administrative penalties assessed in [TCEQ] agreed orders have failed to put a stop to the ongoing violations alleged in this action"); ¶ 88 ("The [EPA] consent decree has not abated the Clean Air Act violations alleged in this Complaint"); Prayer for Relief 1 ("Declare Defendants to have violated and *to be in continuing violation of* the CAA") (emphasis added); Prayer for Relief 2 ("Permanently enjoin Defendants

from operating all stationary sources of air pollutants at the Baytown Complex

except in accordance with the CAA and any applicable permits and regulatory

requirements").

Exxon also claims that "Plaintiffs have not presented, and will not present,

any evidence that the ExxonMobil Defendants are currently in violation of an

emission standard or limitation…" Exxon Mot. 55. This also is untrue.

To establish a defendant's liability for the violation of a particular standard

(such as a permit condition or emission limit), the citizen plaintiff must prove that

the defendant was "in violation" of that standard at the time suit was filed. Natural

Resources Defense Council v. Texaco Ref. and Marketing, Inc., 2 F.3d 493, 501

(3d Cir. 1993) (citing Gwaltney, 484 U.S. at 66). The Fifth Circuit has held that a

plaintiff establishes that the defendant is "in violation" for citizen suit purposes

> (1) by proving violations that continue on or after the date the complaint is
> filed, or (2) by adducing evidence from which a reasonable trier of fact
> could find a continuing likelihood of recurrence in intermittent or sporadic
> violations.

Carr v. Alta Verde Indus., Inc., 931 F.2d 1055, 1062 (5th Cir. 1991) (citing

Chesapeake Found., Inc. v. Gwaltney of Smithfield, Ltd., 890 F.2d 690, 693 (4th

Cir. 1989) ("Gwaltney III"). Even a single post-complaint violation is

"conclusive" proof that a violation is continuing and that a defendant is thus "in

violation" within the meaning of the citizen suit provision. Texaco, 2 F.3d at 502

(citing Carr, 931 F.2d at 106, n. 12). Once the citizen plaintiff establishes that

post-complaint violation of a particular standard has occurred, and that the defendant thus is "in violation" of that standard, the court may adjudicate (and award appropriate relief to redress) the defendant's pre- and post-complaint violations of that standard.  See e.g. Atlantic States Legal Foundation, Inc. v. Tyson Foods, Inc., 897 F.2d 1128, 1135 (11th Cir. 1990) (defendant's monitoring records showing pre- and post-compliant violations of its CWA permit "conclusively establish the existence of ongoing violations," and entitle citizen plaintiff "to seek civil penalties for [the defendant's] non-compliance with its…permit.").

Determining whether a violation has continued after a complaint is filed is straightforward:  as cases cited by Exxon itself show, if a permit limit is violated after the complaint is filed, the violation is "continuing," and the permit holder is "in violation" of the permit.[31]

Here, it is indisputable (and in fact Exxon does not dispute) that after the Complaint was filed Exxon violated each of the permit limits set out in the seven counts.  (It is also apparent from the following discussion that Exxon has repeatedly violated its various permit limits *ad nauseum*.)

---

[31] E.g., Gwaltney III, 890 F.2d at 694, 698 (in CWA case, defendant was in violation of nitrogen permit limit because it violated that limit after the complaint was filed); Texaco, 2 F.3d at 493, 501 (in CWA case, defendant was in violation of effluent limits in permit because it violated those limits after the complaint was filed); Satterfield v. J.M. Huber Corp., 888 F. Supp. 1561 (S.D. Ga. 1994) (in CAA case, defendant was not in violation of emission limits in permit where permit was modified and plaintiffs did not claim the new permit limits were being violated).

As part of Plaintiffs' Motion for Summary Judgment, Plaintiffs filed tables summarizing STEERS reports, recordable emission events, and Title V deviations for each Count of the Complaint; these tables show how many days of violation correspond with each emission limit violated during an emission event and with each permit deviation. Exhibits 1-14 to Declaration of Mary Rock in Support of Plaintiffs' Motion for Partial Summary Judgment on Liability ("Rock MSJ Dec.") (Docket Entry [76-1] – Docket Entry [76-14]); Exhibit 1 to Confidential Declaration of Mary Rock in Support of Plaintiffs' Motion for Partial Summary Judgment on Liability ("Conf. Rock MSJ Dec.") (Docket Entry [87-1]).[32]

Plaintiffs' summary tables also document the repeated and continuing nature of Exxon's violations. But since even these summary tables of violations are

_____

[32] Tables 1, 2A, 2C, and 2E list events in reverse chronological order. Tables 2B, 2D, and 2F are in chronological order. Tables 3, 4, and 5 each have three sections - one for the Refinery, one for the Olefins Plant, and one for the Chemical Plant. Within each section, the information is in reverse chronological order. Tables 6A, 6B, 6C, 6D, and 6E are in chronological order of deviation report filing periods (as seen in the first column of each of those tables). Within each reporting period, the information is presented in the same order that Exxon numbered and presented it in the underlying documents, the deviation reports submitted to TCEQ.

The Bates numbers referenced in the tables show the aforementioned source documents of information that Exxon prepared and Plaintiffs filed concurrently with the Motion for Summary Judgment. Declaration of David A. Nicholas in Support of Plaintiffs' Motion for Partial Summary Judgment ("Nicholas MSJ Dec.") (Docket Entry [73-1] ¶ 12-14, 33); Exhibits 11 and 12 to Nicholas MSJ Dec. (Docket Entry [73-3] – Docket Entry [73-5]) (Recordable Event Lists for the Olefins Plant and Refinery); Exhibit 13 to Nicholas MSJ Dec. (Docket Entry [73-6] – Docket Entry [75-18]) (Deviation Reports); Exhibit 32 to Nicholas MSJ Dec. (Docket Entry [75-17]); Declaration of Neil Carman in Support of Plaintiffs' Motion for Partial Summary Judgment (Carman MSJ Dec.) (Docket Entry [78] ¶¶ 6-8); Exhibit 2 to Carman MSJ Dec. (Docket Entry [78-2] – Docket Entry [78-12]) (STEERS Reports); Declaration of David A. Nicholas in Support of Confidential Portion of Plaintiffs' Motion for Partial Summary Judgment ("Conf. Nicholas MSJ Dec.") (Docket Entry [85] ¶ 4); Exhibit 3 to Nicholas MSJ Dec. (Docket Entry [85-3]) (Recordable Event List for the Chemical Plant).

themselves so large, Plaintiffs present the following "summaries of the summary tables" for the Court's convenience.  The charts that follow present the number of pre- and post-Complaint days of violation, and highlight the large numbers of repeated violations, of each emission standard and limitation Plaintiffs seek to enforce.

