# Exhibit 11

## Page 1

```
              UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF TEXAS
                    HOUSTON DIVISION
ENVIRONMENT TEXAS      )
CITIZEN LOBBY, INC.    )
and SIERRA CLUB,       )
                       )
     Plaintiffs,       )
                       )
VS.                    ) CIVIL ACTION NO. 4:10-cv-4969
                       )
EXXON MOBIL CORPORATION, )
et al.                 )
                       )
     Defendants.       ) JUDGE DAVID HITTNER

*****************************
      ORAL VIDEOTAPED DEPOSITION OF
             R. SHAE COTTAR
              MAY 14, 2012
*****************************
```

ORAL VIDEOTAPED DEPOSITION OF R. SHAE COTTAR, produced as a witness at the instance of the Defendants, and duly sworn, was taken in the above-styled and numbered cause on the 14th day of May, 2012, from 9:06 a.m. to 11:52 a.m., before Linda S. Partida, CSR, in and for the State of Texas, reported by computerized stenotype machine at the offices of Beck, Redden & Secrest, L.L.P., 1221 McKinney Street, Suite 4500, Houston, Texas, pursuant to the Federal Rules of Civil Procedure (and the provisions stated on the record or attached therein.)

## Page 2

```
 1              A P P E A R A N C E S
 2  FOR THE PLAINTIFFS AND THE WITNESS
 3      Mr. Joshua R. Kratka
        National Environmental Law Center
 4      44 Winter Street
        4th Floor
 5      Boston, Massachusetts 02108
        Telephone: 617-747-4333 - Fax: 617-292-8057
 6
    FOR THE DEFENDANTS
 7
        Mr. Bryon A. Rice
 8      Beck, Redden & Secrest, L.L.P.
        1221 McKinney Street
 9      Suite 4500
        Houston, Texas 77010
10      Telephone: 713-951-6256 - Fax: 713-951-3720
11  VIDEOTAPED BY:
12      Patrick Mahoney
        Legal Media, Incorporated
13      1602 Washington Avenue
        Houston, Texas 77007
14      Telephone: 713-861-4700 - Fax: 713-861-2951
15
16
17
18              * * * * *
```

## Page 3

```
 1                      INDEX
 2                                          PAGE
 3  R. Shae Cottar
 4      Examination by Mr. Rice............     4
        Examination by Mr. Kratka..........   126
 5      Further Examination by Mr. Rice....   127
 6  Witness' Correction/Signature Page.....   129
 7  Reporter's Certification...............   131
 8
 9                    EXHIBITS
10  EXHIBIT       DESCRIPTION            PAGE
11    1     The eight-page Notice and Subpoena   25
            Duces Tecum for the deposition of
12          Shae Cottar
13    2     A three-page article written by      29
            Shae Cottar titled "Protecting
14          the Future of our Gulf Coast"
15    3     The 30-page Complaint pertaining     49
            to the aforementioned litigation
16
      4     A three-page PowerPoint titled       60
17          "Toxic Emissions per Compounds
            in 2008" prepared by Air Alliance
18
      5     One page containing a black and      64
19          white Xerox copy of a photograph
            of clouds over an industrial plant
20
      6     A seven-page declaration prepared    72
21          by Shae Cottar
22
23
24
25
```

## Page 4

```
 1              PRELIMINARY PROCEEDINGS
 2        THE REPORTER:  Please put your
 3  stipulations on the record.
 4        MR. KRATKA:  I think we want to --
 5  Shae to review and sign the transcript.
 6        MR. RICE:  Sure.
 7        MR. KRATKA:  I'll make objections, and
 8  that will be preserved for trial.
 9        MR. RICE:  Yes.
10        MR. KRATKA:  And unless it is an area
11  of, you know, attorney-client privilege, the witness
12  will go ahead and answer the question.
13        MR. RICE:  That'll work.
14        THE REPORTER:  Do you have a trial or
15  hearing date, anything pressing I need to be aware
16  of?
17        MR. RICE:  No.
18
19              R. SHAE COTTAR,
20  having been first duly sworn, testified as follows:
21                  EXAMINATION
09:08  22  Q.  (BY MR. RICE) Would you state your name for
23  the record, please?
09:08  24  A.  Richard Shae Cottar.
09:08  25  Q.  And, Mr. Cottar, how old of a man are you?
```

