## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| ENVIRONMENT TEXAS CITIZEN | § | |
| LOBBY, INC. AND SIERRA CLUB, | § | |
| *Plaintiff*s, | § | |
| | § | |
| vs. | § | CIVIL ACTION H-10-4969 |
| | § | |
| EXXON MOBIL CORPORATION, *ET AL.*, | § | |
| *Defendant*s. | § | |

## MEMORANDUM AND RECOMMENDATION

This action brought by environmental advocacy groups for violations of the Clean Air Act (Act) is before the court on defendants' motion for summary judgment (Dkt. 82).[1]  Having considered the parties' submissions and argument of counsel at a hearing in open court on April 2, 2013, the court recommends that the motion be granted in part and denied in part.

## Background

Defendants Exxon Mobil Corporation, ExxonMobil Chemical Company, and ExxonMobil Refining and Supply Company operate a refinery, olefins plant, and chemical plant in Baytown, Texas (Baytown Complex).  Plaintiffs Environment Texas Citizen Lobby, Inc. and Sierra Club have sued defendants under the citizen suit provision of the Act for air emissions or events from the Baytown Complex.  Any

---

[1]     The District Court referred this case to this Magistrate Judge for pretrial management (Dkt. 120).

penalties awarded would be paid to the United States Treasury or to fund mitigation projects.

All of the alleged violations on which plaintiffs' claims are based were disclosed by defendants in its reports to the Texas Commission of Environmental Quality (TCEQ).  Defendants seek summary judgment on all of plaintiffs' claims.

## Summary Judgment Standards

Summary judgment is appropriate if no genuine issues of material fact exist, and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).  The party moving for summary judgment has the initial burden to prove there are no genuine issues of material fact for trial.  *Provident Life & Accident Ins. Co. v. Goel*, 274 F.3d 984, 991 (5th Cir. 2001).  Dispute about a material fact is "genuine" if the evidence could lead a reasonable jury to find for the nonmoving party.  *In re Segerstrom*, 247 F.3d 218, 223 (5th Cir. 2001).  "An issue is material if its resolution could affect the outcome of the action."  *Terrebonne Parish Sch. Bd. v. Columbia Gulf Transmission Co.,* 290 F.3d 303, 310 (5th Cir. 2002).

A summary judgment movant who bears the burden of proof on a claim must establish each element of the claim as a matter of law.  *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986).  If the movant meets this burden, "the nonmovant must go beyond the pleadings and designate specific facts showing that there is a

genuine issue for trial." *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 282 (5th Cir. 2001) (quoting *Tubacex, Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1995)).

If the evidence presented to rebut the summary judgment is not significantly probative, summary judgment should be granted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986). In determining whether a genuine issue of material fact exists, the court views the evidence and draws inferences in the light most favorable to the nonmoving party. *Id.* at 255.

In a non-jury trial, the judge is the ultimate trier of fact. In such cases, the court may grant summary judgment where a trial would not enhance the court's ability to draw inferences and conclusions. *Nunez v. Superior Oil Co.*, 572 F.2d 1119, 1123-24 (5th Cir. 1978); *In re Placid Oil Co.*, 932 F.2d 394, 398 (5th Cir. 1991). The district court must be aware that assessments of credibility, however, come into sharper focus upon hearing live witnesses. *Placid Oil*, 932 F.2d at 398.

Defendants seek summary judgment on eight grounds: (1) plaintiffs' citizen suit impermissibly second guesses enforcement of the Act by regulatory agencies; (2) there is no evidence that the many of the violations alleged by plaintiffs have been "repeated" within the meaning of the Act; (3) some of the alleged violations do not constitute actual violations of the Act; (4) some of the alleged violations are the subject of a Consent Decree between defendants and EPA; (5) some of the alleged

violations occurred during a period when defendants were excused from compliance with environmental regulations due to Hurricane Ike; (6) some of the alleged violations have been the subject of prior TCEQ enforcement actions; (7) some of the alleged violations are subject to the affirmative defense set forth in TCEQ's regulations implementing the Act in Texas; and (8) some of the alleged violations are not emissions at all and did not cause any harm.

