1                  UNITED STATES DISTRICT COURT

2                  SOUTHERN DISTRICT OF TEXAS

3                      HOUSTON DIVISION

4    ENVIRONMENT TEXAS CITIZEN LOBBY, INC.,   .
     and SIERRA CLUB,                         .
5                                             .
                    Plaintiffs,               .
6                                             .   Civil Action
     VS.                                      .   No. H-10-CV-4969
7                                             .
     EXXONMOBIL CORPORATION,                  .   Houston, Texas
8    EXXONMOBIL CHEMICAL COMPANY,             .   February 10, 2014
     and EXXONMOBIL REFINING AND SUPPLY       .   10:04 a.m.
9    COMPANY,                                 .
                                              .
10                  Defendants.               .
     . . . . . . . . . . . . . . . . . . . . .
11
                     TRANSCRIPT OF PROCEEDINGS
12               BEFORE THE HONORABLE DAVID HITTNER
                            BENCH TRIAL
13                        **DAY 1 OF 13**

14   APPEARANCES:

15   FOR THE PLAINTIFFS:
                 Mr. Joshua R. Kratka
16               Ms. Heather Govern
                 NATIONAL ENVIRONMENTAL LAW CENTER
17               44 Winter Street
                 4th Floor
18               Boston, Massachusetts
                 617.747.4333
19               917.710.5180
                 FAX:  617.292.8057
20               josh.kratka@verizon.net

21               Mr. David A. Nicholas
                 20 Whitney Road
22               Newton, Massachusetts 02460
                 617.964.1548
23               FAX:  617.663.6233
                 dnicholas@verizon.net

24
             PROCEEDINGS RECORDED BY STENOGRAPHIC MEANS,
25        TRANSCRIPT PRODUCED FROM COMPUTER-AIDED TRANSCRIPTION


                 Gayle Dye, CSR, RDR, CRR - 713.250.5582

```
 1                        APPEARANCES
 2                        (continued)
 3   FOR THE PLAINTIFFS:
 4          Mr. Philip Harlan Hilder
            Mr. William B. Graham
 5          HILDER & ASSOCIATES, PC
            819 Lovett Boulevard
 6          Houston, Texas  77006-3905
            713.655.9111
 7          FAX:  713.655.9112
 8   ALSO PRESENT:
 9          Ms. Mary Rock
            Paralegal
10
     FOR THE DEFENDANTS:
11
            Mr. Eric J. R. Nichols
12          BECK REDDEN
            515 Congress Avenue
13          Suite 1750
            Austin, Texas 78701
14          512.708.1000
            FAX:  512.708.1002
15          enichols@beckredden.com
16          Mr. Bryon A. Rice
            Mr. Fields Alexander
17          Mr. William Brad Coffey
            BECK REDDEN
18          1221 McKinney Street
            Suite 4500
19          Houston, Texas  77010
            713.951.6256
20          713.951.6220
            713.951.6274
21          FAX:  713.951.3720
            brice@beckredden.com
22          falexander@beckredden.com
            bcoffey@beckredden.com
23
24
25
```

```
 1                        APPEARANCES

 2                         (continued)

 3  FOR THE DEFENDANTS:

 4          Mr. Keith Courtney
            WINSTEAD PC
 5          401 Congress Avenue
            Suite 2100
 6          Austin, Texas  78701
            512.370.2813
 7          FAX:  512.370.2850
            kcourtney@winstead.com
 8
    ALSO PRESENT:
 9
            Mr. David Mantor
10          In-house counsel
            EXXONMOBIL
11
            Ms. Hien Luu
12          Paralegal

13

14

15  COURT REPORTER:

16          GAYLE L. DYE, CSR, RDR, CRR
            515 Rusk, Room 8016
17          Houston, Texas  77002
            713.250.5582
18

19

20

21

22

23

24

25
```

1                              INDEX

2                                                        Page

3    PLAINTIFFS' OPENING STATEMENT BY MR. NICHOLAS          8
     DEFENDANTS' OPENING STATEMENT BY MR. NICHOLS          50
4

5

6

7

8                      INDEX OF WITNESSES

9    FOR THE PLAINTIFF:

10   **RICHARD SHAE COTTAR**

11        DIRECT EXAMINATION BY MR, KRATKA                 98
          CROSS EXAMINATION BY MR. RICE                   154
12        REDIRECT EXAMINATION BY MR. KRATKA              186
          RECROSS EXAMINATION BY MR. RICE                 190
13
14   **DIANE AGUIRRE**

          DIRECT EXAMINATION BY MR. KRATKA                191
15        CROSS EXAMINATION BY MR. NICHOLS                207

16   **LUKE WILLIAM METZGER**

17        DIRECT EXAMINATION BY MR. KRATKA                223
          VOIR DIRE EXAMINATION BY MR. ALEXANDER          249
18        DIRECT EXAMINATION (CONTINUED) BY MR. KRATKA    249

19

20

21

22

23

24

25

              Gayle Dye, CSR, RDR, CRR - 713.250.5582

```
 1                          PROCEEDINGS

 2                      February 10, 2014

 3              THE COURT:  All right.  Everyone comfortable in the

 4      seats you're in now?  I'm not going to make sure you stay there

 5      but -- okay.

 6                      Is that the corporate representative?

 7              MR. NICHOLS:  As I mentioned on Friday, we have a

 8      corporate representative, Mr. Gary Robbins.

 9              THE COURT:  Okay.  Thank you.  You can be seated.

10                      Then we have Mr. Mantor back there, right?

11              MR. DAVID MANTOR:  Yes, sir, your Honor.

12              THE COURT:  All right.  Out comes the timer.

13                      All right.  Court calls the case for trial Case

14      Number 10-469, Sierra Club, et al., versus ExxonMobil.

15                      Who represents the Plaintiffs?  Just making a

16      formal announcement, the three attorneys.

17              MR. NICHOLAS:  Dave Nicholas.

18              MR. KRATKA:  Josh Kratka.

19              MR. HILDER:  Philip Hilder.

20              THE COURT:  For the Defendants?

21              MR. NICHOLS:  Eric Nichols.

22              MR. RICE:  Bryon Rice.

23              MR. ALEXANDER:  And Fields Alexander, your Honor.

24              MR. COURTNEY:  Keith Courtney.

25              MR. COFFEY:  Brad Coffey, your Honor.
```

10:04:26 — 5
10:06:20 — 10
10:09:44 — 15
10:09:57 — 20
10:10:07 — 25

1          THE COURT:  Okay.  You're with who?

2          MR. COFFEY:  Beck Redden, your Honor.

3          THE COURT:  Okay.  Are you going to be in the trial?

4          MR. COFFEY:  Yes, sir.

10:10:08  5          THE COURT:  Let me add Mr. Coffey.  All right, thank

6     you.

7          MR. HILDER:  Excuse me, Judge.  Will Graham also will

8     be making an appearance.  He pulled up with flu this morning, so

9     as soon as he recovers --

10:10:20  10          THE COURT:  Is he an attorney?

11          MR. HILDER:  Yes, he is.

12          THE COURT:  His name is what?

13          MR. HILDER:  Will Graham.

14          THE COURT:  All right.  When he sits down, I'll put

10:10:25  15     him on there.  Remind me tomorrow.

16              And again, Counsel, name?

17          MR. COFFEY:  Brad Coffey, your Honor.

18          MS. GOVERN:  I'm Heather Govern, your Honor, for the

19     Plaintiffs.

10:10:33  20          THE COURT:  Are you an attorney?

21          MS. GOVERN:  Yes.

22          THE COURT:  Okay.  That's what I thought.  All right.

23     All right.  It's not necessary, but does the Plaintiff desire to

24     make an opening statement?

10:11:26  25          MR. NICHOLAS:  Yes, your Honor.


                 Gayle Dye, CSR, RDR, CRR - 713.250.5582

1          THE COURT:  All right.  Go right ahead.

2          MR. NICHOLAS:  Good morning, your Honor.  Dave

3 Nicholas for the Plaintiff.

4          THE COURT:  Microphone up so everybody can hear you in

5 the back.

6          MR. NICHOLAS:  Dave Nicholas for the Plaintiffs.

7          THE COURT:  I don't think it's on.  It's not plugged

8 in.  Yeah, we got to plug it in.

9     (Discussion off the record.)

10         MR. NICHOLAS:  Good morning, your Honor.  Dave

11 Nicholas for the Plaintiffs.

12          Your Honor, the Defendants, ExxonMobil

13 Corporation and two wholly-owned subsidiaries, own and operate a

14 petrochemical complex in Baytown, Texas, 25 miles east of

15 Houston.  It is a large, integrated plant.  There are three

16 plants within the complex.  There's a refinery, an olefins

17 plant, and a chemical plant.

18          It is the largest manufacturing facility in the

19 United States.  The emissions from the plant and other operating

20 aspects of the plant are governed by permits issued under Title

21 5 of the Clean Air Act.  These are known as Title 5 permits or

22 federal operating permits.  These permits -- and we've

23 identified these permits as -- for the three plants as

24 Plaintiffs' Exhibits 191 to 215 and 222 to 252.

25          There are five federal operating permits for the

1    three plants, one for the refinery, one for the olefins plant,

2    three for the chemical plant.  These Title 5 permits incorporate

3    by reference other state-issued permits known as new source

4    review permits and prevention of significant deterioration --

10:13:58    5    prevention of significant deterioration permits.

6                 And these are Plaintiffs' Exhibits 113 through

7    189, 216 through 221.  So, the Title 5 -- the federal operating

8    permits incorporate these permits and other regulations.  The

9    Clean Air Act prohibits violations of Title 5 permits.  The

10:14:20    10    Plaintiffs are bringing -- the two environmental groups are

11    bringing this suit under the citizen suit provision of the Clean

12    Air Act to enforce violations of these permits.

13                 The citizens have the same remedies as the EPA

14    has.  Citizen supervision is not a limited remedy.  Plaintiffs

10:14:39    15    will prove that Exxon has violated its Title 5 permits thousands

16    of times.  Many of these violations lasted more than one day so

17    that there are over 10,000 days of violations during the period

18    at issue in this case, which is October 14, 2005, through

19    September 3, 2014 -- 2013, excuse me.

10:15:02    20                 Now, Plaintiffs will prove Exxon's violations

21    with Exxon's own records, and there are three types of records

22    that will prove the violations.  One type of record is an

23    emission event report filed with -- filed with TCEQ that is put

24    online and is known as a STEERS Report.

10:15:24    25                 An emission event is by definition an event that

1   is an event that results in unauthorized emissions; but when

2   these emissions are above a certain quantity, Exxon and other

3   facilities are required to put them online on what's known as

4   the STEERS database, which stands for the State of Texas

10:15:45   5   Environmental Electronic Reporting System.

6           The second type of records that prove these

7   violations are records of emission events that do not rise to

8   the level of being put on the STEERS database because they do

9   not involve a reportable quantity but they are emissions

10:16:05   10   nonetheless, and they by law must be recorded and maintained by

11   Exxon on its facilities.

12           The third type -- well, let me just go back for

13   one second.  There are -- between the STEERS events and the

14   recordable emission events, there have been 3,979 emission

10:16:27   15   events during the period at issue.  And many of those lasted

16   more than one day.  There have been 241 events that have made it

17   onto the STEERS database.  There have been 3,738 events that

18   have been recordables and are on lists maintained by Exxon on

19   site.

10:16:43   20           THE COURT:  What about those 10,000?  What was that

21   10,000 number as it compares to the other numbers you just gave

22   me?

23           MR. NICHOLAS:  The 10,000 arises because there are

24   multiple violations during each event, and that's for two

10:16:56   25   reasons.  One is sometimes the events go on for more than one

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1  day.  And so, there are more than -- so, there is more than one

2  day of violation.

3              Under the Clean Air Act, every 24-hour period is

4  a day of violation.  Five days of violation would be -- you

10:17:13  5  know, if it lasted a week, then it would be seven days of

6  violation, that kind of thing.  And then each of the events --

7  or almost all of the events involved multiple violations.

8              THE COURT:  Give me an example.

9              MR. NICHOLAS:  An example would be a STEERS event that

10:17:27  10  reports a carbon monoxide release, a sulfur dioxide release and

11  a hydrochloric acid release.  And so three different pollutants,

12  three violations, three days of --

13              THE COURT:  All right.

14              MR. NICHOLAS:  The third type of record that proves

10:17:48  15  Exxon's violations are known as deviation reports, and these are

16  Plaintiffs' Exhibits 23 through 100.  Twice a year Exxon is

17  required and does file reports with the TCEQ that identifies

18  violations of its Title 5 permits.

19              These are not only emission violations in that

10:18:06  20  they don't -- they don't only reflect air contaminants being

21  released into the air, these also include reporting violations,

22  monitoring violations, testing violations, other things that are

23  in the permit and are -- when they are violated, they are

24  reflected in these deviation reports.  So, those are the three

10:18:27  25  types of records that establish these violations, and the Court

1  will hear from Exxon's own personnel who we'll call as a witness

2  to talk about these types of records.

3         Now, the contents of records are not in dispute.

4  The parties stipulated to the contents of them.  We submitted to

10:18:44  5  them in the pretrial order as an admission of fact, and these

6  are -- the stipulated contents of the records are Plaintiffs'

7  Exhibits 1 through 7E.  They incorporate the underlying records

8  that I just referred to, the STEERS Reports, the recordable

9  reports, and the deviation reports.

10:19:06  10         Your Honor granted summary judgment on a

11  relatively small number of violations.  Those violations have

12  been taken out of the stipulations.  So, they are not reflected

13  in Plaintiffs' Exhibits 1 through 7E.

14         Now, these records prove violations of, as I

10:19:27  15  mentioned, limits on direct emissions that are in the permit,

16  and the permit limits on direct emissions into the atmosphere

17  are set to protect public health.  And the records also prove

18  operational reporting and monitoring requirements to minimize

19  emissions and keep the complex operating safely.

10:19:51  20         The records prove repeat violations of the

21  various standards.  So, carbon monoxide limit will be violated

22  more than once, that's a repeat violation; or the company failed

23  to file a certain type of report on more than one occasion,

24  that's a repeat violation.  Repeat violations make our citizens

10:20:14  25  suit actionable.

1              Now, Exxon is fond of saying that Plaintiffs'

2    lawsuit is really a gotcha theory, that there's a paper trail of

3    violations and that all we -- all the Plaintiffs did was look at

4    the paper trail and bring a lawsuit.  Having a paper trail of

10:20:36    5    violations is not a defense.  Having a paper trail of violations

6    shows that there is a paper trail of violations and that the

7    violations are established.

8              The citizens -- citizens don't have access to the

9    Baytown Complex.  There's no right for citizens to go in and

10:20:53   10    inspect the plant.  So, Congress set up a system where

11    facilities like Exxon have to self-report its violations to TCEQ

12    and EPA.  Those violations are publicly available.  In this case

13    they're put on STEERS reports.  Some of them -- some of them are

14    available through a FOIA at the TCEQ office.

10:21:20   15              THE COURT:  You mean Freedom of Information Act just

16    for the record?

17              MR. NICHOLAS:  Yes, Freedom of Information Act.  And

18    Congress was aware and knew that this was a basis for citizens

19    to file suits under the citizen suit provision.  And, in fact,

10:21:35   20    this is the only way citizens can bring suit because they don't

21    have any other information.

22              Now, Plaintiffs will prove that the violations

23    are serious and of harm to the community and Plaintiffs'

24    members.  There have been many, many different chemicals that

10:21:49   25    have been emitted during these emission events.  These include

1    air pollutants that are EPA hazardous air pollutants such as

2    benzene, 1,3-butadiene, hydrochloric acid, that kind of thing.

3                   You'll hear from Plaintiffs' own -- excuse me,

4    from Exxon's own personnel that carcinogens, chemicals that are

10:22:17    5    respiratory hazards and chemicals that form ozone are emitted

6    during emission events and during these violations.

7                   The Court will also hear from Plaintiffs' members

8    as to how they've been affected by the violations and what it's

9    like to live next to the Exxon plant.  Some of the members grew

10:22:33   10    up in Baytown, some of them live nearby, some of them lived

11    nearby and moved away and are grateful to feel better because

12    they moved away, and some still have family back home and go

13    visit them regularly.

14                   And you will hear from these witnesses that none

10:22:48   15    of them want to breathe Exxon's emissions and certainly none of

16    them want to breathe illegal emissions.  You'll also hear that

17    they fear that the plant will explode because it's not being run

18    correctly.

19                   Now, the members are not suing for damages.

10:23:02   20    They -- so, this is not a personal injury suit.  And they joined

21    Environment Texas and Sierra Club because they are working to

22    fight air pollution and they are supporting the groups in this

23    enforcement case.

24                   You'll hear from -- the Court will hear from --

10:23:21   25    the Court will have before it Exxon's own modeling of emission

1  events and violations which will show that regulatory thresholds

2  and levels have been exceeded on occasion.  The Court will hear

3  from Plaintiffs' expert, Dr. Edward Brooks, who is -- who will

4  look at the -- who will testify that looking at the emissions of

10:23:45  5  individual chemicals doesn't tell the whole story, that a more

6  appropriate way to look at and assess the impact of these

7  violations is to consider the synergistic effect and the fact

8  that a variety of chemicals are being put into the atmosphere at

9  the same time and mixing, basically, a chemical soup idea and

10:24:06  10  that they're mixing not only together in one emission event from

11  Exxon but also mixing together -- I'm sorry, that the various

12  emissions and violations and the pollutants emitted during the

13  violations mixed together in a soup not only just from Exxon's

14  own emissions but from other industrial sources in the area and

10:24:24  15  that Exxon contributes to that problem.

16                 Now, Dr. Brooks is not a treating doctor.  He's

17  got --

18                 THE COURT:  He's an MD or PhD?

19                 MR. NICHOLAS:  He is a medical doctor.  He's an MD.

10:24:36  20                 THE COURT:  Because you also have a pediatrician, I

21  remember.

22                 MR. NICHOLAS:  Same person.

23                 THE COURT:  Same person?

24                 MR. NICHOLAS:  Right.

10:24:42  25                 THE COURT:  He's not a treating physician?

1          MR. NICHOLAS:  He did not treat the Plaintiffs'

2    members.  That's right.  So he's going to testify on the health

3    risks posed by the chemicals emitted.

4          THE COURT:  Is there any -- now, again, I mentioned to

10:24:52  5    both sides don't assume by any questions I ever ask or my

6    perceived hostility that I'm leaning one way or another.  It's

7    for me to get to the bottom.  Are you going to have anybody

8    coming and saying, Well, such and such is my patient and these

9    are the symptoms and that's what -- and link it up somehow to

10:25:11  10    the alleged pollution problem?

11          MR. NICHOLAS:  We will not have any treating doctors.

12    Dr. Brooks will testify that the symptoms described by the

13    Plaintiffs' members are consistent with the effects of the type

14    of pollution being emitted.

10:25:24  15          THE COURT:  This gentlemen, again, I don't know, is he

16    a practicing pediatrician or --

17          MR. NICHOLAS:  Yes.

18          THE COURT:  -- is he an academic pediatrician?

19          MR. NICHOLAS:  Both.

10:25:32  20          THE COURT:  Okay, Thank you.  What -- where is he --

21          MR. NICHOLAS:  University of Texas, San Antonio.

22          THE COURT:  San Antonio.  Okay, thank you.

23          MR. NICHOLAS:  Yeah.  And he will testify on the

24    likely impact on the community and the members of the

10:25:43  25    violations; and he will, as I mentioned, testify that the

1  members' symptoms are consistent with exposure to Exxon's

2  chemicals.  Nearly 10 million pounds of unauthorized emissions

3  have been reported by Exxon.

4          THE COURT:  10 million pounds over how much time?

10:25:59  5          MR. NICHOLAS:  Over since -- in the period at issue,

6  which is approximately at this point eight years.

7          THE COURT:  Okay.

8          MR. NICHOLAS:  Now, that is as reported by Exxon.

9  That amount, we will show, is understated.  And that is because

10:26:13  10  many of the violations involve flaring.  And the EPA and the

11  TCEQ allow Exxon and other facilities to report the amount

12  coming out of its flares using a certain formula.

13          THE COURT:  Flares, by that, I mean, is that the fire

14  that you see burning at the top of some refinery?

10:26:35  15          MR. NICHOLAS:  Yes.

16          THE COURT:  Okay.

17          MR. NICHOLAS:  Those are flares.  And there are many

18  flaring events that result in violations and they're reported by

19  Exxon.  Now, the amount that comes out of those flares is

10:26:47  20  determined by a formula that EPA and TCEQ set and it's -- and

21  there's no question that Exxon is allowed to report its -- the

22  amount of pollution coming out of the flares consistent with

23  that regulation.

24               But what we will show is that that regulation

10:27:04  25  makes assumptions and allows Exxon and other facilities to

1    report its pollution in a way that understates and undercounts

2    the amount that's actually coming out of the flares.  And when

3    that's taken into account, it shows that, in fact, the pollution

4    that's coming out of the flares and these emission events and

10:27:27    5    the violations alleged in this case is actually greater than

6    reported.  And that will have an effect; and you will hear

7    Dr. Ran Sahu, an engineer, talk about that for the Plaintiffs.

8              That has an effect on Exxon's modeling of

9    emissions.  Exxon will sometimes be asked by TCEQ to model the

10:27:51    10    effect of its violations, and you'll hear Dr. -- you'll hear

11    Randy Parmley testify about that, but Mr. Parmley is modeling

12    these emissions and estimating impacts of these emissions based

13    on -- often based on flaring incidents that understate the

14    amount of pollution coming out of the flares.

10:28:14    15              You will also hear from Dr. Sahu and Dr. Brooks

16    that the odds of the pollution plume actually hitting an air

17    monitoring station that are located in parts of Harris County

18    are very slim.  So it's difficult to actually monitor the -- in

19    real-time monitoring the actual effect of these violations.

10:28:42    20              You'll also hear from Exxon.  We anticipate that

21    you'll hear from Exxon, and we -- indeed, we heard it on

22    Friday:  that these violations that Plaintiffs are bringing

23    before the Court are not serious.  Exxon will say that they're

24    doing well in a lot of aspects of the permit compliance, in

10:29:00    25    complying with their permits; and they're going to argue that

1    overall their emissions are down.

2              THE COURT:  Are down?

3              MR. NICHOLAS:  Yeah.  That over the course of a

4    decade, the amount of emissions that they've put out from the

10:29:13   5    Baytown Complex have decreased.

6              THE COURT:  Are they down enough?

7              MR. NICHOLAS:  Well, no, they're not down enough; and

8    it does not excuse violations of their permit.  So they may

9    have --

10:29:21  10              THE COURT:  You mean the violations in the past?

11              MR. NICHOLAS:  It does not -- excuse me?

12              THE COURT:  Doesn't -- doesn't --

13              MR. NICHOLAS:  No.

14              THE COURT:  -- excuse the violations in the past?

10:29:28  15              MR. NICHOLAS:  It doesn't -- it doesn't excuse

16    violations in the past, nor does it -- nor does it excuse

17    violations that will occur in the future unless -- unless the

18    Court orders otherwise.

19              So there are, for instance, hourly limits --

10:29:44  20    hourly limits on the amount of -- or pounds per hour limits on

21    the amount of pollution that can be emitted from the plant.  And

22    when those are violated, the people living near the plant are,

23    obviously, greatly affected because they're breathing a -- I'll

24    say a great amount of pollution in a short period of time, that

10:30:02  25    doesn't do -- the argument that an overall, say, yearly decrease

1  in emissions is cold comfort to people -- to the people who live

2  in the plant and get a blast of an illegal air emission event.

3           Now, Exxon will also -- Exxon will also say that

4  some of these emission events are not serious because they

10:30:27  5  involved a small amount of emissions, and you will hear from

6  Exxon's own personnel and Plaintiffs' expert, Keith Bowers, an

7  engineer, that, in fact, these emission events are not known

8  beforehand whether they're going to be big or small.  So, they

9  all have to be prevented.  You'll also hear that the gasses

10:30:49  10  emitted are flammable causing an explosion risk.  And that's

11  regardless of whether the emission is big or small.  And you'll

12  also hear that --

13           THE COURT:  In other words, an explosion risk, isn't

14  the flaring, a flame enough to ignite it if it was going to

10:31:05  15  explode?

16           MR. NICHOLAS:  No, the flares are elevated.  So a lot

17  of the emission events that we're talking involve leaks which

18  are lower down.  And so --

19           THE COURT:  Any igniting has to be done lower down.

10:31:20  20  If any, if it ever occurs, igniting has to occur lower down.

21  The flaring from the top won't ignite --

22           MR. NICHOLAS:  Well, the flare from the top of -- I

23  believe the flame from the top of the flare -- I can't answer

24  that off the top of my head with certainty, but I believe that

10:31:33  25  poses less of a risk than anything below the flare height

1  because it's very high because there are a lot of things that

2  could cause the plant -- there's a lot of things that could

3  cause an ignition such as a car, cigarettes, static electricity,

4  other things.  So, that's a -- obviously, a tremendous risk at

10:31:53  5  the plant, and even a small amount of a flammable pollutant can

6  trigger that risk.

7              Now, there are many, many of these recordable

8  smaller events.  Well, they're only smaller relative to the ones

9  reported on the STEERS events, but some of them are individually

10:32:14  10  quite large.  And all totaled, they still have put into the

11  atmosphere more than a million pounds of pollution.  And they

12  show, because they happen over and over again, that the plant is

13  operated, maintained, and designed inadequately.

14             Now, Exxon will say that some of the violations

10:32:33  15  aren't serious because they only involve recordkeeping or

16  monitoring, but all those requirements are in their permits for

17  a reason.  A shoddy recordkeeping should not be tolerated, and

18  the fact that reports can't be filed on time is not reassuring

19  for the people who live -- who live near the plant because it

10:32:54  20  shows that -- well, really, when a -- such a large facility,

21  such a large petrochemical plant is being entrusted to somebody

22  to run, it should really be run correctly.

23             Now, the permit conditions -- the permit

24  conditions allow Exxon -- they govern Exxon's operations.  They

10:33:18  25  allow Exxon to operate.  They allow them to profit.  They are

1    the rules that Exxon must follow in order to operate.  And they

2    could have appealed those permits.  But the fact is that they've

3    accepted those permits, they operate on them, and they must

4    comply with the permits.

10:33:35    5            Now, these -- the Clean Air Act is a strict

6    liability statute, and the permits themselves countenance no

7    excuse for violations.  The Texas Administrative Code, 30, Texas

8    Administrative Code, 122.143, Sub 4 -- Subparagraph 4, provides

9    that every permit, including Exxon's permits, have the following

10:33:59   10    provisions in them:  "It shall not be a defense in an

11    enforcement action that it would have been necessary to halt or

12    reduce the permitted activity in order to comply with the permit

13    terms and conditions of the permit."  So, if they had to -- if

14    the facility has to shut down in order to comply with the

10:34:19   15    permit, that's what it has to do.

16            Now, we heard on Friday that Exxon maintains that

17    it is difficult or impossible to operate its permits -- to

18    operate its plant in a way to always be in compliance with its

19    permits.  But that's just saying -- that's, basically, asserting

10:34:38   20    an inevitability defense, that it is inevitable --

21            THE COURT:  So how do they correct it?

22            MR. NICHOLAS:  They correct it by -- and we will put

23    on expert testimony about this.

24            THE COURT:  I understand.  We all know an opening

10:34:48   25    statement is what you anticipate the evidence will show.

1              MR. NICHOLAS:  Right.  Yes.  They will show -- we will

2    show that by spending an additional $90 billion a year in annual

3    maintenance spending, they could prevent these, and by putting

4    in certain capital projects, they could have prevented these

10:35:03   5    violations.  So --

6              THE COURT:  "Capital" meaning new construction?

7              MR. NICHOLAS:  Correct.

8              THE COURT:  Would that entail shutting down the

9    operation for awhile?

10:35:14  10              MR. NICHOLAS:  Not in its entirety, no.  And if Exxon

11   makes this a priority, they spend the money, if they have the

12   personnel, they do it correctly, there would not be these

13   violations.  Now, there are systemic problems at the plant that

14   are causing these violations.

10:35:38  15              There are certain units that are problem units.

16   There are certain types of equipment that keep breaking.  It has

17   many, many leaks.  There have been 350 fires that have broken

18   out, leading to violations and other common, recurring problems

19   that can be addressed.  Now --

10:35:58  20              THE COURT:  300 some-odd fires, that's, what, over the

21   whole --

22              MR. NICHOLAS:  Yes.

23              THE COURT:  -- multi-year span?

24              MR. NICHOLAS:  Correct.

10:36:05  25              THE COURT:  Now, I guess those fires haven't ignited

1    anything, thank goodness, right?

2              MR. NICHOLAS:  Correct.  Well, they haven't --

3              THE COURT:  Or have they -- there have been no

4    explosions or anything out there?

10:36:15   5              MR. NICHOLAS:  Correct.  There has not been an

6    explosion.  Exxon will dispute that its maintenance practices

7    are inadequate, and we anticipate that you will hear about their

8    maintenance practices in detail.  I'm sure that there will be a

9    lot of discussion of programs with a lot of jargon being thrown

10:36:40  10   in and perhaps some photographs and perhaps pictures of people

11   in hardhats and that kind of thing.

12             But when the Court listens to that detail -- the

13   Court has before it the result of that maintenance program, the

14   current maintenance program, the inadequate maintenance program.

10:36:58  15  And the result before it is approximately 4,000 emission events

16   and over 10,000 days of violations.  That --

17             THE COURT:  Is it getting any better over the years?

18             MR. NICHOLAS:  It is not -- it is not getting better

19   at the refinery, which has -- which has held steady at its total

10:37:15  20  number of emission events, reportables and recordables; and the

21   olefins plant has increased the number of reportable and

22   recordable emission events.

23             So it is still inadequate and, again,

24   anticipating the large number -- the large amount of detail that

10:37:40  25  we anticipate that we believe Exxon will be going into that the

1  Court will have before it, the actual record of -- the record of

2  violations.

3          THE COURT:  All right.  And part of your case, will it

4  or will it not make suggestions on what must be done?

10:37:56  5          MR. NICHOLAS:  Yes.

6          THE COURT:  Okay.

7          MR. NICHOLAS:  Exxon has also suggested that we should

8  not be suing for events that occurred during Hurricane Ike and

9  falsely stated on Friday that the Plaintiffs wanted the plant to

10:38:12  10  continue to operate during the hurricane, which is not true.

11          What the Plaintiffs wanted was when the plant

12  shut down and when the plant started up again not to violate its

13  permits terms.  There is an act of God defense that can be

14  asserted, and it's an affirmative defense.  And the Eastern

10:38:35  15  District of Texas wrestled with this actually in a Hurricane Ike

16  case called Select -- Century Select Insurance from 2011.

17          And there is -- there are hoops that Exxon has to

18  go through to prove that -- prove up that affirmative defense.

19  The bottom line is hurricanes are anticipated, and hurricane

10:38:55  20  plans have to be put in place so that when they shut down and

21  start up there aren't tremendous emissions and violations of its

22  permits.

23          Exxon will also say that citizens have no role in

24  this -- have no role here because the agencies are aware of the

10:39:11  25  violations and have been addressing it or, at least, aware of

1   them.  They either can or -- they either may or may not address

2   them, but they're aware of them.  But this Court has already

3   ruled.

4          It is true that every emission cited by

10:39:24   5   Plaintiffs were self-reported by Defendants to the TCEQ and that

6   TCEQ had authority and in some cases did take enforcement action

7   against Defendants for these emissions.  And Defendants are

8   correct that citizen suits are a way of second-guessing this

9   TCEQ action or inaction.

10:39:40  10          But that is precisely the point.  Citizen suits

11   were intended to be a mechanism for the public to second-guess

12   the adequacy of an agency's response to Clean Air Act

13   violations --

14          THE COURT:  That's why we're at trial here.

10:39:53  15          MR. NICHOLAS:  Right.  -- as an antidote to regulatory

16   capture.

17          THE COURT:  It's not an absolute bar.

18          MR. NICHOLAS:  Correct.  Now, because citizens do not

19   have access to the plant, every citizen suit -- as I mentioned

10:40:07  20   before, every citizen suit is based on public records.  So every

21   single citizen suit has the same issue, that an agency is aware

22   of the violations that are being alleged in the suit.

23          THE COURT:  State or federal or both?

24          MR. NICHOLAS:  Both, well -- both.  And, again, so

10:40:34  25   that's -- that puts -- that puts into context the role of

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1 citizens with respect to these kinds of lawsuits.  Again, the

2 record on TCEQ enforcement is before the Court, 4,000 emission

3 events causing approximately 10,000 violations.  So, again,

4 whatever TCEQ did, that is the record before the Court.  That is

10:41:00  5 the amount of violations it is allowed over this period.

6             And as we already mentioned, there has not been a

7 stop to the violations.  They've been continuing.  The Court

8 will also hear about poorly written and ineffective enforcement

9 orders and other shortcomings of TCEQ.

10:41:19 10             THE COURT:  Enforcement orders by who?

11             MR. NICHOLAS:  TCEQ.

12             THE COURT:  In other words, where you say -- you're

13 saying the state agency fell down a bit?

14             MR. NICHOLAS:  More than a bit.

10:41:29 15             THE COURT:  More than a bit.

16             MR. NICHOLAS:  More than a bit, that they have wholly

17 failed to address the problems at the plant, that there have

18 been huge number of violations under their watch, and that

19 they've actually cut a recent deal that allows the facility to

10:41:44 20 keep violating.  And so that is, obviously -- it's a bigger

21 problem.

22             THE COURT:  So that's the position.  Now, is there

23 any -- what federal agency is involved here, probably to the

24 lesser extent?  You're saying it's primarily a state policing?

10:41:59 25             MR. NICHOLAS:  Yes.  EPA did take an enforcement

1   action against Exxon and other facilities in a so-called

2   refinery enforcement initiative back in 2005, and there's a

3   consent decree addressing certain limited aspects of the plant.

4               It is not an overreaching, overarching consent

10:42:17  5   decree.  It does not have anything to do with the olefins plant

6   or the chemical plant.  It has only a limited amount of -- to do

7   with the refinery, and any of the violations that we had alleged

8   that might have overlapped with the consent decree, this Court

9   has already ruled against.

10:42:36  10   So those are not in the case.  And we've actually

11   entered into a stipulation setting out separately those

12   violations, which, I believe, is Plaintiffs' Exhibit 8.  So

13   those have been taken out and are not reflected in the

14   violations tables.

10:42:54  15               Now, when the Court hears all the evidence, we

16   believe that it will establish that Plaintiffs should be

17   granted -- are entitled to grant -- that the Court should grant

18   the relief they seek which -- and that relief is a declaratory

19   judgment, an injunction to stop violating the Title 5 permits,

10:43:15  20   special master to be appointed to assure compliance at the

21   plant, and a penalty to be imposed.

22               Economic benefit, which is the -- which is a

23   concept that strips the amount that the plant -- that the

24   company has benefitted from its non-compliance with its permits,

10:43:37  25   by not spending the money to come into compliance with its

1    permits.  The company has benefitted from that financially.

2    That amount is a significant amount in this case, has a

3    significant component in the penalty calculation.

4          THE COURT:  The dollar amount is what?  It was -- they

10:43:52  5    were initially over a billion.  It's now, what, 600 and

6    something million?

7          MR. NICHOLAS:  It's approximately 630 million.  It was

8    never a billion because there was certain overlapping

9    violations, and we never asserted over a billion dollars.  And

10:44:07  10    so the penalty that is warranted in this case is large because

11    of economic benefit, because of the seriousness of the

12    violations, because of the public harm, the public risk.

13          THE COURT:  Now, special master, at the end of the

14    case, are you going to be in a position to recommend somebody?

10:44:25  15          MR. NICHOLAS:  Yes.  But we have not actually come up

16    with a name and did not anticipate that that could be an option.

17    I think --

18          THE COURT:  Well, I'm just saying the same thing.  I

19    may ask Exxon the same thing, if, indeed, I believe that is, who

10:44:42  20    might they suggest, that if you care to reserve that right at

21    the end, fine.  I'm saying you're going to get that question.

22          MR. NICHOLAS:  Okay.  That's fair.  We can come up

23    with a name.

24          THE COURT:  What I'm saying to both sides, you don't

10:44:56  25    have to, but you're going to get that question.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1          All right, go on.

2          MR. NICHOLAS:  We anticipated that that would be --

3    that that would be dealt with after the decision whether or not

4    to issue the -- to appoint a special master.  And as we

10:45:10    5    discussed last week, a hundred thousand could be ear-marked for

6    beneficial projects that -- that can be arrived -- that can be

7    designated by the Court, and the balance goes to a treasury fund

8    that can be accessed by EPA for enforcement activities.

9          Now, I would just -- in concluding here, I would

10:45:32    10    just like to go through the counts in the complaint quickly, and

11    I would just like to just draw the Court's attention to what the

12    stipulated tables look like.

13          THE COURT:  What exhibit number?

14          MR. NICHOLAS:  These are -- I'll go count by count

10:45:51    15    so --

16          THE COURT:  Which book -- whose book are they in?

17          MR. NICHOLAS:  First -- this would be the first book.

18          THE COURT:  Those are Plaintiffs' books.  The Defense

19    is on disk, right?

10:46:04    20          MR. NICHOLS:  Yes, sir.

21          THE COURT:  All right.  Which ones?

22          MR. NICHOLAS:  Number 1.

23          THE COURT:  Book number 1.

24          MR. NICHOLAS:  I was going to throw it on the ELMO.

10:46:12    25          THE COURT:  Okay.  That's fine.  Let's do it that way.

```
 1    Let me -- I've got a screen here as well as up there.  All
 2    right.
 3                MR. NICHOLAS:  All right.  So the first --
 4                THE COURT:  On -- do we have the screens on back
 5    there, Ellen?
 6                THE CASE MANAGER:  Yes, sir.
 7                MR. NICHOLAS:  All right.  So the first table, we've
 8    got this -- so Count 1 of the complaint alleges --
 9                THE COURT:  That's a little intimidating right now.
10    How many counts are you going to go over?  I mean, the type is
11    small, and how many pages?  I can get a feel for what you have.
12                MR. NICHOLAS:  I was just going to give you a feel for
13    it.
14                THE COURT:  Give me an example.  Okay.
15                MR. NICHOLAS:  I'll give you a feel for it.  Okay.
16    The first count is --
17                THE COURT:  Is that focused in, by the way, Ellen, do
18    you think?  Is it focused?
19                THE CASE MANAGER:  Not to me but --
20                THE COURT:  Okay.  Do you want to help with the focus?
21    We'll get it straight the first time.  We'll sharpen that up if
22    we can a bit.
23                MR. NICHOLAS:  All right.
24                THE COURT:  All right.  Yeah.  Sometimes when you zoom
25    in or out, it helps.  Yeah, that may be the best we can get for
```

10:46:28 (line 5)
10:46:47 (line 10)
10:47:01 (line 15)
10:47:09 (line 20)
10:47:45 (line 25)

```
 1    right now.  If you have a little pointer there or a pencil or
 2    something, just point out --
 3               MR. NICHOLAS:  Okay.
 4               THE COURT:  -- exactly where you want us to look.
 5               MR. NICHOLAS:  In Count 1, this claim is that all
 6    upset -- all upset emissions from the refinery are violations.
 7               THE COURT:  Where are you looking -- I'm sorry.  Where
 8    are you looking at?
 9               MR. NICHOLAS:  First, I'm just describing the count,
10    which is upset events at the refinery, Count 1.
11               THE COURT:  How many counts are there?  I haven't
12    looked at them.
13               MR. NICHOLAS:  Seven.
14               THE COURT:  Seven.  Okay.
15               MR. NICHOLAS:  So, the first count is there -- that
16    all upset events at the refinery have yielded violations that
17    result in unauthorized, illegal emissions, and that is because
18    the permit states, "This permit does not authorize upset
19    emissions, emissions from activities that occur as a result of
20    upsets or any unscheduled, unplanned emissions associated with
21    an upset.  Upset emissions are not authorized, including
22    situations where that upset is within the flexible emission cap
23    or an individual permit emission limit."  So --
24               THE COURT:  Just explain what --
25               MR. NICHOLAS:  Okay.
```

10:47:54 (line 5)
10:48:05 (line 10)
10:48:13 (line 15)
10:48:30 (line 20)
10:48:47 (line 25)

1          THE COURT:  This is all across here.

2          MR. NICHOLAS:  Right.  So --

3          THE COURT:  From the left to the right, because when

4  you go over that, the contaminant is listed at the right.   Is

10:48:57   5  one through eight, what is that, one incident?

6          MR. NICHOLAS:  Yes.

7          THE COURT:  Okay.

8          MR. NICHOLAS:  One through eight is one incident.

9          THE COURT:  On what date?

10:49:04  10          MR. NICHOLAS:  And it is on --

11          THE COURT:  10-14-2005?

12          MR. NICHOLAS:  Right.  So you got a start date, the

13  end date -- okay.  First, you've got -- in some occasions we

14  have a tracking number, which, if you recall, I referred to

10:49:20  15  STEERS reports.  These are STEERS report numbers generated by

16  TCEQ.  This is our case Bates number.  So the underlying

17  documents have been put into evidence or into -- into the

18  exhibit books.

19          So, this STEERS report is reflected in these

10:49:50  20  Bates numbers ranges.  Here's the start time -- start date and

21  time of the emission event, end date and time, how long, the

22  duration, how long the event took.

23          THE COURT:  All right.  Now, you're using military

24  time here or not?

10:50:05  25          MR. NICHOLAS:  Well, this is actually --


Gayle Dye, CSR, RDR, CRR - 713.250.5582

1          THE COURT:  You're using -- first, at the top it says

2     2:47 and the ending is 10:11.  Is it a.m., p.m., or is that

3     military time?

4          MR. NICHOLAS:  Military.

10:50:19  5          THE COURT:  All right.  Duration is what, 17 minutes

6     or 17 hours?

7          MR. NICHOLAS:  17 hours.  So it's --

8          THE COURT:  17 hours?

9          MR. NICHOLAS:  Right.  Hours and minutes.

10:50:26  10   Authorization is the permit that governs this emission or lack

11    of a permit, and that will -- that's self-explanatory from that

12    column.  The unit number -- the unit at the plant that is

13    involved in the emission event, again this is all as reported by

14    Exxon.

10:50:45  15         These are just Exxon's records copied onto a

16    summary document.  The emission point is the -- is a more

17    specific location where the pollution is coming from.  Some of

18    them are numbered.  EPN stands for emission point number, which

19    is just another reference.  The contaminant is the actual

10:51:06  20   pollutant that's being emitted during this violation.  So,

21    you've got ammonia and carbon monoxide, hydrogen cyanide.

22         THE COURT:  Now, when you say particulate matter, what

23    am I going to learn that is?  Is that -- what is particulate

24    matter?

10:51:21  25        MR. NICHOLAS:  Particulate matter is a measure -- it's

1  literally particles.

2          THE COURT:  And that's dirt in there?

3          MR. NICHOLAS:  Soot.

4          THE COURT:  Soot.

10:51:28  5          MR. NICHOLAS:  Soot, smoke, that kind of thing.

6          THE COURT:  Okay.  Got it.

7          MR. NICHOLAS:  Total VOC -- VOCs, which you'll hear a

8  lot about in this case are volatile organic compounds.  And

9  since the refinery permit regulates them as a -- as a group on

10:51:47  10  occasion, they -- we have lumped together the VOCs to give one

11  total.  We agreed that that -- we agreed with Exxon on that.

12          THE COURT:  And these are matter of pounds in the air?

13          MR. NICHOLAS:  Yes.  And the next column shows how

14  much is released in pounds.

10:52:03  15          THE COURT:  All right.  So the first thing is -- for

16  is -- the first one is 1,125 pounds?

17          MR. NICHOLAS:  Yes.

18          THE COURT:  The next one, carbon monoxide, 283,767

19  pounds?

10:52:18  20          MR. NICHOLAS:  Yes.

21          THE COURT:  All right.

22          MR. NICHOLAS:  Then the next column is the reported

23  emission limit in pounds per hour.  So that's the permit limit.

24          THE COURT:  In other words, they're not supposed to

10:52:31  25  put anything in the air?

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1         MR. NICHOLAS:  Right.  This shows -- this shows zero.
2    Sometimes it shows another number.  A lot of times it shows
3    zero.  Then there's a cause as written by Exxon.
4         THE COURT:  Yeah, move it over, please.
5         MR. NICHOLAS:  Oh, I'm sorry.  It cut off.  Then,
6    there's a cause column.
7         THE COURT:  Well, take a look at that 263 -- or 83.
8    Why don't we see what that is.  Read that, if you would.
9         MR. NICHOLAS:  "FCCU 3 C, boiler, tripped off line at
10   2:47 and again shortly after start-up at noon.  Cause of event
11   currently under investigation."  So that's a --
12        THE COURT:  Well, when it's under investigation, do
13   you ever get results?  What was the result, for instance, to
14   that one event?
15        MR. NICHOLAS:  I don't recall off the top of my head,
16   but --
17        THE COURT:  And you don't need to.  What I'm saying,
18   that's a question people ask.  Okay?
19        MR. NICHOLAS:  Right.
20        THE COURT:  It seems a lot number-wise into the air,
21   okay?  And that they have under investigation.  Now, somewhere
22   they investigated and had to make a report, right?
23        MR. NICHOLAS:  Yes.
24        THE COURT:  Okay.
25        MR. NICHOLAS:  It's -- it is, I believe, almost always

1   the case that eventually that -- usually the cause column is a

2   little more certain than that, so -- or it will just say

3   something tripped because of -- and then there will be an

4   explanation.

10:53:47   5            And so the way these STEERS reports work is that

6   there's an initial report and then there's an opportunity for

7   the company to file an additional report two weeks later that

8   becomes the final report and they usually have a more certain

9   explanation of the cause.  That's the typical way it happens.

10:54:04   10           So, all of these in Count 1, everything in here

11   is a violation because no upsets are allowed at the refinery

12   under its permit.  And these are -- those were STEERS events.

13           THE COURT:  Okay.  What do you anticipate -- what's

14   the defense to that?  Oh, I know I'll hear it, but what's their

10:54:27   15   defense to that?  It looks -- on the paper it looks egregious.

16   What's the defense?  Certainly we'll hear from it, and then you

17   respond right now, if you would.  Tell me what the evidence --

18           MR. NICHOLAS:  Do both sides?  I can do that.  I can

19   do that.

10:54:39   20           THE COURT:  No, no.  Just tell me what argument you're

21   going to have to meet because it's discovery.  In federal cases

22   you know what's coming, right?

23           MR. NICHOLAS:  I do know what's coming.  The argument

24   is TCEQ knew about it and cared about it, didn't care about it,

10:54:54   25   whatever.  They either -- they penalized us.  They didn't

1  penalize us.  There's not a claim that these aren't violations.

2  There's only a claim that they haven't -- that we shouldn't --

3  that Plaintiffs shouldn't be the one dealing with it.

4            These are -- these -- these statistics only arise

10:55:12  5  -- these reports only arise because there's an unauthorized

6  emission.  If it wasn't unauthorized, it wouldn't be on -- in a

7  report, and it wouldn't be on this page.  So it --

8            THE COURT:  So your position is they reported it and

9  nothing was done or they were penalized for it and they moved

10:55:30  10  on.

11            MR. NICHOLAS:  Right.

12            THE COURT:  I'm not -- I'm not putting words in their

13  mouth, but I'm just saying is that -- is that generally the

14  position we're going to hear?

10:55:38  15            MR. NICHOLAS:  Yeah.  That's generally the position

16  that you're going to hear or you're also going to also hear --

17  as I mentioned, Exxon will also argue that some of these have

18  been small.  You know, there's been a lot of small emissions, a

19  half a pound of this, ten pounds of that, which is why I brought

10:55:53  20  up earlier about how these pollutants are flammable.

21            When you add them all up, they are -- they're

22  more than a million pounds.  You never know what's going to come

23  out at any given time during an emission event.  So if you don't

24  care about the small ones, it could become large.  It shows that

10:56:09  25  there's an inattentiveness to maintenance, a shoddily run plant.

1   And that's what you're going to hear about the smaller events.

2   And the chart -- let's see.  Exhibit 1B.

3            THE COURT:  Let me ask you this:  Are we going to have

4   any -- and we don't need it -- necessarily need it.  I'm just

10:56:21   5   asking.  Any input from the state agency which your position is,

6   I'm gathering, just didn't look -- watch them close enough?

7            MR. NICHOLAS:  Well, there will be some -- as we

8   mentioned last week, there's a former TCEQ investigator that was

9   more than hundred miles away -- so his deposition has to be

10:56:42   10   used -- who is going to talk about essentially lack of resources

11   at TCEQ to deal with this.  He's also going to testify about how

12   fines -- TCEQ fines do not affect Exxon's behavior.

13            THE COURT:  Are those video or are those written

14   depositions?  Video --

10:56:59   15            MR. NICHOLAS:  Video.

16            THE COURT:  -- depositions?

17            MR. NICHOLAS:  Video.

18            THE COURT:  Well, that helps.

19            MR. NICHOLAS:  We'll be able to play the video.  We'll

10:57:05   20   be able to play the video.  So there's that testimony, and he's

21   also going to testify about a specific order that --

22            THE COURT:  Has he refused to come?  Have you asked

23   him to come?

24            MR. NICHOLAS:  I have never been able to actually -- I

10:57:17   25   have never reached him on the telephone when I've called him,

1   so I --

2            THE COURT:  Well, maybe I'll reach him if you have to.

3   Just ask him if he'll come but --

4            MR. NICHOLAS:  I have not asked him.

10:57:27   5            THE COURT:  No, but if you have any problem contacting

6   anybody, you let me know --

7            MR. NICHOLAS:  Well, I -- we assume --

8            THE COURT:  Because I have ways to contact them.  I

9   may not have the authority to bring him in.

10:57:37   10            MR. NICHOLAS:  I have his phone number.  Both sides

11   agreed that we would put in the video.

12            THE COURT:  All right.  Go on.

13            MR. NICHOLAS:  At this point I think it's probably the

14   easiest way to deal with it.

10:57:48   15            All right.  Now these recordables -- so the

16   recordables that I mentioned, the events that don't rise to the

17   level of being put onto the TCEQ website, are compiled in lists,

18   maintained on site and --

19            THE COURT:  What is this I'm looking at?

10:58:07   20            MR. NICHOLAS:  So we have compiled -- this is

21   another -- this is Exhibit 1B, Plaintiffs' Exhibit 1B.

22            THE COURT:  Non-reportable emission events, right?

23            MR. NICHOLAS:  Right.  So these are non-reportable

24   emission events at the refinery for Count 1.  So Exhibit 1 is

10:58:29   25   linked to Count 1, and there's a 1A and a 1B.


                    Gayle Dye, CSR, RDR, CRR - 713.250.5582

1          THE COURT:  These are not reportable.  Who prepared

2   this?

3          MR. NICHOLAS:  These are based on Exxon's -- so these

4   are Exxon's own records.  And then these are the actual -- this

10:58:42   5   is just a copy of the reportable.

6                Is that right?

7                This is an actual copy of Exxon's own records.

8   The first one was the spreadsheet that Exxon and the Plaintiffs

9   agreed on because they're reportable.  We took them from the

10:58:54   10   website.

11          THE COURT:  Well, let me ask you this:  What's your

12   theory -- why does Exxon go to the self-reporting, self-damage

13   report if, indeed, they don't have to?

14          MR. NICHOLAS:  They have to.

10:59:09   15          THE COURT:  They have to under what regulation,

16   federal?

17          MR. NICHOLAS:  State, state.

18          THE COURT:  State.  So even when it's non-reportable,

19   they have to report them internally --

10:59:19   20          MR. NICHOLAS:  Right.  Yes.

21          THE COURT:  Or do they have to send them to the

22   agency?

23          MR. NICHOLAS:  They keep them on site.

24          THE COURT:  They keep them on site.  They don't have

10:59:27   25   to turn them in?

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1          MR. NICHOLAS:  Correct.  The agency can look at them

2    any time they want.  They actually refer to the -- report

3    complies with 30 TAC 101.201.  Do you see that?

4          THE COURT:  Where are you reading?

10:59:39    5          MR. NICHOLAS:  On the very bottom.  I can point on the

6    ELMO.

7          THE COURT:  Okay.  I see it.

8          MR. NICHOLAS:  So that is -- I'm pretty sure, should

9    be -- that is the regulation that says if it doesn't rise, if

10:59:53   10   there's no -- if there's not a reportable quantity at issue, if

11   it doesn't rise to the level of being put onto the TCEQ website,

12   then these are maintained on site.

13          THE COURT:  All right.  Now, what are we looking at

14   here?  The numbers are small, but what are they?

11:00:08   15          MR. NICHOLAS:  Same information on Table 1A,

16   essentially, the same information that goes onto the website but

17   just it doesn't go on the website.

18          THE COURT:  In other words, it says one and

19   three-quarter pounds, another one, one hundredth of a pound.

11:00:20   20          MR. NICHOLAS:  Right.

21          THE COURT:  It goes down to .25 pounds.

22          MR. NICHOLAS:  Right.

23          THE COURT:  That's a quarter of a pound.

24          MR. NICHOLAS:  Exactly.  Yeah.  And they're not always

11:00:31   25   that small.  Some of them are very large.  I believe we'll

1    hear -- probably hear testimony about one that's 20,000 pounds.

2              THE COURT:  20,000 pounds not reportable?

3              MR. NICHOLAS:  Right.  I mean, we're not -- we're

4    not -- we're taking them --

11:00:46  5    THE COURT:  So what would the state agency come -- are

6    they -- they have access to these?  They're supposed to look at

7    these once in awhile when they come out to inspect the plant?

8    Yes, are they supposed to?

9              MR. NICHOLAS:  They're supposed to.  Well, they don't

11:01:00  10   always -- yeah, they should.  They don't always go out and

11   inspect it.

12             THE COURT:  If they're out there inspecting it -- I

13   understand a pound and a half or whatever; but if they come

14   across a 20,000-pound -- you know, 20,000-pound emission that's

11:01:16  15  not reportable, wouldn't that ring a bell of some sort?

16             MR. NICHOLAS:  It should, but it's --

17             THE COURT:  Again, we're not hearing the other side.

18   It rings a bell.

19             MR. NICHOLAS:  It should --

11:01:23  20   THE COURT:  It got my attention.

21             MR. NICHOLAS:  And, in fact, I believe you'll hear

22   from the clips that we'll play here from the former TCEQ

23   enforcement person, TCEQ used to consider these when they came

24   up with penalty enforcement orders.  They used to consider these

11:01:39  25  so-called recordables, but then TCEQ adopted a policy of not

1  considering them.  So we view it as a failure.

2          THE COURT:  Go on.

3          MR. NICHOLAS:  Then there is -- all right.  So Count 2

4  of the complaint.

11:01:52  5          THE COURT:  We're on Count 2?

6          MR. NICHOLAS:  We're on Count 2 which is violations of

7  hourly emission limits.

8          THE COURT:  All right.

9          MR. NICHOLAS:  So they could be anything.  They could

11:02:02  10  be a thousand pounds an hour.  They could be 5,000 pounds an

11  hour.  It depends on what the pollutant is.

12          THE COURT:  What are the -- are there hourly limits

13  that are not violations or all of them are violations?

14          MR. NICHOLAS:  If they're under the -- if they're

11:02:16  15  under the limit, they would not be a violation.  So if there's a

16  1,000 -- as an example, if there's a 1,000-pound per hour carbon

17  monoxide emission limit and -- at the chemical plant and they

18  emit 500 pounds per hour, that wouldn't be a violation

19  necessarily.

11:02:37  20          So for each of the plants, we have come up with

21  an agreement with Exxon, a set of stipulated tables that reflect

22  emission events, both STEERS and recordable, that show

23  violations of the hourly emission limits.  These are Plaintiffs'

24  Exhibits 2A through 2F, and these are -- these are the same kind

11:03:07  25  of records -- the stipulations will look the same as the ones we

1  just went over.

2          But here's an example for the olefins plant.  So

3  it would be on the top summary, emission limits -- limit

4  violations from the olefins plant.  So this would be 2C, same

11:03:31  5  sort of information, tracking number, Bates number, date and

6  time, start date and time, end date and time, duration, all of

7  the same columns.

8          And here again there's a column for reported

9  emission limit.  So here's an example of -- you'll see some

11:04:00  10  zeros.  You'll see some non-zeros.  All of this information

11  is -- so here you'll see 780 pounds per hour, reported emission

12  amount released 12,000 pounds.  So that is -- these are

13  reflected in Exhibits 2A through 2F.  The reason that they're

14  broken up -- they're broken up by plant, and they're broken up

11:04:33  15  by reportables and recordables.

16          So there's six tables for that.  Then Table -- or

17  Count 3 are violations of highly reactive VO -- volatile organic

18  compounds rule.  There's a special rule in Texas that caps

19  emissions of HR VOCs which are particularly ozone-forming

11:05:00  20  chemicals.  They're particularly susceptible to the formation of

21  ozone.  And there's a 1200-pound per hour limit on that, and

22  that's reflected in Exhibit 3.  And so that's self -- this is --

23          THE COURT:  Exhibit 3 or Count 3?

24          MR. NICHOLAS:  Exhibit 3, Count 3, we've linked up the

11:05:22  25  numbers.  Count 4 is violations of the smoking flare

1    prohibition.  So what --

2              THE COURT:  Smoking flare?

3              MR. NICHOLAS:  Right.  Flares can't smoke for more

4    than five minutes in any two-hour time period.

11:05:37  5              THE COURT:  What is smoking flare?

6              MR. NICHOLAS:  Literally smoking.  The flares that

7    have the flames coming out of them can't smoke.  They can't emit

8    smoke.

9              THE COURT:  That can't emit smoke, not the flame,

11:05:47  10   smoke?

11             MR. NICHOLAS:  Right.  Because the smoke is

12   essentially particulate matter and billows all over the place.

13   So there's a limit on how much -- on how much a flare can smoke.

14   It's five minutes in two hours.  So the records reflect when --

11:06:05  15   when the flare smoked for more than five minutes in two hours.

16   And it will be described in, perhaps, deviation reports or

17   STEERS reports; but essentially, these reports will reflect and

18   will literally say it smoked for more than five minutes.  That's

19   Count 4.

11:06:26  20             Count 5 is the permits prohibit flares from --

21   pilot flames that flares have to be operating at all times

22   because if pollution goes into a flare, it's supposed to -- the

23   flare is supposed to burn it.  That's what's supposed to happen.

24   If the pilot flame is out, the pollution just goes right out.

11:06:50  25             THE COURT:  Where is the pilot flame, up top or in the

1    bottom?

2            MR. NICHOLAS:  Top.

3            THE COURT:  So that's what we call the pilot flame?

4            MR. NICHOLAS:  Correct.

11:06:57  5            THE COURT:  Not like on an oven where it's somewhere

6    else?  In other words, it's -- so is a pilot --

7            MR. NICHOLAS:  It's --

8            THE COURT:  When you say "pilot flame," is that the

9    main flame we see flaring at the refineries?

11:07:08  10            MR. NICHOLAS:  No.  It's a flame that when the gasses

11    go through the pilot flame they will combust and create the

12    flame --

13            THE COURT:  Got it.

14            MR. NICHOLAS:  -- that you see.

11:07:17  15            So Count -- Plaintiffs' Exhibit 5 is a listing of

16    all of the times that Exxon has self-reported that the pilot

17    flame at the flare went out.  That's Count 5, Plaintiffs'

18    Exhibit 5.  Again, those are stipulated.

19            Count 6 is a prohibition on fugitive emissions.

11:07:42  20    Fugitive emissions are emissions that are not vented through,

21    basically, a stack of some sort.  They're loose.  They're rogue.

22            THE COURT:  What do they do with them?  I mean --

23            MR. NICHOLAS:  They go out -- they just go out in the

24    atmosphere.

11:07:55  25            THE COURT:  Go out of where?

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1           MR. NICHOLAS:  They go out of leaks.  They go out of

2  unvented spots and equipment.  They just -- they're not rooted

3  to a particular emission point.

4           THE COURT:  All right.

11:08:06  5           MR. NICHOLAS:  So, again, the -- Exxon's own records

6  will report when something is a fugitive emission leak both in

7  the deviation reports and the STEERS reports.  These columns

8  will reflect that, and they are also -- the EPN, the emission

9  point number, will often have something like a -- or an FUG on

11:08:33  10  it, which means fugitive.  So, took those, put them into a

11  table; and that's Count 6 and Exhibit 6.

12           Count 7 are all of the violations reported in

13  twice yearly deviation reports.  These are the reports.

14           THE COURT:  This is, what, summaries or not?

11:08:56  15           MR. NICHOLAS:  Well, the deviation reports are

16  literally lists of violation.  And so they will have a variety

17  of information on them.

18           THE COURT:  What's the differences between this and

19  the other charts we've seen?

11:09:08  20           MR. NICHOLAS:  Well, they over --

21           THE COURT:  They overlap?

22           MR. NICHOLAS:  They overlap to some degree.  But the

23  deviation reports also include recordkeeping, monitoring

24  problems, failure to test equipment properly.  So, there will be

11:09:21  25  that kind of a violation in addition to direct emissions into

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1    the air.

2              So, we have created 7A through 7E with Exxon.

3    Those are stipulated tables.  So, 7A -- so, we have

4    cross-referenced.  If there's a STEERS event, that would mean

11:09:52   5    it's an overlapping on one of the other charts that's identified

6    here.

7              Again, we've always -- we always have an

8    underlying document referred to, Bates number.  And as a permit

9    condition that's being violated, that's this column.  If there's

11:10:09   10    a pollutant that's coming out, that's identified here.  It's not

11    always the case, but here it's hydrogen sulfide.

12              The regulatory requirement that's being violated,

13    that's in this column.  Type of requirement, that's in this

14    column.  The start and end date, again, the reported cause of

11:10:27   15    the deviation is spelled out in these reports.  Corrective

16    action that's been taken and the number of deviations is also

17    listed.

18              And so, we do that for each of the plants.  All

19    the deviation reports, underlying deviation reports, are in the

11:10:51   20    record.  And so, these are -- Plaintiffs' Exhibits 1 through 7E

21    are again a stipulated -- stipulated versions, summaries of all

22    of the underlying records that prove the violations.

23              THE COURT:  All right.

24              MR. NICHOLAS:  Thank you.

11:11:15   25              THE COURT:  I'm not going to -- you've used about

1  almost -- just almost exactly an hour, 59 minutes.

2            What we're going to do -- I'm going to give you

3  about -- since we take a break every hour and a half for about

4  ten minutes or so -- okay, so I stick to that so everybody can

11:11:29  5  take a break -- I'll let you know in about 20 -- 20 minutes.

6  We'll take a ten-minute break, and then we'll continue to pick

7  up.

8            You're under no time constraints either.  All

9  right, Defense.  Mr. Nichols.

11:11:43  10       MR. NICHOLS:  Good morning and thank you, your Honor,

11  for giving us the time to provide a little bit more of an

12  overview of the case other than what we did on Friday.

13       THE COURT:  Your time.

14       MR. NICHOLS:  And with respect to the time that the

11:11:52  15  Court has given us on opening, I would just like to lay out a

16  big picture overlay, a road map, of where this case is going

17  from our perspective.

18            Now, with respect to the matters that are at

19  issue in this case, you've heard this is a citizen suit brought

11:12:10  20  by two environmental advocacy programs.  And, your Honor, could

21  we just get the slides up.

22       THE COURT:  All right.  It's now -- I have 11:14.

23  We'll be back in at 11:25.  All right?  We'll see you in about

24  ten minutes, and we'll keep on going.

11:13:25  25       (Court recessed at 11:12 a.m.)

Gayle Dye, CSR, RDR, CRR - 713.250.5582

```
 1              (Court resumed at 11:26 a.m.)
 2              THE COURT:  All right.  Go right ahead, sir.
 3              MR. NICHOLS:  Good morning, your Honor.  What I was
 4    saying before the break is we want to provide an overview of
 5    where we think the case is headed from our perspective.
 6                   As your Honor remarked on Friday, we are not here
 7    to judge what the two Plaintiff organizations need to do to have
 8    their case survive a motion to dismiss.  We are not here to
 9    decide what the Plaintiffs' organizations need to do to survive
10    a motion for summary judgment.  We're here for trial.
11                   And, your Honor, with respect to the trial of any
12    lawsuit, there are certain standards of proof that the person
13    with the burden of proof must meet before they come to this
14    Court seeking any form of relief.  There's been a lot of
15    discussion about the various cases that apply in Clean Air Act
16    cases.
17                   Judge, I'll tell you right now, you're not going
18    to find a whole lot of cases on the sufficiency of evidence at a
19    trial on a Clean Air Act case.
20              THE COURT:  What about that East Texas case he was
21    referring to?
22              MR. NICHOLS:  That East Texas case he's referring to
23    refers to a burden of proof on our affirmative defense for the
24    act of God for Hurricane Ike.
25              THE COURT:  Where is that, out of which?  Was it out
```

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1   of Beaumont?

2          MR. NICHOLS:  I believe -- I need to check their site,

3   but I believe it was out of the Eastern District.  I don't --

4   can't remember if it was Beaumont or not; but in any event, that

11:27:14  5   relates to the discussion we had last Friday about the Hurricane

6   Ike events.  And that is a matter in which we bear the burden of

7   proof.

8              And, your Honor, we're going to meet that.  And

9   so as a result of that, we're going to ask you to be dismissing,

11:27:28  10  entering a directed verdict, entering a final judgment on

11  those -- on those claims because they are subject to the act of

12  God defense but more broadly --

13       (Discussion off the record.)

14          MR. NICHOLS:  So, your Honor, as we discussed, we're

11:29:37  15  here -- two groups, Environment Texas Citizen Lobby and Sierra

16  Club are bringing this lawsuit.  Now, no matter what the agenda,

17  no matter what the goal, no matter what the rhetoric is of

18  environmental groups like this, your Honor, it is undisputed in

19  the case that these groups in and of themselves do not have the

11:29:59  20  right to bring a citizen suit.  The only way they get a right to

21  come to federal court is if there are members of these groups

22  that can demonstrate the type of injury that is required to

23  bring a citizen suit.

24          THE COURT:  All right.  So that's where we're here to

11:30:21  25  see the factual basis, correct?

1          MR. NICHOLS:  Exactly, Judge.  And what you heard from

2    Mr. Nicholas was we have the same remedy that the EPA has.  We

3    have the same remedy that TCEQ has.  Your Honor, that could

4    be -- there could be not a statement made in this case that is

11:30:40  5    further from the truth than that.  The remedy that is provided

6    under the citizen suit provision of federal law is by its very

7    nature, as we're going to go through here, a limited remedy.

8          Now, your Honor, you also heard that there are

9    three Defendants in the case.  You got ExxonMobil Corporation

11:30:58 10    and two wholly-owned subsidiaries, the ExxonMobil Chemical

11    Company which runs the chemical plants involved in the case and

12    also ExxonMobil Refining and Supply Company that runs the

13    refinery.

14          Next slide, please.

11:31:14 15          So, your Honor, you're going to be hearing a lot

16    about the ExxonMobil Baytown Complex; and this is a large,

17    industrial complex located on the Ship Channel in the Baytown

18    area.  You're going to hear evidence of -- just to orient the

19    Court, that line that I'm doing the pointer on, that's I-10.

11:31:36 20    Then you've got a spur that runs off I-10 down towards the

21    Baytown Complex.

22          THE COURT:  Now, I-10.  Where is Beaumont?  Which way

23    is --

24          MR. NICHOLS:  Beaumont is down in this direction.

11:31:45 25          THE COURT:  Okay.  And downtown is to the left?

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1            MR. NICHOLS:  Yes, sir.  And then this is a spur, 330,

2       that you're going to hear about that runs from I-10 down towards

3       the plant.

4            THE COURT:  Where is the Gulf Freeway?  Doesn't

11:31:56   5       that --

6            MR. NICHOLS:  No.  It's going to be back over here in

7       this direction, your Honor.  So here is the Ship Channel right

8       here in this area.  And you're going to see additional photos.

9       Remember I told you you're going to get a virtual tour of the

11:32:08  10       plant.  Down here are the docks where the facility takes in the

11       raw product, in other words, where it takes in the crude; and

12       then you're going to hear --

13            THE COURT:  The crude comes in by ship, not by

14       pipeline?

11:32:19  15            MR. NICHOLS:  That's exactly right, Judge.  So it

16       comes by -- on these docks here, and it's going to be processed

17       through this plant.  You're going to hear about the three

18       constituent parts of the plant.

19            THE COURT:  Now, what comes out of this plant, what

11:32:29  20       product?

21            MR. NICHOLS:  So, in the refinery you've got refined

22       petrochemical products.  So everything from jet fuel, gasoline

23       lube oils, you name it.  Then you've got a chemical plant that

24       produces, basically, feed stock chemicals that are used in

11:32:45  25       other -- other types of facilities to produce various chemicals,

1   household chemicals and other things that people use every day.

2   And then you have the -- you have -- at the top you have an

3   olefins plant, which -- which produces other chemical-type

4   products that are used in everyday application, including

11:33:07   5   precursors, such things as polyethylene that we use in all --

6               THE COURT:  Plastics, things like that?

7               MR. NICHOLS:  In plastics, yes, sir.  So, we're going

8   to spend a great deal of time -- and I agree with Mr. Nicholas

9   on this.  We are going to look at the nuts and bolts of this

11:33:23   10   plant because, as I told the Court on Friday, the Plaintiffs

11   under their gotcha theory, under their scattershot approach are

12   operating at a level of abstraction that completely ignores what

13   the many good, hard-working men and women of ExxonMobil are

14   doing out there at the Baytown Complex.

11:33:43   15               Next slide, please.

16               THE COURT:  But that -- I also understand that you

17   feel there's some sort of a standing problem.  They're going to

18   have to prove as a matter of fact that, in effect, it's not the

19   organizations but actual individuals within those organizations

11:33:56   20   that, in effect, have been damaged somehow to give them standing

21   at all.

22               MR. NICHOLS:  Yes, sir.  And so what -- the difference

23   between -- if I can crystallize it, the difference between the

24   Plaintiffs' approach and the approach that you're going to see

11:34:11   25   us do as if we were the Plaintiffs, as if we were prosecuting a

1  citizens suit ourselves, we're actually going to be presenting

2  from our standpoint, if you really wanted to touch all the bases

3  of a citizen suit claim, if you really want to do it, they could

4  do it.

5            They could have tried to meet those bases; but

6  we're going to show in this case that they haven't done it,

7  including by virtue of standing.  So, your Honor, with respect

8  to the men and women who are working out there everyday --

9            Next slide.

10            -- we're here to represent, defend these clients

11  against a limited remedy that's provided to citizens under the

12  Clean Air Act.  And this is the statute itself, Judge.

13        THE COURT:  Now, it says, provided subsection, "Any

14  person may commence a civil action on his own behalf."

15        MR. NICHOLS:  Yes, sir.

16        THE COURT:  And you're saying that's not the case

17  here.

18        MR. NICHOLS:  This is the statute.  This is the --

19        THE COURT:  No, I know.  But you're saying this is not

20  the case with the Plaintiffs in this case?

21        MR. NICHOLS:  That's correct.  Because they can't

22  meet -- they can't run all the bases that you have to run to

23  proceed with a citizen suit case.  And we've highlighted --

24  remember the statement that Mr. Nicholas said --

25        THE COURT:  Let me read the whole thing first.

1          MR. NICHOLS:  Yes, sir.

2          THE COURT:  Okay, got it.

3          MR. NICHOLS:  So where the difference is -- one of the

4    key differences is, first of all, they have to show -- it's the

11:36:14  5    Plaintiffs' burden to show a violation.  It's not just any old

6    violation, as we talked about on Friday, your Honor, that allows

7    a citizen to bring a citizen suit.

8              The Congress specifically said that for

9    wholly-past violations, in other words, things that occurred in

11:36:32 10    the past, you had an emissions event in the past, you can't go

11    get to that under this statute.  You have to show evidence that

12    the alleged violation had been repeated, and that's going to be

13    another key element in addition to standing, your Honor, that is

14    going to be at issue in this case.

11:36:50 15              What does it mean?  What is the Plaintiffs'

16    burden to show that a violation has been repeated?

17          THE COURT:  What's the case law?  Case law goes both

18    ways or there's not much case law?

19          MR. NICHOLS:  We think the case law indicates that you

11:37:04 20    cannot do what Mr. Nicholas told you this morning they intend to

21    do, which is to say that every time the facility had a carbon

22    monoxide release, that that's a repeat event.

23          MR. NICHOLAS:  Objection, your Honor.  Your Honor has

24    already ruled on that.

11:37:18 25          MR. NICHOLS:  That's -- that's -- you already ruled

1  against it.

2          THE COURT:  How did I rule on it?  Put it in the

3  record, and then I want Mr. Nichols to meet it.

4          MR. NICHOLAS:  Yes.  The ruling was in the

11:37:30  5  memorandum -- okay.

6          MR. NICHOLS:  Your Honor, may I proceed?

7          THE COURT:  No, no.  But I'm going to put him on the

8  clock.  This is a better way to do it.

9              Go on.

11:37:45  10          MR. NICHOLAS:  Document 126, Memorandum and

11  Recommendation on Exxon's Motion for Summary Judgment; and I

12  specifically refer to pages --

13          THE COURT:  Just tell me about it.

14          MR. NICHOLAS:  Yeah.  This Court has already ruled

11:38:00  15  that when an emissions standard in a permit, say, pounds per

16  hour for carbon monoxide, if it's repeated, if it's been

17  violated more than once, that's the way to establish the

18  violation.  That's one way to do it.  So, the other way to do

19  it, an alternative, an addition not required is to show that

11:38:24  20  there are a variety of different types of violations all caused

21  by the same underlying cause.

22          THE COURT:  All right.  Got it.

23          MR. NICHOLAS:  Two separate concepts.

24          THE COURT:  It is a theory.  Talk about it.

11:38:35  25          MR. NICHOLS:  Yes, sir.

1          THE COURT:  The easiest way -- and this is a non-jury

2     case.  That's why I will go around -- I did that on Friday.  I

3     stopped, and I get a short verse.  That way you can deal with it

4     while it's fresh in my mind instead of waiting until later.

11:38:47   5          MR. NICHOLS:  Yes, sir.

6          THE COURT:  Go right ahead.

7          MR. NICHOLS:  The Court has made no ruling as to what

8     evidence these Plaintiffs have to show to prevail.

9          THE COURT:  What is Mr. Nicholas referring to?

11:38:56  10          MR. NICHOLS:  He's referring to a statement about the

11    fact that under their current set of allegations, they could

12    bring certain allegations to trial.  We're here to try the

13    lawsuit, and the Court said in that same memorandum that this

14    Court is not saying that the Plaintiffs have met or will meet

11:39:12  15    their burden of proof at trial.

16          With respect to the statute, your Honor, it's

17    their burden to show that the alleged violation has been

18    repeated.

19          THE COURT:  All right.  So there's the key, there's

11:39:22  20    the word that got them up.  Now I understand it, as far as the

21    theory goes.  So, go on.

22          MR. NICHOLS:  There is an alternative, but not the one

23    that Mr. Nichols mentioned, which is that you can bring a suit

24    if -- or to be in violation of.  And what that means, what the

11:39:38  25    cases have said, your Honor, is that means an ongoing violation.

1   In other words, you can go one of two ways.  If the events that
2   you're talking about occurred in the past -- and, believe me,
3   with respect to all that volume of paper that Mr. Nicholas told
4   you about --
5   11:39:56        THE COURT:  A lot of paper is your own.
6           MR. NICHOLS:  Exactly, but we're dealing with
7   wholly-past violations.  So they're going -- it's their burden
8   to show repeated.
9           MR. NICHOLAS:  Objection.
10  11:40:06        THE COURT:  Overruled.  That's enough.
11          Now, keep going.
12          MR. NICHOLS:  And with respect to ongoing, that is
13  their burden to show that there are ongoing violations, and we
14  contend the evidence will show --
15  11:40:19        THE COURT:  So, you're saying each one of those
16  events, none of them ever been repeated?
17          MR. NICHOLS:  Not -- not in the way that the -- that
18  the statute contemplates if you want to bring a Clean Air Act
19  citizen suit.
20  11:40:33        Judge, you have heard me say from the get-go in
21  this case that -- I have asked repeatedly, we've asked in our
22  pleadings, we've asked in our motions -- focus your case on
23  those matters where you truly believe that incidents have been
24  repeated.  You heard me on Friday say -- when Mr. Kratka got up
25  11:40:55  and said "We want to put in evidence of things that happened

1    after the cutoff date," you heard my response.

2              I will withdraw my objection if they're prepared

3    to prove that that -- those post cut-off events are repeated of

4    something that happened before.  And you heard Mr. Kratka say,

11:41:12  5    "No, no, that's not the point.  That's not what we're doing."

6    That's not the point, Judge.

7              THE COURT:  I understand the legal point, okay?  And

8    I'm going to do it as a matter of law eventually if the legal

9    matter is controlling, but then again if we don't reach to that

11:41:26  10   point or it's not true, then this is ongoing and a lot of

11   pollution, apparently, going into the air.  What could be done

12   to stop it?

13             MR. NICHOLS:  But it's got to be --

14             THE COURT:  I know.  It's got be repeated, according

11:41:38  15   to you, correct?

16             MR. NICHOLS:  Or it can be ongoing.  But it's got to

17   be ongoing in the way that the statute contemplates, which is,

18   for example, if as of today, we had an ongoing release at the

19   facility, that would be ongoing.  The cases talk about events

11:41:55  20   that may be capable of repetition, but you've got to show the

21   specifics.  And that's where the Plaintiffs --

22             THE COURT:  No, sir.  You're going to -- that's what

23   we have -- that's what we have opening statements for, what they

24   anticipate the evidence will show.  I never lose sight of that

11:42:12  25   fact.  Okay.  So you're all right.  We're going to hear all your

1   evidence.

2              Go right ahead.

3              MR. NICHOLS:  So, it's their burden to show ongoing

4   violations.  We don't believe they're going to get there.

11:42:23   5              Now, with respect to the other element, it's got

6   to be -- either way you go, if it's a repeated violation or an

7   ongoing violation, you've got to show that that's a violation of

8   an emission standard or limitation under this chapter.  Okay.

9              The last part, your Honor, I'll respectfully

11:42:40   10   suggest to you, is not even going to come into play.  In other

11   words --

12              THE COURT:  Or an issue or an --

13              MR. NICHOLS:  Order.

14              THE COURT:  -- order issued by the administrator or a

11:42:48   15   state with respect to such a standard or limitation.

16              MR. NICHOLS:  So, for example, if there was a consent

17   decree or a court order or an administrative order that was out

18   there, then the Plaintiffs could go there; but they're not

19   claiming --

11:43:01   20              THE COURT:  Is it your position that there's no, in

21   effect, control specific enough to control this case?

22              MR. NICHOLS:  There are -- there are -- no, that's not

23   our position.  Our position is this.  Exxon scrupulously reports

24   and records everything that goes on at that plant.  The fact

11:43:22   25   that you are going to hear about so many records in the case

1   should tell you, contrary to what Mr. Nicholas said, about this

2   not being a shoddy operation.

3           THE COURT:  You're saying all of that is not repeat

4   offenses, they're all brand new?

11:43:37   5           MR. NICHOLS:  They may not be repeat issues, they may

6   not even be violations, Judge, because for the reasons we'll

7   discuss at trial, just because you have made one of these

8   reports, does not mean that it is a violation in the way that

9   the Plaintiffs have characterized.  But you have to show the

11:43:56   10   emission standard or limitation that is being violated.

11                   Next slide.

12           THE COURT:  Hold on a second.  Go back to the prior

13   slide.  I didn't understand that last phrase of yours.

14           MR. NICHOLS:  So, you can go two ways, if you want to

11:44:12   15   show a repeated violation or an ongoing violation.  Of what?  It

16   can either be an emission standard or limitation or an order

17   issued by the administrator or estate.  That second part, your

18   Honor, is not going to come into play in this case.  In other

19   words, no one is alleging --

11:44:30   20           THE COURT:  All right.  I didn't understand your

21   phraseology concerning where it's subsection capital "A."

22           MR. NICHOLS:  Sure.

23           THE COURT:  "An emission standard or limitation under

24   this chapter."  You're saying it's not found in the chapter or

11:44:41   25   it's what?

                   Gayle Dye, CSR, RDR, CRR - 713.250.5582

1          MR. NICHOLS:  No, no.  The statute itself -- and we'll

2  get there -- actually defines what an emission standard or

3  limitation is, and it will include various elements.

4          If we can go to the next slide.

11:44:52  5          THE COURT:  But it's not within that limitation?

6          MR. NICHOLS:  No, no, no.

7          Let's go back to that slide.

8          THE COURT:  Please.  This is the advantage of a

9  non-jury trial.

11:45:05  10          MR. NICHOLS:  So an emission standard or limitation is

11  a defined term under this very provision, 7604 of Title 42.  In

12  other words, it sets out what an emission standard or limitation

13  is and is not.

14          THE COURT:  Okay.  As it applies to this case, what's

11:45:20  15  your position?

16          MR. NICHOLS:  Our position is that with respect to the

17  various things that the Plaintiffs will claim are emission

18  standard or limitations that they're not.

19          THE COURT:  Okay, got it.  Next.

11:45:31  20          MR. NICHOLS:  Next slide.

21          So, standing.  We've discussed that.  I think the

22  Court has a very good idea of where we're going on that.

23          Next, you have to show an actual violation of the

24  Clean Air Act.

11:45:42  25          THE COURT:  Now, Article 3 requirement.  Article 3 of

1    what?

2              MR. NICHOLS:  Article 3 of the United States

3    Constitution.

4              THE COURT:  That's what I thought.  Go on.

11:45:48  5              MR. NICHOLS:  And so -- and as you know, Judge, you

6    can't even walk into the federal court successfully especially

7    at a trial of the case unless you can show your standing.  And

8    as the cases -- legion cases have said, if you fail on standing,

9    that's where you stop.

11:46:05  10             THE COURT:  Isn't that jurisdiction?

11             MR. NICHOLS:  It is jurisdiction.

12             THE COURT:  All right.  Jurisdiction can be raised any

13   time?

14             MR. NICHOLS:  Yes, sir.

11:46:11  15             THE COURT:  Go on.

16             MR. NICHOLS:  So, second, even if you get past first

17   base on standing for recovery on the merits, then you go to --

18   you try to get to second base, an actual violation of the Clean

19   Air Act.

11:46:23  20                  Next.

21             THE COURT:  Federal Clean Air Act?

22             MR. NICHOLS:  Yes, sir.

23             THE COURT:  Go on.

24             MR. NICHOLS:  That Title 42.  As we discussed, a

11:46:28  25   repeated or ongoing violation of a specific emission standard or

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1    limitation.

2                    And then, finally, if you circle all those bases,

3    then it is also the Plaintiffs' burden to show an appropriate

4    remedy.

11:46:43    5         THE COURT:  Now, I assume that you will without

6    prejudice discuss that last point --

7         MR. NICHOLS:  We will.

8         THE COURT:  -- somewhere in your case and/or in your

9    summation.

11:46:54    10        MR. NICHOLS:  We will.

11        THE COURT:  In other words, notwithstanding you say

12   you have them prove one, two, or three, if they have, then I'm

13   going to hear what your position is without waiving any of the

14   other positions that you have, correct?

11:47:08    15        MR. NICHOLS:  And you actually are going to hear about

16   remedy in two places.  If you recall when we went through, we

17   tracked for you on Friday.  We tracked the elements of what the

18   standing are.  And one of the elements for standing that these

19   environmental groups can choose to try to invoke is through

11:47:28    20   their members; and as part of that standing requirement, it is

21   their burden to show that whatever they're asking for will

22   remedy the violations that they're claiming to sue over.

23                    So, in other words -- so, a remedy making the

24   link between something they say could prevent these alleged

11:47:48    25   violations is part of their standing requirement and it's also

                   Gayle Dye, CSR, RDR, CRR - 713.250.5582

1    their burden, even if they were to round these bases, to show an

2    appropriate remedy.

3                    And, your Honor, I'm not going to preview all the

4    evidence for you; but I think at the end of the day, you are

11:48:03   5    going to get to hear directly from people like Gary Robbins

6    sitting right here.  You're going to look him in the eye.  He's

7    going to tell you about what goes on at that facility, and you

8    can ask him whatever questions you want.

9                    And to preview what we will be closing with,

11:48:17  10    Judge, is that whatever suggestions -- whatever helpful

11    suggestions these Plaintiff groups want to make do not make a

12    lot of sense.

13                    Next slide.

14                    So, with respect to the standing issue, Judge, if

11:48:35  15    you'll recall, one of the key cases that Plaintiffs rely on is

16    the Texans United versus Crown Central Petroleum case.  It's a

17    case out of the Fifth Circuit in 2000.  And this case

18    illustrates two things:  Number one, it illustrates the

19    difference between being on a motion to dismiss, a motion for

11:48:55  20    summary judgment, and being at trial.

21                    So, what the Fifth Circuit said was, "Moreover,

22    we disagree with Crown's assertions" -- Crown was the Defendant

23    -- "that Texans United" -- they were the citizen suit Plaintiff

24    -- "must at this stage establish that Crown violated the CAA."

11:49:14  25                    THE COURT:  What's the stage?  What's the --

1        MR. NICHOLS:  It was a summary judgment case.

2        THE COURT:  Summary judgment.

3        MR. NICHOLS:  Judge Gilmore granted summary judgment.

4   The Fifth Circuit reversed her by saying at this point --

11:49:23   5        THE COURT:  That's at this stage because also --

6   again, don't assume one thing or another -- jurisdiction even if

7   it has some factual basis that needed to be proved can be raised

8   at any time even on appeal.  We all know that.

9        MR. NICHOLS:  So the Fifth Circuit says --

11:49:41  10        THE COURT:  Read it again.  It's easy for me to follow

11  you along.

12        MR. NICHOLS:  So, it says, "We disagree with Crown's

13  assertion that Texas United" --

14        THE COURT:  Slow down, please.  The court reporter

11:49:48  15  needs to take it down.  Go on.

16        MR. NICHOLS:  "We disagree with Crown's assertion that

17  Texans United must at this stage establish that Crown violated

18  the CAA on the occasions that affiants suffered harm from the

19  Crown emissions."  See by the word "affiants," Judge, you know

11:50:04  20  this is a summary judgment case, right, because they're dealing

21  with affidavits.  They're not dealing with the live testimony

22  which is going to be their burden to put on.

23            "Although Texans United must ultimately establish

24  causation if they are to prevail on the merits, they need not do

11:50:19  25  so to establish standing at this stage."  So what you got is a

1   situation where --

2          THE COURT:  Well, let me --

3          MR. NICHOLS:  -- the Fifth Circuit.

4          THE COURT:  Hang on.  Let me finish.

11:50:28   5          MR. NICHOLS:  Yes, sir.

6          THE COURT:  All right.

7          MR. NICHOLS:  And the causation being discussed there

8   is a causation of injury.  It's not like some abstract thing

9   like we talked about on Friday of the fact that when a butterfly

11:50:46  10   flaps its wings in Japan it affects global climate conditions.

11   It's not a situation where the emissions -- permitted emissions

12   at the Baytown facility, obviously, go into the atmosphere.

13          The causations link that it is Plaintiffs' burden

14   to show at trial means that they need to show the Court:  I've

11:51:06  15   got a member.  This member lives at a particular address.  And

16   at this particular address, this particular person was affected,

17   injured by one of these events that we're trying to get remedies

18   for under the citizen suit case.

19          And so as the Fifth Circuit says, they are going

11:51:26  20   to have that burden at trial.

21          Next slide.

22          This, your Honor -- you asked about this earlier.

23   This is a very long definition of what an emission standard or

24   limitation is under the statute, but I'm respectfully suggesting

11:51:43  25   -- if we go to the next slide.

1                    -- that they -- these are going to be the ones,

2    the portions of that definition, that is, the definition of

3    emission standard or limitation, that will be at issue in this

4    case.

11:51:55    5          THE COURT:  All right.  Well, what -- who has to prove

6    what?

7                    MR. NICHOLS:  So the Plaintiffs are going to have to

8    show -- to establish a violation, they're going to have to show

9    one of these three things that are implicated under the

11:52:10   10    definition of -- of the statute.  So you've got requirements

11    under Section 7411 or 7412 of the title which may come into

12    effect.

13                    THE COURT:  What's that?

14                    MR. NICHOLS:  That deals, your Honor, with certain

11:52:21   15    types of emissions or certain types of opacity events and

16    certain types of things that relate to the flaring issues.

17                    THE COURT:  Hold it.  Without regard to whether such

18    requirement is expressed as an emission standard or otherwise.

19                    All right, go on.

11:52:38   20                    MR. NICHOLS:  Then any other standard limitation or

21    schedule established under any permit issued pursuant to

22    Subchapter V of this chapter.

23                    THE COURT:  Now, permit, Subchapter V, what -- who can

24    issue permits?

11:52:50   25                    MR. NICHOLS:  So, this overlaps what you heard from

1  Mr. Nicholas earlier today what's called the Title V permits.

2  So when we're talking about Title V, you've got that statement

3  there.

4            THE COURT:  Who issues the Title V permits?

11:53:00  5            MR. NICHOLS:  So, the Title V permits are going to be

6  issued by the regulatory authorities, that is, the state

7  authorities under the cooperative federalism that we have

8  between EPA and TCEQ.

9            THE COURT:  Got it.

11:53:12  10            MR. NICHOLS:  And then, third, any other standard

11  limitation or schedule established under any applicable state

12  implementation plan approved by the administrator, any permit

13  term or condition.

14            THE COURT:  Stop a second.  I want to read it again.

11:53:34  15            MR. NICHOLS:  Yes, sir.  And these were --

16            THE COURT:  Administrator.  Who is the administrator?

17  Is that the administrator of the state agency?

18            MR. NICHOLS:  No.  That's the EPA.

19            THE COURT:  Okay.

11:53:40  20            MR. NICHOLS:  You're going to hear a lot about this

21  term "State Implementation Plan."  It goes by an acronym, SIP.

22  And so the State Implementation Plan is a plan that TCEQ and the

23  State of Texas is authorized to implement, in other words, the

24  enforcement of the environmental laws in this country.

11:54:00  25            THE COURT:  Who draws up the plan, the state and

 1  submits it for federal approval?

 2         MR. NICHOLS:  Yes, sir.

 3         THE COURT:  But the state agency submits it to the

 4  feds for approval.  If it's approved, they can go ahead.

11:54:10  5         MR. NICHOLS:  And the State Implementation Plan is,

 6  quite frankly, what has led to the generation of all of these

 7  records.  In other words, TCEQ says we are going to implement

 8  the Clean Air Act in the State of Texas under this State

 9  Implementation Plan.

11:54:27  10         THE COURT:  All right.  Right on that point, part of

11  what we heard from the Plaintiffs' opening as to what they feel

12  the evidence shows, shall we say that there were some

13  shortcomings with the state agency?  What's the defense position

14  on that?

11:54:38  15         MR. NICHOLS:  The defense position on that will be

16  clear from a slide that I'm going to show you in just a minute,

17  Judge.

18         THE COURT:  Okay.

19         MR. NICHOLS:  Let's go -- let's go -- so, first of

11:54:46  20  all, on the issue of repeated violation, we believe the Court

21  had asked, you know, what do you need to show to show repeated

22  violation?  We believe these are the things that the Plaintiffs

23  have to show.  It's their burden.  These are wholly-past

24  violations as we talked about.

11:55:04  25         Next.

```
 1              And as the cases have said, repeated, it's the
 2  same violation occurring more than once.
 3              THE COURT:  What does that mean as far as you
 4  interpret the cases because there's a difference of opinion?
```
11:55:15
```
 5              MR. NICHOLS:  Yes.  So, instead of dealing with the
 6  level of abstraction the Plaintiffs are dealing with, which is
 7  that -- as you heard from Mr. Nicholas, that any time you
 8  violate a carbon monoxide limit at the plant anywhere, anywhere
 9  across the expanse of a facility that runs, I believe, two and
```
11:55:33
```
10  half miles wide at one place that has thousands of pieces of
11  equipment, millions and millions of valves, millions of complex
12  systems, that no matter where on that facility, where in that
13  fence line perimeter a carbon monoxide emissions event occurs,
14  that ipso facto it's repeating; and that is not the law.
```
11:56:01
```
15              THE COURT:  All right.
16              MR. NICHOLS:  Next.
17              So, in other words, Mr. Nicholas is right on one
18  score.  You need to show it's the same pollutant but that's not
19  all.
```
11:56:14
```
20              Next.
21              You got to show it's the same limit.  Remember,
22  we talked about emission standard of limitations.  So it's got
23  to be the same, in this case, pound-per-hour limit.  I think
24  Mr. Nicholas just admitted for you they're not even raising any
```
11:56:30
```
25  issues concerning annual limits.
```

1               Next.

2               Same emission point.  In other words, you can't

3 take --

4          THE COURT:  Same tower?

11:56:38  5          MR. NICHOLS:  Yes.  You can't take one event that

6 occurs on the east side of the facility, one emission plant over

7 there and an issue with that, and then say if a carbon monoxide

8 release occurs on the complete opposite side of the facility --

9          THE COURT:  What if it's the same unit, a couple of

11:56:53  10 days apart or a month apart?

11          MR. NICHOLS:  Exactly, Judge.

12               Next bullet point.

13               Same emission source.  So you've got the same

14 emission source, that is, the same source of trouble that you

11:57:06  15 have at the facility.

16               Next.

17               And to the Court's question, the same root cause.

18 In other words, you're going to evidence in the case, Judge,

19 that it's not only the law but it's also the regulatory

11:57:21  20 framework that requires everyone, everyone that has a genuine

21 interest in operating facilities, everyone who has a genuine

22 interest in regulating facilities.  You don't deal at the level

23 of abstraction that the Plaintiffs' environmental groups are

24 dealing with.  You get to the root cause.

11:57:40  25          THE COURT:  Well, have you gotten to the root cause of

1    these problems?

2            MR. NICHOLS:  Yes, sir.  And this man right here, Gary

3    Robbins, is going to testify to it.

4            THE COURT:  So, how come it keeps coming over and over

5    and over?

6            MR. NICHOLS:  Because, your Honor, the Plaintiffs have

7    presented you with two things.  They presented you with --

8            THE COURT:  They pointed me with your records.

9            MR. NICHOLS:  Yes, exactly.  Records that show a lot

10   of numbers, okay.  They've presented that, and they've also

11   presented the Court with what, in essence, is a false standard.

12   The false standard they presented to the Court, which no one

13   agrees with, you're going to hear -- you're --

14           THE COURT:  Well, there's some folks that agree with

15   it.

16           MR. NICHOLS:  No.  You're going to hear -- you're

17   going to hear that the environmental regulators, the EPA, the

18   TCEQ, everyone that's involved in the operation of these plants,

19   understands that you are never -- so long as you have plants

20   that run mechanical equipment and that are run by human beings,

21   the idea that you are going to have an absolutely perfect record

22   with each and every one of hundreds of thousands of permit

23   conditions, that is a false standard.

24           THE COURT:  Okay.  Now, is that going to be the

25   testimony of your experts?

1                    MR. NICHOLS:  Yes, sir.

2                    THE COURT:  Is that going to be the testimony of their

3    experts?

4                    MR. NICHOLS:  I think it will.

11:58:58    5        THE COURT:  Well, that's what cross examination is

6    for.

7                    MR. NICHOLS:  I think it will.

8                    THE COURT:  All right, go on.

9                    MR. NICHOLS:  Next.

11:59:05    10               So this is the other prong, Judge, that we talked

11   about, ongoing events.  So, the case law says single completed

12   violations are not ongoing or repeated.

13                   THE COURT:  Once again, I'm going to ask you this --

14   and both sides eventually are going to have to back this up, I

11:59:20    15   suppose.  Is case law backing this up?

16                   MR. NICHOLS:  This comes out of case law.

17                   THE COURT:  And I assume it may be from both sides.

18   But I'm just saying, you know, they -- I'm seeing where the

19   issues are really being drawn.

11:59:33    20               Okay, go on.

21                   MR. NICHOLS:  Yes, sir.

22                   Or as I said earlier, ongoing can be a likelihood

23   of recurrence of same violation.  So -- so, if you operate at

24   Mr. Nicholas's level of abstraction, that is, is it likely that

11:59:50    25   the ExxonMobil facility at some point in the future is going to


                    Gayle Dye, CSR, RDR, CRR - 713.250.5582

1  have a carbon monoxide release, the answer to that question is

2  yes.

3          THE COURT:  All right.  You're anticipating my

4  question.

12:00:05   5          MR. NICHOLS:  That's not the standard.  The standard

6  is it's got to be a likelihood of recurrence of the same

7  violation which again loops you back to the idea --

8          THE COURT:  Of the definition.

9          MR. NICHOLS:  -- of the definition and the idea that

12:00:18  10  plants emit carbon monoxide.  The purpose of this citizen suit

11  provision is to -- as the cases have said, if a plant is out

12  there and if it's operating and it has a continuous acting up

13  source of trouble and the regulators don't do anything about it

14  and the plant doesn't do anything about it, bring your citizen

12:00:42  15  suit.  Bring it on.

16          THE COURT:  But you still have to show in the

17  standing.

18          MR. NICHOLS:  You've got to show --

19          THE COURT:  You go back to the standing.

12:00:47  20          MR. NICHOLS:  You've got to show standing, but, you

21  know, that's something we can deal with.  And that's what I've

22  been saying all along in this case.  If you have something that

23  meets those criteria, if you want to talk about two events

24  specifically, dig into the details, go into the files that are

12:01:03  25  available on the publicly available websites.

1        THE COURT:  Now, your position is that every time some

2   smoke blows out of a stack, it's a separate violation.

3        MR. NICHOLS:  It is a -- it can be a violation.  If it

4   is a violation, it is a separate violation; but I'm not

12:01:16   5   suggesting that there cannot -- there's no way to prove in a

6   citizen suit case that events are repeated.

7            The fact of the matter is, though, as the

8   Plaintiff, you got to show it.  You've got to take on that

9   burden.  You got to run those bases.  And for them to come into

12:01:30   10   court and just slap a bunch of Exxon's own reports together and

11   say these are all repeated, it doesn't meet that burden.

12            Next.

13            Same inadequately corrected source of trouble.

14   And this makes sense, Judge, because you don't want a situation

12:01:48   15   where there's a facility that has a piece of equipment that is

16   continuing to fail, a plant is not addressing that piece of

17   equipment.  That's where the Court steps in and says, "Hey, look

18   guys, you've had chances to correct this thing.  You haven't

19   done it.  Why haven't you done it?"

12:02:04   20        THE COURT:  So what's your evidence going to show?

21   That's what we haven't talked about, what your evidence is going

22   to show.

23        MR. NICHOLS:  The evidence is going to show that the

24   events that we're talking about -- number one, there are about

12:02:14   25   240 reportable events.  Those are the events that are more

1    serious that deal with the reportable quantity of emissions that

2    require the STEERS reporting that you've heard about.  So, with

3    respect to those, that there is an exhaustive root cause

4    analysis that occurs with each and every one of those.

12:02:32    5            THE COURT:  Have they corrected them?

6            MR. NICHOLS:  They correct those issues.

7            THE COURT:  How come they keep recurring with hundreds

8    or thousands of pounds of pollutants in the air?

9            MR. NICHOLS:  And that's -- again, that's the false

12:02:46   10    premise that I believe the Plaintiffs are operating under.

11            THE COURT:  That's their theory, which I haven't heard

12    yet.  I haven't heard yours yet either as far as evidence goes

13    but --

14            MR. NICHOLS:  Every time -- their theory is every time

12:02:58   15    you have a reportable event, ipso facto, it's a recurring issue.

16    We disagree with that, and we --

17            THE COURT:  Well, how about corrective each time?

18            MR. NICHOLS:  We are going to show the types of

19    corrective actions that are taken with respect to the issues

12:03:10   20    that arise.  But that doesn't mean you're not going to have new

21    issues that crop up.

22            THE COURT:  Well, let me ask you this:  Do your -- is

23    your evidence going to show at least it's improving out there?

24            MR. NICHOLS:  Absolutely.  I'm going to get to a

12:03:20   25    couple of slides, if I might, in just a minute.  You're

1  previewing my presentation, Judge.

2              Any appropriate remedy.  Again, this is the

3  Plaintiffs' burden.  Injunctive relief.  And quite frankly, at

4  the end of the day, we believe you're going to hear, as I said

12:03:34   5  earlier, about some Plaintiffs' suggestions on how to run the

6  complex which we believe make no sense whatsoever.

7              Penalties.  Again, this is, again, part of

8  Plaintiffs' gotcha theory.  The reason, Judge, the reason, in my

9  view, that the Plaintiffs do not want to focus on particular

12:03:50  10  events is because they're all about the numbers.  They're all

11  about generating the biggest numbers, the 1.3 billion, the 600

12  million, however you add them all up.

13              And the way they get there is not by looking at

14  specific events and saying, "We have evidence that this is

12:04:07  15  repeated," because that doesn't get them to the numbers they

16  want to get to.  So, instead, under this gotcha theory that

17  they're putting before this Court at trial, they just want to

18  throw it all up against the wall, see what sticks.

19              Next.

12:04:21  20              And the third part is that the regulators are on

21  the job.

22          THE COURT:  Which regulators?

23          MR. NICHOLS:  This is the --

24              If I can go to the next slide, please.

12:04:31  25              First of all, Judge, this just illustrates the

1   bases that they need to follow.  So, they got to get -- standing

2   gets them to first base, violation gets them to second base,

3   repeat or ongoing gets them to third base; and then, they got to

4   show an appropriate remedy before they even get to the point of

12:04:52   5   asking the Court for appropriate remedy here at home plate.

6                    Next slide.

7                    Why are citizen suits limited?  And, again, you

8   heard a fundamental disagreement between the two sides as to

9   whether citizen suits are limited or not.  I think the Supreme

12:05:08   10   Court of the United States has said that they are limited.  And

11   this is a case -- one of the leading cases -- this is a Clean

12   Water Act case, Judge, but it relates to a citizen suit

13   provision under the Clean Water Act.  And so the general

14   principle behind citizen suits and what they are intended to do

12:05:26   15   and what they are not intended to do is set forth in this case.

16           THE COURT:  Give me a moment.  Let me read it.  Then

17   you can point out -- I'll read over it just a moment.

18                    Okay, go on.

19           MR. NICHOLS:  So just reading this language, it's

12:06:20   20   difficult to understand how somebody could read this language

21   and say that the citizen suit remedy is unlimited because what

22   the Supreme Court is saying is that the citizen suit has a

23   supplementary role.  It has an interstitial role.  It should not

24   be potentially intrusive.

12:06:41   25                    And the example that the Supreme Court uses in

                    Gayle Dye, CSR, RDR, CRR - 713.250.5582

1   this very case overlaps with what the Court has asked about

2   these events, these more serious events that do involve large

3   amounts of emissions that get reported through the STEERS system

4   to the regulator.

12:06:55   5            So here, they're talking about the administrator,

6   EPA.  So, suppose that the EPA agreed not to assess or otherwise

7   seek civil penalties on the condition that the violator take

8   some extreme corrective action, such as to install particularly

9   effective but expensive machinery that it otherwise would not be

12:07:13   10   obliged to take.  So, what the Supreme Court is saying is the

11   citizen suit is not intended to come in and undercut --

12            THE COURT:  Has your client done that?

13            MR. NICHOLS:  Yes, absolutely.  And I'm going to --

14   we're going to -- we're going to take you on a virtual tour of

12:07:27   15   the plant and show you some of the equipment.

16            THE COURT:  What they've done?

17            MR. NICHOLS:  Yes, sir.  So what the Supreme Court has

18   said is that, you know, again, we're beyond the motion to

19   dismiss, we're beyond the motion for summary judgment.

12:07:39   20            THE COURT:  We're in trial.

21            MR. NICHOLS:  We're in trial.  And so, of course, as

22   the Court says, you can get to trial by second-guessing; but

23   then, when you get to trial, then the Court gets to decide

24   whether your second-guessing is appropriate or not.  And that's

12:07:49   25   exactly what the Supreme Court said in this case.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

```
 1                    Next slide.
 2                    The overview, Judge, of the regulations.  So,
 3       you've got the Baytown Complex down here in Baytown.  And the
 4       Baytown Complex regulation is through two entities.  That's the
12:08:08  5       EPA, the administrator, that word that you picked up on from the
 6       statute, and the TCEQ through this SIP, or State Implementation
 7       Plan, that we talked about.  So there's a relationship that runs
 8       between these two agencies.
 9                    Next.
12:08:20 10                    And that is what the Court will recognize as what
11       the Courts have said is cooperative federalism.
12                    THE COURT:  By the way, the Defense -- the Defense had
13       just a minute short of an hour.  So you've got another 20
14       minutes.  Okay.
12:08:34 15                    MR. NICHOLS:  So cooperative federalism is a -- is a
16       term that the Court is familiar with.  And what that means is
17       that federal authorities and state authorities work together in
18       this area to enforce the Clean Air Act.
19                    As the Court has already picked up on, the EPA
12:08:51 20       supervises the program.  That SIP is submitted for approval by
21       the EPA.  And also, there's a situation which you -- you'll hear
22       about in the evidence of the case, something called overfiling.
23       So that is even --
24                    THE COURT:  Known as what?
12:09:04 25                    MR. NICHOLS:  Overfiling.  So, even if TCEQ is
```

1    delegated authority, the primary authority to enforce the Clean

2    Air Act in the State of Texas, the EPA as you heard about this

3    morning, as an example with the consent decree and the refinery

4    initiative, the EPA can overfile.

12:09:26    5            In other words, if they're not happy with how

6    TCEQ handles something, they can come in over TCEQ's shoulder.

7    Okay.  So then how do we go down to the plant?  So we got both

8    TCEQ and the EPA overseeing the operations of that complex.

9            How do they do that?  TCEQ, we've talked about

12:09:41   10    the permitting.  We've talked about the reports and the record

11    review.  And we have a very different view, your Honor, what the

12    evidence is going to show in terms of what the TCEQ does with

13    the records that it receives, inspections that occur at that

14    facility; enforcement activities by -- of the type that the

12:10:05   15    Supreme Court talked about in Gwaltney, G-w-a-l-t-n-e-y;

16    penalties and corrective actions that are imposed as part of the

17    TCEQ requirements.

18            And the Plaintiffs are going to belittle these,

19    Judge.  There's no doubt about it.  But you're going to hear the

12:10:24   20    evidence of what the TCEQ has actually done with respect to the

21    Baytown Complex.

22            Next.

23            The EPA also is involved in the permitting

24    process, has certain enforcement initiatives like the refinery

12:10:39   25    initiative that came into play in this case, and they have the

1    ability to pursue their own actions against the facility if they
2    determine that's appropriate.
3                    Next.
4                    And then back in return, what does the complex do
12:10:50  5    with respect to these environmental regulators?
6                    Next.
7                    Provides these reports that the Plaintiffs have
8    compiled and sought to throw against the wall.
9                    Records.  Access to the facility.  Penalty
12:11:10  10   payments.  Compliance with enforcement orders.  All of these
11   things are -- you'll hear evidence, are running between the
12   complex and the TCEQ.
13                   Next.
14                   There are certain reports that get filed
12:11:25  15   federally.  Certain records that are made available federally.
16   Access that has to be made under provisions of law to EPA
17   investigators.  Penalty payments and compliance with the consent
18   decrees like the one that you know was involved in this case.
19   So, all of that overlay over to the Baytown Complex is precisely
12:11:47  20   why the citizen suit is an interstitial, non-intrusive remedy.
21                   That's what it's supposed to be.  But what the
22   Plaintiffs are doing is they are trying to deride, they are
23   trying to criticize the amount of work that TCEQ and the EPA
24   does in regulating this facility.  And the reason why they are
12:12:09  25   going to be going after TCEQ and EPA is for this very reason,

1    that they do, in fact, recognize that the citizen suit remedy is

2    limited and they should only be here in federal court asking for

3    this Court to intervene if for some reason this system has

4    failed.

12:12:25    5                    Next slide.

6                    You asked about some data, Judge, and I believe

7    that the representation was made to you that the number of

8    reportable events had stayed flat across these plants when, in

9    fact, as you will see from the evidence in the case that from

12:12:42    10   the beginning of the period where they're alleging -- if you'll

11   recall, they filed this lawsuit in 2010, December of 2010.

12                    They get to go -- they didn't file -- they filed

13   the lawsuit here.  When they file a lawsuit, they get to look

14   back for five years and two months which is why the time period

12:13:03    15   starts, as Mr. Nicholas said, on October 14 of 2005.  Then

16   through Magistrate Judge Smith, we arrived at a cut-off period

17   for the case.  In other words, we got here to September the 3rd

18   of 2013.  So, at the end of the day, we're talking about a

19   period that as, Mr. Nicholas said, is about eight years.  And

12:13:24    20   over those eight years, you're going to see evidence of a

21   significant number of decline in reportable events in the

22   facility.

23                    THE COURT:  Well, what are these two graphs?  You have

24   a broken line and a solid line.

12:13:38    25                    MR. NICHOLS:  Yes, sir.  This is the actual data on

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1  reportable events that occurred across these plants, and this is

2  not just with respect to the events that are still in the case.

3  This is everything.  So if you plot these data lines, then you

4  get this trend line which is the dotted line that allows you to

12:13:56  5  evaluate what kind of a trend are we seeing over the years.

6             THE COURT:  So that answers -- at least from your

7  point of view, the question is has it improved at all?

8             MR. NICHOLS:  Absolutely.  And there's going to be --

9  we're going to spend a lot of time with slides like this, Judge,

12:14:09  10  that will show the Court from our perspective the improvement

11  that has been made.

12             THE COURT:  So you're saying there was a decline of 81

13  percent over the life of this case.

14             MR. NICHOLS:  Yes, sir.

12:14:18  15             Next slide.

16             Then I think you were told that the emissions

17  continued to be flat or increase.  You're going to hear

18  evidence, Judge -- these boxes up here, these are what the --

19  what are classified as what are called criteria pollutants,

12:14:37  20  c-r-i-t-e-r-i-a.  And these are the pollutants that are the

21  regulated.  They include the VOCs that Mr. Nicholas mentioned,

22  carbon monoxide, nitrogen oxides, sodium dioxide and particulate

23  matter, sulfur dioxide, I'm sorry.  So, with respect to these

24  matters, these criteria pollutants, look at the trend line as

12:15:05  25  well.  From 2006 all the way down to 2013, you're seeing

1   reductions in the magnitude of 95 percent in the reductions

2   across that complex.

3                    Next slide.

4                    Then, your Honor, remember, we're here about

12:15:24   5   permits.  And permits, in essence, are a recognition.  In other

6   words, I don't think the Plaintiff environmental groups are

7   going to take this position.  Maybe they will.  But I think

8   everybody understands that industrial facilities of any type are

9   going to have emissions.  The system recognizes that that's what

12:15:47   10   a permit does.  It permits a certain amount of emissions.  In

11   other words, it sets forth an expectation as to what a

12   facility's emissions would be in any given year.

13                    THE COURT:  Now, is that the gray?

14                    MR. NICHOLS:  That's the gray.  So, you got the gray

12:16:02   15   bar broken down for each year, 2006 all the way through 2012.

16   So, you've got -- the emissions would be the entirety of gray.

17   Then you see at the bottom of the key, this is the permitted

18   emissions.  That is, these are the emissions that occurred in

19   the ordinary course of operation of the facility.

12:16:21   20                    THE COURT:  What do you mean by permitted?

21                    MR. NICHOLS:  That means that when you have permits,

22   you have permit limits for certain types of criteria pollutants,

23   the ones listed up here in these blue boxes.  So, in other

24   words, the permit has a permitted level, an expectation of how

12:16:38   25   much in volatile organic compounds the facility will issue or

1   emit in any particular year.  And so that -- when you add all

2   those together, you come up with an amount, an expectation, a

3   regulatory expectation that the facility is going to be emitting

4   that amount.  So, for example --

12:16:59  5           THE COURT:  No, I got it.  I got it.

6           MR. NICHOLS:  You got it.

7           THE COURT:  Let's look at the differentiation between

8   the gray, the beige, and the orange.

9           MR. NICHOLS:  Yes, sir.  So you got the gray.  That's

12:17:12  10  the total.  Then the beige is the total emissions for that

11  particular year that the Plaintiffs aren't raising any issue

12  about.  These are permitted emissions.

13          THE COURT:  Are they raising anything about the grays?

14          MR. NICHOLS:  They're not raising anything about the

12:17:25  15  grays, not in this case.

16          THE COURT:  Or the -- or the beige?

17          MR. NICHOLS:  Not in this case.

18          THE COURT:  Or the beige?

19          MR. NICHOLS:  Not in this case.  I think we --

12:17:29  20          THE COURT:  I'm talking about this case.

21          MR. NICHOLS:  Yeah, yeah.  No, I don't think they're

22  raising anything about it in this case.  They might raise it in

23  another context.  They may think that these levels are too high,

24  but that's not an issue for this Court.  So we've got the beige,

12:17:43  25  which is the permitted emissions.  Those are the emissions that

1  occur in the ordinary course.

2          THE COURT:  According to you, there's no -- nothing

3  wrong with either the gray or the beige.

4          MR. NICHOLS:  Correct.  And, so, what we're dealing

12:17:53   5  with in this case at most -- and these graphs are actually

6  overstated because this includes all of them, including the ones

7  that have been knocked out of the case by the Court.

8                  So even if you were to disregard what the Court

9  has knocked out of the case, these orange slivers for each of

12:18:07  10  these years are what the Plaintiffs are raising in the case.

11  And the bottom line, Judge, is that for each and every one of

12  these years, the Baytown Complex, despite the claims that it's

13  irresponsible, that it's shoddily run, that they don't know what

14  they're doing out there, whatever other things they want to say,

12:18:30  15  is operating at a level where you can see it's been 50 percent

16  or less total emissions from ordinary operations and from

17  upsets, total emissions have been far below, 50 percent down to

18  levels that are approaching 25 percent of what the regulatory

19  expectation is of what the amount of these pollutants is going

12:18:54  20  to be emitted every year.  And, again, Judge, this goes back to

21  the false premise that underlies the case, which we'll get into

22  in the trial that somehow --

23          THE COURT:  You've got about ten minutes left.

24          MR. NICHOLS:  -- facilities cannot do any emissions.

12:19:07  25  But this is not all, Judge.  So, if I can just show you real

1   quick --

2              THE COURT:  I'm sure it's not all.

3              MR. NICHOLS:  Can we go to 2A?  So you're going to see

4   again numbers like this showing the decline in reportable

12:19:34   5   events.

6                   And then the next slide, please.

7                   And, Judge, these are the reportable events that

8   still are in the case.  When you take away all the ones that the

9   Court has taken away -- which I disagree with the suggestion

12:19:46   10   that it's only a few that the Court has done; the Court has

11   dismissed 130 some-odd reportable events under its prior

12   rulings -- you get down to the 240 which, again, if we were

13   focused on those and, more specifically, if we were focused on

14   specific ones of those that the Plaintiffs felt like they had

12:20:06   15   standing to raise and that they felt were truly repeated or

16   ongoing, we would be spending a lot less time than the three

17   weeks that we think we're going to be spending here during the

18   trial.

19                   2B, please.

12:20:31   20                   You saw this slide earlier, and we're going to be

21   showing you lots more slides.

22                   Next one, please.

23                   Next one.  These are for all the different

24   criteria pollutants, Judge.

12:20:45   25                   Next.

                Gayle Dye, CSR, RDR, CRR - 713.250.5582

1          NOx.

2          THE COURT:  What's NOx?

3          MR. NICHOLS:  That is Nitrogen Oxide, your Honor.  And

4   particulate matter, the soot that we talked about earlier,

12:20:59   5   you're going to see the trend lines that show a very high level

6   of environmental performance at the Baytown Complex.

7          Is the Baytown Complex capable of avoiding every

8   upset event?  No.  Is any facility in the United States, in the

9   world capable of avoiding all upset events?  The answer to that

12:21:21  10   is no.  No one who operates a facility like this one with a

11   complexity that it has is capable of doing that.  So you are

12   going to have those.

13          And you are going to have situations, Judge,

14   where during the course of one of those upsets you violate an

12:21:37  15   hourly limit, for example.  So, if you look not at the annual

16   limits but at the hourly limit, you're going to see some of

17   those violations and you will hear about some of those in this

18   case.

19          The suggestion that we are saying that these are

12:21:49  20   not serious matters is -- falls of its own weight.  All matters

21   relating to the operation of this complex are extremely serious

22   to the men and women who work at the Baytown Complex.

23          Your Honor, the reason why you don't see these

24   cases being tried very often is because the normal business

12:22:14  25   model is that environmental groups will put together these

1   numbers.  They will go out after they've put the numbers

2   together, which I think you will hear evidence about how this

3   case came to be.  After they put the numbers together, they go

4   out and try to find somebody that they say can -- was affected

12:22:34   5   by at least one of the numbers on their charts.

6                    They hold a press conference.  And then because

7   of the nature of these cases, they often will settle; and

8   they'll settle in consent decrees that, by the way, do not

9   embody a standard of perfection, even the settlement agreements

12:22:56   10   that the Plaintiffs have entered into --

11                    THE COURT:  And there have been some.

12                    MR. NICHOLS:  There have been.  And the ones they've

13   entered into -- for example, you're going to hear about one they

14   did with Shell, Deer Park.  You're going to hear about one they

12:23:10   15   did with Chevron Phillips, the C. P. Chem plant out there on

16   I-10.  You've probably driven by it a thousand times going

17   towards Beaumont.

18                    These consent decrees don't embody a standard of

19   perfection.  They don't embody a standard of no upset events.

12:23:26   20   And as a matter of fact, Judge, you are going to see evidence in

21   the case that the Plaintiffs have crowed about the results

22   they've gotten with Shell and C. P.  They've held press

23   conferences.  They've said what a great job they're doing for

24   the environment.

12:23:37   25                    THE COURT:  Is that Crown Petroleum?

1          MR. NICHOLS:  That's -- no, that's Chevron Phillips,

2     Judge.

3          THE COURT:  Chevron Phillips.

4          MR. NICHOLS:  They've touted these results that they

12:23:48  5     have achieved as being environmentally responsible in terms of

6     the results that have been achieved.  You are going to see

7     evidence, Judge, that without a consent decree, without a need

8     for Environment Texas or Sierra Club to bring this case, that

9     the men and women at the Baytown Complex have exceeded the

12:24:04  10    results achieved under those consent decrees.

11          So for all these reasons, Judge, we ask you -- we

12     appreciate and we thank you for giving us the time that you've

13     given us because we believe the case is going to be very

14     interesting; and it's a very important case to determine, if you

12:24:22  15    want to bring a citizen suit case under the Clean Air Act, you

16     want to bring it to federal court, what you need to be prepared

17     to show at trial.

18          Thank you, judge.

19          THE COURT:  Thank you.

12:24:33  20          Thank you both sides.  I'm going to take about

21     two minutes here, and then you're going to call your first

22     witness.

23          MR. NICHOLS:  Your Honor, at this time we would like

24     to invoke the rule.

12:25:30  25          THE COURT:  All right.  We'll do it as soon as we get

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1    underway.

2            MR. NICHOLAS:  Which rule is that, your Honor?

3            THE COURT:  The rule.  The rule referring to

4    sequestration of witnesses.

5            MR. NICHOLAS:  Just wanted to make sure I knew.

6            THE COURT:  The generic rule.

7            MR. NICHOLAS:  Well, I wanted to make sure I was in

8    the same generic rule.

9            Your Honor, will that rule also apply to expert

10   witnesses?

11           THE COURT:  No, I never -- I don't have expert

12   witnesses or, what is it, corporate representatives or --

13           MR. NICHOLAS:  Can we designate our corporate

14   representatives?

15           THE COURT:  We'll talk -- yeah, we'll get that back on

16   the record.

17       (Court recessed at 12:26 p.m.)

18       (Court resumed at 12:37 p.m.)

19           THE COURT:  Plaintiff call your first witness.

20           MR. NICHOLAS:  Your Honor, we would like to designate

21   the two --

22           THE COURT:  Hold it.  The rule's been invoked.

23   Everyone who anticipates being called as a witness in this case

24   at this time, everyone please stand if you're -- expect to be

25   called as a witness wherever you're sitting.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1            Okay.  Raise your right hand to be sworn.

2       (Several witnesses were sworn.)

3            THE COURT:  All right.  Have a seat for a moment to

4  see whether this pertains to you.  All right.  The rule --

12:37:56    5  actually, the rule concerning sequestration of witnesses has

6  been invoked.  That means anyone who is not a party to the

7  lawsuit, meaning a designated representative of either the

8  Plaintiff or the Defendant or -- and I always have done this in

9  state court, exempted the expert witnesses.

12:38:11   10            Anyone falling into that category must remain

11  outside until he or she is called to testify.  And once you're

12  called to testify, you'll be released from the rule and you can

13  remain in the courtroom.  However, while you're excluded from

14  the courtroom, you're not to discuss this case with anyone,

12:38:30   15  including other witnesses or anyone else, except you may discuss

16  the case, if you want to, just with the attorneys in this case.

17            Anyone falling into that category with the help

18  of the attorneys right now, please step outside.

19            I don't think anyone at this time needs to step

12:38:55   20  outside.

21            MR. NICHOLS:  There was one, Judge.  I think she's

22  left.

23            MR. NICHOLAS:  Just for the -- yes, one has left.  And

24  just for the record, we'd like -- the Plaintiffs would like to

12:39:03   25  designate Luke Metzger as the corporate representative.

1          THE COURT:  Any objection?

2          MR. NICHOLS:  No, your Honor.

3          MR. NICHOLAS:  And Neil Carman for Sierra Club.

4          THE COURT:  Okay.  So we have two corporate

12:39:10  5  representatives?

6          MR. NICHOLAS:  Yes, sir.

7          THE COURT:  All right, no problem.

8          I'm also going to ask the attorneys, now that the

9   rule has been invoked and we all know the boundaries, that if

12:39:17  10  you see a witness coming in of yours or even if it's the other

11  side, mention it to the other side, just come around and mention

12  it to them, go out and inform them of the rule.

13          Then if you need me to swear them in specifically

14  and to give them that admonition also, if you have any witness

12:39:35  15  -- I don't want witnesses hanging out in the hallway.  I don't

16  think that's fair.  So, if there's a timing question, if they're

17  here under subpoena and need an instanter or for a certain date,

18  bring them in.  I'll swear them in, and then they can come back

19  as you notify them by phone so they don't sit out here for a day

12:39:56  20  and, you know, wait five or six hours to be called.  All right.

21          MR. NICHOLAS:  Your Honor, one other preliminary

22  matter which is the matter of notice.  In citizen suits

23  Plaintiffs give notice to the Environmental Protection Agency,

24  in this case TCEQ, prior -- 60 days prior to -- at least 60 days

12:40:18  25  prior to filing suit and afterwards a copy of the complaint is

1    provided to the Department of Justice.

2              That was done in this case.  It was done by

3    actually Mr. Kratka; and we have submitted an affidavit, made it

4    as part of the record, part of the exhibits.  It's not an issue

12:40:35   5    in this case; but rather than -- it's not a contested issue in

6    this case rather than -- so anyway we would like -- this is --

7              THE COURT:  I'll take judicial notice.  What exhibit

8    number?

9              MR. NICHOLAS:  395.

12:40:52   10             THE COURT:  395?

11             MR. NICHOLAS:  395.

12             THE COURT:  Any objection?

13             MR. NICHOLS:  No, your Honor.

14             THE COURT:  Now, Mr. Nicholas when you speak, you need

12:41:00   15   to get a microphone pulled all the way over to you, okay?  There

16   are a couple -- aren't there microphones at that table?  There

17   should be.  In other words, pull it -- pull it in to you.  You

18   don't have to pull it into you.

19             MR. NICHOLAS:  I understand.

12:41:13   20             THE COURT:  Pull it.  You can -- okay.  Yeah, you can

21   pull it in, and you can pull it to the front so you're sort of

22   speaking.  Yeah, I just need it to pick up.  You don't have to

23   speak right into it.  I just want it to pick up as you, you

24   know, visit with your, what is it, with your witnesses.

12:41:29   25             All right, Counsel, call your first witness.

Cottar - Direct/Kratka

```
 1              MR. KRATKA:  Plaintiffs call Richard Shae Cottar.
 2              THE COURT:  Okay.  Yes, sir.  Did he step outside
 3  already?
 4                    Federal court, you need to get somebody to do it.
 5  Mr. Kratka, you're going to need the microphone now.
 6              MR. KRATKA:  How about if I use this one?
 7              THE COURT:  Yes, sir.
 8                    Have a seat.  By the way, if I forget or if Ellen
 9  forgets to turn the lights off when you're using overheads, if
10  you need it, let us know if we forget.  I have a light switch
11  here, and she's got one down there.
12                    Go right ahead.
13              MR. KRATKA:  Thank you, your Honor.
14        (The witness, **RICHARD SHAE COTTAR,** called on behalf of the
15  Plaintiff, was previously sworn.)
16                    DIRECT EXAMINATION
17  BY MR. KRATKA:
18  Q     Please state your name for the record.
19  A     Richard Shae Cottar.
20  Q     And, Mr. Cottar, are you currently a member of the Sierra
21  Club?
22  A     I am.
23  Q     And when did you first join the Sierra Club?
24  A     Fall of 2010, probably September, October.
25              THE COURT:  Mr. Cottar, it's K-o-t-t-e-r?
```

12:41:50 (line 5)
12:42:17 (line 10)
12:42:29 (line 20)
12:42:37 (line 25)

Cottar - Direct/Kratka

1          THE WITNESS:  C-o-t-t-a-r.

2          THE COURT:  C-o-t-t-a-r.  First name?

3          THE WITNESS:  Richard.

4          THE COURT:  Okay, thank you.

12:42:48  5  BY MR. KRATKA:

6  Q    And when you say you joined Sierra Club, did you do that by

7  paying a membership fee?

8  A    Yes.

9  Q    And over the years -- and over the years since you first

12:43:02 10 joined in 2010, have you renewed your membership fee?

11 A    Yes.

12 Q    Several times?

13 A    Yes.

14 Q    How did it come about that you joined Sierra Club in the

12:43:11 15 first place?

16 A    It was --

17         THE COURT:  Where do you reside, sir?

18         THE WITNESS:  I live in Baytown, Texas.

19         THE COURT:  Okay, thank you.

12:43:17 20        THE WITNESS:  A couple of different factors all sort

21 of came at the same time.  I guess the shortest answer is that I

22 had a lot of friends that were involved in different

23 environmental organizations.  And the Sierra Club was the one

24 that I kept hearing the most about.

12:43:35 25        And at that point I was sort of new to, I guess,

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Cottar - Direct/Kratka

1   thinking environmentally.  It's still fairly not that -- I

2   wouldn't consider myself an environmentalist, if I can say it

3   that way; but I believe that the work they are doing is

4   important and decided to invest myself in that direction.

12:44:05   5   BY MR. KRATKA:

6   **Q**     And do you recall when you first learned about this lawsuit

7   or the possibility of this lawsuit?

8   **A**     It was probably -- it was about the same time, October,

9   September of 2010.

12:44:17   10   **Q**     And how did you hear about the possibility of this lawsuit

11   in October of 2010?

12   **A**     I had earlier that year in April moved -- I've lived in

13   Baytown my whole life -- moved to a townhouse that was right

14   across the street from both the chemical and the olefins plant

12:44:40   15   and immediately started noticing things that were very different

16   than my experiences living in the Baytown community for the

17   previous, you know, 30 some-odd years, realized that it was a

18   different experience living right next door.  And at the time I

19   was working for an organization, environmental organization in

12:45:09   20   Houston, Air Alliance Houston.

21             THE COURT:  Which group?

22             THE WITNESS:  Air Alliance Houston.

23             THE COURT:  What's your educational background, sir?

24             THE WITNESS:  Bachelor's degree in communications.

12:45:19   25             THE COURT:  From?

Cottar - Direct/Kratka

1          THE WITNESS:  East Texas Baptist University.

2                   And I was employed there as their communications

3      director.  That was sort of my first entrance into

4      environmentally-astute thinking, I guess.  And honestly, my

12:45:38   5      experience was so drastically different than, like I said, the

6      previous 30 some-odd years.

7                   The executive director at Air Alliance Houston

8      came to me and said, "Hey, I heard about some people that are

9      getting together for some sort of a legal action against Exxon.

12:46:01  10      Are you interested?"  And at that point he had heard me

11      articulate several issues, living right across the street.  And

12      I said, "Absolutely.  I would love to explore anything that can

13      be done to help correct these issues."

14      BY MR. KRATKA:

12:46:17  15      Q     Okay.  I'm going to ask you a bunch of questions to get

16      into the details --

17      A     Okay.

18      Q     -- of the general topics you've mentioned.  Now, you

19      mentioned you've lived in Baytown most of your -- all of your

12:46:26  20      life, most of your life?

21      A     Since I was three.  At this point that's 38 years.

22      Q     And there were -- were there any periods of time when you

23      didn't live in Baytown?

24      A     Before I was -- before three, yeah.  And there was about a

12:46:43  25      three and half year stretch where I lived in Marshall, Texas,

Cottar - Direct/Kratka

1  while I attended East Texas Baptist University but my residence

2  was always in Baytown.

3  **Q**    And where do you currently live in Baytown?

4  **A**    1008 Wright Boulevard.

12:46:58  5  **Q**    For how long have you lived there?

6  **A**    About a year and half.

7  **Q**    Where did you live immediately prior to the Wright

8  Boulevard address?

9  **A**    Immediately prior to that, for a period of about two and

12:47:07  10  half years, I lived at 3206 Briar Court which is in the Shady

11  Hill Villa subdivision of townhouses.

12            THE COURT:  About how far away from the plant?

13            THE WITNESS:  About a quarter of a mile.

14            MR. KRATKA:  Your Honor, I am going to pull out a map,

12:47:22  15  and we'll see exactly where it was.

16            THE COURT:  That's all right.

17  BY MR. KRATKA:

18  **Q**    Now, just before I do that, do you roughly know the dates

19  of the times you lived at Briar Court?

12:47:28  20  **A**    Yes, Briar Court, I moved to that facility -- to that

21  residence around April of 2010, and I believe we closed on our

22  house moving away from that facility -- from that residence late

23  -- I think it was August 31st of --

24            THE COURT:  You say "we."  Just for the record, who do

12:48:00  25  you mean, sir?

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Cottar - Direct/Kratka

1              THE WITNESS:  My wife and I and our kids.

2              THE COURT:  How many children?

3              THE WITNESS:  Three.

4              THE COURT:  Thank you.

12:48:08   5              THE WITNESS:  2012.  August or September is probably

6      about the time we moved out.  So September of 2012.

7      BY MR. KRATKA:

8      Q    All right.  I'm going to put a map of Baytown on the

9      projector here and hopefully it will show up properly on the

12:48:29  10      screen.  Does something need to be done to activate?

11             THE COURT:  Oh, yeah.  Yeah.  Hang on.

12      BY MR. KRATKA:

13      Q    Sorry, I don't have the advanced graphics that we saw

14      during the Defendants' presentation.

12:49:06  15                  Mr. Cottar, can you --

16             THE COURT:  First of all, what are those major

17      thoroughfares, please?

18             MR. RICE:  Your Honor, may I just take a look at this

19      exhibit?

12:49:17  20             THE COURT:  Sure.

21             MR. KRATKA:  Yeah.  I'm sorry.  This is Exhibit -- I

22      apologize.  This is this Plaintiffs' Exhibit -- and we're

23      pulling out the number.  Since it's an actual map, we will

24      provide -- it was not in the physical notebook that we provided

12:49:49  25      to the Court but we can give the Court -- we'll actually give

Cottar - Direct/Kratka

1   this map.

2           THE COURT:  Any objection?

3           MR. RICE:  It's marked as an exhibit.  No objection.

4           THE COURT:  Mark it as an exhibit, and then it will be

12:50:01   5   entered without objection.  Okay?

6           MR. KRATKA:  All right.  We'll get to -- we'll work

7   out the number.

8           THE COURT:  Just tell me about it later and make sure

9   my case manager knows.  That's really important.

12:50:09   10          All right.  What are we looking at here?  What's

11   the thoroughfares here?

12   BY MR. KRATKA:

13   Q    First of all, can you tell -- Mr. Cottar, can you identify

14   where the Baytown facility is?

12:50:21   15   A    Absolutely.

16           MR. KRATKA:  Your Honor, may I walk over there?

17           THE COURT:  Sure.  Just speak loud enough where the

18   court reporter picks it up, please.

19           THE WITNESS:  This is the facility here.  This is 330,

12:50:33   20   Spur 330.  Up there is I-10.

21           THE COURT:  Where is I-10?

22   BY MR. KRATKA:

23   Q    It would be up above where we could see it?

24   A    That top most red line.

12:50:44   25           THE COURT:  That's I-10, the red line?

Cottar - Direct/Kratka

1          THE WITNESS:  Yes, sir.

2          MR. KRATKA:  I actually think I-10 may be a little

3    farther north than that.

4          THE COURT:  All right.  So I-10 is north because

12:50:56  5    that's at the top of the map, off the map, right?

6          THE WITNESS:  Correct.

7          THE COURT:  And which -- and if you go right, you're

8    going toward Galveston?  Is Galveston to the right?

9          MR. KRATKA:  Galveston would be south.

12:51:07  10         THE COURT:  Well, I-10 --

11         THE WITNESS:  To Beaumont.

12         THE COURT:  I-10 is going to Beaumont.  Beaumont is to

13   the right.

14         THE WITNESS:  Correct?

12:51:11  15        THE COURT:  Is that correct?

16        THE WITNESS:  Yes, sir.

17        THE COURT:  Okay.  Got it.  Now go on.

18   BY MR. KRATKA:

19   **Q**    All right.  So can you identify generally where the Baytown

12:51:19  20   complex is on this map?

21   **A**    Yes, sir.  It's this general -- whole general area there.

22        MR. KRATKA:  If the record would reflect that the

23   witness is referring to that largely blank area as it appears on

24   the map.

12:51:32  25        THE WITNESS:  Yes.  Within the bounds, typically, of

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Cottar - Direct/Kratka

 1    this line here.

 2          THE COURT:  What's that line?  Oh, I see.  I see what

 3    you're talking about.

 4    BY MR. KRATKA:

 5    Q    And can you identify for the Court where your current

 6    address is?

 7    A    My current address is right about here.

 8    Q    And can you estimate, not by using the map.  Do you know

 9    roughly how far away your house is from the fence line of the

10    plant?

11    A    A couple of miles.

12    Q    And can you identify where your previous address was on

13    Briar Court?

14    A    Yes, it's right here.

15          THE COURT:  So, you've lived right close to the

16    boundary of the plant for how many years?

17          THE WITNESS:  Roughly two and half.

18          THE COURT:  So you moved within -- you moved and then

19    moved again?

20          THE WITNESS:  Correct.

21          THE COURT:  Okay.

22    BY MR. KRATKA:

23    Q    And you mentioned that you have a wife and three children?

24    A    Yes.

25    Q    Do they live with you all the time?

                  Gayle Dye, CSR, RDR, CRR - 713.250.5582

Cottar - Direct/Kratka

 1  A     The three kids live with me 50 percent of the time.  They
 2  live with their mother the other 50 percent.
 3  Q     Is that true during your residences at both of these
 4  addresses?
 5  A     Yes.
 6  Q     Okay.  Let me direct your attention now to the -- I'm going
 7  to ask you some questions about the time when you lived on Briar
 8  Court directly -- the nearer location to the plant.
 9  A     Sure.
10  Q     I may have missed.  Did you say how far from the plant you
11  thought that Briar Court was?
12  A     Quarter of a mile from the fence line.
13  Q     Do you know which part or which plants in the Baytown
14  Complex were closest to your residence?
15  A     The -- that residence is very close to the fence line that
16  separates Baytown olefins from Baytown chemical.  So, to say
17  which one I was closest to, I was probably slighter closer to
18  the Baytown olefins plant but within a matter of feet.
19  Q     Okay.  And did you ever have any concerns about air quality
20  living in proximity to the Exxon plant?
21  A     Before I moved there no more than, you know, living in
22  Baytown almost 40 years.
23  Q     And what happened after you moved there?
24        THE COURT:  Which one?  There's two moves.
25        MR. KRATKA:  We're talking about the move to -- the

12:52:50  (line 5)
12:53:05  (line 10)
12:53:19  (line 15)
12:53:47  (line 20)
12:54:01  (line 25)

Cottar - Direct/Kratka

1  first of the two addresses that we'll be discussing which is the

2  Briar Court address.

3            THE COURT:  Thank you.

4  BY MR. KRATKA:

12:54:10  5  **Q**    When you moved to -- after you moved to Briar Court, did

6  you have any concerns about air quality?

7  **A**    You know, when I first moved to Briar Court in April of

8  2010, my prior concerns were the smell that Baytown has that's

9  always been associated with Baytown -- with Exxon.  After I

12:54:37  10  moved --

11            THE COURT:  Did you say Baytown or Exxon?

12            THE WITNESS:  Exxon.

13            THE COURT:  Okay.

14            THE WITNESS:  The -- however, after I moved, it wasn't

12:54:52  15  but a matter of weeks before I experienced what the residents

16  around that area experience and what they knew.  At that point

17  they included me, as well.  The really loud noises that come

18  from the flares.  The upsets that happen, the physical upsets

19  that happen to the community when these flares go on for

12:55:25  20  prolonged periods of time.  The questions, the unanswered

21  questions that the community -- that we have when these things

22  happen and everybody is saying, "What's going on?"  And nobody

23  can tell us.  Nobody knows if we should run for our lives or

24  shelter in place or what.

12:55:40  25  //

Cottar - Direct/Kratka

1  BY MR. KRATKA:

2  **Q**   Did you ever experience any odors living at the Briar Court

3  address?

4  **A**   I did.

12:55:46  5  **Q**   And were you able to -- do you believe those odors were --

6  any of those odors were associated with the Baytown -- the Exxon

7  complex?

8  **A**   Yes.

9         MR. RICE:  Objection.  Leading and speculation.

12:56:01  10        THE COURT:  Sustained.

11  BY MR. KRATKA:

12  **Q**   Let me backtrack then.  Did you ever witness any flaring

13  events --

14  **A**   I did.

12:56:06  15  **Q**   -- while living there?

16            And can you describe -- do you know whether the

17  flares that you viewed were part of the Exxon complex?

18  **A**   I do.

19  **Q**   And how do you know that?

12:56:19  20  **A**   That's the only complex around.

21  **Q**   Okay.  And could you tell -- you testified a minute ago

22  that you did experience odors while living there.  Can you

23  describe the nature of the odors that you were referring to?

24  **A**   Sure.  Within a few months after moving to that residence,

12:56:48  25  probably late spring or early summer, May, June-ish, came home

Cottar - Direct/Kratka

1    one night, again referring to the map -- hopefully, I don't have

2    to get up, but I will if I need to point it out -- I was coming

3    up Rolling Brook Drive headed toward my residence, had the kids

4    in the car.  It was late at night.  We got within about a half

12:57:15    5    mile from the facility and --

6    **Q**    So if you were coming down Rolling Brook, were you

7    traveling from east to west?

8    **A**    Traveling from sort of the northeast to the southwest.

9    **Q**    Towards the plant?

12:57:27    10   **A**    Towards the plant.  And, you know, the kids said, "Oh, my

11   God, dad, what's that smell?"  Of course, my response was,

12   "Well, it's Exxon."  We get home, and the minute we open the

13   doors it was really, really, really strong, so much that it just

14   -- an immediate headache.

12:57:46    15   **Q**    Can you describe what the odor was?

16   **A**    It was very sweet.  The only thing I can say to accurately

17   describe it is both sweet and that it was just hitting me right

18   here, like right in the sinus cavity.  I don't know.  I'm not a

19   doctor, just know that I smelled it and it hurt.

12:58:06    20   **Q**    It hurt to smell it?

21   **A**    Yes.

22   **Q**    And why did you say that -- when the children asked you

23   what the odor was, why did you say, "It's Exxon"?

24   **A**    It's sort of just common knowledge, if I can say it that

12:58:23    25   way.  In Baytown you smell smells, and people know it's Exxon,

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Cottar - Direct/Kratka

1   or they say it's Exxon.  There's --

2            THE COURT:  Are there any other facilities in Baytown?

3            THE WITNESS:  There's one on the far outskirts between

4   Baytown and Mont Belvieu down I-10 several miles down the road.

12:58:43   5            THE COURT:  Who is that?

6            THE WITNESS:  Chevron.

7   BY MR. KRATKA:

8   Q    That's several miles away?

9   A    Ten miles or so.

12:58:49   10   Q    And on this particular occasion, were the odors more

11   intense or less intense or the same as you got closer to the

12   Exxon facility?

13            MR. RICE:  Objection, your Honor, to the leading

14   nature of the question.

12:58:59   15            THE COURT:  Overruled.

16            THE WITNESS:  They were more intense, like I said,

17   when we were going up Rolling Brook as we neared the facility.

18   That's when the odor hit us, and we were pretty equidistant from

19   whole -- from that point all the way around to our residence at

12:59:12   20   that point.

21   BY MR. KRATKA:

22   Q    Okay.  And was this the only time you experienced odors

23   while living at that address?

24   A    No, sir.

12:59:24   25   Q    And did you ever call anyone to complain about emissions or

Cottar - Direct/Kratka

1    odors while you were living at that address?

2    **A**    I did.  I did.  That time in particular but several times

3    after that.

4    **Q**    Do you recall -- the first time you made a complaint call,

12:59:41    5    do you recall who it was that you called?

6    **A**    I did.  Before I ever called any complaints in, I always

7    called the CAER line.

8    **Q**    What is the CAER line?

9    **A**    It stands for Community Awareness Emergency Response line.

12:59:55    10   To describe it, it's more of an answering service where

11   community members can call and listen and see what's going on at

12   facilities in the general area.  When I say "general area," I

13   mean I've heard stuff on there from Deer Park, LaPorte.  It's a

14   wide area.  The idea is that when there's an upset that happens,

01:00:16    15   some sort of emission event or flaring, that these facilities

16   call, they leave a message.

17            They say either this is scheduled, it's

18   unscheduled, it's maintenance, it's this, it's that.  This is

19   what's going on, and it's a way for the community to hear from

01:00:38    20   their neighbors what's going on.  Is this something that I

21   should be worried about?  Okay.  Go on about our business.

22   **Q**    And by "their neighbors," do you mean the industrial

23   facilities that report?

24   **A**    Yes, sir.

01:00:47    25   **Q**    Is the CAER line something you or other citizens would call

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Cottar - Direct/Kratka

1 simply to get information?

2 **A**    Correct.  There's no way to report anything.  There's not

3 anything to leave a message.  It's just to hear from the

4 facilities what's going on.

01:00:59    5 **Q**    And did you call the CAER line --

6 **A**    I did.

7 **Q**    -- while you lived at Briar Court?

8 **A**    Several times.

9 **Q**    Did you ever call to actually make a complaint or ask a

01:01:10   10 question to anyone about emissions or odors or these air quality

11 experiences that you were describing?

12 **A**    Sure.  Absolutely.  That particular time that I was just

13 referring to I called Harris County Pollution Control.

14 **Q**    Do you know what Harris County Pollution Control is, what

01:01:28   15 government agency that is?

16 **A**    I did.  I had just heard about it, basically, because I was

17 working at Air Alliance Houston.  Having grown up in Baytown, I

18 never knew there was any way of either asking questions or

19 getting answers or making reports.  So it was only by working

01:01:47   20 there for the short time that I did that I knew this.

21 **Q**    And what happened on that occasion and can -- do you recall

22 when it was, the early summer of 2010?

23 **A**    It was early summer of 2010.

24 **Q**    What happened on that occasion when you called Harris

01:02:07   25 County Pollution Control?

Cottar - Direct/Kratka

1   **A**     Like I said, it was late at night.  We were coming home

2   from dinner.  It was about 9:30ish.  By the time I got the kids

3   inside, it was --

4                THE COURT:  Slow down a little bit, sir.

01:02:16  5                THE WITNESS:  -- it was 9:45.  And I called the

6   Pollution Control line, and it put me over to their on-call

7   investigator.  It was a Friday night.  So, at 9:45 on a Friday

8   night, the investigator who lived in Galveston informed me that

9   it was -- you know, he didn't have any equipment.  He didn't

01:02:37 10  have -- it was 9:45.  So, he wasn't going to drive into the

11  office and pick up equipment and come out but to call back

12  Monday and let him know if it was still going on and they would

13  investigate.

14  BY MR. KRATKA:

01:02:49 15  **Q**     What happened after that?  Did you call back?

16  **A**     It was gone the next morning.  There was no reason to call

17  back anymore.

18  **Q**     By "it," you mean the odor was gone the next morning?

19  **A**     Correct.

01:02:58 20  **Q**     Have you ever made any calls to the Texas Commission on

21  Environmental Quality regarding air quality?

22  **A**     Yes, sir.  Multiple.

23  **Q**     How many times would you say you called the TCEQ?

24  **A**     I would say a conservative figure is probably six to eight.

01:03:13 25  **Q**     And was the TCEQ -- and these were -- were you calling to

Cottar - Direct/Kratka

1    file complaints?

2  **A**    Yes, sir.

3  **Q**    And was the TCEQ responsive to your complaints?

4  **A**    Not entirely.  Occasionally.  There were times when I got

01:03:30    5    an investigator that came out several days later.  Occasionally,

6    there were times when I called and nobody was available to take

7    a report.  I just got a receptionist.

8  **Q**    Were you able to even file a complaint on those instances?

9  **A**    Eventually through their website, yes.

01:03:49   10  **Q**    But you couldn't do it?

11  **A**    But I couldn't do it over the phone.

12  **Q**    And on the occasions when TCEQ sent an investigator out,

13    can you just maybe be a little more specific about how quickly

14    an investigator would show up?

01:04:05   15  **A**    Earliest was typically three days.  At the greatest was

16    five days, six days.

17  **Q**    And what would happen when an investigator did show up?

18  **A**    The conversations that ensued were typically one of they

19    realized that the event was no longer going on; that as an

01:04:32   20    investigator, they were no longer investigating a live action

21    but were just investigating the facts of what I experienced,

22    would then go over to Exxon, investigate their paperwork to see

23    if there was any correlation.  And then they would get back to

24    me.

01:04:50   25  **Q**    Overall, were you satisfied with TCEQ's responsiveness to

Cottar - Direct/Kratka

1  your complaint?

2  **A**    I was not.

3  **Q**    Did you ever make your dissatisfaction or concerns known to

4  the TCEQ?

01:05:00  5  **A**    I did.  I did.  At one point I finally sat down, had a

6  meeting with a couple of the investigators.  Manuel Bautista was

7  one of them.  I don't remember the other gentleman's name but

8  also their supervisor, Donna -- I can't remember her name but,

9  yeah.

01:05:19  10  **Q**    About when did that meeting take place, do you recall?

11  **A**    That would have been fall of 2011, probably Septemberish,

12  Octoberish.

13  **Q**    And what was the result of that meeting?

14  **A**    The result of that meeting was they gave me a Xeroxed blank

01:05:42  15  form -- blank checklist for me to start taking like a log sheet

16  of every time I smelled something of, you know, writing it down

17  and eventually, you know, as I filled up the page, to give it

18  back to them so that they could see a repeatable occurrence.

19  **Q**    And did you fill out the log sheet?

01:06:03  20  **A**    I did not.

21  **Q**    Why not?

22  **A**    It seemed pointless.  I was calling, and if they're not

23  keeping records of me calling, why am I keeping records?  My

24  calling should be a record.  My -- the forms that I filled out

01:06:17  25  online should be record.  These should be record enough.

Cottar - Direct/Kratka

1  **Q**    All right.  Let's get back to your actual experiences with

2  air quality while living on the Briar Court address.  Did your

3  concerns about -- and you may have already answered this, but

4  did -- your concerns about air quality, were they more of a

01:06:37   5  general nature, or did they focus on specific incidents?

6  **A**    Can you rephrase that question or repeat it?

7  **Q**    Sure.

8  **A**    I don't understand it.

9  **Q**    I apologize for the poor question.  While you were living

01:06:51  10  at the Briar Court address, did you have air quality -- concerns

11  about air quality?

12  **A**    Yes.

13  **Q**    And were your concerns of a general nature or did your

14  concerns focus on specific incidents?

01:07:05  15  **A**    Specific events.

16  **Q**    Okay.

17          THE COURT:  Hang on one second.  So, we got to stop

18  sometime.  I have about 1:08 on the clock as far as time goes.

19  Let's take a lunch break at this time.  Otherwise, we're just

01:07:20  20  going to keep going without any break at all.  I'd always

21  usually in a jury take about an hour and 15 minutes, but -- so,

22  usually it's from 1:00 to 2:15.  It's now 1:08.  We'll see you

23  back ready to resume at 2:15.  We'll see you at that time.

24          (Court recessed at 1:07 p.m.)

02:18:01  25          (Court resumed at 2:18 p.m.)

Cottar - Direct/Kratka

1          THE COURT:  All right.  Let's continue.

2   BY MR. KRATKA:

3   Q    Mr. Cottar, I believe the last question I asked you was

4   about whether there were concerns about air quality on Briar

02:18:30   5   Court centered on any specific incidents.

6   A    Yes, sir.

7   Q    And your answer was?

8   A    They do.

9   Q    Can you describe in any more detail the types of air

02:18:37   10   quality incidents that you are referencing?

11   A    Certainly.  Other than the one I already detailed early on

12   in my experience, there was another incident.

13   Q    Actually, if I could just stop you there.  Rather than go

14   incident by incident, if you could, give kind of a general idea

02:19:01   15   for the Court of the types of experiences or odors or whatever

16   it was that you were referring to.

17   A    Sure.  There were the odors.  There were the flaring noises

18   that -- in the townhouse on Briar Court, my bedroom windows

19   faced the facility, the Exxon facilities.  And there were --

02:19:25   20   there were a number of times where the flaring was so profound

21   that the windows in my bedroom actually shook.  That's kind of

22   alarming when it happens at any time but especially when it

23   wakes you up at 2:00 or 3:00 in the morning.  The flares

24   themselves, the size, the black plumes of smoke.

02:19:47   25   Q    Can you describe the odors with any more specificity?

Cottar - Direct/Kratka

1  **A**    They were very similar to what I described earlier, very

2  sweet most of the time.  There was one particular event that was

3  not a sweet smell.  It was definitely an onion-type smell, but

4  most of them were very sweet.

02:20:08   5  **Q**    And could you tell where those smells were coming from?

6  **A**    Definitely.  From the Exxon facilities.  I could tell

7  because of the winds, basically.  If the winds were moving from

8  the east to the west and the flaring was going on, we wouldn't

9  smell anything, but if the flaring was going on and the wind was

02:20:31  10  moving from the west to the east and we did smell something,

11  that was an indication, number one.  Indication number two was

12  then following up later, looking at those STEERS reports online

13  on the TCEQ website and being able to correspond my experience

14  with the record of the event.

02:20:51  15  **Q**    And when you say when the wind is blowing from the west to

16  the east, did -- the Baytown Complex was then located to the

17  west of your house?

18  **A**    Correct.

19  **Q**    So you just mentioned checking STEERS reports.  Do you know

02:21:09  20  what pollutants were being released from Exxon when you

21  associated one of your experiences with an incident at the

22  plant?

23  **A**    By looking at those STEERS reports, yes, sir.

24  **Q**    How did you know about the STEERS reports?

02:21:22  25  **A**    Again, through my work for the time when I was working at

Cottar - Direct/Kratka

1  Air Alliance Houston.

2  **Q**    And how often would you say you checked the TCEQ website to

3  look at STEERS events?

4  **A**    Just whenever it corresponded with an experience that I had

02:21:40  5  had.  Typically, I would check within the first 24 hours after

6  an experience, and I typically wouldn't find anything.  Two,

7  three days later, I would find something, sometimes a little bit

8  later but typically within the first two, three days.

9  **Q**    You're saying within the first two or three days you would

02:21:59  10  find it posted on the actual website?

11  **A**    Correct.

12  **Q**    And over what period of time would you say you would check

13  the TCEQ website to look for STEERS reports?

14  **A**    From, say, if the event was on a Monday night, from Tuesday

02:22:15  15  through until I would find it.

16  **Q**    I asked the question poorly.  What I mean is over what --

17  you know, months, years, when would you do -- over what period

18  of time in your time in Baytown would you -- have you checked

19  the STEERS database?

02:22:32  20  **A**    From the first few months of working at Air Alliance

21  Houston when I first found out about the website and the STEERS

22  reports through till probably within the last few months that I

23  lived there.

24  **Q**    And what is your understanding of what a STEERS Report is?

02:22:54  25  **A**    My understanding of a STEERS Report is when the facility

Cottar - Direct/Kratka

1    itself reports an emissions event that goes above and beyond

2    their permitted emissions.

3    **Q**    And can you estimate on how many occasions you were able to

4    match a particular incident that you experienced with a report

02:23:14    5    that you found on the TCEQ STEERS database?

6    **A**    I would estimate probably half a dozen.

7    **Q**    And how -- you said that you could see flares and see

8    flaring from your townhouse?

9    **A**    Correct.

02:23:29    10    **Q**    How frequently would you say you saw flaring events at the

11    Baytown Complex during the time you lived on Briar Court?

12    **A**    I would say on average once a week.  You know, there may be

13    a week where I didn't see an event or experience some sort of

14    flaring event; but I would say easily within a four-week span, I

02:23:55    15    would see three or four events.

16    **Q**    Can you describe a little more -- in a little more detail

17    when you say you saw a flaring event.  Exactly what was it that

18    you saw that you considered to be a flaring event?

19    **A**    There are typically flares burning -- you know, when I use

02:24:13    20    the words within reason I mean, you know, they're small.

21    There's no black plume coming out.  They're not audibly

22    disruptive.  Those kinds of things happen, and as I understand

23    it, that's a good thing.  What I refer to as a flaring event is

24    when either it is audibly disruptive or the black plume is

02:24:36    25    something that is continuing on end for, you know, an hour or

Cottar - Direct/Kratka

1  more.

2  Q    And when you refer to a black plume, are you referring to

3  black smoke?

4  A    Correct.

02:24:46  5  Q    And would that be smoke coming from the flare or the --

6  A    From the flare.

7  Q    From the flare?

8  A    Yes, sir.

9  Q    Can you describe the size of the flames when you would see

02:24:56  10  something that you considered to be a flaring event?

11  A    I don't know that I could estimate the size of the flame

12  other than to say it's relative to, say, the size of the stack

13  itself.

14  Q    You mean the elevated structure on which the flare sits?

02:25:12  15  A    Correct.  There were times when the flare may be an eighth

16  to a quarter of the stack itself, the elevated structure.  There

17  were times when it was much greater than that, and those were

18  the times that were, obviously, of greater concern.

19  Q    Are you comparing the length of the flame to the height of

02:25:38  20  the structure?

21  A    The length, correct.

22  Q    And so when you say it was a quarter or a half of the

23  structure, you don't mean it was overlapping and it went above

24  the structure?

02:25:49  25  A    Correct.

Cottar - Direct/Kratka

1          MR. RICE:  Objection.  Leading.

2          THE COURT:  Overruled.  Technically, it's leading, but

3    I'll give him a little leeway.

4          MR. KRATKA:  Thank you, your Honor.

02:25:58  5    BY MR. KRATKA:

6    Q    And when you say you saw black plumes along with flaring

7    events, did you always see a black plume along --

8    A    Not always.

9    Q    About how -- if you could estimate, what percentage of the

02:26:06  10   time that you witnessed what you considered to be a flaring

11   event would you also see a black plume of smoke?

12   A    I would say probably every two to three months at least.

13   Q    And could you -- can you recall for what length of times

14   these plumes of smoke would come from -- would continue from a

02:26:30  15   flaring -- a single flaring event?

16   A    I've seen it go from a few minutes to several hours.

17   Q    In a single event?

18   A    In a single event, yes, sir.

19   Q    Did you ever record with photographs or video any flaring

02:26:48  20   events?

21   A    I did.  I photographed one flaring event one day going back

22   and forth from taking my kids to and from school and I videoed a

23   number of flaring events.

24   Q    I'm going to show you what has been offered into evidence

02:27:04  25   as Plaintiffs' 398 which is a short video.

                              Cottar - Direct/Kratka

 1                MR. KRATKA:  We'll play the video.  Your Honor, the

 2      clip is maybe a minute and a half.

 3                THE COURT:  Okay.

 4                MR. KRATKA:  We'll play the clip, and I'll ask you

02:27:17  5     some questions about it.

 6                THE WITNESS:  Sure.

 7                MR. RICE:  Your Honor, at this time I'm going to

 8      object to the admission of these videos on a couple of grounds.

 9      One, they are replete with hearsay.

02:27:26  10              THE COURT:  Why is it hearsay?

 11               MR. RICE:  Well, on several -- I don't know what

 12     portions of the videos that Mr. Kratka is going to show, but in

 13     several instances in the video there are voices coming from off

 14     camera that are purporting to describe what's going on.  That's

02:27:39  15    clearly hearsay.  There's opinion testimony in these videos that

 16     lack foundation, and there's also speculation by the witness

 17     himself.

 18               THE COURT:  Response?

 19               MR. KRATKA:  First of all, I plan on showing two short

02:27:54  20    clips.  The first clip does have some narration by Mr. Cottar,

 21     but I intend to ask him afterwards to explain here in court

 22     through testimony what it was that he was experiencing and

 23     seeing.  And the second clip, I believe, is about a 25-second

 24     clip that has no narration or, perhaps, a word or two.

02:28:15  25               THE COURT:  Sustained as to the narration on the first

Cottar - Direct/Kratka

1    one, but he can narrate it as it goes along and overruled as to

2    the second.

3            MR. KRATKA:  Do you want that first one played with

4    the sound off then?

02:28:25    5            THE COURT:  Off.

6            MR. KRATKA:  Can we switch the monitor to video as

7    opposed to the ELMO or to the --

8            THE COURT:  The computer?

9            MS. MARY ROCK:  Uh-huh.

02:28:56   10            MR. KRATKA:  398 is the Plaintiffs' exhibit of this

11    video.

12            THE COURT:  Is that your computer or not?

13            MS. GOVERN:  That is not my computer.

14            THE COURT:  Hang on.  It's the other one.

02:29:32   15            MR. KRATKA:  Could you pause it for a second?

16                Would you like Mr. Cottar narrating as he's going

17    or --

18            THE COURT:  It's up to you.  Whatever you want.  I

19    don't mind him narrating as it goes along.

02:29:44   20        (Plaintiffs' Exhibit Number 398 played in open court.)

21            THE WITNESS:  I had been awakened probably 15 minutes

22    prior to this by a loud rambling noise in my bedroom.  I grabbed

23    my phone so I could verify the date and time.  It was 5:41 in

24    the morning and at this point I'm still inside the house about

02:30:02   25    to walk out.

Cottar - Direct/Kratka

1            THE COURT:  What year is it?

2            THE WITNESS:  2011.

3            THE COURT:  Okay.

4            THE WITNESS:  We can go from there.  So I was

02:30:08  5  recording.

6            THE COURT:  Let's wait until it begins.

7            THE WITNESS:  I'm sorry?

8            THE COURT:  Wait until it begins.

9            THE WITNESS:  It's going.  I'm walking to the door.

02:30:17  10           THE COURT:  Okay.

11           THE WITNESS:  I'm walking to the door, and there's no

12  audible sound.  And then I open the door, and you can hear the

13  rumbling.

14           THE COURT:  All right.  Rumbling.  That's the

02:30:29  15  background.  What's next?

16           THE WITNESS:  I walk from there to where you could see

17  the flares better.  It sounds like a jet engine.

18           THE COURT:  That light, what is that light?

19           THE WITNESS:  That light is a street light.  What you

02:30:38  20  see silhouetted are the town homes and then that glowing behind

21  it is the flare that I'm going to walk around toward.

22  BY MR. KRATKA:

23  **Q**    This is -- the sun hasn't come up yet?

24  **A**    Correct.

02:30:48  25           THE COURT:  By the way, just -- the narration is not

Cottar - Direct/Kratka

1  anything extraneous, but I'm allowing him -- if you have one

2  with no narration with the sound, but I assume that it's really

3  loud.

4             THE WITNESS:  Yes, sir.  It's the loudness that woke

02:31:04  5  me up.

6             THE COURT:  Okay.  Is this outside your house?

7             THE WITNESS:  Correct.  Walking down the driveway to

8  where you can see the flaring.  You could kind of see it through

9  the trees there, and there you see both flare stacks.

02:31:22  10            THE COURT:  There are two in there?

11            THE WITNESS:  Correct.

12            THE COURT:  Oh, yeah, there's the second one.

13            THE WITNESS:  And I don't think I'm saying anything at

14  that point.  It's just rumbling.

02:31:45  15            MR. KRATKA:  I'll just ask some questions as this is

16  playing.

17            THE COURT:  Now, if you want to put the sound on with

18  the rumbling, that's fine.  Do you want to try it?

19            MR. KRATKA:  That's okay.  We've got the testimony on

02:31:57  20  that.

21  BY MR. KRATKA:

22  Q    Now, the -- on the image it looks like two very, very

23  bright headlights.  Is that the way the flares looked to you

24  when you were actually watching?

02:32:07  25  A    No, sir.  That's the distortion of the camera.  They were

Cottar - Direct/Kratka

1   just very large flames.

2   **Q**   And at this time you said you were awakened by the noise?

3   **A**   By the noise.

4   **Q**   And was there any -- did you experience any odors at this

02:32:21   5   time?

6   **A**   I didn't on this one until I opened the door.  And then I

7   opened the door and I got hit with that same very sweet odor.

8   **Q**   All right.  Now after this event, did you attempt to

9   consult the STEERS database?

02:32:36   10   **A**   I did.  Took a couple of days for it to show up the next

11   morning or later that day -- you know, it was already morning at

12   that point.  Later that day, I checked the website.  There was

13   nothing.  Checked the next day and the STEERS Report had been

14   filed and it directly corresponded to this time frame.  It

02:32:55   15   actually had started, I believe, about an hour earlier, went for

16   a couple of hours after this.

17              THE COURT:  That flame and the noise?

18              THE WITNESS:  Yes, sir.

19   BY MR. KRATKA:

02:33:05   20   **Q**   I'm going to show you -- I'm going to hand you a copy of

21   Plaintiffs' -- an excerpt from Plaintiffs' Exhibit 17 which --

22              THE COURT:  By the way, I assume that everybody is

23   making notes or somebody is on each side of the exhibits as

24   they're identified.  Okay.

02:33:24   25              MR. KRATKA:  Yes.  Plaintiffs' Exhibit 17, your Honor,

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Cottar - Direct/Kratka

1   is a compendium of STEERS reports relating to STEERS events at

2   the olefins plant.

3           THE COURT:  Including this one?

4           MR. KRATKA:  Including this one.

02:33:39  5           THE COURT:  Any -- well, we don't -- it's in.  Let's

6   keep moving.  If it's something you have a problem, get with me.

7   Okay.

8

9           MR. KRATKA:  I'm going to hand the witness a copy of

02:33:49  10  Plaintiffs' Exhibit 17 and, your Honor, I also put it up on the

11  screen.  We can switch.

12          THE COURT:  Oh, yeah, hang on.

13  BY MR. KRATKA:

14  **Q**    And, Mr. Cottar, is this -- can you identify what this

02:34:23  15  document is?

16  **A**    This is a STEERS Report from the event that I videotaped.

17  **Q**    How do you know it's the event you videotaped?

18  **A**    The date and time match up, and the location matches up,

19  the date and time where it shows the event beginning in that

02:34:38  20  quadrant there and the event ending with the time and date stamp

21  and with the fact that below that it specifies that it was the

22  Baytown olefins plant, the primary flare on that first page and

23  the secondary flare on the second page.

24  **Q**    And can you tell what pollutants were emitted during this

02:35:03  25  event?

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Cottar - Direct/Kratka

1    **A**    Butane, carbon monoxide, butene, ethylene, iso-butane,

2    iso-butene, NOx, propane, propylene and trans-2-butene.

3    **Q**    And the STEERS Report also lists the amount of each

4    pollutant?

02:35:40    5    **A**    Correct.

6    **Q**    In the far right-hand column?

7    **A**    Right.  For instance, the carbon monoxide is 1800 pounds.

8    The ethylene is over a thousand pounds.

9    **Q**    That's from one flare?

02:35:54    10    **A**    Correct.

11    THE COURT:  When they say "pounds" in gas, is that

12    what the liquified product would be?

13    MR. KRATKA:  There's a way -- I believe, your Honor,

14    there's a way of measuring the poundage of actual --

02:36:05    15    THE COURT:  What is that poundage, in other words, in

16    real pounds?

17    MR. KRATKA:  I think those are real pounds.

18    THE COURT:  Okay.

19    MR. KRATKA:  We'll have an expert witness and I'm sure

02:36:15    20    the other side will as well who can explain exactly how that is

21    calculated.

22    BY MR. KRATKA:

23    **Q**    And then from the second flare, there were also additional

24    emissions?

02:36:26    25    **A**    Correct.  Over 1400 pounds of carbon monoxide on that

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Cottar - Direct/Kratka

1  secondary flare and over 800 pounds of the ethylene.

2  **Q**   Thank you.  And I want to draw your attention to, if you

3  can recall, back to September of 2011, later that year.

4  **A**   Sure.

02:36:51  5  **Q**   Do you recall another air incident happening in September?

6  **A**   I do.  There was an incident where I was working from home

7  that day.  I believe it was a Friday, but it may not have been.

8  And my office at home faced our mailbox, and I saw the mail

9  truck come by.  So I went out to get the mail.  It was about

02:37:17  10  9:00 o'clock in the morning, and it was the strongest odor I've

11  ever smelled in my life.  And I don't mean to speak

12  hyperbolically.  It really, truly was the strongest experience

13  like this from an olfactory perspective.  When I opened the

14  door, it just immediately hit me.  And so I went and I got the

02:37:38  15  mail and I came back.

16  **Q**   Just to break in, can you describe what the odor was?

17  **A**   Again, it's that really strong, sweet, kind of painful odor

18  that hurts.

19        THE COURT:  What does that mean?

02:37:51  20        THE WITNESS:  Have you ever had a smell that hurts

21  right in the middle of your head when you smell it.  I don't

22  know any other way to describe that.  I'm sorry.

23        THE COURT:  Okay.  Go on.

24  BY MR. KRATKA:

02:38:01  25  **Q**   I guess I would ask:  Did it -- are you saying that

Cottar - Direct/Kratka

1 breathing it caused pain?

2 **A**    Yes.  I didn't have the pain before I opened the door, and

3 then once I closed the door and sort of cleared out my system,

4 the pain did go away.

02:38:16  5 **Q**    So what else happened that morning?

6 **A**    First thing I did like every time, called the CAER line.

7 Like every time, I hadn't heard anything on the CAER line.

8 There was nothing called in at least at that point.  I called

9 TCEQ to find out if they knew anything and to also file a

02:38:37 10 report.

11         THE COURT:  Are there any emergency procedures at

12 Baytown or the plant have maybe some danger --

13         THE WITNESS:  Your Honor, I don't know.  I've tried to

14 find that out on several occasions.  And I simply don't know.

02:38:51 15         THE COURT:  So there's no warning or loud speakers?

16         THE WITNESS:  There is -- there is a very loud alarm

17 that I have heard.

18         THE COURT:  What's it sound like?

19         THE WITNESS:  Like an air-raid siren, but I have no

02:39:04 20 idea what that means.

21         THE COURT:  Okay.

22 BY MR. KRATKA:

23 **Q**    So continuing on, you were talking about attempting to call

24 the TCEQ?

02:39:13 25 **A**    The TCEQ.  That particular morning when I called,

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Cottar - Direct/Kratka

1   apparently all the investigators were out of the office and
2   there wasn't even an investigator or anybody that I could leave
3   a message with and sort of log a complaint or a question.  All I
4   found was a receptionist who said she would call me whenever an

02:39:32   5   investigator came back in.

6                   I made several calls throughout the day.  The
7   event itself lasted well into the afternoon, early evening time.
8   I never heard back from a TCEQ investigator on that day, never
9   had anyone call me back.  I made multiple calls.

02:39:50  10   **Q**   Did you experience any other symptoms that day?
11   **A**   Only when I went outside.  So I stayed inside.
12   **Q**   And did you subsequently attempt to check the STEERS
13   database?
14   **A**   I did.

02:40:01  15   **Q**   And what did you discover?
16   **A**   I found a corresponding event report similar to this one
17   that was again about an hour earlier that day, 8:00 something
18   that went through about 6:00 p.m.
19   **Q**   I'm going to show you another STEERS Report drawn from

02:40:25  20   Plaintiffs' Exhibit 17 which is also -- I should say that both
21   of these STEERS reports are reflected on the stipulated summary
22   Table 2C, Plaintiffs' Exhibit 2C.

23                   Can you identify this document for the Court?
24   **A**   Yes, sir.  It's the STEERS Report corresponding to -- it

02:40:50  25   looks like that same -- that same day.

1-134

Cottar - Direct/Kratka

1    Q    Is that the right day and time?

2    A    It is the right day but the time seems to be off.

3    Q    How so?

4    A    Well, it definitely went on until late in the afternoon,

02:41:04   5    and this is showing an event that only lasted about an hour

6    unless I'm misreading it.

7    Q    I think you're reading it correctly?

8    A    Okay.

9    Q    And can you identify which pollutants were reported as

02:41:20   10   being emitted in this event?

11   A    Let's see.  Almost 700 pounds -- 697 pounds of propylene,

12   100 pounds of ethylene, and then smaller recorded amounts of

13   butene, butadiene, butane -- no, butene, again, CL --

14   CIS-2-butene.

02:41:49   15   Q    And the emission limit is listed as what?

16   A    Not specifically authorized.

17   Q    And the limit is listed as zero?

18   A    Correct.

19   Q    And drawing your attention now to a little later, to May of

02:42:13   20   2012, do you recall any air quality incidents occurring during

21   that time?

22   A    Yes, sir, and it was a turning point for me.

23   Q    All right.  Before we get into the turning point aspect of

24   it, this is when I would like to show another short video clip.

02:42:27   25   This will be Plaintiffs' Exhibit 401.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Cottar - Direct/Kratka

1          THE COURT:  Are you going to show that off, what, the
2   computer system?

3          MR. KRATKA:  Yes, if we could.

4          THE COURT:  What time was this?

02:42:49   5          THE WITNESS:  Approximately 9:30, 9:45 in the evening.

6          MR. KRATKA:  Could you pause it there, Mary?

7   BY MR. KRATKA:

8   **Q**    And what was that sound in the background?

9   **A**    That was that siren.

02:43:02  10          THE COURT:  That was the siren going off?

11          THE WITNESS:  (Indicated yes.)

12          THE COURT:  Who runs that siren?  Anybody know?
13   Anybody know who runs the siren?

14          MR. RICE:  Your Honor, it's Exxon siren.

02:43:17  15          THE COURT:  Okay.  It's in-house rather than the city
16   itself.

17          MR. RICE:  Your Honor, I think you'll hear testimony
18   later in the --

19          THE COURT:  That's okay.  That's all I needed to know.
02:43:26  20   Go on.

21   BY MR. KRATKA:

22   **Q**    Can you describe what's being looked at there, what's being
23   shown, those two bright lights?

24   **A**    Two very large flares.  Again, the picture kind of distorts
02:43:36  25   the scope and size of it.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Cottar - Direct/Kratka

1  Q     And can you describe what's above the flare?

2  A     Above the flaring, you can see -- it's easier to see when

3  the video is in motion, but there's two very large black plumes

4  of smoke.  In reality again the distortion of the camera kind of

02:43:52  5  makes it look whiter than it is, but it was definitely not

6  steam.  It was definitely black soot.

7              THE COURT:  How long is the video?

8              MR. KRATKA:  Just a few more seconds.

9              THE COURT:  Yeah, I know.  In other words, I'd like to

02:44:05  10  hear it again.  Let me hear it again.

11              MS. MARY ROCK:  Start it over?

12              THE COURT:  Yes, please.

13              MR. KRATKA:  Just rewind it.

14              THE COURT:  Turn the sound up, please.

02:44:22  15      (Video played in open court.)

16  BY MR. KRATKA:

17  Q     And did you take this video?

18  A     I did.

19  Q     Did you also take additional video footage that evening?

02:44:50  20  A     I took a lot of footage that night.

21  Q     Why did you take make a video of this event?

22  A     Because honestly I had no idea what was going on.  I was --

23  I was scared.  I was trying to get answers.  I called the CAER

24  line again.  Nothing was recorded on the CAER line.  I --

02:45:09  25  actually I called 911 and spoke to a 911 operator to find out if

Cottar - Direct/Kratka

1   they knew what was going on.  And the 911 operator told me that

2   they didn't know and that they didn't need to know, that Exxon

3   had its own emergency service -- its own emergency response

4   services and that they didn't communicate with the City as to

02:45:29  5   the emergencies that were going on.  I called the only public

6   number at the Baytown facility which rang to a security booth,

7   and the security person at the booth told me that it was --

8           MR. RICE:  Your Honor, I'm going to object to the

9   hearsay testimony.  This is precisely --

02:45:47  10          THE COURT:  Sustained.

11   BY MR. KRATKA:

12   Q    If you can describe what happened without including

13   specific things --

14          THE COURT:  After you made that call, what, if

02:45:54  15   anything, did you do?

16          THE WITNESS:  I made other calls.  I won't -- I guess

17   I can't go into the details of what those calls were, but I made

18   other calls.

19          THE COURT:  To who, not what they said, to who.

02:46:07  20          THE WITNESS:  I called the -- I called 911.  I called

21   the front office.

22   BY MR. KRATKA:

23   Q    Of Exxon?

24          THE WITNESS:  The security booth.  Someone finally at

02:46:22  25   the security booth gave me a number inside the facility to speak

Cottar - Direct/Kratka

1  to someone in that unit.  I called that number on several

2  occasions in succession of about five minutes and every time --

3  the first time I called, I asked what was going on, and they

4  hung up.  And then every time I called after that, they picked

02:46:43  5  it up and hung up immediately.

6  Q    How many times did that happen would you say?

7  A    Five or six.

8  Q    And how long did this event continue that night?

9  A    It began around 9:15, 9:30.  I can honestly say that I know

02:47:03  10  that it went until 12:45 or 1:00 a.m. that night because I was

11  writing all of this, trying to document everything every step of

12  the way.  And I do remember stating at about 1:00 a.m. that it's

13  still going on.  How long after that I don't remember.

14  Q    So you did make a written description?

02:47:23  15  A    I did make a written description.

16  Q    Did you make it at that time?

17  A    I did make it at the time.

18  Q    While the event was still going on?

19  A    Yes, sir.

02:47:30  20  Q    I'm going to show you a copy of Plaintiffs' Exhibit 399.

21       MR. RICE:  Your Honor, I'm going to object to 399 as

22  well on the same hearsay grounds.

23       THE COURT:  Let him take a look at it, but don't say

24  anything about it.  Just take a look at it.

02:48:11  25  BY MR. KRATKA:

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Cottar - Direct/Kratka

1    Q    Can you identify what that --

2         THE COURT:  No, no.  Just look at it and refresh your

3    recollection.

4         THE WITNESS:  Okay.

02:48:18    5         MR. KRATKA:  In response to the hearsay objection,

6    your Honor.

7         THE COURT:  What is it?

8    BY MR. KRATKA:

9    Q    Can you identify that the exhibit is?

02:48:22   10    A    It's an e-mail that I was writing at 1:50 a.m.

11    Q    Had you started writing earlier than that?

12    A    I had.

13         THE COURT:  Who did you send it to?

14         THE WITNESS:  I sent it to some colleagues I worked

02:48:39   15    with and to Mr. Kratka.

16         MR. KRATKA:  Your Honor, I would argue at this time

17    this qualifies for the hearsay exception as contemporaneous --

18    present sense impression of the event.  He recorded it at the

19    time the event was happening.

02:48:53   20         THE COURT:  In writing in an e-mail, correct?

21         MR. KRATKA:  Correct.

22         THE COURT:  All right.  I'm not being overly academic.

23    You got a case on that one?

24         MR. KRATKA:  We can find one.  I don't have it right

02:49:04   25    now.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

 1            THE COURT:  All right.  At this time sustain the

 2    objection.  If you can find something let in something like that

 3    as a contemporaneous comment, I'll take a look at it again.

 4            MR. KRATKA:  Thank you, your Honor.  Let me just --

02:49:20   5            THE COURT:  By the way, when I say "case," it doesn't

 6    have to be a Fifth Circuit case, anything ever on anything.  You

 7    don't have Fifth Circuit, anything serves as guidance and would

 8    be helpful.  Go right ahead.

 9    BY MR. KRATKA:

02:49:32   10   Q    And again did you attempt to consult the STEERS database

11    after this event?

12   A    I did.

13   Q    And what was the result of that search?

14   A    It actually coincided with information that I gained that

02:49:46   15   night from another encounter with a different employee.

16   Q    We're not going to get into statements that you were told

17    by another --

18   A    Sorry.

19   Q    -- Exxon employee, but I'm going to show you another STEERS

02:49:58   20   event from Plaintiffs' Exhibit 17 and which is also reflected in

21    the stipulated table in Plaintiffs' Exhibit 2C and ask you if

22    you can identify this.

23   A    Okay.

24   Q    Can you identify this document?

02:50:26   25   A    Yes, sir.

                Gayle Dye, CSR, RDR, CRR - 713.250.5582

Cottar - Direct/Kratka

1  Q     What is it?

2  A     It's another STEERS Report, and this one coincides with the

3  event that I described just a second ago.

4         MR. KRATKA:  Your Honor, if you want to look at this,

02:50:37  5  I can put it back on the --

6         THE COURT:  No just stretching, that's all.

7         MR. KRATKA:  No, no.  I was asking if you could switch

8  back to the ELMO.

9         THE COURT:  Oh, okay.  Sure.  I'm sorry.

02:50:54  10        MR. KRATKA:  Don't want to interrupt the stretch.

11        THE COURT:  Hang on a second.  Off the record.

12     (Discussion off the record.)

13  BY MR. KRATKA:

14  Q     And, Mr. Cottar, is this the STEERS event that you found

02:51:28  15  that was associated with the event?

16  A     Yes.

17  Q     What was the date and time of this event?

18  A     May 22, 2012 at 9:35 p.m. through May the 23, 2012, at 3:35

19  a.m.

02:51:48  20  Q     Flipping to the second page, again, were there olefin plant

21  flares involved in this event?

22  A     Yes, sir.

23  Q     And those are the flares that you believe you observed and

24  videotaped?

02:51:57  25  A     Yes, sir.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Cottar - Direct/Kratka

1  **Q**     And there were again a number of different pollutants were

2  emitted during this event?

3  **A**     Correct.

4  **Q**     And did you detect any odors during that night?

02:52:09   5  **A**     Very, very strong odors.

6  **Q**     You said that you had received information by speaking with

7  an Exxon employee that evening?

8  **A**     Yes, sir.

9          MR. RICE:  Objection, your Honor.  First it

02:52:28   10  mischaracterizes his evidence.  I don't think he testified to

11  that.

12          THE COURT:  I can't hear you.

13          MR. RICE:  I also raise my hearsay objection to any

14  testimony that he gives as to what some purported ExxonMobil

02:52:41   15  employee told him that night.

16          THE COURT:  What's your response?

17          MR. KRATKA:  That it is an admission of a party

18  opponent and, therefore, not hearsay.

19          MR. RICE:  Your Honor, it's not an admission of a

02:52:50   20  party opponent because they haven't identified who this

21  purported Exxon employee is, and if he's not a member of

22  administration or an executive member of Exxon, he doesn't speak

23  for Exxon.

24          THE COURT:  A little more predicate.

02:53:04   25  BY MR. KRATKA:

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Cottar - Direct/Kratka

1   **Q**    Can you describe how you encountered this person who

2   provided information?

3   **A**    Sure.  When I -- I said earlier that -- I called the

4   security booth.  When I finally realized that I -- I didn't feel

02:53:21   5   like I was getting enough information for the safety of my

6   family.  I got in my car, and I drove over -- again, I'm just

7   across the street.  I drove over there to find out, and on the

8   big U-turn that you have to make, I realized that the security

9   booth was Exxon Chemical and that when -- the stacks were

02:53:48  10   Baytown Olefin plant because as I made that U-turn, there were

11   dozens, hundreds, I don't know, dozens -- I'll stick with

12   dozens -- of cars quickly exiting the plant.  That further

13   alarmed me.  And I just simply stopped in front of one of the

14   cars and asked the guy.  I said, What's going on.

02:54:11  15            THE COURT:  Okay.  Hold it.

16   BY MR. KRATKA:

17   **Q**    Did the person identify himself?

18   **A**    He did.

19   **Q**    And what did he -- who did he -- how did he describe who he

02:54:19  20   was?

21   **A**    He didn't give a name.  I didn't ask for a name.  And I

22   won't even describe what he said.  That's just how -- he was

23   coming out of the parking lot.  He did describe himself as an

24   employee, and I asked, you know, "Is everything okay?  What do I

02:54:33  25   need be doing?  This is scaring me."  And that -- and so -- so

Cottar - Direct/Kratka

1   he responded.

2              MR. RICE:  Your Honor --

3              THE COURT:  We haven't heard yet.  We're not there

4   yet.

02:54:45   5              Sir, if you see the other lawyer get up, don't

6   answer the question.

7              THE WITNESS:  Okay.

8              THE COURT:  Go right ahead.

9   BY MR. KRATKA:

02:54:51   10   Q   Did he identify himself as an Exxon employee?

11   A   Yes, sir.

12   Q   And did he say what position he held at Exxon?

13   A   No, sir.

14   Q   Did he describe what his job was in any way at Exxon?

02:55:04   15   A   No, sir.

16   Q   Well, what did he say to you?

17              MR. RICE:  I have to object at this time.

18              THE COURT:  Sustained.

19              MR. KRATKA:  All right.  We'll move on.

02:55:16   20   BY MR. KRATKA:

21   Q   Did you -- did this emission event, this experience that

22   night, concern you in any way?

23   A   Yes, sir, enough that we moved.

24   Q   You earlier described this emission event as a turning

02:55:34   25   point?

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Cottar - Direct/Kratka

1    **A**    Yes, sir.

2    **Q**    Can you explain what you mean by that?

3    **A**    Well, when I look at the STEERS Report here, 4,000 pounds

4    of carbon monoxide 20 -- and that's, you know, again the

02:55:48   5    permitted limit, according to the STEERS Report, is 531 and

6    we're talking about 4,000 pounds.  Almost 3,000 pounds of

7    ethylene which is heavier than air.

8                    That to me coupled with the fact that -- to me

9    it's not so much the emissions.  I understand that -- that

02:56:13  10    facilities like these are going to have problems.  Problems are

11    understandable.  No communication, no idea of how to understand

12    what's safe or what's not, what is truly harmful or things I

13    should run from, trying to call and make contact with every

14    conceivable place that I can think of to get that information

02:56:36  15    and getting no response, that's not worth my family anymore.

16    **Q**    So you decided to move at that point?

17    **A**    So we decided to move.

18                    THE COURT:  Where did you move?

19                    THE WITNESS:  To the 1008 Wright Boulevard home that

02:56:48  20    we bought about six months later.

21                    THE COURT:  That's the second one that you pointed

22    out?

23                    THE WITNESS:  Yes, sir.

24                    THE COURT:  And that you say is, what, about two miles

02:56:56  25    from the plant?

Cottar - Direct/Kratka

1          THE WITNESS:  About two miles.

2   BY MR. KRATKA:

3   Q     Let me ask you about some health issues.  You said you have

4   children?

02:57:05   5   A     Yes, sir.

6   Q     And how old are your children now?

7   A     Now eight, ten, and 14.

8   Q     And do you personally have -- have you had any health

9   issues while living in Baytown?

02:57:18  10   A     I've had asthma most of my life.

11   Q     And what about your family members, have they?

12   A     My wife --

13          MR. RICE:  Objection, your Honor.  I'm going to object

14   to the testimony about extended family member's health.  It's

02:57:32  15   irrelevant.  First of all, it's -- it's irrelevant to the claims

16   in this case.

17          THE COURT:  Where is it irrelevant to the claims in

18   the case?

19          MR. RICE:  Because they're not standing members in the

02:57:42  20   organizations that are suing Exxon.  Mr. Cottar is a standing

21   member; and if he wants to ask Mr. Cottar about his health

22   problems that he attributes to Exxon, I certainly think that's

23   relevant to the case; but anybody outside of Mr. Cottar is not

24   relevant to the case.

02:57:58  25          THE COURT:  What's your response, please?

Cottar - Direct/Kratka

1          MR. KRATKA:  Response is that to the extent that

2    health impacts on his family personally impact Mr. Cottar,

3    they're certainly relevant.

4          THE COURT:  I'll use it -- I'm going to allow it in

02:58:10  5    for a limited purpose, to show the reason why he moved, his

6    reason that he moved.  Beyond that I understand it, and I'm not

7    going to -- I understand that we're going to look at medical

8    testimony later on linking up and so forth.  So at this point

9    for that limited purpose as to why he took certain actions, I'll

02:58:29  10   allow it in for that limited purpose.  Now, if it was a jury --

11   if it was a jury case, it might be different.  Okay.  Go on.

12   The ruling might be different out of an abundance of caution to

13   a jury.  Go right ahead.

14   BY MR. KRATKA:

02:58:45  15   Q    Mr. Cottar, is your -- I'm sorry.  I don't know if you got

16   to complete your answer as to --

17          THE COURT:  You say your children and spouse have some

18   problems, health problems; is that correct.

19          THE WITNESS:  Correct.  Two of my kids have asthma.

02:58:57  20   My wife has asthma.  I have asthma.

21   BY MR. KRATKA:

22   Q    And where is your wife from?

23   A    Baytown.

24   Q    Born and raised in Baytown?

02:59:07  25   A    Yes, sir.

Cottar - Direct/Kratka

1  Q    And your children have always lived in Baytown?

2  A    Yes, sir.

3  Q    Do your health issues, your asthma, and do the health

4  issues you've described with your family play any role in your

02:59:26  5  concern about emissions from the Baytown Complex?

6            THE COURT:  That's a yes or no.

7            THE WITNESS:  Can you restate that again?

8            THE COURT:  Do you want it read back?

9            THE WITNESS:  Sure.

02:59:37  10            THE COURT:  Gayle, please.

11        (The last question was read.)

12            THE WITNESS:  Yes.

13  BY MR. KRATKA:

14  Q    And what role do they play?

02:59:53  15  A    I certainly can't say that there's a causal role.  I will

16  say that there's definitely --

17            THE COURT:  Now you're objecting?

18            MR. RICE:  No.  No, sir.

19            THE COURT:  Okay.  That's the beauty of a non-jury

03:00:06  20  case.  Go right ahead.  You may answer the question.

21            THE WITNESS:  I can't say that there's a causal role,

22  but I have noticed a corollary relationship at least in that --

23  living in that town home right across the street, we have a

24  nebulizer with a lot of albuterol for our health issues for the

03:00:30  25  asthma.  When we lived there, we were using that nebulizer

Cottar - Direct/Kratka

1   almost on a monthly basis.  Someone in the family was that bad

2   off that they were using that.  A year and half later, we've

3   moved, and it's never come out of the packing box.

4          THE COURT:  You're talking about a nebulizer.  Is that

03:00:49   5   an individual inhaler or something that mists in the air?

6          THE WITNESS:  It's sort of the gas mask looking

7   inhaler.

8          THE COURT:  Okay.

9   BY MR. KRATKA:

03:01:01   10   Q   The fact of your own asthma, whether or not you're

11   attributing your asthma to Exxon, does the fact that you have

12   asthma play any role in your own concern about your own exposure

13   to air emissions?

14   A   Yes.

03:01:16   15   Q   What role does it play?

16   A   Again just going by the location and my own experiences, it

17   seems to me that every time there was one of these events that

18   had that pungent odor there was some sort of asthma-related

19   reaction.  It -- to me it seems to exacerbate the issue for us.

03:01:51   20   Q   Do you know whether or not Exxon emits any -- based on your

21   review of STEERS reports, whether or not Exxon emits any

22   pollutants that are capable of causing cancer?

23   A   Yes.

24          MR. RICE:  Objection.  Your Honor, speculation, first

03:02:06   25   of all; lacks foundation.

Cottar - Direct/Kratka

1          THE COURT:  Read it back.  I'll listen.  Let me hear

2    it one more time.

3        (The last question was read.)

4          THE COURT:  Sustain the objection.

03:02:39  5  BY MR. KRATKA:

6    Q    Mr. Cottar, do you know whether or not benzene is a human

7    carcinogen?

8             MR. RICE:  Same objection, your Honor.

9             THE COURT:  Sustain the objection.

03:02:55  10             Based upon what you know, you were really

11   concerned and still are, correct?

12            THE WITNESS:  Yes, sir.

13   BY MR. KRATKA:

14   Q    Mr. Cottar, what do you and your family do for recreation

03:03:05  15  in Baytown?  Do you ever spend time outdoors?

16   A    We do.  There is --

17            THE COURT:  Yes.  Next question.  A lot easier as far

18   as getting your points out.  If you want to ask him to describe,

19   that calls for a narrative.

03:03:18  20  BY MR. KRATKA:

21   Q    Would you describe what your outdoor recreational

22   activities are with your family in Baytown?

23   A    Sure.  There are about three different places that we like

24   to spend time at outdoors.  One is a park close to where we live

03:03:35  25  now, Roseland Park.  Then there are two different Baytown nature

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Cottar - Direct/Kratka

1    facilities.  One is the Eddie Gray Wetlands Facility and the

2    other one, I believe, is just called the Baytown Nature Center,

3    I believe, is the actual name, the Baytown Nature Center.

4    **Q**    Can you point out the location of these centers on the

03:04:05   5    Baytown map?

6    **A**    Yes.  It may take me a minute to orient myself.  The

7    Baytown Nature Center is approximately right in here and the --

8            MR. KRATKA:  Just let the record reflect that the

9    witness is pointing to a location just to the west of the

03:04:23  10    Baytown Complex.

11            THE WITNESS:  And the wetlands center, I believe, is

12    right around here.

13            THE COURT:  Where is the water?  Wetlands center, is

14    that stream below, coming in below?

03:04:40  15            THE WITNESS:  I believe it's Goose Creek, yes, sir.

16    BY MR. KRATKA:

17    **Q**    Mr. Cottar, perhaps you could just circle on the map here

18    with a pen so the Court has a recollection of where those two

19    locations are.

03:04:58  20    **A**    Right there is the wetlands center.

21    **Q**    Just put your initials, R. C. or S. C., next to that.

22    **A**    And then approximately right here is the Baytown Nature

23    Center.

24    **Q**    While you're -- while I have you here, why don't you circle

03:05:16  25    the area where your Briar Court home was.


Gayle Dye, CSR, RDR, CRR - 713.250.5582

Cottar - Direct/Kratka

         1          THE COURT:  Why don't you put like a one and then a

         2  two.  The first one is a one and the second one is -- and put a

         3  circle around that.  I can't see it.  It's a little bit off

         4  the --

03:05:39 5          MR. KRATKA:  I'm just going to put his initials next

         6  to this.

         7  BY MR. KRATKA:

         8  Q    That's -- you go by your middle name, Shae Cottar?

         9  A    Yes.

03:05:47 10 Q    So S. C., thank you.

        11          Has your use of these outdoor recreational areas

        12  been affected in any way by air quality concerns?

        13  A    Yes, sir.

        14  Q    How so?

03:06:07 15 A    First of all, on high ozone days with our asthma, we try to

        16  stay indoors, and that can vary from location to location.  But

        17  the second thing is, with the Baytown Nature Center, that's

        18  right there next to the fence for ExxonMobil.  If there are

        19  emissions events going on, there have been a few times when

03:06:33 20 we've gone over there, we see an emission event.  We just don't

        21  stay.

        22  Q    And has moving farther away from the Exxon complex now in

        23  your second location, has that eliminated your concerns about

        24  air emissions from the Exxon facility?

03:06:50 25 A    No.

                   Gayle Dye, CSR, RDR, CRR - 713.250.5582

Cottar - Direct/Kratka

1  Q    Why hasn't it?

2  A    Well, number one, it still hasn't eliminated our

3  experiences.  The experiences have grown increasingly more

4  limited, but it's still a community that I love.  My family

03:07:13  5  lives there.  I have extended family that lives there.  And I --

6  you know, I've invested there.  I've lived my whole life there.

7  I've owned property there.  And to me these are issues of

8  investment and issues of community.

9  Q    And you understand that Exxon has air operating permits?

03:07:31  10  A    Yes, sir.

11  Q    And do you understand that those permits allow the company

12  to emit certain authorized amounts of pollutants into the air?

13  A    Yes, sir.

14  Q    And do you want to breath any pollutants that are not

03:07:43  15  authorized by those permits?

16  A    No, sir.

17  Q    Okay.  And if Exxon were to reduce its emissions of

18  unauthorized pollutants, would that serve to lessen your

19  concerns any about air quality in Baytown?

03:07:58  20  A    Yes, sir.

21          MR. KRATKA:  That's all I have for now.

22          THE COURT:  Thank you.

23          MR. RICE:  May I proceed, your Honor?

24          THE COURT:  Yes.

03:08:06  25  //

Gayle Dye, CSR, RDR, CRR - 713.250.5582

```
 1                        CROSS EXAMINATION
 2  BY MR. RICE:
 3  Q    Good afternoon, Mr. Cottar?
 4  A    Hi.
 5  Q    You also go by the name Shaeman on the Internet?
 6  A    Yes, sir.
 7  Q    Is that your blog Shaeman dot-com?
 8  A    It is.
 9           THE COURT:  How do you spell it?
10           THE WITNESS:  S-h-a-e-m-a-n.
11  BY MR. RICE:
12  Q    I want to talk about how you got involved in this lawsuit.
13  A    Okay.
14  Q    I think that you testified -- first of all, you understand
15  that this lawsuit was filed in December of 2010, right?
16  A    Yes, sir.
17  Q    Okay.
18           MR. RICE:  And, in fact, Judge, can we switch the
19  monitors over to --
20  BY MR. RICE:
21  Q    And in December of 2010, you were working for this group
22  Air Alliance Houston, correct?
23  A    That's correct.
24  Q    And Air Alliance Houston is another environmental advocacy
25  group much like the Plaintiffs in this case; is that correct?
```

03:08:11
03:08:21
03:08:30
03:08:38
03:09:13

 1  **A**     Correct.

 2  **Q**     And in fact --

 3              THE COURT:  Blow that up a little bit.

 4              MR. RICE:  Can you just pull out the top line there?

03:09:31  5  BY MR. RICE:

 6  **Q**     Isn't it true, sir, that part of Air Alliance Houston's

 7  mission is to, as it says there, reduce air pollution, but

 8  specifically through things such as advocacy, right?

 9  **A**     Yes, sir.

03:09:43  10              MR. RICE:  And, Hien, if you can go to the second

11  highlighted area, please.

12  BY MR. RICE:

13  **Q**     That advocacy involves litigation?

14  **A**     Yes, sir.

03:09:56  15  **Q**     Litigation to try to further that environmental advocacy

16  group's goals, right?

17  **A**     Yes, sir.

18              MR. RICE:  And, Hien, if you'll show us the third

19  piece of this page, please.

03:10:07  20  BY MR. RICE:

21  **Q**     In fact, Air Alliance partners with groups such as

22  Environment Texas and Sierra Club, Lone Star Chapter, the very

23  Plaintiffs in this case, do they not?

24  **A**     Yes, sir.

03:10:20  25  **Q**     Now, as I understand your testimony, you began working for

Cottar - Cross/Rice

1   Air Alliance Houston sometime in the summer of June, 2010.  Now,

2   is it May or June that you started with Air Alliance?

3   **A**    I believe it was May.

4   **Q**    So, you started with Air Alliance Houston about the same

03:10:39  5   time that you moved into your house at Briar Court; is that

6   right?

7   **A**    I moved into the house in April.

8   **Q**    And it was through your employment with Air Alliance

9   Houston that you first became familiar with this lawsuit which

03:10:53  10   at the time was just an impending lawsuit, right?

11   **A**    Correct.

12   **Q**    Because when you first -- you first joined Air Alliance, it

13   was your director there, Mr. Tejeda, who got you connected with

14   Mr. Kratka's firm; is that correct?

03:11:09  15   **A**    Correct.

16   **Q**    His organization, the National Center for --

17          MR. KRATKA:  The National Environmental Law Center.

18          MR. RICE:  Thank you very much.  The National

19   Environmental Law Center.

03:11:21  20   BY MR. RICE:

21   **Q**    In fact, was Mr. Tejeda -- it was Mr. Tejeda, your

22   executive director at Air Alliance?

23   **A**    Yes, sir.

24   **Q**    He told you that there was something going on in Baytown

03:11:32  25   that you ought to know about?  He asked you because he knew you

Cottar - Cross/Rice

1    lived in Baytown, right?

2    **A**    He knew of the experiences that I had already had, yes,

3    sir.

4    **Q**    He knew you lived in Baytown?

03:11:40    5    **A**    Yes, sir.

6    **Q**    Mr. Tejeda, being the executive director of Air Alliance

7    said, "Hey, you live in Baytown.  There's something going on

8    over there that you need to know about"; isn't that true?

9              MR. KRATKA:  Objection, your Honor.  He's creating a

03:11:49    10    dialogue for a conversation he's not a part of.

11              THE COURT:  Overruled.

12              THE WITNESS:  Could you restate that?

13              MR. RICE:  Could you read the question back?

14              THE COURT:  I'll tell you what, let's state it again.

03:11:55    15    It will be a lot quicker.

16    BY MR. RICE:

17    **Q**    Mr. Tejeda was the executive director of Air Alliance,

18    correct?

19    **A**    Yes.

03:12:02    20    **Q**    You had went to work for Mr. Tejeda as executive director

21    at Air Alliance, correct?

22    **A**    Correct.

23    **Q**    He knew you lived in Baytown?

24    **A**    Correct.

03:12:10    25    **Q**    He came to you and said, "There's something going on in

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Cottar - Cross/Rice

 1  Baytown that you need to know about"?

 2  A    Correct.

 3  Q    Okay.  And then you got in touch with Mr. Kratka's group,

 4  the National Center For Environmental Law, true?

03:12:24   5  A    Correct.

 6  Q    Now, when you first got in touch with Mr. Kratka's

 7  organization, that was in the late summer, early fall of 2010,

 8  correct?

 9  A    I would say, to the best of my knowledge and memory, it was

03:12:46  10  probably late fall, not late summer or early fall.

11  Q    So it was late fall of 2010.  And Mr. Kratka's group then

12  informed you about this lawsuit that they were thinking about

13  filing, correct?

14  A    Correct.

03:13:05  15  Q    And he told you about a press conference they were going to

16  have?

17  A    Correct.

18  Q    He invited you to the press conference?

19  A    Correct.

03:13:14  20  Q    You attended that press conference?

21  A    Correct.

22  Q    Now -- and the purpose of that press conference was to

23  announce the filing of this lawsuit; is that -- is that correct?

24  A    Yes, sir.

03:13:30  25  Q    And it was just a few weeks before this press conference

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Cottar - Cross/Rice

1   that you were told by Mr. Kratka's group that you might be a

2   witness in this case, that you would be a good witness in this

3   case?

4   **A**    I don't know about the time line.

03:13:42   5   **Q**    Now, when did you become a member of the Sierra Club?

6   **A**    I'm sure their records can say that.

7            THE COURT:  You said, what, about 2011 somewhere?

8            MR. RICE:  Hien, can you bring up Plaintiffs' Exhibit

9   345, please.

03:13:59   10            And can you pull up the -- first of all, let's

11   pull up the name and address up at the top if you would, please.

12   BY MR. RICE:

13   **Q**    So this is -- this is an exhibit that the Plaintiffs have

14   put in the record in this case, shows Shae Cottar.  That's you,

03:14:27   15   correct?

16   **A**    Correct.

17   **Q**    3206 Briar Court.  That was the address you were living in

18   at the time?

19   **A**    Yes, sir.  Correct.

03:14:33   20            MR. RICE:  And now, Hien, if you would please, show

21   the second part where -- where it has the date.

22   BY MR. RICE:

23   **Q**    Okay.  So does that help you remember when you first became

24   a member of the Sierra Club?

03:14:56   25   **A**    Yes, sir.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Cottar - Cross/Rice

1    Q    Which is October 4, 2010, correct?

2    A    Correct.

3    Q    Which happens to coincide with the first time that you

4    became connected with Mr. Kratka and his organization out of

03:15:09  5    Boston; is that correct?

6    A    It does happen so, yes, sir.

7    Q    Now, before you began work for Air Alliance, you were not a

8    member of Sierra Club, correct?

9    A    I had never heard of Sierra Club, correct.

03:15:20  10   Q    You were not a member of Environment Texas at the time?

11   A    Correct.

12   Q    In fact, you're still not a member of Environment Texas.

13   Have I got that correct?

14   A    Correct.

03:15:30  15   Q    Now -- so if you first became a member of Sierra Club in

16   October 4, 2010, you'd agree with me that you weren't a member

17   of the Sierra Club on November 30, 2009; is that correct?  Do

18   you agree with that?

19   A    Correct.

03:15:52  20         MR. RICE:  Hien, can you bring up the 395?

21   BY MR. RICE:

22   Q    By the way, are you aware that before the Plaintiffs'

23   environmental advocacy groups like these can file suit, they

24   have to give notice to certain -- they have to give notice to

03:16:16  25   the entities they intend to sue?  Do you understand that?

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Cottar - Cross/Rice

1    A    Yes, sir.

2    Q    They also have to give notice to some of the regulatory

3    agencies and government agencies.  Do you understand that?

4    A    It makes sense.

03:16:27   5    Q    Were you aware, sir, that the Plaintiffs in this case had

6    given notice to Exxon November 30, 2009 --

7    A    No, sir.

8    Q    -- that they intended to sue Exxon?

9    A    No.  That's the first time I heard this.

03:16:44   10    Q    Well, I will submit to you --and it's there on the

11    screen -- an exhibit that Mr. Nicholas put in the record today

12    as an exhibit declaring that they timely filed notice and the

13    first notice they gave was November 2, 2009.

14    A    Okay.

03:17:10   15    Q    But you weren't a Sierra Club member at the time, were you?

16    A    No, sir.

17    Q    Now, you gave a deposition in this case back in May of

18    2012.  Do you remember that?

19    A    Yes, sir.

03:17:19   20    Q    I took your deposition in our office here in Houston?

21    A    I remember that.

22    Q    And at the time you told me that you had never attended any

23    Sierra Club meetings?

24    A    I had -- I don't have any recollection of that, but I'm

03:17:31   25    sure if the deposition shows that, that's the case.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Cottar - Cross/Rice

1   **Q**    Well, and I just wonder, has that changed since you joined

2   the team?

3   **A**    No, sir.

4   **Q**    Now, as of May 14, 2012, at your deposition, you also had

03:17:47   5   never taken part in Sierra Club activities.  That's what you

6   told me that day.

7   **A**    Okay.

8   **Q**    Has that changed since you joined the team?

9   **A**    May I answer more than a yes or no?

03:18:00   10          THE COURT:  If you can't answer yes or no -- just so

11   state if you can't answer it yes or no.

12          THE WITNESS:  I can't answer that yes or no.

13          THE COURT:  All right.  Do you want to follow up or do

14   you want --

03:18:08   15   BY MR. RICE:

16   **Q**    Aside from joining the team and being here today in this

17   Sierra Club activity, have you taken part in any other Sierra

18   Club activity since you joined the team?

19   **A**    Yes, sir.

03:18:19   20   **Q**    Now, I want to talk about where you've lived because you

21   testified earlier that there's been a couple of moves -- in

22   fact, there's been three or four moves in the past 12 or 15

23   years, right?

24   **A**    Three.

03:18:38   25   **Q**    Okay.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Cottar - Cross/Rice

1          MR. RICE:  Hien, can you bring up the first slide,

2  please?

3  BY MR. RICE:

4  Q    Now, this is your current address, right, 1008 Wright

03:18:50   5  Boulevard?

6  A    Correct.

7  Q    I think you testified -- or you said about -- approximately

8  two miles, but give or take two miles or so?

9  A    Sure.

03:18:56  10          THE COURT:  What do you mean give or take two miles?

11  It says approximately three miles on your graphic.

12          MR. RICE:  Well, your Honor --

13          MR. KRATKA:  Objection, your Honor.  There's no

14  foundation for this exhibit or for the mileage numbers.

03:19:08  15          THE COURT:  Overruled.  Let's see what he says because

16  I saw that, too.  All right.  Where do you get three from?

17          MR. RICE:  Your Honor, we approximated it at three

18  miles.  The witness earlier approximated it at two miles.

19          THE COURT:  Very well.  Move on.  Gotcha.  Go on.

03:19:20  20               I shouldn't use that term.  I understand.

21          MR. RICE:  Yes, sir.

22  BY MR. RICE:

23  Q    Nonetheless, the address is correct, yes?

24  A    Yes, sir.

03:19:28  25  Q    And you moved to that address August, 2012, right?

Cottar - Cross/Rice

1  A    Correct.

2  Q    Okay.

3        MR. RICE:  Hien, if you'll bring up the next.

4  BY MR. RICE:

03:19:36  5  Q    Now, prior to moving to your current residence, you lived

6  at 3206 Briar Court which you told us earlier you approximated

7  at a quarter mile, right?

8  A    Yes, sir.

9  Q    So we have a difference in the approximations; but,

03:19:50  10  nonetheless, we're not off too far, right?

11        MR. KRATKA:  Objection, your Honor.  It's unclear

12  what -- the distance between which two points are being

13  estimated.

14        THE COURT:  Overruled.

03:20:04  15  BY MR. RICE:

16  Q    The address is correct, sir?

17  A    Yes, sir.

18  Q    The dates are correct?  Are those the dates at which you

19  lived at Briar Court?

03:20:12  20  A    Yes, sir.

21  Q    Is Briar Court also sometimes known as Shady Hill Street?

22  A    No, sir.

23  Q    Okay.  Well, I'm not trying to trick you.  The only reason

24  I ask is because in your declaration that you gave in this case,

03:20:29  25  I think you said it was Shady Street and at your deposition you

Cottar - Cross/Rice

1  said it was Briar Court.  And so I want to be -- I want to make

2  sure that the more accurate --

3  **A**    The street -- and I thought I articulated this in my

4  deposition, but I may not have.  The front of the townhouse

03:20:42   5  faces Shady Hill Street, but my mailbox is on Briar Court.

6  Therefore, my address is Briar Court.

7  **Q**    Very well.  Now -- and this is where you were living at the

8  time you went to work for Air Alliance Houston?

9  **A**    Correct.

03:21:04   10           MR. RICE:  Okay.  Hien, if you would please bring up

11  the next.

12  BY MR RICE:

13  **Q**    Now, prior to the -- to living at the Briar Court address,

14  you lived at Tri City Beach Road for a year, right?

03:21:16   15  **A**    Yes, sir.  A little less but 11 months.

16  **Q**    Okay.  And so would those dates be correct, May, 2009, to

17  May, 2010, or what are the correct dates?

18  **A**    May, 2009, to April, 2010.

19  **Q**    And before you lived at the Tri City Beach Road -- and let

03:21:39   20  me go back.  I think that you had told us once or you told us at

21  the deposition, I believe, that it was about 15 to 20 miles from

22  the Tri City Beach Road where you lived to the complex.  Does

23  that sound right?

24  **A**    I don't have any recollection of that, sir; but again, if

03:22:01   25  it's in the deposition, I'm sure I did.

Cottar - Cross/Rice

1  Q    Well, is that not -- is that not a -- the right mileage?

2  Between the Tri City Beach Road and the ExxonMobil Baytown

3  Complex, how many miles is it, do you know?

4  A    I don't know, sir.

03:22:21   5         THE COURT:  Now, you're saying he said one time one --

6  a different one in his deposition, correct?

7         MR. RICE:  Yes, sir.

8         THE COURT:  All right.  Show him the deposition.  If

9  it's not going to matter to you, move on then.

03:22:33  10         MR. RICE:  Hien, could you pull up page 14, lines 17

11  through 22.

12         THE COURT:  Why don't you just read it in.

13  BY MR. RICE:

14  Q    Let's do it this way.  Let's go back to our map.

03:23:48  15  Mr. Cottar, I'm not trying to trip you up.  I've just -- I just

16  want to make sure that we're accurate or at least have an

17  accurate approximation.  And I will -- I will represent to

18  you -- and I can show you your deposition if you'd like; but at

19  your deposition back in May of 2012, you told us that it was 15

03:24:03  20  to 20 minutes -- or 15 to 20 miles -- that it was 15 to 20 miles

21  from the Tri City Beach Road to -- and on 17 I asked the

22  question, "At the Tri City Beach Road residence that you lived

23  at prior to moving to Briar Court, how far would that be from

24  the ExxonMobil complex?"  And on line 22 you answer?

03:24:49  25  A    Okay.

Cottar - Cross/Rice

1    **Q**    What was your answer?

2    **A**    "15 to 20 miles."

3    **Q**    Now, I'm just asking you, is that an -- is that an accurate

4    approximation that you gave us back in May of 2012?

03:24:58    5    **A**    I would -- I would say no.

6    **Q**    What would you say today was the accurate -- most accurate

7    approximation of the miles between your Tri City Beach Road and

8    the ExxonMobil complex, if you know?

9    **A**    I couldn't tell you the mileage.

03:25:16    10    **Q**    Okay, very well.  Let's -- before you moved to Tri City

11    Beach Road, you lived on Cherokee Street, correct?

12    **A**    That's correct.

13    **Q**    And you lived there for 12 years?

14    **A**    Right.

03:25:34    15    **Q**    From approximately sometime in 1997 to May of 2009, would

16    that be correct?

17    **A**    I believe it was -- that sounds about right.

18    **Q**    And I think you told us earlier that it was about a

19    15-minute drive from that location to the ExxonMobil complex?

03:25:48    20    **A**    Yes, sir.

21    **Q**    Now, you were living at the Tri City Beach Road address on

22    November 30, 2009, correct?

23    **A**    Correct.

24    **Q**    And we already know that you weren't a -- you were not a

03:26:07    25    Sierra Club member on that date?

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1    **A**    Correct.

2    **Q**    Now, is it interesting to you that -- well, let's do this.

3    Would you agree with me, sir, that the Baytown area is a very

4    industrial area?

03:26:30    5    **A**    Yes, sir.

6    **Q**    Entire ship channel very industrialized?

7    **A**    Yes, sir.

8    **Q**    A number of industrial facilities?

9    **A**    Yes, sir.

03:26:36    10    **Q**    A number of other refineries?

11    **A**    Yes, sir.

12    **Q**    A number of other chemical companies, chemical facilities?

13    **A**    A couple.

14    **Q**    Well, now, a couple that you know of?

03:26:49    15    **A**    That I know of.  Yes, sir.  You asked if I would agree

16    and --

17    **Q**    Sure, sure.  Okay.  Now, you testified earlier that it was

18    only until you moved to Briar Court -- or let's put it this way.

19    Before you moved to Briar Court in April of 2010, your concerns

03:27:08    20    or complaints were mostly just the general smells?

21    **A**    That is correct.

22    **Q**    General Baytown odors, right?

23    **A**    Correct.

24    **Q**    So prior to April of 2010, there aren't any specific events

03:27:21    25    or specific occurrences that you can point to and say that event

Cottar - Cross/Rice

1   or that date and time concerned me as a Baytown resident?

2   **A**   Correct.

3   **Q**   Now, sir, you understand that Exxon has permits that allow

4   it to emit certain amounts of contaminants?

03:27:44   5   **A**   Yes, sir.

6   **Q**   And these permits allow them to emit these certain -- at

7   certain times any day of the -- any time of the day?

8   **A**   Yes, sir.

9   **Q**   Any day of the week?

03:27:53   10   **A**   Yes, sir.

11   **Q**   Any week of the year?

12          Now, you also understand, sir, that a flaring

13   event can be an emission event like some of these that you've

14   already talked about?

03:28:12   15   **A**   Right.

16   **Q**   But it can also be a permitted activity, you understand

17   that?

18   **A**   Yes, sir.

19   **Q**   Now, you talked about some specific events earlier, and I

03:28:32   20   want to go through -- I want to go down through those.

21   **A**   Okay.  Yes, sir.

22   **Q**   And I want to make a list and I want you to be as specific

23   as you can and tell me each and every event that has affected

24   you and you've witnessed at Baytown -- at the Baytown Complex.

03:28:45   25   Can we do that?

Cottar - Cross/Rice

1          THE COURT:  Affected or observed or what?

2    BY MR. RICE:

3    **Q**    Let's do it this way.  I want to make a list of every

4    specific event that you can recall that you complained about as

03:28:58   5    part of this lawsuit.  How's that?

6    **A**    I don't know if I'm ready to do that right now.

7    **Q**    Well, this is -- there's no other time to do it, sir.  This

8    is the time.  This is trial.  Okay.  Now, you've already

9    identified three that's in your direct examination.  We'll write

03:29:15   10   those down, but we'll go through the rest of them, okay?

11   **A**    Okay.

12          MR. RICE:  Judge, may I use your flip chart?

13          THE COURT:  Sure.

14   BY MR. RICE:

03:29:39   15   **Q**    All right.  Earlier you testified that there was a

16   particular event on July 26, 2011, correct?

17   **A**    Correct.

18   **Q**    And this was one of them that you videoed early in the

19   morning, correct?

03:30:14   20   **A**    Correct.

21   **Q**    And Mr. Kratka showed you a STEERS report that you

22   testified links up to that event, the time that you witnessed

23   it, true?

24   **A**    Right.

03:30:21   25   **Q**    And that was part of Exhibit -- or, yeah, part of

Cottar - Cross/Rice

1  Plaintiffs' Exhibit 17.  I believe the number, if I'm not

2  mistaken, the STEERS number was 157283.  That was the first one.

3  Now, are you certain that that event occurred on July 26, 2011?

4  **A**    Yes, sir.

03:30:43   5           MR. RICE:  And if I could, Mary, could I get you to

6  replay that video, just the first video that you showed on

7  direct.

8           MR. NICHOLS:  398.

9           MR. RICE:  That's Exhibit 398, please, and I think

03:31:00  10  we'll need to flip it.

11           THE WITNESS:  May I interject something, your Honor?

12           THE COURT:  Yeah, sure.

13           THE WITNESS:  I just wanted to make sure that I'm

14  double-checking the STEERS reports.  I've experienced a lot.

03:31:14  15  This is my first time to ever do this, and I just honestly want

16  to make sure.  Yes.  Okay.  If I'm going to answer definitively,

17  I'd like to have --

18           THE COURT:  All right.  Let's go.  What's next?  What

19  do you want?

03:31:31  20           MR. RICE:  It's Exhibit 398, and I think if Ms. Rock

21  will be kind enough to replay it for us, I'd appreciate it.

22  BY MR. RICE:

23  **Q**    And so your testimony, sir, is that it's July 26 based on

24  what you saw on that -- on the phone?

03:32:05  25  **A**    No, sir.

Cottar - Cross/Rice

1  Q    You specifically recall that it was July 26th?

2  A    Yes, sir.

3  Q    Very well.

4       (Plaintiffs' Exhibit 398 was played in open court.)

03:32:13  5       MR. RICE:  Thank you.

6  BY MR. RICE:

7  Q    Now, the second event that you testified about was on

8  September 30, 2011, true?

9  A    True.

03:32:21  10  Q    And you also testified that you -- subsequent to that event

11  you went on the STEERS database and looked to see if it was

12  reported?

13  A    Yes, sir.

14  Q    And, again, Mr. Kratka showed you that STEERS Report, and

03:32:41  15  that number was 159900; am I right?

16  A    Yes, sir.

17  Q    And then, finally, you testified about an emission event on

18  May -- in May of 2012, correct?

19  A    Yes, sir.

03:33:08  20  Q    And that was the 22nd of May, I believe?

21  A    Correct.

22  Q    And you have those STEERS reports in front of you that

23  Mr. Kratka showed you on direct.  So you can correct me if I'm

24  wrong, but the STEERS number on that event was 168810, right?

03:33:28  25  A    Correct.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Cottar - Cross/Rice

1  **Q**    Okay.  Now, what other events, Mr. Cottar, can you testify

2  about here today that you've witnessed out at the Baytown

3  Complex?

4  **A**    Many.

03:33:57  5  **Q**    Okay.  Well, let's start with the first ones.  What's the

6  date?  What's the first date?

7  **A**    I can't give you specific dates.

8  **Q**    Okay.  Well, let me help you out.  You made out a

9  declaration in this case, right?  Do you remember that?

03:34:11  10  **A**    Yes, sir.

11  **Q**    And in your declaration --

12        MR. RICE:  And if we may flip the audio -- or the

13  video, please.

14            And, Hien, if you would, please bring up

03:34:27  15  paragraph 19.

16  BY MR. RICE:

17  **Q**    In your declaration, Mr. Cottar, you state that in March,

18  2011, while you were on a tour of the Houston Ship Channel, you

19  saw flaring from your house.  Do you recall that?

03:34:38  20        THE COURT:  Shown what from your house?

21        MR. RICE:  Flaring.

22        THE COURT:  From his house?

23        MR. RICE:  From his house.

24        THE COURT:  Well, he was --

03:34:50  25        MR. KRATKA:  Objection.  He was on the ship channel?

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Cottar - Cross/Rice

1                 THE COURT:  Yeah, I don't understand.  He was on the

2    ship channel?

3    BY MR. RICE:

4    Q    Well, Mr. Cottar, let me ask you this:  Can you explain

03:34:56   5    that?  Can you recall this event of March, 2011?

6    A    Yes, sir, I can.

7    Q    And do you recall what specific day in March of 2011?

8                 THE COURT:  What are we looking at up on the screen?

9                 MR. RICE:  Your Honor, this is a declaration that

03:35:06   10   Mr. Cottar made out in this case and brought to his deposition.

11                THE COURT:  Okay.

12                THE WITNESS:  I can't recall a specific date, no, sir.

13   BY MR. RICE:

14   Q    Do you recall, was it on the weekend?

03:35:17   15   A    No, sir.

16   Q    It was during the week?

17   A    I believe so.

18   Q    And am I right in that you were a part of a group that was

19   touring the ship channel?

03:35:29   20   A    I was not in the group, no, sir.

21                THE COURT:  You weren't in the group?

22                THE WITNESS:  No, sir.

23   BY MR. RICE:

24   Q    The group ended up coming to your house at some point,

03:35:41   25   right?

                 Gayle Dye, CSR, RDR, CRR - 713.250.5582

Cottar - Cross/Rice

1  **A**    Yes, sir.

2          THE COURT:  After they toured the ship channel, they

3  came to your home?

4          THE WITNESS:  Yes, sir.

03:35:48  5  BY MR. RICE:

6  **Q**    Now, was your -- your home was a tour stop?

7  **A**    Yes, sir.

8  **Q**    And this was an environmental group, right?

9  **A**    It was a -- it was a large number of people, some in

03:35:56  10  environmental groups, some not.

11  **Q**    Okay.  But, nonetheless, in March of 2011 during a weekday

12  at some point, there was what you claim an event that you saw

13  flaring?

14  **A**    Yes, sir.

03:36:11  15          MR. KRATKA:  Object -- well, objection.  Looking at

16  the record, it mischaracterizes the statement of the testimony.

17  It does not say that there was an event.  He said there was

18  flaring going on.

19          THE COURT:  Overruled.  He said yes.

03:36:25  20  BY MR. RICE:

21  **Q**    Did you happen to go on the TCEQ website, like you've done

22  these other three, and try to determine if an event was

23  recorded?

24  **A**    No, sir.

03:36:33  25  **Q**    Did you make a complaint to Exxon about that particular

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Cottar - Cross/Rice

1   day?

2   **A**   I did not.

3          MR. RICE:   Now, Hien, if you will, bring up paragraph

4   7 of the declaration.

03:36:49   5   BY MR. RICE:

6   **Q**   You also say here, looks like, in the second sentence

7   several times in June and July of 2011 strong smells woke you up

8   in the middle of the night.

9   **A**   Yes, sir.

03:36:59   10   **Q**   Now, can you give us any specific dates in July of -- June

11   and July of 2011 where you --

12   **A**   No, sir.

13   **Q**   You can't -- you can't link this up to any specific

14   emission event?

03:37:13   15   **A**   Not here right now today.

16   **Q**   Now, you go on to say that you later looked at reports of

17   upset events on the TCEQ website and saw that these upset events

18   had occurred at the same times and dates, but you're telling

19   this Court that you can't provide this Court any specific about

03:37:37   20   these particular events in June or July of 2011?

21   **A**   That's correct.

22   **Q**   You also earlier testified that there were times when you

23   were taking your family to the nature center when there -- the

24   Baytown Nature Center when there might be a flaring event or an

03:38:05   25   emission event.  Do you recall that testimony?

1    A      Yes, sir.

2    Q      Tell me about those times.  What dates have you been out to

3    the Baytown Nature Center and have experienced an emission event

4    or what you claim to be an emission event coming from the

03:38:18   5    ExxonMobil complex?

6            THE WITNESS:  Your Honor, I can't say a specific date

7    off the top of my head, but I have a picture that has a date on

8    it, if I can show that.

9    BY MR. RICE:

03:38:39   10   Q      Are you referring to the picture that you showed me during

11   your deposition?

12   A      No, sir.

13   Q      Does this picture show the date that you were at the --

14   A      It doesn't show the date the picture was taken, but it

03:38:49   15   shows the date the picture was posted, and the two were the same

16   date.

17           THE COURT:  Posted being where, online?

18           THE WITNESS:  On Facebook, yes, sir.

19   BY MR. RICE:

03:38:59   20   Q      Do we have this photo?

21   A      If I can pull it up.  My phone was almost dead earlier.

22   Q      While you're doing that, Mr. Cottar, are there any other

23   times, specific dates that you can tell -- that you can give

24   this Court that you've experienced what you thought was an

03:39:51   25   emission event from Exxon and subsequently verified that through

 1  the STEERS website?

 2  **A**    No, sir.

 3  **Q**    Are there any other dates that you can give this Court when

 4  you experienced what you thought was an emission event

 5  regardless of whether you verified it on the STEERS website?

 6  **A**    Not specific dates.

 7  **Q**    Okay.  Do you recall the date on which you took this photo

 8  that you're getting ready to show us?

 9  **A**    If I can pull it up.

10          THE COURT:  Counsel, do you want to give him some time

11  to pull it up?  It's been almost an hour and a half that we've

12  been in session.

13          MR. RICE:  I think, Judge, if we look at this photo,

14  then we can --

15          THE COURT:  Yeah, sure.

16          THE WITNESS:  Sorry.  I've never done this.  I'm very

17  nervous.  January the 14th.  That's the photo.

18  BY MR. RICE:

19  **Q**    And your testimony today is that's a photo of something

20  coming from the Exxon complex?

21  **A**    Yes, sir.

22  **Q**    And where were you when you took this photo?

23          MR. KRATKA:  Can we show this to the Judge while he's

24  testifying?

25          MR. RICE:  Sure.



                Gayle Dye, CSR, RDR, CRR - 713.250.5582

Cottar - Cross/Rice

```
 1              THE WITNESS:  That's from the Baytown Nature Center
 2    facing the ExxonMobil facility.
 3    BY MR. RICE:
 4    Q    And the date was January?
 5    A    14th.
 6              THE COURT:  What year?
 7              THE WITNESS:  2014.
 8              MR. RICE:  All right, Mr. Cottar.  Thank you.
 9              THE WITNESS:  Sure.
10    BY MR. RICE:
11    Q    Now, let me ask you this:  Have you gone onto the STEERS
12    website and tried to link up an emission event --
13    A    No, sir.
14    Q    -- with that photo?
15    A    I have not.
16    Q    So your testimony today is that these five events represent
17    the universe of emission events that you've witnessed and
18    complain about in this case today?
19    A    No, sir.
20              MR. KRATKA:  Objection.
21    BY MR. RICE:
22    Q    Well, now, you'll have to tell me -- you'll have to tell me
23    the rest of them.  What other emission events are you
24    complaining about?  Give me a date.
25              THE WITNESS:  Your Honor, I feel like those are two
```

Gayle Dye, CSR, RDR, CRR - 713.250.5582

03:41:45 (line 5)
03:41:59 (line 10)
03:42:07 (line 15)
03:42:26 (line 20)
03:42:38 (line 25)

Cottar - Cross/Rice

1    different questions.

2            THE COURT:  Okay.  Break it down.

3    BY MR. RICE:

4    **Q**    You're complaining about other emission events outside of

03:42:48   5    these five that we have on this list?

6    **A**    Yes, sir.

7    **Q**    Give me a date for the next emission event that you're

8    complaining about that should be a part of this case.

9            MR. KRATKA:  Objection.

03:42:59   10           THE WITNESS:  That's a different question, sir.

11           MR. KRATKA:  It's asking the witness to determine what

12   should be part of the case rather than just asking him about his

13   personal knowledge.

14           THE COURT:  All right.  Rephrase it.

03:43:08   15   BY MR. RICE:

16   **Q**    Mr. Cottar, I'm just asking you:  Give me some detail.  You

17   understand that the Plaintiffs have made claims in this case

18   that ExxonMobil has violated permits with emission events,

19   correct?

03:43:22   20   **A**    Correct.

21   **Q**    You understand that?

22   **A**    I understand that.

23   **Q**    Now, we need to know what specific events that you're

24   complaining about.

03:43:36   25   **A**    Again, I don't understand protocol in these situations.

Cottar - Cross/Rice

1  I've never testified --

2          THE COURT:  Hold it a second.  I'll say that's

3  unresponsive.  If you can't answer the question, state it.  The

4  man is going to have to move on or ask another question.

03:43:50  5  BY MR. RICE:

6  Q    Let me ask it this way, Judge.  Outside of these five for

7  which you've given the date and three of which you've given us

8  some information based on STEERS reports, are there any other

9  events, emission events or occurrences, that you can give us,

03:44:06  10  that you can provide this United States Court, with specific

11  details?

12  A    No, sir.

13  Q    Very well.  Now, you'll agree with me, sir, that each one

14  of these five that you've listed here occurred after October

03:44:31  15  2010, did it not?

16  A    Yes, sir.

17          THE COURT:  What's the key for October of 2010?  I

18  know -- I think I know but get in it on the record.

19  BY MR. RICE:

03:44:41  20  Q    That's the day you became a Sierra Club member; isn't that

21  correct?

22  A    Yes, sir.

23  Q    That's about the same time that you had your initial

24  conversation with Mr. Kratka?

03:44:49  25  A    Yes, sir.

Cottar - Cross/Rice

1    Q    And, in fact, that was after you -- Mr. Kratka had already

2    told you about this lawsuit, right?

3    A    These dates, yes, sir.

4    Q    You joined the team?

03:45:03    5            MR. KRATKA:  Objection.

6            THE COURT:  Overruled.  It's cross examination.

7    BY MR. RICE:

8    Q    In fact, these five events --

9            THE COURT:  By the way, I'll extend the same to you,

03:45:09   10    sir, on cross examination.

11    BY MR. RICE:

12    Q    In fact, these same events all occurred after you found out

13    that you would be -- that you could be a potential witness in

14    this case for Mr. Kratka's group, right?

03:45:20   15    A    Sure.  Yes, sir.

16    Q    Now, you testified that after the September --

17            THE COURT:  Hold it.  I think -- I'm not in any rush,

18    but if -- otherwise, we'll have a tendency to move on and on.  I

19    take a break every hour and -- an hour and a half.  It's a

03:45:38   20    little more than that already.  So I have 3:46.  We'll get back

21    in -- now, let me mention to you, we're going to go on until

22    about -- I always break between 6:00 and 6:05.  So we'll take

23    another really short break in there sometime after 5:00, between

24    5:00 and 5:30.  All right?  So my clock is off.  We'll see you

03:45:59   25    back ready to resume at 4:00 o'clock.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Cottar - Cross/Rice

1          (Court recessed at 3:46 p.m.)

2          (Court resumed at 4:02 p.m.)

3    BY MR. RICE:

4    Q    Mr. Cottar, I only have a few more questions for you.

04:02:50  5    Before I do, I realized that I made a mistake over here

6    transcribing these dates as we were talking about them.  The one

7    on May 22nd was actually May 22nd of 2012, correct?

8    A    Correct.

9    Q    And I wrote --

04:03:02  10          THE COURT:  Now, wait a second.  That was one of the

11   instances he testified about, correct?

12          MR. RICE:  That's right, your Honor.

13          THE COURT:  And when was the suit filed?

14          MR. RICE:  December, 2010.

04:03:12  15          THE COURT:  Okay, go on.

16   BY MR. RICE:

17   Q    It should be 2012, correct?

18   A    Correct.

19   Q    So I'm just going to correct that here because I made the

04:03:21  20   mistake.  And, also, I'm going to just put up here at the top

21   your name so that we know throughout the trial that those are

22   the events that -- that you specifically recall and complain

23   about.

24          Now, Mr. Cottar, none of these events that you've

04:03:45  25   testified about caused you to seek medical attention; isn't that

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Cottar - Cross/Rice

1   true?

2   **A**   Correct.

3   **Q**   And, in fact, you don't contend that you personally have

4   health problems that have been caused by or have been

04:03:57   5   exacerbated by what ExxonMobil has done, true?

6   **A**   That's incorrect.

7   **Q**   What is incorrect about that statement?

8   **A**   I spoke earlier and said that I felt like they had

9   exacerbated the asthma issues.

04:04:09   10   **Q**   Yeah.  In fact, you -- you did and earlier testified that

11   you thought these emission events had exacerbated things.  And

12   you also, I believe, testified that you think there is a

13   corollary relationship between these emissions events and your

14   asthma, correct?

04:04:26   15   **A**   Causal but not corollary -- I mean, corollary but not

16   causal.

17   **Q**   Okay.  Now, have you ever testified differently?

18   **A**   Not that I'm aware of, not to my memory.

19   **Q**   Do you recall giving a deposition in this case?

04:04:36   20   **A**   I do.

21   **Q**   Back in May 14, 2012?

22   **A**   Correct.

23   **Q**   Held in my office here in Houston, right?

24   **A**   Correct.

04:04:44   25   **Q**   I took that deposition.  Do you remember that?

Cottar - Cross/Rice

1    A    I remember it fondly.

2    Q    Mr. Kratka was there.  Your attorney was there with you?

3    A    Yes, sir.

4    Q    And I asked you specifically, "Do you contend that you

04:05:00  5   have -- you personally have health problems or health issues

6    that have been caused by or have been exacerbated by what

7    ExxonMobil has done?"

8              MR. RICE:  Hien, can you bring it up?

9    BY MR. RICE:

04:05:19  10  Q    And I'll just show you what I just read, and then your

11   answer to that question has been highlighted.  And what answer

12   did you give in your deposition in May 14, 2012?

13   A    I said that "I do not have any correlative evidence of any

14   health conditions either exacerbated by or perpetuated by."

04:05:40  15  Q    But yet, today -- right, perpetuated by ExxonMobil,

16   correct?

17   A    Correct.

18   Q    But today your testimony is different?

19   A    No, sir.

04:05:46  20  Q    Well, now --

21   A    The keyword here --

22             THE COURT:  Hold it.  Wait a second.  No.  By the way,

23   if the lawyers for your -- who called you want to follow up,

24   they will.  But this is cross examination.

04:05:56  25             Go right ahead.


Gayle Dye, CSR, RDR, CRR - 713.250.5582

1            THE WITNESS:  I'm sorry.  My apologies.

2   BY MR. RICE:

3   Q    On May 14, 2012, when we took your deposition in this case,

4   you said that you didn't have any correlative evidence?

04:06:11  5   A    Correct.

6   Q    You didn't have any evidence to suggest that there was any

7   corollary relationship between your asthma or any other health

8   condition and these emission events by ExxonMobil, correct?

9   A    Correct.  Evidence, yes, sir.

04:06:24 10   Q    Well, in fact, you don't have any evidence of that sitting

11  here today, do you?

12  A    No, sir.

13            MR. RICE:  That's all I have for now, Judge.

14            THE COURT:  Okay.  Go right ahead.

04:06:34 15                  REDIRECT EXAMINATION

16  BY MR. KRATKA:

17  Q    Let's stay with that question and answer, Mr. Cottar.

18  A    Sure.

19            MR. KRATKA:  Could we leave that on the screen?

04:06:51 20            THE COURT:  Why don't we put that back on the screen,

21  please.  I'll stop your time until it goes up.

22            Go on.

23  BY MR. KRATKA:

24  Q    Save five seconds.  Mr. Cottar, you answered -- when

04:07:09 25  Mr. Rice asked you whether your testimony during your deposition

Cottar - Redirect/Kratka

1   was inconsistent with your testimony today, you answered that it

2   was not, correct?

3   **A**    Correct.

4   **Q**    Can you explain why you believe your testimony then is not

04:07:22   5   inconsistent with your testimony today?

6   **A**    Correct.  Yes, sir.  The keyword in that sentence there is

7   evidence.  And as I understand it, evidence in this context

8   would be doctor's reports, some sort of -- some sort of hard

9   fact.  And I said earlier today "I believe."  And that's

04:07:45   10   different than evidence.  I wouldn't use the word "believe" if I

11   had evidence.  I would say, "I know."

12   **Q**    And what has your experience been in terms of experiencing

13   emissions that you've observed from Exxon and experiencing

14   health effects?

04:08:08   15   **A**    My experience is that living a quarter mile, half a mile,

16   whatever the distance actually is, living at the 3206 Briar

17   Court address, we experienced far more asthma issues on a

18   consistent basis than since we moved or before that point.

19   **Q**    And were any of those asthma issues also --

04:08:24   20          MR. KRATKA:  Strike that.

21   BY MR. KRATKA:

22   **Q**    Were any -- were any specific incidents of exacerbated

23   asthma issues, did they occur at the same time --

24   **A**    Yes, sir.

04:08:38   25   **Q**    -- as your experience of emission events?

Cottar - Redirect/Kratka

1  A    Yes, sir.

2  Q    Thank you.

3             And Mr. Rice also asked you a number of questions

4  about specific dates.  Did you create a written record of every

04:08:56  5  incident -- every time that you experienced what you believed

6  was an air emission event?

7  A    I did not.

8  Q    And are you able just through your memory to recall every

9  single -- the date of every incident that you experienced?

04:09:09  10  A    I cannot.

11  Q    But as you testified earlier -- let me just recall your

12  earlier testimony.  Were there numerous instances when you did

13  experience emission events?

14  A    Yes, sir.

04:09:20  15  Q    And were there numerous instances other than those listed

16  on the chart that you were able to match up your experience with

17  specific STEERS events?

18  A    At the time, yes, sir.

19  Q    So at the time you were able to match them?

04:09:34  20  A    I was able to match them up.

21  Q    But sitting here right now, your memory is insufficient to

22  recall the dates?

23  A    Correct.

24  Q    And --

04:09:50  25             MR. KRATKA:  Your Honor, we're going -- we're in the

Cottar - Redirect/Kratka

1    process of providing a copy of the picture from January, 2014,

2    of the flaring event that Mr. Cottar photographed.  We're in the

3    process of trying to get a copy of it to the Court, and we want

4    to tender -- would like to offer that as Plaintiffs' Exhibit

04:10:07   5    612.

6              THE COURT:  Any objection?

7              MR. RICE:  No objection, your Honor.

8              THE COURT:  It's admitted.  Don't forget we need to

9    give numbers and check with my case manager on this when there

04:10:21   10   are new pieces of evidence.

11             MR. KRATKA:  For the record, I would like to state

12   that I didn't have it at hand before but the exhibit --

13   Plaintiffs' exhibit number for the Baytown map is Plaintiffs'

14   Exhibit 396.

04:10:34   15             THE COURT:  Therefore, this picture was 397.

16             MR. KRATKA:  No, no, no.

17             THE COURT:  Okay.  Something else?

18             MR. KRATKA:  Yes.

19             THE COURT:  Oh, I see.

04:10:39   20             MR. KRATKA:  I'm sorry.  Jumping back to the --

21             THE COURT:  No.  The Baytown map was already

22   identified, but we didn't have the number.

23             MR. KRATKA:  It's 396 and will be labeled as such.

24                  That's all I have, your Honor.

04:11:12   25             THE COURT:  Anything further?

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Cottar - Recross/Rice

```
 1              MR. RICE:  Briefly, your Honor.
 2                    RECROSS EXAMINATION
 3  BY MR. RICE:
 4  Q    Mr. Cottar, you can't, sitting here today, give this Court
 5  any specific data or specific dates related to any other events
 6  from ExxonMobil outside of these five we listed here, correct?
 7              MR. KRATKA:  Objection.  Asked and answered.
 8              THE COURT:  Sustained.
 9  BY MR. RICE:
10  Q    And that's because you didn't keep a written record as
11  Mr. Kratka just asked you, right?
12              MR. KRATKA:  Objection.  Asked and answered.
13              THE COURT:  Sustained.  Got it.
14  BY MR. RICE:
15  Q    And you didn't keep a written record because the TCEQ
16  personnel that you met with, Mr. Bautista, gave you the log
17  sheet to keep that written record with.  You just threw it away,
18  didn't you?
19              MR. KRATKA:  Objection.  Asked and answered.
20              THE COURT:  Overruled.
21              THE WITNESS:  Correct.
22              MR. RICE:  Nothing else, your Honor.
23              THE COURT:  Anything further, Counsel?
24              MR. KRATKA:  No, sir.
25              THE COURT:  Thank you.  You may step down.  You're
```

Aguirre - Direct/Kratka

 1   excused.  You're free to leave.  Now, you may stay in the

 2   courtroom, but you're free to leave.

 3                  All right.  Call your next witness.

 4              MR. KRATKA:  Plaintiffs call Diane Aguirre.

04:12:42   5              THE COURT:  Yes, ma'am.  Do you want to come down the

 6   center, please?

 7                  Raise your right hand to be sworn, please.

 8         (The witness, **DIANE AGUIRRE,** called on behalf of the

 9   Plaintiff, was sworn.)

10              THE COURT:  Have a seat, please.

11                  Get comfortable.  Pull that microphone in.  The

12   chair does not move forward.

13                  Okay, go right ahead.

14              MR. KRATKA:  Thank you.

15                        DIRECT EXAMINATION

16   BY MR. KRATKA:

17   **Q**    Would you state your name for the record, please.

18   **A**    Diane Aguirre.

19              THE COURT:  How do you spell your last name, please.

04:13:10  20              THE WITNESS:  A-g, as in Gary, u-i-r-r-e.

21   BY MR. KRATKA:

22   **Q**    And where did you currently live, Ms. Aguirre?

23   **A**    I live in Oakland, California.

24   **Q**    And before moving to Oakland, did you -- where did you live

04:13:25  25   before moving to Oakland?

Aguirre - Direct/Kratka

1  **A**    The Houston area.  I grew up in Baytown.

2  **Q**    Okay.  And we'll get to the more details on that in a

3  minute.  Are you currently a member of the Sierra Club?

4  **A**    Yes.

04:13:34  5  **Q**    And when did you first join the Sierra Club?

6  **A**    In June of 2010.

7  **Q**    And you joined by paying membership dues?

8  **A**    Yes.

9  **Q**    And over the years have you renewed those membership dues?

04:13:46  10  **A**    I have.

11  **Q**    And is your membership current?

12  **A**    It is.

13  **Q**    And similarly, did you join -- are you a member of

14  Environment Texas?

04:13:52  15  **A**    I am.

16  **Q**    And when did you first join Environment Texas?

17  **A**    June, 2010.

18  **Q**    Okay.  And similarly, did you pay membership dues to join

19  and renew those dues?

04:14:04  20  **A**    Yes, I did.

21  **Q**    And you're currently -- your membership is current?

22  **A**    Yes, it is.

23  **Q**    How did it come about that you joined Sierra Club and

24  Environment Texas back in June of 2010?

04:14:13  25  **A**    I had been aware of the groups before, and I became a

Aguirre - Direct/Kratka

1   member when I heard that this was going on and I want to be a

2   part of it.

3   Q    And "this" meaning this lawsuit?

4   A    Exactly.

04:14:26   5   Q    So you joined the clubs because you were -- wanted to

6   participate in the lawsuit?

7   A    Yes.

8   Q    Okay.  And you said you were originally from Baytown.  Did

9   you grow up in Baytown?

04:14:38   10   A    I did grow up there.

11   Q    From what age?

12   A    We moved there from Los Angeles when I was about six, and I

13   -- we lived in pretty much the same area up until I went to

14   college.

04:14:53   15   Q    And what was the address of the home you grew up in?

16   A    1016 Dailey Street.

17   Q    Can we go through the map again, your Honor?

18        THE COURT:  Sure.

19   BY MR. KRATKA:

04:15:08   20   Q    Plaintiffs' Exhibit 396.

21            Are you able to identify on this map where your

22   home is?  You can stand up and walk up to the map if you --

23   A    It's a little hard to see.  I can't read any of the

24   letters.

04:15:35   25   Q    Why don't you come around and look at the map itself and

Aguirre - Direct/Kratka

1   see if you can circle where your -- approximately where your

2   home is.

3   **A**     Sure.  Right here.

4   **Q**     I'm going to circle that and put an "A" --  D. A., your

04:16:09   5   initials.

6            MR. NICHOLAS:  You have to adjust the map.

7            MR. KRATKA:  Yeah.

8            THE COURT:  Where was it?

9            MR. KRATKA:  Right here, your Honor.  Yes, right here.

04:16:20  10   BY MR. KRATKA:

11   **Q**     And, Ms. Aguirre, is the Baytown Complex located on this

12   part of the map?

13   **A**     It is.

14   **Q**     And do you know how far roughly your home is -- your

04:16:31  15   parents' home is from the Baytown Complex?

16   **A**     It's about a mile and a half.

17   **Q**     Okay.  Are there -- are you aware of any other industrial

18   facilities that are closer to your home than the Baytown

19   Complex?

04:16:46  20   **A**     No.

21   **Q**     When you grew up in that home in Baytown, who else lived in

22   your household?

23   **A**     My parents, my mom and my dad, my sister, and my brother.

24   **Q**     And are you -- how -- what's the relationship in ages

04:17:01  25   between you and your brother and sister?

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Aguirre - Direct/Kratka

1  A    I'm 25.  My brother is 20, and my sister is 15.

2  Q    And do you have other family also in Baytown?

3  A    I do.  I have a lot of family.

4  Q    Could you -- just a very quick rundown of what other parts

04:17:16  5  of the family live in Baytown?

6  A    Sure.  My grandma.  My -- one of my mom's sisters, my aunt,

7  an uncle.  And their family, their spouses and maybe like

8  ten-ish cousins in total.

9  Q    Where do they live in relation to your parents' home?

04:17:37  10  A    They live really close by.  It's like a ten-minute drive to

11  get to any of their houses.

12  Q    And where did you graduate -- where did you go to high

13  school?

14  A    I went to Sterling High School.

04:17:48  15  Q    Is that in Baytown?

16  A    It is.

17  Q    What year did you graduate?

18  A    In 2010.

19  Q    2010?

04:17:53  20  A    Sorry, 2005.

21  Q    2005.  And after graduating high school, did you go to

22  college?

23  A    I did.

24  Q    And where did you initially attend college?

04:18:01  25  A    I initially attended Lee College, which is in Baytown,

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Aguirre - Direct/Kratka

1  also.

2  **Q**    And about approximately is Lee College -- where is Lee

3  College in relation to the Baytown Complex?

4  **A**    It is very close.  I would say, like, less than two miles

04:18:18  5  away.

6  **Q**    And when you attended Lee College, did you live at home?

7  **A**    I did.

8  **Q**    And that year was 2010 -- sorry.

9  **A**    2005.  Yeah, 2005, 2006.

04:18:31  10  **Q**    And did you change --

11            THE COURT:  Lee College, that's a junior college?

12            THE WITNESS:  It is.

13            THE COURT:  Did you get a degree?

14            THE WITNESS:  I did.

04:18:37  15            THE COURT:  An AA?

16            THE WITNESS:  No.  I went to the University of Houston

17  after a year.

18            THE COURT:  All right.  So you graduated University of

19  Houston?

04:18:44  20            THE WITNESS:  Uh-huh.

21            THE COURT:  What was your major?

22            THE WITNESS:  I got a BA in English and a BS in

23  political science.

24  BY MR. KRATKA:

04:18:50  25  **Q**    And what year did you graduate from the University of

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Aguirre - Direct/Kratka

1  Houston?

2  **A**    2010.

3  **Q**    And when you attended the University of Houston, where did

4  you live?

04:18:57  5  **A**    I lived on campus.

6  **Q**    In Houston?

7  **A**    Yes.

8  **Q**    And, I'm sorry, did you spend any time at your parents home

9  when you were attending the University of Houston?

04:19:11  10  **A**    Yeah.  Every summer I would spend at my parents' house.

11  And I would come home on the weekends, pretty much every

12  weekend.

13  **Q**    Every weekend all through the three years at the University

14  of Houston?

04:19:22  15  **A**    It was actually four years there, and, yes, pretty much

16  every weekend.

17  **Q**    Okay.  Did you spend summers at home?

18  **A**    Yes.

19  **Q**    What about school vacations, holidays?

04:19:32  20  **A**    Yeah.  Christmas, everything like that.

21  **Q**    You spent them all at home --

22  **A**    Yes.

23  **Q**    -- in Baytown?  And what year did you graduate from the

24  University of Houston?

04:19:41  25  **A**    2010.

Aguirre - Direct/Kratka

1  Q    And after that, what was your first job out of college?

2  A    I worked with Texas Campaign for the Environment as a field

3  organizer.

4  Q    And did you still live in Houston?

04:19:52  5  A    I did still live in Houston.

6  Q    And --

7       MR. KRATKA:  Strike that.

8  BY MR. KRATKA:

9  Q    What did you do for the Texas Campaign for the Environment

04:20:01  10  as a field organizer?

11  A    It's door-to-door political organizing.  So I went to

12  people's doorsteps and talked to them about environmental issues

13  and then asked them to write letters to elected officials and I,

14  also, fundraised.

04:20:17  15  Q    And what -- why did you decide to do that kind of work?

16  A    Because it was important.  I think it's important to

17  protect the environment.  I think definitely growing up in

18  Baytown had a lot to do with that attitude.

19  Q    Why did growing up in Baytown influence your feelings about

04:20:36  20  environmental work?

21  A    Because I saw the effects of air pollution, just not living

22  in a place that had a good environment.

23  Q    What did you do after -- how long were you with Texas

24  Campaign for the Environment?

04:20:50  25  A    In total, about two and half years.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Aguirre - Direct/Kratka

1  Q    And you lived in Houston the whole time?

2  A    Yes.

3  Q    What did you do after leaving that organization?

4  A    A couple of different things.  I worked for a travel

04:21:03  5  agency.  I did some kind of writing and other jobs.

6  Q    What are you doing current for employment?

7  A    I'm a travel writer.

8  Q    When did you move from Houston to Oakland?

9  A    That was in February -- sorry, March of 2013.

04:21:21  10  Q    And have you been back to Baytown since you moved last

11  March?

12  A    Yes, twice.

13  Q    And when was the first time you were back in Baytown?

14  A    For Christmas.

04:21:31  15  Q    This past Christmas?

16  A    Uh-huh.  I came for a week and to see family.

17  Q    And when was the second time?

18  A    This last weekend.

19  Q    All expenses paid tour of Houston.

04:21:44  20        Are you planning to come back to Baytown in the

21  near future?

22  A    For the holidays probably next year -- or sorry, this year.

23  Q    So you will -- you have plans to come back and stay at your

24  parents' home again?

04:21:58  25  A    Yes.

Aguirre - Direct/Kratka

1  Q    Now, growing up in Baytown and living there, the time

2  you've spent in your parents' home, were you aware of the

3  ExxonMobil Baytown Refinery --

4  A    I was.

04:22:14  5  Q    -- Complex?

6  A    It was part of daily life.

7  Q    How so?

8  A    Well, pretty much a lot of my friends' parents worked for

9  Exxon and just driving passed it, it's really hard to miss this

04:22:26  10  big, you know, industrial area and other things, like smells

11  that would come up, sounds.  It was --

12  Q    All right.  I'll ask you a few more -- I'll try to ask you

13  some more specific questions.  You just mentioned smells.  What

14  types of smells are you talking about that you associate with

04:22:47  15  the Exxon complex?

16  A    The two main ones are this like sulfury -- sulfur kind of

17  smell and a gasoline smell.

18  Q    And why do you associate those odors with the Exxon

19  complex?

04:23:05  20  A    They were around pretty often and it is a huge complex and

21  the closest one to where I grew up so it makes sense.

22  Q    Could you smell these odors while -- or can you smell these

23  odors while you're at your parents' home?

24  A    Yes.

04:23:24  25  Q    And could you smell these odors, for example, when you were

Aguirre - Direct/Kratka

1   at Lee College?

2   A     Yes.

3   Q     Could you tell any difference in the intensity or the

4   frequency of the odors between the time you were at Lee College

04:23:38   5   and the time you spent at home?

6   A     Not specifically, no.

7   Q     Okay.  During your time in Baytown, did you spend time at

8   any -- or have you spent time at any parks or other outdoor

9   areas near the Exxon complex?

04:23:56   10  A     Pretty often.  Bicentennial Park is really close to my

11  house, and we spend time there.

12  Q     And when you spend time at Bicentennial Park, did you ever

13  smell any of these odors that you associated with the Exxon

14  complex?

04:24:14   15  A     Very often.

16  Q     And are there some days when these odors that you're

17  describing are worse or more intense than others?

18  A     Definitely.  It's not constant.  They're definitely times

19  when it is more pronounced and noticeable than others.

04:24:32   20  Q     Now, when an odor is more pronounced, are you able to link

21  up -- are you able to tell whether there is something going on

22  at the Baytown Complex that is associated with those odors?

23  A     No.  Growing up, I didn't have a lot of communication with

24  what was going on in the plant or knowing, like, what -- what

04:24:55   25  those odors were exactly.  I couldn't point to any specific --

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Aguirre - Direct/Kratka

1  anything specific.

2  **Q**    Okay.  And you also mentioned seeing things regarding to

3  the -- with respect to the Baytown Complex.  Are you referring

4  to actually being able to see evidence of air pollution?

04:25:14  5  **A**    Yeah.  Sometime -- well, there's, you know, smoke coming

6  out of, you know, various places in the refinery.  And other

7  times there would be this haze that was kind of like brownish.

8  **Q**    Was that haze coming from the complex?

9  **A**    Yeah.  It's pretty easy to see that it's, you know, kind of

04:25:38  10  like lingering over there.

11  **Q**    For example, if you're driving over the Fred Hartman Bridge

12  going over the Ship Channel, can you see that haze over the

13  complex?

14  **A**    Yeah, especially going down Spur 330, like a -- I think a

04:25:52  15  clearer picture of the whole complex.

16  **Q**    Going back to Plaintiffs' Exhibit 396, is this Spur 330?

17  **A**    Yes.

18  **Q**    When was the last time you drove down Spur 330?

19  **A**    It was Saturday when my dad picked me up from the airport.

04:26:12  20  **Q**    During that trip, did you observe any emissions at the

21  Baytown Complex?

22  **A**    It was nighttime, so --

23  **Q**    Have you ever -- I'm sorry, have you ever seen flaring at

24  the Baytown Complex?

04:26:27  25  **A**    Yes.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Aguirre - Direct/Kratka

1  Q    And are you familiar with what a flare is or looks like?

2  A    I am.

3  Q    Can you describe what you've seen in terms of seeing flares

4  at the complex?

04:26:36    5  A    It's -- I mean, it's part of the landscape, essentially.

6  Just driving past there, you see like flames coming off -- I

7  don't even know what they're called, but you would see it really

8  often every time you drove by.

9  Q    And seeing the flares or seeing the haze over the complex

04:26:58   10  or smelling the odors you described, do any of those things

11  cause you any concern?

12  A    Absolutely.

13  Q    Can you describe what your concerns are?

14  A    Well, it's -- they're, obviously, emitting something into

04:27:12   15  the air, and I know that they emit cancer-causing chemicals.

16  So, that's -- that's a really big concern for me.

17  Q    And do you have any safety fears or any concerns about

18  physical safety when you observe flares or other

19  emission-related experiences at the complex?

04:27:38   20  A    I do.  Especially growing up, every now and then I would

21  hear, like, a siren, a really loud siren.  I have no idea what

22  it is.  But it was --

23            THE COURT:  You don't know what it is?

24            THE WITNESS:  No, I don't know what it signified or

04:27:54   25  why they were sounding it.  But it would kind of make me think,

Aguirre - Direct/Kratka

1    what if it's a really terrible emergency and something is about

2    to blow up.  That was the first thing that came to mind.

3    BY MR. KRATKA:

4    **Q**    When you smelled odors that you associated with Exxon, does

04:28:17   5    that -- has that given you any specific concern?

6    **A**    It does.  Since I'm smelling it, I'm, obviously, breathing

7    in whatever it is; and like I said, I know that they emit

8    chemicals that are harmful.  And so the smell to me is

9    associated with something harmful.

04:28:36   10    **Q**    Now, do you exercise at all?

11    **A**    I do.  I like to run.

12    **Q**    And when you spend time in Baytown, do you run, jog?

13    **A**    I don't usually when I go to Baytown.

14    **Q**    Why not?

04:28:51   15    **A**    Because the times when I have in the past, it didn't feel

16    like I was doing something healthy.  I would run, and I would

17    feel kind of, you know, a little bit of, like, labored

18    breathing.  It was very -- it was a very abrasive feeling.

19    **Q**    Okay.  Abrasive feeling where?

04:29:08   20    **A**    In my throat and lungs.

21    **Q**    And are you aware of ozone warnings?

22    **A**    I am.  That was another big concern was -- especially

23    during the summer, I would hear about ozone warnings, telling me

24    to stay inside, not to do any kind of strenuous activity.  And

04:29:35   25    so that was -- that was always on my mind when I wanted to

Aguirre - Direct/Kratka

1   exercise at home.

2   Q    If you felt that the air were cleaner in Baytown around

3   your parents' home, would you exercise outdoors more frequently?

4   A    Yeah, absolutely.  It's something that I really enjoy, and

04:29:58   5   it's -- I don't think it's the best idea to do.

6   Q    Now, have you experienced any health problems growing up in

7   Baytown?

8   A    I had allergies, so, like, running nose, watery eyes, kind

9   of like a constricted feeling in my chest growing up pretty much

04:30:17   10   year around.

11   Q    Do you know when that started, at what age?

12   A    When I was a kid.  It must have been, like, between eight

13   and ten.

14   Q    And how frequently would you experience these symptoms?

04:30:30   15   A    At least a couple of times a week.

16   Q    And did that persist all the way through high school while

17   you were living in Baytown?

18   A    Pretty much.

19   Q    And after you left the -- after you started college and

04:30:44   20   lived in Houston, was there any change in those respiratory

21   symptoms?

22   A    Yeah, they -- there was a little bit of alleviation.  I no

23   longer took the allergy medications that I would take while I

24   was living at my parents' house, like Claritin, Benadryl, things

04:31:01   25   like that.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Aguirre - Direct/Kratka

1  Q      And how about now?  When you're living in Oakland, what are

2  your respiratory symptoms like?

3  A      It's non-existent.

4  Q      Now when you returned to Baytown for a week this last

04:31:18  5  Christmas, did you experience any respiratory symptoms?

6  A      I did.  The same symptoms that were there when I was a kid,

7  just runny nose, watery eyes, sneezing.

8  Q      Those came back just during the week you were there?

9  A      Yes.

04:31:33  10  Q      What about after you left and went back to Oakland?

11  A      They did not persist when I left.

12  Q      Do you have any concerns, any personal impact on you

13  involving the fact that your parents and family still live where

14  they live?

04:31:51  15  A      Yeah.  I worry about them living there and I would prefer

16  it if they didn't, but sometimes that's not an option.  But I

17  worry that they're -- you know, especially my brother and sister

18  grew up since -- pretty much they were born, they've lived in

19  Baytown.  And I know that air pollution and stuff like that has

04:32:11  20  a much bigger effect on children and their development.  So, I'm

21  worried about them, even though they're mostly grown now.  I

22  would prefer it if they were farther away from there.

23  Q      Are you aware that Exxon has government-issued permits that

24  govern their air emissions?

04:32:34  25  A      I am aware of that.

Aguirre - Cross/Nichols

1  Q     And are you aware that these permits do authorize the

2  complex to emit certain pollutants into the air?

3  A     Yes.

4  Q     And do you want to breathe any emissions from the Baytown

04:32:47  5  Complex that are not authorized by these permits?

6  A     No.

7  Q     Would it lessen the concerns you've expressed if Exxon did

8  not put any authorized emissions into the air?

9  A     It would lessen my concerns.

04:33:00  10  Q     And -- no, I asked that question.

11           MR. KRATKA:  I believe that's all I have, your Honor.

12           THE COURT:  Thank you.  Pass the witness.

13           MR. NICHOLS:  May I approach, Judge?

14           THE COURT:  Go right ahead.

04:33:11  15                    CROSS EXAMINATION

16  BY MR. NICHOLS:

17  Q     Good afternoon, Ms. Aguirre.

18  A     Good afternoon.

19  Q     Ms. Aguirre, you understand that we're here to -- for the

04:33:20  20  Court to address emissions that were not done in the normal

21  course of the Baytown Complex.  Do you understand that?

22           MR. KRATKA:  Objection.

23           THE COURT:  I didn't understand the question.

24  BY MR. NICHOLS:

04:33:38  25  Q     Ms. Aguirre, do you understand that we're here in this case

Aguirre - Cross/Nichols

1  to address emission events?

2  **A**    Yes, violations.

3            MR. KRATKA:  Again, I'm sorry, objection.  It

4  mischaracterizes the nature of the case.

04:33:48    5            THE COURT:  Well, what is it?  Hold it.  Let me ask

6  him what his theory is because we're talking non-jury case.

7                 Go on.

8            MR. KRATKA:  Emission events are certainly a large

9  part of the case but there are other violations as well, as

04:34:01   10  Mr. Nicholas outlined in his opening.

11            THE COURT:  All right.  Rephrase the question.

12  BY MR. NICHOLS:

13  **Q**    So you understand that we're here in part on emission

14  events, right?

04:34:08   15  **A**    Yes.

16  **Q**    You understand that we're here in part on emissions that

17  the Plaintiff groups, that is, Sierra Club and Environment

18  Texas, say fell outside the ExxonMobil permits, correct?

19  **A**    Yes.

04:34:19   20  **Q**    Okay.  So what we want you to do, Ms. Aguirre, is to tell

21  the Court, give us a date on which you believed that you were

22  exposed to emissions from an emission event or emissions that

23  fell outside the ExxonMobil Baytown Complex permit.

24  **A**    I don't think that's the kind of thing that Exxon

04:34:44   25  necessarily advertises.  So it would be really hard to pinpoint.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Aguirre - Cross/Nichols

1  Q    I'm asking for you.  Do you have any knowledge,

2  Ms. Aguirre, that you were ever exposed to any emissions from an

3  emissions event at ExxonMobil?

4  A    I could say that I probably have just by the sheer fact

04:35:04  5  that there have been 4,000 or so since 2005, and I have been

6  home and visited my family several times since then.

7  Q    Yes, ma'am.  Just give us -- give us a particular date on

8  which you say you were exposed to these emissions.

9  A    I can't give you a particular date.

04:35:21  10  Q    Okay.  And give us a particular date on which you were

11  exposed to any emissions that came outside of ExxonMobil's

12  permit.

13          MR. KRATKA:  Objection.  Asked and answered.

14          THE COURT:  Overruled.

04:35:32  15          THE WITNESS:  I can't do that.

16  BY MR. NICHOLS:

17  Q    So what you're describing, Ms. Aguirre, is growing up in

18  Baytown and being exposed to the atmosphere in Baytown, correct?

19  A    Correct.

04:35:47  20  Q    Generally?  Generally to the atmosphere in Baytown,

21  correct?

22  A    I think you may be a little incorrect because I live really

23  close to the Exxon facility, in particular.

24          MR. NICHOLS:  Sure.  And it's -- could we go to 7A,

04:35:58  25  please?

Aguirre - Cross/Nichols

1          THE COURT:  Let's see.  You need to go --
2    BY MR. NICHOLS:
3    Q    So the residence where you lived --
4          THE COURT:  What exhibit again?
04:36:24  5          MR. NICHOLS:  This is part of our demonstrative
6    exhibit.  It's Demonstrative 7A, as in Adam.
7          MR. KRATKA:  I'm going to object because I certainly
8    can't tell where -- whatever the dotted line is and which part
9    of the plant is being compared to the location of the home.
04:36:42  10          THE COURT:  Overruled.
11   BY MR. NICHOLS:
12   Q    So, Ms. Aguirre, did you -- did your parents live at 1016
13   Dailey Street in Baytown?
14   A    Yes.
04:36:50  15   Q    And that, I think you told us, is about two miles away from
16   the facility; is that correct?
17   A    I thought it was a little less than that, maybe a mile and
18   half.
19   Q    Okay.  And this is the residence where you lived through
04:37:03  20   the year 2006 when you went to go to U of H?
21   A    Yes.
22   Q    Okay.  So as of 2006, you would come back to your -- to
23   your parents' home to visit as you talked about, but your
24   primary residence from 2006 onward was over at the U of H
04:37:23  25   campus?

Aguirre - Cross/Nichols

1          MR. KRATKA:  Objection.  Mischaracterizes the

2    testimony.

3          THE COURT:  Overruled.

4          THE WITNESS:  In terms of the --

04:37:30   5          THE COURT:  Where did you live most of the time during

6    that --

7          THE WITNESS:  On campus.

8          THE COURT:  Okay.

9    BY MR. NICHOLS:

04:37:35  10   **Q**    At the University of Houston?

11   **A**    That's correct.

12   **Q**    Okay.  And so you lived there from 2006 until you graduated

13   in 2010, right?

14   **A**    Yes.

04:37:46  15   **Q**    And when you graduated, 2010, you moved to another location

16   in Houston?

17   **A**    Yes.

18   **Q**    And that's when you went to go to work for this group

19   called the Texas Campaign for the Environment?

04:38:01  20   **A**    That is correct.

21   **Q**    So, let's just put a little more flesh on the bones of how

22   you got involved in the lawsuit.

23   **A**    Uh-huh.

24   **Q**    You were -- the way you became aware of the lawsuit was

04:38:14  25   that somebody from Environment Texas was canvassing the Baytown

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Aguirre - Cross/Nichols

1  neighborhood in 2010 about their claims, correct?

2  **A**    That's correct.

3  **Q**    So somebody from Environment Texas actually went door to

4  door and talked to your mom, and your mom suggested since you

04:38:30  5  work for Texas Campaign for the Environment that you might be a

6  good person for them to talk to, right?

7  **A**    Yes.

8  **Q**  And this was in 2010?

9  **A**    That is correct.

04:38:42  10  **Q**    So, did you understand, Ms. Aguirre, that as of 2010 that

11  the Plaintiffs in the case, Environment Texas and Sierra Club,

12  had already announced to ExxonMobil and to others that they were

13  going to file a lawsuit?

14  **A**    Yes.

04:39:01  15  **Q**    Now, Ms. Aguirre, you actually got a call in the spring of

16  2010 from a paralegal at the National Environmental Law Center;

17  isn't that correct?

18  **A**    Yes.

19  **Q**    Now, we got a paralegal here, sitting here.  Was it Mary

04:39:22  20  Rock who is sitting here?

21  **A**    No.  It was Janine Panchok-Berry.

22  **Q**    And you understand that during your deposition,

23  Mr. Nicholas told us, made sure we understood, that that person

24  was a paralegal at the National Environmental Law Center,

04:39:38  25  correct?

Aguirre - Cross/Nichols

1    **A**    Yes.

2    **Q**    So you got a call about participating in this lawsuit from

3    a paralegal at the National Environmental Law Center, correct?

4    **A**    I did.

04:39:50    5    **Q**    Somebody called you and asked you to participate in a

6    lawsuit, correct?

7    **A**    That's correct.

8    **Q**    You were here in Texas, correct?

9    **A**    Yes.

04:39:59    10    **Q**    And you understood the person that was calling you was a

11    representative of lawyers, maybe out-of-state lawyers but was a

12    representative of lawyers, correct?

13    **A**    Yes.

14    **Q**    Now, you said that you joined Sierra Club in June of 2010,

04:40:20    15    correct?

16    **A**    That's correct.

17    **Q**    I think you testified that you also joined Environment

18    Texas in -- you also said June of 2010, I think, is what you

19    testified to.

04:40:29    20    **A**    That's correct, also.

21         MR. NICHOLS:  Okay.  Let's just put up Plaintiffs'

22    Exhibit 339 if we could.  Let's just highlight the exhibit

23    sticker, please, first, because this is Plaintiffs' exhibit.

24         Can you just expand it, please; make it bigger.

04:41:21    25    //

Aguirre - Cross/Nichols

1  BY MR. NICHOLS:

2  **Q**    Can you read this, Ms. Aguirre.

3  **A**    I can.

4  **Q**    Do you see that this is a record of you with the group,

04:41:40   5  Environment Texas, that's actually been produced by the

6  Plaintiffs and they've actually marked it as an exhibit for

7  trial?  Do you see your name here?

8  **A**    Yes.

9         THE COURT:  No.  What document is this?  You don't

04:41:52  10  need to scroll it back.  What's the heading on this?

11         MR. NICHOLS:  This is -- it's a document printed off

12  of a group called ROI Solutions, and this was produced to us,

13  your Honor, as being the membership information that the

14  organization had for Ms. Aguirre.

04:42:09  15         THE COURT:  Which organization?

16         MR. NICHOLS:  This is Environment Texas.

17         THE COURT:  Okay.  That's the basic background

18  information?

19         MR. NICHOLS:  Yes.

04:42:15  20         THE COURT:  Okay.

21  BY MR. NICHOLS:

22  **Q**    So this is your -- this is your address where you live now

23  in Oakland, California?

24  **A**    That's correct.

04:42:20  25  **Q**    So you currently live out there, correct?

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Aguirre - Cross/Nichols

```
 1  A    Yes, I do.
 2  Q    And then if we look down on the --
 3            THE COURT:  Excuse me.  When did you move to Oakland,
 4  ma'am?
 5            THE WITNESS:  In March of 2013.
 6            THE COURT:  Okay.
 7  BY MR. NICHOLS:
 8  Q    And by the way, do you have any plans to move back to
 9  Texas?
10  A    I don't.
11  Q    You do not?
12  A    I do not.
13            MR. NICHOLS:  Okay.  So if we go -- the next section.
14  Can we grab the next section of the document?
15            We need to grab the part that's just above that.
16  BY MR. NICHOLS:
17  Q    So, head of household, Ms. Diane Aguirre; and it says
18  Environment Texas, okay, to contact.  And then it says when they
19  added a record of your membership, correct?
20  A    Yeah.
21  Q    Does this help refresh your recollection that you actually
22  joined this group in December of 2010?
23  A    I guess I must have.
24            THE COURT:  December?  Where's December, 2010?
25            MR. NICHOLS:  Oh, I'm sorry, your Honor.  It's on this
```

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Aguirre - Cross/Nichols

1    little part that we grabbed out.  Do you see where it says

2    "record added"?

3    BY MR. NICHOLS:

4    **Q**    It says, "12-9-2010," correct, ma'am?

04:43:40    5    **A**    It does.

6                THE COURT:  So, Environment Texas.  Is that the same

7    date you joined the Sierra Club?

8                THE WITNESS:  I don't think it is.

9                THE COURT:  Okay.  All right.

04:43:48    10               MR. NICHOLS:  I think the record is that she testified

11   that she joined the Sierra Club in June of 2010, Judge.

12               THE COURT:  That's right.  June, 2010, but --

13               MR. NICHOLS:  But would you agree with me that --

14               THE COURT:  Environment Texas when?

04:44:03    15               MR. NICHOLS:  December 9th of 2010.

16               THE COURT:  Okay.

17   BY MR. NICHOLS:

18   **Q**    Would you agree with me that we cleaned up that part of the

19   record?

04:44:10    20   **A**    Yes.

21   **Q**    So, Ms. Aguirre, do you know the date on which this lawsuit

22   was filed?

23   **A**    I don't.

24               MR. NICHOLS:  Pull it up, please.  Pull up the

04:44:20    25   complaint.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1          THE COURT:  The record will speak for itself.

2               All right, there it is.  Okay.

3    BY MR. NICHOLS:

4    Q    So this is a document that the -- a court record.  Do you

04:44:36  5    see the date that appears at the very top of that page?  It says

6    filed in TXSD on what date, ma'am?

7    A    December 13, 2010.

8    Q    And so the record reflects that you would have joined the

9    Environment Texas group, one of the Plaintiffs in the case, as a

04:44:54  10   member four days before the lawsuit was filed?

11   A    Yes.

12          THE COURT:  Was it December 9th?

13          MR. NICHOLS:  Yes, sir.

14          THE COURT:  Okay.

04:45:05  15   BY MR. NICHOLS:

16   Q    And as you say, you don't make any bones about it, you

17   joined both groups because you wanted to participate in the

18   lawsuit, right?

19   A    Yes.

04:45:16  20   Q    Now, Ms. Aguirre, you mentioned a little bit about having

21   seen flares at the Baytown Complex?

22          THE COURT:  And you also state that some folks called

23   you about seeing if you were interested in being a party to this

24   suit, filing suit, correct?

04:45:30  25          THE WITNESS:  That's correct.

Aguirre - Cross/Nichols

1          THE COURT:   Okay, go on.

2   BY MR. NICHOLS:

3   Q    So, you mentioned about that -- your observations of some

4   flares at the Baytown Complex, correct?

04:45:41   5   A    Yes, I've seen flares.

6   Q    And, Ms. Aguirre, do you know whether or not flares are a

7   normal part of the operation of the complex that are permitted?

8   A    I believe that they are up to a certain point.

9   Q    Okay.  And, so, just like I asked you earlier -- you know

04:45:57  10   we're trying to drill down as much as we can into the detail.

11   Can you describe for me having observed any flaring activity at

12   the Baytown Complex that you knew was outside the course and

13   scope of the Baytown Complex permits?

14   A    No.  Like I said, it was part of the landscape.  At that

04:46:17  15   point, growing up there, it's just something that you see all

16   the time.  So, it's like you don't normally count every single

17   cloud that you see go by on any given day, so --

18   Q    But you understand, in answer to my question,

19   Ms. Aguirre -- I'm trying to get very specific -- if you can

04:46:33  20   ever recall or ever make the link for us between your observing

21   a flare out at the Baytown Complex and a time when you knew or

22   understood that that flaring was outside the range of the

23   permit?

24   A    I can't make that connection for you.

04:46:51  25   Q    Okay.  Now, the -- let's talk real briefly about your

Aguirre - Cross/Nichols

1  allergies.  These were allergies you had when you were a kid,
2  right?
3  **A**    Yeah, through high school.
4  **Q**    And you first went -- I think you told us in your
5  deposition that these allergies cropped up when you were 10 or
6  11 years old, correct?
7  **A**    Correct.
8  **Q**    That your parents took you to the doctor, correct?
9  **A**    That's correct.
10 **Q**    And the doctor prescribed you some allergy medication?
11 **A**    Yes.
12 **Q**    And you took that allergy medication all the way through
13 high school?
14 **A**    That's correct.
15 **Q**    And outside of what you've described as allergies that a
16 number of us suffer in a number of different places in the
17 world, are there any other health conditions that somehow limit
18 your daily routine or your normal life activity that you contend
19 are related somehow to something that ExxonMobil may have done?
20 **A**    No.
21 **Q**    And even, Ms. Aguirre, with your allergies and so forth,
22 you do not have any knowledge of any events at the Baytown
23 Complex that have resulted in you having experienced harm,
24 correct?
25 **A**    Can you repeat the question?

04:47:11 (line 5)
04:47:23 (line 10)
04:47:39 (line 15)
04:48:07 (line 20)
04:48:31 (line 25)

Aguirre - Cross/Nichols

1  Q    Yes, ma'am.  And even with your allergies that you've

2  described for the Court, you do not have any knowledge of any

3  events at the Baytown Complex that have resulted in you having

4  experienced harm, correct?

04:48:45  5              MR. KRATKA:  Objection.  Vague.

6              THE WITNESS:  You mean specific events?

7              THE COURT:  Overruled.

8  BY MR. NICHOLS:

9  Q    I mean specific events, anything that ExxonMobil has done

04:48:54  10 specifically over the years that has caused you to have

11 experienced any sort of harm?

12 A    Like I said, I can't give you any specific dates on

13 anything.

14 Q    Now, you recall that you gave a deposition in the case,

04:49:08  15 ma'am, correct?

16 A    Yes.

17 Q    And you recall being asked in your deposition --

18             THE COURT:  Page and line, when you get to it.

19 BY MR. NICHOLS:

04:49:36  20 Q    -- that you recall testifying that you had not been to see

21 a doctor to complain of symptoms that you contend are related to

22 something that ExxonMobil may have done.  Would you agree with

23 that?

24 A    Yes.

04:49:56  25 Q    And would you also agree that you don't have any way to

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Aguirre - Cross/Nichols

1  know for certain that any of the symptoms that you've ever had

2  in your life, including your allergy, are related to anything

3  that ExxonMobil did, correct?

4  **A**    I feel that it's --

04:50:16  5           THE COURT:  Excuse me.  That's yes or no.  If you

6  can't answer it yes or no, state it.

7            THE WITNESS:  Okay.

8            THE COURT:  Can you answer it yes or no?

9            THE WITNESS:  I can.

04:50:20 10            THE COURT:  Can?

11            THE WITNESS:  Yes.

12            THE COURT:  Okay.  And your answer?

13            THE WITNESS:  No.

14  BY MR. NICHOLS:

04:50:25 15  **Q**    So, your answer to my question which was you don't have any

16  way to know for certain that any of these symptoms are related

17  to anything that ExxonMobil did, that's a correct statement,

18  correct?

19  **A**    Can you repeat that?

04:50:36 20  **Q**    Yes, ma'am.  It is correct to say that as you sit here

21  today before this Court you don't have any way to know for

22  certain that any of the symptoms you've ever experienced,

23  including your allergies, are related to anything that

24  ExxonMobil did, correct?

04:50:51 25            MR. KRATKA:  Objection.  Asked and answered.

1          THE COURT:  Overruled.  I think she answered already,

2    but if you want to do it again --

3                Is that correct?

4          THE WITNESS:  Yes.

04:50:58   5          THE COURT:  All right.

6          MR. NICHOLS:  I'll pass the witness.

7          THE COURT:  Thank you.

8          MR. KRATKA:  One second, your Honor.

9          THE COURT:  Sure.

04:51:26  10          MR. KRATKA:  I have nothing.  No questions, your

11   Honor.

12          THE COURT:  No questions.  Thank you, ma'am.  You may

13   step down.  You're excused.  You're free to leave.  You can

14   remain in the court if you like, but you're free to leave.

04:51:37  15                Call your next witness.

16          MR. KRATKA:  Plaintiffs call Luke Metzger.

17          THE COURT:  L-u-k-e, is it?

18          MR. KRATKA:  Yes.

19          THE COURT:  Last name?

04:51:54  20          MR. KRATKA:  M-e-t-z-g-e-r.

21          THE COURT:  Have you already been sworn?

22          THE WITNESS:  Yes, I was earlier.

23          THE COURT:  Okay.  Have a seat.

24   //

25   //

Metzger - Direct/Kratka

1          (The witness, **LUKE WILLIAM METZGER,** called on behalf of the

2     Plaintiff, was previously sworn.)

3                          DIRECT EXAMINATION

4     BY MR. KRATKA:

04:52:26   5   **Q**    Good afternoon, Mr. Metzger.

6   **A**    Good afternoon.

7   **Q**    Can you state your full name for the record.

8   **A**    I'm Luke William Metzger.

9   **Q**    And are you currently employed by Environment Texas Citizen

04:52:38  10   Lobby?

11   **A**    Yes.

12   **Q**    And Environment Texas Citizen Lobby is one of the

13   Plaintiffs in this case?

14   **A**    Yes.

04:52:42  15   **Q**    And as we go forward, I'll simply refer to the organization

16   as Environment Texas and you'll understand who I'm referring to?

17   **A**    Yes.

18   **Q**    What is your job title?

19   **A**    I'm the director.

04:52:53  20   **Q**    And do you have a college degree?

21   **A**    I do.

22              THE COURT:  Now, as director, you mean you're top

23   person?

24              THE WITNESS:  Yes.

04:52:59  25              THE COURT:  Okay.


Gayle Dye, CSR, RDR, CRR - 713.250.5582

Metzger - Direct/Kratka

1  BY MR. KRATKA:

2  Q    Where did you graduate from?

3  A    The University of Southern California.

4  Q    When was that?

04:53:04  5  A    1998.

6  Q    And what was your major?

7  A    I double majored in political science and theater.

8  Q    And just very briefly, can you describe your employment

9  history since graduating from USC?

04:53:17  10  A    I first worked for the California Public Interest Research

11  Group, CALPIRG, which is a student-based environmental consumer

12  advocacy organization, the California Public Interest Research

13  Group, or CALPIRG.  And then in 2000, I moved to Texas and

14  worked for the US Public Interest Research Group, U.S. PIRG.  In

04:53:42  15  2003 I began to work for the Texas Public Interest Research

16  Group, TexPIRG, and then in 2006 began working with Environment

17  Texas.

18            THE COURT:  When did you become director?

19            THE WITNESS:  I believe in 2007, approximately.

04:53:56  20  BY MR. KRATKA:

21  Q    And was Environment Texas actually formed in 2006?

22  A    Yes.

23  Q    And were you involved in the founding of the group?

24  A    Yes.

04:54:03  25  Q    How were you involved?

Metzger - Direct/Kratka

1  **A**    I worked together with our board members to put together

2  the organization.

3  **Q**    Okay.  And you said you moved to Texas in the year 2000?

4  **A**    Yes.

04:54:18  5  **Q**    What brought you to Texas?

6  **A**    As a child I had lived in Lawton, Oklahoma, for about seven

7  years.  My father worked at Fort Sill.  And, so, I spent a lot

8  of time as a child in that area, in Wichita Falls area, and had

9  very fond memories of Texas.  And I was, in pursuing

04:54:37  10  environmental work, excited by the challenge of working on

11  environmental issues here in Texas.

12  **Q**    And where is Environment Texas headquartered?

13  **A**    In Austin, Texas.

14  **Q**    Is that where you live?

04:54:48  15  **A**    Yes.

16  **Q**    Do you have any children?

17  **A**    I do.

18  **Q**    How many?

19  **A**    I have one son.

04:54:53  20  **Q**    How old is he?

21  **A**    He's seven years old.

22  **Q**    And have you spent much time in the parts of the state

23  other than Austin?

24  **A**    Yes.  So both professionally I spend a lot of time

04:55:03  25  traveling to Houston, Dallas, San Antonio, all over, and then

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Metzger - Direct/Kratka

1  personally I spend a lot of time exploring the state and

2  visiting, camping in state parks and enjoying all the great

3  places Texas has to offer.

4  Q     And do you do that, you said, both personally and

04:55:23   5  professionally?  Do you travel with your family?

6  A     Yeah, I bring -- we -- my family, my son and my fiancee and

7  I, have a particular goal to visit every state park in the

8  state.  I've -- was a Boy Scout and spent -- had fond memories

9  of spending a lot of time in parks.  So, I want to share that

04:55:40   10  with my son.

11  Q     And has that contributed to your decision to go into

12  environmental work as a career?

13  A     Absolutely.  I spent a lot of time, you know, appreciating

14  nature and learning about the outdoors, and so that helps

04:55:54   15  instill a deep love for the environment.

16  Q     And have you received any honors as a result of your work

17  for Environment Texas?

18  A     Yes.  I was named the -- one of the top lobbyists for

19  causes by a newsletter called Capitol Inside that monitors the

04:56:11   20  Texas Capitol.  And I was also recently named one of the next

21  generation Texans which is a -- put together by the University

22  of Texas and the Strauss Institute.  It was a group of a few

23  dozen kind of rising stars in Texas, everybody from best selling

24  novelists to George P. Bush and me.

04:56:33   25  Q     And have you served on any government panels through your

Metzger - Direct/Kratka

1   work?

2   **A**    Yes.  I served on the Pollution Prevention Advisory

3   Committee of the Texas Commission on Environmental Quality.  I

4   served on the Open Records Steering Committee at the Office of

04:56:46    5   the Attorney General of Texas.  And I currently serve as a

6   commissioner on the Austin Resource Management Commission which

7   helps oversee the electric and water utilities for the city.

8   **Q**    Let's talk more about Environment Texas.  As founder and --

9   a founder and the director of the organization, are you familiar

04:57:04   10   with Environment Texas's by-laws?

11   **A**    Yes.

12          MR. KRATKA:  And, your Honor, we've submitted the

13   Environment Texas by-laws as Plaintiffs' Exhibit 338 in case we

14   need to refer to those.

04:57:15   15   BY MR. KRATKA:

16   **Q**    And Environment Texas is a profit or a non-profit

17   organization?

18   **A**    We're a non-profit.

19   **Q**    And what is the corporate purpose of Environment Texas?

04:57:24   20   **A**    We advocate for Texas's air, land, and water using -- you

21   know, through research, through grassroots organizing, through

22   lobbying, and through litigation.

23   **Q**    Is it fair to call Environment Texas an environmental

24   group?

04:57:39   25   **A**    Yes.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Metzger - Direct/Kratka

1  Q    Can you outline your responsibilities as the Environment

2  Texas director?

3  A    Yes.  I help develop the programs for the organization.  I

4  help oversee our staff.  I help raise funds for the organization

04:57:53  5  and help administer the organization in terms of, you know,

6  overseeing bookkeeping and tax filings.  I lobby directly at the

7  capitol and kind of our -- one of our main spokespeople to the

8  media.  I do a lot of work with other environmental

9  organizations to strategize and work together, among other

04:58:16  10  things.

11          THE COURT:  Hang on.  Hold it one second.  I stopped

12  the clock.

13          Okay.  Go right ahead.

14  BY MR. KRATKA:

04:58:57  15  Q    Mr. Metzger, is -- based on what you just described, is it

16  fair to say you're involved in all aspects of Environment

17  Texas's work?

18  A    Yes.

19  Q    And what are Environment Texas's current policy priorities?

04:59:10  20  A    Right now we're doing a lot of work to promote water

21  conservation amid the drought that Texas is suffering from.  We

22  are working to promote clean energy and we -- including energy

23  efficiency and wind and solar power.  We had a successful

24  campaign working to increase funding for our state park system,

04:59:33  25  clean air, so working to improve -- reduce pollution at power

Metzger - Direct/Kratka

1    plants, refineries, chemical plants around the state.

2    Q    And have you done any work as far as -- have you done any

3    work regarding -- that has any relation to the Texas Commission

4    on Environmental Quality?

04:59:48    5    A    Yes.

6    Q    What has that work involved?

7    A    Around 2003 the state auditor of Texas released a report --

8    kind of a scathing indictment of the TCEQ's enforcement program.

9    The quote was that TCEQ --

05:00:13    10    MR. ALEXANDER:  Your Honor, I object to the question.

11    THE COURT:  Sustained.

12    Next question.  You can get around it.

13    BY MR. KRATKA:

14    Q    Can you describe what your policy work was regarding the

05:00:23    15    Texas Commission on Environmental Quality?

16    A    In response to the state auditor's report, we launched a

17    campaign to get the TCEQ to change its enforcement policies to

18    better hold violators accountable.

19    Q    And the spur for that campaign was this report from the

05:00:39    20    Texas state auditor?

21    A    Yes.

22    THE COURT:  Is there a board for this organization?

23    THE WITNESS:  My organization?

24    THE COURT:  No, the state organization, the Texas --

05:00:48    25    what is it?

Gayle Dye, CSR, RDR, CRR - 713.250.5582

                         Metzger - Direct/Kratka

 1                   MR. KRATKA:  Environment Texas?

 2                   THE COURT:  Environment Texas, yes.  No, no.  I'm

 3      sorry.

 4                   THE WITNESS:  TCEQ?

05:00:55  5          THE COURT:  TCEQ.

 6                   THE WITNESS:  There are three commissioners.

 7                   THE COURT:  Who appoints them?

 8                   THE WITNESS:  The governor.

 9                   THE COURT:  All right.  Go on.

05:01:01 10     BY MR. KRATKA:

11      Q    Now you said you're familiar with the Environment Texas's

12      by-laws?

13      A    Yes.

14      Q    Do Environment Texas's by-laws create a class of members as

05:01:09 15     the term "members" is defined in Texas corporation law?

16      A    No.

17      Q    And do you know why Environment Texas's by-laws do not

18      provide for that type of membership?

19      A    Yes.

05:01:20 20     Q    Why not?

21      A    The -- under Texas law, the definition of members, any

22      member could get access to our entire membership list.  And, so,

23      we feel that's a violation of privacy of our members and could

24      invite our opposition to join Environment Texas as a way to get

05:01:41 25     access to our membership list.


                    Gayle Dye, CSR, RDR, CRR - 713.250.5582

Metzger - Direct/Kratka

1   Q    But can people, nonetheless, join Environment Texas?

2   A    Yes.

3   Q    And what are the ways that people can join Environment

4   Texas?

05:01:47   5   A    We have two classes of membership.  So, they can join by

6   making a donation or they can become what we call a grassroots

7   member where they affirm affiliation with us.

8   Q    So the organization still considers itself to be a

9   membership organization?

05:02:03   10   A    Yes.

11   Q    And do people -- you just answered this.  Do people pay

12   money to join Environment Texas?

13   A    Yes.

14   Q    And people can join without paying money as well?

05:02:12   15   A    Yes.

16   Q    And do the by-laws -- what do the by-laws refer to those

17   two classes of people as?

18   A    Well, the grassroots members are members who don't pay.

19   Q    I asked a poor question, and I think it was poor because

05:02:34   20   you've already answered it a minute ago.  And I'll withdraw the

21   question.  In your role as director, do you ever communicate

22   with Environment Texas members?

23   A    Yes.

24   Q    And how do you communicate with them, in what ways?

05:02:44   25   A    Well, we as an organization, going door to door, and

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Metzger - Direct/Kratka

1  educating the public is a core part of our mission.  And so from

2  time to time, I'll go out myself and knock on doors, talk to our

3  members about our issues.

4          Several times a year, I'll sit down and have

05:02:59  5  about an hour-long meeting with a handful of our members to

6  brief them on our campaigns, get their feedback, and get their

7  impact about what they would like to see us prioritize.  I will

8  regularly hold member events.  So, for example, just in December

9  we had a holiday party where the Speaker of the House in Texas

05:03:19  10  came and briefed our members about our work around -- or to

11  thank us for our work around water conservation, so met with our

12  members and spoke with them there about our campaigns.

13          I will sometimes hold advocacy trainings where

14  I'll meet with our members and teach them skills of citizen

05:03:41  15  advocacy and also talk to them about our campaigns like that.  I

16  will regularly, you know, post -- well, regularly write e-mails

17  that go to our members inviting them to sign petitions and get

18  involved and frequently will get responses from our members

19  about that issue or other issues and then also through social

05:04:05  20  media, you know, posting on Facebook and Twitter, ask our

21  members what they think about a certain issue and get their

22  input.

23  Q    And in your role as director and through all these

24  activities, have you developed an understanding as to why people

05:04:21  25  join Environment Texas?

Metzger - Direct/Kratka

1  **A**    They join Environment Texas because --

2           MR. ALEXANDER:  Your Honor, I object to the

3  speculation.

4           THE COURT:  Sustained.

05:04:27  5           Just rephrase it.

6           MR. KRATKA:  Yeah.

7  BY MR. KRATKA:

8  **Q**    Let me ask you this:  What is your understanding as to why

9  people join Environment Texas?

05:04:39  10  **A**    My understanding -- and I'm a member myself.  So I can also

11  speak to my own experience.  But my understanding is that they

12  join because they seem to get results for the environment.

13  They've seen that we have helped protect state parks from

14  closure.  We've helped, you know, clean up the air.  We've

05:04:55  15  helped conserve water, you know, amid an historic drought.  And

16  they, you know, are excited about the work that we do through

17  advocacy, through litigation, through grassroots organizing.  So

18  they believe very strongly in our mission.

19  **Q**    Does Environment Texas actively encourage people to join as

05:05:15  20  members?

21  **A**    Absolutely, we -- yes.

22  **Q**    And why does Environment Texas seek to have people join as

23  members?

24  **A**    Because we're a -- we're a grassroots organization.  We

05:05:26  25  don't take any money from the government or from corporations or

Metzger - Direct/Kratka

1    unions.  We rely entirely on the support of our members and, you

2    know, we are -- we are a citizens' organization.  So when I go

3    to the capitol and meet with legislators, you know, being able

4    to show that we have members standing behind us that care about

05:05:43   5    these issues, I think this is powerful; and it allows us to have

6    a base of people that we can ask to write letters or show up for

7    hearings at the legislature and other things.  Our members are,

8    you know, a critical part of the organization.  You know, they

9    define us.

05:06:00   10   Q    And does Environment Texas have a corporate board of

11   directors?

12   A    Yes.

13   Q    How many people serve on the board?

14   A    Three.

05:06:08   15   Q    And do supporting members and grassroots members of

16   Environment Texas have any role in the selection of the board?

17   A    Yes.  They elect one member of the board.

18   Q    And can people who are not considered either supporting or

19   grassroots members vote in board elections?

05:06:28   20   A    No.

21   Q    In your role as director, do you keep abreast of the member

22   numbers of your organization?

23   A    Yes.

24   Q    And how many people currently are considered to be

05:06:37   25   Environment Texas members?

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Metzger - Direct/Kratka

1  **A**    I believe we are at about 2900.

2  **Q**    2900?

3           THE COURT:  And which -- which class of membership?

4           THE WITNESS:  That was the dues paying members.

05:06:44  5  BY MR. KRATKA:

6  **Q**    And do you know how many members live -- Environment Texas

7  members live in the Houston area?

8  **A**    I believe it's several hundred.

9  **Q**    Okay.  And do you know whether Diane Aguirre is a member of

05:06:58  10  Environment Texas?

11  **A**    Yes, she is.

12  **Q**    And how do you know that?

13  **A**    From her membership record.

14  **Q**    And you said she is currently a member?

05:07:08  15  **A**    Yes.

16  **Q**    Okay.  And do you know whether Stuart Halpryn is a member

17  of Environment Texas?

18  **A**    Yes, he is.

19  **Q**    And how do you know that?

05:07:15  20  **A**    From his membership record.

21  **Q**    Now, other than your -- the personal efforts and outreach

22  that you've described, does Environment Texas as an organization

23  do anything to keep its members apprised of the organization's

24  work?

05:07:30  25  **A**    I'm sorry.  Could you say that --

Metzger - Direct/Kratka

1  Q    Yes.  In addition to the communications with members that

2  you described that you personally participated in, are there any

3  other ways that the organization communicates its work to its

4  members?

05:07:43  5  A    Yes.  We have a staff that regularly will go door to door

6  talking to people about our issues.  We have a newsletter that

7  goes out three times a year and an annual report that comes out

8  annually.  So those would be some of the main ways.

9  Q    And do members of the organization have any role in setting

05:08:05  10  the priorities for Environment Texas's policy work?

11  A    Yes.

12  Q    In what ways can members affect the organizational policies

13  and issues of Environment Texas?

14  A    They can communicate them to us, and we -- as a membership

05:08:25  15  organization, you know, we take very seriously what our members

16  are concerned with and what they want us to work on.  So that

17  plays a major role in our deciding our agenda.

18  Q    And in what ways can members communicate with the

19  organization?

05:08:39  20  A    They can communicate through canvasser at their door, to a

21  caller on the phone, with me or one of my staff during, you

22  know, the several dozens of meetings we hold with our members

23  individually, through events we hold like the holiday party I

24  mentioned or advocacy trainings, online in responding to an

05:09:00  25  e-mail or something I posted on social media.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Metzger - Direct/Kratka

1  Q     Can you think of any examples of an issue that Environment
2  Texas works on that arose from member input or feedback?
3  A     Our water conservation campaign, we, you know, heard from a
4  number of members that they're very concerned about the drought
05:09:22  5  and what it meant to our rivers and, you know, the urgent need
6  to increase water conservation to help protect our environment.
7  Q     And can you think of any examples of an issue that
8  Environment Texas works on that was influenced by the interests
9  of Houston area members?
05:09:34  10  A     Yeah.  Air quality.  Yes.  And so our -- a number of our
11  members are very concerned about air pollution here.  They are
12  especially concerned by the air pollution coming from
13  petrochemical facilities and -- and then even especially
14  concerned then that pollution is coming from illegal emission
05:09:55  15  events.  I think they're angry at the events happening and at
16  the -- what they see as the failure of the state to stop the
17  violations.
18  Q     And does this lawsuit fall within that issue area?
19  A     Yes.
05:10:06  20  Q     Was this lawsuit approved by the Environment Texas board of
21  directors?
22  A     Yes.
23  Q     And this is -- this is not the first lawsuit that
24  Environment Texas has brought?
05:10:17  25  A     No.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Metzger - Direct/Kratka

1   Q    What others have Environment Texas participated in, what

2   other lawsuits?

3   A    A suit against Shell's facility in Deer Park -- a lawsuit

4   against Shell at their facility in Deer Park and a lawsuit

05:10:32   5   against Chevron Phillips for their facility in Baytown.

6   Q    And can you give just a general description of the nature

7   of those cases?

8   A    They involved emission events and upsets and exceedances of

9   Clean Air permit -- Clean Air Act permits.

05:10:51   10   Q    Similar to this case?

11   A    Similar to the case.

12   Q    And how did Environment Texas learn about the violations

13   that, you know, those cases were based upon?

14   A    From the STEERS database.

05:11:01   15   Q    And what were the outcomes of those two lawsuits?

16   A    The companies both settled with us and committed to reduce

17   their emissions by over 80 percent, to install some additional

18   monitoring and pollution control, and to pay a penalty.  That

19   money went to support Clean Air projects here in the Houston

05:11:22   20   area, including one to retrofit dirty diesel school buses to

21   help reduce exhaust exposed to children.

22        THE COURT:  Are those settlements a matter of public

23   knowledge?

24        THE WITNESS:  Yes.

05:11:34   25        THE COURT:  All right.  How much were they settled

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Metzger - Direct/Kratka

1    for?

2              THE WITNESS:  Shell was, I think, about $5.8 million

3    and Chevron Phillips was $2 million.

4              THE COURT:  All right.

05:11:46  5         MR. KRATKA:  And, your Honor, we've submitted those --

6    both those settlement agreements, one of which was signed by

7    this Court, the consent agreement, as Plaintiffs' Exhibits 568

8    for the Shell case and 569 for the Chevron.

9              THE COURT:  Thank you.  If I need to look at them,

05:12:02  10   thank you.

11   BY MR. KRATKA:

12   Q    And, Mr. Metzger, were you satisfied with the results of

13   those cases?

14   A    Yes.

05:12:07  15  Q    Why?

16   A    The companies ultimately reduced their emissions by 95

17   percent, so -- and together led to a reduction of about 1.1

18   million pounds in pollution.  So big improvement in air quality

19   in addition to, you know, paying a penalty, admitting the

05:12:29  20   responsibility.  We were satisfied.

21   Q    And was the 95 percent reduction in emissions you were

22   referring to, was that unauthorized emissions?

23   A    That's right.

24   Q    And was the --

05:12:39  25             THE COURT:  95 percent under what -- from where, from

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Metzger - Direct/Kratka

1   the date of settlement until then --

2            MR. KRATKA:  You anticipated my next question, your

3   Honor.

4            THE COURT:  Go on.  Go on.

05:12:51   5   BY MR. KRATKA:

6   Q     What was the comparison level from which you computed that

7   95 percent?

8   A     It was based on a five-year average of emissions from the

9   facilities, 95 -- 95 percent reduction from that five-year

05:13:04  10   average.

11   Q     The five-year average prior to when the lawsuit -- each

12   lawsuit was filed?

13   A     Yes.

14   Q     And are those consent decrees still in effect?

05:13:12  15   A     No.  They ended in November.

16   Q     And are you aware of the --

17            THE COURT:  I don't have them right in front of me,

18   needless to say.  What was the date that they were issued?  Now,

19   how long was it?  In other words, how long a time was it until

05:13:28  20   they're no longer in effect?  I just don't have them in front of

21   me.

22            THE WITNESS:  It was a three-year consent decree.

23            THE COURT:  Okay.

24            MR. KRATKA:  Roughly three years for each.

05:13:37  25   //

Metzger - Direct/Kratka

1    BY MR. KRATKA:

2    Q    And are you aware of the environmental performance of the

3    Shell Deer Park facility after the termination of the Shell

4    consent decree?

05:13:48   5    A    Yes.

6    Q    And do you have any concerns with Shell's performance once

7    their consent decree ended?

8    A    Yes.

9    Q    What concerns do you have?

05:13:58   10   A    They had at least one major emission event since the end of

11   the consent decree involving a large amount of pollution.

12   Q    Do you have any feeling about whether --

13         MR. KRATKA:   Strike that.

14   BY MR. KRATKA:

05:14:14   15   Q    Referring to those cases themselves, you were the director

16   of Environment Texas at the time that both of those cases were

17   brought?

18   A    Yes.

19   Q    And during the pendency of those cases, were -- and after

05:14:28   20   the settlement of those cases, did the Texas Commission on

21   Environmental Quality ever contact you to inform you that they

22   felt those suits were intrusive on their work?

23   A    No.

24   Q    And did they ever contact you to let you know that those

05:14:44   25   lawsuits in any way interfered with their enforcement?

Metzger - Direct/Kratka

1  A      No, they did not.

2  Q      Did the EPA ever contact you to let you know that either of

3  those suits was either intrusive or interfering with their

4  enforcement efforts?

05:14:59  5  A      No.

6  Q      Why did Environment Texas bring this lawsuit?

7  A      Because Exxon, according to their own records, has exceeded

8  their Clean Air Act permits thousands of times, putting out

9  nearly 10 million pounds of pollution into the air above and

05:15:25  10  beyond what they're legally allowed to and we feel that the

11  state has not held them accountable for those violations and

12  taken steps necessary to prevent them from continuing in the

13  future.

14          THE COURT:  Let me just mention to you:  It's now

05:15:40  15  about 5:15.  I can go straight through to about 6:05, or if you

16  need to, we'll take a five-minute break.  You call it.  What do

17  you prefer doing?  I mean, just five minutes.

18          MR. KRATKA:  Let me ask just about three more

19  questions and then take a five-minute break.

05:15:57  20          THE COURT:  Absolutely.

21          MR. KRATKA:  That will be a better breaking point.

22          THE COURT:  Yeah.

23  BY MR. KRATKA:

24  Q      Okay.  Now, how did Environment Texas learn about the

05:16:03  25  alleged violations that you're referring to?

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Metzger - Direct/Kratka

1    **A**    From the STEERS database.

2    **Q**    And you are familiar with the STEERS database?

3    **A**    Yes.

4    **Q**    What is your understanding of what a STEERS report is?

05:16:14   5    **A**    It's a report filed by a company when they have an emission

6    event, so an unauthorized release of emissions above a certain

7    quantity.

8    **Q**    Have you seen STEERS reports yourself?

9    **A**    Yes.

05:16:27   10    **Q**    Are you familiar with the types of information contained in

11    STEERS reports?

12    **A**    Yes.

13    **Q**    And have you reviewed STEERS reports that relate

14    specifically to the Exxon Baytown Complex?

05:16:36   15    **A**    Yes.

16            MR. KRATKA:  And, your Honor, just to let the record

17    reflect that for each of the three plants, Plaintiffs have put

18    into evidence the STEERS reports underlying those stipulated

19    tables as Plaintiffs' Exhibits 16, 17, and 18.  And for those

05:16:53   20    post September, 2013, events that we discussed on Friday, those

21    are Exhibits 20, 21, and 22.

22            THE COURT:  Uh-huh.

23    BY MR. KRATKA:

24    **Q**    And are you familiar with the terms non-reportable or

05:17:07   25    recordable emission events?

Gayle Dye, CSR, RDR, CRR - 713.250.5582

                          Metzger - Direct/Kratka

 1   **A**    Yes.

 2   **Q**    What is your understanding of a non-reportable or

 3   recordable emission event?

 4   **A**    That is an emission event that involved an unauthorized

05:17:19  5   release of emissions but below a reportable quantity.

 6   **Q**    And, again, for the record, I'm sorry.  You've reviewed

 7   Exxon's records of non-reportable emission events?

 8   **A**    Yes.

 9   **Q**    And you're familiar with the information they contain?

05:17:33  10   **A**    Yes.

11           MR. KRATKA:  And, again, your Honor, those have been

12   submitted as Plaintiffs' Exhibits 101 through 112.  This would

13   probably be a good breaking point.

14           THE COURT:  I have about 5:18.  We'll get back in at

05:17:54  15   5:25.  We'll take about a five-minute break.

16        (Court recessed at 5:17 p.m.)

17        (Court resumed at 5:26 p.m.)

18   BY MR. KRATKA:

19   **Q**    Mr. Metzger, are you familiar with the term "deviation

05:27:08  20   report?"

21   **A**    Yes.

22   **Q**    And what is your understanding of what a deviation report

23   is?

24   **A**    It's a report filed I believe two times a year documenting

05:27:17  25   deviations or violations with a Title 5 permit.


            Gayle Dye, CSR, RDR, CRR - 713.250.5582

Metzger - Direct/Kratka

1  **Q**     And have you reviewed Exxon's deviation reports for the

2  Baytown Complex?

3  **A**     Yes.

4            MR. KRATKA:  And, your Honor, those reports which are

05:27:28  5  the underlying documents for stipulated Tables 7A through 7E are

6  in evidence as Plaintiffs' Exhibits 23 through 100.

7            THE COURT:  All right.

8  BY MR. KRATKA:

9  **Q**     Now, Mr. Metzger, are you familiar with -- generally with

05:27:50  10  what Title 5 permits are?

11  **A**     Yes.

12  **Q**     And do you know whether Title 5 permits incorporate the new

13  Source Review and Prevention of Significant Deterioration

14  permits issued by the TCEQ?

05:28:03  15  **A**     Yes, they do.

16  **Q**     And do they incorporate them?

17  **A**     Yes.

18            MR. KRATKA:  And, your Honor, again, we've submitted

19  into evidence all of the permits that are relevant to this case.

05:28:13  20  The Title 5 permits are Plaintiffs' Exhibits 191 through 215 and

21  222 through 252.  That's overall the revisions to the permits.

22  And the NSR and the PSD permits that are incorporated into them,

23  which have also been revised many times, are -- for the period

24  covered by this lawsuit are Plaintiffs' Exhibits 113 through 189

05:28:40  25  and 216 through 221.

 1            THE COURT:  221, okay.

 2   BY MR. KRATKA:

 3   Q     Now, I just referred to a stipulation, Mr. Metzger.  Are

 4   you aware that the parties have entered into a stipulation

 5   regarding the information and the reports we've just been

 6   discussing, STEERS reports, non-reportable emission events, and

 7   deviation reports?

 8   A     Yes, I am.

 9   Q     And have you reviewed the tables of information, the

10   stipulated tables that the parties have entered into?

11   A     Yes.

12   Q     And just, again, this will probably be said a million

13   times, but those are Plaintiffs' Exhibit 1A through 7E.  And

14   you're generally familiar with those tables?

15   A     Yes.

16   Q     And I want to turn your attention now to a number of

17   summary charts in which calculations have been made of the days

18   of violation, which those -- these numbers have been thrown

19   around quite a bit.

20            MR. KRATKA:  As your Honor has already heard.

21   BY MR. KRATKA:

22   Q     And I want to ask you some questions about how these

23   numbers were arrived at.  If you would turn your attention to

24   Plaintiffs' Exhibit 587, I'll hand you a copy of it, and also

25   put the first page of it up on the screen.


             Gayle Dye, CSR, RDR, CRR - 713.250.5582

Metzger - Direct/Kratka

1          THE COURT:  Can you put it on the screen?  Oh, that
2     screen?

3          MR. KRATKA:  Yes, sorry.  Low tech here.

4     BY MR. KRATKA:

05:30:30   5   Q    Mr. Metzger, have you seen this document before?

6     A    Yes.

7     Q    Can you tell the Court what this exhibit is?

8     A    This is the calculation of numbered days of violations from
9     our Plaintiffs' Exhibit 1A.  It's nearly identical to the
05:30:48  10    stipulated table; however, we added one column to the far right
11    where we calculated the number of days of violations.

12    Q    So if I could just -- if we could just show the Court
13    exactly what you mean.  You've taken the stipulated Table 1A
14    which was STEERS events for the refinery under Count 1 --

05:31:11  15   A    Yes.

16    Q    -- and at the far right of this stipulated table, you've
17    added a new column entitled "Number of Days of Violation"?

18    A    Yes, that's right.

19    Q    And at the top of this exhibit, there's some language up
05:31:26  20    there.  Can you tell the Court generally what that is up on top?

21    A    Yes.  So first we count one day of violation for each
22    24-hour period.  And so a violation that was less than 24 hours
23    or 24 hours or less would be counted as one violation.  If it
24    were 30 hours, for example, that would be counted as two days of
05:31:49  25    violations.

Metzger - Direct/Kratka

1          THE COURT:  How do you count -- how do you do the

2   multiple counting?  How did you come to that?

3          THE WITNESS:  If my understanding is -- under the law,

4   each day of violation is -- each 24-hour period is considered a

05:32:03   5   day, and each 24-hour period or each day then can be counted as

6   a violation.

7          THE COURT:  All right.  But is it a continuing

8   violation of the same -- excuse me.

9               You know what the positions are.  Is this a

05:32:17   10   continuing -- is this a continuing violation or each one

11   independent for every day?  Maybe I'm inarticulate.

12          MR. KRATKA:  Yes.

13          THE COURT:  You know what I was -- the point I'm --

14          MR. KRATKA:  I'm going to be leading Mr. Metzger

05:32:33   15   through a number of summaries that get precisely to that issue,

16   and I apologize ahead of time.  It's going to take a little bit

17   of time.

18          THE COURT:  Nope, nope.  That's what we've got.

19   That's why I have a timing order.

05:32:44   20          MR. KRATKA:  Okay.

21          THE COURT:  Go on.

22          MR. ALEXANDER:  Your Honor, I apologize.  May I take

23   the witness on voir dire just very briefly?

24          THE COURT:  Absolutely.

05:32:48   25   //

1                    VOIR DIRE EXAMINATION

2  BY MR. ALEXANDER:

3  Q    Mr. Metzger, did I hear you right to say that you

4  personally did the work behind this -- this day, the violation

05:32:56   5  table?

6              MR. KRATKA:  We jumped ahead a second.  I've got a

7  couple of background --

8              THE COURT:  All right.  Let him lay some more

9  predicate, and then get up if you still need that same point,

05:32:57  10  Okay?

11             MR. KRATKA:  Thank you, your Honor.

12             THE COURT:  I understand you're entitled to it; but if

13  he says he's going to get there, then you know what he had in

14  mind.

05:33:10  15             MR. ALEXANDER:  Understood, your Honor.

16             MR. KRATKA:  I had a poorly worded question that

17  allowed the witness to jump the order.  So, I -- that's my

18  fault.

19                    DIRECT EXAMINATION

05:33:15  20                      (continued)

21  BY MR. KRATKA:

22  Q    What I meant to ask:  Were there guidelines listed for

23  counting days of violation?  Is that what appears at the top of

24  this table?

05:33:21  25  A    Yes.

Metzger - Direct/Kratka

1  **Q**    And did you yourself come up with these guidelines for how

2  to count what constituted a day of violation?

3  **A**    I did in concert with the legal team.

4  **Q**    And without revealing the contents of any attorney/client

05:33:36  5  communications, you participated in discussions with the legal

6  team as to what constituted a day of violation?

7  **A**    Yes, I did.

8  **Q**    And do you understand the guidelines that were arrived at

9  for this particular table?

05:33:50  10  **A**    Yes.

11  **Q**    But you also understand that it is ultimately this Court

12  who will determine whether or not a particular violation

13  actually occurred?

14  **A**    Yes.

05:34:03  15  **Q**    And did you play any role in actually going through this

16  table and doing the computation of the days of violation?

17  **A**    Yes.  I authorized and reviewed the work of the paralegal,

18  Mary Rock, who did much of the work.

19  **Q**    And you did review these calculations after they were

05:34:17  20  performed?

21  **A**    Yes.

22  **Q**    And you stated that you understand the -- how they were --

23  these calculations were undertaken?

24  **A**    Yes.

05:34:23  25  **Q**    And are you able to answer questions about how these

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Metzger - Direct/Kratka

1  calculations were made?

2  **A**    Yes.

3  **Q**    Okay.  So now let's go back to the top of Exhibit 587

4  itself and let me ask you some more specific questions.  So,

05:34:40   5  again, you just explained the first guideline about 24-hour

6  periods?

7  **A**    Yes.

8  **Q**    And if you look down at row -- let's see -- Row 9, you got

9  the rows on the table here.  Row 9 of the first page of this

05:35:08  10  exhibit.  And this is for STEERS Event 66872.  Can you explain

11  why at the far right of Row 9 there is a number two on the days

12  of violation column?

13  **A**    Yes.

14  **Q**    Would you explain?

05:35:24  15  **A**    Yes.  The duration of the event was 28 hours and ten

16  minutes.  So that was counted as two days' violations because it

17  extended into a second day.

18  **Q**    Okay.

19          MR. ALEXANDER:  Mr. Kratka, I apologize.

05:35:37  20          May I interrupt for just a second, your Honor?

21  They have not offered this document into evidence.  And I

22  understand the Court's procedure.  We're not objecting to it

23  because it's not a jury trial, but I just want to note for the

24  record that, although we don't object to the document, we're not

05:35:50  25  acceding to the arguments they've got here at the top that

Metzger - Direct/Kratka

1   they're going through with regard to how to calculate a day of

2   violation of those --

3              THE COURT:  I understand.

4              MR. ALEXANDER:  Thank you, your Honor.

05:36:00   5   BY MR. KRATKA:

6   Q    And if you'd turn to the second guideline at the top of

7   this exhibit, can you explain to the Court what that's about?

8   A    Yeah.  The permit for the refinery regulates emissions on a

9   pollutant-by-pollutant basis.  So, we calculated each pollutant

05:36:25   10   separately except for VOCs which are grouped together in the

11   permit except for benzene which is regulated separately, and

12   oxide and nitrogen are also grouped together as a pollutant.

13   Q    So if you look back down again at Row 9 of this exhibit

14   under the contaminant column, there's a grouping of a number of

05:36:44   15   different volatile organic compounds as total VOCs.  Under the

16   contaminant column, there's a listing for total VOCs.  Is that

17   what you're referring to as a grouping of a number of different

18   pollutants?

19   A    Yes.

05:37:14   20   Q    And that entire group would be counted as a single

21   pollutant when you were computing days of violation?

22   A    That's right.

23   Q    Again, this is from the original stipulated table of the

24   parties?

05:37:27   25   A    Yes.

Metzger - Direct/Kratka

1  Q    And then going to the third guideline at the top of the

2  page for determining what constituted days, a day of violation,

3  can you describe what the third guideline is?

4  A    Yes.  The every emission limit is considered to be zero

05:37:47  5  because the refinery permits specifically says that no upset

6  emissions are allowed.

7           THE COURT:  Say that again.  I don't understand.

8  Just --

9           THE WITNESS:  Sure.  The permit for the refinery

05:37:56  10  specifically states that no amounts of upset emissions are

11  allowed.  So we counted the emission limit as zero because of

12  that.

13           THE COURT:  Oh, the limit.  Okay.

14           THE WITNESS:  Yes.

05:38:07  15  BY MR. KRATKA:

16  Q    So if any amount was emitted of a particular pollutant, it

17  was compared to a limit of zero?

18  A    Right.

19  Q    And that's, again, just for Count 1 involving upset events

05:38:18  20  at the refinery?

21  A    That's right.

22  Q    And then the fourth rule, the guideline for counting days

23  of violations, can you describe that for the Court?

24  A    Sure.  We only counted one violation per day for each

05:38:30  25  pollutant released in an emission event regardless of the -- how

Metzger - Direct/Kratka

1    many emission points there were from the same event.  That's

2    because the flex permit groups all emission sources together.

3    Q    Can you describe for the Court what you mean by "flex

4    permit"?

05:38:45    5    A    Yes.  A flex permit, basically, aggregates the pollution

6    limits for multiple sources into one facility-wide cap on

7    emissions.

8    Q    So, for example, all sources of sulfur dioxide would be

9    grouped together under a single emission limit?

05:39:05    10    A    Yes.

11    Q    When you say "flex permit" or "flex cap," is that short for

12    flexible permit?

13    A    Yes, it is.

14    Q    And those are issued by the TCEQ?

05:39:12    15    A    Yes.

16    Q    And then to illustrate that, if you flip to page 3 of the

17    exhibit -- well, actually pages 2 and 3 of this exhibit on the

18    far right column, you'll see entries that say "already counted"

19    under the "Days of Violation" column?

05:39:45    20    A    Yes.

21    Q    What does "already counted" mean?

22    A    That means we had already counted that pollutant as a day

23    of violation and because under our methodology we won't count it

24    as a second time because it's covered under that same flex

05:40:01    25    permit.

Metzger - Direct/Kratka

1    **Q**    So if sulfur dioxide were emitted from three different

2    flares in the same emission event, you only counted it once?

3    **A**    That's right.

4    **Q**    And I want you to turn your attention -- if you would, flip

05:40:25    5    to the next exhibit which will be Plaintiffs' Exhibit 588.

6                    MR. KRATKA:   And if your Honor recalls the very small

7    print on --

8                    MR. ALEXANDER:   I apologize, your Honor.  I think the

9    point is amply made, but with regard to Exhibit 588, just like

05:40:52    10   587, although we're not objecting to the exhibit, we're not

11   acceding in any way to the --

12                   THE COURT:   Don't worry about it.   That's a

13   continuing -- it's a running objection.   Let's go.

14                   MR. ALEXANDER:   Thank you, your Honor.

05:41:01    15   BY MR. KRATKA:

16   **Q**    Can you explain to the Court what Exhibit -- have you seen

17   Exhibit 588 before?

18   **A**    Yes.

19   **Q**    Can you tell the Court what this exhibit is?

05:41:09    20   **A**    This, again, is a stipulated table from our Exhibit 1B.

21   However, we added one column which is "Number of days of

22   Violations" on the far right.

23   **Q**    And so this is the stipulated Table 1B which is recordable

24   emission events at the refinery under Count 1 of the complaint?

05:41:27    25   **A**    Yes.

Metzger - Direct/Kratka

1   **Q**    And, again, you added a single column computing numbers of

2   days of violation?

3   **A**    Yes.

4   **Q**    And did you play the same role in participating in the

05:41:37   5   production and review of this table as you did with the previous

6   one?

7   **A**    Yes, I did.

8   **Q**    And you're able to answer questions about how these

9   calculations were performed?

05:41:45   10   **A**    Yes.

11   **Q**    And looking again at the rules for counting on top, are

12   they -- since it's both under Count 1, are the rules the same as

13   we just discussed for Table 1 -- for Plaintiffs' Exhibit 587?

14   **A**    Yes.

05:42:00   15   **Q**    And we -- I believe this came up before when your Honor was

16   looking at the original stipulated table of these recordable

17   emission events, some of which involve small amounts of

18   emissions.  Can you explain why Environment Texas is even

19   bothering to sue over such small emission amounts?

05:42:24   20   **A**    Yes.

21   **Q**    Can you do so?

22   **A**    If it were, you know, five emission events involving half

23   pound, then we wouldn't be suing over this; but this is, I

24   think, 287 pages of small nice print that together adds up to

05:42:39   25   more than or almost a million and quarter pounds of pollution.

Metzger - Direct/Kratka

1  So together it adds up to a huge amount; and I think it, you

2  know, goes to show that Exxon's not running the facility very

3  well, that they're having, you know, these emission events over

4  and over and over again.

05:42:59  5  Q    Now, if you flip down to page 7 of this exhibit, this

6  particular event again was mentioned earlier.  Row 270, which is

7  only on page 7, can you explain why there is a 12 in the far

8  right column under number of days of violations?

9  A    Yes.

05:43:23  10  Q    Please go ahead and do so.

11  A    Because the event lasted 272 hours, so that counts as up to

12  about 12 days.

13  Q    And what was the total amount of pollutants released in

14  this event?

05:43:44  15  A    20,533 pounds of carbon monoxide.

16  Q    So this is a 20,000-pound recordable emission event?

17  A    Yes.

18  Q    If you flip to the last -- very last page of the exhibit --

19  I should have done this for the previous one as well -- is there

05:44:03  20  a total under the days of violation column?

21  A    Yes.

22  Q    And what page of the exhibit is that?

23  A    Page 287.

24  Q    That's 287 pages of recordable emission events.  And what

05:44:16  25  was total number of days of violation?

                          Metzger - Direct/Kratka

 1  **A**     9,390.

 2  **Q**     And that's what you had computed -- or the Plaintiffs had

 3  computed for number of days of recordable emission violations

 4  under Count 1?

 5  **A**     Yes.

 6          MR. KRATKA:  So why don't we flip right back to

 7  Exhibit 587 and look at the last page there.  Got that up on the

 8  screen now.

 9          THE COURT:  That's the prior one?

10          MR. KRATKA:  That's the prior one.

11  BY MR. KRATKA:

12  **Q**     This is the last page of Plaintiffs' Exhibit 587, which

13  totals the number of violations for STEERS events under Count 1?

14  **A**     Yes.

15  **Q**     And what is the total?

16  **A**     1,359 days of violations.

17  **Q**     Okay.  Were you in the courtroom earlier when Mr. Nichols

18  was giving his opening statement for Exxon?

19  **A**     Yes.

20  **Q**     And did you hear the argument regarding whether

21  Plaintiffs -- the argument about Plaintiffs having to prove

22  repeated violations?

23  **A**     Yes.

24  **Q**     Let me show you Plaintiffs' Exhibit 9.  And have you seen

25  this document before?

Metzger - Direct/Kratka

1   A    Yes.

2   Q    Can you tell the Court what this document is?

3   A    This summarizes the number of days of violations from both

4   the STEERS events and the recordable events at the refinery as

05:46:19   5   presented in Exhibit 587 and 588.

6   Q    And did you play any role in creating this summary table?

7   A    Yes.

8   Q    What role did you play?

9   A    I authorized and reviewed the creation of the table.

05:46:32   10   Q    And are you able to answer questions about how the

11   summaries were arrived at?

12   A    Yes.

13   Q    Can you describe for the Court what this first section,

14   which is called calculation of statutory maximum penalty, is?

05:46:48   15   A    Yes.

16   Q    Again, actually before you do -- again, this -- this

17   summary table relates to which exhibits?

18   A    587 and 588.

19   Q    So those are the ones we just looked at regarding

05:47:04   20   calculating days of violation?

21   A    Yes.

22   Q    Okay.  And what -- what's being done here in this first

23   section called calculation of statutory maximum penalty?

24   A    We documented the days of violations from both STEERS and

05:47:19   25   recordables events occurring before January 12, 2009, which was

Gayle Dye, CSR, RDR, CRR - 713.250.5582

                          Metzger - Direct/Kratka

 1   the date that EPA raised the maximum penalty.  So prior to

 2   January 12, 2009, the maximum daily penalty was 32,500; and

 3   after January 12, 2009, the maximum penalty was 37,500.

 4              THE COURT:  Who set those amounts?

 5              THE WITNESS:  EPA.  So then we calculated or

 6   multiplied the maximum penalty per day times the number of days

 7   of violations to arrive at the total maximum penalty.

 8   BY MR. KRATKA:

 9   Q    So this is a calculation of the maximum possible penalty

10   that could be awarded for Count 1?

11   A    Yes.

12   Q    And the totals here for the -- under each of these columns,

13   these are taken from the -- those two counting tables or

14   calculating tables, for lack of a better word, that we just went

15   through?

16   A    Yes.

17   Q    Okay.  And then please describe for the Court the second

18   section of this summary exhibit which is entitled "Repeated

19   Violations of Emission Limits, Refinery Flexible Permit 18287."

20   A    Here we went through pollutant by pollutant from both the

21   STEERS and recordables records and documented how many

22   violations there were both before we filed the complaint and

23   after we filed the complaint --

24   Q    And --

25   A    -- and then totals thereof.


                 Gayle Dye, CSR, RDR, CRR - 713.250.5582

Metzger - Direct/Kratka

1    **Q**    Okay.  And you testified a moment ago that permit -- that's

2    listed here Permit 18287 for the refinery is a flexible permit?

3    **A**    Yes.

4    **Q**    And the refinery flexible permit has flexible emission

05:49:15  5    caps?

6    **A**    Yes.

7    **Q**    So, what does that mean?  If there's a limit for sulfur

8    dioxide, what does that emission cap apply to at the refinery?

9    **A**    That means that we only counted that pollutant once and so

05:49:29  10   we didn't -- even if there were emissions of the same pollutant

11   from multiple sources, we only counted that as, you know, one

12   day of violation.

13   **Q**    And because it's a flexible permit cap, does it matter

14   which source caused the violation of the cap in terms of whether

05:49:46  15   a violation occurred?

16            MR. ALEXANDER:  Your Honor, I'm sorry, I think we're

17   treading into legal areas now for which this witness is not

18   qualified.

19            THE COURT:  Overruled.  Ask the question again.

05:49:54  20   BY MR. KRATKA:

21   **Q**    Yeah.  I'll ask it again.  For purposes of your

22   computations and summary of the stipulated tables, did it matter

23   in your counting whether or not -- which emission point was the

24   source of the violation of a particular flexible cap?

05:50:14  25   **A**    No.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Metzger - Direct/Kratka

1    Q     I may have asked this already -- and I apologize if I

2    did -- but can you explain again what a flexible cap and a

3    flexible permit is?

4    A     Yes.  It's the total facility-wide cap on emissions for a

05:50:52   5    certain pollutant no matter what source it came from.

6    Q     So every source -- so if we're using sulfur dioxide as an

7    example, every listed source of sulfur dioxide is grouped

8    together and combined under a single emission limit for sulfur

9    dioxide?

05:51:07  10    A     Yes.

11    Q     And so when you counted violations of that limit, it didn't

12    matter which source was the listed cause of that violation,

13    correct?

14    A     Right.  Because any exceedance is a violation no matter

05:51:22  15    what the source if it exceeded the facility-wide cap.

16    Q     And, so, just to show the Court, the second page of the

17    exhibit, you went through all the different pollutants that was

18    emitted separately during emission events, upset events at the

19    refinery?

05:51:38  20    A     Yes.

21    Q     And you testified earlier that the refinery permit through

22    the maximum allowable emission -- let's backtrack again.  Are

23    you familiar with the term "maximum allowable emission rate

24    table"?

05:51:51  25    A     Yes.

Metzger - Direct/Kratka

1  **Q**    And what is that?

2  **A**    That is a table showing how much pollution per hour is

3  allowed from -- for a pollutant.

4  **Q**    And the maximum allowable emission rate table for the

05:52:06    5  refinery sets those limits by each pollutant?

6  **A**    Yes.

7  **Q**    Okay.  If you'll turn your attention to -- we're going to

8  move on to Count 2 -- Plaintiffs' Exhibit 589.

9           THE COURT:  Let me ask you this:  If you want to stop

05:52:30   10  at this point, if it's a good stopping pointing, we can do that.

11  It's strictly up to you because we can go to 6:05.  If you want

12  to get in some more, that's fine.  I have no problem.

13           MR. KRATKA:  Let's try to get in one more.

14           THE COURT:  Absolutely.

05:52:43   15           MR. KRATKA:  Or two if we can, if I'm efficient.

16           MR. ALEXANDER:  Mr. Kratka, what document did you just

17  reference?

18           MR. KRATKA:  Plaintiffs' Exhibit 589.

19           MR. ALEXANDER:  Thank you.

05:52:53   20  BY MR. KRATKA:

21  **Q**    Will you turn to that -- yeah, in the other volume.

22           Mr. Metzger, can you identify this exhibit for

23  the Court?

24  **A**    Yes.  Again, this is the -- largely drawn from the

05:53:21   25  stipulated table in our Exhibit 2A -- stipulated table -- sorry,

Metzger - Direct/Kratka

1    Plaintiffs' Exhibit 2A.  And we added a column on the far right

2    calculating the number of days of violations.

3  Q    So, again, like with the Count 1 tables, you added a single

4    "Days of Violation" column to the stipulated table?

05:53:37    5  A    Yes.

6  Q    And did you have the same role in preparing this

7    document -- in the creation of this document that you testified

8    to with respect to the Count 1 tables?

9  A    Yes.

05:53:53   10  Q    And if we look up to the guidelines -- we're under a

11    different count now.  And it looks like some of these guidelines

12    are a little different for how days of violation were computed.

13  A    Yes.

14  Q    Did you still determine -- in terms of duration, did you

05:54:15   15    still use the 24-hour period to determine number of days of

16    violation?

17  A    Yes.

18  Q    And did you still go pollutant by pollutant in terms of

19    looking at categorizing days of violation?

05:54:29   20  A    Yes.

21  Q    Similarly to the previous count?

22  A    Yes.

23  Q    And you testified that for Count 1 the emission limit was

24    assumed -- was assumed to be zero because of upset prohibition

05:54:45   25    at the refinery.  And for Count 2 how did you determine whether

Metzger - Direct/Kratka

1   an emission limit was exceeded?

2   **A**    Well, so, first, if the emission limit in the permit was

3   zero, then we counted that as a violation.

4   **Q**    And so the column here on reported emission limit -- I got

05:55:07   5   to slide it.

6   **A**    Yes.  So if the amount released was greater -- or so that

7   it was counted as zero, then any emission was a violation.

8   **Q**    And if the -- if the limit column contained a number, an

9   actual limit rather than zero, what did you do to determine

05:55:28   10   whether a violation occurred?

11   **A**    First, if a -- under the authorization column it stated

12   that the -- it was not specifically authorized, we counted that

13   as a violation or if it -- the column -- Exxon stated that only

14   portions were authorized, that means then that portions were not

05:55:51   15   authorized since we counted that as a violation.  And then,

16   finally, if the amount released was larger than the number

17   divided -- so the amount released divided by the number of hours

18   of the event were greater than the reported emissions limit,

19   then we counted that as a violation.

05:56:13   20   **Q**    So you determined -- so in those cases you determined the

21   actual emission rate during the event?

22   **A**    Yes.

23   **Q**    Pounds per hour?

24   **A**    Yes.

05:56:19   25   **Q**    And you compared that rate to the permit limit?

1    **A**    Yes.

2    **Q**    And if the emission rate was larger than the permit rate,

3    you counted a violation?

4    **A**    Yes.

05:56:29   5    **Q**    And, again, similarly you -- because of the flexible permit

6    issue, you grouped multiple sources of the same pollutant

7    together and just counted them once?

8    **A**    Yes.

9    **Q**    So let's just go through a couple of examples for the

05:56:45   10    Court.  Look at the bottom of page 2 of this exhibit.  Now, do

11    you see in the far right-hand column, which is "Days of

12    Violation," there is nothing listed here?  Can you explain why?

13    **A**    Yes.  Because the amount released was less than the

14    emission limit, the emission rate.

05:57:13   15    **Q**    So for those pollutants for this event, no violation was

16    counted?

17          THE COURT:  You are saying "rate."  What do you mean

18    by "rate"?

19          THE WITNESS:  The hourly rate from the permit.

05:57:24   20          THE COURT:  The permissible rate?

21          THE WITNESS:  The permissible rate.  So in this case

22    it was less than that.  So we didn't count it as a violation.

23    BY MR. KRATKA:

24    **Q**    And then just for another example, if you could flip to

05:57:38   25    page 27 of this exhibit.  I'm going to put that up on the

Metzger - Direct/Kratka

1    screen.

2            MR. KRATKA:  I'm sorry.  If I zoom in, we're going to

3    miss some of the columns.

4            THE COURT:  That's all right.

05:57:51   5    BY MR. KRATKA:

6    Q    Looking again at the highlighted items, can you explain why

7    there's no violations, no days of violation counted for ammonia

8    and total VOCs for this event?

9    A    Because under authorization, it says all emissions were

05:58:09  10    authorized by Permit 18287.  So we counted -- we didn't count

11    that as a violation.

12    Q    Okay.  And then -- but for this same event benzene was

13    counted as a violation.  Can you explain why there's a nine in

14    the benzene column?

05:58:24  15    A    Yes.  Because under authorization Exxon stated that only --

16    only 34 pounds of the 442 pounds were authorized.  So that means

17    that the rest were not authorized.

18    Q    And then how long did that violation last?

19    A    202 hours.

05:58:42  20    Q    So that was counted as nine days of violation just for the

21    pollutant benzene?

22    A    Yes.

23    Q    If you could flip to Plaintiffs' Exhibit 590 -- I'm sorry.

24    Let me just go back for one second.  Turn to the last page of

05:59:14  25    Exhibit 589.  Can you just -- can you tell the Court what the

Metzger - Direct/Kratka

1  total number of days of violation for Count 2 STEERS events at

2  the refinery is?

3  **A**    1,218 days of violation.

4  **Q**    And that's a lower number than under Count 1.  Is that

05:59:37  5  because the emission limit was not always assumed to be zero?

6  **A**    Yes.

7  **Q**    And if you look to Plaintiffs' Exhibit 590, is this the

8  same calculations for -- performed for refinery recordable

9  events under Count 2?

05:59:57  10  **A**    Yes.

11  **Q**    And that was done under the same guidelines as STEERS

12  events under Count 2?

13  **A**    Yes.

14  **Q**    And, again, the total of -- total number of violations is

06:00:09  15  shown on the last page of that exhibit?

16  **A**    Yes, it is.

17  **Q**    And what's that total?

18  **A**    6,723 days of violations.

19  **Q**    Okay.  So these first two exhibits under Count 2 dealt with

06:00:28  20  refinery STEERS events and refinery recordable events; and if

21  you would turn your attention to --

22         MR. KRATKA:  The next four exhibits, your Honor, maybe

23  we can kind of save a little time.

24  BY MR. KRATKA:

06:00:39  25  **Q**    Exhibits 591 through 594, do those perform the same

Metzger - Direct/Kratka

1    calculations for olefins plant STEERS events under Count 2,

2    olefins plant recordable events, chemical plant STEERS events,

3    and chemical plant recordable events under Count 2?  Those

4    exhibits perform the days of violation calculations in the same

06:01:21    5    manner as you've just described?

6    **A**    Yes.

7    **Q**    And you participated in the creation of those tables in the

8    same way that you did for the previous tables we've discussed?

9    **A**    Yes.

06:01:43    10    THE COURT:  I'll make it easy.  It's 6:02.  I'm going

11    to stop the clock.  Hang on one second.  I'll give you your

12    totals in a moment.  You can step down, sir.

13    THE WITNESS:  Thank you.

14    THE COURT:  All right.  I want the staff up here.  I

06:02:09    15    always get them to help me with the numbers, make sure I have

16    them right.

17    All right.  We got a lot in today.  Defendant had

18    two hours and two minutes.  The Plaintiff, three hours and 45

19    minutes.  Take a look at the sheet, how I'll do it; and the

06:03:19    20    number in parenthesis are those times in minutes so you can keep

21    track of them; and you can see your total minutes are up at the

22    top together with hours.

23    Thank you for moving it along.  We'll see you

24    tomorrow at 10:00 a.m.

06:03:32    25    (Court recessed for the day at 6:03 p.m.)

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1                         C E R T I F I C A T E

2

3          I certify that the foregoing is a correct transcript

4     from the record of proceedings in the above-entitled matter, to

5     the best of my ability.

6

7     By: /s/Gayle L. Dye_____        04-15-2014_____

8              Gayle L. Dye, CSR, RDR, CRR        Date

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25