```
 1                   UNITED STATES DISTRICT COURT

 2                   SOUTHERN DISTRICT OF TEXAS

 3                        HOUSTON DIVISION

 4   ENVIRONMENT TEXAS CITIZEN LOBBY, INC.,   .
     and SIERRA CLUB,                         .
 5                                            .
                     Plaintiffs,              .
 6                                            .  Civil Action
     VS.                                      .  No. H-10-CV-4969
 7                                            .
     EXXONMOBIL CORPORATION,                  .  Houston, Texas
 8   EXXONMOBIL CHEMICAL COMPANY,             .  February 11, 2014
     and EXXONMOBIL REFINING AND SUPPLY       .  10:05 a.m.
 9   COMPANY,                                 .
                                              .
10                   Defendants.              .
     . . . . . . . . . . . . . . . . . . . .
11
                     TRANSCRIPT OF PROCEEDINGS
12               BEFORE THE HONORABLE DAVID HITTNER
                          BENCH TRIAL
13                      DAY 2 OF 13

14   APPEARANCES:

15   FOR THE PLAINTIFFS:
             Mr. Joshua R. Kratka
16           Ms. Heather Govern
             NATIONAL ENVIRONMENTAL LAW CENTER
17           44 Winter Street
             4th Floor
18           Boston, Massachusetts
             617.747.4333
19           917.710.5180
             FAX:  617.292.8057
20           josh.kratka@verizon.net

21           Mr. David A. Nicholas
             20 Whitney Road
22           Newton, Massachusetts 02460
             617.964.1548
23           FAX:  617.663.6233
             dnicholas@verizon.net
24
             PROCEEDINGS RECORDED BY STENOGRAPHIC MEANS,
25       TRANSCRIPT PRODUCED FROM COMPUTER-AIDED TRANSCRIPTION
```

```
 1                         APPEARANCES

 2                          (continued)

 3   FOR THE PLAINTIFFS:

 4           Mr. Philip Harlan Hilder
             Mr. William B. Graham
 5           HILDER & ASSOCIATES, PC
             819 Lovett Boulevard
 6           Houston, Texas  77006-3905
             713.655.9111
 7           FAX:  713.655.9112

 8   ALSO PRESENT:

 9           Ms. Mary Rock
             Paralegal
10
     FOR THE DEFENDANTS:
11
             Mr. Eric J. R. Nichols
12           BECK REDDEN
             515 Congress Avenue
13           Suite 1750
             Austin, Texas 78701
14           512.708.1000
             FAX:  512.708.1002
15           enichols@beckredden.com

16           Mr. Bryon A. Rice
             Mr. Fields Alexander
17           Mr. William Brad Coffey
             BECK REDDEN
18           1221 McKinney Street
             Suite 4500
19           Houston, Texas  77010
             713.951.6256
20           713.951.6220
             713.951.6274
21           FAX:  713.951.3720
             brice@beckredden.com
22           falexander@beckredden.com
             bcoffey@beckredden.com
23

24

25


               Gayle Dye, CSR, RDR, CRR - 713.250.5582
```

```
 1                          APPEARANCES

 2                           (continued)

 3   FOR THE DEFENDANTS:

 4           Mr. Keith Courtney
             WINSTEAD PC
 5           401 Congress Avenue
             Suite 2100
 6           Austin, Texas  78701
             512.370.2813
 7           FAX:  512.370.2850
             kcourtney@winstead.com
 8
     ALSO PRESENT:
 9
             Mr. David Mantor
10           In-house counsel
             EXXONMOBIL
11
             Ms. Hien Luu
12           Paralegal

13

14

15   COURT REPORTER:

16           GAYLE L. DYE, CSR, RDR, CRR
             515 Rusk, Room 8016
17           Houston, Texas  77002
             713.250.5582
18

19

20

21

22

23

24

25
```

1                          INDEX OF WITNESSES

2                                                              Page

3    FOR THE PLAINTIFFS:

4    **LUKE WILLIAM METZGER**

5         DIRECT EXAMINATION (CONTINUED) BY MR. KRATKA          5
          CROSS EXAMINATION BY MR. ALEXANDER                   55
6         REDIRECT EXAMINATION BY MR. KRATKA                  110
          RECROSS EXAMINATION BY MR. ALEXANDER                116
7
     **NEIL JON CARMAN**

8
          DIRECT EXAMINATION BY MR. NICHOLAS                  120
9         VOIR DIRE EXAMINATION BY MR. NICHOLS                129
          DIRECT EXAMINATION (CONTINUED) BY MR. NICHOLAS      129
10        CROSS EXAMINATION BY MR. NICHOLS                    132
11   **JEFFREY KOVACS**

12
          DIRECT EXAMINATION BY MR. NICHOLAS                  194
13

14

15

16

17

18

19

20

21

22

23

24

25

Metzger - Direct/Kratka

1                         PROCEEDINGS

2                      February 11, 2014

3          THE COURT:  All right.  Okay.  Mr. Metzger, you're

4   still on the stand, correct?

10:05:16  5          THE WITNESS:  Yes.

6        (The witness, **LUKE WILLIAM METZGER,** called on behalf of the

7   Plaintiff, was previously sworn.)

8          THE COURT:  All right.  Go right ahead, sir.

9          MR. KRATKA:  Okay.

10:05:38  10                    DIRECT EXAMINATION

11                      (continued)

12  BY MR. KRATKA:

13  **Q**    Okay.  Good morning, Mr. Metzger.

14  **A**    Good morning.

10:05:42  15  **Q**    Yesterday when we broke, we were going through the various

16  calculation of days of violation tables.  Do you recall that?

17  **A**    Yes.

18  **Q**    And we had gone through Plaintiffs' Exhibit 589 and 590

19  regarding Count 2 of the complaint?

10:06:02  20  **A**    Yes.

21  **Q**    And I believe we skipped over one aspect of the calculation

22  of days of violation for recordable emission events under Count

23  2.  So I'm just going to put Exhibit 590 back up on the screen.

24  If you could flip to that, that's Plaintiffs' Exhibit 590.  And

10:06:34  25  you had testified that the method of calculating days of

Metzger - Direct/Kratka

1   violation for recordable events and STEERS events under Count 2

2   were the same, but I believe we left out one aspect.  If you

3   would look at the fourth guideline on Plaintiffs' Exhibit 590

4   for counting days of violation for recordable emission events,

10:07:10   5   could you explain that to Court, please.

6   **A**    Yes.  If none of the amounts released were greater than the

7   emission limit, then we counted just one violation a day because

8   by definition -- you know, for the entire event because by

9   definition emission event is an unauthorized release.  So we

10:07:28   10   counted that as one day.

11   **Q**    So that's by regulatory definition that an emission event

12   involves an unauthorized release?

13   **A**    Yes.

14   **Q**    So looking down on this table, the very first entry on the

10:07:41   15   far right column, there's just one day of violation for this

16   entire event?

17   **A**    Yes.

18   **Q**    And is that for the reason you just described, that none of

19   the amounts released appear to exceed an emission limit?

10:07:53   20   **A**    Yes.

21        THE COURT:  Those are all ones, correct?  Going back?

22   Yeah.

23   BY MR. KRATKA:

24   **Q**    Yes.  So it's one total -- just one total violation despite

10:08:07   25   the fact there were very -- a very large number of different

Metzger - Direct/Kratka

1  pollutants released?

2          THE COURT:  Now, it says "Calculation Methodology."

3  Is that the Number 3.

4          MR. KRATKA:  No.  That's Exxon's calculation, your

10:08:17  5  Honor.  If you look up here, that's the method by which they

6  calculated the amount of emissions.

7          THE COURT:  Okay.

8          MR. KRATKA:  And on the far right column is the one

9  that Plaintiffs added to count days of violation.  Make sense?

10:08:47  10  BY MR. KRATKA:

11  Q    And we went through the fact yesterday afternoon that

12  Plaintiffs' Exhibits 591 through 594 performed the same

13  calculations for the olefins plant and the chemical plant?

14  A    Yes.

10:09:00  15  Q    Okay.  If you could, turn to Plaintiffs' Exhibit 10 which

16  is in notebook 2.  And can you describe for the Court what the

17  document is?

18  A    This is a summary of the number of days calculations

19  presented in the Exhibits 589, 590, 591, 592, 593, and 594.

10:09:34  20  Q    So this would -- this sums up the various days of violation

21  calculations under Count 2 of the complaint?

22  A    Yes.

23  Q    And based on those previous exhibits that you just named.

24          And as with the previous summary table we looked

10:09:47  25  at for Count 1, did you play the same role in participating in

Metzger - Direct/Kratka

1    the creation of this table as you testified to earlier?

2    **A**    Yes.

3    **Q**    And you're able to answer questions about it?

4    **A**    Yes.

10:10:06  5    **Q**    Could you describe for the Court -- this will be somewhat

6    repetitive of the previous table but could you describe for the

7    Court the calculation of the statutory maximum penalty?

8    **A**    Yes.  We wrote in the number of days of violations from

9    STEERS events and recordables both before January 12, 2009, when

10:10:25  10   the statutory -- or the maximum penalty was 32,500 and then

11   again after that date when it was raised to 37,500.  We then

12   multiplied the number of days violations times that maximum

13   penalty to arrive at the total maximum penalty.

14   **Q**    Okay.  And then the second part of this exhibit, if you

10:10:47  15   flip to page 2, again, as with the Plaintiffs' Exhibit 9,

16   there's a section entitled "Repeated Violations of Emission

17   Limits."  Do you see that?

18   **A**    Yes.

19   **Q**    Can you describe what you did in this table -- in this

10:11:07  20   section of the table?

21   **A**    We documented pollutant by pollutant how many days

22   violations there were from both STEERS and recordable events and

23   both before we filed the complaint and after we filed the

24   complaint.

10:11:19  25   **Q**    So this shows repeated violations of each individual

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Metzger - Direct/Kratka

1    emission limit?

2  **A**    Yes.

3  **Q**    For each permit?

4  **A**    Yes.

10:11:25  5  **Q**    And it shows repeated violations that occurred both before

6    and after the complaint was filed?

7  **A**    Yes.

8  **Q**    And now you had testified yesterday about flexible permits

9    and you had -- you had testified that the refinery permit was a

10:11:40  10    flexible permit with a single emission limit across the plant

11    for each pollutant?

12  **A**    Yes.

13         MR. ALEXANDER:  Your Honor, I'm going to object to the

14    continued leading.

10:11:49  15         THE COURT:  Overruled.

16  BY MR. KRATKA:

17  **Q**    And to your knowledge --

18         THE COURT:  Leading, if it's a non-jury matter, you

19    can -- I'm not penalizing you on objecting.  I've got some

10:11:59  20    flexibility in a non-jury matter.

21              Go right ahead.

22         MR. ALEXANDER:  Understood, your Honor.

23  BY MR. KRATKA:

24  **Q**    And to your understanding, is the olefins plant permit also

10:12:07  25    a flexible permit?

Gayle Dye, CSR, RDR, CRR - 713.250.5582

```
 1  A    Yes.
 2  Q    And is it your understanding --
 3           THE COURT:  Give me a definition again for flexible
 4  permit.
 5           THE WITNESS:  That is a facility-wide cap on emissions
 6  for a certain pollutant.  So rather than having a specific
 7  emission limit per, you know, source or emission point, a
 8  flexible permit aggregates the total of each of those individual
 9  emission points to have one facility-wide.
10           THE COURT:  Daily or monthly or what?
11           THE WITNESS:  I believe hourly.
12           THE COURT:  Hourly?
13           THE WITNESS:  Yeah, but there may be other --
14           THE COURT:  Okay.
15           THE WITNESS:  -- other terms as well.
16  BY MR. KRATKA:
17  Q    All right.  And Count 2 concerns violations of hourly
18  emission limits?
19  A    Yes.
20  Q    And if you'll look to page -- I think it's the third page
21  of this exhibit where we get to the chemical plant permits.  Is
22  it -- what is your understanding as to whether the chemical
23  plant permits are or are not flexible permits?
24  A    They're not flexible.
25  Q    And so for counting up violations -- counting repeated
```

10:12:15 (line 5)
10:12:35 (line 10)
10:12:43 (line 15)
10:12:49 (line 20)
10:13:07 (line 25)

Metzger - Direct/Kratka

1    violations for the chemical plant permits, how is that done?

2    A    It was done by each individual permit.  So for each flare

3    stack -- flare permit number, individual permit.

4    Q    So for -- if a particular source such as Flare Stack 12

10:13:27   5    here had its own emission limits, you only counted repeated

6    violations of the limits for that one source?

7    A    Yes.

8    Q    And that was done throughout the chemical plant permits?

9    A    Yes.

10:13:59   10   Q    Could you turn your attention to Plaintiffs' Exhibit 595.

11   Have you seen this document before?

12   A    Yes.

13   Q    And can you describe for the Court what the document is.

14   A    Yes.  This is a chart we created based on the stipulated

10:14:24   15   table from Exhibit 3 where we again added a column at the far

16   right where we totaled the number of days of violations.

17   Q    And these are for violations of Count 3 which has to do

18   with the HR VOC rule?

19   A    Yes.

10:14:39   20   Q    Can you describe how violations were counted in this table?

21   A    Yes.  By counting one day of violation for each 24-hour

22   period per event per exceedence.

23   Q    Per exceedence of the one-hour HR VOC rule?

24   A    Yes.

10:14:58   25   Q    And then as with the other calculation tables, the total

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Metzger - Direct/Kratka

1   number of violations under this count are presented at the end

2   of the exhibit?

3   **A**   Yes.

4   **Q**   And how many were there for this count?

10:15:10    5   **A**   18.

6   **Q**   If you can, turn back to the other notebook and look at

7   Plaintiffs' Exhibit 11.  Can you describe this exhibit for the

8   Court?

9   **A**   Yes.  This is a summary of the -- all the Count 3

10:15:35   10   violations and broken down both before EPA raised the maximum

11   penalty and after, and then we calculated the total maximum

12   penalty by multiplying those maximum penalties by the number of

13   days of violation.

14   **Q**   As in the previous summary tables?

10:15:53   15   **A**   Yes.

16   **Q**   And were repeated violations also counted?

17   **A**   Yes.  We also counted for both the olefins plant, the

18   chemical plant violations both before we filed the complaint and

19   after and totaled them up.

10:16:08   20   **Q**   Okay.

21        MR. KRATKA:  Your Honor, we'll do the same thing with

22   Count 4.

23   BY MR. KRATKA:

24   **Q**   Can you look at Plaintiffs' Exhibit 596.

10:16:24   25        Count 4 is the smoking flare regulation.  Can you

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Metzger - Direct/Kratka

1  describe what --

2          THE COURT:  That's when the flame and smoke

3  accompanying it?

4          MR. KRATKA:  Correct.

10:16:33  5          THE COURT:  Okay.

6          THE WITNESS:  Yes.  This is again a table based on the

7  stipulated table from Exhibit 4.  We added the number of days of

8  violations to the far right of the chart.

9  BY MR. KRATKA:

10:16:46  10  Q    And the -- how were those days of violation calculated for

11  this count?

12  A    Again, we counted one day of violation for each 24-hour

13  period.

14  Q    For each flare that was smoking?

10:17:00  15  A    Yes.

16  Q    And, again, the total number of violations under this count

17  is listed at the end of the exhibit?

18  A    Yes, it is.

19  Q    How many was it?

10:17:15  20  A    44.

21  Q    And I'm going to show you Plaintiffs' Exhibit 12.  Describe

22  that for the Court, please.

23  A    Yes.  This summarizes the number of days of violations and

24  calculates the statutory maximum penalty and also outlines the

10:17:44  25  repeated violations -- I'm sorry.  It also documents the

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Metzger - Direct/Kratka

1   repeated violations of the smoking flare rule both before and

2   after we filed the suit.

3   **Q**   And the repeated violations are segregated by plant?

4   **A**   Yes, they are.

10:18:11  5   **Q**   And moving on to Count 5 of the complaint which has to do

6   with the prohibition on flare pilot flame outages, I'm showing

7   you Plaintiffs' Exhibit 597.  And can you describe what this

8   exhibit is for the Court.

9   **A**   This calculates the number of days of violations based on

10:18:33  10   the stipulated table from Exhibit 5.

11   **Q**   And how were days of violation counted for pilot flame

12   outages?

13   **A**   For each flare where there was an outage, we counted one

14   day of violation for each 24-hour period.

10:18:49  15   **Q**   And the total number of violations calculated under Count 5

16   was what?

17   **A**   32.

18   **Q**   And Plaintiffs' Exhibit 13, can you describe that for the

19   Court.  Another summary table?

10:19:14  20   **A**   Yes.  So this is the -- calculates the number of days of

21   violations for -- pilot flame violations multiplied by the

22   appropriate penalty at the time to drive a total maximum

23   penalty; and then it also outlines the repeated violations of

24   the pilot flame outage rule both -- for each of the facilities

10:19:41  25   and before and after we filed the suit.

Metzger - Direct/Kratka

1          THE COURT:  I think -- hold it a second.  Before you

2   get off that, look at it where it says, "Days of Violations,"

3   "Days of Violations," and then a dollar amount to the right.

4   See where it says, "Total Maximum Penalty"?  Under that line is

10:19:58  5   $882,000, right, 162,000, 70,000 and then what's that down

6   below?  Is that adding up?

7          THE WITNESS:  Yes.  That's adding up the three total

8   maximum penalties.

9          THE COURT:  What does that come to?

10:20:14  10          THE WITNESS:  232,500.

11          THE COURT:  I don't follow it.  When you add all those

12   together, it doesn't come to 232.  What am I missing?

13          MR. KRATKA:  You're correct, your Honor.  I think

14   we're missing a decimal place.

10:20:37  15          THE COURT:  Let's go off the record.

16      (Discussion off the record.)

17          MR. KRATKA:  Thank you for catching the error, your

18   Honor.  We'll submit a corrected version with the math --

19          THE COURT:  Of course, to which the defense objects,

10:21:37  20   right?

21          MR. NICHOLS:  We would object.

22          THE COURT:  That's overruled.

23          MR. NICHOLS:  Thank you for inviting it, your Honor.

24          MR. KRATKA:  If I could just for the record, it looks

10:21:51  25   as if only the bottom two numbers were totaled and the top was

Metzger - Direct/Kratka

 1   not.  So we'll submit a corrected version.

 2          THE COURT:  Yes, sir.

 3   BY MR. KRATKA:

 4   Q    Mr. Metzger, we're now up to Count 6 of the complaint which

10:22:10  5   has to do with fugitive emissions.  Can you describe what

 6   Plaintiffs' Exhibit 598 is?

 7   A    Yes.  This is a table -- a chart based on the stipulated

 8   table from Exhibit 6 where we added the number of days of

 9   violations for each of these violations.

10:22:34  10   Q    And how were days of violation calculated under Exhibit

11   6 -- I'm sorry, under Count 6?

12   A    We counted one day of violation for each 24-hour period for

13   a fugitive emission that it lasted.  We did a pollutant by

14   pollutant, and we counted each emission limit as zero because

10:23:00  15   the permit doesn't authorize fugitive emissions, and then we --

16   because the permit has the flexible emission caps, we grouped

17   emission sources together.  So, we only counted one day

18   violation for each pollutant released from the fugitive source.

19   Q    And again, were the total days of violation computed at the

10:23:26  20   end of the table?

21   A    Yes.

22   Q    And how many violations of Count 6 are Plaintiffs alleging?

23   A    233.

24   Q    And please turn to Plaintiffs' Exhibit 14 which, hopefully,

10:23:46  25   has no mathematical errors.  Could you tell the Court what this

Metzger - Direct/Kratka

1  is?

2  **A**    Yes.  This summarizes the violations from Count 7 and

3  calculates the total maximum penalties and then also --

4           THE COURT:  Hold it.  Count 7?  It says here Count 6.

10:24:07  5           MR. KRATKA:  Count 7 --

6           THE COURT:  Weren't we on Count 6 or Count 7?

7           MR. KRATKA:  Exhibit 14?

8           THE WITNESS:  Oh, I'm sorry.  I'm looking at 15.  Oh.

9  I think I'm missing Count 6.

10:24:29  10          THE COURT:  Just make sure when -- at the end of the

11  trial, make sure just at the end of the trial when we all go

12  over exhibit books to go into the record that, you know, the

13  correct -- what the exhibits are in there.  Okay.  Where are we

14  now?  What exhibit number, Counsel, are we looking at?

10:24:51  15          MR. KRATKA:  We're looking at Plaintiffs' Exhibit 14.

16  BY MR. KRATKA:

17  **Q**    Which is the -- can you describe what this exhibit is?

18  **A**    Yes.  This is the number of days violations from Count 6

19  and where we calculated the maximum penalty and documented

10:25:06  20  repeat violations for fugitive emissions pollutant by pollutant

21  both before we filed the complaint and after we filed the

22  complaint.

23  **Q**    And I'm going to anticipate a question from the Court.  I

24  believe there's a similar totalling error under the total

10:25:20  25  maximum penalty which -- for which we will submit a revised

Metzger - Direct/Kratka

1  version of this exhibit as soon as possible.  And, again, you

2  also counted -- can you describe the section on repeated

3  violations of unauthorized fugitive emissions?

4  **A**    Yes.

10:25:41  5  **Q**    Can you describe what -- how that was done?

6  **A**    Yes.  So, again, we calculated for -- the days of

7  violations for each pollutant at each of the facilities both

8  before and after we filed the complaint to show the -- that

9  these emissions were repeated.

10:26:00  10  **Q**    And the -- were the --

11           THE COURT:  Repeated, what, 14 times for the refinery?

12           THE WITNESS:  Well, for the refinery, total 163.

13           THE COURT:  Right.  But 14 were post-complaint.

14           THE WITNESS:  Oh, yes.

10:26:20  15  BY MR. KRATKA:

16  **Q**    And, again, you went pollutant by pollutant for each of the

17  different plants?

18  **A**    Yes.

19           THE COURT:  Oh, wait a second.  The chemical plant

10:26:31  20  had, what, 200 some odd?  Yeah.  That's the highest amount for

21  any of the plants; is that correct -- at least for Count 6, 235?

22           THE WITNESS:  No, that was complex-wide.  So, that's

23  all three facilities.

24           THE COURT:  All three.  Okay.

10:26:48  25           MR. KRATKA:  We'll look at it again.

Metzger - Direct/Kratka

1          THE COURT:  I'm sorry.  I see it.  Got it.  Okay.

2  BY MR. KRATKA:

3  **Q**    And, Mr. Metzger, if you would, turn to Plaintiffs' Exhibit

4  599 and describe for the Court what this exhibit is.

10:27:07   5  **A**    This is the calculation of number of days violations.

6          THE COURT:  All right.  I just want to stop for a

7  second and ask the defense, your position generally is that

8  these are not continuing violations, correct, the word

9  "continuing"?

10:27:21  10          MR. ALEXANDER:  Well, we have a number of --

11          THE COURT:  No.  Is that one of them?

12          MR. ALEXANDER:  Yes, it is, your Honor.

13          THE COURT:  That's all I want to know.  That's the

14  position.  I just want to make sure because that's where the

10:27:29  15  bottom line is.

16          MR. NICHOLS:  And bottom line, we're not objecting

17  every time this witness talks about repeated --

18          THE COURT:  I understand.

19          MR. NICHOLS:  -- but you know we object to that as

10:27:37  20  well.

21          THE COURT:  I think I -- did I give you a running

22  objection on that?

23          MR. ALEXANDER:  You did, your Honor.

24          THE COURT:  I think I did.  Okay.  Go on.

10:27:43  25          MR. KRATKA:  Would you like our position on what

                          Metzger - Direct/Kratka

    1   defines continuing?

    2           THE COURT:  No, no.  I just want to make sure I keep

    3   what the other allegation is.  The same thing, when they put

    4   their case on, if I have a question, that's the advantage again.

10:27:55   5   With a jury you can't ask questions.

    6               Go on.

    7   BY MR. KRATKA:

    8   Q    Would you describe what Plaintiffs' Exhibit 599 is?

    9   A    Yeah.  This calculates the number of days of violations

10:28:07  10   based on the table from 7A.

   11   Q    And so now we're on Count 7 of the complaint?

   12   A    Yes.

   13   Q    And these are violations stemming from -- that were

   14   contained in ExxonMobil's deviation reports, Title V deviation

10:28:26  15   reports?

   16   A    Yes.

   17   Q    Now, let's go through how days of violation were calculated

   18   in Count 7.  How were days of violation calculated for emission

   19   standard violations?

10:28:48  20   A    We counted one day of violation for each 24-hour period.

   21   But when Exxon reported numerous separate incidents of

   22   violations of the same standard of a period lasting more than

   23   one day, we counted that -- and the number of days violations is

   24   smaller than the number of times the standard was violated, we

10:29:10  25   counted the lower of those two.

                    Gayle Dye, CSR, RDR, CRR - 713.250.5582

Metzger - Direct/Kratka

1  Q    So let's go through that a little more slowly.  So you're

2  dealing with -- you're describing a situation with -- in which a

3  single emission standard was reportedly violated multiple times?

4  A    Yes.

10:29:27  5  Q    And the situation involves multiple violations, say, of a

6  one-hour emission limit that occurred intermittently over a

7  number of days?

8  A    Yes.

9  Q    And let's run through an example.  If there were 25

10:29:42  10  reported violations of that one-hour emission limit over three

11  days, how many days of violation were counted for this

12  deviation?

13  A    That would be three days.

14        THE COURT:  Say that again.  Just repeat -- repeat it

10:29:54  15  again.

16        MR. KRATKA:  Do you want it read back?

17        THE COURT:  Yeah, please, the last question please.

18    (The last question was read.)

19        THE COURT:  And the answer?

10:30:18  20        THE WITNESS:  Three.

21        THE COURT:  Okay.

22  BY MR. KRATKA:

23  Q    And conversely, if there were the same 25 intermittent

24  violations of the one-hour emission standard but they occurred

10:30:28  25  over a period of 50 days, how many days of violation would be

Metzger - Direct/Kratka

1    counted in that instance?

2    **A**    That would be 25.

3    **Q**    Because they occurred on -- at minimum on 25 different

4    separate actual days?

10:30:45    5    **A**    Right.

6    **Q**    And how were days of violation counted for violations of

7    monitoring, recordkeeping, or reporting requirements?

8    **A**    We counted one day of violation per monitoring,

9    recordkeeping, or reporting violation.  So, for example, a

10:31:07   10    failure to submit a monthly report on time would just count as

11    one day of violation.

12    **Q**    So it counts as one day, not 30 days for a month?

13    **A**    Or 31 days, yeah.

14    **Q**    And let's look at an example of some of those reporting

10:31:25   15    recordkeeping violations.  If you turn to the final page of the

16    exhibit which is page 45 and under type of requirement, can you

17    read for the Court the violation -- the deviation reported in

18    Row 597, which would be -- it might be easier for you to look on

19    your copy.

10:32:03   20    **A**    The reported cause was a -- that they did not meet an

21    initial 24-hour reporting deadline.

22    **Q**    I'm sorry.  Could you just say that a little more slowly

23    and clearly?

24    **A**    Yes.  The deviation was that Exxon did not meet the initial

10:32:19   25    24-hour reporting deadline.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Metzger - Direct/Kratka

1    Q    Was that for a STEERS event?  Can you tell?  This would be

2    the regulation.  Why don't you just read off the number of that

3    regulation that required the report?

4    A    That would -- the regulatory requirements would be 30 TAC

10:32:43   5    101.201(a)(1).

6    Q    All right.  And further down the page, can you describe

7    this deviation which is listed as a monitoring requirement?

8    That's in Row 605.

9    A    Yes.  This one, the flow rate was not continuously

10:33:10   10    monitored while waste gas was being sent to the flare.

11    Q    And can you also read the testing requirement that was

12    deviated from in the row below?

13    A    Yes.  An HR VOC flare gas sample was not taken within ten

14    hours of the initial online analyzer outage.

10:33:32   15    Q    And one more, could you read the cause of the monitoring

16    requirement deviation that was listed below?

17    A    NOx analyzer was not adjusted within 24 hours after

18    analyzer drift.

19    Q    And did all of these violations occur -- the ones you just

10:33:54   20    reported -- the ones you just read into the record, did they all

21    occur in the same year?

22    A    Yes, they did.

23    Q    And what year was that?

24    A    2013.

10:34:09   25    Q    And my question to you now is why is Environment Texas

Metzger - Direct/Kratka

1  suing Exxon for violations of this type involving monitoring,

2  testing, and recordkeeping requirements?

3  **A**    Because everything that's put into a permit by the

4  government is there to protect public health and safety.  It's

10:34:26  5  there for a reason, and these reports matter.  These details

6  matter.  So, for example, not alerting or meeting the deadline

7  within 24 hours of -- to notify the state of an emission

8  violation or emissions event -- you know, somebody living in the

9  community might be checking those records regularly to determine

10:34:47  10  whether my family needs to run or is safe.  That's critical to

11  have that information in a timely manner.  So recordkeeping is

12  -- reporting is very critical.

13  **Q**    And getting back to how days of violation were counted for

14  Count 7 -- flip back to the first page of the exhibit -- how did

10:35:17  15  you count days of violation for a situation where numerous

16  regulatory requirements were listed as being applicable to the

17  same deviation?

18  **A**    We counted it just as violating a single regulatory

19  requirement.

10:35:29  20  **Q**    So if there were four regulations that were listed as

21  having been deviated from, you still only counted that as one

22  day of violation?

23  **A**    Yes.

24  **Q**    And, again, the totals from Count 7 violations -- and let

10:35:46  25  me just backtrack a second.  This exhibit we're looking at has

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Metzger - Direct/Kratka

1  to do with Plaintiffs' Exhibit 7 -- this summarizes the days of

2  violation calculated for Plaintiffs' Exhibit 7A which is the

3  stipulated table?

4  **A**    I'm sorry, which document are you referring to?

10:36:09  5  **Q**    The one we've just been looking at.

6  **A**    Okay.  You're looking at the end?

7  **Q**    I'm just reminding you and the Court exactly what it is

8  we're talking about.  These are violations for the refinery

9  Title V permit?

10:36:24  10  **A**    Yes.

11  **Q**    Deviations for Title V permit?

12  **A**    Yes.

13  **Q**    What is the total number of days of violation that were

14  computed?

10:36:30  15  **A**    883.

16  **Q**    You may be looking at the wrong -- page 45 of Exhibit 599.

17  **A**    I apologize.  That number is 2,814.

18  **Q**    Thank you.  Then for Plaintiffs' Exhibits 600 through 603,

19  did those compute days of violation for the other four Title V

10:37:05  20  permits at issue in the case?

21  **A**    Yes.

22  **Q**    Rather than run through each of those -- and the days of

23  violation were calculated in the same manner as you just

24  described?

10:37:18  25  **A**    Yes.

Metzger - Direct/Kratka

1  Q     So let's move right to the summary table for Count 7

2  violations.  That's Plaintiffs' Exhibit 15.  And can you

3  describe what Plaintiffs' Exhibit 15 is for the Court?

4  A     Excuse me.  Yes.  This is -- we summarize the number of

10:37:51  5  days of violations and calculate the statutory maximum penalty.

6  Then we also document the repeated and continuing violations of

7  the regulatory requirements in Title V -- the Title V

8  requirements.

9  Q     And the maximum potential penalty was divided by permit and

10:38:10  10  then totalled?

11  A     Yes.

12          THE COURT:  Total is?

13          THE WITNESS:  Well, what it states -- and hopefully,

14  it's correct -- is 160,702,500.

10:38:16  15  BY MR. KRATKA:

16  Q     And if you turn to the next page of this exhibit, which is

17  the -- entitled "Repeated Continuing Violations of Regulatory

18  Requirements in Title V Permits," can you describe what was done

19  here?

10:38:43  20  A     Yes.  We noted which regulatory requirements were violated

21  and whether they were violated again after we filed the

22  complaint.

23  Q     And now under the regulatory requirement column, were those

24  the regulatory requirements that Exxon listed in its deviation

10:39:09  25  reports as we saw in the previous exhibit?

Metzger - Direct/Kratka

1  **A**    Yes.

2  **Q**    And for each regulatory requirement, you looked at each one

3  and determined whether each individual one had been violated

4  more than once?

10:39:20  5  **A**    Yes.

6  **Q**    And you did that separately for each of the five Title V

7  permits?

8  **A**    Yes.

9  **Q**    And you also determined whether any of those repeated

10:39:29  10  violations also occurred after the complaint had been filed?

11  **A**    Yes.

12  **Q**    And that -- the "Y" in these columns, what does that stand

13  for?

14  **A**    It stands for yes.

10:39:45  15  **Q**    So, was there a violation repeated if a "Y" is listed under

16  there?

17  **A**    It means, yes, the violation was repeated.

18  **Q**    Okay.  Now that we've gone through that exercise of

19  counting and summing up violations and repeated violations, can

10:40:17  20  you tell the Court the bigger picture now, what it is

21  Environment Texas is asking the Court to do in this case?

22  **A**    Yes.  We're asking the Court to rule that these were

23  violations, to issue an injunction to order Exxon to stop

24  violating their permits, to appoint a special master to oversee

10:40:39  25  the facility to ensure compliance with those permits.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Metzger - Direct/Kratka

1    THE COURT:  Who would pay for the master?

2    THE WITNESS:  Exxon.

3    THE COURT:  Go on.

4    THE WITNESS:  And to assess a penalty that ideally at

10:40:49  5  least recovers the economic benefit of non-compliance.

6  BY MR. KRATKA:

7  **Q** And is Environment Texas looking for damages to be paid to

8  itself or to its members?

9  **A** No, we're not.

10:41:00  10  **Q** Just going back again to the violations themselves, we

11  heard something during -- I believe you may have been in the

12  courtroom during opening arguments yesterday, which I want to

13  address -- or I want you to address.  Is Environment Texas

14  complaining that Exxon should have kept operating the Baytown

10:41:21  15  Complex during Hurricane Ike?

16  **A** No.

17  **Q** Why did Environment Texas include in this lawsuit

18  violations that occurred during the pre-hurricane shutdown and

19  the post-hurricane startup of the plant?

10:41:36  20  **A** Because they were violations of the law and they emitted

21  significant amounts of pollution and we think that they could

22  have done much more to reduce those emissions.  You know, for

23  example, in our settlements with Shell and Chevron Phillips,

24  they both committed to hurricane plans to dramatically minimize

10:42:00  25  any -- any pollution.  And we think that hurricanes are

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Metzger - Direct/Kratka

1 predictable events, that, you know, they happen and Exxon should

2 have a better plan in place to limit emissions especially

3 after -- when they're starting up again and we see no excuse for

4 having an unauthorized emission at that point.

10:42:18  5 **Q**    Okay.  And let's move on to another issue.  Are you aware

6 that the TCEQ has taken a number of enforcement actions over the

7 years with respect to the Baytown Complex?

8 **A**    Yes.

9 **Q**    And are you aware that some of these enforcement actions

10:42:38  10 were for the same violations that Environment Texas is including

11 in this lawsuit?

12 **A**    Yes.

13 **Q**    And are you aware that the TCEQ on occasion imposed

14 penalties for some of those violations?

10:42:47  15 **A**    Yes.

16 **Q**    And are you aware that on occasion TCEQ ordered

17 correction -- corrective actions for some of those violations?

18 **A**    Yes.

19 **Q**    Given that, why is Environment Texas suing for violations

10:42:58  20 that have -- some of which have already been penalized or for

21 which corrective actions have been ordered?

22 **A**    Because clearly they weren't enough to stop Exxon from

23 continuing to violate its permits over and over again and

24 putting out a huge amount of pollution that can threaten the

10:43:15  25 health of our members in the large community.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Metzger - Direct/Kratka

1   **Q**     I'm going to show you Plaintiffs' Exhibit 337.  And have

2   you seen this exhibit before?

3   **A**     Yes.

4   **Q**     And can you tell the Court what this exhibit is?

10:43:41   5   **A**     This is the summary of information from the TCEQ, agreed

6   orders with Exxon.

7   **Q**     And is this summary chart based on other documents --

8   information from other documents?

9   **A**     Yes.  It's based on the agreed orders covering, you know,

10:44:03   10   STEERS events and Title V deviations.

11   **Q**     And does it also involve other TCEQ documents?

12   **A**     Yes.  It also includes some penalty calculation worksheets.

13   **Q**     So this table summarized information that you gleaned from

14   a voluminous amount of documents?

10:44:22   15   **A**     Yes.

16              THE COURT:  What exhibit, that's 337?

17              MR. KRATKA:  Yes.  And, your Honor, the Plaintiffs'

18   exhibit numbers for each of the underlying documents as well as

19   the Bates numbers are listed on this table, and the penalty

10:44:46   20   calculation worksheets are Plaintiffs' Exhibits 307 through 336.

21   BY MR. KRATKA:

22   **Q**     Now, are you familiar with TCEQ agreed orders in general?

23   **A**     Yes.

24   **Q**     And are you familiar in general with what TCEQ penalty

10:45:02   25   calculation worksheets are?

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Metzger - Direct/Kratka

1    **A**    Yes.

2    **Q**    What is your understanding as to what they are?

3    **A**    They calculate the penalty that TCEQ staff believe are

4    warranted for a -- in an enforcement case where they look at

10:45:18   5    multiple factors including things like economic benefit,

6    culpability and other factors.

7    **Q**    And did you play any role in creating this summary table?

8    **A**    Yes, I did.

9    **Q**    And what role did you play?

10:45:40   10    **A**    I authorized and reviewed the work of the paralegal and the

11    legal team in this preparation.

12    **Q**    And do you understand the information contained in this

13    table?

14    **A**    Yes.

10:45:51   15    **Q**    And how it was created?

16    **A**    Yes.

17    **Q**    And you're able to answer questions about it?

18    **A**    Yes.

19    **Q**    And are there explanatory notes also describing how this

10:46:00   20    table was put together on the table itself?

21    **A**    Yes.

22    **Q**    And those are listed on the final page?

23    **A**    Yes.

24    **Q**    Now, can you just walk the Court through the information

10:46:16   25    that is presented on this exhibit?

Metzger - Direct/Kratka

1  **A**    Yes.  Starting from the far left, we document the agreed

2  order number, then the exhibit number.

3  **Q**    That would be the Plaintiffs' exhibit number for the

4  corresponding TCEQ agreed order with Exxon?

10:46:37   5  **A**    Yes.  Then we documented the violations that are part of

6  our case and then violations that are not part of our case.

7  **Q**    So let me just stop you there, and let's go through an

8  example.  The very first TCEQ order listed under violations not

9  part of Plaintiff case, can you read what that says?

10:47:00   10  **A**    2004 emission event.

11          THE COURT:  Let me ask you this:  Adding up that --

12  and I haven't seen the bottom line -- violations that are part

13  of the Plaintiffs' case and violations that are not part of the

14  Plaintiffs' case, correct, those are two columns, correct?

10:47:16   15          THE WITNESS:  Yes.

16          THE COURT:  What's the bottom line, that are part of

17  the Plaintiffs' case and are not part of the Plaintiffs' case?

18          THE WITNESS:  Some of the violations were from before

19  the period that we're suing and then some were a part of the

10:47:28   20  consent decree which the Court pulled out from our case.

21          THE COURT:  If it's part of -- I see.  If it's part of

22  the Plaintiffs' case, then it's within the time frame.

23          THE WITNESS:  Yes.

24          THE COURT:  If it's within the time frame, how many of

10:47:41   25  these are you asking -- in effect, are you asking for additional

Metzger - Direct/Kratka

1    penalties for some of those where it's part of your case and

2    there's already been a penalty assessed by the state agency?  I

3    think you are.