The Complaint was filed on December 13, 2010.  The enforceable period of pre-Complaint violations runs from five years and 60 days before the filing of the Complaint – October 14, 2005 – to the filing of the Complaint.  Events and deviations that occurred after the Complaint was filed are listed in the post-Complaint columns.

*Count I:*  The Baytown Refinery's permit provides that any emission of any air contaminant that results from an upset event or any activity associated with an upset is not authorized.  Pl. MSJ 7-8 (Docket Entry [73]).  Exxon's violations of this emission limit continued after the Complaint was filed:

**COUNT I:  Pre- and Post-Complaint Days of Violation**

|  | Pre-Complaint | Post-Complaint |
|---|---|---|
| **From STEERS Reports Table 1 (Docket [76-1])** | 4,745 | 319 |
| **From Recordable Events Table 2B (Docket [76-3])** | 3,832 | 478 |

*Count II:*  The federal operating permits for all three plants authorize emissions only of specifically named contaminants and only from specifically identified emission points; even authorized emissions are subject to pounds per hour emission limits.  Pl. MSJ 8.  Emissions of specific contaminants in violation of these limits continued after the Complaint was filed:

**COUNT II:  Pre- and Post-Complaint Days of Violation at the Refinery[33]**

| Contaminant | Pre-Complaint | | | Post-Complaint | | |
|---|---|---|---|---|---|---|
| | STEERS Reports Table 2A (Docket [76-2]) | Recordable Event List Table 2B (Docket [76-3]) | TOTAL Pre-Complaint Days of Violation | STEERS Reports Table 2A (Docket [76-2]) | Recordable Event List Table 2B (Docket [76-3]) | TOTAL Post-Complaint Days of Violation |
| **Ammonia (NH3)** | 174 | 148 | **322** | 3 | 8 | **11** |
| **Benzene** | 50 | 173 | **223** | 16 | 16 | **32** |
| **Carbon Disulfide (CS2)** | 34 | | **34** | 1 | 6 | **7** |
| **Carbon Monoxide (CO)** | 844 | 568 | **1,412** | 49 | 77 | **126** |
| **Carbonyl Sulfide (COS)** | 29 | 16 | **45** | | 7 | **7** |
| **Chlorotytriazole Sodium** | | | | | 1 | **1** |
| **Dichlorotolytrizole** | | | | | 35 | **35** |
| **Hydrogen Sulfide (H2S)** | 669 | 694 | **1,363** | 54 | 51 | **105** |

---

[33] Additionally, there were 290 days of pre-Complaint violations for hydrogen cyanide (HCN) and 25 days for miscellaneous other contaminants for which there have as yet been no post-Complaint violations.  Plaintiffs are unaware of any specific measures Exxon has taken to eliminate the possibility of future violations involving these pollutants at the Refinery.

| | | | | | | |
|---|---|---|---|---|---|---|
| **MEA** | | 80 | **80** | | 11 | **11** |
| **Methanol** | | 2 | **2** | | 1 | **1** |
| **Nitrogen Oxides (NOx)** | 788 | 292 | **1,080** | 46 | 36 | **82** |
| **N-Methyl-2-pyrrolidone (NMP)** | 5 | 38 | **43** | | 15 | **15** |
| **Oil Products (petroleum distillate, crude oil, diesel, heavy coker gas oil (HCGO), Naphtha, heavy cat Naphtha, Kerosene)** | 1 | 17 | **18** | 2 | 2 | **4** |
| **Opacity/visible emissions from non-flare sources** | 34 | | **34** | 2 | | **2** |
| **"Other"** | | | | | 1 | **1** |
| **Particulate Matter (PM)** | 156 | 145 | **301** | 1 | 1 | **2** |
| **Phosphoric Acid** | | 1 | **1** | | 1 | **1** |
| **Sodium Hydroxide (NaOH)** | | | | | 2 | **2** |
| **Sodium Hypochlorite (NaClO/NaOCl)** | | 7 | **7** | | 2 | **2** |
| **Sulfur Dioxide (SO2)** | 757 | 358 | **1,115** | 46 | 14 | **60** |
| **Sulfuric Acid** | | | | 1 | | **1** |
| **Sulfurs (Sulfur, Sulfur Comopounds, Total Sulfur, Other Sulfur)** | 34 | 12 | **46** | | 2 | **2** |
| **VOCs** | 729 | 1,132 | **1,861** | 64 | 188 | **252** |

**COUNT II: Pre- and Post-Complaint Days of Violation at the Olefins Plant[34]**

| Contaminant | Pre-Complaint | | | Post-Complaint | | |
|---|---|---|---|---|---|---|
| | STEERS Reports Table 2C (Docket [76-4]) | Recordable Event List Table 2D (Docket [76-5]) | TOTAL Pre-Complaint Days of Violation | STEERS Reports Table 2C (Docket [76-4]) | Recordable Event List Table 2D (Docket [76-5]) | TOTAL Post-Complaint Days of Violation |
| Ammonia (NH3) | | 2 | **2** | 1 | | **1** |
| Carbon Monoxide (CO) | 152 | 417 | **569** | 30 | 69 | **99** |
| Chlorine | | 10 | **10** | | 1 | **1** |
| "Corrosion Inhibitor" | | | | | 1 | **1** |
| DMF | | 8 | **8** | | 3 | **3** |
| DMS | | 6 | **6** | | 1 | **1** |
| Hydrogen Sulfide (H2S) | 8 | 1 | **9** | | 1 | **1** |
| Morpholine | | | | | 1 | **1** |
| Nitrogen oxides (NOx) | 126 | 192 | **318** | 31 | 10 | **41** |
| Oil Products (Diesel, Kerosene) | | 4 | **4** | | 1 | **1** |
| Opacity from non-flare sources | 9 | | **9** | 1 | | **1** |

---

[34] Additionally, there were 18 days of pre-Complaint violations for miscellaneous other contaminants for which there have as yet been no post-Complaint violations.  Plaintiffs are unaware of any specific measures Exxon has taken to eliminate the possibility of future violations involving these pollutants at the Olefins Plant.

| Particulate Matter (PM) | | 109 | **109** | | 46 | **46** |
|---|---|---|---|---|---|---|
| Sodium Sulfite | | | | | 1 | **1** |
| VOCs | 202 | 686 | **888** | 91 | 120 | **211** |

For Plaintiffs' summary of pre- and post-Complaint violations of Count II occurring at the Chemical Plant, <u>see</u> Conf. Resp.