CONFIDENTIAL - Shae Cottar - 5/14/12

Page 81

```
10:47   1        Let's talk about the smells and the
        2    stuff in the air that you -- that you -- you just
        3    mentioned.
10:47   4     A.  Awesome.
10:47   5     Q.  What -- just describe for me -- let's take
        6    the smells.
10:47   7        Have there been times where you
        8    smelled these odors that you attribute to or you
        9    associate with an emission event?
10:47  10     A.  Yes.
10:47  11     Q.  Okay.
10:47  12        How often does that occur?  If you
       13    recall, let's say in the past five years, how often
       14    would -- would it occur that you would smell an odor
       15    that you attribute to an emission event at a
       16    petrochemical facility?
10:48  17     A.  May I limit it to the last two?
10:48  18     Q.  Sure.
10:48  19     A.  Because I really couldn't tell you how
       20    often until I lived next door.
10:48  21     Q.  Right.  That makes sense.  Let's -- let's
       22    limit it to the -- the time that you've lived here at
       23    Briar Court --
10:48  24     A.  Briar Court.
10:48  25     Q.  -- right across the Spur 330.
```

Page 82

```
10:48   1     A.  I would say that, while not always every
        2    week, it averages out to about once a week.  It may
        3    go a week without having any issue; but then, the
        4    next issue, you might have two or three -- or, the
        5    next week, you might have two or three.
10:48   6     Q.  And -- I'm sorry.
10:48   7     A.  So, on an average of about once a week.
10:48   8     Q.  And just describe for me what -- what it
        9    is.  What do you smell?  What does it smell like that
       10    you -- when you -- when you smell something that you
       11    associate with an emission event, what does it smell
       12    like?
10:49  13     A.  A very, very strong, pungent chemical odor.
10:49  14     Q.  Is there any particular time of the day
       15    that this tends to occur more often?
10:49  16     A.  Yes.
10:49  17     Q.  And what time of day is that?
10:49  18     A.  It is not limited to nighttime, but it is
       19    most often at night.  I would say 9:00 p.m. on.
10:49  20     Q.  So, 9:00 to?
10:49  21     A.  Sometimes 2:00, 3:00 o'clock.
10:49  22     Q.  Okay.
10:49  23        And if it had -- if -- if -- when
       24    these events occur, at that time, are you generally
       25    awake and you -- you happen to notice them; or...
```

Page 83

```
10:49   1     A.  They -- it -- there are times when it will
        2    happen when I'm awake.  I go out to take the trash
        3    out, go out to walk the dogs.
10:50   4        There have been times, as well, that I
        5    have awakened at 2:00 o'clock in the morning with a
        6    horrible headache and the smell of it in my bedroom.
        7    My bedroom window faces the complex.
10:50   8     Q.  Okay.
10:50   9        Now, when you -- I'm -- I'm looking
       10    back now at your declaration; and in Paragraph 2, it
       11    says that you've -- you've often seen sooty black
       12    smoke coming from the flare flames.
10:50  13        How many times have you visually
       14    witnessed an emission of a flaring event, where
       15    something's been flaring off at the ExxonMobil --
10:51  16     A.  How many --
10:51  17     Q.  -- complex?
10:51  18     A.  -- times?
10:51  19     Q.  Right, if you can recall.
10:51  20     A.  I would roughly say once a week for the
       21    last two years.
10:51  22     Q.  And when those occur, do you -- what do you
       23    do?  Do -- I mean, have you ever contacted ExxonMobil
       24    about these events?
10:51  25     A.  As a matter of fact, I tried Friday.
```

Page 84

```
10:51   1     Q.  Okay.
10:51   2        What --
10:51   3     A.  Or Thursday.
10:51   4     Q.  And what did you do on Thursday?
10:51   5     A.  I contacted -- I -- I -- when the picture,
        6    Exhibit 5, was taken, I immediately went home.  I
        7    Googled Baytown Exxon Chemical; found the main
        8    number; called the main number and said, "Hey, this
        9    is what I just witnessed.  Is there anything going
       10    on?  Is -- you know, is there any cause for concern?"
10:51  11        And I was led on a 30-minute wild
       12    goose chase that netted me nothing.
10:52  13     Q.  When you say "wild goose chase," what do
       14    you mean really?
10:52  15     A.  I talked to four different people, and
       16    nobody knew either how to answer me or who I should
       17    talk to.  I repeatedly asked for either public
       18    relations or a community liaison, and it was as if
       19    I'd asked them to speak to the man in the moon.  I
       20    got this complete, "Uh.  Uh.  Let me get you to
       21    hold."
10:52  22        They finally then transferred me to --
       23    or told me that -- that I -- the only recourse I had
       24    or the only way I could find out anything was to call
       25    the main Houston number, which that's like asking,
```

21 (Pages 81 to 84)