## Analysis

### A.    Regulatory enforcement of the Clean Air Act

Under the Act, the EPA sets standards for air emissions through its new source performance standards program (NSPS, 42 U.S.C. § 7411) and its national emission standards for hazardous air pollutants program (NESHAP, 42 U.S.C. § 7412).  The Act requires each state to create a state implementation plan (SIP) to implement these national ambient air quality standards.  42 U.S.C. § 7410.  A SIP must include "enforceable emissions limitations and other control measures, means and techniques as may be necessary or appropriate" to satisfy the Act, as well as permitting and enforcement programs.  *Id.* § 7410(a)(2).  The EPA must approve a state's SIP, but the state has primary responsibility for implementing it.  *Id.* § 7407(a).  In Texas, TCEQ handles that responsibility.  30 TEX. ADMIN. CODE § 116.10 *et seq.*

4

TCEQ issues permits for new or modified sources of air emissions called new source review ( NSR) permits.  TCEQ also issues operating permits under Title V of the Act to facilities that are sources of air emissions.  Because unplanned emissions occur for numerous reasons at facilities like the Baytown Complex, TCEQ has rules in addition to its NSR and Title V permit requirements that tell facilities what to do when an emission event occurs.  *See* 30 TEX. ADMIN. CODE §§ 101.201-101.222. These rules set forth self-reporting processes for different levels of emission events. The reports are typically referred to as "STEERS Reports," in reference to the State of Texas Environmental Electronic Reporting System.

TCEQ requires defendants to report within 24 hours any emission event at the Baytown Complex that meets the TCEQ standard for a "reportable" event.  *Id.* § 101.201(a).  In addition, defendants must submit a report to TCEQ at least 10 days or as soon as practicable before any scheduled maintenance, startup, and shutdown activities at the Baytown Complex that are expected to cause unauthorized emissions in excess of a reportable quantity.

TCEQ requires defendants to keep records of "recordable" emissions – those that do not rise to a reportable quantity – on Recordable Emission Event lists maintained at the Baytown Complex.  *Id.* § 101.201(b).  Recordable emission events

that represent a deviation from the Title V or NSR permits must be contained in a semi-annual Title V deviation report to TCEQ. *Id.* § 122.145(2)(A).

TCEQ is charged with reviewing STEERS reports, undertaking investigations to determine the cause of reportable events, and ordering corrective actions. TEX. HEALTH & SAFETY CODE §§ 382.0215, 382.0216, 382.022. If the investigation shows that the operator took prompt action to achieve compliance and meets other criteria set forth in affirmative defense provisions of the rules, TCEQ may refrain from assessing a civil penalty. 30 TEX. ADMIN. CODE §§ 101.222, 101.223. Where the affirmative defense is not applicable, TCEQ exercises discretion pursuant to its Enforcement Initiation Criteria to determine the proper penalty or other corrective action.

For recordable events and Title V deviations, TCEQ maintains jurisdiction and discretion to take enforcement action if it determines that the record reflects a trend of non-compliance. In addition, the EPA monitors TCEQ oversight and enforcement of the Act and may step in when it deems necessary. The EPA has never, as far as this record reflects, exercised its right to pursue enforcement on its own, or "over-file," with respect to any of TCEQ's investigations and enforcement actions regarding violations alleged this lawsuit.

## B.   Defendants' grounds for summary judgment

### 1.   Does this citizen suit impermissibly second-guess enforcement by regulatory agencies?

Defendants' first ground, and the only one which would dispose of the entire case, is that "Plaintiffs cannot use the citizen suit provision of the CAA to second-guess the results of the application of the CAA by TCEQ and the EPA to the operations of the Baytown Complex."[2]  This "second-guess" argument, by far the most vigorously pressed by defendants, is also the most readily dismissed.

While primary responsibility for enforcement lies with the TCEQ and EPA, the Act plainly invites citizens to play an enforcement role:

(a)   Authority to bring civil action; jurisdiction

Except as provided in subsection (b) of this section, any person may commence a civil action on his own behalf –

(1) against any person . . . who is alleged to have violated (if there is evidence that the alleged violation has been repeated) or to be in violation of (A) an emission standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation.