4            THE WITNESS:  Yes.

10:47:58    5            THE COURT:  You're saying it's insufficient?

6            THE WITNESS:  Yes.

7            THE COURT:  How many are there in that category, you

8    know, that are part of your case and -- but also part of

9    penalization already by the Texas agency?  Do you have that

10:48:14    10   number?

11           MR. KRATKA:  I don't believe that --

12           THE WITNESS:  I don't have that number.

13           MR. NICHOLS:  Your Honor, just to give the Court -- we

14   do have a summary chart of our own that will show that.

10:48:23    15           MR. KRATKA:  And we can provide that number, as well.

16           THE COURT:  All right.  If it's somewhere coming in

17   the case, you know, just a question I had.  Okay?

18               I'll tell you what, there are how many

19   allegations?  How many incidents are you claiming, 200 and what?

10:48:41    20           THE WITNESS:  Days of violation?

21           THE COURT:  No.  How many -- there are 200 and what?

22   What's that 200 figure?

23           MR. KRATKA:  For STEERS reported events?

24           THE COURT:  That's correct.

10:48:50    25           MR. KRATKA:  There were 350-something occurred during

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1    the period and about 114 have been knocked out because they were

2    under the consent decree.

3                 THE COURT:  All right.  So how many --

4                 MR. KRATKA:  Approximately 250.

10:49:01   5                 THE COURT:  Okay.  That was the number I was looking

6    for.

7                 MR. KRATKA:  Yes.  And some subset of those are

8    listed.

9                 THE COURT:  Of those 250 how many did the state

10:49:12  10   penalize prior to the -- prior to filing suit -- in other words,

11   where you're looking for -- that was insufficient?

12                MR. KRATKA:  What we will do is -- and perhaps on a

13   break --

14                THE COURT:  Okay.

10:49:23  15                MR. KRATKA:  -- we'll total up the numbers in the

16   events that are within Plaintiffs' case, but what we do on this

17   table -- and Mr. Metzger will get to it -- is total up the

18   penalty, the amount of penalties that were assessed for those.

19                THE COURT:  You mean the monetary penalty?

10:49:38  20                MR. KRATKA:  Yes.

21   BY MR. KRATKA:

22   Q    So let's go through the table and get right to that.

23   A    Okay.

24   Q    So let's keep going across.  So the next column over?

10:49:47  25   A    The next is the TCEQ's calculated penalty, which is pulled

Metzger - Direct/Kratka

1    from the penalty worksheets where we're able to get them where

2    they're available.

3            THE COURT:  Now, are these penalties similar to what

4    they've assessed for other similar violations for other

10:50:04  5    companies generally?  We're looking at about $26,000, then

6    10,000, then what is that, another 10,000, 20,000?  Is that

7    generally the ballpark of what their fines have been for all of

8    the refineries that they've gone after ballpark?

9            THE WITNESS:  I believe, yeah, that would be.

10:50:26  10            THE COURT:  Okay.

11            THE WITNESS:  Not too different in many cases.

12            THE COURT:  Okay.  Go on.

13    BY MR. KRATKA:

14    Q    Well, let's go down -- you have two columns here, one for

10:50:34  15    the -- TCEQ's calculated penalty and then one for the penalty --

16    is this the one they actually assessed?

17    A    That's right.

18    Q    So let me go flip down to some specific examples.

19            THE COURT:  First of all, what exhibit?  I'm going to

10:50:54  20    pull that out.

21            MR. KRATKA:  Yeah, 337.  Plaintiffs' Exhibit 337.

22            THE COURT:  Where would I find that?

23            MS. MARY ROCK:  16.

24            THE COURT:  Okay.  What number, Exhibit 337?

10:51:17  25            MR. KRATKA:  Yes.

Metzger - Direct/Kratka

1        THE COURT:  Okay.  Now, where are we looking?

2        MR. KRATKA:  The fourth page of the exhibit, your

3   Honor.

4        THE COURT:  All I have is three pages.

10:51:56   5        MR. KRATKA:  Double-sided.

6        THE COURT:  Double-sided.

7        MR. KRATKA:  Saving paper.

8        THE COURT:  Yes, sir.  Thank you.

9   BY MR. KRATKA:

10:52:06  10   **Q**    So, Mr. Metzger, and the Court, directing your attention to

11   the second event, the order listed there, Order Number

12   2009-1944, how many STEERS events were involved in this penalty

13   order?

14   **A**    I believe just one.

10:52:32  15   **Q**    And that's STEERS Number 118545?

16   **A**    Yes.

17   **Q**    And what did TCEQ calculate -- what does TCEQ's penalty

18   worksheet calculation arrive at for that emission event?

19   **A**    They calculated that a penalty of $368,000 was warranted in

10:52:55  20   the case.

21        THE COURT:  And what was that at, 32 or $37,000 per

22   day?  How do they get that amount of money?  How did you get

23   that amount of money?

24        THE WITNESS:  That's taken straight from the --

10:53:07  25        THE COURT:  I'm sorry.  Then where would they have

Metzger - Direct/Kratka

1    gotten it, based upon what?

2              THE WITNESS:  They have a formula by which they derive

3    calculations are to be multipliers based upon previous

4    violations and various other factors.

10:53:20   5              THE COURT:  Had nothing to do with the 32 or 36,000 or

6    37,000 per day?  That's EPA?

7              THE WITNESS:  That's EPA, yeah.

8              THE COURT:  So that's -- okay.  So, what's your

9    position concerning that 368,000?  How does that equate into

10:53:35   10   what you're asking for?  Do you ask for this or are you going

11   with the federal rate?

12             THE WITNESS:  Well, we're asking for the statutory --

13   the maximum possible penalty under the federal.

14             THE COURT:  Which is how much per day, now 37 --

10:53:52   15             THE WITNESS:  Yeah.  32,500 prior to January, 2009.

16   Now it's 37,500.

17             MR. KRATKA:  Per violation per day.

18             THE WITNESS:  Per violation per day.

19             THE COURT:  So how long did this go on?  I'm just

10:54:03   20   taking that as an example.  I'm not jumping just on that one

21   line; but since Mr. Kratka was referring to it, how do they get

22   there?  Is that for one emission on one day or is it ongoing or

23   what?  How do they get that?

24             THE WITNESS:  I don't remember that specific.

10:54:21   25             THE COURT:  All right.  Look, it's a non-jury case.

1    Counsel, how do they get that?  Are you familiar with it?

2              MR. KRATKA:  I am.  And we've listed here -- we can

3    look up the --

4              THE COURT:  Is there some sort of a formula they use

10:54:34   5    that's different than the federals?

6              MR. KRATKA:  They have a number of factors, and they

7    look at, as Mr. Metzger said, the violator's compliance history,

8    whether there was economic benefit, whether the pollutants

9    emitted were serious, dangerous, various factors like that that

10:54:53   10    can multiply the daily maximum.

11              THE COURT:  What I is it goes -- look on this one

12    page, $617,000, and this one we're looking at is 368.  Any idea

13    how long that went on?  I'm not picking on you.  I'm just

14    wondering.

10:55:08   15              MR. KRATKA:  Well, one way to --

16              THE COURT:  It's one STEERS report.

17              MR. KRATKA:  Yes.  And as we know, some of these

18    events can last for days.

19              THE COURT:  I understand.

10:55:19   20              MR. KRATKA:  Let me ask a couple of follow-up

21    questions of Mr. Metzger.  We may get at it.

22    BY MR. KRATKA:

23    Q    At this time it looks like this event was from 2009.  Do

24    you know what TCEQ's maximum daily administrative penalty limit

10:55:32   25    was?

Metzger - Direct/Kratka

1  **A**    $10,000 a day.

2  **Q**    And do you know how TCEQ applied that limit to an emission

3  event that may have involved violations of multiple different

4  emission limits?

10:55:44   5  **A**    They only counted one day violation for all pollutants.

6  They didn't count it for each pollutant.

7  **Q**    So the fact -- so what penalty was actually assessed in

8  this case?

9  **A**    Only $30,000.

10:55:58   10  **Q**    So --

11  **A**    So far, far less than what their own staff calculated was

12  warranted.

13         THE COURT:  So who made that decision?

14         MR. ALEXANDER:  Your Honor, I apologize for

10:56:09   15  interrupting; but I object to Mr. Metzger testifying as to what

16  the TCEQ felt was warranted.

17         THE COURT:  Sustained as to the responsiveness.  But

18  who makes that determination from 368,000 down to 30,000?  Is

19  that the three-judge -- is that the three-member panel of the

10:56:25   20  board?

21         THE WITNESS:  Yes, they make the final decision.

22         THE COURT:  Okay.

23  BY MR. KRATKA:

24  **Q**    And then, similarly, looking further down, if you look at

10:56:36   25  Order Number 2010-0656, how many events were involved -- STEERS

Metzger - Direct/Kratka

1  events were involved in that penalty order?

2  A    Two.

3  Q    And were they both part of this case?

4  A    No.

10:56:52  5  Q    And what was the -- what calculated penalty did TCEQ arrive

6  at for those two events?

7  A    $617,600.

8  Q    And what did TCEQ actually assess?

9  A    Only $80,000.

10:57:06  10       THE COURT:  And another column is:  Did Exxon deny

11  liability?  And the answer is no, okay, correct?

12       MR. KRATKA:  Correct.

13       THE COURT:  They did not deny liability for being

14  liable 617,600 for whatever that violation was or ongoing

10:57:23  15  violation, however, you want to look at it.

16  BY MR. KRATKA:

17  Q    What was the amount actually assessed?

18       THE COURT:  80,000.

19       THE WITNESS:  Yes, $80,000.

10:57:32  20  BY MR. KRATKA:

21  Q    And in terms of determining the amount of penalty that

22  applied to the event that is in this case, can you describe how

23  that was done?

24  A    Yes.  Because in this case one of the two events is not

10:57:52  25  covered in our case, we divided the penalty by two to determine

Metzger - Direct/Kratka

1   the penalty that applies for our case.

2             THE COURT:  Okay.  I don't understand that.  In other

3   words -- but didn't you add up per day?  You just divided 617 in

4   half, got about 300,000?  I didn't understand that.

10:58:12   5             THE WITNESS:  No.  Because the actual penalty assessed

6   was only $80,000.

7             THE COURT:  Okay.  And then, therefore, you took half

8   of that?

9             THE WITNESS:  Yeah.

10:58:19   10             THE COURT:  So that would be 40,000?

11             THE WITNESS:  That's right.

12             THE COURT:  For the purpose of this case?

13             THE WITNESS:  Yes.

14             THE COURT:  Why?

10:58:25   15             THE WITNESS:  Because it's difficult to determine

16   exactly how much the penalty was for which of the two cases.  So

17   it's our best effort to determine --

18             THE COURT:  All right.

19             MR. KRATKA:  If your Honor would turn to the final

10:58:37   20   page of the exhibit where there are totals.

21   BY MR. KRATKA:

22   Q    Mr. Metzger, drawing your attention to the column entitled

23   "Net Penalty for Violations that are in Plaintiffs' Case," can

24   you describe -- can you point the Court to how much -- the total

10:59:02   25   amount TCEQ assessed for those STEERS events and other

Metzger - Direct/Kratka

1   violations?

2   A    1.1 -- approximately $1.1 million.

3   Q    And the total amount that TCEQ assessed for all violations

4   during the period is -- was how much?

10:59:20   5   A    A little more than $2 million.

6   Q    But only the 1.1 million is applicable to events that are

7   concerned in this case?

8   A    Yes.

9   Q    And there's a column entitled "Amount of Penalty Paid to

10:59:37   10   HRM Corp."  Can you describe what that is about?

11   A    Yes.  In lieu of a penalty, Exxon was allowed to put some

12   money towards what's called a supplemental environmental

13   project.  And so they gave -- of the $491,000 of that penalty

14   towards the Houston Regional Monitoring Corporation.

10:59:58   15   Q    And do you know what the Houston Regional Monitoring

16   Corporation is?

17   A    It's an air monitoring effort run by industry here in the

18   Houston area to which Exxon is a member.

19   Q    Now, you had testified a moment ago that at the time of

11:00:32   20   that 2009 violation we were discussing that TCEQ's penalties

21   were limited to $10,000 per day?

22   A    Yes.

23   Q    Do you know -- is that a statutory limit on TCEQ's penalty

24   power?

11:00:46   25   A    It was, yes.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Metzger - Direct/Kratka

1  Q    And do you know whether that limit has changed?

2  A    Yes, it has.

3  Q    And how has it changed?

4  A    I believe it was in 2011 the legislature raised it to

11:00:59  5  25,000.

6  Q    And are you aware of one TCEQ order in particular that's

7  already been discussed, I believe, in the opening statements, a

8  February of 2012 consent agreement between Exxon and -- a 2012

9  agreed order between Exxon and TCEQ?

11:01:23  10  A    Yes.

11           THE COURT:  Is it on this list?

12           MR. KRATKA:  Yes, I believe it is.

13           THE COURT:  Okay.  If you're not referring, doesn't

14  matter.

11:01:30  15           MR. KRATKA:  I'm actually showing him a copy of that

16  particular order itself.

17           THE COURT:  All right.

18  BY MR. KRATKA:

19  Q    I just handed you Plaintiffs' Exhibit 306, and is that the

11:02:01  20  penalty order that we were just -- the February, 2012, agreed

21  order that we were just discussing?

22  A    Yes.

23  Q    Have you read this order?

24  A    Yes.

11:02:09  25  Q    Have you drawn any conclusions from your reading of it?

Metzger - Direct/Kratka

1    **A**    Yes.

2    **Q**    What conclusions have you drawn from this order?

3    **A**    That it's wholly inadequate; that if -- there are a number

4    of problems here that don't make it a very strong enforcement

11:02:28  5    order.  So, for example, the order agrees that any violations

6    won't be treated as violations -- or won't be subject to notice

7    violations.

8                   And that's important because those notices of

9    violations are counted towards the company's compliance history

11:02:47  10    which, as we just discussed, can influence their penalties and

11    other enforcement orders based on their calculation worksheet.

12    It can also --

13    **Q**    Before you go on, the incidents for which you're -- you

14    just stated that a violation would not be counted as a

11:03:05  15    violation.  How -- is that referring to STEERS events?

16    **A**    Yes.

17    **Q**    And under what circumstances would a STEERS event not be

18    counted as a violation under this order?  Does it have to do

19    with stipulated penalties?

11:03:30  20    **A**    Yes.

21    **Q**    Can you describe how that -- how that works to the best

22    of -- if you -- if you recall or perhaps understand it?

23    **A**    Yes.  So there is -- let's see.  Yeah, the order has a

24    penalty amount stipulated per each emission event covered under

11:04:02  25    the order, and those emissions events and reporting violations

Metzger - Direct/Kratka

1   aren't subject to a notice of violation.

2   **Q**   So going forward, if Exxon pays a stipulated penalty, that

3   event is not counted as a violation?

4   **A**   Yes.

11:04:16   5   **Q**   Do you have other concerns regarding this order?

6   **A**   Right.  Also, if it's not counted as a notice of violation,

7   then that influences its compliance history, which is reviewed

8   during permitting.  So if they had -- if these were counted as

9   violations, they may be subject to greater scrutiny during the

11:04:35   10   permitting review.

11                   Also, by, you know, having these violations

12   scrubbed clean from their record, it allows them to present what

13   we think is a false record of their compliance to the community.

14   We also --

11:04:51   15   **Q**   Are there other parts of the order that you have concerns

16   about?

17   **A**   Yes.  There's a section of the order involving VOC emission

18   reductions that we have concerns with.

19   **Q**   All right.  Let me show you Plaintiffs' Exhibit 408.  Have

11:05:41   20   you seen this document before?

21   **A**   Yes.

22   **Q**   Can you describe for the Court what this document is?

23   **A**   This is -- the TCEQ agreed order required Exxon to reduce

24   their VOCs by -- ultimately by 126 tons but based on a base line

11:06:02   25   calculated over five years.  So this document pulls the five

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Metzger - Direct/Kratka

1    years covered under the base line from their -- TCEQ's annual

2    contaminant summary reports of VOC emissions and documents what

3    that base line is.

4    Q    So just going step by step, this table -- does this table

11:06:26    5    summarize information that you took from other documents?

6    A    Yes.

7    Q    And those other documents were what?

8    A    The TCEQ annual contaminant summary reports.

9    Q    And are those cited to on the table?

11:06:40    10    A    Yes.

11    Q    And did you -- and then a calculation is performed using

12    information from that -- from those contaminant emission

13    summaries?

14    A    Yes.

11:06:51    15    Q    And did you have any role in creating this summary table?

16    A    Yes.

17    Q    What role did you play?

18    A    I authorized and reviewed the creation of the table.

19    Q    And were you able to answer questions about how this table

11:07:03    20    was created?

21    A    Yes.

22    Q    And if you could, just walk the Court through the

23    calculations that were actually performed here and what each of

24    these columns of information shows.

11:07:14    25    A    Sure.  So first -- the first column shows the year and the

Metzger - Direct/Kratka

1  specific plant.  Next documents the routine authorized

2  emissions.  The next column is the non-routine unauthorized

3  emissions and then the annual totals by plant.

4  **Q**    And, again, these -- this emission information came from

11:07:37  5  where?

6  **A**    The annual contaminant summary reports.

7  **Q**    Of what agency?

8  **A**    From TCEQ.

9  **Q**    And then keep going.  So you have annual totals by plant.

11:07:51  10  Then what did you do?

11  **A**    Then we total the three annual totals for a total for the

12  whole complex.

13  **Q**    And you did that for each year?

14  **A**    Yes.

11:08:00  15  **Q**    2006 through 2010?

16  **A**    Yes.

17  **Q**    And were those the years that TCEQ in its order used to

18  calculate -- you called it a base line?

19  **A**    Yes.

11:08:10  20  **Q**    And what was the purpose of that base line figure in the

21  TCEQ order?

22  **A**    It was to determine by -- the amount by which Exxon had to

23  reduce their emissions of VOCs.

24  **Q**    So Exxon needed to reduce VOC emissions below this

11:08:29  25  calculated five-year average?

Metzger - Direct/Kratka

1   **A**    Yes.

2   **Q**    And can you tell the Court what the five-year average of

3   VOC emissions turns out to be?

4   **A**    3,304.4 tons per year.

11:08:43  5   **Q**    And the order requires -- what does the order -- how much

6   does the order require Exxon to reduce their VOC emissions from

7   that base line?

8   **A**    I believe by 2017 it requires a reduction of 200 -- or 126

9   tons.

11:09:04  10  **Q**    So 2017.  So three years from now, Exxon has to reduce VOC

11  emissions by 126 tons?

12  **A**    Yes.

13  **Q**    From this amount?

14          THE COURT:  Per year?

11:09:15  15  BY MR. KRATKA:

16  **Q**    Per year?

17          THE COURT:  Or what?

18          THE WITNESS:  Well, it's -- there's three different

19  standards.  So by the third year of this agreed order, they have

11:09:32  20  to reduce total emissions for the year -- for that -- in that

21  year by 45 tons and the fourth year by 71 tons and then in the

22  fifth year by 126 tons.

23  BY MR. KRATKA:

24  **Q**    And that's tons per year?

11:09:47  25  **A**    Tons per year.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Metzger - Direct/Kratka

1   Q    And so can you tell from this table whether or not annual

2   VOC emissions at the Baytown complex were already below the base

3   line by the time the order was issued?

4   A    Yes.  In four of the five years, they're already below the

5   base line by more than 126 tons.

6   Q    So from this calculation have you drawn any conclusion as

7   to the significance of the VOC reduction contained in the 2012

8   order?

9   A    We think it's bogus.  It doesn't require any reductions.

10           THE COURT:  I don't understand that.  Beef that up.  I

11   heard it, but I don't understand.

12   BY MR. KRATKA:

13   Q    Can you explain more fully why you think --

14           THE COURT:  They have to go down by what, 126 tons,

15   right?

16           THE WITNESS:  Yeah, from -- three years from now.

17           THE COURT:  Let me see the attorneys up here for a

18   second.  I don't need the court reporter.  Just for a second.

19       (Side-bar discussion off the record.)

20           THE COURT:  Okay.

21   BY MR. KRATKA:

22   Q    Let's -- can you explain for the Court maybe a little more

23   fully why it is you've concluded that, as you said, you don't

24   believe that is a legitimate -- that there's actually a

25   reduction requirement?

Metzger - Direct/Kratka

1  **A**    Yes.  Because this shows that the TCEQ --

2              THE COURT:  What shows, your chart?

3              THE WITNESS:  This chart shows that the -- yes, your

4  Honor, this chart shows that the TCEQ base line is 3,304.4 tons

11:12:39  5  per year and --

6              THE COURT:  That's the annual total that year -- for

7  these years, correct?

8              THE WITNESS:  Yes, your Honor.

9              THE COURT:  All right.  Go on.

11:12:48  10              THE WITNESS:  This -- the order requires a reduction

11  of 126 tons from three years from now, and you can see if you

12  subtract three thousand three hundred -- subtract 126 from

13  3,304, it's actually still above the annual totals emitted in

14  2007, in 2008, in 2009, and 2010.

11:13:19  15              THE COURT:  All right.  Who set those other limits?

16  That's what -- that's the state agency or the feds regulate how

17  much they, for want of a better term, get away with; and it's

18  still above that amount; is that correct?  Is that what you're

19  saying?

11:13:34  20              THE WITNESS:  Yes.  This was -- your Honor, this was

21  pulled from the agreed order.  So this is what TCEQ, their --

22              THE COURT:  Right.  And where did you get the number

23  that even with that it's still above some level, correct?

24              THE WITNESS:  Yes.  We pulled this off.

11:13:48  25              THE COURT:  And what level is that?  Where does that

Metzger - Direct/Kratka

1   level come from?  It may be an elementary question, but I want

2   to make sure.  You're saying it's below -- even then, okay, it's

3   a violation of some sort, right; or it's above what they ought

4   to be at?  I'm not following.

11:14:06   5          MR. KRATKA:  Yeah, I understand.

6          THE COURT:  If you want to follow it up, that's the

7   one question -- again, it's non-jury case, if you can explain

8   it, Counsel, that's where I'm at.

9          MR. KRATKA:  Yes.  I think I understand your

11:14:18   10   confusion.

11          THE COURT:  Okay.

12          MR. KRATKA:  I'll take responsibility for poor

13   questions.  Let's run through it again.

14   BY MR. KRATKA:

11:14:23   15   Q    TCEQ's order required a particular reduction in VOC

16   emissions for the entire complex, correct?

17   A    Yes.

18   Q    And to determine what level the reduction had to come from,

19   you testified that TCEQ first said, Let's -- let's pick a base

11:14:43   20   line?

21   A    Yes.

22   Q    And that base line was determined -- was to be determined

23   under the order how?

24   A    I can read from the document.

11:14:54   25          THE COURT:  Just tell us.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Metzger - Direct/Kratka

1              THE WITNESS:  It was based on an average emissions

2      from the 2006 to 2010 emissions inventory by the end of the

3      fifth calendar year after the effective date of the agreed

4      order.

11:15:10  5  BY MR. KRATKA:

6  **Q**     So by using actual emissions that occurred from 2006 to

7      2010, a calculation was required to be made?

8  **A**     Yes.

9  **Q**     And that calculation you performed yourself on that chart?

11:15:18  10  **A**     Yes.

11  **Q**     And the result of that calculation was a base line?

12  **A**     Yes.

13  **Q**     And the base line was how much?

14  **A**     3,304.4 tons per year.

11:15:28  15             THE COURT:  Now, what should it have been, in your

16      estimation, instead of 3,000 some-odd tons.

17             MR. KRATKA:  Maybe I can clear this up.

18             THE COURT:  Sure, absolutely.

19  BY MR. KRATKA:

11:15:41  20  **Q**     TCEQ created that base line purely as a yardstick?

21  **A**     Yes.

22  **Q**     That was not --

23             THE COURT:  Which one, the 3,000?

24             MR. KRATKA:  Yes.

11:15:48  25             THE COURT:  As a yardstick.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Metzger - Direct/Kratka

 1  BY MR. KRATKA:

 2  **Q**    And that yardstick was used to measure whether in the

 3  future Exxon would reduce its VOC emissions below that

 4  yardstick?

11:15:56   5  **A**    Yes.

 6  **Q**    And you're claiming that you've compared actual emissions

 7  during some -- that have already occurred?

 8  **A**    Yes.

 9  **Q**    And are you saying that actual emission levels are already

11:16:13  10  below that yardstick?

11  **A**    Yes.

12  **Q**    And, therefore, if actual emissions are already below the

13  yardstick, what is your conclusion as to whether this order

14  requires any real reductions from the facility?

11:16:26  15  **A**    Our conclusion is that it requires no additional

16  reductions.

17          THE COURT:  I don't understand.  I'm sorry.  I just

18  don't follow that.

19          MR. NICHOLAS:  Can I take a crack at it?

11:16:39  20          THE COURT:  Doesn't matter, doesn't matter who does

21  it.  If you do it through this witness or not, you say -- I

22  think you got the information in the file for an appellate

23  record, but I don't understand it.

24          MR. KRATKA:  Would you like me to take one quick crack

11:16:52  25  at it?

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Metzger - Direct/Kratka

1          THE COURT:  Sure.

2          MR. KRATKA:  Mr. --

3          THE COURT:  I'll do this just for the Defense the same

4    way.

11:16:57    5          MR. KRATKA:  Yeah, sure.

6          THE COURT:  If I don't understand it, I need someone

7    to explain it.  You've got it in the record and via your

8    testimony, but I don't understand it.

9          MR. KRATKA:  Maybe I can.  Mr. Metzger is criticizing

11:17:06    10   this particular TCEQ order for not actually doing much in the

11   way of enforcement.  One of the provisions of the order said,

12   "Exxon, you need to reduce your VOC emissions."  And what

13   Mr. Metzger is saying, the way they calculate whether Exxon is

14   going to reduce its VOC emissions is they've set a base line

11:17:31    15   from which the reductions need to occur.

16          THE COURT:  Which is, that's the 3,000 base line?

17          MR. KRATKA:  Yes.  Now, the base line they set from

18   which reductions need to occur is higher than what Exxon's

19   emissions already are.  So when this order says, "Hey, we're

11:17:47    20   forcing Exxon to reduce its emissions in the future," it's not

21   forcing them to reduce their emissions in the future because

22   their emissions are already below this base line that they've

23   used as a measuring stick.

24          THE COURT:  Why did they set the base line where it

11:18:00    25   is?  How did they get that number?  You're saying -- what?

Metzger - Cross/Alexander

1          MR. KRATKA:  They negotiated with Exxon to come up

2    with a number from which to reduce.  They took --

3          THE COURT:  Which they're already down to?

4          MR. KRATKA:  Yes.

11:18:11  5          THE COURT:  Okay.

6    BY MR. KRATKA:

7    **Q**    Mr. Metzger, did you object to this order, the February,

8    2012 order, when it was issued?

9    **A**    No.

11:18:35  10   **Q**    Why not?

11   **A**    I wasn't aware of it.

12          MR. KRATKA:  All right.  That's all I have, your

13   Honor.

14          THE COURT:  All right, thank you.

11:18:43  15          Go right ahead.

16          MR. ALEXANDER:  Thank you, your Honor.

17          May I proceed, your Honor?

18          THE COURT:  Sure.

19          MR. ALEXANDER:  Thank you, your Honor.

11:19:10  20                    CROSS EXAMINATION

21   BY MR. ALEXANDER:

22   **Q**    Good morning, Mr. Metzger.

23   **A**    Good morning.

24   **Q**    My name is Fields Alexander, and I've got a couple of

11:19:17  25   questions for you.  I wanted to start off with some of the

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Metzger - Cross/Alexander

1  summary tables that you were visiting with earlier with --

2  yesterday afternoon and this morning with Mr. Kratka.  Okay?

3  **A**    All right.

4  **Q**    Do you have in front of you Exhibit 587?

11:19:37  5       THE COURT:  Do you need your computer on or are you

6  going to use the overhead?

7       MR. ALEXANDER:  I'm going to try to use the ELMO here,

8  your Honor.

9       THE COURT:  Okay.  That's fine.

11:19:57  10      THE WITNESS:  Yes, I do.

11  BY MR. ALEXANDER:

12  **Q**    All right.  And can you also take a look at 589 for me?

13  Are you able to look at those simultaneously?

14  **A**    I can -- yes.  I can flip back between the two, or I can

11:20:13  15  pull them out of the binder.

16  **Q**    Super.  587, Mr. Metzger, is one of the summary tables that

17  your legal team prepared that you say you reviewed, right?

18  **A**    Yes.

19  **Q**    And it relates to the days of violation that you're

11:20:29  20  claiming -- Environment Texas is claiming in connection with

21  Table 1A, stipulated Table 1A; is that right?

22       THE COURT:  What volume may I find that in, somebody?

23  This is defense?

24       MR. ALEXANDER:  This is Plaintiffs' Exhibit 587, your

11:20:44  25  Honor.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Metzger - Cross/Alexander

1        THE COURT:  Which book is it in?

2        MR. ALEXANDER:  At least in our book, your Honor, it's

3 in Volume 28, but I'm not sure they're numbered the same.

4        MR. KRATKA:  That's correct.  Volume 28.

11:20:53  5        THE COURT:  That's the last one.

6        MR. ALEXANDER:  Yes, your Honor.  I believe, your

7 Honor, that both 587 and 589 can be found in that volume.

8        THE COURT:  They are.  You're starting where, with

9 587?

11:21:11 10        MR. ALEXANDER:  I am, your Honor.

11        THE COURT:  Which page or just generally now?

12        MR. ALEXANDER:  I'm on page 1, your Honor.

13        THE COURT:  Okay.

14 BY MR. ALEXANDER:

11:21:18 15 Q    Now, Mr. Metzger, if you look at 587, would you read for

16 me, please, the first two what are called tracking numbers.

17 Those are STEERS numbers, are they not?

18 A    Yes.

19 Q    And that's -- these are for reportable events, right?

11:21:36 20 A    Yes.

21 Q    So they have a STEERS file because they were reported

22 through the STEERS reporting system, correct?

23 A    Yes.

24 Q    Would you read for me the first two STEERS numbers that

11:21:46 25 appear on this Exhibit 587.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Metzger - Cross/Alexander

1    **A**      66438 and 66872.

2    **Q**    Now, if you'd turn to 589, Mr. Metzger, would you read for

3    me the first two STEERS numbers -- and 589 is another wholly

4    separate days of violation calculation that Environment Texas

11:22:14   5   has submitted this for; is that right?

6    **A**      Yes.

7    **Q**    All right.  Would you read for me the first two STEERS

8    numbers in Exhibit 589?

9    **A**      66438 and 66872.

11:22:25  10   **Q**    Those are the same two events, are they not, as we just

11   referenced from 587?

12   **A**      Yes, they are.

13   **Q**    In fact, if you go to the next, what's the third STEERS

14   number -- or actually the third and fourth?

11:22:42  15            THE COURT:  On which?

16            MR. ALEXANDER:  In 587.

17            THE WITNESS:  66884 and 67926.

18   BY MR. ALEXANDER:

19   **Q**    And can you read for me the third and fourth STEERS numbers

11:22:58  20   that you've put in for days of violation in Exhibit 589?

21   **A**      66884 and 67926.

22   **Q**    Again, the same two events; is that correct?

23   **A**      Yes.

24   **Q**    In truth, Mr. Metzger, if you've reviewed this, all of the

11:23:18  25   events in Exhibit 589 are the exact same STEERS events for which

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Metzger - Cross/Alexander

 1   you're already seeking penalties in 587; is that correct?

 2   **A**    Yes.

 3   **Q**    And just by way of example, Mr. Metzger, if you go back to

 4   the first two STEERS numbers in 587, sir, you've got multiple

 5   days of violation for each of those events; is that right?

 6   **A**    Yes.

 7   **Q**    And then in 589 we again see the same STEERS numbers

 8   reappear on a different schedule of violations again with

 9   multiple days of violation; is that right?

10   **A**    Yes.

11   **Q**    Can you count up for me, sir, out of just these first two

12   STEERS numbers that repeat, how many separate days of violation

13   you're asking the Court to award twice?

14           MR. KRATKA:  Objection, your Honor.  This misstates

15   what Plaintiffs are asking for.

16           THE COURT:  Overruled.

17   BY MR. ALEXANDER:

18   **Q**    Did you understand the question, Mr. Metzger?

19   **A**    If you could restate it and specify which --

20   **Q**    Yes, sir.  I'm looking at the first two STEERS numbers in

21   587 that we know now again reappear in 589 because all of 589 is

22   a repeat of 587, correct?

23   **A**    We --

24           THE COURT:  Hold it.

25   //

Metzger - Cross/Alexander

1 BY MR. ALEXANDER:

2 **Q**    Is my answer correct?

3         THE COURT:  Hold it.  It's a yes or no answer, sir.

4 If you can't answer it yes or no, so state, and he'll have to

11:24:46  5 rephrase it.  Ask it again, Counsel.

6 BY MR. ALEXANDER:

7 **Q**    Are all the STEERS numbers -- and I think we just went over

8 this.  Are all the STEERS numbers in 589 the same STEERS numbers

9 that already appeared in 587 in terms of your calculation of

11:24:57  10 days of violation?

11 **A**    Yes.

12 **Q**    All right.  So my next question for you, Mr. Metzger, is

13 just taking these first two STEERS numbers by way of example,

14 how many days of violation appear in these first two STEERS

11:25:07  15 numbers both in 587 and 589?

16         THE COURT:  Why don't you tell us how many.  Did you

17 count them up?

18         MR. ALEXANDER:  Your Honor, there's about a half dozen

19 in each twice.

11:25:18  20         THE COURT:  Okay.

21 BY MR. ALEXANDER:

22 **Q**    Does that look right, Mr. Metzger?

23         THE COURT:  About?  Is that about right?

24         THE WITNESS:  I would have to count it myself.

11:25:25  25         THE COURT:  Then count them yourself.  Go right ahead.

Metzger - Cross/Alexander

1 No.  You're entitled to.  You're entitled to.  That's why we

2 have a timing order here.

3         THE WITNESS:  I believe that's right, but the -- if I

4 could add -- explain why that is.

11:25:37  5         THE COURT:  No, not yet.

6 BY MR. ALEXANDER:

7 Q    I would like you to turn, if you would please, Mr. Metzger,

8 to 588.  And I want to run the same comparison, sir, between

9 Exhibit 588 and 590.  Are those both in that book, as well?

11:26:01  10 A    Yes.

11 Q    If you take a look at -- now 588 is also out of Count 1; is

12 it not?

13 A    Yes, it is.

14 Q    But here we're looking at recordable events, the ones that

11:26:20  15 didn't rise to a reportable threshold; is that right?

16 A    Yes.

17 Q    So they weren't reported in the STEERS database, but they

18 were recorded by Exxon in their annual reports; is that right?

19 A    Yes.

11:26:31  20 Q    Now, if you look at 588 and compare it to 590 -- do you

21 have 590 in front of you?

22 A    Yes.

23 Q    Again, sir, are we looking at the same events, the same

24 recordable events in 588 that we're looking at in 590?

11:27:00  25         Take a look at the first couple.  We can run

Metzger - Cross/Alexander

1   through them if you like.

2   A     Yes, they are the same.

3   Q     All right.  The same recordable events for which you're

4   asking the Court to award days of violation in Exhibit 588

11:27:19   5   reappear again, sir, in the table that you submit to the Court

6   under Table 590; is that right?

7   A     Yes.

8   Q     And again, Mr. Metzger, we're looking at multiple days of

9   violation for these events, as many as you could count under

11:27:34   10   your theory of the case; is that right?

11   A     Yes.

12   Q     Twice?

13   A     We counted them separately.

14   Q     Right.  Twice.  588 and then again in 590?

11:27:48   15   A     In two separate places.

16   Q     Sure.  And that's true, by the way, not just for these

17   first couple we looked at.  That's all of Exhibit 588 and

18   Exhibit 590.  Those are the same exact recordable events that

19   appear in both places, do they not?

11:28:05   20   A     Yes.

21   Q     And for which Plaintiffs seek not only penalties for each

22   event but the maximum statutory penalty each time; is that

23   right?

24   A     Yes.

11:28:13   25   Q     And for each separate day of violation for each event in

1   each table?

2   **A**   Yes.

3   **Q**   No matter how many times it shows up; is that right?

4   **A**   Could you ask that last question again?

11:28:21   5   **Q**   Sure.  No matter how many times these events that you're

6   suing about show up in these tables you've submitted, you're

7   asking the Court for the maximum statutory penalty for each day

8   of violation for each event no matter whether it's in one table

9   or two tables or four tables; is that right?

11:28:38   10   **A**   Well, not -- we're not asking for that for a total.  Our --

11   the penalty we're asking for is not a total of all of those.

12           THE COURT:  Is it included in your calculations?

13           THE WITNESS:  It's included in our calculations.

14           THE COURT:  Both full sets?

11:28:53   15           THE WITNESS:  Yes.

16           THE COURT:  Okay.

17   BY MR. ALEXANDER:

18   **Q**   Now, let me ask you, if you would, to take a look at

19   Exhibit 599.  Is that in your notebook?

11:29:08   20   **A**   Yes.

21   **Q**   All right.  599 is another whole table of violations for

22   which you're asking this Court to award penalties, is it not?

23   **A**   Yes.

24   **Q**   And these fall under Count 7; is that right?

11:29:32   25   **A**   Yes.

Metzger - Cross/Alexander

1  **Q**    I want to ask you about a few of these, Mr. Metzger.

2           MR. ALEXANDER:  Does the Court have Exhibit --

3           THE COURT:  Right here.  599.

4           MR. ALEXANDER:  Thank you, your Honor.

11:29:41  5           THE COURT:  You may -- yeah, I guess everybody's got

6  copies.  Go on.

7           MR. ALEXANDER:  I was going to put it on the ELMO, but

8  it's fairly small print.  If the Court has any --

9           THE COURT:  That's why I pulled it.  It's small print.

11:29:54  10  You can't get a feel for the whole page.  You have to zoom it

11  all.

12               Go on.

13           MR. ALEXANDER:  Thank you, your Honor.

14  BY MR. ALEXANDER:

11:29:59  15  **Q**    If you would, sir, turn to -- you see how they're numbered

16  on the very far left column?  You've numbered the events

17  separately?

18           THE COURT:  1, 2, 3 or is it 5, 6, 7?

19           MR. ALEXANDER:  Yes, your Honor.

11:30:10  20           THE COURT:  There's a tiny column.

21  BY MR. ALEXANDER:

22  **Q**    There's a tiny column on the far left, Mr. Metzger.  Do you

23  see that?

24  **A**    Yes.

11:30:16  25  **Q**    All right.  Turn, if you would, please, to Number 30 in

Metzger - Cross/Alexander

1    that column.  Do you see that?  Let me know when you're there.

2  **A**    Yes, I'm there.

3  **Q**    All right.  Now, this is one of the events for which you're

4  seeking the maximum statutory penalty; is that right?

11:30:39  5  **A**    Yes.

6  **Q**    These, by the way, are what's called deviations.  Do you

7  understand that?

8  **A**    Yes.

9  **Q**    And Exhibit 30 -- if we look over here, first of all, you

11:30:49  10  see the type of requirement?  What does it say there?