*Count III:*   The permits for all three plants incorporate the Texas "HRVOC Rule," which limits facility-wide emissions of highly reactive volatile organic compounds to no more than 1,200 pounds per hour.  Pl. MSJ 8-9.  Exxon's violations of this emission limit continued after the Complaint was filed:

**COUNT III: Pre- and Post- Complaint Days of Violation of the HRVOC Rule**

| | Pre-Complaint | Post-Complaint |
|---|---|---|
| | **From STEERS and Deviation Reports Table 3 (Docket Entry [76-7])** | |
| **Refinery** | 3 | |
| **Olefins** | 9 | 2 |
| **Chemical** | | 1 |

*Count IV:*   The permits for all three plants incorporate federal regulations prohibiting visible emissions from flares for periods exceeding five minutes during any two-hour period.  Pl. MSJ 9.  Exxon's violations of this emission limit continued after the Complaint was filed:

**COUNT IV: Pre- and Post-Complaint Days of Smoking Flare Violations[35]**

|  | Pre-Complaint | Post-Complaint |
|---|---|---|
|  | From STEERS and Deviation Reports Table 4 (Docket Entry [76-8]) | |
| Refinery | 48 | 6 |
| Olefins | 16 | 5 |
| Chemical | 5 | |

*Count V:*  The permits for all three plants incorporate federal regulations requiring flares to operate with a pilot flame present at all times.  Pl. MSJ 9. Exxon's violations of this emission standard continued after the Complaint was filed:

**COUNT V: Pre- and Post-Complaint Days of Pilot Flame Violations[36]**

|  | Pre-Complaint | Post-Complaint |
|---|---|---|
|  | From STEERS Reports, Deviation Reports, and Recordable Emission Event Lists Table 5 (Docket Entry [76-9]) | |
| Refinery | 7 | 5 |
| Olefins | 4 | |
| Chemical | 2 | |

Plaintiffs did not move for Summary Judgment on Count VI, fugitive emission violations, but for this count, too, there are pre- and post-Complaint violations.  See, e.g. STEERS event 85962 (January 11, 2007, release of pollutants

---

[35] Plaintiffs are unaware of any specific measures Exxon has taken to eliminate the possibility of future smoking flare violations at the Chemical Plant.

[36] Plaintiffs are unaware of any specific measures Exxon has taken to eliminate the possibility of future violations of pilot flame outages at the Olefins and Chemical Plants.

from "Gofiner Unit 1 Fugitives") and STEERS event 162526 (November 24, 2011, release of benzene from "Wastewater Oxidation Unit Fugitives") (Docket Entry [78-7], pp. 73-74 (Bates number ETSC 001027-001028), and Docket Entry [78-12], pp. 46-47 (Bates number ETSC 068133-068134), respectively).

*Count VII:*  Count VII covers a variety of types of permit violations.  These self-reported "deviations" are summarized in Tables 6A through 6E (Docket Entries [76-10 through 76-14]).  Summary tables of these violations are attached as Nicholas Resp. Dec. Exh. 12.  They show that most standards cited in Exxon's Deviation Reports have been violated repeatedly, many of them more than 50 times, and that there are post-Complaint violations of many standards.

Plaintiffs note that in its Ground II discussion, Exxon misstates the holdings of two cases.  First, Exxon states that "a citizen suit plaintiff must adduce proof that claimed violations resulted from 'the same inadequately corrected source of trouble.'  Anderson v. Farmland Indus., 70 F. Supp. 2d 1218, 1229 (D. Kansas) (citing Natural Resources Defense Council v. Texaco Refining & Marketing, 2 F.3d 493, 499 (3d Cir. 1993))."  Exxon Mot. 56.  In fact, Anderson held the opposite.  The court held a CAA citizen suit plaintiff need only show that a violation of an emission limit was repeated, or occurred after a complaint was filed, in order to prevail, and that a common cause of the violations need not be proven.  Anderson, 70 F. Supp. 2d 1228-1230.

In <u>Anderson</u>, plaintiffs claimed that defendant Farmland's refinery violated a requirement to report on a quarterly basis the magnitude of excess emissions.  <u>Id.</u> at 1228.  Before the complaint was filed, Farmland failed to submit that report for FCCU catalyst regenerator emissions.  After the complaint was filed, Farmland failed to submit that report for Clause sulfur recovery unit emissions.  <u>Id.</u> Farmland argued that its pre-complaint and post-complaint violations were completely different, and thus it had not "repeated" the violation nor could it be found in "continuing violation."

The court rejected that argument, holding that Farmland could be found "in violation" without a finding that the pre- and post-complaint violations shared a common cause because "the alleged reporting violations related to the magnitude of the FCCU catalyst regenerator and the magnitude of the FCCU catalyst regenerator emissions *involve the same reporting requirements*."  <u>Id.</u> at 1229 (emphasis added).  The court went on to hold that citizen suit plaintiffs also have the *option* of demonstrating that a defendant is "in violation" of an emission limit that is *different* from previously violated limits by proving that an unaddressed problem will lead to violations of those different limits in the future.  The court stated, in a passage only selectively quoted by Exxon:

> In <u>Texaco Refining</u>, the court ruled that a plaintiff can establish that violations are continuous or intermittent "*in either of two ways*:  first by proving a likelihood of recurring violations of the same parameter [limit]; *or* second, by proving a likelihood that the same inadequately corrected source

of trouble will cause recurring violations of one or more different parameters." [Texaco, 2 F.3d at 499].  Even if the Court believed that he FCCU catalyst regenerator magnitude reporting violations and the Clause sulfur recovery unit magnitude reporting violations involved two separate parameters (which it does not), the two violations meet the second prong of the Texaco Refining test.  The "same inadequately corrected source of trouble," Farmland's reporting methods, account for the violations.