CONFIDENTIAL - Shae Cottar - 5/14/12

Page 85

10:52  4  Q.  Did you call the Houston number?
10:53  5  A.  I did. I did. And I got the same deer in
       6  the headlights response that completely just -- "I
       7  don't know who that would be."
10:53  8      "Well, do you have a public relations
       9  office? Do you have a community liaison?" I -- I
      10  don't know how else to ask other than those two
      11  keywords.
10:53 12      Finally, I -- I said to the lady that
      13  answered the phone -- I'm assuming she was a
      14  receptionist for that main number -- I said, "You
      15  know, no one can even tell me who I should talk to.
      16  Do you understand how frustrating that is? You guys
      17  tell me you're my neighbor. I don't know my
      18  neighbor's name. And you say you're a good neighbor.
      19  I can't contact my neighbor. I can't find out if I
      20  should shelter in place. Nobody's called the CAER
      21  line. Nothing's going on."
10:53 22      And I -- and I got repeated silences,
      23  so much so that I was concerned that maybe I had lost
      24  the phone call. And, so, I would ask again, "Did I
      25  lose you? Are you still there?"

       1  you know, somebody from Baytown Wal-Mart to call
       2  Fayetteville, Arkansas, to find out why there's a
       3  spill on Aisle 7.

Page 86

10:54  1      "Yes, sir, I'm still here."
10:54  2      "Okay. Do you understand my
       3  question?" Silences, almost as if, you know, she was
       4  afraid to answer.
10:54  5  Q.  And -- and what wa -- what was the
       6  question -- or what were the questions you were
       7  asking?
10:54  8  A.  The quest -- as I just stated, the
       9  questions were, "I don't know who I could even talk
      10  to. Do you have a community liaison? Is there a
      11  public relations person? Is there somebody in Exxon
      12  I can talk to about what's going on?" And I got
      13  complete silence.
10:54 14      Finally, she routed my call, funny
      15  enough, to the credit card customer care line; and a
      16  lady named Mary with customer care was extremely
      17  patient, extremely helpful. She was bewildered, too,
      18  as to why they routed me to her. She's like, "What's
      19  going on?"
10:54 20      I said -- and I explained the whole
      21  thing to her, probably for the fourth or fifth time.
      22  And I explained to her, "I'm not a customer. I'm --
      23  I'm a resident, and I'm concerned."
10:55 24      And she finally took the initiative to
      25  call someone at the local Baytown facility that she

Page 87

       1  was able to dial up. I was never told who that was
       2  or how I could get in touch with anyone.
10:55  3      My core complaints were never
       4  answered, the core complaints being, "Can I talk to
       5  somebody? You know, if -- if you guys purport to be
       6  a good neighbor, good neighbors talk to each other.
       7  So, who can I talk to?" And that was never answered.
10:55  8  Q.  Were you ever given an answer to the
       9  question as to what this might have been depicted in
      10  the photograph?
10:55 11  A.  I was told -- and this is, as best as I can
      12  remember, a direct quote -- it was nothing that the
      13  public needed to be aware of, which implicitly states
      14  that it -- not that it was nothing, but that it was
      15  nothing that the public needed to be aware of.
10:55 16  Q.  Well, do you have any reason to believe
      17  that it was something that --
10:56 18  A.  Well --
10:56 19  Q.  -- the public --
10:56 20  A.  -- it's black smoke. That tells me it's
      21  something.
10:56 22  Q.  Did you contact the TCEQ on that day?
10:56 23  A.  I did, and there was nothing reported.
10:56 24  Q.  Have you contacted the C -- TCEQ subsequent
      25  to that day --

Page 88

10:56  1  A.  I was --
10:56  2  Q.  -- about this --
10:56  3  A.  -- going to give it the weekend and try
       4  again today.
10:56  5  Q.  Okay.
10:56  6      Was that the first time that you had
       7  contacted ExxonMobil or tried to contact ExxonMobil
       8  regarding a potential --
10:56  9  A.  That was --
10:56 10  Q.  -- emission event?
10:56 11  A.  -- the second time.
10:56 12  Q.  And when was the first time?
10:56 13  A.  A year ago maybe. It was a long time ago.
      14  And I -- it -- it -- it -- I didn't have the patience
      15  to follow through. I got the same runaround
      16  initially of, "I don't know who you can talk to."
10:57 17      And, so, I just said, "Okay. Thank
      18  you," and hung up; and I called the TCEQ directly.
10:57 19  Q.  And was that -- that initial time, was that
      20  instigated by something that you saw?
10:57 21  A.  No. That was about a smell.
10:57 22  Q.  A smell that you smelled?
10:57 23  A.  (Nodding head)
10:57 24  Q.  And what did -- when you contacted the
      25  TCEQ, what was the outcome of that call?

22 (Pages 85 to 88)

Linda S. Partida, CSR
Nell McCallum & Associates, Inc.