42 U.S.C. § 7604(a)(1).  The only statutory limits to these citizen suits are found in subsection b – plaintiff must give 60-days notice, and the government must not be "diligently prosecuting" a related civil action in court.  42 U.S.C. § 7604(b)(1).

---

[2]      Dkt. 82 at 37.

Defendants do not assert, and expressly disclaim, reliance on either of the statutory bars of § 7604(b).[3]  Instead, defendants would have this court add another limitation on citizen suits based solely on policy grounds untethered to any statutory language.  Stressing the importance of agency discretion and compromise, defendants posit a rule that citizen suits should not be allowed to proceed without a showing that government agencies have "abdicated their CAA enforcement obligations."  But the court has found no reported case holding that "agency abdication" is a pre-condition for citizen suits under the Act; indeed, such a holding would be difficult to square with the Fifth Circuit's ruling that an administrative enforcement action by a state agency does not bar a citizen suit under the statutory preclusion section of the Act. *Texans United for a Safe Economy Education Fund v. Crown Central Petroleum Corp.,* 207 F.3d 789, 795 (5th Cir. 2000).

Defendants rely upon assembled snippets from *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found.*, 484 U.S. 49, 60 (1987) and various appellate opinions describing citizen suits as "interstitial" and "supplemental" to government action.[4]

---

[3]       *See* Dkt. 114 at 5.

[4]       *See* Dkt. 82 at 38-39 (citing *Louisiana Env't Action Network v. City of Baton Rouge*, 677 F.3d 737, 740 (5th Cir. 2012); *E.P.A. v. City of Green Forest*, 921 F.2d 1394, 1402 (8th Cir. 1990); *Karr v. Hefner*, 475 F.3d 1197-98 (10th Cir. 2007); *Supporters to Oppose Pollution, Inc. v. Heritage Group*, 973 F.2d 1320, 1324 (7th Cir. 1992); *Envt'l Conservation Org. v. City of Dallas*, 529 F.3d 519, 528 (5th Cir. 2008)).

But those opinions were addressing express statutory limits on citizen suits, not the novel policy-based bar urged by defendants here. *See, e.g., Karr*, 475 F.3d at 1196-97 (addressing diligent prosecution under 33 U.S.C. § 1365(b)(1)(B)). Moreover, most of the cited cases were construing a different statute (the Clean Water Act) with materially different limits on citizen suits than the Clean Air Act.[5]

It is true that every emission cited by plaintiffs was self-reported by defendants to the TCEQ, and that TCEQ had authority to (and in some cases did) take enforcement action against defendants for these emissions. And defendants are correct that citizen suits are a way of second-guessing this TCEQ action (or inaction). But that is precisely the point – citizen suits were *intended* to be a mechanism for the public to second-guess the adequacy of an agency's response to Clean Air Act violations.[6] As an antidote to regulatory capture, a citizen suit is itself an integral part of the regulatory scheme created by Congress. At the same time, Congress was aware that unbridled citizen suits might sometimes "intrude" upon the enforcement scheme, and accordingly set boundaries it deemed appropriate for such suits. It is not for this

---

[5] Compare 42 U.S.C. § 7604 with 33 U.S.C. § 1365.

[6] Plaintiffs contend not only that they are entitled to bring this suit, but that defendants' self-reporting establishes liability as a matter of law. Judge Hittner denied plaintiffs' partial motion for summary judgment on liability (Dkt. 117). Plaintiffs have asked this court to reconsider Judge Hittner's ruling (Dkt.121). The court declines. Judge Hittner can revisit his rulings prior to entry of final judgment if he deems it appropriate.

court to move those boundaries, or indeed to erect new ones, merely to satisfy defendants' policy concerns.    Defendants' first ground for summary judgment should be denied.

## 2.    Were the alleged violations "repeated"?

Defendants' motion asserts that plaintiff's have no evidence of any "repeated" violations, apart from certain events and deviations listed in the expert report of Keith Bowers.[7]  They further assert that, because plaintiffs do not contend that defendants are currently in violation of an emission standard or limitation, the court should grant summary judgment as to all events and Title V deviations listed in the schedules attached to the complaint, other than those mentioned in Bowers report.  Again, this ground for summary judgment is not well taken.