11              THE COURT:  Where?

12              THE WITNESS:  Exhibit 30?  Did you mean line 30?

13              MR. ALEXANDER:  Your Honor --

14              THE COURT:  I'm looking across the top to see.

11:30:59  15              MR. ALEXANDER:  -- I'm on -- if you go to the far

16  left-hand column, your Honor, it's Number 30.

17              THE COURT:  Got it.

18  BY MR. ALEXANDER:

19  **Q**    And then if you scan across about halfway, there's a column

11:31:08  20  that's titled -- it's Column H.  It's titled, "Type of

21  Requirement."  It says, "Monitor," does it not, Mr. Metzger?

22  **A**    Yes.

23  **Q**    And if you read over a couple of lines over when it looks

24  at reported cause of deviation, would you tell us what it says

11:31:23  25  there?

Metzger - Cross/Alexander

1   A   "TK 1033 Annual Secondary Gap Seal Inspection Missed."

2   Q   All right.  And that -- that's -- first of all, there were

3   no emissions associated with this event, were there, sir?

4           MR. KRATKA:  Objection, your Honor.  It goes beyond

11:31:41   5   the scope of the document.

6           MR. ALEXANDER:  He's --

7           THE COURT:  Overruled.

8           MR. ALEXANDER:  He's --

9           THE COURT:  Overruled.  Go on.

11:31:44   10  BY MR. ALEXANDER:

11   Q   Do you know, Mr. Metzger -- as we sit here right now as

12   you're asking this Court for the maximum statutory penalty for

13   each of these infractions, do you have any idea of whether

14   missing an inspection on an annual secondary gap seal -- do you

11:32:01   15  know whether that involves emissions?

16   A   I don't know.

17   Q   All right.  It doesn't say that on the face, does it?

18   A   No, it doesn't.

19   Q   I'll represent to you, sir, that it does not.  And do you

11:32:09   20  see that there's a corrective action which is the next line

21   over?

22   A   Yes.

23   Q   And that corrective action says what, Mr. Metzger?

24   A   Inspection was completed 2-24-06 with no findings.

11:32:21   25  Q   They did the inspection a few days later and found nothing;

Metzger - Cross/Alexander

1   is that right?

2   **A**   That's what it appears.

3   **Q**   All right.  And you're seeking the maximum statutory

4   penalty?

11:32:34   5   **A**   Yes, it is.

6   **Q**   Okay.

7   THE COURT:  What is it now?  Was there any kind of

8   emission that day or just that report of -- that they forgot to

9   inspect the seal and went back and do it?  Which is --

11:32:45   10   MR. ALEXANDER:  The Court is exactly right.  There

11   were zero emissions out of this event.

12   THE COURT:  Okay.

13   BY MR. ALEXANDER:

14   **Q**   And if you look at the next one, Mr. Metzger --

11:32:51   15   THE COURT:  31.

16   MR. ALEXANDER:  Yes, your Honor.

17   BY MR. ALEXANDER:

18   **Q**   If you look under "Type of Requirement," it says, "Report."

19   Do you see that?

11:32:59   20   **A**   Yes.

21   **Q**   And what -- we look under reported cause of deviation.  The

22   reported cause of deviation is that a reportable emissions event

23   was not created within the two-week period.  Do you see that?

24   **A**   Yes.

11:33:13   25   **Q**   What does it say under "Corrective Action Taken," sir?

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Metzger - Cross/Alexander

1  A    "Final records submitted 1-25, 2006, communicated

2  importance of final record of events to appropriate personnel."

3          THE COURT:  What is it, one day after the cutoff of

4  1-24?

11:33:31  5          MR. ALEXANDER:  That's exactly right, your Honor.

6  BY MR. ALEXANDER:

7  Q    Now, do you know, Mr. Metzger, whether or not this -- this

8  is a STEERS event relating to, obviously, a reportable emissions

9  event.  You understand that, right?

11:33:43  10  A    Yes.

11  Q    Do you know whether this reportable emissions event for

12  which you're seeking a penalty here because the report was filed

13  late -- do you know whether that emissions event is already in

14  the case under any of your other tables?

11:33:56  15  A    I can't say for sure.

16  Q    Did you -- did you look at that when you oversaw the

17  creation of these tables?

18  A    I didn't look at that -- cross-reference that specific one,

19  no.

11:34:07  20  Q    Okay.  Take a look, if you would -- let's go back to

21  Exhibit 587, Mr. Metzger.  Let me know when you're there.

22          THE COURT:  All right.  What page are we looking at?

23          MR. ALEXANDER:  Your Honor, we're looking at -- again,

24  on the far left column, your Honor, it would be the column line

11:34:52  25  53 and 54.  I apologize.  It's line 55, your Honor.  I was off

Metzger - Cross/Alexander

1    by one.

2                THE COURT:  The carbon monoxide contaminant, is that

3    55?

4                MR. ALEXANDER:  Yes, your Honor, it is.

11:35:15  5          THE COURT:  Okay.  So that's what we're looking for?

6                MR. ALEXANDER:  Yes, your Honor.

7    BY MR. ALEXANDER:

8    Q    Are you there, Mr. Metzger?

9    A    On page 5?

11:35:23  10  Q    Yes.

11   A    Yes.

12   Q    Do you see the STEERS number here under line 55 of Exhibit

13   587?

14   A    Yes.

11:35:27  15  Q    And what is that STEERS number?

16   A    69967.

17   Q    That's the same event we just looked at for which you're

18   seeking penalties for filing the report late; is that right?

19   A    I'd have to go back and double-check.

11:35:41  20  Q    I would like you to do that, if you would.

21   A    What was the page exhibit number again?

22   Q    Sure.  That was the exhibit -- the other one was the

23   Exhibit 599, Mr. Metzger, line 31.  Yes?

24   A    Yes.

11:36:10  25  Q    All right.  We're seeking -- Environment Texas is seeking

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Metzger - Cross/Alexander

1    the maximum statutory penalty for this one event both for

2    failing to file its report on time and separately for the event

3    itself, right?

4  **A**    Yes, they're two separate violations.

11:36:22  5  **Q**    And by the way, since this is Exhibit 587, do we know

6    already that this same event again appears a third time in

7    Exhibit 589?  We can look at it, if you'd like.  Turn to 589, if

8    you would.

9  **A**    Okay.

11:36:49  10  **Q**    And if you would, go to line 55.  Do you see the STEERS

11    number there?

12  **A**    Yes.

13  **Q**    And what is it?

14  **A**    69967.

11:37:16  15  **Q**    The same event that we've been talking about?

16  **A**    Yes.

17  **Q**    All right.  Just so the Court's clear, Mr. Metzger, you're

18    seeking the maximum statutory penalty for this one event both in

19    Exhibit 587 and in Exhibit 589 for the emissions; is that

11:37:31  20    correct?

21  **A**    Yes.

22  **Q**    And then again in Exhibit 599 because they didn't file the

23    report on time?

24  **A**    Yes.

11:37:37  25             THE COURT:  Let me ask you this:  Without looking back

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Metzger - Cross/Alexander

1  at it since, you know, you've been working with this, are the

2  emissions the same day, same time?

3          MR. ALEXANDER:  Your Honor, these two tables that

4  we've been discussing -- and they do it at least twice, 587 and

11:37:54   5  589 and then 588 and 590, they're the same precise events, same

6  emissions, same time, same place, same everything.

7          THE COURT:  Let me ask this question because I got it:

8  How come you're asking, what, 32 or $37,000 for that, for the

9  same -- what appears to be the same event three times entry?

11:38:16  10          THE WITNESS:  We -- we, for each of the counts, we

11  calculated the violations in different ways.  So the first

12  count, we're dealing with the refinery since the permit

13  specifically says that no emissions are authorized, no upset

14  emissions are authorized.

11:38:32  15          THE COURT:  That's refinery.  Okay.  How about the

16  others?  Are they --

17          THE WITNESS:  The others we did --

18          THE COURT:  Is it also refinery emissions?

19          THE WITNESS:  It did, but then we looked at -- we

11:38:44  20  looked at it a different way than to actually comparing it to

21  the different rules that we walked through, including comparing

22  the emission rate allowed or as the permit says.

23          THE COURT:  So you're saying it's both a continuing

24  violation that allows you to get a fee, to be penalized for it,

11:39:00  25  and then there's, what is it, three 32 or $37,000 violations?

Metzger - Cross/Alexander

1  Am I not following it?

2        THE WITNESS:  Sure.  Well, the record violation is a

3  completely different violation, but then the -- in terms of the

4  two different exhibits, we calculated the violations for the

11:39:22  5  refinery just based on because it says the permit specifically

6  says no upset emissions are authorized.  Then we went through

7  again and looked at whether the -- for the different facilities

8  the emission rates were violated, the days of violations.  We

9  looked at it kind of two different ways.

11:39:40  10        THE COURT:  Okay.  This may be a question out of left

11  field.  I understand if you don't know offhand.  How many of

12  those multiple occasions penalties are you asking for?  How many

13  more than one for the same day and same event?  I'm not saying

14  you're not entitled to it.  I just -- ballpark have any idea?

11:39:59  15        THE WITNESS:  Your Honor, I don't know now, but we

16  definitely acknowledge that there's some -- it's double counted

17  in some places.

18        THE COURT:  It's a double counting, but that you're

19  entitled to it -- in other words, the Government's entitled to

11:40:11  20  penalize for double counting for different reasons.

21        THE WITNESS:  We just wanted to demonstrate the

22  different ways the violations happened.

23        THE COURT:  Well, demonstrate versus bottom line

24  dollar amounts are two different things, so -- that's in my

11:40:26  25  head.  You need to clear it up, Counsel, when you can.  I'm

Metzger - Cross/Alexander

 1   looking at Defense lawyers -- I mean, the Plaintiffs' lawyers.
 2   Okay.
 3           MR. KRATKA:  I can clear it right now if you would
 4   like.
 5           THE COURT:  Let me just see, and that way you can meet
 6   it.  Okay.  Yes.
 7           MR. KRATKA:  This is where the discrepancy came in
 8   when, I believe, Mr. Nichols was saying we're asking for more
 9   than a billion dollars in penalties and we were saying, "No,
10   it's less than that."  And the reason was, as we outlined in our
11   pretrial proposed findings of fact and proposed conclusions of
12   law, we explained that there's certain counts where for certain
13   facilities there's an overlap and we're not seeking the double
14   recovery.
15           THE COURT:  I understand his position.  I just needed
16   to know his position.
17           MR. KRATKA:  Yeah.  Two different alternative
18   theories.  We're not seeking double recovery.
19           THE COURT:  Go right ahead.
20   BY MR. ALEXANDER:
21   Q    Mr. Metzger, can you turn back to Exhibit 599, please?
22   A    Yes.
23   Q    Would you turn, please, sir, to, again, the column on the
24   far left, Mr. Metzger, and I'm looking at Number 39.  Are you
25   there?

Metzger - Cross/Alexander

1    **A**    Yes.

2    **Q**    Starting at 39 and looking at these next few, sir.  39, if

3    you look at -- again, it says "Report" there.  Do you see that

4    under "Type of Requirement"?

11:41:55    5    **A**    Yes.

6    **Q**    In other words, this is a reporting requirement, not an

7    emission standard, is it?

8    **A**    Yes, it's a reporting requirement.

9    **Q**    All right.  And you know this case is about emission

11:42:07   10    standards or limitations, sir?

11                MR. KRATKA:  Objection, your Honor.

12                THE COURT:  Sustained.

13    BY MR. ALEXANDER:

14    **Q**    Mr. Metzger, if you slide over to "Reported Cause of

11:42:15   15    Deviation."  Do you see that column?

16    **A**    Yes.

17    **Q**    And, again, we're on 39?

18    **A**    Yes.

19    **Q**    It says, "Late submittal to TCEQ regarding performance

11:42:26   20    tests."  Then it references a couple of tests and when they were

21    due?

22    **A**    Yes.

23    **Q**    And if you look at the reported correction action, it says

24    those tests were submitted to TCEQ as follows; and do you see

11:42:36   25    that?

1    A    Yes.

2    Q    All right.  Now, if you look, sir, just -- just by way of

3    example, let's look at the next one, Number 40.  It looks like

4    this is a recordkeeping requirement.  Do you see that under --

11:42:47   5    under Column H?

6    A    Yes.

7    Q    And if you look at the reported cause of deviation, sir, it

8    says, "HON maintenance wastewater plan was not fully implemented

9    as part of the HON SSM plan."  Do you see that?  Did I read that

11:43:18   10   correctly?

11   A    Yes.

12   Q    This is some sort of a wastewater requirement, is it not?

13   A    Yes.

14   Q    Do you understand this is a Clean Air Act case?

11:43:29   15        MR. KRATKA:  Objection, your Honor.  This is a

16   requirement in a Clean Air Act permit.

17        THE COURT:  All right.  I've heard the other side.  Go

18   on.

19   BY MR. ALEXANDER:

11:43:37   20   Q    And then if we look at the next one, Mr. Metzger, it

21   says -- I'm looking at Number 41 -- "Monthly engine fuel usage

22   record for April was not completed"; is that right?

23   A    Yes, uh-huh.

24   Q    And what was the corrective action?

11:43:52   25   A    "Reviewed importance of recordkeeping to appropriate

Metzger - Cross/Alexander

1   personnel."

2   **Q**   Okay.  Thank you, sir.  Oh, one other thing.  Sorry.  Look

3   at Exhibit 590, if you would?

4          THE COURT:  Five nine zero.

11:44:09   5          MR. ALEXANDER:  Yes, your Honor.

6   BY MR. ALEXANDER:

7   **Q**   I'm looking, Mr. Metzger, and the Court, at the first page.

8   Are you there?

9   **A**   Yes.

11:44:26  10   **Q**   Okay.  You talked about this, I believe, with Mr. Kratka,

11   but I just want to make sure I understand it.

12          THE COURT:  By the way, I haven't used this ever since

13   I've been up here.  For the appellate record I just grabbed a

14   big magnifying glass.  All right.  Go on.

11:44:47  15   BY MR. ALEXANDER:

16   **Q**   If you look at Exception 4 there at the top, Mr. Metzger --

17   **A**   Yes.

18   **Q**   -- if I understand that right, sir, what -- what that

19   exception means to Environment Texas is that for these

11:45:00  20   recordable events that are in this table, even if none of the

21   emissions exceeded the permitted limit, you're still counting it

22   as a violation; is that right?

23   **A**   Yes.

24   **Q**   And we see that here in these -- in these first couple,

11:45:16  25   right?

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Metzger - Cross/Alexander

1   **A**   Yes.

2   **Q**   It looks like none of the emissions in -- I'm looking at

3   the first two events.  There's a sour water unit event here,

4   first page of 590, and then a hydrofining Unit 6B event.  Do you

11:45:34   5   see those?

6   **A**   Yes.

7   **Q**   And for each of those events, you counted a day, a one day

8   of violation, did you not?

9   **A**   Yes.

11:45:41   10   **Q**   But for those events none of the contaminants listed

11   exceeded the permitted limit, did they?

12   **A**   No.

13   **Q**   But you're still counting them?

14   **A**   Uh-huh, yes.  Excuse me.

11:45:52   15         THE COURT:  All right.  We've completed, according to

16   the clock, our -- what is it, the hour and a half.  It's now

17   11:46 by my regular clock.  We'll take a break.  We're going to

18   take a break until 12:00 noon and then go on until about 1:05,

19   somewhere in that area.  So we'll see you back in about 13

11:46:17   20   minutes.

21         (Court recessed at 11:46 a.m.)

22         (Court resumed at 12:03 p.m.)

23         MR. ALEXANDER:  May I proceed, your Honor?

24         THE COURT:  Yes.

12:03:47   25   //

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Metzger - Cross/Alexander

1  BY MR. ALEXANDER:

2  **Q**    Mr. Metzger, just so we're clear on a couple of things,

3  you're not an expert in the management and operations of a

4  petrochemical facility, are you?

12:03:58  5  **A**    No.

6  **Q**    You're not an expert in flaring?

7  **A**    No.

8  **Q**    As the executive director of Environment Texas,

9  Mr. Metzger, one of you-all's agenda items is lobbying, right?

12:04:13  10  **A**    Yes.

11        THE COURT:  What?

12        MR. ALEXANDER:  Lobbying.

13  BY MR. ALEXANDER:

14  **Q**    And you do a fair amount of that?

12:04:15  15  **A**    Yes.

16  **Q**    And then another agenda item is, obviously, initiating

17  litigation or we wouldn't be sitting here talking, would we?

18        MR. KRATKA:  Object to the form of the question.

19        THE COURT:  Overruled.  I'll take judicial notice of

12:04:29  20  that.

21  BY MR. ALEXANDER:

22  **Q**    It wasn't a trick question, Mr. Metzger.

23  **A**    I know.  It was just -- I wasn't sure which -- how we

24  wouldn't be here -- no, we wouldn't be here if, yes -- or we

12:04:37  25  wouldn't be here if litigation wasn't part of our mission.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Metzger - Cross/Alexander

1          THE COURT:  Move on, Counsel.

2          MR. ALEXANDER:  I'm moving on.

3   BY MR. ALEXANDER:

4   Q    After you, Environment Texas, sent the notice letter

12:04:48  5   regarding this case, you sent staff members out to the Baytown

6   area canvassing for potential supporters; is that right?

7   A    I don't remember when we sent -- when I sent staff out.

8   Q    Do you remember -- do you know that one of the folks that

9   at least -- you have at least one time designated in this case

12:05:06  10   was a gentleman by the name of Stuart Halpryn?

11   A    I'm sorry.  Could you ask the question again?

12   Q    Sure.  You know that one of the -- one of the folks that

13   you-all put forth as a standing member in this case was a

14   gentleman by the name of Stuart Halpryn -- is a gentleman by the

12:05:21  15   name of Stuart Halpryn?

16   A    Yes.

17   Q    And do you understand that Mr. Halpryn was also a standing

18   member in the case that -- that you-all filed against Shell?

19   A    I'm not sure.

12:05:37  20   Q    Or C. P., I apologize.

21   A    Yes, I believe he was for Chevron Phillips.

22   Q    Do you recall sending staff members to go door to door in

23   the Baytown area to locate folks that you could use to help

24   support your claims against Exxon in this case?

12:05:52  25   A    Yes.

Metzger - Cross/Alexander

1    Q    Okay.  As the executive director of Environment Texas, I

2    assume you monitor the -- what's going on with air pollution and

3    air conditions both in Baytown and Houston and around the state?

4    A    Yes.

12:06:12  5    Q    Do you understand that air pollution, generally speaking,

6    is on an improving trend?

7    A    I understand that there are fewer days of exceeding the

8    standard for ozone in Houston.  So for an eight-county region,

9    the eight-county region has improved in air quality for ozone.

12:06:36  10    Q    Are you familiar with the annual publication titled,

11    "What's Happening to Our Air Quality that's put out in Houston"?

12    A    No, I'm not.

13         MR. ALEXANDER:  All right.  Would you pull up Exhibit

14    518, please.

12:07:06  15    BY MR. ALEXANDER:

16    Q    Have you ever seen, Mr. Metzger, in this document or any of

17    the other annual publications put out concerning Houston air

18    quality trends?

19    A    I'm not sure.

12:07:14  20    Q    All right.  I want to run through with you some of the data

21    that's in here.  I'll represent to you, Mr. Metzger, that this

22    summarizes air quality from all the air monitors around the

23    Houston area.

24         MR. KRATKA:  I'm going to object, first, because he

12:07:27  25    just testified he's never seen the document and, second, it's

1 hearsay.

2            THE COURT:  What's your response?

3            MR. ALEXANDER:  Your Honor, as my -- several

4 responses.  First of all, the data in here is indisputable as to

12:07:38    5 the air quality -- air monitoring that it -- air quality that it

6 monitors.

7                 Second of all, we have -- both sides have several

8 experts that are going to be able to corroborate the data in

9 here.

12:07:49   10                 And, third of all, as the executive director and

11 the corporate representative of Environment Texas who brought

12 this lawsuit, they should have been looking at this.  So at the

13 very -- at the very least, your Honor, it's -- it should be

14 conditionally admitted.  We've got -- we've got experts coming

12:08:06   15 that will verify.  This is not controversial data, your Honor.

16 This is air monitoring data from the Houston area.

17            MR. KRATKA:  Well, there is no foundation laid for

18 that document.  You can say it's undisputed.  Your saying it's

19 undisputed doesn't make it so.  Mr. Metzger has testified he

12:08:23   20 hasn't seen it, can't corroborate it.  If you want to ask him

21 what he knows about air quality, ask him; but this is hearsay.

22            THE COURT:  Sustain the objection.

23            MR. ALEXANDER:  All right.  Would you pull down

24 Exhibit 518.

12:08:37   25 //

Metzger - Cross/Alexander

1  BY MR. ALEXANDER:

2  **Q**    You do understand, I think you just testified, that ozone

3  exceedances are on a reducing trend and have been reducing?

4  **A**    Yes.

12:08:45  5  **Q**    In the Houston area?

6  **A**    Yes.  In the eight-county region.

7  **Q**    And do you understand that the same is true for HR VOCs,

8  highly reactive volatile organic compounds?

9  **A**    Yeah, I believe that's the case.

12:09:00  10  **Q**    That those numbers have been coming down and, in fact, have

11  increased significantly in the last 10 or 15 years.  Do you

12  understand that?

13  **A**    Could you ask the question again?

14  **Q**    Sure.  Do you understand that in the Houston area that the

12:09:09  15  emission readings for highly reactive volatile organic

16  compounds, HR VOCs, have been coming down and have decreased a

17  good amount over the last ten years?

18  **A**    Okay, yeah.  I thought you said increased but yes.

19  **Q**    If I did, I misspoke.  Same would be true for benzene,

12:09:29  20  would it not, Mr. Metzger?

21  **A**    I'm not sure.

22  **Q**    Okay, don't know the answer.  How about butadiene?  Do you

23  know the answer to that one?

24  **A**    I don't know the answer.

12:09:41  25  **Q**    Okay.  You discussed yesterday afternoon the lawsuits that

Metzger - Cross/Alexander

1    Environment Texas brought against Shell and C. P. -- the C. P.

2    Cedar Bayou facility.  Do you recall that?

3  **A**    Yes.

4  **Q**    And in both those cases -- first of all, they were both

12:09:53    5    filed identical to this case, citizen suit Clean Air Act cases;

6    is that right?

7  **A**    Yes.

8  **Q**    And they were both filed in federal court in Houston?

9  **A**    Yes.

12:10:00   10  **Q**    In fact, the case against Shell, I believe, was in this

11    Court?

12  **A**    Yes.

13  **Q**    And the case against C. P. was in Judge Atlas's court.  Do

14    you recall that?

12:10:11   15  **A**    I believe that's right, yes.

16  **Q**    Both of those cases ended up with consent decrees agreed to

17    and entered into with the Court between the Defendant Shell or

18    C. P. and the Plaintiffs; is that right?

19  **A**    Yes.

12:10:27   20  **Q**    And you were satisfied with those consent decrees, were you

21    not?

22  **A**    Yes.

23  **Q**    Those consent decrees did a number of things, right?

24  **A**    Yes.

12:10:38   25  **Q**    They had stipulated penalty provisions for the company

Metzger - Cross/Alexander

1    Shell and C. P. to try to hit certain emission targets; is that

2    right?

3    **A**    Yes.

4    **Q**    And they required the consideration or implementation of

12:10:51    5    various emission reduction plans that you thought would be

6    beneficial to those entities; is that right?

7    **A**    Yes.

8    **Q**    In fact, you were so satisfied with not only the consent

9    decrees but with those companies' performance under them that

12:11:08    10    last November they were released from their obligations under

11    the consent decrees; is that accurate?

12    **A**    Yes.  The consent decree was just a three-year period.  So

13    it had ended.

14    **Q**    Okay.  You understand -- well, first of all, let's pull

12:11:24    15    them up.

16          MR. ALEXANDER:  If we could pull up Defendant's 394,

17    please.

18    BY MR. ALEXANDER:

19    **Q**    That's the consent decree in the Shell case, correct?

12:11:38    20    **A**    Looks like it, yes.

21    **Q**    And do you see it up there at the top, Mr. Metzger, that it

22    was entered on June 16th of 2009?

23    **A**    Yes.

24          MR. ALEXANDER:  And then if you'll pull up, please,

12:11:50    25    393.

Metzger - Cross/Alexander

1   BY MR. ALEXANDER:

2   **Q**    That's the consent decree that we just were discussing in

3   the Chevron Phillips Chemical case; is that right?

4   **A**    Yes.

12:12:02   5   **Q**    And this one was entered by the Court on January 10th of

6   2011, correct?

7   **A**    Yes.

8   **Q**    Now, we've been talking a lot, Mr. Metzger, about emission

9   events and reportable events and reportable events in this case,

12:12:20   10   right?

11   **A**    Yes.

12   **Q**    And we both understand that the reportable events are the

13   events that exceed a reportable quantity and, therefore, have to

14   be reported to STEERS -- through the STEERS system to TCEQ?

12:12:33   15   **A**    Yes.

16   **Q**    Now, do you understand, Mr. Metzger, that after the entry

17   of these consent decrees, the Shell and the C. P. consent

18   decrees, neither of those companies stopped having reportable

19   emission events, did they?

12:12:43   20   **A**    I believe that's correct.

21   **Q**    Your counsel earlier in this case represented to the

22   Court -- and I think you were here -- that Exxon should be able

23   to reduce its emission events to virtually nil.  Did you hear

24   that?

12:12:58   25   **A**    Yes.

Metzger - Cross/Alexander

1    Q    After entry of these consent decrees, the Shell and the

2    C. P. consent decrees, they continued to have reportable events,

3    did they not?

4    A    Yes.

12:13:10   5    Q    In fact, I want to ask you about those reportable events.

6                MR. ALEXANDER:  If we could turn to Exhibit 505,

7    please.  Now -- and Ms. Luu, if you could zoom in on the bottom

8    half of that -- of the columns there, tracking all the way up to

9    the top 2012 entry.  Do you see what I'm talking about?  Do you

12:13:53   10   see there under -- under ended -- here, I'll show you.  There

11   you go.

12   BY MR. ALEXANDER:

13   Q    All right.  So if we look here, Mr. Metzger, first of all,

14   the consent decree for Cedar Bayou we just mentioned was in

12:14:22   15   January of 2011; is that right?

16   A    Yes.

17   Q    If you recall?

18   A    Yes.

19   Q    And let's just look at 2011 after entry of the consent

12:14:33   20   decree, sir.  The consent decree was on the 10th, all right?

21   A    Uh-huh.

22   Q    Now, these are the reportings in the STEERS system when a

23   company, whether it's Exxon or Shell or C. P. or whoever, has a

24   reportable event, they have to report that within two weeks to

12:14:51   25   the TCEQ, right?

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Metzger - Cross/Alexander

1   **A**   I believe they have to report it within 24 hours, but --

2   **Q**   You're right.  And the final report is within two weeks, I

3   apologize.

4   **A**   Yes.

12:14:58   5   **Q**   And you've looked at these?

6   **A**   Yes.

7   **Q**   You can find these online, right?  You can go up and look

8   up any regulated entity -- in fact, that's how you got the

9   information to file this case was by looking at these reports on

12:15:10   10   the TCEQ database?

11   **A**   Yes.

12   **Q**   Right.  So, if we look now at the continued reportable

13   events for C. P. after the consent decree that you entered into,

14   they don't stop, do they?

12:15:23   15   **A**   No.

16   **Q**   In fact, we've got an event four days later, the 14th,

17   several more events in January; and if you run up to the top of

18   2011, I'll represent to you, Mr. Metzger, that there were 12

19   additional reportable events just in 2011 after entry of the

12:15:44   20   consent decree with all the provisions that -- that you had

21   instituted, okay?  You understand that?

22   **A**   Yes.

23   **Q**   Okay.  You knew that.  You knew they didn't stop having

24   reportable events even with the consent decree, did you not?

12:15:57   25   **A**   I did know that.

Metzger - Cross/Alexander

1  Q    Okay.  And if we look to 2012 --

2         MR. ALEXANDER:  Ms. Luu, if you can scroll up to

3  capture 2012.

4  BY MR. ALEXANDER:

12:16:26  5  Q    We've got seven more events in 2012 from C. P.,

6  reportable -- I'm not even counting the recordable events.  Do

7  you understand that, Mr. Metzger?

8  A    Yes.

9  Q    This is just the reportable events, the ones in the STEERS

12:16:40 10  system.

11         MR. ALEXANDER:  And if we scroll up to 2013, Ms. Luu.

12  BY MR. ALEXANDER:

13  Q    Now, this is the third year after the consent decree was

14  put in effect.  In fact, this is the year that C. P. was

12:17:00 15  released from its obligations under the consent decree, right?

16  A    Yes.

17  Q    Because according to you, Mr. Metzger, they had fulfilled

18  their requirements; is that correct?

19  A    Yes.

12:17:09 20  Q    And in 2013 alone, Mr. Metzger, there were 14 additional

21  reportable events filed by C. P. with the TCEQ; is that right?

22  A    That looks about right.

23         MR. ALEXANDER:  Okay.  Now, if you could turn,

24  Ms. Luu, to Exhibit -- we'll start with 388, please.

12:17:24 25  //

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Metzger - Cross/Alexander

1  BY MR. ALEXANDER:

2  Q    And I want to talk to you about the reportable events that

3  Shell continued to have after its consent decree was entered.

4  Just to refresh you, Mr. Metzger, and the Court, the Shell

12:17:44   5  consent decree was a little bit earlier than the C. P.; is that

6  right?

7            THE COURT:  Okay.  Your reason for going into this is

8  what, to show what?  I don't object to it.  There's no

9  objection, I agree, but what purpose are we looking at,

12:17:55  10  selective enforcement?

11            MR. ALEXANDER:  Your Honor -- no, your Honor, there

12  are several reasons.  The primary reason is to show that the

13  Plaintiffs' stated purpose that these emission events can be

14  reduced to practically nil is an impossibility.

12:18:07  15            THE COURT:  All right.  Go on.

16            MR. ALEXANDER:  The --

17            THE COURT:  That's all right.

18            MR. ALEXANDER:  Thank you.

19            THE COURT:  Got it.

12:18:11  20            MR. ALEXANDER:  Thank you, your honor.

21  BY MR. ALEXANDER:

22  Q    If we look, Mr. Metzger, at just since the June, 2009,

23  consent decree, looking at Exhibit 388.

24            MR. ALEXANDER:  If we could go to page 3, please.

12:18:23  25  //

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Metzger - Cross/Alexander

1    BY MR. ALEXANDER:

2    **Q**    Shell, by the way, you understand, is bigger than C. P.?

3    **A**    Yes.

4    **Q**    And you understand that ExxonMobil -- the ExxonMobil

12:18:42  5    Baytown Complex is bigger than Shell and C. P.?

6    **A**    Yes.

7    **Q**    In fact, you heard your counsel refer to the ExxonMobil

8    Baytown Complex as the largest manufacturing facility in the

9    United States, right?

12:18:51  10    **A**    Yes.

11    **Q**    All right.  So it makes sense that Shell would have more

12    reportable events then C. P.; it's just a larger facility?

13            MR. KRATKA:  Objection.  No foundation.

14            THE COURT:  Overruled.  He can disagree if he'd like.

12:19:06  15            THE WITNESS:  Could you ask the question again.

16    BY MR. ALEXANDER:

17    **Q**    Sure.  It makes sense that Shell as a larger facility than

18    C. P. would have more reportable events, right?  They've got

19    more opportunities for them, right?

12:19:18  20    **A**    I suppose so.

21    **Q**    And if we look starting with the consent decree in June of

22    2009, June 16th of 2009, we see here that the events don't stop.

23    The reportable events at Shell don't stop with entry of the

24    consent decree, do they?

12:19:34  25    **A**    No.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Metzger - Cross/Alexander

1    Q    In fact -- and I'll represent to you that I've counted

2    these up, Mr. Metzger -- since June 10 -- 16, excuse me, of

3    2009 -- in fact, there was one two days later.  And if you count

4    all those through 2009, Mr. Metzger, you've got 21 additional

12:19:53    5    reportable events by Shell after entry of the consent decree,

6    okay?

7    A    Okay.

8    Q    And then if we go to 2010, which is up above and then

9    carries over, I believe, to the next page --

12:20:04   10         MR. ALEXANDER:  If you can skip to page 2, Ms. Luu.

11    BY MR. ALEXANDER:

12    Q    -- we've got a number of additional reportable events by

13    Shell in 2010.  Do you see that?

14    A    Yes.

12:20:18   15    Q    In fact, the number -- and your counsel can verify this if

16    they want to try to correct.  The number I counted was 30

17    additional reportable events by Shell in 2010 alone.  Okay?  And

18    then in 2011, sir, you see that there was an event -- a couple

19    of events in January, four or five in February.  They continue

12:20:35   20    in March and April and May.  It looks like there wasn't a month

21    where Shell didn't have at least one reportable event in 2011,

22    which is how long after the entry of the consent decree?

23    A    How long from -- sorry.  Could you ask the question again.

24    Q    Sure.  The consent decree again was when?

12:20:58   25    A    I believe 2009.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Metzger - Cross/Alexander

1   **Q**   June, 2009?

2   **A**   Yeah.

3   **Q**   So we're now -- we're now two years in --

4   **A**   Yeah.

12:21:02  5   **Q**   -- to the consent decree that implements these improvements

6  that Environment Texas wanted.  And Shell as a large,

7  complicated manufacturing facility can't stop having these

8  reportable events, can it?

9   **A**   We -- I disagree with that assertion.

12:21:18  10   **Q**   I understand your position is they could, but they didn't

11  even after the consent decree, did they?

12   **A**   The consent decree didn't require them to stop all emission

13  events.

14   **Q**   It didn't require them to get their emission events to

12:21:31  15  virtually nil, did it?

16   **A**   No.

17   **Q**   All right.  And they didn't get their emission events to

18  virtually nil, did they?

19   **A**   No.

12:21:36  20   **Q**   In fact, they had 30 in 2010, 37 in 2011, 28 in 2012.

21         MR. ALEXANDER:  If you can skip, Ms. Luu, to the next

22  page.

23  BY MR. ALEXANDER:

24   **Q**   28 more in 2012.

12:21:52  25        MR. ALEXANDER:  And then if we'll flip very quickly,

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Metzger - Cross/Alexander

1  Ms. Luu, to Exhibit 504.

2  BY MR. ALEXANDER:

3  **Q**     And this, Mr. Metzger, is the latest printout of the

4  reportable -- it encompasses part of what we've already seen in

12:22:18  5  2012, but it also adds the 2013 events and a couple of 2014

6  events.  And there are 14 additional events -- reportable events

7  by Shell 14 in 2013.  Do you see that?

8  **A**     That looks about right.

9  **Q**     Now, one of the things the consent decree -- one of the

12:22:41  10  things it did was it targeted emission limits for both Shell and

11  C. P.; is that right?

12  **A**     Yes.

13         MR. ALEXANDER:  Okay.  You can pull that down.

14              Thank you, Ms. Luu.

12:22:51  15  BY MR. ALEXANDER:

16  **Q**     And if you look at exhibit --

17         MR. ALEXANDER:  Let's pull up Exhibit 394, please, at

18  page 7.  This is the Shell decree when we get it up.

19              And, Ms. Luu, if you could scan in on or zoom in

12:23:21  20  on that box at the top.

21  BY MR. ALEXANDER:

22  **Q**     Mr. Metzger, this was the goal that Environment Texas set

23  for Shell in the consent decree for year three.  Do you recall

24  that?

12:23:37  25  **A**     Yes, I believe that's right.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Metzger - Cross/Alexander

1  **Q**    All right.  And the goal was total pollutants of 135,000.

2  Do you see that?

3  **A**    Yes.

4  **Q**    And then various smaller amounts of these other

12:23:48  5  constituents; is that correct?

6  **A**    Yes.

7  **Q**    Okay.  Now, you issued a press release on November 21,

8  2013, in conjunction with the release of Shell and C. P. from

9  their consent decree obligations.  Do you recall that?

12:24:05  10  **A**    Yes.

11        MR. ALEXANDER:  And, Ms. Luu, if you could pull up

12  Exhibit 519 for me.

13  BY MR. ALEXANDER:

14  **Q**    And you said a number of things in this press release.  One

12:24:26  15  of the things you said was that they have cut emissions by about

16  95 percent.

17        MR. ALEXANDER:  And if you'll flip, Ms. Luu, to the

18  second page and if we can pull up, please, that top bullet point

19  there.

12:24:45  20  BY MR. ALEXANDER:

21  **Q**    What you told the public in this press release,

22  Mr. Metzger, was that Shell cut its emissions from large upset

23  events, those releasing enough pollutants to trigger the state's

24  public reporting requirements by about -- sorry.  It says,

12:25:07  25  "Shell cut its emissions from large upset events."  That's

Metzger - Cross/Alexander

1   talking about reportable events; is that right?

2   **A**   Yes.

3   **Q**   And it says here that it dropped it by about 95 percent.

4   Do you see that?

12:25:19   5   **A**   Yes.

6   **Q**   Okay.  You weren't counting in this number the reportable

7   events, were you?

8   **A**   No, I don't believe so.

9   **Q**   Okay.  I want to ask you about Shell's actual performance

12:25:39   10   under the -- under the constraints of the consent decree that

11   you entered into with them.  And I'd like to do it -- I'd like

12   to turn, if we could, to Exhibit 385, please.  Now, this is

13   what's called a criteria -- excuse me, a "2012 Contaminant

14   Summary Report."  Do you see that?

12:26:29   15   **A**   Yes.

16   **Q**   And this is what's known as the emissions inventory that

17   all companies, not just Shell but Exxon and C. P. and everybody

18   files to represent their emissions over the preceding year.  Do

19   you understand that?

12:26:44   20   **A**   Yes.

21          MR. ALEXANDER:  Okay.  And if you could, Ms. Luu,

22   please, pull up the top box right here.

23   BY MR. ALEXANDER:

24   **Q**   Now, this is Shell's reporting of its emissions for 2012 to

12:27:05   25   the TCEQ.  Do you understand?

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Metzger - Cross/Alexander

1  **A**    Yes.

2  **Q**    And we've got several columns here, pollutant over here --

3          MR. ALEXANDER:  And if you could -- I'm sorry,

4  Ms. Luu.  If you could pull it up so that the pollutant is

12:27:19  5  visible.  Thank you.

6  BY MR. ALEXANDER:

7  **Q**    Got the pollutant over here and those are each of the --

8  what's called the criteria pollutants.  Those are the pollutants

9  that the EPA has singled out, right?

12:27:36  10  **A**    Yes.

11  **Q**    Okay.  And then it's got a number of columns, annual

12  emissions.  And, by the way, this is all in tons per year.  Do

13  you understand that?

14  **A**    Yes.

12:27:45  15  **Q**    And it's got an ozone column --

16  **A**    Except for ozone, I think, which I think PPD would be

17  pounds per day?

18  **Q**    You know what, ozone, I think you're right, is the only

19  one.  These over here that I want to ask you about are in tons

12:28:03  20  per year; is that right?

21  **A**    Yes.

22  **Q**    And, particularly, we've got emission events -- that's

23  EE -- along with the emissions from maintenance, startup, and

24  shutdown.  Do you see that?

12:28:13  25  **A**    Yes.

Metzger - Cross/Alexander

1  Q    And those are the kinds of emissions that -- that are at

2  issue in this case, right?

3  A    Yes.

4  Q    And what we've got are a total of the emissions that Shell

12:28:21  5  put out in 2012 as reported to TCEQ, right?