Id. (emphasis added).

Second, Exxon incorrectly states, "[d]ifferent equipment and operational failures corrected by distinct engineering solutions are not recurring violations. See Chesapeake Bay Found. v. Gwaltney, 890 F.2d 690, 698 (4th Cir. 1989) [Gwaltney III]."  Exxon Mot. 56.  Gwaltney III held that continuing violation of one effluent limit did not establish that the defendant was "in violation" of a *different* effluent limit that the defendant had violated before the complaint was filed, because the violations were caused by distinct and unrelated equipment and operational failures.  Id. at 697-98.  But Gwaltney III did *not* (as Exxon claims) hold that pre- and post-complaint violations of the *same* limit must be attributable to the same underlying cause before the defendant can be said to be "in violation" of that limit,[37] and that is not the law.

---

[37] The plaintiffs in Gwaltney sued to enforce a chlorine limit and a nitrogen limit.  Gwaltney had installed equipment that abated its chlorine violations almost two years before the citizen suit was filed.  Gwaltney III, 890 F.2d at 697.  Violation of the nitrogen limit, however, "was ongoing at the time suit was filed."  Id. at 698.  The plaintiffs argued that as long as the defendant is "in violation" of one permit limit at the time suit is filed, the defendant can be held liable for violations of *other* permit limits that had wholly ceased prior to filing.  The Fourth Circuit held that this is permissible only to the extent that the violations of the different limits are linked by a common set of causes.  Id.

In fact, requiring citizens to prove that each violation of a single limit had the same cause would run directly counter to the Texas Flexible Permit Program under which the Baytown Complex's permits were issued. A flexible permit can set a single, plant-wide emission cap for one or more contaminants. As explained by the Fifth Circuit,

> [t]o determine a facility's cap under the Flexible Permit Program, the permit applicant must identify each air contaminant and each source it expects to be covered by the proposed permit. [Cite omitted]. Then, the TCEQ calculates emissions limits for each source and each contaminant…The sum of the emission limits for each of the covered sources comprises the permit's cap on pollution for that contaminant. [Cite omitted]. Thus, a facility remains in compliance so long as the aggregate sum of its emissions for a particular contaminant is less than the total output of all the sources under the permit.

State of Texas v. United States Envtl. Prot. Agency, 2012 U.S. App. LEXIS 16898, at * 34-35 (5th Cir. August 13, 2012). If a facility exceeds its cap for a contaminant, it can get back into compliance by reducing emissions at any of the sources of that contaminant (or even multiple sources). It can make that choice based on economics if it chooses (which is one point of having a flexible permit). Thus, if one emission source becomes a "source of trouble" for a contaminant, a facility could adopt an "engineering solution" that applies to a *different* source of that contaminant, and thereby lower emissions from that different source to comply with the cap. In short, violations of a flexible emission cap do not have a single "distinct engineering solution" and it would not make sense to force a citizen suit plaintiff to act as if the facts were otherwise.

Although Plaintiffs are not required to prove that Exxon's violations share common causes, the evidence shows that many of them in fact do. Exxon views unauthorized emissions as a systemic issue, and deals with them on "site-wide" and "unit-specific" bases. Answer No. 7 in Defendants' Objections and Answers to Plaintiffs' First Set of Interrogatories ("Interrogatory Answers") (Nicholas Resp. Dec. Exh. 7). Design, operation, maintenance/repair and training systems are employed to try to reduce unauthorized emissions. Id. Deposition testimony by Exxon personnel in this regard is discussed in the accompanying Conf. Resp.

Moreover, Exxon's own records show that the same types of equipment at the Complex are responsible for many of the recurring upset events and permit deviations, and that certain process units are particularly beset with repeated problems resulting in violations. This is made clear in Attachments C, E, G, and H to the report of Plaintiffs' engineering expert Keith Bowers (attachments to Exhibit 1 of the Bowers Deposition, Exxon Mot. Exh. 9).

### III.   GROUND III IS MERITLESS BECAUSE THERE IS NO ADMISSIBLE EVIDENCE PROVING THAT CERTAIN OF EXXON'S SELF-REPORTED VIOLATIONS ARE NOT REALLY VIOLATIONS.

Exxon does not dispute that the 20 emission events listed in Exhibit 12 to its motion were the subject of STEERS Reports.  However, Exxon argues that eventually it turned out these events did not involve any unauthorized emissions.

As explained above, Exxon does not submit admissible evidence to prove that these 20 emission events did not involve unauthorized emissions.  On the other hand, the STEERS Reports, which were filed with Plaintiffs' summary judgment motion, are admissible and establish that Exxon committed violations.

### IV.   GROUND IV IS MERITLESS BECAUSE THE EPA CONSENT DECREE DOES NOT BAR ANY PART OF THIS ACTION.

Exxon argues that claims regarding emission events listed in Exhibit 13 to its motion are barred because EPA's consent decree with Exxon covers these violations.  This argument is without merit.

#### A.   The Diligent Prosecution Bar Does Not Apply.

At pages 45-49 of their motion for partial summary judgment, Plaintiffs discussed why the 2005 Consent Decree with EPA does not bar any claims in this case under 42 U.S.C. § 7604(b)(1)(B).  Plaintiffs will not burden the Court by repeating that discussion, but incorporate it herein by reference.

The lawsuits and consent decrees at issue in the cases cited by Exxon are a vivid contrast to EPA's consent decree with Exxon here, and show that 42 U.S.C. § 7604(b)(1)(B) is not applicable to this case.  First, and unlike this case, the cases Exxon cites all involved complaints or consent decrees that addressed the same violations that the citizens sued for.  Piney Run Pres. Ass'n v. County Comm'rs of Carroll County, 523 F.3d 453 (4th Cir. 2008) (citizens' temperature claims included in prior state lawsuit and consent decree); Citizens for Clean Power v. Indian River Power, L.L.C., 636 F. Supp. 2d 351, 358 (D. Del. 2009) (citizens' opacity claims addressed in consent decree); Envt. Integrity Project v. Mirant Corp., 2007 U.S. Dist. LEXIS 1219, at *3, n.2 (D. Md. January 3, 2007) (plaintiffs conceded consent decree sought compliance with same CAA limits that were at issue in citizen suit); Connecticut Fund for the Envt. v. Contract Plating Co., 631 F. Supp. 1291, 1294 (D. Conn. 1986) (comparison of complaints showed both state and citizens sought compliance with same standard, order or limitation).