In the first place, plaintiffs have in fact alleged ongoing violations of the Act, and not merely historical violations.[8]  The alleged violations may be actionable if they are shown to be ongoing violations under the two-part test adopted by the Fifth

Circuit:    (1) by proving violations that continue on or after the date
the complaint is filed, or (2) by adducing evidence from
which a reasonable trier of fact could find a continuing

---

[7]    Dkt. 82 at 5 and Ex. 11.  Defendants have moved to exclude Bowers's testimony (Dkt.89).  For present purposes the court assumes without deciding that the testimony is admissible.

[8]    Dkt. 1, ¶ 7.

> likelihood of recurrence in intermittent or sporadic
> violations.  Intermittent or sporadic violations do not cease
> to be ongoing until the date when there is no real
> likelihood of repetition.

*Carr v. Alta Verde Industries, Inc.,* 931 F.2d 1055, 1062 (5th Cir. 1991) (quoting

*Chesapeake Bay Foundation, Inc. v.  Gwaltney of Smithfield Ltd.,* 890 F.2d 690, 693

(4th Cir. 1989)).

Defendants argue that it is not enough for plaintiffs to show multiple violations

of the same emission standard or limitation.  It is defendants' position that plaintiff

must also show that the violations resulted from "the same inadequately corrected

source of trouble," citing *Anderson v. Farmland Indus.*, 70 F. Supp. 2d 1218, 1229

(D. Kan. 1999) (citing *National Resources Defense Council, Inc. v. Texaco Ref'g &

Marketing, Inc.*, 2 F.3d 493, 499 (3d Cir. 1993)).  Defendants' citation to *Farmland*

ignores the full holding of the Third Circuit decision on which *Farmland* relies,

which reads as follows:

> a plaintiff can establish at trial that violations are continuous or
> intermittent in either of two ways:  first, by proving a likelihood of
> recurring violations of the same parameter; or second, by proving a
> likelihood that the same inadequately corrected source of trouble will
> cause recurring violations of one or more different parameters.

*Texaco Ref'g*, 2 F.3d at 499.  The court defined "parameter" as:

> a particular attribute of discharge.  Parameters under the permit included
> specific types of pollutants, as well as other discharge characteristics,

such as temperature and flow rate.  Most parameters were subject to strict effluent limits, of which there were two types.  Maximum daily limits specified the maximum amount of a pollutant that could be discharged from an outfall during any calendar day.  Daily average limits, which were lower than maximum daily limits, specified the maximum average amount that could be discharged over the course of the days in a calendar month that the facility operated.

2 F.3d at 496.  The parameters described in *Texaco Refining* are very analogous to the emission standards and limitations contained in Baytown's permits that plaintiffs allege have been violated in each count of the complaint.[9]

Defendants' insistence that plaintiffs must prove violations arising from the same source is unduly restrictive for another reason.  *Texaco Refining*, a Clean Water Act case, addresses only what it means to be "in violation" of that act, not what it means "to have violated" the Clean Air Act.  The same is true of *Carr* and *Gwaltney*.  This is because the phrase "to have violated (if there is evidence that the alleged violation has been repeated)" is not in the Clean Water Act.  *See* 33 U.S.C. § 1365(a).  After *Gwaltney* was decided, Congress added the phrase in order to allow suits for past violations.  *See Atlantic States Legal Found. v. United Musical Instruments,*

---

[9]    Count I is for unlawful "upsets," which are unauthorized emissions that either are unexpected, or that exceed by a reportable amount what was expected in a maintenance, startup, or shutdown activity.  Count II is for excessively hourly emissions.  Count III is for exceeding emission limits for highly reactive volatile organic compounds. Count IV is for excessive emissions from smoking flares. Count V is for periods of pilot flame outages. Count VI is for "fugitive emissions." Count VII is for all reported violations on Title V deviation reports.  Dkt. 1.