6  A    Yes.

7  Q    And this was year three of the consent decree; is that

8  right?  This was -- wasn't the consent decree in June of 2009?

9  A    Yes, that's right.

12:28:44  10  Q    So 2012 would have been the third year?

11  A    Yeah, I think that's right.

12  Q    Okay.  Have you ever looked to see, Mr. Metzger, how

13  Shell's performance in year three under your consent decree

14  compared with Exxon's performance last year in 2012 for the same

12:29:00  15  types of emission events that were -- that were -- that are at

16  issue in this case?

17  A    No.

18  Q    Would you be interested?

19  A    Do I have a choice?

12:29:12  20  Q    You may not.  You may not.  I'll represent to you, sir,

21  that I've done the calculations and totaled them up, and I want

22  to walk through it with you.  So Shell, although it's got

23  several different facilities, it captures them all in one

24  report, this report here.  Do you understand that?

12:29:32  25  A    Yes.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Metzger - Cross/Alexander

1  Q    And Exxon, by contrast, files separate reporting for its

2  refinery -- Exxon Baytown, I should say, files separate

3  reporting for its refinery, for its olefins facility, and for

4  its chemical plant.  Did you understand that?

12:29:49  5  A    Yes.

6  Q    Okay.  I want to walk through with you Exxon's performance

7  from last year, and I want to start with Defendants' -- and you

8  know what, because there will be a lot of paper, I'm going to

9  give you copies of these so you can walk along with me.

12:30:24  10       Mr. Metzger, let me hand you, first of all,

11  Shell's 385.  This is the document we're looking at right here.

12  All right.  And then I want to walk through with you, sir,

13  Exxon's performance last year; and I'm going to hand you 380

14  which is for the Exxon Baytown refinery.  285, Mr. Metzger, is

12:31:04  15  for the Exxon Chemical Company.  And, Mr. Metzger, 276 is the

16  Exxon -- it says "chemical" under "company," but if you see the

17  site, that's actually for the olefins plant.  Do you see that?

18  A    Yes.

19       MR. ALEXANDER:  Ms. Luu, if you could pull up, please,

12:31:32  20  for me the refinery numbers 380 -- Exhibit 380, I apologize.

21       And again, Ms. Luu, if you could focus in on that

22  criteria summary chart.

23  BY MR. ALEXANDER:

24  Q    These are the refinery's emission totals for last year,

12:31:56  25  same as we were looking at for Shell; is that right?

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Metzger - Cross/Alexander

1   **A**    Yes.

2   **Q**    And you can look at this or the one in front of you,

3   whatever is easier for you.  And we've got the same totaling of

4   the same criteria pollutants here for Exxon under this -- this

12:32:09   5   last column which is for emission events and emissions from the

6   maintenance startups and shutdowns.  Do you see that?

7   **A**    Yes.

8        MR. ALEXANDER:  Now, Ms. Luu, if you could pull for

9   me, please, Exhibit 285 which is the chemical plant.

12:32:20   10   BY MR. ALEXANDER:

11   **Q**    Same data, Mr. Metzger, correct, for the Baytown chemical

12   facility; is that right?

13   **A**    Yes.

14        MR. ALEXANDER:  And then last, Ms. Luu, if you could

12:32:45   15   pull up Exhibit 276.

16   BY MR. ALEXANDER:

17   **Q**    And this is -- if you'll look here under site name,

18   Mr. Metzger, it's the olefins plant.  Do you see that?

19   **A**    Yes.

12:32:59   20        MR. ALEXANDER:  And, Ms. Luu, if you would, please,

21   pull up the same.

22   BY MR. ALEXANDER:

23   **Q**    All right.  And we've got here the same right-hand column

24   for emissions events and emissions from maintenance, startup,

12:33:10   25   and shutdown.  Now, I wanted those in front you, Mr. Metzger,

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Metzger - Cross/Alexander

1    because I want you to be able to do the math; and I can actually

2    provide a calculator if you'd like because I've added all those

3    up.

4              MR. ALEXANDER:  And, Ms. Luu, if you could please pull

12:33:24  5    up Exhibit 520 for us.

6    BY MR. ALEXANDER:

7    Q    Now -- and what we have here, Mr. Metzger, is those same

8    criteria pollutants we were just talking about, right?

9    A    Yes.

12:33:38  10   Q    And the three different Baytown Complex facilities,

11   refinery, chemical, and olefins; is that correct?

12   A    Yes.

13   Q    And this is the -- this is the 2012 data for the emissions

14   from the types of events that Environment Texas is suing about

12:33:56  15   in this case.  You understand that?

16   A    Yes.

17   Q    All right.  And so what we've done, because this lawsuit

18   involves the entire Baytown Complex, is we've added all these up

19   and then we've totaled both Shell's criteria pollutants from

12:34:12  20   emission events and the Baytown Complex, the entire Baytown

21   Complex emissions for 2012, and would you -- would you tell the

22   Court which of the two facilities had less emissions from

23   events?

24   A    Well, according to your chart, Baytown had less, but I

12:34:34  25   don't necessarily agree with that characterization.

Metzger - Cross/Alexander

1  **Q**    All right.  Well, you're free to look at the documents I've

2  laid in front of you.  If I've done the math wrong or put any

3  numbers up incorrectly, please let me know.

4  **A**    Well, it's not a matter of the documents.  It's a matter

12:34:47  5  of, I believe, that Exxon is grossly undercounting the emissions

6  it's actually emitting.  Shell as part of its consent decree

7  agreed to actually test and verify the flare destruction rate to

8  determine exactly how much they are emitting.  Exxon has not

9  done that.

12:35:04  10  **Q**    Mr. Metzger, we're going to have Exxon witnesses up here

11  that are going to be able to testify to the Court's content as

12  to how Exxon estimates its emissions, but the bottom line is, at

13  least according to what both facilities were reporting -- and

14  they're required to make these reports by law, are they not?

12:35:21  15  **A**    Yes.

16  **Q**    The Baytown Complex reported 193.4 tons of criteria

17  pollutants from emission events in 2012 and the Shell complex in

18  year three of your consent decree reported 196.8 tons; is that

19  right?

12:35:36  20  **A**    According to your chart.

21  **Q**    And you understand, sir, that as we said earlier the

22  ExxonMobil Baytown Complex is larger than the Shell refinery,

23  Shell complex?

24  **A**    Yes.

12:35:48  25  **Q**    But at least according to the emissions inventory both

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1    facilities reported, Exxon's numbers were lower?

2  **A**    Yes.

3  **Q**    All right.  Now, you were asked some questions about the

4    agreed order, and I want to ask you a couple about it myself.

12:36:06    5             MR. ALEXANDER:  If you could pull up, Ms. Luu, Exhibit

6    222.  And I want to turn, if you could, please, to page three,

7    paragraph 12.

8                  Could we switch, your Honor, to the ELMO?  I

9    apologize.

12:36:59   10             THE COURT:  Hold it.

11    BY MR. ALEXANDER:

12  **Q**    Do you have it in front of you, Mr. Metzger?

13  **A**    Yes.

14  **Q**    I'm looking at paragraph 12.

12:37:23   15             MR. KRATKA:  I'm sorry.  What page are you looking at,

16    please?

17             MR. ALEXANDER:  It's page 3, paragraph 12.

18                  Your Honor, can -- would you read that?

19             THE COURT:  Which paragraph are you looking at?

12:37:45   20             MR. ALEXANDER:  Paragraph 12, your Honor.

21             THE COURT:  Okay.

22    BY MR. ALEXANDER:

23  **Q**    Mr. Metzger, if you have it in front of you, this finding

24    of fact in the agreed order references that from 2000 to 2010

12:37:59   25    Exxon reported a 60 percent reduction in aggregate emissions of

Metzger - Cross/Alexander

1    VOCs, HR VOCs, CO, SO2, and NOx from the complex.  Do you see

2    that?

3    **A**    Yes.

4    **Q**    And that over the same period of time emissions of VOCs by

12:38:18    5    themselves from the complex dropped 44 percent?

6    **A**    Yes, I see that.

7    **Q**    And then a larger reduction in CO and a similar reduction

8    63 percent in NOx?

9    **A**    Yes, I see that.

12:38:33   10    **Q**    Those reductions between 2000 and 2010 were achieved

11    without any citizen suit, were they not?

12    **A**    No, I would say that's perhaps not.  I mean, we -- well,

13    that's -- I think we sent the notice letter -- I can't remember

14    when we sent the notice letter, but I think that probably our

12:38:52   15    lawsuit's having some impact.

16    **Q**    You filed -- I didn't mean to interrupt you, Mr. Metzger.

17    You filed this lawsuit at the end of 2010, did you not?

18    **A**    I think we filed it -- I think we sent the notice letter,

19    you know, about a year before that.

12:39:07   20    **Q**    Okay.  And the reductions that are referenced in here were

21    done without any special master appointed to oversee Exxon and

22    tell it how to run the Baytown Complex; is that correct?

23    **A**    Yes.

24    **Q**    Okay.

12:39:24   25    **A**    But can I add something?

Metzger - Cross/Alexander

1  Q    Your counsel can ask whatever they would like to ask,

2  Mr. Metzger.

3              We talked about the fact that Shell and C. P.,

4  like virtually every facility, continues to have reportable

12:39:51   5  emission events, right?

6  A    Yes.

7  Q    And I think you referenced yesterday that those events

8  haven't stopped.  In fact, they've already had -- Shell has

9  already had a big one in 2013, correct?

12:39:59  10              THE COURT:  A big what?

11              MR. ALEXANDER:  A big emission event, your Honor.

12              THE WITNESS:  Yes.

13              MR. ALEXANDER:  Could we turn, please, to Exhibit 394?

14  Excuse me.  I apologize.  Exhibit 504.  Sorry, your Honor.

12:40:23  15              THE COURT:  It's no problem, just let me know.

16              MR. ALEXANDER:  If you could turn, Ms. Luu, to page 4

17  of this document.  This is -- I assume you have some familiarity

18  with it because you testified about it yesterday.  This is the

19  emissions event I believe you were referencing, is it not?

12:40:53  20              MR. KRATKA:  Objection.  He may need to see the entire

21  exhibit to be able to answer that question.

22              MR. ALEXANDER:  Tell you what, let me -- why don't we

23  pull it up, Ms. Luu, if you could, to the next page.  I think

24  that may help jog his memory.

12:41:08  25  //

Metzger - Cross/Alexander

1   BY MR. ALEXANDER:

2   **Q**   Looking at these amounts, does that refresh your

3   recollection as to this being the emissions event you were

4   probably referencing yesterday?

12:41:19   5   **A**   Yes, I think so.

6            MR. ALEXANDER:  All right.  And if you'll flip back,

7   Ms. Luu, to the first page.

8               You know what?  I apologize.  The first page of

9   that report, which is page 3, the previous page, page 3.  I'm

12:41:57   10   sorry.  Flip, if you would, to the very next page, page 4,

11   because we were on 5.  My fault.  My mistake.

12   BY MR. ALEXANDER:

13   **Q**   All right.  This is the page before the page we were just

14   looking at, and this is from Shell Deer Park.  This was an event

12:42:12   15   that began on the 12th of January and lasted about two weeks.

16   Do you see that?

17   **A**   Yes.

18   **Q**   And they've got a long discussion about the cause, but in

19   any event if you flip then to the next page, we've got

12:42:32   20   reportable emissions from this event -- and this is just one

21   event in 2013 -- of forty -- almost 42,000 pounds of butadiene.

22   Do you see that?

23   **A**   Yes.

24   **Q**   39,000 pounds of benzene?

12:42:49   25   **A**   Yes.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Metzger - Cross/Alexander

1    Q    Looks like over 1.3 million pounds of ethane?

2    A    Yes.

3    Q    And then I guess one point -- almost, yeah, 1.56 million

4    pounds of ethylene, right?

12:43:09   5    A    Yes.

6    Q    Another 153,000 pounds of methane?

7    A    Yes.

8    Q    And it was an unfortunately large event, was it not?

9    A    Yes.

12:43:32   10   Q    Just to sum up, Mr. Metzger, whether before or after the

11   consent decree that was entered into with Shell and C. P.,

12   neither of those entities were able to stop having reportable

13   emission events, were they?

14   A    No.

12:43:47   15   Q    Nor were they able to reduce their reportable emission

16   events to virtually nil, were they?

17   A    No.

18   Q    In fact, the target that you referenced -- that we

19   referenced earlier for year three with Shell was 135 pounds; is

12:44:05   20   that right?

21           MR. KRATKA:  Objection.  Misstates the -- both the

22   testimony and what the consent decree says.

23           THE COURT:  Rephrase it then.

24           MR. ALEXANDER:  We can go back.

12:44:12   25   //

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Metzger - Cross/Alexander

1    BY MR. ALEXANDER:

2    Q    Do you recall -- Mr. Metzger, for year three of the Shell

3    consent decree, do you recall what the -- what the targeted

4    emissions limit was?

12:44:21    5    A    I don't, no.

6    Q    All right.

7            MR. ALEXANDER:  Let's flip back, Ms. Luu, to that

8    decree which is Exhibit 394.

9                    And turn, if you would, please, to page 7.

12:44:47   10                    Actually, let's turn to page 6 first.

11    BY MR. ALEXANDER:

12    Q    And it says there at the bottom --

13            MR. ALEXANDER:  If you could pull out that paragraph C

14    at the bottom, please.

12:44:56   15    BY MR. ALEXANDER:

16    Q    -- "Emissions of pollutants from the Deer Park site during

17    the third and each succeeding year following entry of this

18    decree shall not exceed the emission limits."  Do you see that?

19    A    Yes.

12:45:13   20    Q    And then those limits are provided on the next page.

21            MR. ALEXANDER:  If you could please go back to the

22    chart on the following page.

23                    And if you could pull that up, Ms. Luu.

24    BY MR. ALEXANDER:

12:45:41   25    Q    The total pollutants listed there is -- is that 135,000

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Metzger - Cross/Alexander

1    pounds?

2    A    Yes.

3    Q    Now, Mr. Metzger, do you still have the 2012 Contaminant

4    Summary Report for Shell in front of you?

12:46:03    5    A    Yes.

6    Q    Just looking at the criteria pollutants -- and let's go --

7    just looking at the criteria pollutants, Mr. Metzger, what's

8    the -- what's the total in tons for emissions events for Shell

9    for 2012 as they reported it to TCEQ?  Just give us a rough

12:46:22    10    estimate.

11    A    Sorry.  Could you ask the question again?

12    Q    Sure.  Just looking at the criteria pollutants,

13    Mr. Metzger, with that Shell Contaminant Summary Report in front

14    you, what is the rough total of criteria pollutants for 2012 as

12:46:37    15    recorded by Shell to the TCEQ?

16             MR. KRATKA:  Are you asking --

17             THE WITNESS:  I don't think it has a total column.

18             MR. KRATKA:  Objection.  You're asking him to perform

19    a fairly complicated calculation.

12:46:52    20             THE COURT:  At the very top it says, "Total

21    Pollutants."

22             THE WITNESS:  Your Honor, it doesn't on this

23    document that --

24    BY MR. ALEXANDER:

12:46:58    25    Q    I'm not -- I wasn't trying to make you do complicated math.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1    Do you see here -- let me take my glasses off so I can read it.

2    For 2012 under this column, we've got 108.4 tons of SO2.  Do you

3    see that?

4  **A**    Yes.

12:47:11    5  **Q**    About 50 tons of VOC.

6            THE COURT:  Hold it.  I'm looking at the screen.

7            MR. ALEXANDER:  I'll pull the screen down, your Honor.

8    I apologize.  I was trying to do a comparison between the target

9    and their actual emissions.

12:47:24   10            THE COURT:  Well, it says -- what you have on the

11    screen says, "Total Pollutants, 135,000."

12            MR. ALEXANDER:  Yes.  Ms. Luu, could you pull up 385.

13            THE COURT:  And that's for which company, for what

14    year?

12:47:37   15            MR. ALEXANDER:  This, your Honor, is for Shell.

16            THE COURT:  2012?

17            MR. ALEXANDER:  This is their 2012 consent decree

18    emission limit.

19            THE COURT:  Was the consent decree still in operation?

12:47:47   20            MR. ALEXANDER:  The consent decree, your Honor, was in

21    operation until it was finally lifted late last year, your

22    Honor.

23            THE COURT:  That was, what, the three years?

24            MR. ALEXANDER:  Yes, your Honor.

12:47:55   25            THE COURT:  All right.

Metzger - Redirect/Kratka

1  BY MR. ALEXANDER:

2  **Q**    So if we look at the emissions events alone, Mr. Metzger,

3  we've got about 50 tons of VOCs.  Do you see that?

4  **A**    Yes.

12:48:05   5  **Q**    And about -- almost 32 tons of CO.  Do you see that?

6  **A**    Yes.

7  **Q**    And another 108.4 tons of SO2, right?

8  **A**    Yes.

9  **Q**    Almost 200 tons or 400,000 pounds of emissions from events

12:48:25   10  in maintenance, startup, and shutdown; is that right?

11  **A**    That sounds about right.

12  **Q**    Okay.  And just so we're clear, you understand the

13  ExxonMobil Baytown Complex is larger than both Shell and C. P.?

14  **A**    Yes.

12:48:40   15  **Q**    Thank you, Mr. Metzger.

16          MR. ALEXANDER:  I have nothing further, your Honor.

17          THE COURT:  Go right ahead, sir.

18          MR. KRATKA:  Quick follow-up, your Honor.

19                  REDIRECT EXAMINATION

12:48:46   20  BY MR. KRATKA:

21  **Q**    Since we were just talking about the Shell consent decree,

22  let me ask you a couple of follow-up questions about that.

23  Mr. Alexander was trying to get you to compare emission totals

24  from TCEQ's calendar year 2012 reports?

12:49:29   25  **A**    Yes.

Metzger - Redirect/Kratka

1  **Q**    And to compare those to compliance with annual emission

2  limits under the Shell consent decree?

3  **A**    Yes.

4  **Q**    I'm going to show you a copy of the Shell consent decree,

12:49:42  5  page 4 of the decree; and if you could -- this is in the

6  paragraph 6 of the consent decree which is "Definitions."  Could

7  you read the definition of "Year" under the consent decree?

8  **A**    "Year means the 12-month period beginning on the first day

9  of the first calendar year or the yearly recurrence of such date

12:50:12  10  following entry of this decree."

11  **Q**    I think you may have misread that.  Try it again.  It's

12  first calendar quarter.

13  **A**    Oh.  "Year means the 12-month period beginning on the first

14  day of the first calendar quarter or the yearly recurrence of

12:50:28  15  such date following entry of this decree."

16  **Q**    And this consent decree was entered in June?

17  **A**    Yes.

18  **Q**    Of 2009?

19  **A**    Yes.

12:50:38  20  **Q**    So the reporting year under this consent decree was not

21  the -- did not -- does not match up to an actual calendar year,

22  correct?

23  **A**    Correct.

24  **Q**    So can you -- so are you able to compare --

12:50:51  25         THE COURT:  Does it match up to 12 months?

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1    BY MR. KRATKA:

2    Q    12 months but not the same 12 months as appeared in

3    Mr. Alexander's chart, correct, Mr. Metzger?

4    A    Correct.

12:51:05    5    Q    And -- now, the Shell consent decree, was it a product of

6    negotiation?

7    A    Yes.

8    Q    Was there give and take between the parties?

9    A    Yes.

12:51:23    10    Q    And were there -- as you discussed, one of the goals of the

11    consent decree was to -- or one of the products of the consent

12    decree was to reduce pounds of pollutant emissions?

13    A    Yes.

14    Q    Were there other aspects of the consent decree that you

12:51:46    15    considered to be important benefits that you gained from

16    achieving that settlement?

17    A    Yes.

18    Q    Can you describe some of them?

19    A    I believe Shell had to institute a flare minimization plan.

12:51:59    20    They added additional monitors.  They paid a major penalty that

21    went to support community projects, including cleaning up dirty

22    diesel school busses and solar energy and solar panels put on

23    some -- Pasadena high school.

24         THE COURT:  All of that but still more was going into

12:52:19    25    the air.  They didn't completely do away with it.  It's still

Metzger - Redirect/Kratka

 1  pouring out what seems to be an amount per year, correct?

 2          THE WITNESS:  Yes, it was -- it was a settlement.  So

 3  we accepted bird in hand and -- but it did still amount to, I

 4  think, between the two facilities a 1.1 million-pound reduction,

12:52:40   5  so, you know, significantly cleaner air for the Houston area.

 6          THE COURT:  Sure.  Go on.

 7  BY MR. KRATKA:

 8  **Q**    Was it -- was it important to you that each of those

 9  companies took responsibility in the settlement for their past

12:52:54  10  actions?

11  **A**    It was.  And both companies did accept responsibility.

12  **Q**    And, now, in the press release when you reported the

13  percentage reductions that had been achieved by the consent

14  decrees, what was the comparison that you were using to

12:53:15  15  determine what percentage emission reductions had been achieved

16  in the final year of each consent decree?

17  **A**    I believe it was based on a five-year average of the

18  facility's emissions.

19  **Q**    Five-year average from prior to each lawsuit?

12:53:30  20  **A**    Right.

21  **Q**    So you were not comparing reductions to the highest level

22  at some point earlier before the lawsuits?

23  **A**    Correct.

24  **Q**    And do you know whether the emissions amounts that Shell

12:53:43  25  had to -- upon which you based your press release were based on

Metzger - Redirect/Kratka

1    Shell's reports pursuant to this -- to the Plaintiffs' pursuant

2    to this Court's consent decree?

3    **A**    Yes.

4    **Q**    And they were not based on the TCEQ contaminant summaries,

12:53:59    5    correct?

6    **A**    Correct.

7    **Q**    Now, you looked at that very large emission event at the

8    Shell Deer Park facility.  Do you consider that -- the

9    performance of Shell in that emission event to be acceptable to

12:54:21    10   you?

11   **A**    No.

12   **Q**    Would you consider Shell's performance to be poor after the

13   consent decree ended?

14   **A**    Yes.

12:54:34    15   **Q**    Did Shell's poor performance after that consent decree

16   ended affect your concern with Exxon's permit compliance?  Let

17   me ask you another way:  Is it your view that Shell's poor

18   performance after your consent decree ended excused the

19   environmental compliance of any other facility?

12:54:55    20   **A**    No.  It doesn't excuse it.

21   **Q**    Now, you were asked earlier by Mr. Alexander whether -- the

22   issue of double counting.  Do Count 1 and Count 2 of this

23   lawsuit assert different legal theories or the same legal

24   theory?

12:55:22    25   **A**    Different legal theories.

Metzger - Redirect/Kratka

```
 1  Q    And do some emissions events at the refinery appear in both
 2  Count 1 and Count 2 of this lawsuit?
 3  A    Yes.
 4  Q    If the Court finds for Plaintiffs on both Count 1 and Count
 5  2, is Environment Texas asking for double penalties to be
 6  assessed for these same emission events?
 7  A    No, we're not.
 8  Q    And if the Court finds for Plaintiffs on either count or
 9  both counts or all counts, does Environment Texas want an
10  injunction against all the types of violations that you're
11  asserting in this lawsuit?
12  A    Yes.
13       MR. KRATKA:  Let me just see if I have any additional
14  questions.  One second, please.
15       THE COURT:  Sure.
16       MR. KRATKA:  Just a couple more questions.
17  BY MR. KRATKA:
18  Q    Mr. Alexander showed you a number of emissions events that
19  occurred at the Chevron Phillips Cedar Bayou plant during the
20  last several years.  Do you recall that?
21  A    Yes.
22  Q    And he showed you that only 12 emissions events occurred
23  the first year after your consent decree began?
24  A    Yes, that sounds right.
25  Q    And he showed you that only seven in the following year,
```

12:55:36

12:55:51

12:56:10

12:56:44

12:56:54

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Metzger - Recross/Alexander

1   2012, occurred?

2   **A**   That sounds right.

3   **Q**   And is 2012 the year the consent decree expired?

4   **A**   I believe -- I don't remember exactly what year.

12:57:09   5   **Q**   Did you see -- were you able to see any improvement in

6   either the number of emission events or the total emissions from

7   the Cedar Bayou plant during the time it was covered by your

8   consent decree?

9   **A**   Yes.

12:57:33   10   **Q**   All right.  That's all I have.

11            MR. ALEXANDER:  Just very brief, your Honor.

12            THE COURT:  Go on.

13            MR. ALEXANDER:  Thank you, your Honor.

14                          RECROSS EXAMINATION

12:57:41   15   BY MR. ALEXANDER:

16   **Q**   Did I understand you correctly, Mr. Metzger, that the way

17   you set a benchmark for Shell's reductions and emissions was by

18   using a five-year average of previous emissions?

19   **A**   Yes.

12:57:53   20   **Q**   And just to refresh ourselves, both Shell and C. P. paid a

21   penalty in connection with the consent decrees; is that right?

22   **A**   Yes.

23   **Q**   And is it accurate that the penalty Shell -- excuse me, the

24   penalties that C. P. paid in connection with their consent

12:58:08   25   decree was $2 million?

Metzger - Recross/Alexander

1  **A**    Yes.

2  **Q**    And the penalty that Shell paid in connection with their

3  consent decree was $5.8 million?

4  **A**    Yes.

12:58:17  5  **Q**    Thank you, Mr. Metzger.

6            MR. ALEXANDER:  I have nothing further, your Honor.

7            THE COURT:  Anything further?

8            MR. KRATKA:  No, your Honor.

9            THE COURT:  All right.  Thank you, sir.  You may step

12:58:24  10  down.  You're free to leave.  You may remain in the courtroom

11  now if you desire.

12            All right.  It's just about right at 1:00

13  o'clock.  We'll take our break.  Be back ready to resume at

14  2:15.

12:58:36  15      (Court recessed at 12:58 p.m.)

16      (Court resumed at 2:20 p.m.)

17            THE COURT:  All right.  Call your next witness.

18            MR. NICHOLAS:  Before we do, your Honor, two matters.

19            THE COURT:  Sure.

02:20:35  20            MR. NICHOLAS:  One is that the parties have agreed

21  amongst ourselves that Plaintiffs can call Lisa Chisholm, who is

22  an Exxon employee, by showing a videotape.  It's 30 seconds

23  long, and we agreed, too.

24            THE COURT:  No problem.

02:20:51  25            MR. NICHOLAS:  And then --

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1          MR. NICHOLS:  Your Honor, we agree; but if they're

2    going to offer a video, the entire video needs to come in.

3          MR. NICHOLAS:  Well, we're only showing the clip of

4    one employee.  The rest of the clip is of somebody else who we

02:21:07  5    are -- do not intend on showing.

6          THE COURT:  Well, the only thing that comes in is the

7    video of your witness, okay?  I'm not -- I mean, if it's on one

8    disk, so be it; but the only thing coming into evidence would be

9    the witness they have, right?

02:21:25  10          MR. NICHOLS:  Your Honor, it's a video of a Baytown

11   City Council presentation.

12          THE COURT:  Oh, okay.

13          MR. NICHOLS:  And they just want to play an excerpt.

14   My point is that if they want to put that in, that's fine.  And

02:21:36  15   I've told them that before trial, but we ought to put the whole

16   thing in.

17          MR. NICHOLAS:  Well, I think they can -- they are,

18   obviously, free to play it on their -- in their case; and ours

19   is a separate --

02:21:46  20          THE COURT:  Good.  We're all on the same page.  Thank

21   you.  What exhibit number is that?  No, no.  We'll get to it

22   later.  Don't worry.  That's fine.  The other point?

23          MR. KRATKA:  Two other quick things:  the photograph

24   that Mr. Richard Cottar produced yesterday --

02:22:02  25          THE COURT:  It's already in the file.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1          MR. KRATKA:  I wanted to confirm that.

2          THE COURT:  The phone video.

3          MR. KRATKA:  Right.  That's in as Exhibit 612.

4          THE COURT:  It's already there.

02:22:10  5          MR. KRATKA:  And the other matter is there was --

6   during his -- Mr. Cottar's testimony, there was an objection

7   based on -- to an e-mail he wrote which I argued should be

8   admitted under the present sense impression exception, and you

9   asked for a case on that.

02:22:24  10          And this is a Southern District of Texas case

11  from 2008, Judge Rosenthal, specifically dealing with -- it's

12  Canatxx Gas Storage Limited against Silverhawk Capital Partners.

13         THE COURT:  What's the cite on it?

14         MR. KRATKA:  The cite is Westlaw -- 76 Federal Rules

02:22:42  15  of Evidence Service 500 and also 2008 Westlaw 1999234, and it

16  specifically deals with the admission of a contemporaneously

17  written e-mail during an event.  There's a tab here where I've

18  highlighted -- there's a short section on that issue.

19         THE COURT:  Thank you, sir.  Don't let me forget.  If

02:23:09  20  I don't mention it, you mention it again to me.

21         MR. KRATKA:  That was with regard to Plaintiffs'

22  Exhibit 399.

23         THE COURT:  Ordinarily, I would look at it, but we

24  don't have a jury.  So I'll leave it aside, and I'll look at it

02:23:22  25  during a break or after the day.

Carman - Direct/Nicholas

1                 All right.  Call your next witness, please.

2                 MR. NICHOLAS:  Plaintiffs call Dr. Neil Carman.

3                 THE COURT:  You've already been sworn.  How do you

4    spell your name, please?

02:23:39    5                 THE WITNESS:  Neil, N-e-i-l, Jon, J-o-n, Carman,

6    C-a-r-m-a-n.

7                 THE COURT:  All right.  Go right ahead.

8              (The witness, **NEIL JON CARMAN**, called on behalf of the

9    Plaintiff, was previously sworn.)

10                THE COURT:  Go right ahead.

11                          DIRECT EXAMINATION

12   BY MR. NICHOLAS:

13   **Q**     Dr. Carman, do you have a position with the Sierra Club?

14   **A**     Yes.

02:23:51   15   **Q**     What is your position with the Sierra Club?

16   **A**     Clean Air Program Director.

17   **Q**     And is the Sierra Club a national group?

18   **A**     Yes.

19   **Q**     Does Sierra Club also have state chapters?

02:24:01   20   **A**     Yes.

21   **Q**     Are you a Clean Air Director for any of the state chapters?

22   **A**     Just the Lone Star Chapter in Texas.

23   **Q**     And can you explain to the Court what you do as Clean Air

24   Director?

02:24:14   25   **A**     I work on a lot of air quality issues in Texas.  Industrial

Carman - Direct/Nicholas

1    emissions ozone is a big problem in different parts of the state

2    and --

3              THE COURT:  What -- Texas Clean Air, what was the last

4    word, the name of the group?  Lone Star?

02:24:37    5              MR. NICHOLAS:  Dr. Carman is with the Lone Star

6    Chapter of the Sierra Club, and he is the Clean Air Director --

7              THE COURT:  Air Director.  All right.

8              MR. NICHOLAS:  -- for the Lone Star Chapter of the

9    Sierra Club.

02:24:46   10    BY MR. NICHOLAS:

11    **Q**    Can you continue to explain what you do as Clean Air

12    Director?

13    **A**    Yes.  I interact with the state -- Texas Commission on

14    Environmental Quality.  I attend a lot of meetings.  I also

02:25:00   15    interact with the Environmental Protection Agency in Dallas and

16    Washington, DC.  I prepare comments to the state commission on

17    environmental quality and also to EPA because there's a lot of

18    rule makings with respect to air quality at the state and the

19    federal level.

02:25:19   20              I'm also involved in legal issues that the Sierra

21    Club has with EPA over Federal Clean Air Act standards for --

22    like MACT, standards for industrial facilities, and so that's

23    kind of an overview.

24    **Q**    All right.  And just to clear that up, MACT is an acronym

02:25:42   25    that refers to something in the Clean Air Act?

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Carman - Direct/Nicholas

1   **A**    Yes.

2   **Q**    And do you have -- are you paid as an -- as the Clean Air

3   Director?  Is that a paid position?

4   **A**    Yes.

02:25:50  5   **Q**    And how long have you been with the Lone Star Chapter of

6   the Sierra Club?

7   **A**    Since 1992.

8   **Q**    And do you have any role in the national Sierra Club?

9   **A**    Yes, I do.

02:25:59  10   **Q**    Could you just briefly describe that?

11   **A**    Well, I served as a volunteer on a national clean air

12   committee.

13           THE COURT:  I'm not clear.  You stated that you're the

14   Clean Air Program Director for the Sierra Club.

02:26:12  15           THE WITNESS:  In Texas.

16           THE COURT:  In Texas.  Okay.

17   BY MR. NICHOLAS:

18   **Q**    There's a state chapter of a national group, is that,

19   essentially, what it is?

02:26:20  20   **A**    Yes.

21   **Q**    And you have a role in the national group as well as the

22   Texas group; is that right?

23   **A**    Yes.

24   **Q**    Could you just briefly describe your role for the national

02:26:32  25   Sierra Club?

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Carman - Direct/Nicholas

1  **A**    I serve on a voluntary committee.  In other words, these

2  are not paid staff people, and I'm on it as well.  So it's

3  somewhat separate, but it's air work in which we approve and

4  authorize legal cases.  These are mostly appeals against the US

02:26:53  5  Environmental Protection Agency under the Clean Air Act.

6             THE COURT:  When you say "approve legal cases," what,

7  to take or to get into?

8             THE WITNESS:  Yes.  To authorize, to make sure we have

9  attorneys, to make sure we have funding; but this is against the

02:27:07  10  Environmental Protection Agency.

11  BY MR. NICHOLAS:

12  **Q**    And can you describe in more detail your work with ozone?

13  **A**    Yes.  Ozone is a very important air quality problem here in

14  the Houston area and other areas of Texas such as it's been a

02:27:22  15  problem in Beaumont/Port Arthur, the Dallas/Fort Worth area.

16  And so because of the -- these areas have failed to meet the

17  EPA's standards on ozone -- it's now an 8-hour standard -- the

18  different areas have been required to develop plans to -- ozone

19  SIP plans or clean air plans to reduce pollution from small

02:27:47  20  farming chemicals to clean up the air.

21  **Q**    Let me just -- let me just clarify just a few things.

22  You're familiar with the National Ambient Air Quality standards?

23  **A**    Yes.

24  **Q**    And there are -- there is a National Ambient Air Quality

02:28:01  25  standard for ozone?

Carman - Direct/Nicholas

1  **A**    Yes.

2  **Q**    And part of your work is to track the status of whether an

3  area is in or not in attainment for National Ambient Air Quality

4  standard for ozone?

02:28:15   5  **A**    Yes.

6  **Q**    And you do that for Texas?

7  **A**    Yes, but I do look at ozone levels around the country.

8  **Q**    And a National Ambient -- National Ambient Air Quality

9  standard for ozone is determined on a geographical area; is that

02:28:33  10  right?

11  **A**    Yes.

12  **Q**    So there's a geographical area that covers Baytown?

13  **A**    Yes.

14  **Q**    Could you just tell the Court what the -- what the

02:28:40  15  geographical area is that covers Baytown for the purpose of

16  National Ambient Air Quality standards for ozone?

17  **A**    The EPA has determined that the Houston area, which is an

18  8-county region, including Harris County and seven other

19  counties, to be a non-attainment area for ozone, which means it

02:29:01  20  doesn't comply with the current ozone standard.

21  **Q**    And how long has Harris County and the surrounding counties

22  been out of attainment for ozone?

23  **A**    Since, I believe, around the late 1970s with the first

24  one-hour standard.

02:29:17  25              THE COURT:  By the way, Doctor, what was your

1   educational background, please?

2         THE WITNESS:  I have a BS and an MS in the biological

3   sciences and a PhD from the University of Texas at Austin in

4   botany emphasizing natural products chemistry.

02:29:40   5   BY MR. NICHOLAS:

6   Q     You are familiar with the organizational structure of

7   Sierra Club?

8   A     Yes.

9   Q     Is Sierra Club a corporation?

02:29:46   10   A     Yes.

11   Q     Is Sierra Club a non-profit corporation?

12   A     Yes.

13   Q     And could you especially -- can you tell the Court what the

14   corporate purpose of Sierra Club is?

02:29:55   15   A     To protect humanity and the environmental and to enjoy the

16   outdoors.

17   Q     And Sierra Club has by-laws?

18   A     Yes.

19   Q     And, your Honor, we've submitted those by-laws as

02:30:07   20   Plaintiffs' Exhibit 341.  So it's fair to call the Sierra Club

21   an environmental group?

22   A     Yes.

23   Q     And the Sierra Club has members?

24   A     Yes.

02:30:16   25   Q     Do you know how many members there are in Texas?

Carman - Direct/Nicholas

1    **A**    About 25,000.

2    **Q**    Are you familiar with how the Lone Star Chapter of the

3    Sierra Club sets the agenda of what it's going to work on?

4    **A**    Yes.

02:30:28    5    **Q**    And do the members help set the Lone Star Chapter agenda?

6    **A**    Yes.

7    **Q**    Can you explain how the members help set the Lone Star

8    Chapter agenda?

9    **A**    There are local executive committees, such as Houston,

02:30:42    10    Dallas, Fort Worth, Dallas, Austin, and other major areas; and

11    they all elect their own executive committees, a group of

12    members who meet and determine what they think policy should be

13    at a local, state, and national level.

14                   And then those recommendations go to a state

02:31:02    15    elected executive committee that meets in Austin every quarter.

16    So every year they review the priorities for the state chapter

17    to work on, and air quality has consistently been a top priority

18    over the last 25 years.

19    **Q**    And it's fair to say that reducing air pollution is a top

02:31:23    20    priority for the Sierra Club in Texas?

21    **A**    Yes.

22    **Q**    And the Sierra Club has a national board?

23    **A**    Yes.

24    **Q**    Do the members vote for the national board?

02:31:33    25    **A**    Yes.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Carman - Direct/Nicholas

1 **Q**    And does this suit fit into Sierra Club's priorities in

2 Texas?

3 **A**    Yes.

4 **Q**    Now, are you familiar with the types of membership records

02:31:43   5 that Sierra Club maintains?

6 **A**    Yes.

7 **Q**    I'm going to show you Plaintiffs' Exhibits 342, 343, 344,

8 and 345.  I just want you to tell the Court what these documents

9 are.  Here's 342.  I'll just hand them to you.

02:32:27   10 **A**    This is a membership record for Diane Aguirre.

11 **Q**    Okay.  And this is -- identify the Plaintiffs' exhibit

12 number.  Then say what it is.

13 **A**    This is Exhibit Number 343 for the Plaintiffs.  This is the

14 membership record for Marilyn Kingman.  Plaintiffs' Exhibit

02:32:52   15 Number 344, this is the membership record for Sharon Sprayberry.

16 This is Plaintiffs' Exhibit 345, and this is the membership

17 record for Shae Cottar.

18 **Q**    I'm not sure this came into the record, but the exhibit

19 number for Ms. Aguirre's membership information is Plaintiffs'

02:33:30   20 Exhibit 342.

21        As part of your job as Clean Air Director, do you

22 review emissions data from facilities in Texas?

23 **A**    Yes.

24 **Q**    And are some of those emissions data publicly available?

02:33:46   25 **A**    Yes.

Carman - Direct/Nicholas

1  Q    They're available on a TCEQ website?

2  A    Yes.

3  Q    You're familiar with annual contaminant summary reports?

4  A    Yes.

02:33:52  5  Q    Have you reviewed annual contaminant summary reports for

6  the Baytown Complex?

7  A    Yes.

8  Q    Did you review annual contaminant summary reports for the

9  Baytown Complex for the years 2006 through 2012?

02:34:06  10  A    Yes.