Second, they all involved consent decrees or lawsuits filed just before the citizens commenced their suits.  Piney Run, 523 F.3d at 457-458 (consent decree filed one month before citizens sent pre-suit notice); Indian River, 636 F. Supp. 2d at 357 (proposed consent decree filed less than two weeks before citizens filed suit); Mirant, 2007 U.S. Dist. LEXIS 1219, at *5 (same); Contract Plating, 631 F. Supp. at 1293 (state enforcement suit pending at the time citizens sued).  By

contrast, here the Consent Decree was over five years old at the time Plaintiffs filed suit. It plainly had not averted the torrent of permit violations at the Complex that followed (this, of course, is because it addressed different types of CAA violations). As the court in Contract Plating stated, "there is nothing in the 'diligent prosecution' rule that would bar a future citizens' suit if the state suit failed to bring the defendant into compliance with its [CWA] permit." Id. at 1294.

In addition, as set forth above, Exxon submits no admissible evidence to substantiate its claim that the emission events listed in Exhibit 13 to its motion were subjected to actual (as opposed to theoretical) Consent Decree enforcement.

### B.      Res Judicata Does Not Bar Any Claims.

"Res judicata…is an affirmative defense, Fed. R. Civ. P. 8(c)," Howard v. Green, 555 F.3d 178, 181 (8th Cir. 1977), and the "party seeking to assert that an issue was already adjudicated upon bears the burden of proving that contention." In re Braniff Airways, 783 F.2d 1283, 1289 (5th Cir. 1986) (cites omitted). As set forth below, Exxon has not met its burden.

Where a common law principle such as res judicata is well established, "the courts may take it as a given that Congress has legislated with an expectation that the principle will apply except 'when a statutory purpose to the contrary is evident.'" Astoria Fed. Sav. & Loan Ass'n v. Solimino, 501 U.S. 104, 108 (1991) (citation omitted; emphasis added); United States v. Manning Coal Corp., 977 F.2d

117, 121 (4th Cir. 1992), as amended Jan. 20, 1993 (res judicata is common law that can be changed by Congress); Thiebaut v. Colo. Springs Utils., 2007 U.S. Dist. LEXIS 63963, at **11-14 (D. Colo. Aug. 29, 2007) (Congress can limit application of res judicata). Congress legislated as to the effect of prior-filed EPA enforcement lawsuits in 42 U.S.C. § 7604(b)(1)(B), the "diligent prosecution" provision discussed above. Res judicata cannot be applied in a manner that would give greater preclusive effect than provided by Congress in the diligent prosecution provision. To do otherwise would render 42 U.S.C. § 7604(b)(1)(B) meaningless. (Exxon does not argue otherwise. Exxon Mot. 67.) Thus, Exxon must establish that the consent decree is a "diligent prosecution" to prevail on a res judicata defense. Since, as discussed, Exxon has not proven its diligent prosecution defense, it cannot prevail on its (functionally identical) res judicata defense. It has been more than seven years since the Consent Decree was entered; there is no end in sight to Exxon's violations. Compare St. Bernard Citizens for Envtl. Quality, Inc. v. Chalmette Ref., 500 F. Supp. 2d 592, 607 (E.D. La. 2007) (diligent prosecution for res judicata purposes found where consent decrees had been in effect for less than one year; court held, "[t]his is not enough time for the Court to conclude that the consent decrees are not capable of requiring compliance with the Act").

Moreover, it is clear res judicata does not apply on its own terms.

> The test for res judicata has four elements:  (1) the parties are identical or in privity; (2) the judgment in the prior action was rendered by a court of competent jurisdiction; (3) the prior action was concluded by a final judgment on the merits; and (4) the same claim or cause of action was involved in both actions.

Petro-Hunt, L.L.C. v. United States, 365 F.3d 385, 395 (5th Cir. 2004).  Three of these elements are missing here.

      1. **Privity.**  It is odd for Exxon to make a privity argument:  Exxon's motion stresses that Plaintiffs' interests are very *different* from the agencies'. Exxon Mot. 47 ("Environmental advocacy groups and environmental regulators have different concerns.").  In any event, EPA would be in privity with Plaintiffs only if it had adequately represented their interests in the earlier enforcement action.  Meza v. Gen. Battery Corp., 908 F.2d 1262, 1266 (5th Cir. 1990).  In the citizen suit context, some courts have expressly used a "diligent prosecution" analysis to determine privity, looking at whether a government consent decree was either "capable of requiring compliance" with the Act or "calculated to do so." FMR I, 382 F.3d at 759 (CWA); Chalmette Ref., 500 F. Supp. 2d at 605-606 (CAA); cf. Alaska Sport Fishing Ass'n v. Exxon Corp., 34 F.3d 769, 773 (9th Cir. 1994) (in CWA and CERCLA citizen suit, earlier government action had already obtained damages plaintiffs sought).  One court looked to whether violations "are in fact continuing" after a government settlement, or whether a "realistic prospect of continuing violations exists" despite the settlement.  Atl. States Legal Found. v.

Eastman Kodak, 933 F.2d 124, 127-128 (2d Cir. 1991).  By either of these criteria, EPA is not in privity with Plaintiffs because EPA sued to enforce standards and limitations different from the ones at issue in the case at bar, and because the agency's action has not abated the violations alleged in Plaintiffs' complaint. Compare Chalmette, 500 F. Supp. at 606 (plaintiffs conceded consent decree requirements will bring defendant into compliance with the CAA).

      **2.  Judgment on the merits**.  The violations alleged by Plaintiffs all occurred (except for those occurring in October and November 2005) after the entry of the EPA consent decree and thus could not have been adjudicated on the merits in the previous action.  Chesapeake Bay Found., Inc. v. Bethlehem Steel Corp., 652 F. Supp. 620, 629 (D. Md. 1987) (stipulated penalties for future violations in consent decree were not adjudications and therefore had no res judicata effect on citizen suit concerning those violations).