*U.S.A.*, 61 F.3d 473, 477 (6th Cir. 1995).  Other district courts have held that the Act allows citizen suits for a wholly past violations if plaintiffs present evidence of a second violation of the ***same*** emission standard or limitation.  *See, e.g., Satterfield v. J.M. Huber Corp.*, 888 F. Supp. 1561, 1564-65 (N.D. Ga. 1994); *Patton v. General Signal Corp.*, 984 F. Supp. 666, 672 (W.D.N.Y. 1997); *Glazer v. American Ecology Enviro. Serv. Corp.*, 894 F. Supp. 1029, 1938 (E.D. Tex. 1995).  The court concludes that this construction of the statute is appropriate.

Thus, plaintiffs are entitled under § 7604(a)(1) to sue for (i) ongoing violations, *i.e.*, those that a reasonable fact-finder could find have some likelihood of recurrence, and (ii) repeated violations of the same emission standard or limitation.  Plaintiffs have met their summary judgment burden to present evidence of such ongoing or repeated violations.[10]

Defendants argue that this evidence is not detailed enough to persuade the finder of fact on each violation asserted in every count at trial, but that is not plaintiffs' burden at this summary judgment stage.  The evidence is sufficient to

---

[10]    Dkts. 76-1 through 76-14 and Dkt. 82 at 46-52.  Judge Hittner previously overruled defendants' objections to the Rock declaration (Dkt. 117).  For current purposes, the court is ***not*** relying on the Rock declaration as evidence for the number of days defendants were in violation of a standard or limit, but only as evidence there have been repeated violations.  In addition, defendants concede that Bowers's expert report is sufficient to defeat summary judgment as to the violations listed on defendants' exhibit 11.

create a genuine issue of material fact as to each count of the complaint, and so summary judgment on ground 2 of defendants' motion should be denied.

### 3.    Do plaintiffs rely on incidents that do not constitute violations of the Act?

Plaintiffs are authorized to bring a citizen suit to enforce "an emission standard or limitation" of the Act. 42 U.S.C. § 7604(a), (f).   Defendants have submitted evidence of 20 alleged "violations" that do not in fact reflect a violation of any emission standard or limitation.[11]   It is undisputed that the events were listed on STEERS reports, but defendants have submitted evidence that the reporting was inaccurate and the referenced incidents were not reportable or recordable incidents and were not violations of any regulatory requirements.[12]

In the face of defendants' evidence on a point on which plaintiffs have the burden of proof at trial, plaintiffs have failed to produce even a scintilla of contrary evidence.   The court recommends summary judgment be granted on the 20 alleged violations identified in defendants' ground 3.

### 4.    Is the EPA diligently prosecuting the 2005 EPA consent decree?

---

[11]     Defendants' exhibit 12 (Dkt. 91-52).

[12]     Defendants' exhibit 2, ¶ 7 (Dkt. 91-10).

14

As discussed in section B(1) above, a citizen suit is barred if the EPA is diligently prosecuting an enforcement action in court at the time the complaint is filed. Continued enforcement of a consent decree such as that at issue here can prohibit a citizen suit. *Louisiana Envir. Action Network v. City of Baton Rouge*, 677 F.3d 737, 749 (5th Cir. 2012). The evaluation of EPA's diligent enforcement is quite deferential. *Karr v. Hefner*, 475 F.3d 1192, 1198 (10th Cir. 2007).

The Consent Decree relates to emissions at a number of ExxonMobil facilities, including the Baytown Refinery. It has been amended three times to date, and in addition to assessing monetary penalties, implements ongoing corrective actions and reporting requirements.[13] Defendants identify the alleged violations that duplicate the EPA's enforcement pursuant to the Consent Decree in their exhibit 13. Plaintiffs do not present any evidence to show that the violations identified in exhibit 13 are outside the scope of the Consent Decree. The court recommends that summary judgment be granted in defendants' favor on the violations identified in their exhibit 13.

**5.    Are some of the alleged violations excused by defendants' Hurricane Ike disaster response?**

---

[13]    Defendants' exhibit 6, 6A-6C (Dkt. 91-19 through 91-28).