11  Q    Do the annual contaminant summary reports for the Baytown

12  Complex include emissions information from emissions events and

13  startup, shutdown, and maintenance records -- maintenance

14  events?

02:34:21  15  A    Yes.

16  Q    Did you prepare a summary of this information for the year

17  2006 through 2012?

18  A    Yes.

19  Q    Dr. Carman, can you -- can you tell me what exhibit --

02:34:55  20  Plaintiffs' Exhibit 609 is?

21  A    Yes.

22        MR. NICHOLS:  Your Honor, may I take the witness on

23  voir dire?

24        THE COURT:  Sure.

02:35:00  25  //

                        VOIR DIRE EXAMINATION

1

2   BY MR. NICHOLS:

3   Q   Sir, did you prepare this document?

4   A   Yes, I did.

02:35:03   5   Q   Did you type it up?

6   A   Yes, I did.

7   Q   Okay.

8          MR. NICHOLS:  Thank you, Judge.

9                       DIRECT EXAMINATION

02:35:09   10                  (continued)

11   BY MR. NICHOLAS:

12   Q   Could you tell the Court what this exhibit is?

13   A   It's the Baytown Complex Emissions Criteria Summary.

14   Q   And these are emission summaries just for emission events,

02:35:26   15   startup, shutdown, and maintenance events; is that right?

16   A   Yes.

17   Q   And this is for the period of 2006 to 2012, right?

18   A   Yes.

19   Q   And you've totaled these emissions for each of the three

02:35:37   20   plants within the Baytown Complex?

21   A   Yes.

22   Q   And you've done those each year from 2006 through 2012?

23   A   Yes.

24   Q   And you came up with a grand total in both tons and pounds?

02:35:46   25   A   Yes.

                    Gayle Dye, CSR, RDR, CRR - 713.250.5582

Carman - Direct/Nicholas

1  Q    And can you tell the Court what the grand total of tons and
2  pounds of these emissions are?
3  A    The grand total in tons is 4,702.47 tons, and in pounds it
4  calculates to 9,404,940 pounds.
02:36:11  5  Q    So during emission events at the Baytown Complex during the
6  years 2006 through 2012, there have been 9,400 -- 9,404,940
7  pounds of the types of pollutants that are listed on the top
8  there emitted from the complex, correct?
9  A    Yes.
02:36:32  10         THE COURT:  Well, when you say "Baytown Complex,"
11  just -- it's the ExxonMobil operation, correct?
12         THE WITNESS:  Yes.  The three Exxon plants in Baytown.
13  BY MR. NICHOLAS:
14  Q    And this information is based on contaminant summary
02:36:44  15  reports that are referenced at the bottom of the -- of this
16  document, the Plaintiffs' exhibit numbers?
17  A    Yes, TCEQ annual contaminant reports.
18  Q    All right.  So those are the Plaintiffs' Exhibits 347
19  through 353, 356 through 362 and 365 through 371; and could you
02:37:03  20  just for the Court go through the acronyms on the top of the
21  various pollutants, starting with the PM 2.5 and explain what
22  these are?
23  A    PM 2.5 stands for particulate matter, 2.5 microns in size
24  or smaller.  CO is carbon monoxide.  NOx is nitrogen oxides.  PM
02:37:31  25  10 is particulate matter, ten microns or less in diameter.  SO2

Carman - Direct/Nicholas

1   is sulphur dioxide.  And VOC is volatile organic compounds.

2        THE COURT:  What's the first word?

3        THE WITNESS:  Volatile.

4   BY MR. NICHOLAS:

02:37:51   5   Q    All right.  And so for each of these five -- six pollutants

6   that you've listed, there's a column totaling the number of

7   those -- the number of the amounts of emissions for those

8   pollutants for each of the facilities, correct?

9   A    Yes.

02:38:04   10   Q    Were you in the courtroom for the opening statements?

11   A    Yes.

12   Q    Do you recall a chart that Exxon put up on the -- on its

13   PowerPoint that had a -- it was a bar graph, and it had gray and

14   amber and maybe a yellow --

02:38:31   15   A    Orange.

16   Q    -- orange bars?

17   A    Yes.

18   Q    And one of those bars reflects this 9 million pounds,

19   correct?

02:38:41   20   A    Yes.

21   Q    That was the thinnest bar?

22   A    Yes.

23   Q    Those were for different years.  It might have been --

24   those were for additional years than 2006, 2012, correct?

02:38:50   25   A    Yes.

2-132

Carman - Cross/Nichols

```
         1              MR. NICHOLAS:  No further questions, your Honor.
         2              MR. NICHOLS:  May I proceed, your Honor?
         3                         CROSS EXAMINATION
         4    BY MR. NICHOLS:
02:39:06 5    Q    Good afternoon, Dr. Carman.
         6    A    Good afternoon.
         7    Q    Now, you've talked about a number of things with the Court
         8    today.  You talked about ozone generally, correct?
         9    A    Yes.
02:39:16 10   Q    You talked about air pollution generally, correct?
        11   A    Yes.
        12   Q    Talked about the NAAQS which are the National Ambient Air
        13   Quality Standards, correct?
        14   A    Yes.
02:39:27 15   Q    You've talked about your review of emissions data total,
        16   correct?
        17   A    Yes.
        18   Q    And what I want to do very briefly, Dr. Carman, is try to
        19   tie some of the things that you've talked about back to your
02:39:46 20   areas of expertise, if I could.  Is that all right?
        21   A    Okay.
        22   Q    Now, you've described your background to the Court before,
        23   and I believe that you said you had a Bachelor's Degree and a
        24   Master's Degree in the Biological Sciences, correct?
02:40:01 25   A    Yes.
```

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Carman - Cross/Nichols

1  Q     In fact, to be more precise, you have a Bachelor of Science

2  Degree and a Master of Science Degree in Botany?

3  A     Yes.

4  Q     Okay.  And your PhD, I think you told the Court, was in

02:40:13    5  botany, correct?

6  A     Yes.

7  Q     Now, botany is the branch of biology that deals with plant

8  life; is that correct?

9  A     Yes.

02:40:21   10  Q     And more specifically, it's the scientific study of plants,

11  including their physiology, structure, genetics, ecology,

12  distribution, classification, and economic importance, correct?

13  A     Yes.

14  Q     Now, there are other branches of biology that deal with

02:40:43   15  human beings, correct?

16  A     Yes.

17  Q     There's a whole area of biology that is called human

18  biology, correct?

19  A     That's one name for it, yes.

02:40:51   20  Q     And your area of biology from your background deals with

21  plants, correct?

22  A     Yes.

23  Q     Now, to be fair, Dr. Carman, you also profess to have some

24  experience in the -- and expertise in the field of human

02:41:08   25  consciousness, correct?

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Carman - Cross/Nichols

```
 1              MR. NICHOLAS:  Objection.

 2              THE COURT:  Yes, sir.

 3              MR. NICHOLAS:  Mr. Nichols is going to stray into an

 4    area covered by Rule of Evidence 610.

 5              THE COURT:  Let me look at 610.

 6                   Okay.  Look at 610.

 7              MR. NICHOLAS:  I'm looking.

 8              THE COURT:  Okay.  Does it apply?

 9              MR. NICHOLAS:  No, sir, they've proffered.

10              THE COURT:  Hold it.  Hold it one second.  Let's do it

11    up here, okay?  Approach the bench.  We can turn off the

12    microphones.  We have a mike that's live up here.

13         (At side bar.)

14              THE COURT:  All right.  I read it.  It's the one about

15    usage of one's religious background to attack credibility,

16    correct?

17              MR. NICHOLAS:  That's correct.

18              THE COURT:  I don't know what's coming.

19                   What's coming?

20              MR. NICHOLAS:  Judge, we're talking about a witness who

21    has been designated --

22              THE COURT:  You might as well keep your voice down.

23              MR. NICHOLAS:  Actually, he has not been designated as

24    an expert in this case.

25              MR. NICHOLAS:  Yes, he has.
```

02:41:22
02:42:01
02:42:41
02:42:50
02:42:59

Carman - Cross/Nichols

1          MR. NICHOLAS:  We are not calling him as an expert.

2          MR. NICHOLS:  He's been formally designated in the

3    case as an expert.

4          MR. NICHOLAS:  I don't have to call --

02:43:07   5          MR. NICHOLS:  We have an expert designation.

6          THE COURT:  Let's see what it says.

7          MR. NICHOLAS:  I can tell you, your Honor, we had

8    designated him at some point as an expert but we did not qualify

9    him as an expert on -- we're not calling him as an expert.

02:43:21   10          THE COURT:  I'm looking at a summary of his testimony

11    so far.

12          MR. NICHOLAS:  Very basic information within the scope

13    of his duties.  A very limited examination.

14          THE COURT:  Okay.

02:43:36   15          MR. NICHOLS:  They asked him questions about ozone.

16    They asked him questions about pollutants.  They asked him

17    questions that are areas they proffered him as an expert, and

18    there's a formal designation in the Court's record.

19          MR. NICHOLAS:  Even if he was designated --

02:43:50   20          THE COURT:  Okay, come on.  Tell me -- tell me what's

21    -- what's the volatile point here?

22          MR. NICHOLS:  The point is the area of expertise that

23    this witness is testifying to gives open -- opens the door to

24    other areas that this man has already testified under oath that

02:44:10   25    he is an expert in.  So in evaluating this witness's

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1  credibility, it has nothing to do with religious beliefs.

2          MR. NICHOLAS:  Why don't you be specific and tell the

3  Court what you're about to bring up?

4          MR. NICHOLS:  I can do it now or I can -- I'm already

02:44:25  5  on the record.  I can do it out in open court.

6          MR. NICHOLS:  I don't think the Court is going to be

7  able to rule.  I realize that -- you're aware that this is a

8  religious issue.  And, so, you've brought it up.  So, now, it's

9  inevitably -- once the bell is rung, it's not possible to unring

02:44:41  10  it.  So by forcing me to object to it, you're forcing me to have

11  it said -- what you're about to bring up, your --

12          THE COURT:  I'm both the judge and the jury here.  So

13  I see your point about doing it.

14          MR. NICHOLS:  Sure.

02:44:57  15          THE COURT:  So I don't know where it's going.  So I

16  don't know what's coming.  All right.

17          MR. NICHOLS:  Well --

18          THE COURT:  Let's talk about it out here.  I'm not

19  getting into the details yet, okay?  We might as well do it so

02:45:09  20  we don't have to whisper.

21      (Side bar concluded.)

22          THE COURT:  We're back on the record.  The first point

23  I want to talk about is whether or not this man is designated as

24  an expert, okay?  And then if so, what he testified to that you

02:45:41  25  say brings him outside -- makes him subject to cross examination

Carman - Cross/Nichols

1 on his qualifications to give testimony that either was or you

2 say bordered on expert testimony.  Now, let's see, I guess we

3 could find this, what, in the joint pretrial order where the

4 designation was?

02:46:02   5          MR. NICHOLAS:  Yes, your Honor.  It's --

6          THE COURT:  That might be the easier way to find it.

7 What page of the joint pretrial order?  They're going to hand it

8 up to me.

9              I'm looking at first page 2 of the Plaintiffs'

02:46:55  10 witness list, okay?

11          MR. NICHOLAS:  Yes.  On page 2, correct, we do not

12 identify him as an expert.  That is contrasted with Number 9,

13 Keith Bowers.

14          THE COURT:  Hang on.  Keith Bowers.

02:47:19  15          MR. NICHOLAS:  Number 13, Ranajit Sahu; Number 14,

16 Edward Brooks; and Number 17, Jonathan Shefftz.

17          THE COURT:  All right.  Now, if I keep this gentleman

18 out as far as an expert, there's something -- as we all know,

19 something known as an offer of proof, correct?

02:47:36  20          MR. NICHOLS:  Yes, sir.

21          THE COURT:  An offer of proof is like the state

22 equivalent of -- what is it?  What do they call it?  A bill of

23 exceptions where you have to -- in a bill of exceptions, you've

24 got to put on testimony.  You got to -- the jury is cleared out,

02:47:48  25 and the attorneys ask questions.

Carman - Cross/Nichols

1                In the federal court it's an offer of proof.  So,

2    either way what's coming is going to be on the record in order

3    to protect, all right, the Defendants' record.  The position is

4    the rule that was cited.  I'm sitting as the law and the fact

02:48:11    5    person.  It's -- evidence of a witness's religious beliefs or

6    opinions is not admissible to attack or support the witness's

7    credibility.  But you're saying that if, indeed, he was --

8    where's he been designated as an expert?

9                MR. NICHOLS:  In the Court filings in the case that

02:48:32   10    preceded the joint pretrial order, your Honor.

11                THE COURT:  But then, again, we know joint pretrial

12    order in federal court supplants all the pleadings.

13                MR. NICHOLS:  Absolutely.  But then the other issue,

14    your Honor, is if they're not designating him as an expert, not

02:48:43   15    offering him as expert, then the other option the Court would

16    have would be to strike those portions of his testimony that are

17    not based on his personal knowledge because he can't have it

18    both ways.  Either you're an expert or you're not.

19                THE COURT:  Wait a second.

02:48:58   20                MR. NICHOLS:  May I ask some additional questions,

21    your Honor, to --

22                THE COURT:  Wait a second.  Yeah.  Because don't

23    forget he said where did he get those figures from.

24                MR. NICHOLS:  Right.

02:49:03   25                THE COURT:  And he said that there was a question

Carman - Cross/Nichols

1   whether he did it himself.  He said, yes, he did it; he prepared

2   it himself.

3           MR. NICHOLS:  Yes, sir.

4           THE COURT:  So I'm looking whether it's not just a

02:49:12   5   compilation versus an interpretation of what he did.  All right?

6   I'll allow you to have an additional predicate.  All right?  And

7   then you remind me; and if need be, if it's important to you, we

8   can go pull some cases if we have to; or we can set them aside

9   and then pick them up later, okay, or you can cross examine him

02:49:36   10   except on those areas you want to get into; and then we'll

11   look -- I don't mean an appellate brief but a short excerpt of

12   some matters I give -- like one case was handed up to me that

13   I'll be looking at on another problem.

14               All right.  How do you want to proceed?

02:49:53   15           MR. NICHOLS:  I would like to ask some more questions,

16   Judge.

17           THE COURT:  All right.  Just stay within the bounds of

18   that rule of evidence at this time.

19   BY MR. NICHOLS:

02:49:59   20   Q   So, Dr. Carman, do you understand from all of the

21   discussions that have happened before you that you are not being

22   offered as an expert in any area that relates to the case?

23   A   Yes.

24   Q   So you were offering no level of expertise that the Court

02:50:11   25   relies on in making any decision in this case, correct?

Carman - Cross/Nichols

1  **A**    Correct.

2  **Q**    So any of the discussion you had about ozone, you're not

3  offering that as an expert, correct?

4  **A**    Correct.

02:50:20   5  **Q**    Any discussion about air pollution generally, you're not

6  offering that as an expert, correct?

7  **A**    Correct.

8  **Q**    Any discussion about the NAAQS, you're not offering that as

9  an expert, correct?

02:50:29   10  **A**    Correct.

11  **Q**    But you are the person that has been designated as the

12  human representative of Sierra Club in this case, correct?

13  **A**    Correct.

14  **Q**    So if the Court wanted to look at somebody and say, "That's

02:50:39   15  the face of the Sierra Club in this case," that would be you,

16  correct?

17  **A**    Yes.

18  **Q**    So, Dr. Carman, you have issued various statements about

19  this case in the public domain, correct?

02:50:56   20  **A**    Yes.

21  **Q**    How many -- tell the Court how many press conferences you

22  and others have held with respect to this case pending before

23  the Court.

24  **A**    I recall two.

02:51:12   25  **Q**    And when would those have occurred?

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Carman - Cross/Nichols

1  **A**    Well, the one I specifically recall is the filing of the

2  lawsuit.

3  **Q**    Okay.

4  **A**    I'm not sure if there was one on the 60-day notice letter.

02:51:31  5  It may have just been one.

6              MR. NICHOLS:  May I approach, Judge?

7              THE COURT:  Yes, go right up.

8              MR. NICHOLS:  I'm going to hand to the witness what

9  we've marked as Exhibit 1015.

02:52:16  10  BY MR. NICHOLS:

11  **Q**    Do you recognize that, sir?

12  **A**    I've not seen this document before.

13  **Q**    Do you recognize the picture?

14  **A**    Yes.

02:52:26  15  **Q**    Who is in that picture?

16  **A**    I'm in that picture with the attorneys and several citizens

17  from Baytown.

18  **Q**    Okay.  And is that a photograph that you recognize as

19  having occurred during the press conference that you would have

02:52:42  20  held in connection with this lawsuit?

21  **A**    Yes.

22              MR. NICHOLS:  Your Honor, can we put this up on the

23  ELMO?

24              THE COURT:  Go right ahead.  It's a non-jury matter.

02:52:58  25  It's not in evidence.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Carman - Cross/Nichols

1   BY MR. NICHOLS:

2   Q    And is this -- the photograph that we are seeing here that

3   you've described, is that you on the left?

4   A    Yes.

02:53:13   5   Q    And right over your shoulder, is that Mr. Metzger that the

6   Court heard from earlier?

7   A    Yes.

8   Q    And then Mr. Hilder is in the background there?

9   A    Yes.

02:53:23   10   Q    And Mr. Nicholas to the right of the picture?

11   A    Yes.

12   Q    And as part of this press conference, you made statements

13   concerning the performance of the ExxonMobil Baytown Complex,

14   correct?

02:53:43   15   A    Yes.

16   Q    You made statements about how the ExxonMobil Baytown

17   Complex was run in a shoddy manner, correct?

18   A    Yes.

19   Q    But you were not an expert in that area, correct?

02:53:54   20   A    Correct.

21   Q    You made statements about how the ExxonMobil Baytown

22   Complex could take all of its emissions down to a much lower

23   level than what it is currently experiencing out there at

24   Baytown, correct?

02:54:13   25   A    Yes.

Carman - Cross/Nichols

1   Q    But you were not an expert in plant operations, correct,

2   Dr. Carman?

3   A    Correct.

4   Q    Now, Dr. Carman, I want to ask you about some disciplines

02:54:37  5   that actually do involve expertise that can come into play in

6   studying air emissions and their effects on human beings, okay?

7   A    Yes.

8   Q    Now, you are not a medical doctor, correct?

9   A    Correct.

02:54:52  10  Q    But you understand that medical doctors can perform testing

11  and evaluation of patients, correct?

12  A    Yes.

13  Q    They can evaluate patients and determine whether they have

14  a documented ailment, correct?

02:55:05  15  A    Yes.

16  Q    Including documented ailments that can be attributed to

17  exposure to substances or pollutants, correct?

18  A    Yes.

19  Q    Now, you personally are not qualified to do these types of

02:55:17  20  evaluations, correct?

21  A    Correct.

22  Q    And in pursuing this lawsuit, Dr. Carman, Sierra Club has

23  not hired or retained any medical doctors to evaluate anyone out

24  at Baytown, much less any members of Sierra Club, correct?

02:55:37  25  A    Correct.

1  Q    Dr. Carman, as the face of the Sierra Club in this lawsuit,

2  you know that you have a medical doctor on your team, Dr. Edward

3  Brooks, correct?

4  A    Yes.

02:55:53  5  Q    Dr. Brooks is a medical doctor, correct?

6  A    Yes.

7  Q    Dr. Carman as the face of Sierra Club in this case.  Can

8  you tell the Court whether or not Dr. Brooks, the doctor that

9  you have on your team, has ever examined any of the folks that

02:56:14  10  you all signed up to be members for purposes of the lawsuit?

11             MR. NICHOLAS:  Objection.

12             THE COURT:  What's the objection?

13             MR. NICHOLAS:  Mr. Nichols is asking questions about

14  expert testimony that has not been presented to the Court yet.

02:56:26  15             THE COURT:  Overruled.  The other thing is he can just

16  call him back later on.  Okay?  So overruled.

17             THE WITNESS:  I'm not aware of any -- any work by

18  Dr. Brooks.

19  BY MR. NICHOLS:

02:56:39  20  Q    On examining anybody, any members of Sierra Club, correct?

21  A    Correct.

22  Q    I mean, when I ask you these questions, Dr. Carman, you

23  understand that -- that you are the client representative for

24  Sierra Club in this case, correct?

02:56:56  25  A    Yes.

Carman - Cross/Nichols

1   Q     In other words, the client is the one who is supposed to
2   control claims that are made in a lawsuit, correct?
3   A     Yes.
4   Q     A client through its representative is the one who is
02:57:11  5   driving the litigation strategy in a lawsuit, correct?
6   A     Partially.  I mean, I -- you know, work with the attorneys
7   and the experts.
8   Q     Sure.  But you're the person at the client who is most
9   directly responsible for determining on behalf of the client how
02:57:30  10   the litigation is going to proceed, correct?
11   A     I think that's only part of the situation, okay?  I mean,
12   again, I said I interact with the attorneys and the experts and
13   look at all the information.  So it's not, you know, something
14   that I determine myself.
02:57:47  15   Q     Sure.  I'm not suggesting that.  What I'm asking is is
16   there anyone else at Sierra Club that is as involved in this
17   lawsuit as you?
18   A     No.
19   Q     Okay.  So with respect to medical doctors, doctors, men and
02:58:02  20   women who can go examine patients and determine whether or not a
21   particular person has been exposed to pollutants or other
22   substances that have caused injury, you understand that can be
23   done, correct?
24   A     Yes.
02:58:19  25   Q     You understand that that has not been done in this case,

1  correct?

2  **A**    Right.

3  **Q**    Another area of expertise, Dr. Carman, you understand can

4  come into play in determining injury to persons from emissions

02:58:37    5  of pollutants is a toxicologist, correct?

6  **A**    Yes.

7  **Q**    Now, a toxicologist is a person who studies the adverse

8  effects of chemical, physical, or biological agents on living

9  organisms and the ecosystem, including the prevention and

02:58:57   10  amelioration of such adverse effects, correct?

11  **A**    Yes.

12  **Q**    And in cases -- first of all, going back to medical

13  doctors, do you understand that there are Clean Air Act cases,

14  citizen suits that get prosecuted where the person prosecuting

02:59:13   15  the case actually goes out and retains medical testimony?

16  **A**    I'm not aware of those cases.

17  **Q**    So if -- are you telling the Court --

18            THE COURT:  Now, wait a second.  You do a lot of this

19  work, correct, sir?

02:59:27   20            THE WITNESS:  Yes.

21            THE COURT:  You're not aware of any kind of

22  neurotoxicologists and neuropharmacologists, neurologists or

23  whoever who come and testify on cases that involve someone --

24  involved in some alleged emissions or gas exposure?  I'm

02:59:51   25  choosing my question very carefully, okay?  You're not aware of

Carman - Cross/Nichols

1  any of that?

2          THE WITNESS:  I know there are personal injury cases.

3  I tend to stay away from all of that, so --

4          THE COURT:  Above waste dump cases, I mean waste

03:00:05  5  dump -- cases, pollution -- pollution cases.

6          THE WITNESS:  I know there's cases involving Superfund

7  sites, but I've never been involved in any of those.

8  BY MR. NICHOLS:

9  **Q**    Yes, sir.  You understand that Sierra Club as an entity --

03:00:19  10  no matter what its admission statement is or its bylaws are,

11  Sierra Club in and of itself cannot pursue a citizen suit,

12  correct?

13  **A**    Correct.

14  **Q**    It has to pursue a citizen suit through members who can be

03:00:35  15  shown to have sustained an injury, correct?

16          MR. NICHOLAS:  Objection.

17          THE COURT:  Overruled.

18              Wait a second, Counsel.  I know you were standing

19  up thinking -- thinking of some objection.  I cut you off

03:00:49  20  beforehand.

21          MR. NICHOLAS:  Yes.

22          THE COURT:  What's your objection?

23          MR. NICHOLAS:  Misstatement of law.

24          THE COURT:  All right.  I'll consider it.  I'm not

03:00:55  25  going to consider it for having any legal consequence.


Gayle Dye, CSR, RDR, CRR - 713.250.5582

Carman - Cross/Nichols

1                    You may ask the question.

2  BY MR. NICHOLS:

3  **Q**    Do you understand that?

4  **A**    Yes.

03:01:02  5  **Q**    And so with respect -- and you've -- how many cases -- just

6  for the Court's reference, how many Clean Air Act cases have you

7  been involved in on behalf of Sierra Club?

8  **A**    Dozens.

9  **Q**    So, you've developed an understanding of kind of what the

03:01:20  10  rules of the road are with respect to what needs to be shown in

11  one of these cases, correct?

12  **A**    Yes, but these are not personal injury type cases.

13  **Q**    And no one is suggesting that they are.  You understand,

14  though, with respect to documenting an injury -- back to the

03:01:36  15  Court's question:  If you want to document an injury from an

16  emission event that you can, if you choose to, hire a doctor to

17  evaluate someone and determine whether they, in fact, have been

18  injured by a particular substance, correct?

19  **A**    Yes.

03:01:56  20  **Q**    And you haven't done that in this case, correct?

21  **A**    A medical doctor was hired in the case, but, you know, I've

22  not interacted with him much.

23  **Q**    Sure.  But my question is that medical doctor who is on the

24  team, he has not gone and talked to the nice Ms. Aguirre that

03:02:15  25  was here yesterday or Mr. Cottar or you talked about Ms. Kingman

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Carman - Cross/Nichols

1   or Ms. Sprayberry?  He hadn't gone --

2            THE COURT:  There was a Mr. Halpryn, also.

3            MR. NICHOLS:  There was.  I think he may have

4   disappeared, Judge.

03:02:32  5   BY MR. NICHOLS:

6   Q    Dr. Brooks hasn't looked at any of those folks, right,

7   hadn't talked to them, hadn't examined them, correct?

8   A    Correct.

9   Q    Now, back to toxicology.  You understand that there are

03:02:46  10  toxicologists that -- I'm sure you've retained a toxicologist or

11  two in one or more of the Sierra Club lawsuits, citizen suit

12  lawsuits that you've filed, correct?

13  A    I'm not aware of a single case.

14  Q    Okay.  So Sierra Club doesn't hire toxicologists when it

03:03:00  15  pursues a citizen suit case?

16  A    Not -- not any that I've been involved in.

17  Q    Okay.  So a toxicologist is someone with the expertise in

18  the adverse effects of chemical, physical, or biological agents,

19  correct?

03:03:19  20  A    Yes.

21  Q    So, in other words, a toxicologist can by use of reference

22  to reference -- reference levels like NAAQS, correct -- that's a

23  reference level?

24  A    Yes.

03:03:32  25  Q    Another thing called an Effect Screening Level, or ESL, the

Carman - Cross/Nichols

 1  Court is going to hear about, correct?

 2  **A**    Yes.

 3  **Q**    Other types of reference levels -- toxicologists can look

 4  at these reference levels and actually, based on actual

03:03:46  5  expertise, can say whether a certain level of emission is likely

 6  to cause an impact to humans or their environment, correct?

 7  **A**    Yes.

 8  **Q**    That can be done, correct?

 9  **A**    Yes.

03:04:03  10  **Q**    And Sierra Club -- again, I'm asking you as a person most

 11  involved in this case from Sierra Club.  Sierra Club has not

 12  done that in this case, correct?

 13  **A**    Not that I'm aware of.

 14          THE COURT:  Now, let me ask you this, Mr. Nichols,

03:04:19  15  while you're there:  Do these type of cases require what you

 16  just said?

 17          MR. NICHOLS:  I believe that they do, Judge.  I

 18  believe that they --

 19          THE COURT:  All right.  No, no.  We'll get to it

03:04:28  20  later.  That's a question that I have.

 21          MR. NICHOLS:  Yes, sir.

 22          THE COURT:  Do they require it before you can get any

 23  recovery, before the Plaintiff can get any recovery?

 24          MR. NICHOLS:  The Court's picked up on it.  The

03:04:39  25  standing issue is critical.

Carman - Cross/Nichols

1          THE COURT:  I understand.  It all goes back to

2    standing and causation and damage.

3          MR. NICHOLS:  Right.

4          THE COURT:  Okay.

03:04:47    5          MR. NICHOLS:  And there are various ways of proving

6    it, and I'm trying to take this witness through as many ways as

7    I can think of actually proving standing from a particular event

8    as opposed to talking about ozone generally or air pollution

9    generally or whatnot.

03:05:02   10          THE COURT:  Go on.

11   BY MR. NICHOLS:

12   Q    Now, a third category of persons that have expertise that

13   come to bear on these kinds of cases would be an environmental

14   engineer, correct?

03:05:14   15   A    Yes.

16   Q    An environmental engineer is someone who can do something

17   called air dispersion modeling, correct?

18   A    Yes.

19   Q    And an air dispersion model as opposed to talking about the

03:05:32   20   condition of ozone in Houston or the condition of ozone in

21   Beaumont generally can actually take a --

22          THE COURT:  Beaumont or Baytown?

23          MR. NICHOLS:  I think the witness earlier referred to

24   Beaumont/Port Arthur and the non-attainment, which I think the

03:05:48   25   Court can disregard because he says he's not an expert.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Carman - Cross/Nichols

1          MR. NICHOLAS:  Objection.  Objection.

2          THE COURT:  Sustained.  Go on.

3  BY MR. NICHOLS:

4  **Q**    An air dispersion modeler can actually focus in on a

03:05:59  5  particular emission event, correct?

6  **A**    Yes.

7  **Q**    And what an air dispersion modeler can do is to take a

8  particular event, see what emissions were emitted during that

9  event, the rate at which they were emitted, and can prepare a

03:06:18  10  model that actually shows, based on those criteria, where those

11  pollutants were likely to go, correct?

12  **A**    Yes.

13  **Q**    So, in other words, instead of talking about abstract

14  issues of an emissions event that may occur in the course of

03:06:34  15  normal operations and trying to figure out, you know, what was

16  caused in regular operations and an emissions event, an air

17  dispersion modeler can look at a particular event and trace the

18  amounts of pollutants that were involved in that emissions event

19  and where they went, correct?

03:06:54  20          MR. NICHOLAS:  Objection.

21          THE COURT:  What?

22          MR. NICHOLAS:  Number one, Mr. Nichols --

23          THE COURT:  Whatever it is, it's granted.

24              Next question.

03:07:07  25  //

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Carman - Cross/Nichols

1    BY MR. NICHOLS:

2    Q    Dr. Carman, as the face of Sierra Club for the case, can

3    you tell us whether or not you have ever retained an air

4    dispersion modeler in a citizen suit case?

03:07:19    5    A    Yes.

6    Q    And you have not done that in this case, correct?

7    A    Correct.

8    Q    Dr. Carman, just want to talk about some of the folks that

9    you've mentioned.  Mr. Nicholas asked you to prove up the

03:07:43   10    records of these various members that the Court has heard about.

11    First of all, with respect to Ms. Aguirre, I believe you told me

12    during your deposition in June of 2012 that you had never met

13    Ms. Aguirre as of that time, correct?

14    A    Correct.

03:08:03   15    Q    And with respect to two others I'm going to talk to you

16    about, Ms. Sprayberry and Mr. Cottar, you'll agree with me that

17    you approached both of those folks about becoming members of

18    Sierra Club after Sierra Club had given notice to ExxonMobil and

19    others about its intent to file this lawsuit, correct?

03:08:32   20    A    I don't remember when those conversations were held.

21    Q    Okay.  Do you remember I asked you questions about these

22    folks during your deposition?

23    A    Yes.

24            MR. NICHOLS:  Do we have Dr. Carman's deposition?

03:08:43   25    //

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1  BY MR. NICHOLS:

2  Q    Dr. Carman, I'm going to hand you a copy of your

3  deposition.  It was taken on June 22, 2012.  I'll direct your

4  attention to page 67, line 24.

03:09:24  5  A    This is just a list, like an index.

6  Q    Oh, I gotcha.  I want you to follow along with me,

7  Dr. Carman.  Question: "Okay.  So of the two members we've

8  talked about today, we talked about Ms. Sprayberry -- or

9  actually three members we've talked about today, we talked about

03:10:01  10  Ms. Sprayberry.  You did have some discussion with her?"

11           Your answer?  68, line 4, what was your answer?

12  A    "Okay.  So, of the two members we talked about today" --

13  oh, that's the question.

14           Answer:  "December, 2009; however, I should

03:10:21  15  clarify.  I had no contact with this member."

16  Q    You need to go down the page actually, sir.  If you'll look

17  at page 68, it's in the -- the page numbers are in the top right

18  of the box.

19  A    Okay.

03:10:34  20  Q    Do you see the question I asked you about "We talked about

21  Ms. Sprayberry.  You did have some discussion with her"?  And

22  your answer appears below that at line 4.  What was your answer?

23  A    "Yes."

24  Q    And then go down to page 68, line 7.  Question:  "Would

03:10:49  25  have been sometime between the time that notice was provided and

Carman - Cross/Nichols

1    when the lawsuit was filed, correct?"

2                    And your answer?

3    **A**    "Yes."

4    **Q**    So, does that help refresh your recollection that you had a

03:11:10    5    conversation with Ms. Sprayberry between the time the notice was

6    delivered to ExxonMobil in November, 2009, and the time the

7    lawsuit was filed?

8    **A**    I just don't recall the conversations.  They were very

9    brief, and I don't have any notes on it.  So, it's like five --

03:11:23    10    almost four or five years ago.

11    **Q**    Yes, sir.  The Court will understand.  So page 68, line 24:

12    "And would you have had contact with Shae Cottar similar to the

13    contact that we talked about," going over to page 69, "with

14    Ms. Sprayberry between the time that notice of the suit was

03:11:41    15    provided to the ExxonMobil Defendants and the time that suit was

16    filed?"

17                    And your answer?

18    **A**    "Yes."

19    **Q**    And the records that -- the records that Mr. Nicholas

03:11:56    20    showed you just a minute ago would bear that out.  You still

21    have those exhibits in front of you that Mr. Nicholas showed to

22    you, 342 to 345?

23    **A**    No.

24                    MR. NICHOLS:  Mr. Nicholas, do you still have those?

03:12:14    25    Can you pull up Exhibit 342 for us, please, Plaintiffs' Exhibit

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Carman - Cross/Nichols

1  342?

2              Your Honor, if we can switch over to the --

3  BY MR. NICHOLS:

4  **Q**    So you see that Ms. Aguirre is listed as being an active

03:12:46  5  member as of June of 2010, correct?

6  **A**    Yes.

7  **Q**    That would have been a time period between the time notice

8  was delivered in November, 2009, and the time the lawsuit was

9  filed in December of 2010, correct?

03:12:58  10  **A**    Yes.

11  **Q**    All right.  Let's talk about Mr. Cottar.

12              MR. NICHOLS:  Plaintiffs' Exhibit 345.

13                  And if we could swing in just on this a little

14  bit right there.

03:13:15  15  BY MR. NICHOLS:

16  **Q**    And do you see that the membership was added in October of

17  2010?

18  **A**    Yes.

19  **Q**    And that would have been consistent with you having a

03:13:29  20  conversation with Mr. Cottar between the time notice was

21  delivered to ExxonMobil and the time the lawsuit was filed,

22  correct?

23  **A**    Yes.

24  **Q**    So to be plain to the Court, Dr. Carman, would you agree

03:13:44  25  with me that you and others on the team, including the lawyers,

Carman - Cross/Nichols

1  reviewed a bunch of records that ExxonMobil had filed that were

2  listed on the TCEQ website?

3  **A**    Yes.

4  **Q**    You had done that before he gave that notice?

03:14:11  5  **A**    Yes.

6  **Q**    And you came up with numbers like the numbers you showed

7  the Court earlier about annual emissions and so forth, correct?

8  You'd had looked at those?

9  **A**    Yes.

03:14:20  10  **Q**    But as of the time you delivered the notice --

11         MR. NICHOLS:  Can we pull up the notice, please?

12              Next page.

13  BY. MR. NICHOLS:

14  **Q**    Do you see that what we have up on the screen --

03:15:28  15         MR. NICHOLS:  And, Judge, we don't need to mark this

16  as an exhibit.  This, as you can tell, is part of the Court's

17  file.

18  BY MR. NICHOLS:

19  **Q**    This is a letter on National Environmental Law Center

03:15:37  20  letterhead.

21         MR. NICHOLS:  And let's go back up to the date,

22  please.

23  BY MR. NICHOLS:

24  **Q**    The date is November 30, 2009, correct?

03:15:52  25  **A**    Yes.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Carman - Cross/Nichols

1          THE COURT:  Now, how long -- when was the case filed?

2          MR. NICHOLS:  In December of 2010, your Honor.

3          THE COURT:  Okay.

4          MR. NICHOLS:  Next page.

03:16:12    5   BY MR. NICHOLS:

6   Q    It talks about, "Dear Sirs, I write on behalf of

7   Environment Texas and Sierra Club" --

8          THE COURT:  Can you blow that up a bit?

9          MR. NICHOLS:  Yes, sir.

03:16:22    10         Can we blow up that top section, please?

11         "I write on behalf of Environment Texas and the

12  Sierra Club, the citizen groups, and their members."

13         THE COURT:  Who signed this letter?

14         MR. NICHOLS:  Can we go to the bottom of the --

03:16:30    15         THE COURT:  No, no.  Just tell me.  That's all.

16         MR. NICHOLS:  It was the representatives of the -- of

17  Environment Texas if we go down --

18         THE COURT:  Okay, that's it.  That's all I need.  Go

19  on.

03:16:41    20  BY MR. NICHOLS:

21  Q    So you're writing the letter on behalf of Environment

22  Texas, Sierra Club, and their members, correct?

23  A    Yes.

24  Q    As of November, 2009, Shae Cottar wasn't a member, correct?

03:16:54    25  A    Correct.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Carman - Cross/Nichols

1    Q    As of November, 2009, Diane Aguirre wasn't a member,

2    correct?

3    A    Correct.

4    Q    Okay.  And the language in here says that the citizen

03:17:06   5    groups believe that ExxonMobil has repeatedly violated and will

6    continue to violate its air operating permits, the State

7    Implementation Plan, and the federal Clean Air Act, correct?

8    A    Yes.

9    Q    And it says in here in this letter --

03:17:22   10           MR. NICHOLS:  You can back out of that, Ms. Luu.

11    BY MR. NICHOLS:

12    Q    -- talks about the applicable Clean Air Act requirements.

13           MR. NICHOLS:  Next page.

14    BY MR. NICHOLS:

03:17:34   15    Q    Talks about the PSD and NSR permits.  Talks about various

16    provisions of law, correct?

17    A    Yes.

18    Q    It mentions something the Court is going to hear about a

19    little bit later, 40 CFR 60.18, correct?

03:17:58   20    A    Yes.

21    Q    And that is the provision of law that deals with how

22    companies calculate the emissions from the flares that they run,

23    correct?

24    A    Yes.

03:18:05   25    Q    And 60.18, as you told me during your deposition, sets out

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Carman - Cross/Nichols

1  some rules of the road by which not just ExxonMobil but other

2  companies can calculate those flare emissions, correct?

3  **A**     Yes.

4  **Q**     And I believe you told me during your deposition that as

03:18:23  5  you were looking through all these records, all these records,

6  that you had come to the conclusion or had no information to

7  suggest otherwise that ExxonMobil had calculated its emissions

8  from flares in a manner provided by 60.18, correct?

9  **A**     Correct.

03:18:47  10  **Q**     That's correct?

11  **A**     Yes.