      **3.  Same claim or cause of action**.  The same claim or cause of action is not involved in both cases.  For a government enforcement case to have res judicata effect in a citizen suit, the same permit standards or limitations must be the subject of the two cases.  Chalmette, 500 F. Supp. at 606.  First, as set forth above, Plaintiffs bring this action to enforce standards and limitations not addressed in EPA's action.  See also Exxon Mot. 21-22 (EPA did not "over-file" a lawsuit "with respect to any…of the reportable events, recordable events, or Title

V deviations identified in the complaint").  Second, the violations at issue here all (but two months' worth) occurred after the EPA consent decree was filed.  Lawlor v. Nat'l Screen Serv. Corp., 349 U.S. 322, 328-329 (1955) (prior judgment "cannot be given the effect of extinguishing claims which did not even then exist," otherwise it would confer "partial immunity from civil liability for future violations"); Dawkins v. Nabisco, Inc., 549 F.2d 396-397 (5th Cir. 1977) (same); Bayview Hunters Point v. Metro. Transp. Comm'n, 177 F. Supp. 2d 1011, 1024 (N.D. Cal. 2001), rev'd on other grounds, 366 F.3d 692 (9th Cir. 2004) (applying Lawlor to CAA citizen suit).

Plaintiffs note that Exxon's res judicata argument is undercut by the fact that 31 of the emission events listed in Exxon's Exhibit 13 ("Events Subject to Consent Decree Requirements to Pay Stipulated Penalties and/or to Comply with Corrective Action Requirements") are also emission events listed in Exhibit 15 ("Events for Which TCEQ Initiated and Completed Enforcement Requiring Penalties and Corrective Actions").[38]  If the Consent Decree truly had a res judicata effect, TCEQ would not have been able to take its own enforcement actions for emission events purportedly covered by the Consent Decree.

---

[38] The emission events listed in both Exhibit 13 and Exhibit 15 are:  73958, 75916, 76234, 77600, 79495, 81215, 82316, 86156, 86416, 86677, 87544, 87609, 87852, 93064, 96615, 98207, 100991, 101349, 101490, 104716, 107090, 112449, 119391, 123381, 126041, 127838, 132322, 133845, 136526, 146247, and 146393.

**V.   GROUND V IS MERITLESS BECAUSE THE STATE OF TEXAS DID NOT PROVIDE AMNESTY FOR ALL CAA VIOLATIONS DURING HURRICANE IKE.**

Exxon argues that it is not liable for emission events "subject to" the Governor's Hurricane Ike proclamation and TCEQ regulatory guidance regarding Hurricane Ike.  Exxon lists these events in Exhibit 14 to its motion.  This argument is wrong.

The Governor's proclamation did not state that facilities need not comply with the CAA.  As quoted by Exxon itself, the proclamation suspended "all rules and regulations that may inhibit or prevent prompt response" to the hurricane. Exxon Mot. 71.  TCEQ had to issue regulatory guidance as to what that meant in the CAA context.  This guidance (part of which Exxon attached as Exxon Mot. Exh. 1 [Sadlier Dep. Exh. 4]) did not suspend all air pollution control regulations, either.  To the contrary, it stated: "This Regulatory Guidance does not negate the need to obtain any required permits or authorizations, nor from the need to comply with all regulatory and statutory requirements, unless otherwise specified in these documents [listed below]," one of which was "Air Permit Guidance."  Exxon Mot. Exh. 1 (exhibit 4 to Sadlier Dep.). The rest of the actual Air Permit Guidance issued by TCEQ in response to Hurricane Ike, not provided to the Court by Exxon**,** also did not suspend all air pollution control regulations, though it did discuss repairs, STEERS reporting, temporary boilers, temporary generators, and

exceedances of emission limits.  Nicholas Resp. Dec. Exh. 8.  Notably, the

guidance stated that owners and operators "shall at all times apply best engineering

practices and good air pollution control practices as required by any and all

applicable standards to minimize emissions associated with any activities described

by this document."  Air Permit Guidance, p. 1.  The guidance also stated, in

response to the question "what should I do if I need to temporarily exceed

maximum allowable emission rates":  "If the exceedance or increase is directly

related to disaster prevention or response, no prior approval is necessary…*In no

event shall authorized regulated entities create conditions of air pollution or

exceed National Ambient Air Quality Standards."*  Regulatory Guidance p. 3

(emphasis added).

Exxon has submitted no evidence, let alone undisputed evidence, that the

events listed in its Exhibit 14 did not create a condition of air pollution or exceed

National Ambient Air Quality Standards.  Accordingly, Exxon did not establish the

Governor's proclamation and TCEQ regulatory guidance as a defense.

Nor can Exxon prevail on an "act of God" defense on summary judgment.

To prevail on an act of God defense, Exxon must prove (1) its violations were "due

directly and exclusively to an act of nature and without human intervention," and

(2) "no amount of foresight or care which could have been responsibly required"

could have prevented the violations.  <u>Sentry Select Ins. Co. v. R&R Marine, Inc.</u>,

2011 U.S. Dist. LEXIS 152387, at *20 (E. D. Tex. August 19, 2011) (cites omitted), different portion of recommended decision overruled in part, 2012 U.S. Dist. LEXIS 9455 (S.D. Tex Jan. 26, 2012).  "[T]he act of nature must have been so unusual that it could not have been reasonably anticipated or provided against." Id.

In Sentry Select, defendant R&R Marine claimed an act of God defense for damage to leased equipment during Hurricane Ike.  R&R asserted the defense in a summary judgment motion.  It submitted a detailed affidavit attesting that Ike was unforeseeable and unpredictable, and that R&R acted reasonably in attempting to protect the equipment. Id. at *22-23.  Summary judgment was denied on the grounds that there were issues of fact as to whether Hurricane Ike was an unforeseeable act of nature, id. at *26, and as to whether R&R itself contributed to the damage of the equipment, id. at *26-27.

Exxon submits no evidence at all on the unforeseeability of Hurricane Ike or the steps Exxon took to try to prevent emission violations.  See Kovacs Aff. ¶ 9. Accordingly, Exxon has not met its burden of proving facts to establish an act of God defense.

Plaintiffs note that as far as emissions during a hurricane are concerned, petrochemical plants are not simply at the mercy of the elements; hurricanes are a known risk in the Gulf region and plants there have hurricane preparedness plans,

which might need improvement.  Indeed, the consent decree in <u>Environment Texas</u>

<u>v. Chevron Phillips</u>, 4:09-cv-02662, at pp. 7-8, required Chevron Phillips to revise

its hurricane preparedness plans "to minimize emission of air contaminants to the

extent possible consistent with worker safety."  Nicholas Resp. Dec. Exh. 9.