As Hurricane Ike was approaching landfall in September 2008, Governor Rick Perry issued a disaster proclamation suspending "all rules and regulations that may inhibit or prevent prompt response to this threat . . . for the duration of the state of disaster."[14] Following the Governors proclamation, defendants shut down operations at the Baytown Complex.  Immediately after the storm, TCEQ announced that all TCEQ rules and regulations were suspended for "all reasonable actions necessary and prudent to facilitate, maintain, or restore fuel production and/or distribution, within the State of Texas, directly related to Hurricane Ike."[15]

Several of the alleged violations relied upon by plaintiffs occurred during the shut-down or start up of the Baytown Complex caused by Hurricane Ike.[16]  The only evidence that the emission events were related to the response to Hurricane Ike is the date on which they occurred.  The Governor and TCEQ did not suspend all rules and regulations for all purposes, but only as they inhibited the emergency response to Ike.  The dates on which the events occurred creates a fact issue as to whether they are

---

[14]     Defendants' exhibit 1 and exhibits 3, 5 thereto (Dkt. 91-4).

[15]     *Id.* exhibit 4 (Dkt. 91-4).

[16]     These are listed on defendants' exhibit 14 (Dkt. 91-52).

excused by the emergency response, but do not establish that fact as a matter of law.[17]

The court recommends that defendants' ground 5 for summary judgment be denied.

**6.      Is plaintiffs' suit barred as to violations for which TCEQ conducted a state enforcement action?**

There is no limitation on citizen suits for violations that are the subject of prior

state administrative enforcement actions.  *See* 42 U.S.C. § 7604; *Crown Petroleum*,

207 F.3d at 791, 794-95.  Defendants' sixth ground for summary judgment should be

denied.[18]

**7.      Can plaintiffs sue for violations that the TCEQ determined to be subject to a regulatory affirmative defense?**

TCEQ regulations provide an affirmative defense in enforcement actions.  30

TEX. ADMIN. CODE 101.222(b).  Defendants contend that TCEQ has already

determined that the affirmative defense applies as to certain of the alleged

violations.[19]      The parties agreed at the hearing that the affirmative defense is not

a defense to liability, but to imposition of penalties.   The issue of appropriate

---

[17]      The Affidavit of Jeff Kovacs (Dkt. 91-10), ¶ 9 does not go far enough is establishing a connection between the emission events and necessary hurricane precautions and recovery.

[18]      Defendants' exhibit 15 (Dkt. 91-52).

[19]      Defendants' exhibit 16 (Dkt. 91-52).

remedies is not before the court.  Defendants' motion for summary judgment on ground 7 should be denied.

### 8.    Do plaintiffs have standing to assert claims based on recordable events or Title V deviations that are not reportable events?

Defendants argue that some of the alleged violations that are recordable emission events or Title V deviations do not involve emissions.[20]  Therefore, they argue that  plaintiffs have not shown any adverse impact on public health and thus have not shown the necessary "injury" component of standing.[21]

Defendants' violation-by-violation approach to assessing standing is more exacting than what courts have required in citizen environmental suits.  *See Sierra Club, Lone Star Chapter v. Cedar Point Oil*, 73 F.3d 546, 556-58 (5th Cir. 1996).  Poor operation and maintenance practices may lead to future emissions or other dangerous events such as an explosion.[22]  Summary judgment should be denied on ground 8.

### Conclusion and Recommendations

---

[20]    Defendants' exhibit 2, ¶ 12 (Dkt. 91-10).

[21]    Judge Hittner previously denied defendants' motion to dismiss for lack of jurisdiction (Dkt. 36).

[22]    Defendants' exhibit 9A, Bowers report (Dkt. 91-41).

18

For the reasons discussed above, the court RECOMMENDS that defendants' motion for summary judgment be denied, except for grounds 3 and 4 of the motion. Partial summary judgment should be granted in defendants' favor as to the violations targeted by grounds 3 and 4.

If the district court adopts these recommendations, it is ORDERED that within 21 days of entry of an order of adoption, the parties shall file, jointly to the extent possible, amended schedules identifying the alleged violations that remain for trial.

The parties have 14 days from service of this Memorandum and Recommendation to file written objections. Failure to file timely objections will preclude appellate review of factual findings or legal conclusions, except for plain error. *See* FED. R. CIV. P. 72.

Signed at Houston, Texas on April 3, 2013.



Stephen Wm Smith
United States Magistrate Judge