12  **Q**     So, in other words, you were here during the opening

13  statements talking about how, you know, somebody was saying that

14  somehow ExxonMobil's emissions were higher than what they were

03:19:03  15  reporting, correct?

16  **A**     Yes.

17  **Q**     But as the face of the Sierra Club, you can tell us that

18  from your understanding, ExxonMobil calculated its emissions

19  from flares according to the rules of the road provided by

03:19:25  20  federal law, correct?

21  **A**     Yes.

22  **Q**     Okay.

23          MR. NICHOLS:  Next page.

24  BY MR. NICHOLS:

03:19:28  25  **Q**     Talks about some other things that have been mentioned

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Carman - Cross/Nichols

1    during the case, NESHAPs, highly reactive volatile organic

2    compounds, correct?

3    **A**    Yes.

4    **Q**    Talks about one-hour permit limits, correct?

03:19:42  5    **A**    Yes.

6    **Q**    Next page talks about -- I think you may have mentioned

7    this.  Did you mention something about the MAERT limits?

8    **A**    No.

9    **Q**    Okay.  Talks about STEERS reports and how ExxonMobil is

03:19:56  10   reporting pollutant releases, correct?

11   **A**    Yes.

12             MR. NICHOLS:  Next page.

13                  Next page.

14   BY MR. NICHOLS:

03:20:11  15   **Q**    HR VOC limits are mentioned here, correct?

16   **A**    Yes.

17   **Q**    Unauthorized startup, shutdown, and maintenance emissions

18   are mentioned, correct?

19   **A**    Yes.

03:20:23  20             MR. NICHOLS:  Next page.

21   BY MR. NICHOLS:

22   **Q**    Reporting requirements are mentioned, correct?

23   **A**    Yes.

24   **Q**    NSPS and NESHAP requirements, correct?

03:20:31  25   **A**    Yes.

Carman - Cross/Nichols

1          MR. NICHOLS:  Okay.  Let's blow up this last paragraph

2   on this page 8.

3   BY MR. NICHOLS:

4   **Q**    And what you say in here is this notice letter and the

03:20:41   5   attached tables are based on publicly available sources of

6   information, correct?

7   **A**    Yes.

8   **Q**    And that is -- that was the -- that was the sole basis of

9   the lawsuit when it was filed, correct?

03:20:54  10   **A**    Yes.

11   **Q**    In other words, all that was done was that someone up in

12   Boston or in your office took a bunch of stuff off the TCEQ

13   website and put it into compilations and tables, correct?

14   **A**    I think there was more than that.

03:21:14  15   **Q**    Okay.  But what was done, all falls into the category of

16   review of publicly available sources of information, correct?

17   **A**    Yes.

18   **Q**    And you understand that ExxonMobil rigorously and

19   scrupulously reported the matters that it was required to

03:21:38  20   report, correct?

21          MR. NICHOLAS:  Objection.

22          THE COURT:  What's the objection?

23          MR. NICHOLAS:  He hasn't laid a foundation for that

24   question.

03:21:45  25          THE COURT:  Well, sir, do you know that, or you don't

Carman - Cross/Nichols

1  know that offhand?

2          THE WITNESS:  Well, I don't agree with that.

3          THE COURT:  All right.  Don't agree with it.  Okay.

4  BY MR. NICHOLS:

03:21:57  5  **Q**   And then you talk about how violations of the Clean Air Act

6  at the Baytown Complex that are going to be sued over include

7  but are not limited to emissions events in which emissions

8  exceeded an applicable emission limit, correct?

9  **A**   Yes.

03:22:13  10  **Q**   This letter covers all such violations, correct?

11  **A**   Yes.

12          MR. NICHOLS:  Next page.

13  BY MR. NICHOLS:

14  **Q**   Signed by Josh Kratka, sitting here at counsel table,

03:22:29  15  correct?

16  **A**   Yes.

17          MR. NICHOLS:  Next page.

18              Oh, hold up.

19              Go to the first paragraph of that page.

03:22:33  20  BY MR. NICHOLS:

21  **Q**   It says, "The citizen groups intend to file suit against

22  ExxonMobil in federal court to secure appropriate relief under

23  state and federal law for all violations described in this

24  notice letter occurring within the five years immediately

03:22:55  25  preceding the sending of this letter and for any similar

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1    violations that occur after the date of this notice letter."

2              Did I read that correctly?

3    A    Yes.

4    Q    This is being said on November 30, 2009, correct?

03:23:07    5    A    Yes.

6    Q    A time when the only two people that the Court has heard

7    from, Shae Cottar and Diane Aguirre, were not even members of

8    Sierra Club, correct?

9    A    Correct.

03:23:19    10   Q    Okay.  Next page.  Not only did you send this to

11   ExxonMobil, but you also copied various people as well, correct?

12   A    Yes.

13   Q    Lisa Jackson, who was at that time the administrator of the

14   US EPA, correct?

03:23:40    15   A    Yes.

16   Q    The acting regional administrator for Region 6 of the EPA

17   which includes Baytown, correct?

18   A    Yes.

19   Q    The governor of the state of Texas, Rick Perry?

03:23:52    20   A    Yes.

21   Q    Mr. Mark Vickery, a person the Court will hear from later,

22   the executive director for TCEQ, correct?

23   A    Yes.

24   Q    And I think -- I can't remember if you answered it or

03:24:05    25   somebody else answered it.  Has the EPA, to your knowledge, ever

Carman - Cross/Nichols

1  sought to interfere -- intervene and pursue the claims that you

2  are pursuing in this case on behalf of Sierra Club?  Have they

3  ever sought to intervene?

4  **A**    No.

03:24:31  5        THE COURT:  All right.  Let me just ask you this:  In

6  the scheme of such litigation nationwide, does the EPA ever come

7  in?

8        THE WITNESS:  Not that I'm aware of.  I've never seen

9  the EPA come in in Texas or around the US.

03:24:45  10       THE COURT:  Mr. Nicholas, do you know of any of that?

11       MR. NICHOLAS:  It happens rarely, usually against

12  municipalities, cities.

13       THE COURT:  Okay.

14  BY MR. NICHOLS:

03:24:56  15  **Q**    Then with respect to the TCEQ, has the TCEQ, to your

16  knowledge, ever indicated that they wanted to intervene and

17  pursue these claims?

18  **A**    No.

19  **Q**    But as of November, 2009, Dr. Carman, even though you

03:25:26  20  understand that Sierra Club cannot bring these types of claims

21  as a citizen suit without having members who have sustained

22  injury, you sent that notice letter out, right?

23       MR. NICHOLAS:  Objection.

24       THE COURT:  What?

03:25:45  25       MR. NICHOLAS:  I withdraw the objection.  Excuse me.

1          THE COURT:  Okay.

2                  Is that correct?

3          THE WITNESS:  Yes.

4   BY MR. NICHOLS:

03:25:51   5   Q    Now, Dr. Carman, after this notice was given to ExxonMobil

6   of an intent to file a lawsuit under the citizen suit provision,

7   you and others at Sierra Club had conversations with people in

8   the Baytown area, correct?

9   A    Yes, and also in Channelview around the ship channel.

03:26:20  10   Q    Sure.  And folks from Environment Texas, to your knowledge,

11  went out and started canvassing the neighborhoods, right?

12  A    I wasn't involved in the canvassing.

13  Q    Let's very briefly tell the Court, when you were to talk to

14  someone like Ms. -- you did talk to Ms. Sprayberry, right?

03:26:38  15  A    Yes.

16  Q    You did talk to Mr. Cottar, correct?

17  A    Yes.

18  Q    So let's talk to the Court about what kinds of things you

19  would have discussed with Ms. Sprayberry and Mr. Cottar.  When

03:26:51  20  you talk to someone like that, your opening line, Dr. Carman,

21  is, Do you have concerns about air quality, right?

22          MR. NICHOLAS:  Objection.  He's not -- Mr. Nichols is

23  not asking a question about a specific conversation to a

24  specific person or at least he's not phrasing --

03:27:12  25          THE COURT:  Sustained.  Just rephrase it.

Carman - Cross/Nichols

1  BY MR. NICHOLS:

2  **Q**    Dr. Carman, you told me that in June of 2012 that, without

3  regard to any particular conversation, you have a standard way

4  of talking to people about becoming involved in lawsuits,

03:27:26  5  correct?

6  **A**    Yes.

7  **Q**    So, that standard way you have about talking to people

8  about lawsuits is as follows.  You ask people --

9           MR. NICHOLAS:  Well --

03:27:34  10           THE COURT:  Excuse me.  Yes, sir.

11           MR. NICHOLAS:  Objection, again, because it's not

12  referring to a specific person.

13           THE COURT:  Overruled.  Now he's dealing in

14  generalities.  I understand that, just what he generally does.

03:27:46  15  It's not specific yet.  Go right ahead.

16  BY MR. NICHOLS:

17  **Q**    So when you talk to people about the general way you talk

18  to people about getting involved, you ask the person do you have

19  a concern about air quality?

03:27:59  20  **A**    Yes.

21  **Q**    Are you -- are you interested in having clean air?

22  **A**    Yes.

23  **Q**    So that's your opening line, right?

24  **A**    Yes.

03:28:07  25  **Q**    And then if they express an interest in having clean air,

 1  first of all, do you have -- find many people who don't have an

 2  interest in having clean air?

 3  **A**    Well, I may also ask people if, like, they work for any

 4  industrial plants or if they have relatives.  So, you know, we

03:28:28   5  don't want to create any conflicts for people.

 6  **Q**    Sure.

 7  **A**    So there would be a series of questions like -- kind of

 8  like that.

 9  **Q**    Sure but it's all -- it's all general at that point, right,

03:28:39  10  about industrial plants and having clean air, correct?

11  **A**    Yes.

12  **Q**    And as a matter of fact, you told me during your deposition

13  that what you tell people is that you're interested in maybe

14  pursuing a claim in litigation, correct?

03:28:56  15  **A**    I describe generally what a citizen suit is, but I, you

16  know, indicate if they are interested in finding out more then I

17  can refer them to somebody else.

18  **Q**    Right.  And in the course of getting people involved in

19  this case, Dr. Carman, you do not ask them if they have been

03:29:18  20  affected by any particular event or incident at a particular

21  plant, correct?

22  **A**    Well, no.  I had conversations with -- Stuart Halpryn

23  contacted me several years before any of this was ever filed.

24  He was complaining about the air pollution in Baytown, which is

03:29:36  25  not unusual.  I mean, I have had people over 20 years call me

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Carman - Cross/Nichols

1    about, you know, what's it like in Baytown, Channelview,

2    Pasadena, you know, the whole ship channel.

3    **Q**    Yes, sir.  Right now I understand where you're coming from,

4    but the Court has not heard from Mr. Halpryn.  The Court has

03:29:54  5    heard from Mr. Cottar and Ms. Aguirre, correct?

6    **A**    Yes.

7    **Q**    Those are two people that you talked with in 2010, correct?

8    We've established that?

9    **A**    Yes.

03:30:02  10    **Q**    So the kinds of conversations you would have had with

11    somebody like Mr. Cottar or Ms. Halpryn would have been asking

12    them do you have an interest in air quality, correct?

13              MR. NICHOLAS:  Objection.

14              MR. NICHOLS:  Judge, this is cross examination.

03:30:21  15              MR. NICHOLAS:  This is the same issue of you have

16    getting --

17              THE COURT:  I know.  One second.  You said he would

18    have; is that correct?

19              MR. NICHOLS:  Yes, sir.

03:30:25  20              THE COURT:  All right.  Overrule the objection.  If

21    you know and recall.

22              THE WITNESS:  Yes.

23    BY MR. NICHOLS:

24    **Q**    So you've --

03:30:31  25    **A**    That's the general conversation.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Carman - Cross/Nichols

1  Q    Right.  And so in the course and scope of talking to folks
2  like Mr. Cottar and Ms. Aguirre, Ms. Sprayberry, would have been
3  "You have an interest in air quality.  I want to tell you about
4  a lawsuit that we're interested in filing," right?
03:30:52  5  A    I wouldn't get too specific about it, you know.  I would
6  just try to find out also if they had like health concerns
7  maybe.  You know, I'm not asking if they have cancer or anything
8  like that, but, you know, people do express that they're
9  interested in air quality and that sometimes it's not easy to go
03:31:10  10  outside.  I mean, I hear this a lot.  I've heard it for years
11  and years.
12  Q    Yes, sir.  And you understand that the Baytown area is a
13  heavily industrialized area, correct?
14  A    Yes.
03:31:22  15  Q    And so, you would expect, would you not, that people in
16  Baytown are going to be exposed to pollutants that are emitted
17  from various industrial facilities, correct?
18  A    Yes.
19  Q    Now, with respect to your conversations with these
03:31:42  20  prospective members, you don't talk to them about any specific
21  instances, correct?  That's what you told me in July of 2012.
22  A    Maybe only with Stuart Halpryn.
23  Q    We're limiting our conversation to Mr. Cottar.
24  A    Usually don't get into that kind of specifics.
03:32:02  25  Q    Okay.  And remember, I asked you in July of -- in June of

Carman - Cross/Nichols

1  2012 whether you had had any discussions with anyone who

2  purported to be a member of the Sierra Club who claimed to have

3  been directly affected by any claimed violation of the Clean Air

4  Act at the Baytown Complex?

03:32:24  5          THE COURT:  Hold it.  Repeat that question.

6          MR. NICHOLS:  Yes, sir.

7  BY MR. NICHOLS:

8  **Q**    Remember that I asked you, Dr. Carman, whether you had had

9  any discussions with anyone who purports to be a member of the

03:32:35  10  Sierra Club who claims to have been directly affected by any

11  claimed violation of the Clean Air Act at the Baytown Complex?

12  Remember I asked you that question?

13  **A**    Yes.

14  **Q**    And do you remember telling me in response to that

03:32:47  15  question, "The only discussions I've had with several Sierra

16  Club members living in Baytown were regarding their membership,

17  their concerns about air quality, their concerns about air

18  pollution from Baytown plants, including Exxon"; it did not

19  include a discussion of any specific events?  Do you recall

03:33:08  20  telling me that?

21  **A**    Yes.

22  **Q**    And that was truthful when you told me that back in June of

23  2012, correct?

24  **A**    Yes.

03:33:17  25  **Q**    And you also told me, Dr. Carman, when I asked you -- this

Carman - Cross/Nichols

1  is in June of 2012, long after this time period of 2010 that

2  we're talking about.  I asked you the question, Have you had any

3  discussion with any member of Sierra Club that has involved a

4  discussion of a claim that that member has been directly

03:33:39  5  affected by a specific violation of the Clean Air Act that is

6  claimed to have occurred at the Baytown Complex.  Remember I

7  asked you that question?

8  **A**    Sure.  I would just clarify that these people don't keep

9  records.  I mean, they rely upon the regulatory agencies to

03:33:56  10  enforce the law and -- you know, they may complain.  They may

11  not.  A lot of people don't even know about the regulatory

12  system.  You know, they just -- sometimes people call the

13  plants.  And that's --

14  **Q**    And I appreciate your answer.  I think the question I asked

03:34:08  15  you, though, Dr. Carman, was:  Do you recall me asking you this

16  very specific question:  "As of June of 2012, had you had any

17  discussion with any member of Sierra Club that involved a

18  discussion of a claim that that member had been directly

19  affected by a specific violation of the Clean Air Act that is

03:34:31  20  claimed to have occurred at the Baytown Complex?"

21            Do you remember that question?

22  **A**    Yes.

23  **Q**    And do you remember your answer:  "Not that I recall,"

24  correct?

03:34:38  25  **A**    Correct.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Carman - Cross/Nichols

1   **Q**    And that's consistent, Dr. Carman, with what we talked

2   about because in discussing these matters with folks that you

3   are introducing to membership as you did in 2010 to Ms. Aguirre,

4   Mr. Cottar, Ms. Sprayberry, you don't talk about specific

03:34:59   5   incidents, right?

6   **A**    That's correct.

7   **Q**    You don't ask the individual about whether they've seen a

8   doctor about a particular issue, correct?

9   **A**    Unless they bring it up.  I mean, people may bring up

03:35:13   10   health issues or health concerns or, you know, what they see in

11   the area, the flares, but, you know, it doesn't -- it's pretty

12   general conversation.

13   **Q**    You don't ask them affirmatively, "Hey, have you seen a

14   doctor about exposure to benzene or exposure to butadiene or

03:35:29   15   exposure to carbon monoxide?"  You don't ask the folks that, do

16   you?

17   **A**    No.  If they want to bring something up about a medical

18   issue or health issue or seeing their doctor from their side, I

19   don't pursue it.

03:35:40   20   **Q**    You don't ask for medical records, right?

21   **A**    No.

22   **Q**    And after you have these general conversations like the

23   ones you would have had with Mr. Cottar, Ms. Sprayberry, and

24   Ms. Aguirre, you put them in touch with the lawyers, right?

03:35:56   25   **A**    Yes.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Carman - Cross/Nichols

1   Q     The lawyers at the National Environmental Law Center?

2   A     Yes.

3   Q     Now, Dr. Carman, you heard some discussions earlier in the

4   courtroom about a couple of consent decrees and orders that your

03:36:47   5   group entered into with Shell Oil Company at Deer Park and

6   Chevron Phillips Chemical Company, correct?

7   A     Yes.

8   Q     You, in fact, signed off on those consent decrees, correct?

9   A     Yes.

03:37:01   10   Q     And you have made statements out in the public about how

11   these Clean Air Act settlements resulted in huge emissions

12   reductions, making Houston's air cleaner, correct?

13   A     Yes.

14   Q     Let me show you what's been marked as Defendants' Exhibit

03:37:27   15   522.

16          MR. NICHOLAS:  Your Honor, I object to this line of

17   questioning because it goes beyond the scope of direct.

18          THE COURT:  How about that?

19          MR. NICHOLS:  Your Honor, we could recall Dr. Carman

03:37:40   20   during our case if we had to so --

21          THE COURT:  That's exactly --

22             Mr. Nicholas, you're correct; but rather than put

23   this man back off, get him back down here or whatever, with that

24   assertion by Mr. Nichols, I'll allow him to proceed.  It is a

03:37:55   25   correct objection; but a matter of economy, I always do this.

Carman - Cross/Nichols

1    Okay.  It's nothing new with me.

2              All right, go on.

3              Unless you're dealing very often in direct and

4    redirect as it goes back and forth and back and forth, there is

03:38:10    5    an end to it.  All right.

6    BY MR. NICHOLS:

7    Q    So, Dr. Carman, what we're looking at is a printout of a

8    press release that was actually posted on something called the

9    "Texas Green Report" brought to you by Sierra Club, correct?

03:38:24   10    A    Correct.

11    Q    And the Sierra Club maintains a website where it puts out

12    to its members and others information about what the Sierra Club

13    is doing in terms of pursuing certain initiatives, pursuing

14    lawsuits, what have you, correct?

03:38:38   15    A    Correct.

16    Q    And so this particular press release was issued on November

17    22, 2013, and you are listed here as one of the contacts for the

18    press release, right?

19    A    Yes.

03:38:51   20    Q    And so the headline, as we said, is referring to these two

21    consent decrees that you-all cut with Shell out at Deer Park and

22    Chevron Phillips out at that facility over on I-10 on the way to

23    Beaumont, correct?

24    A    Yes.

03:39:14   25    Q    Okay.  And so what you're saying here is that Shell Deer

Carman - Cross/Nichols

1   Park and Chevron Phillips Cedar Bayou cut major upset emissions

2   by 95 percent, correct?

3   **A**   Yes.

4   **Q**   $7.8 million in penalties that were discussed before,

03:39:30   5   correct?

6   **A**   Yes.

7   **Q**   Next page.  "Sierra Club and Environment Texas announced

8   today that Shell Oil Company and Chevron Phillips have each cut

9   their air pollution from major upset events at their Gulf Coast

03:39:48   10   plants by about 95 percent."  That's the headline, correct?

11   **A**   Yes.

12   **Q**   Okay.  And by those major upset events, you were talking

13   about reportable events, right?

14   **A**   Yes.

03:39:56   15   **Q**   And do you understand that in this case we're dealing with

16   about 240 reportable events?

17   **A**   Yes.

18   **Q**   And to kind of -- a lot of the numbers in the case relate

19   to reportable events, right?

03:40:09   20   **A**   Yes.

21   **Q**   And Title V deviations?

22   **A**   Yes.

23   **Q**   But what you're highlighting up here on your own press

24   release are these reportable events, right?

03:40:19   25   **A**   Yes.

Carman - Cross/Nichols

1   Q     Okay.  These reductions are even more than what was
2   required by their settlements of the lawsuits brought by the
3   environmental groups.  That's you, right?
4   A     Yes.
03:40:30   5   Q     And have contributed to recent efforts to improve air
6   quality in the Houston metropolitan area, correct?
7   A     Yes.
8   Q     And talks about the successful completion of these consent
9   decrees, right?
03:40:45   10   A     Yes.
11   Q     Talked about how the illegal emissions, including
12   carcinogens, smog forming chemicals and other hazardous air
13   pollutants were discharged in excess of the limits in the
14   permits for those facilities, correct?
03:41:04   15   A     Yes.
16   Q     Same type of allegations being made here in this lawsuit,
17   correct?
18   A     Yes.
19   Q     The results achieved through these settlements show that
03:41:12   20   polluters can make dramatic reductions in air pollution if
21   someone requires them to make the effort.  Did I read that
22   correctly?
23   A     Yes.
24   Q     And that's Mr. Metzger back there, what areas?
03:41:22   25   A     Yes.

Carman - Cross/Nichols

1  Q    "Shell and Chevron Phillips are to be commended for moving

2  quickly to achieve compliance with the Clean Air Act after being

3  sued, rather than choosing to pay armies of lawyers to drag

4  things out in court," right?

03:41:36  5  A    Yes.

6  Q    And that's not a veiled reference to me, is it, down there,

7  "armies of lawyers," to drag things out in court?

8  A    No.

9  Q    Okay.  So you were commending Shell and Chevron Phillips

03:41:52  10  for their environmental performance in light of these consent

11  decrees, correct?

12  A    Yes.

13  Q    You even go on to say Mr. Carman -- Dr. Carman, I'm sorry,

14  "Houston's air is cleaner today because of the reductions in

03:42:09  15  illegal emissions at these two large Harris County plants,"

16  correct?

17  A    Yes.

18  Q    You say, "Many other large industrial facilities in the

19  area have yet to upgrade their operations to prevent upset

03:42:23  20  events but have escaped meaningful enforcement by state and

21  federal regulators."

22           So, you're comparing Shell and Chevron Phillips

23  under these consent decrees against other industrial facilities,

24  correct?

03:42:37  25  A    Yes.

Carman - Cross/Nichols

1    Q    Including the ExxonMobil Baytown Complex, correct?

2    A    Yes.

3    Q    Dr. Carman, when you were putting together all these

4    numbers, did you ever take the time -- before you filed the

03:42:49   5    lawsuit or even after, did you ever take the time to compare on

6    an apples-to-apples basis the environmental performance of the

7    ExxonMobil Baytown Complex without a consent decree against the

8    performance of Shell at Deer Park and Chevron Phillips out at

9    that plant on I-10 with consent decrees?

03:43:20   10    A    Yes.  There were comparisons being made.

11    Q    When did you make those comparisons?

12    A    I don't recall.  I mean, you can look at the emission

13    inventories.  You can look at the online summaries from, you

14    know, the TCEQ.  I mean, there's a lot of online information.

03:43:36   15    Q    Sure.  And the point is, Dr. Carman, that all the

16    information that you would need to make that comparison, that

17    is, if we want to put ExxonMobil's Baytown Complex and its

18    performance over here without a consent decree and put the Shell

19    Deer Park and the Chevron Phillips facility on I-10 over here

03:43:57   20    and compare the Baytown Complex against those two, everything

21    that you would need to do that is publicly available, correct?

22    A    Yes.

23    Q    And I think you've told me that there may have been some

24    effort to do that?

03:44:15   25    A    Yes.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Carman - Cross/Nichols

1    Q    Has that ever been produced in this case, if you know?

2    A    Just very, very generally.

3    Q    Okay.

4    A    I mean, TCEQ produces an annual emissions inventory

03:44:27    5    summary.  There's a lot of this information online.  There's a

6    great deal of information, you know, without just making any

7    decisions about, you know, what to do about it.

8    Q    Sure.  So -- so the information is available for somebody

9    that wants to make that comparison?

03:44:48    10    A    There's -- TCEQ has enforcement orders that are online that

11    are years going back that you can look at, various kinds of

12    enforcement actions by the TCEQ to see what results those have,

13    you know, achieved.

14    Q    And as the face of the Sierra Club in this lawsuit, can you

03:45:07    15    tell us whether or not you have ever been made privy to the

16    results of a comparison where you look at the Baytown complex's

17    environmental performance over here without a consent decree

18    against the performance under the consent decree that you were

19    lauding for Shell Deer Park or Chevron Phillips?  You ever seen

03:45:31    20    those results?

21    A    Only what's been presented here perhaps.

22    Q    By ExxonMobil?

23    A    Yes.

24    Q    I want to talk a little bit more about these two consent

03:45:56    25    decrees, and then I'll be done.

Carman - Cross/Nichols

1          THE COURT:  All right.  It's an hour and half.  Do you

2    want to take a break now or continue?

3          MR. NICHOLS:  Yes, sir, we can take a break.

4          THE COURT:  Okay.  It's now about 3:46.  We'll be back

03:46:05  5    in ready to go at 4:00 o'clock.  Then we'll decide if we even

6    need a short five-minute break somewhere in between there and

7    6:00.  See you back in now 13 minutes.

8          (Court recessed at 3:46 p.m.)

9          (Court resumed at 4:03 p.m.)

04:03:50 10   BY MR. NICHOLS:

11   Q    So going back to Exhibit 522, Defendants' Exhibit 522,

12   Dr. Carman, that's the press release that you and Mr. Metzger

13   from the other Plaintiff, Environment Texas, issued in November

14   22, 2013.  Do you recall that press release?

04:04:17 15   A    Yes.

16   Q    So we are on page 2.  And if we look at the bottom, if we

17   can pull up that paragraph, it talks about citizen suit

18   provisions.  It talks about "In addition to the two cases

19   against Shell and Chevron Phillips, Environment Texas and Sierra

04:04:35 20   Club filed a similar Clean Air Act citizen suit against

21   ExxonMobil's Baytown refinery and chemical plants, and that suit

22   is scheduled for trial early in 2014."

23          That's this case, right?

24   A    Yes.

04:04:48 25   Q    And so in the press release where you talk about the --

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Carman - Cross/Nichols

1    what you consider to be outstanding results of the consent

2    decrees that you entered into with Chevron Phillips and Shell

3    Deer Park, this is the context in which you had the opportunity

4    to evaluate apples to apples how ExxonMobil was doing out at the

04:05:19   5    Baytown Complex versus Chevron Phillips and Shell, correct?

6                    MR. NICHOLAS:  Objection.

7                    THE COURT:  Overruled.

8                    THE WITNESS:  We were also evaluating annual consent

9    decree reports filed by the companies, Shell Deer Park and

04:05:37  10    Chevron Phillips, to show the progress they were making; and the

11    progress was quite -- it was more accelerated than what the

12    consent decrees had required in both cases.

13   BY MR. NICHOLS:

14   Q    Yes, sir.  I think my question, though, was:  This is

04:05:47  15   the -- in the context of comparing, basically, you're comparing

16   the results you got with Shell and C. P. against the pending

17   case you got that we're trying, correct?

18   A    Yes.

19   Q    And this was the context in which you had the ability, had

04:06:02  20   you chosen, to look at ExxonMobil's performance at the Baytown

21   Complex from an environmental compliance standpoint versus the

22   results -- the actual results that you were announcing proudly

23   that had been achieved in the consent decrees with Shell and

24   Chevron Phillips, correct?

04:06:22  25   A    Yes.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Carman - Cross/Nichols

1  Q    Okay.  And let's go to the next page.  And on the bottom of

2  this next page, you highlight some of the specifics that you

3  wanted to highlight about what these settlements with Shell and

4  C. P. had achieved, correct?

04:06:41  5  A    Yes.

6         MR. NICHOLS:  The first bullet.  Can we pull that

7  first bullet up, please.

8  BY MR. NICHOLS:

9  Q    So one of the achievements of the consent decrees that you

04:06:52  10  wanted to highlight for the public and your membership was

11  reducing emissions from large upset events, correct, the

12  so-called reportable events, correct?

13  A    Yes.

14  Q    And that's an area where you had the ability, had you

04:07:10  15  chosen, to compare, apples to apples, the performance of the

16  ExxonMobil Baytown Complex against what Shell and Chevron had

17  done under the consent decrees, correct?

18  A    Yes.

19         MR. NICHOLS:  Next bullet.

04:07:24  20  BY MR. NICHOLS:

21  Q    The next bullet, you wanted to highlight for the public

22  about your results of these consent decrees, plant upgrades that

23  improved performance and safety, correct?

24  A    Yes.

04:07:39  25  Q    You talk about the reduction in upset events, reportable

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Carman - Cross/Nichols

1  upset events, correct?

2  **A**    Yes.

3  **Q**    Not recordable, not non-reportable, you highlighted the

4  decline in the reportable events, correct?

04:07:54  5  **A**    Yes.

6  **Q**    That is, the more significant, more serious events that

7  meet the threshold set by the regulators for a 24-hour report,

8  correct?

9  **A**    Yes.

04:08:10  10         MR. NICHOLS:  Next page, please, top paragraph.

11  BY MR. NICHOLS:

12  **Q**    You also wanted to highlight the enhanced monitoring of

13  dangerous pollutants in key areas of each facility to detect

14  leaks and other releases, correct?

04:08:30  15  **A**    Yes.

16  **Q**    So those are all things that you wanted to highlight as a

17  result of these consent decrees, correct?

18  **A**    Yes.

19  **Q**    All right.  Now, I wanted to do what I told you was going

04:08:43  20  to be the last thing we were going to do which is look at the

21  consent decrees themselves.  So let's start with Defense Exhibit

22  393.

23         MR. NICHOLS:  First, just one little matter.  Could we

24  go to page 11, please, Ms. Luu?

04:08:59  25  //

Carman - Cross/Nichols

1  BY MR. NICHOLS:

2  Q    You see in this page 11 of Defense Exhibit 393 that there

3  is a provision called force majeure?

4  A    Yes.

04:09:21   5  Q    And do you understand that force majeure was defined under

6  this consent decree as including an act of God?

7  A    Yes.

8         MR. NICHOLS:  And if we can go to the very tail end of

9  this consent decree, if we go to -- let me give you a page

04:09:48  10  number.

11         If we can go to page 16, please.

12  BY MR. NICHOLS:

13  Q    This reflects that you signed off on this consent decree,

14  correct?

04:09:55  15  A    Yes.

16  Q    And if we turn to page 15, this is where Judge Atlas, a

17  judge in this courthouse, once the parties had submitted it,

18  agreed as to form and substance, she signed it, correct?

19  A    Yes.

04:10:16  20  Q    Okay.  And so there was a provision in this -- in this

21  consent decree concerning force majeure, correct?

22  A    Yes.

23  Q    Which included acts of God, correct?

24  A    Yes.

04:10:30  25  Q    So if we go to page 3, you see on this paragraph, which

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Carman - Cross/Nichols

1    I'll represent to the Court is -- in the prior page it's 6 Sub

2    C, it refers to a force majeure event, an act of God, including

3    a hurricane, correct?

4    **A**    That's what it says.

04:10:59    5    **Q**    So in a document that was filed of record in this

6    courthouse, Environment Texas and Sierra Club took the position

7    for purposes of this consent decree that a hurricane would be a

8    force majeure act of God, correct?

9    **A**    That's what it says in this particular case.

04:11:20    10        THE COURT:  Now, your signature is on that document,

11    correct, sir?

12        THE WITNESS:  Yes.

13        THE COURT:  And you're the chief executive -- you're a

14    director of the department at the Texas Sierra Club, correct?

04:11:35    15        THE WITNESS:  Yes.

16        THE COURT:  Go on.

17    BY MR. NICHOLS:

18    **Q**    So then I want to ask you briefly about some of the

19    requirements that are in the agreement in terms of what's called

04:11:45    20    compliance.  There are various compliance provisions in the

21    consent decree, correct?

22    **A**    Yes.

23    **Q**    Okay.  So if we go to page 4, there are reporting

24    requirements that require the person in the consent decree to

04:12:08    25    not only report what they need to report to the state but also

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Carman - Cross/Nichols

1  submit to the Plaintiffs a summary of those reports, correct?

2  **A**   Yes.

3  **Q**   All right.  Let's go to the next page, page 5.  There are

4  provisions concerning reduction of emissions, correct?

04:12:36  5  **A**   Yes.

6  **Q**   And it talks about how non-routine emissions shall not

7  exceed the following annual amounts, correct?

8  **A**   Yes.

9  **Q**   It provides stipulated penalties, correct?

04:12:50  10  **A**   Yes.

11  **Q**   Doesn't provide for the maximum amount of penalties allowed

12  by law, correct?

13  **A**   Correct.

14        THE COURT:  Where is the stipulated penalties?

04:13:01  15        MR. NICHOLS:  If we look down to the bottom of the

16  page, we'll go through it, Judge, but you'll see paragraph 8B,

17  stipulated penalties for --

18        THE COURT:  Okay, got it.

19        MR. NICHOLS:  -- NOx.

04:13:12  20        THE COURT:  I got it.  I see it.

21        MR. NICHOLS:  Okay.

22  BY MR. NICHOLS:

23  **Q**   So you've got stipulated penalties of $5 per pound -- or $1

24  per pound up to a certain threshold and then $5 per pound

04:13:29  25  thereafter?

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Carman - Cross/Nichols

1    A    Yes.

2    Q    So stipulated penalties, right?

3    A    Yes.  That was agreed upon.

4    Q    Environment Texas and Sierra Club agreed to an order that

04:13:39    5    provided for stipulated penalties for emission events, correct?

6    A    Yes.  But I don't think they ever paid any stipulated

7    penalties.

8    Q    Okay.  But the point is that -- that you-all agreed to a

9    stipulated penalty schedule, right?

04:13:53    10    A    Yes.  It was an incentive for them to accelerate their

11    compliance, and it worked.

12    Q    Sure.  Stipulated penalties can be an incentive to promote

13    compliance, correct?

14    A    Yes.

04:14:06    15    Q    Okay.  Paragraph Number 6 -- or page number 6, I'm sorry,

16    talks about stipulated penalties for benzene and butadiene,

17    correct?

18    A    Yes.

19    Q    Title V deviations talks about the stipulated penalties for

04:14:23    20    those, as well, right?

21    A    Yes.

22    Q    Nowhere near the maximum allowed penalty of 37,500 per day

23    of violation, correct?

24    A    Correct.

04:14:38    25    Q    Okay.  Then, finally, let's talk about the physical and

Carman - Cross/Nichols

1  operational upgrades, page 7.  And we'll just go through the

2  highlights here.  These provisions of the consent decree set out

3  what the obligations were in this case for C. P. Chem for making

4  physical and operational upgrades to the Cedar Bayou plant,

04:15:00  5  correct?

6  **A**    Yes.

7  **Q**    First one is called flare mapping, correct?

8  **A**    Yes.

9  **Q**    Flare mapping is, basically, knowing where your flares are

04:15:11  10  and what's going to those flares, correct?

11  **A**    Yes.

12  **Q**    Now, Dr. Carman, did you make any effort to determine

13  whether we came to this courthouse and had this trial as to

14  whether or not ExxonMobil has flare mapping out at the Baytown

04:15:31  15  Complex?

16  **A**    My understanding is there's been some flare mapping.  I

17  don't have the details about it.

18  **Q**    So you don't know, sitting here today as the face of the

19  Sierra Club, whether ExxonMobil already has flare mapping of the

04:15:44  20  type that's described in this consent decree, correct?

21  **A**    Correct.

22  **Q**    You do know that because you went out on a tour of the

23  facility that ExxonMobil has state of the art facilities that

24  you yourself went into that monitor exactly what is going to a

04:16:05  25  flare, correct?

Carman - Cross/Nichols

1    **A**    Yes.

2    **Q**    We went out there -- you and I together with some lawyers

3    and other people, we went out and walked the plant, correct?

4    **A**    Yes.

04:16:15    5    **Q**    And as part of the walk of the plant, we went to a little,

6    shiny metal, air conditioned shed.  Do you remember that?

7    **A**    Yes.

8    **Q**    Right near a flare?

9    **A**    Yes.

04:16:28    10    **Q**    And that building had very sophisticated equipment mounted

11    on the wall that monitored all of the different types of

12    pollutants that were going to that flare, correct?

13    **A**    That's what I understand.

14    **Q**    Next item on page 7, flare minimization, talks about how

04:16:57    15    the Cedar Bayou plant needs to develop and implement a flare

16    management and minimization plan, correct?

17    **A**    Yes.

18    **Q**    Before we came to this courthouse to try this lawsuit,

19    Dr. Carman, did you or anyone else on behalf of Sierra Club make

04:17:18    20    any effort to determine whether ExxonMobil Baytown Complex

21    already has a flare minimization program?

22    **A**    I have not.

23    **Q**    Next page.  "Flare efficiency, not later than 24 months

24    after entry of the decree, C. P. Chem shall implement

04:17:42    25    EPA-prescribed enhanced flare efficiency equipment and operating

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Carman - Cross/Nichols

1  procedures at the Cedar Bayou plan," correct?

2  **A**    Yes.

3  **Q**    And you've already told me that from your perspective

4  ExxonMobil at the Baytown Complex calculates flare emissions

04:18:02   5  based on the rules of the road that the federal regulations

6  provide, correct?

7  **A**    Yes.

8  **Q**    Next item, hurricane preparedness, talks about a revision

9  to a hurricane shutdown and startup plan.  Before we came to

04:18:18   10  this courthouse to try this lawsuit, Dr. Carman, did anyone on

11  behalf of Sierra Club or anyone else, to your knowledge, try to

12  determine what type of hurricane shutdown and startup plan

13  ExxonMobil has at the Baytown Complex?

14  **A**    I have not.

04:18:47   15  **Q**    Next paragraph -- next page, I'm sorry.  Page 9, "Enhanced

16  preventive maintenance.  C. P. Chem shall update, enhance, and

17  implement preventive maintenance measures that facilitate the

18  reduction of certain emission event root causes at the Cedar

19  Bayou plant:  planned periodic inspection, replacement of power

04:19:24   20  supplies, planned periodic testing or maintenance of electrical

21  switch gear, periodic maintenance or replacement of programmable

22  logic controllers, identification and planned periodic testing,

23  examination and maintenance of rupture disks and pressure

24  relieving devices."

04:19:40   25                    Before we came to this courthouse to try this

Carman - Cross/Nichols

1    lawsuit, Dr. Carman, did you or anyone else, to your knowledge,

2    attempt to examine what types of preventive maintenance along

3    these lines the ExxonMobil Baytown Complex has?

4    **A**    I have not.  I'm not here to testify about this.

04:19:56    5    **Q**    You are here as the face of the Sierra Club?

6    **A**    Yes.  We have experts that are going to testify about this.

7    **Q**    With respect to the emissions event tracking and prevention

8    systems, talking about strategy for prevention of emission

9    events, target for reduction of emission events, before we came

04:20:20    10    to this courthouse to try this lawsuit, did you ever find out

11    whether ExxonMobil had strategies for prevention of emission

12    events?

13    **A**    No.