## VI.   GROUND VI IS MERITLESS BECAUSE TCEQ ENFORCEMENT ACTIONS DO NOT PRECLUDE <u>CAA CITIZEN SUITS.</u>

Ground VI is a repeat of Ground I, and is meritless for the same reasons.

Once again, Exxon fails to cite the line of cases holding that administrative

enforcement actions do not preclude CAA citizen suits.  <u>Crown Petroleum</u>, 207

F.3d at 791, 794-795; <u>WildEarth Guardians v. Lamar</u>, 2012 U.S. Dist. LEXIS

43307 (agency order shutting down plant did not preclude citizen suit); <u>Chalmette</u>

<u>Ref.</u>, 399 F. Supp. at 740.

## VII.   GROUND VII IS MERITLESS BECAUSE THE AFFIRMATIVE DEFENSE IS INAPPLICABLE AND IN ANY EVENT EXXON HAS <u>NOT PROVED IT CAN MEET THE DEFENSE.</u>

Exxon claims an affirmative defense to penalties (but not to declaratory or

injunctive relief) for some of its emission events based on a TCEQ regulation, 30

Tex. Admin. Code § 101.222(b)-(e).  This issue was addressed in Plaintiffs'

motion for partial summary judgment at pages 42-44, and that discussion is

incorporated herein by reference so as to not to burden the Court.

In addition, as discussed above, Exxon has neither submitted admissible evidence to prove that TCEQ determined the affirmative defense applies to each of the events listed in Exxon's Exhibit 16, nor submitted any other evidence to prove that the affirmative defense should apply to any particular emission event.

## VIII.  GROUND VIII IS MERITLESS BECAUSE PLAINTIFFS HAVE STANDING TO ASSERT CLAIMS BASED ON RECORDABLE EMISSION EVENTS AND OTHER TITLE V DEVIATIONS.

Exxon argues that Plaintiffs do not have standing to claim violations involving recordable emission events and permit violations not directly involving emissions.  This argument is without substance.  (Plaintiffs note that Exxon is not challenging Plaintiffs' standing to assert claims involving reportable emission events.)

Plaintiffs have submitted standing declarations[39] and briefed standing in their motion for partial summary judgment, and these are incorporated by reference so as not to overburden the Court with paper.

The Fifth Circuit has held that "the threshold for the injury requirement [of standing] is fairly low."  Sierra Club, Lone Star Chapter v. Cedar Point Oil, 73 F.3d 546, 557, n.23 (5th Cir. 1996) (CWA citizen suit case).[40]  As discussed in

---

[39] Declaration of Shae Cottar (Docket Entry [75-15]); Declaration of Diane Aguirre Dominguez (Docket Entry [75-15]); Declaration of Marilyn Kingman (Docket Entry [75-15]); Declaration of Stuart Halpryn (Docket Entry [79]); Declaration of Sharon Sprayberry (Docket Entry [80]).

[40] The court in Cedar Point Oil gave as an example of this Friends of the Earth v. Consol. Rail Corp., 768 F.2d 57, 61 (2d Cir. 1985), a CWA citizen suit in which the court found sufficient

Plaintiffs' summary judgment motion, breathing even slightly polluted air, being

reasonably concerned about the health risks of air pollution, and smelling bad

odors have all been found to constitute an injury in fact for standing purposes in

citizen suits.  Fear of an explosion has also been found to be an injury sufficient to

confer standing.  Covington v. Jefferson County, 358 F.3d 626, 638 (9th Cir. 2004)

(in RCRA citizen suit, fear of explosion at landfill).

     "Concern" that a violation will cause harm is also sufficient to establish

standing.  Cedar Point Oil, 73 F.3d at 556; see Friends of the Earth v. Laidlaw

Envtl. Serv., Inc., 528 U.S. 167, 184 (2000) (reasonable fear of harm from

pollution is an injury in fact).  In Cedar Point Oil, citizens sued Cedar Point Oil for

discharging "produced water" into Galveston Bay without a permit.  Cedar Point

Oil argued that because the standing affiant only stated he was "concerned" that

the discharges adversely affect the Bay, there was no injury.  Rejecting this

argument, the Fifth Circuit stated:

> Whether the affiants were "concerned" or "believed" or "knew to a moral
> certainty" that produced water would adversely affect their activities on the
> bay is a semantic distinction that makes little difference in the standing
> analysis.  The requirement that a party demonstrate an injury in fact is
> designed to limit access to the courts to those "who have a direct stake in the
> outcome" [cite omitted], as opposed to those who "would convert the
> judicial process into 'no more than a vehicle for the vindication of the value
> interests of concerned bystanders.'"  [Cite omitted].  Sierra Club affiants are
> concerned, but they are not mere "bystanders."  Two of the affiants live near

injury where an organization submitted an affidavit of a member who regularly drove on a bridge
over a river and was offended by pollution in the river.  Cedar Point Oil, 73 F.3d at 557, n.23.

Galveston Bay and all of them use the bay for recreational activities.  All of the affiants expressed fear that the discharge of produced water will impair their enjoyment of these activities because these activities are dependent upon good water quality.  Clearly, Sierra Club's affiants have a "direct stake" in the outcome of this lawsuit.

Cedar Point Oil, 73 F.3d at 556.  The court went on to say, "[t]hat this injury is couched in terms of future impairment rather than past impairment is of no moment."  Id.