14    **Q**    Did you ever find out whether ExxonMobil has targets for

04:20:32    15    reductions in occurrence of emission events?

16    **A**    No.

17    **Q**    Next page talks about providing Plaintiffs with reports it

18    provides to the EPA, correct?

19    **A**    Yes.

04:20:58    20    **Q**    Talks about infrared scanning for leak detection, right?

21    **A**    Yes.

22    **Q**    Before we came to this courthouse to try this lawsuit, did

23    you or anyone else, to your knowledge, determine whether

24    ExxonMobil has practices in place at Baytown to use scanning and

04:21:15    25    other devices for leak detection?

1    **A**    I am aware that there is some use of infrared fugitive leak

2    detection at Baytown.

3    **Q**    And then the order goes on to refer to the stipulated

4    penalties, correct?

04:21:33    5    **A**    Yes.

6    **Q**    We could go through the same exercise with respect to

7    Exhibit 394.  But would you agree with me that those provisions

8    that we went through are, basically, the same ones that were

9    entered into with Shell?

04:21:46    10    **A**    Yes.

11    **Q**    And with respect to the Shell consent decree, let's just go

12    to 394.  And let's turn to page 19, please.  Page 19 is where it

13    is signed by the Honorable David Hittner, correct?

14    **A**    Yes.

04:22:22    15    **Q**    And then if we go to page 20 -- I'm sorry.  I have to

16    actually go to page 21.  Page 20 is Mr. Metzger's signature,

17    right?

18    **A**    Yes.

19    **Q**    And then page 20, that's your signature, correct?

04:22:39    20    **A**    Yes.

21    **Q**    Thank you, Dr. Carman.

22            MR. NICHOLS:  I'll pass the witness.

23            MR. NICHOLAS:  No questions.

24            THE COURT:  Thank you, sir.  You may step down.

04:23:13    25    You're excused.  You're free to leave.  You can remain in the

Kovacs - Direct/Nicholas

1    courtroom if you desire.

2                   Call your next witness.

3              MR. NICHOLAS:  Jeff Kovacs.

4              THE COURT:  Come around that way.

04:23:52   5              Raise your right hand to be sworn.

6         (The witness, **JEFFREY KOVACS,** called on behalf of the

7    Plaintiff, was sworn.)

8              THE COURT:  Have a seat, sir.

9                   DIRECT EXAMINATION

04:23:55  10   BY MR. NICHOLAS:

11   **Q**    Mr. Kovacs, you're employed by Exxon?

12   **A**    Yes, sir, that is correct.

13   **Q**    You work at Exxon's facility located in Baytown?

14   **A**    Yes, sir, that is correct.

04:24:16  15   **Q**    What department do you work in?

16   **A**    I work in the SSHE department.

17              THE COURT:  The what?

18              THE WITNESS:  I apologize.  The Security, Safety,

19   Health, and Environmental Department, SSHE.

04:24:29  20   BY MR. NICHOLAS:

21   **Q**    There are sections within the Safety, Security, Health, and

22   Environment Department?

23   **A**    Yes, sir, there are.

24   **Q**    What is the name of the section you work in?

04:24:38  25   **A**    The environmental section.

Kovacs - Direct/Nicholas

1    Q    What is your job title?

2    A    Currently, I am a SSHE manager.

3    Q    And at some point were you also an environmental

4    supervisor?

04:24:50    5    A    Yes, sir, that is correct.

6    Q    So you've gotten a promotion since you were an

7    environmental supervisor?

8    A    I moved on to a different assignment, yes, sir.

9    Q    Do you have a college degree?

04:25:04    10    A    Yes, sir, I do.

11    Q    Where did you get a college degree?

12    A    From the University of Houston.

13    Q    When did you get the degree?

14    A    I apologize.  When or what?

04:25:09    15    Q    When?

16    A    In December of 1998.

17    Q    What degree did you get from the University of Houston?

18    A    I have a Bachelor of Science in Chemical Engineering.

19    Q    Did you minor in any subjects at the University of Houston?

04:25:16    20    A    Yes, sir.

21    Q    What did you minor in?

22    A    I have a minor in chemistry.

23    Q    Were chemical engineering classes the only engineering

24    classes that you took?

04:25:28    25    A    No, sir.

Kovacs - Direct/Nicholas

1    **Q**    What other engineering classes did you take?

2    **A**    In addition to chemical engineering, I took general

3    engineering courses, mechanical engineering courses, electrical

4    engineering courses, civil engineering courses.

04:25:42    5    **Q**    You learned about pollution control devices while getting

6    your undergraduate degree?

7    **A**    Yes, sir.

8    **Q**    Did you receive any degrees after graduating from the

9    University of Houston?

04:25:52    10    **A**    Yes, sir.

11    **Q**    What degree did you get?

12    **A**    I have a Masters in Business Administration.

13    **Q**    Where did you get that?

14    **A**    Also from the University of Houston.

04:26:00    15    **Q**    Are you a licensed professional engineer?

16    **A**    Yes, sir, I am.

17    **Q**    Do you hold any other certifications?

18    **A**    Yes, sir, I do.

19    **Q**    What are they?

04:26:09    20    **A**    I'm a certified safety professional.

21    **Q**    Are you a lawyer?

22    **A**    No, sir, I am not.

23    **Q**    Who did you first work for after you got your undergraduate

24    degree?

04:26:19    25    **A**    Bayer Material Science.

Kovacs - Direct/Nicholas

1   Q    Where is that located?

2   A    In Baytown, Texas.

3   Q    What does Bayer Material Science do at the facility you

4   worked at?

04:26:28   5   A    It's a chemical manufacturing facility.

6   Q    What were the -- what were your jobs with Bayer Material

7   Science?

8   A    My first assignment was -- the industry term is process

9   engineer.  I was a unit engineer responsible for a wastewater

04:26:49  10   treatment facility.

11   Q    And after that you became an environmental specialist?

12   A    No, sir.

13   Q    All right.  Did you become an environmental specialist at

14   Bayer Material Science at some point?

04:27:00  15   A    Yes, sir, I did.

16   Q    Did you hold any other positions at Bayer Material Science?

17   A    Yes, sir.  In between my first assignment as a process

18   engineer on a wastewater treatment unit, I had an assignment as

19   a process engineer on a chemical processing unit.  Then I became

04:27:16  20   an environmental specialist.

21   Q    How long did you work for Bayer Material Science?

22   A    Approximately seven years.

23   Q    What did you do as an environmental specialist at Bayer

24   Material Science?

04:27:26  25   A    I was responsible for environmental compliance, regulatory

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1  environmental compliance as well as permitting.

2  Q    And as an environmental specialist at Bayer, did your

3  specialties include air permitting activities?

4  A    Yes, sir, they did.

04:27:43  5  Q    As an environmental specialist at Bayer, you dealt with air

6  regulations?

7  A    Yes, sir, I did.

8  Q    You had to understand the applicable air regulations that

9  apply to the site you worked at?

04:27:55  10  A    Yes, sir, that is correct.

11  Q    You dealt with state air regulations at Bayer?

12  A    Yes, sir, I did.

13  Q    You dealt with federal air regulations at Bayer?

14  A    Yes, sir, I did.

04:28:05  15  Q    As part of your experience at Bayer, you became familiar

16  with pollution control devices?

17  A    Yes, sir, I did.

18  Q    After Bayer, you went to work for Exxon?

19  A    Yes, sir, that is correct.

04:28:15  20  Q    Did you go to work for them at the Baytown Complex?

21  A    Yes, sir, I did.

22  Q    How many years have you been working at the Baytown

23  Complex?

24  A    I've been working for ExxonMobil at the Baytown Complex

04:28:24  25  since October, 2005.

Kovacs - Direct/Nicholas

1  Q    There are three plants at the Baytown Complex?

2  A    Yes, sir, that's correct.

3  Q    There's a refinery?

4  A    Yes, sir.

04:28:34  5  Q    There's an olefins plant?

6  A    Yes, sir.

7  Q    There's a chemical plant, right?

8  A    Yes, sir, that is correct.

9  Q    What does Exxon make at the Baytown refinery?

04:28:44  10  A    There's a variety of products that Exxon makes at the

11  Baytown refinery.

12  Q    Could you tell us about some.

13  A    Sure.

14  Q    Could you just list some as best you can?

04:28:53  15  A    In general, fuel products, so motor gasoline, diesel, jet

16  fuel, as well as solvents and lubricants.  So, oil in your car.

17  Q    What does Exxon make at the Baytown olefins plant?

18  A    The primary products at the Baytown olefins plant are

19  ethylene, propylene, and butadiene.

04:29:22  20  Q    What does Exxon make at the Baytown chemical plant?

21  A    They make a mixture of chemical products:  butyl rubber,

22  polypropylene, and a group of chemicals called olefins and

23  aromatics.

24  Q    Some of the products made at the Baytown complex are

04:29:44  25  gaseous in form?

Kovacs - Direct/Nicholas

1    A    Yes, sir, that's correct.

2    Q    Some of the products at the Baytown Complex are made to the

3    specifications of customers?

4    A    Yes, sir, that's correct.

04:29:52   5    Q    Sometimes Exxon makes a finished product that does not meet

6    all of the customer specifications, correct?

7    A    Yes, sir, that's correct.

8    Q    Are you -- this kind of finished product is sometimes

9    called off spec. product?

04:30:15   10    A    Yes, sir.

11    Q    Now what was your first job at Exxon's Baytown Complex?

12    A    I was the environmental coordinator at the Baytown olefins

13    plant.

14    Q    Did you work with any -- excuse me.  What years were you an

04:30:33   15    environmental coordinator at the olefins plant?

16    A    From October, 2005, through September, 2007.

17    Q    Are there environmental coordinators at all three plants in

18    the complex?

19    A    There are two, one at the olefins plant and one that

04:30:51   20    supports the refinery and chem plant combined.

21    Q    What were your job functions as an environmental

22    coordinator at the olefins plant?

23    A    I'd say two broad groups.  One is I had a group of

24    environmental regulations that I was responsible for stewarding

04:31:11   25    compliance with as well as general environmental support for the

Kovacs - Direct/Nicholas

1  olefins plant.

2  Q    As an environmental coordinator was part of your job to

3  help ensure that the environmental requirements were met by

4  operations people?

04:31:30  5  A    Yes, sir, that's correct.

6  Q    As an environmental coordinator was part of your job to

7  help ensure that regulatory requirements relating to air

8  emissions were met by operations people?

9  A    Yes, sir, that's correct.

04:31:43  10  Q    As an environmental coordinator, did you help develop plans

11  to comply with the particular air regulations at the olefins

12  plant?

13  A    Yes, sir.

14  Q    As an environmental coordinator, you worked with olefins

04:31:55  15  plant operational staff?

16  A    Yes, sir.

17  Q    Did you meet with the operational staff?

18  A    Yes, sir.

19  Q    How often did you meet with them?

04:32:05  20  A    Routinely.

21  Q    And at the meetings you would discuss environmental

22  regulations?

23  A    Yes, sir, periodically.

24  Q    The regulations you discussed included federal regulations?

04:32:19  25  A    Yes, sir.

Kovacs - Direct/Nicholas

1  Q    The regulations you discussed included state regulations?

2  A    Yes, sir.

3  Q    The olefins plant has a permit governing its air emissions.

4  A    Yes, sir.

04:32:30  5  Q    As an environmental coordinator when you met with the

6  olefins plant personnel, you also discussed the olefins plant

7  air emissions permit?

8  A    Yes, sir.

9  Q    Olefins plant personnel are made aware of air emission

04:32:45  10  permit requirements?

11  A    Yes, sir.

12  Q    Now you were an environmental coordinator with the olefins

13  plant.  Are you generally familiar with the job functions of the

14  environmental coordinators that covered the refinery and

04:33:12  15  chemical plant?

16  A    Yes, sir.

17  Q    And for the environmental coordinators who covered the

18  refinery and chemical plant, one of the functions for them was

19  to help ensure that those plants meet their regulatory

04:33:23  20  requirements related to air emissions?

21  A    Yes, sir.

22  Q    At all three plants in the complex, environmental

23  coordinators work with operating personnel in an effort to

24  ensure that air emission requirements are met?

04:33:35  25  A    Yes, sir.

Kovacs - Direct/Nicholas

1  Q     Operating personnel are made aware of air emission

2  requirements at all three plants?

3  A     Yes, sir, that's correct.

4  Q     What was your next job at the Baytown Complex?

04:33:50  5  A     In September, 2007, I became the environmental

6  supervisor -- one of the environmental supervisors for the

7  Baytown Complex.

8  Q     And that was in the environmental section of the SSHE

9  Department?

04:34:03  10  A     Yes, sir, that's correct.

11  Q     And how many people are in environmental section?

12  A     Approximately, 28 to 30.

13  Q     The environment section has supervisors, correct?

14  A     Yes, sir.

04:34:14  15  Q     How many are there?

16  A     There are three supervisors.

17  Q     And you were -- you were a supervisor at some point,

18  correct?

19  A     Yes, sir, that's correct.

04:34:20  20  Q     So you managed people?

21  A     Yes, sir, that's correct.

22  Q     How many people did you manage?

23  A     Approximately nine.

24  Q     One of the functions of the environmental section is to

04:34:31  25  identify applicable environmental regulations for the Baytown

Kovacs - Direct/Nicholas

1  Complex?

2  A    Yes, sir.

3  Q    One of the functions of the environmental section is to

4  submit reports to environmental agencies?

04:34:42  5  A    Yes, sir.

6  Q    One of the functions of the environmental section is to act

7  as a liaison between environmental agencies of the Baytown

8  Complex?

9  A    Yes, sir.

04:34:51  10  Q    One of the functions of the environmental section is to act

11  as a liaison --

12          THE COURT:  Slow down, please.

13          MR. NICHOLAS:  I'm sorry.

14  BY MR. NICHOLAS:

04:34:57  15  Q    One of the functions of the environmental section is to act

16  as a liaison between environmental agencies at the Baytown

17  Complex when the agencies notify Exxon that it might take an

18  enforcement action against the complex?

19  A    I apologize.  Could you repeat the question.

04:35:14  20  Q    Sure.  One of the functions of the environmental section is

21  to act as a liaison between environmental agencies and the

22  Baytown Complex when the agencies notify Exxon that it might

23  take an enforcement action against the complex?

24  A    Yes, sir.  That's correct.

04:35:33  25  Q    And you have personally acted in the liaison role?

Kovacs - Direct/Nicholas

1  **A**     Yes, sir, that's correct.

2  **Q**     In the performance of its function, the environmental

3  section must keep current on the regulations applicable to the

4  Baytown Complex?

04:35:58  5  **A**     Yes, sir, that's correct.

6  **Q**     In the performance of its functions, the environment

7  section keeps current on TCEQ guidance on regulations applicable

8  to the Baytown Complex?

9  **A**     Yes, sir, regulations applicable to the facility.

04:36:15  10  **Q**     And TCEQ, the department keeps up on TCEQ guidance on those

11  regulations?

12  **A**     Yes, sir.

13  **Q**     One of the functions of the environmental section is to

14  document Baytown Complex compliance with the environmental

04:36:32  15  regulations?

16  **A**     Yes, sir.

17  **Q**     From time to time, the environmental section documents

18  Baytown Complex violations of environmental regulations?

19  **A**     I would say that the environmental section documents

04:36:49  20  indications of non-compliance.

21  **Q**     Let me ask you again:  From time to time the environmental

22  section documents Baytown Complex violations of environmental

23  regulations?

24  **A**     I'm not sure I understand the distinction between my answer

04:37:26  25  and your question.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Kovacs - Direct/Nicholas

1            MR. NICHOLS:  Can the ELMO be activated?

2   BY MR. NICHOLS:

3   **Q**    Do you recall that I took your deposition?

4   **A**    Yes, sir.

04:37:43   5   **Q**    All right.  Let me draw your attention to page 29 of your

6   deposition.  Actually, it starts up here on page 28.  I asked

7   you -- actually, I can take it down here on page 29.  I asked

8   you, "I take it that from time to time the Baytown Complex is

9   out of compliance with air regulations and laws?"

04:38:25   10            And you answered, "When the site has regulatory

11   non-compliance, it is documented and reported appropriately to

12   the agencies."

13            Do you recall that?

14   **A**    Yes, sir.

04:38:37   15   **Q**    As an environmental supervisor, one of the areas you

16   focused on is federal air permitting?

17   **A**    Yes, sir.

18   **Q**    As environmental supervisor, another area you focused on

19   was state air permitting?

04:39:05   20   **A**    Yes, sir.

21   **Q**    Another area you focused on as the environmental supervisor

22   was reporting the release of air emissions at the Baytown

23   Complex?

24   **A**    Yes, sir.

04:39:16   25   **Q**    As environmental supervisor you dealt with aspects of air

Kovacs - Direct/Nicholas

1  permitting at all three plants of the complex?

2  **A**    I apologize.  Could you repeat the question?

3  **Q**    As environmental supervisor, you dealt with aspects of air

4  permitting at all three plants in the complex?

04:39:33  5  **A**    Yes, sir.

6  **Q**    As an environmental supervisor you dealt with aspects of

7  emission reporting at all three plants in the complex?

8  **A**    Yes, sir.

9  **Q**    And can you just tell us what your job functions are now?

04:39:43  10  I apologize.  I forget your title, but if you will, just tell us

11  what your job functions are?

12  **A**    Sure.  Currently, I'm leading a team that is doing

13  permitting projects for ExxonMobil at its facilities across the

14  Gulf Coast.  So, I'm doing air permitting for multiple

04:40:00  15  facilities.

16  **Q**    Is one of those facilities the Baytown facility?

17  **A**    Yes, sir.

18  **Q**    The Baytown Complex has operating permits issued by the

19  Texas Commission on Environmental Quality under the Clean Air

04:40:18  20  Act?

21  **A**    Yes, sir.

22  **Q**    These operating permits are issued under Title V of the

23  federal Clean Air Act?

24  **A**    Yes, sir, that's correct.

04:40:26  25  **Q**    These permits are sometimes called Title V permits?

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Kovacs - Direct/Nicholas

```
 1  A    Yes, sir.
 2  Q    These permits are sometimes called operating permits or
 3  federal operating permits?
 4  A    Yes, sir.
 5  Q    The Baytown Complex has more than one Title V permit?
 6  A    Yes, sir, that's correct.
 7  Q    There are separate Title V permits for each of the three
 8  plants at the Baytown Complex?
 9  A    Yes, sir, that is correct.
10  Q    And you are familiar with the acronym TCEQ for Texas
11  Commission on Environmental Quality?
12  A    Yes, sir, I am.
13  Q    Title V permits incorporate by reference a number of
14  regulatory requirements?
15  A    Yes, sir, they do.
16  Q    A Title V permit may incorporate a US EPA air pollution
17  regulation?
18  A    Yes, sir.
19  Q    A Title V permit may incorporate a State of Texas air
20  pollution regulation?
21  A    Yes, sir.
22  Q    A Title V permit may incorporate another permit issued by
23  TCEQ for the same facility?
24  A    Yes, sir, typically, by reference.
25  Q    A Title V permit may incorporate a so-called new source
```

04:40:36   5
04:40:51  10
04:41:04  15
04:41:16  20
04:41:28  25

Kovacs - Direct/Nicholas

1    review permit issued by TCEQ?

2    A    Yes, sir, that is correct.

3    Q    The Baytown Title V permits incorporate the complex's new

4    source review permits?

04:41:46    5    A    Yes, sir, they do by reference.

6    Q    And new source review sometimes goes by the acronym NSR?

7    A    Yes, sir, that's correct.

8    Q    A Title V may incorporate a so-called prevention of

9    significant deterioration permit issued by TCEQ?

04:42:02    10    A    Yes, sir.

11    Q    And prevention of significant deterioration sometimes goes

12    by the acronym PSD?

13    A    Yes, sir.

14          THE COURT:  Why don't you get to the ones that are key

04:42:13    15    to your case, okay?

16          MR. NICHOLAS:  I would just like to get some

17    explanation on the flexible permit which is the product --

18          THE COURT:  Well, let's get to something that's

19    flexible.

04:42:23    20    BY MR. NICHOLAS:

21    Q    Are you familiar with the concept of a flexible permit?

22    A    Yes, sir, I am.

23    Q    And a flexible permit is one that can contain an overall

24    emission cap for a variety of all sources of a pollutant in a

04:42:37    25    facility?

Kovacs - Direct/Nicholas

1  **A**    Yes, sir.  That's one way to describe a flexible permit.

2  **Q**    Would you like to -- can you explain what a flexible permit

3  is?

4  **A**    Your summary, I think, was satisfactory.  I apologize.

04:42:51  5  **Q**    Some of the Baytown Complex's NSR permits are flexible

6  permits?

7  **A**    Yes, sir, that is correct.

8  **Q**    Did Exxon ask for its NSR permits to be flexible permits?

9  **A**    Yes, sir, we did.

04:43:03  10  **Q**    And why did Exxon ask for its NSR permits to be flexible

11  permits?

12  **A**    Flexible permits are one of several types of NSR permits in

13  the state permitting program; and for -- for a variety of

14  business reasons, that was the permit that was chosen.

04:43:29  15  **Q**    So it was advantageous to Exxon for business reasons to

16  have a flexible permit, correct?

17  **A**    I would say it was the appropriate permitting tool for the

18  facility.

19  **Q**    Why don't you list as best you can all of the advantages

04:43:53  20  that Exxon considers a flexible permit to give?

21  **A**    I would say that the advantages of a flexible permit

22  include --

23          THE COURT:  Let's speed this up, both sides.

24          MR. NICHOLAS:  I'll move on.

04:44:29  25  //

Kovacs - Direct/Nicholas

1  BY MR. NICHOLAS:

2  Q    The Baytown refinery's new source review permit is a

3  flexible permit, correct?

4  A    Yes, sir, that is correct.

04:44:36  5  Q    And that's permit 18287?

6  A    Yes, sir, that's correct.

7  Q    All right.  And the olefins -- the olefins NSR permit is a

8  flexible permit?

9  A    Yes, sir, that is correct.

04:44:46  10  Q    That's 3452?

11  A    Yes, sir, that is correct.

12  Q    And the chemical plant has -- one of its NSR permits is a

13  flexible permit, correct?

14  A    Yes, sir, that is correct.

04:45:00  15  Q    And that's 20211?

16  A    Yes, sir, that is correct.

17  Q    You are familiar with the concept of a maximum allowable

18  emission rate table?

19  A    Yes, sir, I am.

04:45:12  20  Q    And the maximum allowable emission rate table caps

21  emissions that can be emitted into the atmosphere?

22  A    Yes, sir.

23  Q    Maximum allowable emission rate tables are in Baytown

24  Complex's new source review permits?

04:45:31  25  A    Yes, sir, that's correct.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Kovacs - Direct/Nicholas

1   Q     And the Baytown Complex's NSR permits are incorporated into

2   the Title V permits, right, as you've already said?

3   A     Yes, sir, by reference.

4   Q     So the maximum allowable emission rate tables are

04:45:43   5   incorporated into the Title V permits, correct?

6   A     Yes, sir.

7   Q     Now, maximum allowable emission rate tables are often

8   expressed in pounds per hour?

9   A     Yes.  There's two rate limits on a maximum allowable

04:46:01   10   emissions rate table.

11   Q     And one is an hourly rate, and the other one is an annual

12   rate -- or an annual amount?

13   A     Yes, sir.

14   Q     All right.  I would like to show you a -- the refinery NSR

04:46:31   15   permit which is Plaintiffs' Exhibit 176.  This is a permit from

16   the --

17           THE COURT:  Permit from where counsel?

18           MR. NICHOLAS:  This is a -- this is the TCEQ permit to

19   -- of the Baytown refinery.

04:46:56   20           THE COURT:  All right.  So it's a state permit.

21           MR. NICHOLAS:  This is the new source review permit

22   for the refinery that's incorporated into the Title V operating

23   permit.

24   BY MR. NICHOLAS:

04:47:20   25   Q     This is the flexible permit for the refinery, correct?  I

Kovacs - Direct/Nicholas

1    can represent to you that it is.

2              THE COURT:  Let's assume -- hold it.  Hold it.  Let's

3    assume that it is.  Let's move along, okay.

4              MR. NICHOLAS:  Okay.

04:47:47  5    BY MR. NICHOLAS:

6    Q    Please turn to the numbered page seven -- 077591.

7    A    I'm there.

8    Q    So this is part of the maximum allowable emission rate

9    table, correct?

04:48:12  10   A    Yes, sir.

11   Q    See that up on top?  All right.  So this is part of it,

12   correct?

13   A    Yes, sir.

14   Q    And so this part of the maximum allowable emission rate

04:48:23  15   table -- so this part of the table lists sources of CO.  Do you

16   see that?  That stands for carbon monoxide?

17   A    Yes, sir, that's correct.

18   Q    All right.  And there's identifying numbers on this -- in

19   this column, correct, source numbers?

04:48:51  20   A    Yes, sir.

21   Q    And then there is a narrative describing what the source is

22   for carbon monoxide, correct?

23   A    Yes, sir, that's correct.

24   Q    And the air contaminant name is identified as CO.  So, you

04:49:02  25   know that it's covering carbon monoxide, correct?

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Kovacs - Direct/Nicholas

1   **A**    Yes, sir.

2   **Q**    Now, there's a lot of carbon monoxide sources.  There

3   are -- it goes all the way to page 077600.  This shows the end

4   of the carbon monoxide sources, correct?

04:49:35   5        THE COURT:  So what's the relevance of that?

6        MR. NICHOLAS:  I want to show the hourly limit.

7   BY MR. NICHOLAS:

8   **Q**    So, there's a final emissions cap, correct?  So I'll zoom

9   in on it.  There's been a lot of discussion of the flexible cap

04:49:57   10   and what it is.  So, this is what it looks like in a permit.  So

11   the final emission cap for carbon monoxide is 3,736 pounds per

12   hour, correct, .48?

13   **A**    Yes, sir, .48.

14   **Q**    Okay.  So, that's how much -- that's how much can be

04:50:19   15   emitted per hour from all of those sources of the carbon

16   monoxide, correct?

17   **A**    For routine emissions, that's correct.

18        THE COURT:  From what, one plant or the three?

19        THE WITNESS:  For one plant, for the refinery, sir.

04:50:33   20        THE COURT:  Go on.

21   BY MR. NICHOLAS:

22   **Q**    All right.  Now, staff in the environment section are

23   assigned particular air regulations to focus on?

24   **A**    Yes, sir, that's correct.

04:50:54   25   **Q**    You might say that a staff member assigned to focus on a

Kovacs - Direct/Nicholas

1   particular regulation is that regulation's owner?

2   **A**   Yes, sir.  That's the term we use.

3   **Q**   Now, the regulation owner must read a regulation he's been

4   assigned?

04:51:05   5   **A**   Yes, sir.

6   **Q**   He must understand the regulation?

7   **A**   Yes, sir.

8   **Q**   He must know how the regulation he has been assigned

9   applies to parts of the Baytown Complex?

04:51:14   10   **A**   Yes, sir.

11   **Q**   The regulation owner must be able to recognize violations

12   of a regulation that he's been assigned?

13   **A**   I apologize, repeat the question.

14   **Q**   A regulation owner must be able to recognize violations of

04:51:31   15   a regulation that he has been assigned?

16   **A**   I'd say that understanding non-compliance with a permit is

17   a shared responsibility across the organization.

18   **Q**   And one of the things that a regulation owner who works in

19   the environment section must be able to do is recognize a

04:51:47   20   violation when he sees it?

21   **A**   Yes, they need to understand non-compliance of the

22   regulations that they're responsible for.

23   **Q**   And when you were an environmental supervisor, you were the

24   regulation owner of some air regulations?

04:52:00   25   **A**   When I was the supervisor, I was not specifically

Kovacs - Direct/Nicholas

1    responsible -- I was not a reg owner of specific regulations.

2    My staff were reg owners for specific regulations and permits.

3    **Q**    Now, as environmental supervisor from time to time you have

4    looked at documentation of violations at the Baytown Complex?

04:52:19   5    **A**    Yes.  I've seen documentations of non-compliance.

6    **Q**    Okay.  As environmental supervisor from time to time you

7    have looked at documentation of violations of air regulations at

8    the Baytown Complex?

9    **A**    Yes, sir, I've looked at documentation of non-compliance

04:52:33  10    with air regulations.

11    **Q**    And you've also looked at -- I just want to make sure that

12    I'm getting a clear answer here.  As environmental supervisor

13    from time to time you have looked at documentation of violations

14    of air emissions at the Baytown Complex, correct?

04:52:49  15    **A**    The term we use are non-compliances or exceedance of a

16    permit condition.

17    **Q**    So Exxon uses non-compliance or exceedence of a permit

18    limit to mean a violation, correct?

19             THE COURT:  Basically, isn't that what it means?

04:53:10  20             THE WITNESS:  Yes, sir.

21    BY MR. NICHOLAS:

22    **Q**    I'm going to use the word -- I'm going to use the term

23    "violations."  Do you understand that?

24    **A**    Yes, sir.

04:53:19  25    **Q**    All right.  Now, from time to time -- now, it was part of

Kovacs - Direct/Nicholas

1    your job to discuss violations with personnel at the unit that

2    had the violation when you were an environmental supervisor?

3    **A**    Yes, sir.  It was a shared responsibility, but, yes, sir.

4    **Q**    All right.  You know what a deviation report is?

04:53:41    5    **A**    A Title V deviation report, yes, sir.

6    **Q**    Helping to prepare deviation reports was part of your job

7    responsibilities?

8    **A**    Yes, sir.

9    **Q**    The Baytown Complex submits deviation reports to TCEQ?

04:53:53    10    **A**    Yes, sir.

11    **Q**    Helping the Baytown Complex submit deviation reports to

12    TCEQ --

13                THE COURT:  Slow down, please.

14                MR. NICHOLAS:  I'm sorry.

04:54:00    15                THE COURT:  The court reporter needs to keep up,

16    Counsel.

17    BY MR. NICHOLAS:

18    **Q**    Helping the Baytown Complex submit emission reports to TCEQ

19    was part of your job responsibilities?

04:54:12    20    **A**    Yes, sir.  Not my primary function, but, yes, sir.

21    **Q**    A deviation report identifies non-compliance with a term or

22    condition of a Baytown Complex Title V permit?

23    **A**    Yes, sir, I believe that's the definition of a deviation.

24    **Q**    A deviation report is prepared for each of the Baytown

04:54:28    25    Complex's Title V permits?

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Kovacs - Direct/Nicholas

1   A    Yes, sir.

2   Q    Deviation reports are submitted to TCEQ twice a year?

3   A    Yes, sir, that's correct.

4   Q    Exxon is required to submit deviation reports to TCEQ twice

04:54:40  5   a year?

6   A    Yes, sir, that's correct.

7   Q    And what requires deviation reports to be submitted to TCEQ

8   twice yearly?

9   A    The Title V regulations.

04:54:50  10  Q    Exxon deviation reports are submitted using a form?

11  A    Yes, sir.

12  Q    TCEQ provides a form to use for submitting deviation

13  reports?

14  A    Yes, sir, that's correct.

04:55:03  15  Q    You're familiar with that form?

16  A    Yes, sir, in general.

17  Q    TCEQ provides instructions on how to complete the deviation

18  report form?

19  A    I believe that's correct, yes, sir.

04:55:14  20  Q    You have reviewed those instructions at some point?

21  A    Title V deviation reporting was not under my specific

22  responsibilities as supervisor.  So, I'm not sure if I read

23  fully those instructions, but I am generally familiar with them.

24  Q    All right.  I'm going to show you Plaintiffs' Exhibit 411.

04:55:49  25  Can you tell me whether these are the deviation report form

Kovacs - Direct/Nicholas

1    instructions you are familiar with?  Have you seen this before?

2  **A**    I do not recall reading this document.

3  **Q**    All right.  I'm going to show you Plaintiffs' Exhibit 33,

4    which is a deviation report.  I think I will give it to you in

04:56:42   5    the book form.

6            MR. NICHOLAS:  Your Honor, I'm going to have a number

7    of questions on the deviation report for him, and it might be

8    the easiest to look at it in the book, which would be Volume 5,

9    Exhibit 33.

04:57:41  10  BY MR. NICHOLAS:

11  **Q**    This is a deviation report that Exxon has filed, correct?

12  **A**    Yes, sir.  It appears so, yes.

13  **Q**    And this report is submitted to TCEQ?

14  **A**    Yes, sir.

04:57:58  15  **Q**    And Exxon filled in the information in the form?

16  **A**    Yes, sir.

17  **Q**    Please take a look at Attachment C, and it is page -- on

18    the bottom it is 2954.

19  **A**    I'm there.

04:58:34  20  **Q**    All right.  So the permit holder name is listed, correct?

21  **A**    Yes, sir.

22  **Q**    In the top box?

23  **A**    That's correct.

24  **Q**    And the -- could you just tell the Court what the area name

04:58:45  25    is?  That's the facility -- that's the plant?

Kovacs - Direct/Nicholas

1    **A**    Correct, yes, sir.

2    **Q**    So it would be refinery, chemical plant, or olefins plant?

3    **A**    Yes, sir.

4    **Q**    And the -- there's a box for the report period start date

04:58:59   5    and report period end date, and that covers the time period

6    covered by the report, which would be a six-month period?

7    **A**    Yes, sir, that's correct.

8    **Q**    And the operating permit box states the Title V permit

9    number?

04:59:10   10    **A**    Yes, sir.

11    **Q**    And there is a row of information for -- and this is quoted

12    here -- "Operating permit requirement for which deviations are

13    being reported."  Do you see that?

14    **A**    Yes, sir.

04:59:27   15    **Q**    All right.  So, the unit ID box identifies the unit at the

16    facility that had the violation?

17    **A**    Yes, sir.  I believe as referenced in the Title V permit.

18    So that's the descriptor in the Title V permit.

19    **Q**    The term and condition -- the term and condition number is

04:59:49   20    for the paragraph or subparagraph number of the permit that is

21    being violated, correct?

22    **A**    Yes, sir.

23    **Q**    The regulatory requirement is the -- is a box for a

24    citation to a specific rule included in the Title V permit

05:00:08   25    that's being violated, correct?

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Kovacs - Direct/Nicholas

1    **A**    Yes, sir.

2    **Q**    All right.  Now, there's a -- do you see the type of

3    violation -- excuse me, the type of requirement box?

4    **A**    Yes, sir.

05:00:21  5    **Q**    All right.  And this is -- provides a menu of set options

6    provided by TCEQ to characterize the type of requirement

7    involved in the violation; is that right?

8    **A**    I'm not familiar with this field.

9            THE COURT:  What does the word "standard" mean?

05:00:37  10            THE WITNESS:  I don't know.

11            THE COURT:  Okay.

12    BY MR. NICHOLAS:

13    **Q**    Do you see the monitoring -- excuse me.

14            THE COURT:  There's two monitoring boxes.

05:01:04  15            MR. NICHOLAS:  Yeah, there's a monitoring method and

16    monitoring frequency.

17    BY MR. NICHOLAS:

18    **Q**    Could you tell the Court what the monitoring method box

19    means?

05:01:19  20    **A**    I don't have specific knowledge, but I believe it's the

21    method with which the regulatory requirement applies to.

22    **Q**    All right.  And now under the type of requirements, is

23    it -- are you familiar with the -- with the fact that some

24    requirements are monitor-type requirements that are -- the

05:01:40  25    violations of which are reported in deviation reports?

Kovacs - Direct/Nicholas

1   **A**    Yes, sir.

2          THE COURT:  I don't understand the question.

3   BY MR. NICHOLAS:

4   **Q**    Some of the violations reported in deviation reports are

05:01:49   5   monitor-type violations?  In other words, a monitoring

6   requirement is being violated and then reported in the Title V?

7   **A**    Yes, sir.  Thank you for clarifying.

8   **Q**    And so the Baytown Complex's Title V permits contain

9   monitoring requirements, correct?

05:02:10   10   **A**    Yes, sir.

11   **Q**    And the Baytown Complex is required to monitor for

12   compliance with maximum allowable emission rates, right?

13   **A**    Yes, sir.

14   **Q**    And the Baytown Complex has other monitoring requirements

05:02:24   15   in its Title V permits?

16   **A**    Yes, sir.

17   **Q**    And could you tell the Court what other types of monitoring

18   requirements the Baytown Complex has in its Title V permits?

19   **A**    I don't think I could list them comprehensively, but

05:02:38   20   generally.  So either your permits or the regulations that are

21   incorporated into your Title V permit, they will have monitoring

22   requirements to demonstrate compliance with that regulation or

23   permit.

24          And, so, if it's an hourly emission rate, then

05:02:55   25   there may be a monitoring requirement spelled out in the permit

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Kovacs - Direct/Nicholas

1    or the regulation that -- that describes how to do that

2    monitoring to demonstrate compliance with that limit.

3    **Q**    So, if Exxon does not follow the proper monitoring

4    procedures, it would not know whether it's violating a -- an

05:03:18    5    emission cap, for instance?

6    **A**    I don't think that I can make that statement as an

7    absolute.

8    **Q**    That's one possibility, correct, that if a -- if a -- that

9    a monitoring-type violation might be of the type where Exxon

05:03:43    10    does not correctly monitor it for compliance with the maximum

11    allowable emission rate table, for instance, right?

12    **A**    So, no, I would disagree with that.

13    **Q**    All right.  Now, the monitoring -- you've already said that

14    the monitoring requirements require Exxon to determine whether

05:04:10    15    other limits are being complied with, correct?

16    **A**    Yes, sir.

17    **Q**    Okay.  And those are a variety of other limits contained in

18    the Title V permits, correct?

19    **A**    Yes, sir.

05:04:23    20    **Q**    So, you're -- and there are requirements to monitor for

21    compliance with the maximum allowable emission rate table,

22    correct?

23    **A**    Yes, sir.

24    **Q**    Now, are you saying that if Exxon does not follow the

05:04:39    25    monitoring procedures to figure out whether it's violating a

Kovacs - Direct/Nicholas

1   maximum allowable emission rate table that that's not a

2   violation of the Title V permit?

3   **A**   No, sir.  That's not what I was saying.

4   **Q**   It would be a violation, correct?

05:05:01   5   **A**   It might be, yes, sir.

6          THE COURT:  Wait.  Might be?  Then you said yes, or it

7   might be.  Is that your answer?

8          THE WITNESS:  Yes, sir.  It might be.  It depends on

9   the regulation, sir.

05:05:12   10   BY MR. NICHOLAS:

11   **Q**   There are certain reporting requirements in the Title V

12   permits for the complex?

13   **A**   Yes, sir.

14   **Q**   And if those reporting requirements were violated, those

05:05:33   15   would be reported in the deviation reports?

16   **A**   Yes, sir.

17   **Q**   And there are reporting -- I apologize if I just asked

18   this.  What types of reporting requirements are in the Baytown

19   Complex's Title V permits?

05:05:59   20   **A**   Well, obviously, I don't know if I can list them all; but

21   in general, it's similar to -- as I described before, there

22   would be reporting requirements either in your permit or in the

23   state or federal regulations that are incorporated in your Title

24   V permit.

05:06:17   25   **Q**   And these are reports to state agencies?

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Kovacs - Direct/Nicholas

1    **A**    Yes, sir.

2    **Q**    Back on the deviation report page that we were looking

3    at --

4              THE COURT:  What's that?

05:06:25    5    BY MR. NICHOLAS:

6    **Q**    2954, Exhibit 33.  It's page 2954.  There's a box marked

7    "pollutant."  And that indicates what pollutant is addressed by

8    the regulatory requirement, correct?