As the declarations submitted with Plaintiffs' summary judgment motion show, Plaintiffs' affiants have a direct stake in the outcome of this lawsuit and are no mere bystanders.  They live, spend time, and own property near the Complex.  They breathe, smell, see, and become ill from Exxon's emissions, and fear an explosion.  The fact that some of the Complex's illegal emissions are released in (many) smaller amounts during the extremely numerous recordable, as opposed to reportable, emission events at the Complex does not alter the analysis.  And emissions even during a single recordable event can be very large, involving tens of thousands of pounds of hazardous and other air pollutants, and flammable gases.[41]  And, Plaintiffs' expert Dr. Sahu will testify that recordables involving

---

[41] See, e.g., these pollutant releases during emission events on the Recordable Emission Event Lists submitted by Plaintiffs with their motion for summary judgment:  31,524.82 lbs. of total VOCs during a 1,487.5 hour (62 day) leak at the Olefins Plant (EOMCS00000588); 1,689.50 lbs. of total VOCs in a 1.7 hour event at the Olefins Plant (EOMCS00000584-586); a 3,127 hour (131 day) event at the refinery that released 661.39 lbs. of NOx, 8.8 lbs. of hydrogen sulfide, 3,600.90 lbs. of CO, 826 lbs. of SO2, and 5,610.74 lbs. of unspeciated VOCs (EOMCS000047794); 41,500.00 lbs. of propane during a 277 hour event at the refinery

flaring likely release more pollutants than recorded.  Sahu Report 16-26.  Nicholas

Resp. Dec. Exh. 10.

Moreover, even small leaks can be dangerous.  As Exxon's own expert

Christopher Buehler testified, leaks of flammable gas at the Complex should be

minimized in order to minimize explosion risk.  Deposition of Christopher Buehler

("Buehler Dep.") 58:16-21 (Nicholas Resp. Dec. Exh. 13); see also Conf. Resp.

Similarly, Plaintiffs' expert Keith Bowers stated in his report ("Bowers Report,"

Exxon Mot. Exh. 9A) that "one cannot know beforehand whether an equipment

breakdown, a hole in a pipe, or some other malfunction will result in a minimal

release, or a major loss of containment, or an explosion.  Failure to take sufficient

steps to reduce the possibility of all such incidents to a minimum is to leave worker

and community safety to a roll of the dice."  Bowers Report 6; see also Conf. Resp.

Even Exxon states in its motion that mechanical and electrical failure, and human

error, can risk "dangerous overpressurization" unless gases are released through

valves or flared.  Exxon Mot. 13.

Plaintiffs' members also have a concrete interest in preventing permit

violations that, at least as reported by Exxon in Deviation Reports, do not directly

involve emissions.  Exxon has reported a large number of "open-ended" lines, for

instance, which are potential sources of leaks, even if Exxon happened not to have

(EOMCS000047810); 11,497.30 lbs. of total VOCs from a hole in a pipe at the refinery
(EOMCS00047816).

found them leaking on their inspections.  <u>See</u> Conf. Resp.  Exxon has also reported

fires at the Complex, which court an explosion catastrophe.[42]  Other examples

include:  engines are not tested, valves are not monitored for highly reactive

volatile organic compound emissions, equipment alarms break, and tanks are not

repaired.[43]  As Mr. Bowers made clear in his expert report, poor operation and

maintenance practices create the pre-conditions that can lead to unauthorized

emissions.  Bowers Rep. 2, 6, 10, 15, 18, 19.  "Continuous good condition of

structures, piping, vessels, and equipment are absolutely critical to continuous

containment of the dangerous materials omnipresent in any refinery."  Bowers

Rep. 6.  This is why such requirements for testing, inspections, recordkeeping, and

maintenance are included in Clean Air Act permits to begin with:  they are related

to emission control.  The Deviation Reports report myriad operation and

maintenance violations, all of which Exxon must take seriously to protect the

community.  These are not reporting violations of the type in <u>Steel Co. v. Citizens</u>

<u>for a Better Envt.,</u> 523 U.S. 88, 102-110 (1998); these are violations relating to the

---

[42] <u>See e.g.</u>, four fires in six months at Olefins Plant units.  Exhibit 11 to the Declaration of Mary Rock submitted with Plaintiffs motion for summary judgment (Summary of Olefins Plant Violations from Deviation Report Forms (FOP O-01553) (Docket Entry [76-11])

[43] Rock Dec. Exh. 13 (Table 6D:  Summary of Olefins and Aromatics Chemical Plant Violations from Deviation Report Forms (FOP O-01278), Deviation Items ##5 and 17 in the 10/12/06-4/12/07 reporting period; Deviation Item # 4 in the 4/1/08-9/30/08 reporting period; Deviation Item #3 in the 4/1/09-9/30/09 reporting period.

way Exxon runs the Complex, and Plaintiffs have a direct stake in enforcing

compliance with these requirements. [44]

## CONCLUSION

For the reasons set forth above, Exxon's motion for summary judgment

should be denied.

Dated:  September 14, 2012                    Respectfully submitted,


*/s/ Philip H. Hilder*                        */s/ David A. Nicholas*
Philip H. Hilder                              S.D. Tex. Bar No. 89667
State Bar No. 09620050                        20 Whitney Road
Southern District of Texas Bar No. 2474       Newton, Massachusetts  02460
William B. Graham                             (617) 964-1548 (phone)
State Bar No. 24053236                        (617) 663-6233
Southern District of Texas Bar No. 1132514
Hilder & Associates, P.C.                     Joshua R. Kratka
819 Lovett Blvd.                              S.D. Tex. Bar No. 962922
Houston, Texas  77006-3905                    Rachel Gore Freed (pro hac vice)
(713) 655-9111 (phone)                        National Environmental Law Center
(713) 655-9112 (fax)                          44 Winter Street, 4th Floor
                                              Boston, Massachusetts  02108
PHILIP H. HILDER:                             (617) 747-4333 (phone)
ATTORNEY-IN-CHARGE                            (617) 292-8057 (fax)
FOR PLAINTIFFS

---

[44] In any event, the Plaintiff groups and their members also have a cognizable interest in enforcing reporting requirements.  Environment Texas and Sierra Club advocate before legislative and administrative bodies at the federal, state, and local levels, engage in public education, and rely on their own research in support of this work.  Declaration of Luke Metzger in Support of Pl. MSJ (Docket Entry [77]) ¶¶ 2-4; Declaration of Neil Carman in Support of Pl. MSJ (Docket Entry [78]) ¶¶ 4-5.  Access to timely, accurate, and complete information required to be reported to public agencies is a *sine qua non* of public interest advocacy.  And group members who live near the Complex have an interest in seeing that government regulators receive the information they need in order to monitor operations there.  Sierra Club v. Simkins Indus., Inc., 847 F.2d 1109, 1113 (4th Cir. 1988) (describing harm resulting from failure to report information "to environmental planners and policymakers and those who might undertake to remedy the effects of any pollution").