9    **A**    Yes, sir, I believe that's correct.

05:06:45    10   **Q**    So, for example, if we turn a few pages to 2957, the

11   pollutant is H2S.  Do you see that?

12   **A**    Yes, sir.

13   **Q**    So that's hydrogen sulfide?

14   **A**    Yes, sir.

05:07:08    15   **Q**    So the operating permit requirement for which this

16   violation is being reported is hydrogen sulfide, correct?

17             THE COURT:  Okay.  I understand all this.  We're going

18   through it.  You've explained it.  Where are we going?

19             MR. NICHOLAS:  Okay.

05:07:20    20             THE COURT:  I'll tell you what:  Where we're going,

21   we'll take a five-minute break.  All right.  See you back in

22   five minutes.

23        (Court recessed at 5:07 p.m.)

24        (Court resumed at 5:21 p.m.)

05:21:41    25             THE COURT:  Thank you.  Go right ahead, please.


Gayle Dye, CSR, RDR, CRR - 713.250.5582

Kovacs - Direct/Nicholas

1  BY MR. NICHOLAS:

2  **Q**    Mr. Kovacs, the deviation reports are signed by someone at

3  Exxon?

4  **A**    Yes, sir, that's correct.

05:21:56  5  **Q**    Who signs the deviation reports?

6  **A**    Typically, the plant manager.

7  **Q**    And they're actually certified, is that right, by the plant

8  manager?

9  **A**    Yes, sir, that's correct.

05:22:07  10  **Q**    And in deviation reports one of the fairly common items is

11  an open-ended line.  Are you familiar with the term?

12  **A**    I'm familiar with the term "open-ended line."

13  **Q**    What's an open-ended line?

14  **A**    It's a little bit complicated.

05:22:24  15       THE COURT:  Oh, that's something new.  Thank you very

16  much.

17       THE WITNESS:  In the environmental regulations when

18  you have hydrocarbons inside of a pipe, there is a requirement

19  when you have an access point out to the atmosphere to have two

05:22:42  20  isolation points, for example, two valves right next to each

21  other to isolate the hydrocarbon from the atmosphere.  If you

22  only have one isolation point, it is considered an open-ended

23  line.

24            Even though that valve -- that first valve was

05:22:56  25  closed, if that second involve is left open, it's considered an

Kovacs - Direct/Nicholas

1  open-ended line.  So the concept of an open-ended line is you

2  must have two isolation points between the hydrocarbon and the

3  atmosphere.

4  BY MR. NICHOLAS:

05:23:09  5  Q   And are you familiar with a plugged line?  Have you ever

6  heard of that?

7          THE COURT:  Yeah.  It's a line that's plugged up

8  somewhere.

9          MR. NICHOLAS:  I'm not sure we were going to get that

05:23:23  10  answer, your Honor.

11          THE WITNESS:  Yes, sir, I'm familiar with it.

12          THE COURT:  What's the technical definition?

13          THE WITNESS:  I think you summarized it very well,

14  sir.

05:23:29  15          THE COURT:  Is it some obstruction?

16          THE WITNESS:  Yes, sir.

17          THE COURT:  What is it, some debris or some physical

18  obstruction?

19          THE WITNESS:  Yes, sir, that's correct.

05:23:34  20  BY MR. NICHOLAS:

21  Q   And plugged lines are -- is another common violation

22  reported on deviation reports, correct?

23  A   I would say that a plugged line may be a cause for a

24  deviation.

05:23:44  25          THE COURT:  Does that happen very often?

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Kovacs - Direct/Nicholas

1          THE WITNESS:  No, sir.

2          THE COURT:  What are the -- what usually causes one?

3          THE WITNESS:  What usually causes a plugged line?

4          THE COURT:  Yes, sir.

05:23:54  5          THE WITNESS:  It can be -- it depends on the stuff

6  that's inside the pipe, right.  It could be -- let's say that it

7  gets a -- temperature drops.  If it needs to be really hot to

8  stay in liquid form and it gets to room temperature and it would

9  solidify like a plastic, that could cause a plugged line.  It

05:24:11  10  could be an obstruction in the line.  There's lots of different

11  reasons.

12  BY MR. NICHOLAS:

13  Q    Do you know what an emission event is?

14  A    Yes, sir.

05:24:17  15  Q    TCEQ regulations define what an emission event is?

16  A    Yes, sir, they do.

17  Q    You've read the TCEQ definition of an emission event?

18  A    Yes, sir.

19  Q    I assume you're not able to quote it -- well, are you able

05:24:28  20  to quote it verbatim?  I can show it to you if that will assist

21  you.

22          THE COURT:  Why don't you just read it so you don't

23  have to show it to him, just speed it up.

24          MR. NICHOLAS:  All right.

05:24:36  25  //

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Kovacs - Direct/Nicholas

1  BY MR. NICHOLAS:

2  **Q**    I'm going to read -- I'll read you the definition of an

3  emission event.  You can tell me if you recognize it.  This is

4  in 30 TAC 101.1 Sub 28.  "Emissions event.  Any upset event or

05:24:59  5  unscheduled maintenance startup or shutdown activity from a

6  common cause that results in unauthorized emissions of air

7  contaminants from one or more emissions points at the regulated

8  entity."

9              Are you familiar with that definition?

05:25:15  10  **A**    Yes, sir, I am.

11  **Q**    The TCEQ -- the TCEQ definition of emission event uses the

12  term "upset event."  Are you familiar with the term "upset

13  event"?

14  **A**    I'm generally familiar with the term "upset event," yes,

05:25:31  15  sir.

16  **Q**    And TCEQ regulations define what an upset event is?

17  **A**    Yes, sir.

18  **Q**    And you're familiar with that definition?

19  **A**    I believe it -- generally, yes, sir.

05:25:40  20  **Q**    All right.  I'll read you the definition, and you can tell

21  the Court whether you're familiar with it.  This is from 30 TAC

22  101.1 Sub 109.  "Upset event.  An unplanned and unavoidable

23  breakdown or excursion of a process or operation that results in

24  unauthorized emissions."

05:25:59  25              Are you familiar with that?

Kovacs - Direct/Nicholas

1   A    Yes, sir.

2   Q    Now, the TCEQ definition of an emission event also uses the

3   term "unauthorized emissions."  Are you familiar with that term?

4   A    Yes, sir, I am.

05:26:10   5   Q    And that's a term that's -- that's defined by TCEQ

6   regulations, also?

7   A    Yes, sir, it is.

8   Q    All right.  I will read you that, and you tell the Court

9   whether you're familiar with it.  This is 30 TAC 101.1, 107,

05:26:27   10   "Unauthorized emissions.  Emissions of any air contaminant

11   except carbon dioxide, water, nitrogen, methane, ethane, noble

12   gases, hydrogen, and oxygen that exceed any air emission

13   limitation in a permit, rule, or order of the commission or as

14   authorized by the Texas Clean Air Act, Section 382.0518G."

05:26:53   15               Are you familiar with that?

16   A    Yes, sir, I am.

17   Q    Now, you're aware that the Baytown Complex has had

18   emissions events?

19   A    Yes, sir.

05:27:03   20   Q    All three plants at the Baytown Complex have had emission

21   events?

22   A    Yes, sir.

23   Q    Now, certain emission events are reported to TCEQ?

24   A    Yes, sir, that's correct.

05:27:12   25   Q    And it's part of your job to know under what circumstances

1    Exxon must report emission events to TCEQ?

2    **A**    Yes, sir, that's correct.

3    **Q**    And the Texas Administrative Code specifies what emission

4    events must be reported to TCEQ?

05:27:28    5    **A**    Yes, sir, it does.

6    **Q**    And you're familiar with TCEQ's emission events?

7              THE COURT:  Why couldn't you argue this to me if I

8    need to know it rather than question this witness over and over

9    about --

05:27:39    10             MR. NICHOLAS:  All right.

11             THE COURT:  I'm -- I don't see where you -- Counsel,

12   just tell me, where are you going with this witness?

13             MR. NICHOLAS:  Well, I just want to make sure that

14   we're all on the same page of --

05:27:48    15             THE COURT:  We're on the same page.

16             MR. NICHOLAS:  -- what's being reported as violations.

17             THE COURT:  Well, again, I'm not following.  I just

18   listened to a bunch of questions, and I don't see it linked up.

19   So, eventually, you need to link it up and ask him, you know,

05:28:00    20   the questions that, in effect, help your side of the case

21   because I don't see it yet.

22             MR. NICHOLAS:  All right.

23   BY MR. NICHOLAS:

24   **Q**    All right.  So, there are -- some emission events are

05:28:10    25   reported that are above reportable quantities they put on the

Kovacs - Direct/Nicholas

 1   STEERS database?

 2   A      You're referring to emission events above --

 3            THE COURT:  Hold it.  Did you understand the question?

 4            THE WITNESS:  No, I didn't.

05:28:26  5            THE COURT:  Neither did I.  I'm being perfectly frank.

 6   I'm not getting antsy.  I tend to get a second wind.  So you

 7   better watch out for that.  I really mean it.  Historically, I

 8   really do.  I don't mean to be antsy, and I'm not.  But the

 9   question is, though -- I didn't understand the question either.

05:28:40 10   Put it in plain language and ask the man the questions that you

11   need to get to.

12   BY MR. NICHOLAS:

13   Q      Certain emission events are reported on the TCEQ STEERS

14   database?

05:28:51 15   A      Yes, sir, that's correct.

16   Q      Those emission events involve a -- an emission of an air

17   contaminant above a reportable quantity?

18   A      Yes, sir, that's correct.

19   Q      And the reportable quantities are set by TCEQ?

05:29:05 20   A      Yes, sir, that's correct.

21   Q      And the emission events that involve emissions of air

22   contaminants not involving anything above a reportable quantity

23   are called recordable emission events?

24   A      Yes, sir, I think that I got your logic.  Yes, sir.

05:29:22 25   Q      So the recordable emission events are kept on lists on site

Kovacs - Direct/Nicholas

1   at Exxon?

2   **A**   Yes, sir, that's correct.

3   **Q**   All right.  They're not put on the STEERS database?

4   **A**   Yes, sir.  Recordable events are not reported in the STEERS

05:29:36  5   database.

6   **Q**   And --

7             THE COURT:  I'm going to ask you this:  Why not?

8             THE WITNESS:  The regulations describe that.  The

9   regulations say that if you have an emission event below a

05:29:46  10  reportable quantity, your job is to keep all the records related

11  to that event -- keep them on site for five years.

12            THE COURT:  Slow down.

13            THE WITNESS:  I apologize.  The regulations say if you

14  have an emission event that is below a reportable quantity,

05:29:57  15  below a reporting threshold, that company's job is to keep

16  records of that emission event on site for five years.

17            THE COURT:  Okay.  We got that.  Now, let me ask the

18  Plaintiff.  Your position is, are those -- are those events that

19  are not subject to -- subject to being put on the STEERS report,

05:30:16  20  is that still something you have a concern about?

21            MR. NICHOLAS:  Yes.

22            THE COURT:  Okay.  I understand it.  I just want to

23  get right to that bottom line.  All right.  So they -- and you

24  say those are recoverable events even though they don't show up

05:30:29  25  with a state report?

Kovacs - Direct/Nicholas

1           MR. NICHOLAS:  Yes.  And that's why I went through the

2   definition of emission events because by definition all emission

3   events involve unauthorized emissions.

4           THE COURT:  Well, we're there.  Go right ahead.

05:30:40   5   BY MR. NICHOLAS:

6   **Q**    Now, the final STEERS report contains a variety of

7   information, correct?

8   **A**    Yes, sir.

9   **Q**    All right.  Now, the final -- let me back up for one

05:30:50  10   second.

11           THE COURT:  Now, when you say final --

12           MR. NICHOLAS:  I was going to clarify that.  By STEERS

13   report I'm referring to the emission events -- emission event

14   reports that involve emissions above reportable quantities that

05:31:05  15   are put onto the publicly available database, the STEERS

16   database.  I'll refer to those as STEERS reports.

17           THE COURT:  Are those final STEERS reports or not?

18           MR. NICHOLAS:   Initially, there's an initial STEERS

19   report after an emission event.

05:31:18  20           THE COURT:  Is that 24 hours?

21           MR. NICHOLAS:  Right.

22           THE COURT:  All right.  And then you have a certain

23   amount of time that you have to give all the details.  How long

24   is that, Counsel?  You can tell me?  I mean, what's the time?

05:31:29  25   No, I'm asking you.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Kovacs - Direct/Nicholas

1          MR. NICHOLAS:  Two weeks.

2          THE COURT:  All right.

3  BY MR. NICHOLAS:

4  Q    Now, the final STEERS report includes the name of the

05:31:36  5  process units or areas that experienced the emission event?

6  A    Yes, sir, that's correct.

7  Q    The final STEERS report includes the --

8          THE COURT:  I think I understand it.

9          MR. NICHOLS:  Okay.

05:31:44  10          THE COURT:  I think we've been over that with STEERS

11  reports.  No.  If you need to go into it to make a record,

12  Counsel, don't --

13          MR. NICHOLS:  Well, it's --

14          THE COURT:  -- you know, just go ahead.  Well, if

05:31:53  15  you -- hold it.  If you have to do it to make a record, that's

16  fine.  If you don't, I understand what it is, and you don't have

17  to get it in through this man.  If you think anything is, just

18  tell me that you really feel you need to make a record on this,

19  and that goes for the defense, also.  Then I'll back off.  Okay?

05:32:13  20  If you do, go ahead.  Don't feel cheated.

21          MR. NICHOLAS:  I guess I'm unsure whether I need to.

22  I'm not.

23          THE COURT:  Okay.

24          MR. NICHOLAS:  I mean --

05:32:21  25          THE COURT:  That's what we got a clock for.  All

Kovacs - Direct/Nicholas

1  right.  Go.

2  BY MR. NICHOLAS:

3  Q    All right.  So the STEERS report contains -- estimates the

4  duration of emissions, correct, during the emissions event?

05:32:33  5  A    Yes, sir, that's correct.

6  Q    And the STEERS report identifies the air contaminants

7  released during the emissions event?

8            THE COURT:  This is the final one?

9            MR. NICHOLAS:  Yes, referring to the final STEERS

05:32:40  10  reports.

11  BY MR. NICHOLAS:

12  Q    The STEERS reports identify the air contaminants released

13  during the emissions event.

14  A    Yes, sir, that's correct.

05:32:49  15  Q    All right.  And the STEERS report includes the estimated

16  quantities of the air contaminants emitted during the emission

17  event?

18  A    Yes, sir, that's correct.

19  Q    And the STEERS report includes the best known cause of the

05:33:07  20  emission event at the time of reporting?

21  A    Yes, sir, that's correct.

22  Q    And the STEERS report includes the actions taken to correct

23  the emissions event and minimize emissions?

24  A    Yes, sir.  That's correct.

05:33:19  25  Q    All right.  We talked a lot about STEERS reports.  So I

1  would just like to have one published with the Court.  This is

2  Plaintiffs' Exhibit 412.  So can you identify this as a final

3  STEERS report submitted by Exxon to TCEQ?

4  **A**    Yes, sir, it appears to be.

05:34:22  5  **Q**    All right.  And this is for the olefins plant?

6  **A**    Yes, sir, I believe so.  That's the correct address for the

7  olefins plant.

8  **Q**    All right.  So if we look at --

9         THE COURT:  Why don't you zoom in a little bit on

05:34:51  10  that?  You got plenty of room along the margins.  Yeah, better.

11  Thank you.

12  BY MR. NICHOLAS:

13  **Q**    All right.  So, this column describes the contaminant that

14  was released during the emissions event, correct?

05:35:08  15  **A**    Yes, sir, that's correct.

16  **Q**    And the column identifies the amount that has been

17  released, correct?

18  **A**    Yes, sir, that's correct.

19  **Q**    The units, which in here is pounds, right?

05:35:22  20  **A**    Yes, sir.

21  **Q**    The emission limit governing is listed in this column,

22  correct?

23  **A**    Yes, sir, that's correct.

24  **Q**    And again, this would be pounds per hour.  The units are

05:35:34  25  identified, correct, PP, per hour?

Kovacs - Direct/Nicholas

1  **A**    Yes, sir, that's correct.

2  **Q**    And the permit limit authorization is in this column,

3  correct?

4  **A**    Yes, sir.  The authorization column is a free text field

05:35:47  5  but yes.

6              THE COURT:  What does that mean?

7              THE WITNESS:  It means you can type whatever you want

8  into it.  The other columns in general are drop-down boxes where

9  you select -- where you put numbers, the first column -- the

05:35:57  10  second column.

11             THE COURT:  I'm looking at the authorized --

12             THE WITNESS:  The authorized column is -- you can type

13  whatever you want into that column.

14             THE COURT:  I don't understand.  It says "authorized."

05:36:05  15  BY MR. NICHOLAS:

16  **Q**    So here it says 553 --

17             THE COURT:  But who is doing the authorizing if you

18  can put anything you want in there?  I don't understand.

19             THE WITNESS:  The term "authorization" they're asking

05:36:16  20  for is the -- is the emissions or the pollutant from that point

21  authorized by a permit or a regulation.  They're asking for what

22  is authorizing those emissions.  So you can see what we say in

23  this example is that --

24             THE COURT:  When you say, "type whatever you want," I

05:36:35  25  mean, what is it, a blank that you have to find the reg or the

Kovacs - Direct/Nicholas

1  authorization and type in that number?

2          THE WITNESS:  What I mean is I can type whatever I

3  want into it.  It's just an open text box that I can type

4  whatever I want into it.  For example, the units column, it is a

05:36:51  5  drop-down box.  It's a list that I have to pick from, pounds per

6  hour or tons per year.

7          THE COURT:  So, in other words, you would have to type

8  in where the authorization is and how much it is; you have to do

9  individual typing instead of a drop-down box?

05:37:12  10          THE WITNESS:  Yes, sir, that's correct.

11  BY MR. NICHOLAS:

12  **Q**    So in this case if we look at here, you put in that there

13  was 553 of the 2239 are authorized?

14  **A**    Yes, sir, that's correct.

05:37:36  15  **Q**    So the remaining number -- so the remaining of that would

16  be unauthorized, correct?

17  **A**    Yes, sir, that's correct.

18  **Q**    All right.  Now, there are many emission points of the

19  Baytown Complex, correct?

05:38:02  20  **A**    Yes, sir, I think that's a fair statement.

21  **Q**    And based on what you've observed on your job, an

22  individual emissions event will, typically, involve some

23  emission points at a plant in the complex but not others?

24  **A**    Yes, sir, that's correct.

05:38:16  25  **Q**    And final STEERS reports report the total amount of air

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Kovacs - Direct/Nicholas

1  contaminants associated with the emission event only?

2  A    I'm going to say it just a little bit differently.  The

3  final STEERS you are required to report total emissions from

4  sources that were associated with the event.

05:38:58  5  Q    And what do you mean by that?  What do you mean by

6  "associated with the event"?

7  A    I'll do it as simply as I can.  If I have sources that have

8  unauthorized emissions, each of those sources have to be

9  reported in STEERS.  If I have sources that do not have

05:39:18  10  unauthorized emissions, they are not part of the emissions event

11  and they do not need to be reported in the STEERS.

12  Q    Okay.  All right.  Now, you are familiar with the concept

13  of the affirmative defense?

14  A    Yes, sir, I am.

05:39:56  15  Q    Have you heard of that?

16         Now, let's take a look at the STEERS report

17  again.  All right.  Now, there is a box for the affirmative

18  defense.  Do you see -- do you see that?

19  A    Yes, sir, I do.

05:40:25  20  Q    All right.  So somebody at the Baytown Complex selects a

21  yes or a no in the affirmative defense box?

22  A    Yes, sir.  Those are the only two choices.

23  Q    So, you don't --

24         THE COURT:  So you don't have to put the real reason

05:40:44  25  in there; is that correct?

Kovacs - Direct/Nicholas

1             THE WITNESS:  Correct.  It's a radio button.  You

2    either have to select yes or no.

3             THE COURT:  What information does that, therefore,

4    give to anybody reading it?  It doesn't, correct, as to what

05:40:54   5    you're -- for want of a better term, the excuse that this

6    happened?

7             THE WITNESS:  Correct.  It has no indication on the

8    underlying affirmative defense criteria.  That's correct.

9             THE COURT:  Looks like there was some reason that

05:41:03  10    could be articulated, correct, when you had a yes in there.

11             THE WITNESS:  Yes, sir, at the time.  And you are

12    required to put a yes or a no before you can submit that report.

13    So it doesn't --

14             THE COURT:  This is a final STEERS report?

05:41:15  15             THE WITNESS:  It's required in both, but, yes, this

16    is -- I believe this is a final STEERS.

17             THE COURT:  So it ends right here unless somebody

18    wants to follow it up.

19             THE WITNESS:  The TCEQ always does follow up.

05:41:26  20             THE COURT:  They do?

21             THE WITNESS:  Yes, sir.

22             THE COURT:  Okay.  All right.  Let -- you must get a

23    lot of these coming from all the refineries each day?

24             THE WITNESS:  Yes, sir.

05:41:38  25             THE COURT:  I would assume they would.  It's just -- I

1  imagine they do.  Let me ask you this:  At the state agency do

2  they have lots of -- lots of folks doing -- checking on all

3  this?  I guess they have to, but your position is it's not

4  satisfactory or they don't -- they don't have the personnel to

05:41:57  5  follow up, or what's the position of the Plaintiff?

6          MR. NICHOLAS:  That these come in all the time, that

7  they're always checked yes.  They never check no.

8          THE COURT:  Okay.

9          MR. NICHOLAS:  And TCEQ does not have the manpower to

05:42:11  10  do anything other than --

11          THE COURT:  File it.

12          MR. NICHOLAS:  -- if anything -- yes, file them or

13  look at them briefly.

14          THE COURT:  Okay.

05:42:19  15  BY MR. NICHOLAS:

16  Q    All right.  Now you referred to affirmative defense

17  criteria?

18  A    Yes, sir.  Those are in the regulations.

19  Q    Okay.  And there are 11 criteria for affirmative -- for the

05:42:32  20  affirmative defense?

21  A    Yes, sir.

22  Q    All right.  So it's your understanding that if the Baytown

23  Complex meets the -- all 11 criteria, a penalty will not be

24  imposed for an emissions event?  Is that your understanding?

05:42:45  25  A    In general, yes, sir, but that's at the TCEQ's discretion.

1  Q    So it's your understanding that TCEQ can still penalize you

2  even though the affirmative defense applies?

3  A    I don't know how to answer that for the TCEQ.

4  Q    Now, it is your understanding that the affirmative defense

05:43:10  5  is not a defense against an action for injunctive relief,

6  correct?

7  A    I'm sorry, I don't understand the term "injunctive relief."

8  Q    Have you ever looked at the affirmative defense

9  regulations?

05:43:22  10  A    Yes, sir, I'm familiar with them.

11  Q    And that's part of your job?

12  A    Yes, sir.

13  Q    Okay.  And do you understand the consequence of invoking

14  the affirmative defense?

05:43:43  15  A    I don't know what you mean by "consequence."  I'm not -- I

16  apologize.  I'm not trying to be obtuse.

17  Q    How long were you with the -- you've been in the

18  environmental section for how long?

19  A    Since October of 2005.

05:43:54  20  Q    Okay.  And can you just tell the Court what happens when

21  Exxon checks off the box yes for the affirmative defense?

22  A    Sure.  So once you submit a final STEERS, 100 percent of

23  those events get reviewed by the TCEQ.  The TCEQ has a group of

24  investigators.  The first thing that they will do is they will

05:44:12  25  send you a questionnaire.  The questionnaire exactly mirrors the

Kovacs - Direct/Nicholas

1  11 demonstration criteria, and they will ask you to fill out

2  that form to -- for their review to see if the affirmative

3  defense criteria are met.

4           THE COURT:  How do they know since they're not on

05:44:30  5  that -- they're not on site?

6           THE WITNESS:  Often they will come on site, or we will

7  go to their offices.

8           THE COURT:  There must be hundreds of these a day

9  coming in, though, from various facilities around the state.

05:44:47  10          THE WITNESS:  And 100 percent of our STEERS reports

11  get investigated by the TCEQ.

12          THE COURT:  Okay.

13  BY MR. NICHOLAS:

14  Q    Now, one of these --

05:44:53  15          THE COURT:  Let me ask you this:  Is that because

16  you're a target?

17          THE WITNESS:  No, sir.  I think that that's their

18  policy.

19  BY MR. NICHOLAS:

05:45:00  20  Q    Now, one of the affirmative defense criteria is that the

21  unauthorized emissions did not cause or contribute to an

22  exceedence of the National Ambient Air Quality Standards,

23  prevention of significant deterioration increments or to a

24  condition of air pollution, correct?

05:45:21  25  A    Yes, sir, that's correct.

Kovacs - Direct/Nicholas

1    Q    Now, air pollution is defined in the Texas Health and

2    Safety Code?

3    A    Yes, sir.

4    Q    As part of your job, you informed yourself of the

05:45:29   5    definition of air pollution in the Health and Safety Code?

6    A    Yes, sir.  I don't have it memorized, but I do recall

7    reading it.

8    Q    All right.  All right.  I'll read you the definition.  You

9    can tell me whether you're familiar with it.

05:46:00   10               THE COURT:  Definition of?

11               MR. NICHOLAS:  Of air pollution.

12   BY MR. NICHOLAS:

13   Q    It means, "The presence in the atmosphere of one or more

14   air contaminants or combination of air contaminants in such

05:46:12   15   concentration and of such duration that, "A," are or may tend to

16   be injurious to or to adversely affect human health or welfare,

17   animal life, vegetation, or property or, "B," interfere with the

18   normal use or enjoyment of animal life, vegetation, or

19   property."

05:46:31   20               Does that sound familiar to you?

21   A    Yes, sir, it does.

22   Q    And that's from the Health and Safety Code 382.003,

23   Subsection 3.

24               Now, from time to time Baytown residents call the

05:46:54   25   Baytown Complex?

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Kovacs - Direct/Nicholas

1  A     Yes, sir, that's correct.

2  Q     And Baytown residents have called the complex with concerns

3  about air quality near their homes?

4  A     Yes, sir, that's correct.

05:47:11  5  Q     Baytown residents have called the Baytown Complex to ask

6  what's going on at the complex?

7  A     I don't have -- I'm not familiar with every reason that

8  they've called.

9  Q     Exxon maintains a log of community complaints?

05:47:28  10  A     Yes, sir, that's correct.

11  Q     The complaint log is maintained on an Excel spreadsheet?

12  A     Yes, sir, that's correct.

13  Q     I'm going to show you Exhibit 416.  You're familiar with

14  this log of complaints?  You've seen this before in your

05:47:59  15  deposition?

16  A     Yes, sir, I have.

17  Q     All right.  Now, there is a group within the Baytown

18  Complex responsible for looking at the complaint log?

19  A     Yes, sir, that's correct.

05:48:37  20         MR. NICHOLAS:  And, your Honor, it might probably be

21  easiest to take the book out.

22             THE COURT:  All right.  Let me put this one back.

23             MR. NICHOLAS:  416 is in -- I believe it's Volume 17.

24             THE COURT:  Just keep going.  I'll pull it out.

05:48:59  25  //

Kovacs - Direct/Nicholas

1  BY MR. NICHOLAS:

2  Q     So there's -- the group within the Baytown Complex

3  responsible for looking at the complaint log is the Public

4  Affairs Group?

05:49:06  5  A     Yes, sir, I believe that's correct.

6  Q     And the Public Affairs Group is responsible for public

7  affairs and community relations?

8  A     Yes, sir, that's correct.

9            THE COURT:  You said 17, correct?

05:49:16  10            MR. NICHOLAS:  Right.

11            THE COURT:  Okay.  Exhibit number again, 416?

12            MR. NICHOLAS:  416.

13            THE COURT:  Go on.

14  BY MR. NICHOLAS:

05:49:29  15  Q     So the Public Affairs Group the -- Public Affairs Group

16  that looks at the complaint log is responsible for public

17  affairs and community relations?

18  A     Yes, sir, that's correct.

19  Q     No one in the environment section has the responsibility

05:49:42  20  for looking at the -- the complaint log, correct?

21  A     Yes, sir, that's correct.

22  Q     I'm going to show you Plaintiffs' Exhibit 418 which is a

23  STEERS report for an event at the refinery on February 21, 2009.

24  All right.  So this is Exhibit 418.  And -- all right.  So this

05:50:45  25  is a STEERS report for an emission event on February 21, 2009,

Kovacs - Direct/Nicholas

1   right?

2   A    Yes, sir.

3   Q    And according to the STEERS report, the emissions event

4   started at -- and it's in military time -- 18:49, which is, if

05:51:01   5   I'm doing it correctly --

6              THE COURT:  6:49.

7   BY MR. NICHOLAS:

8   Q    -- 6:49 in the evening?

9   A    Yes, sir, that's correct.

05:51:09   10   Q    And the emissions event lasted three hours, 28 minutes?

11   A    Yes, sir, that's correct.

12   Q    And during the emissions event -- let's flip to what

13   happened during the emissions event.  All right.  So during the

14   emissions event, hydrogen sulfide was emitted, correct?

05:51:29   15              THE COURT:  Where are you looking?

16   BY MR. NICHOLAS:

17   Q    Right?  Hydrogen sulfide was emitted during this emissions

18   event?

19   A    Yes, sir.

05:51:41   20   Q    1,928 pounds were emitted, do I have that right?

21   A    Yes, sir.

22              THE COURT:  And that's per hour, correct?

23              THE WITNESS:  No, sir.  That is the total amount for

24   the entire event.

05:51:53   25              THE COURT:  Okay.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Kovacs - Direct/Nicholas

1  BY MR. NICHOLAS:

2  **Q**     And the emission limit column says that the emission limit

3  was zero, correct?

4          THE COURT:  Where are you looking with the zero?

05:52:05  5          MR. NICHOLAS:  Zero.

6          THE COURT:  I don't have that box.  I'm sure it's

7  here.  Hang on.

8          MR. NICHOLAS:  23736.

9          THE COURT:  All right.  It's the last page.  All

05:52:14  10  right.

11  BY MR. NICHOLAS:

12  **Q**     Mr. Kovacs, zero?

13  **A**     Yes, zero.

14  **Q**     And -- all right.  Now, hydrogen sulfide has a rotten egg

05:52:24  15  smell, right?

16  **A**     Some people have described it that way.

17  **Q**     Some people might describe it as a fecal smell?

18  **A**     Maybe, yes, sir.

19  **Q**     And other chemicals were emitted during this same emissions

05:52:37  20  event, right?

21  **A**     Yes, sir, that's correct.

22  **Q**     Now, if we go back to 416, the complaint log.

23          MR. NICHOLAS:  And, your Honor, flip to 166212.

24              Do you have the complaint log out?

05:53:01  25          THE COURT:  Yeah, 212.

Kovacs - Direct/Nicholas

1  BY MR. NICHOLAS:

2  Q    All right.  Now -- all right.  So, if we go down here to

3  September 21, 2009, and there's the military time.  Actually,

4  yeah, the military time.  Let's start on the first one.

05:53:29  5    THE COURT:  Hold it.  What page am I looking at?  212?

6    MR. NICHOLAS:  We're on 166212 for Exhibit --

7    THE COURT:  You're saying -- what date were you

8  saying?

9    MR. NICHOLAS:  Oh, I'm sorry.  February 21st.

05:53:44  10    THE COURT:  February.  Okay.

11  BY MR. NICHOLAS:

12  Q    So on February 21st there were complaints lodged about the

13  emissions event that we just looked at, right?  Do you see the

14  date here?  It's February 21st.  The time --

05:53:59  15  A    Yes.  There were complaints lodged on February 21st.

16  Q    All right.  Now, even though the STEERS report said 18:49

17  military time on the STEERS report, the complaints started

18  coming in at, what, 17:45?

19  A    Yes, sir.  That's the time the complaint was logged.

05:54:16  20  Q    All right.  And it goes through --

21    THE COURT:  Halpryn's?  This one?

22  BY MR. NICHOLAS:

23  Q    And including Stuart Halpryn phoned in and complained,

24  correct?

05:54:25  25    THE COURT:  Oh, the very first one for 2-21, correct?

Kovacs - Direct/Nicholas

1    BY MR. NICHOLAS:

2    Q    The first one was Bill Pohler.

3              THE COURT:  The 17:45, is that what you're referring

4    to?

05:54:37   5    BY MR. NICHOLAS:

6    Q    Yes.  So at 5:45 people started to call complaining about

7    this emissions event, right?

8                   Mr. Kovacs?

9    A    What?

05:54:46  10              I would say, yes, that at 5:45 Mr. Pohler called

11   about -- called the complaint line.

12   Q    Right.  He was calling about this event, correct, the

13   hydrocracker startup problem?

14   A    I don't know.

05:55:02  15   Q    All right.  So -- all right.  So Mr. Pohler started to

16   complain about a very foul, rotten egg smell.  Do you see that?

17   A    Yes, sir.

18   Q    All right.  And at 18:03 Norma Jimenez called complaining

19   about a very bad smell not going away, right?

05:55:26  20   A    Yes, sir.

21   Q    And nothing was on the CAER line, C-A-E-R?

22   A    That's what it says, yes.

23              THE COURT:  What is that?  I saw that.

24              MR. NICHOLAS:  We heard some testimony yesterday from

05:55:39  25   Mr. Cottar about the CAER line.  That's when you call in to see

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1   whether the plant is --

2            THE COURT:  Oh, yeah, whether something is going on.

3            MR. NICHOLAS:  Right.

4   BY MR. NICHOLAS:

05:55:47   5   **Q**   Now, at 18:15 Jennifer Armistead calls saying that the

6   dispatch -- the west Baytown Fire Dispatch office has had

7   numerous calls from residents complaining of bad odor.  Do you

8   see that?

9   **A**   Yes, sir, I do.

05:55:59   10  **Q**   Then at 18:19 Stuart Halpryn calls?

11           THE COURT:  He even mentions his dog, correct?

12           MR. NICHOLAS:  Does he?

13           THE COURT:  Correct, isn't it?

14           MR. NICHOLAS:  Children -- yes, he does.

05:56:09   15  BY MR. NICHOLAS:

16  **Q**   "Children now sick and vomiting."  Do you see that?

17  **A**   Yes, sir, I do.

18  **Q**   All right.  And then Ms. Pruneda calls and reports that her

19  mother has been complaining?

05:56:23   20  **A**   I apologize.  I can't see that, sir.

21  **Q**   See that?

22  **A**   Yes, sir, I see that.

23  **Q**   So these are all in the complaint log.

24           THE COURT:  But that's another day.  That's --

05:56:38   25           MR. NICHOLAS:  Yeah, that was two days later,

Kovacs - Direct/Nicholas

1    reporting on --

2            THE COURT:  February 23rd.

3            MR. NICHOLAS:  -- the 23rd reporting on something that

4    happened on the 21st.  I believe it makes a reference back

05:56:51    5    saying that her mother complained about an incident two days

6    before.

7            MR. NICHOLS:  Your Honor, I object to counsel

8    testifying.

9            THE COURT:  Let me read it.  "Visiting on Saturday" --

05:57:03   10    okay.  I read it.  I read it.

11   BY MR. NICHOLAS:

12   Q    All right.  Now, if we flip back to this STEERS report that

13   matched up to this complaint, the complaint log --

14           THE COURT:  What number?

05:57:18   15           MR. NICHOLAS:  This would be Plaintiffs' Exhibit 418.

16   BY MR. NICHOLAS:

17   Q    Exxon invoked the affirmative defense, correct?

18   A    Yes, sir.

19   Q    And it invoked the affirmative defense even though one of

05:57:47   20   the criteria is that the emissions event could not have caused a

21   condition of air pollution, correct?  That's one of the criteria

22   of an affirmative defense, the emissions event could not have

23   caused a condition of air pollution?

24   A    Yes, sir.  That is one of the criteria.

05:58:08   25   Q    And as we went over, the condition of air pollution -- the

Kovacs - Direct/Nicholas

1   definition of air pollution by law for this purpose includes "an

2   emission or a presence in the atmosphere of air contaminants

3   that are or may be or tend to be injurious to or to adversely

4   affect human health, welfare, animal life, vegetation, or

05:58:35   5   property or interfere with the normal use or enjoyment of animal

6   life, vegetation or property," right?

7   **A**   Yes, sir, that's correct.

8   **Q**   And the people who are filling out -- who are checking the

9   box yes and no on the affirmative defense, they got -- they have

05:58:52   10   to know what the definition of air pollution is, right?  Or

11   they -- well, do they?  Do they know?  Do the people filling out

12   the affirmative defense box, when they fill out the

13   affirmative -- when they fill out the STEERS forms, do they know

14   this definition of air pollution?

05:59:09   15   **A**   Well, I can't speak to the minds of 28 to 30 people, but

16   what I would say is that the people filling out this form are

17   familiar with the affirmative defense criteria, yes, sir.

18   **Q**   That's not my question.  One of the criteria is that

19   emissions events are not -- or cannot cause a condition of air

05:59:29   20   pollution.  Air pollution is defined in the statute.  You are an

21   environmental supervisor in this department.  Do the people --

22   does your department -- did your department, when they fill out

23   this form, know the definition of air pollution?

24           MR. NICHOLS:  Your Honor, the question has been asked

05:59:47   25   and answered.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

                    Kovacs - Direct/Nicholas

   1            THE COURT:  Overruled.  They know it, don't they?

   2    They know the definition basically or not?

   3            THE WITNESS:  I would say that the environmental

   4    section is aware of that definition, yes, sir.

06:00:00   5    BY MR. NICHOLAS:

   6    Q    They've actually read the definition in the statute?  Do

   7    you know that?  Is their training?  Does anybody get trained to

   8    fill it out?

   9    A    Yes, sir, absolutely.

06:00:08  10    Q    And when they get trained, they know what the definition of

  11    air pollution is?

  12            THE COURT:  You hope they do, right?

  13            THE WITNESS:  What I would say, your Honor, is that

  14    they -- I know that they are trained on the affirmative defense

06:00:19  15    criteria.

  16            THE COURT:  Okay.

  17    BY MR. NICHOLAS:

  18    Q    Now, there's been some discussion of -- have we already

  19    showed a recordable?

06:00:56  20            THE COURT:  I'll tell you what.  Are you going into a

  21    new area?  We can take a break.  It's already after 6:00.  You

  22    call it.

  23            MR. NICHOLAS:  Yeah.

  24            THE COURT:  Whatever you want to do.

06:01:05  25            MR. NICHOLAS:  This is a good breaking point.


                Gayle Dye, CSR, RDR, CRR - 713.250.5582

1          THE COURT:  Okay.  All right.  If you give me a

2     moment, I'll give you the numbers.  By the way, I forgot

3     yesterday.  I show you the clock every day.  Okay.  I'll write

4     it down.  I'm going to show you the clock every day.

06:01:24   5               All right.  You may step down.  We'll see you

6     tomorrow.  We'll get in at 10:00 o'clock.

7               All right.  Here's the time for everybody.  See

8     you tomorrow.

9          (Court recessed for the day at 6:02 p.m.)

10

11

12               C E R T I F I C A T E

13

14     I certify that the foregoing is a correct transcript

15     from the record of proceedings in the above-entitled matter, to

16     the best of my ability.

17

18     By: /s/Gayle L. Dye _____     **04-16-2014**

19          Gayle L. Dye, CSR, RDR, CRR        Date

20

21

22

23

24

25