1                  UNITED STATES DISTRICT COURT

2                  SOUTHERN DISTRICT OF TEXAS

3                      HOUSTON DIVISION

4   ENVIRONMENT TEXAS CITIZEN LOBBY, INC.,   .
    and SIERRA CLUB,                         .
5                                            .
                  Plaintiffs,                .
6                                            .  Civil Action
    VS.                                      .  No. H-10-CV-4969
7                                            .
    EXXONMOBIL CORPORATION,                  .  Houston, Texas
8   EXXONMOBIL CHEMICAL COMPANY,             .  February 13, 2014
    and EXXONMOBIL REFINING AND SUPPLY       .  10:05 a.m.
9   COMPANY,                                 .
                                             .
10                Defendants.                .
    . . . . . . . . . . . . . . . . . . . . .

11                TRANSCRIPT OF PROCEEDINGS
12            BEFORE THE HONORABLE DAVID HITTNER
                        BENCH TRIAL
13                      **DAY 4 OF 13**

14  APPEARANCES:

15  FOR THE PLAINTIFFS:
            Mr. Joshua R. Kratka
16          Ms. Heather Govern
            NATIONAL ENVIRONMENTAL LAW CENTER
17          44 Winter Street
            4th Floor
18          Boston, Massachusetts
            617.747.4333
19          917.710.5180
            FAX:  617.292.8057
20          josh.kratka@verizon.net

21          Mr. David A. Nicholas
            20 Whitney Road
22          Newton, Massachusetts 02460
            617.964.1548
23          FAX:  617.663.6233
            dnicholas@verizon.net
24
            PROCEEDINGS RECORDED BY STENOGRAPHIC MEANS,
25      TRANSCRIPT PRODUCED FROM COMPUTER-AIDED TRANSCRIPTION

```
 1                         APPEARANCES

 2                          (continued)

 3   FOR THE PLAINTIFFS:

 4           Mr. Philip Harlan Hilder
             Mr. William B. Graham
 5           HILDER & ASSOCIATES, PC
             819 Lovett Boulevard
 6           Houston, Texas  77006-3905
             713.655.9111
 7           FAX:  713.655.9112

 8   ALSO PRESENT:

 9           Ms. Mary Rock
             Paralegal
10
     FOR THE DEFENDANTS:
11
             Mr. Eric J. R. Nichols
12           BECK REDDEN
             515 Congress Avenue
13           Suite 1750
             Austin, Texas 78701
14           512.708.1000
             FAX:  512.708.1002
15           enichols@beckredden.com

16           Mr. Bryon A. Rice
             Mr. Fields Alexander
17           Mr. William Brad Coffey
             BECK REDDEN
18           1221 McKinney Street
             Suite 4500
19           Houston, Texas  77010
             713.951.6256
20           713.951.6220
             713.951.6274
21           FAX:  713.951.3720
             brice@beckredden.com
22           falexander@beckredden.com
             bcoffey@beckredden.com
23

24

25
```

```
 1                        APPEARANCES

 2                        (continued)

 3  FOR THE DEFENDANTS:

 4          Mr. Keith Courtney
            WINSTEAD PC
 5          401 Congress Avenue
            Suite 2100
 6          Austin, Texas  78701
            512.370.2813
 7          FAX:  512.370.2850
            kcourtney@winstead.com
 8
    ALSO PRESENT:
 9
            Mr. David Mantor
10          In-house counsel
            EXXONMOBIL
11
            Ms. Hien Luu
12          Paralegal

13

14

15  COURT REPORTER:

16          GAYLE L. DYE, CSR, RDR, CRR
            515 Rusk, Room 8016
17          Houston, Texas  77002
            713.250.5582
18

19

20

21

22

23

24

25
```

```
 1                        INDEX OF WITNESSES

 2                                                        Page

 3  FOR THE PLAINTIFFS:

 4  JEFFREY KOVACS

 5       REDIRECT EXAMINATION BY MR. NICHOLAS              5
         RECROSS EXAMINATION BY MR. NICHOLS              19
 6
    KEITH EVANS BOWERS
 7
         DIRECT EXAMINATION BY MR. KRATKA                29
 8       VOIR DIRE EXAMINATION BY MR. NICHOLS            38
         DIRECT EXAMINATION (CONTINUED) BY MR. KRATKA    39
 9       VOIR DIRE EXAMINATION BY MR. NICHOLS            92
         DIRECT EXAMINATION (CONTINUED) BY MR. KRATKA    93
10       VOIR DIRE EXAMINATION BY MR. NICHOLS           104
         DIRECT EXAMINATION (CONTINUED) BY MR. KRATKA   105
11       VOIR DIRE EXAMINATION BY MR. NICHOLS           106
         DIRECT EXAMINATION (CONTINUED) BY MR. KRATKA   106
12       VOIR DIRE EXAMINATION BY MR. NICHOLS           117
         DIRECT EXAMINATION (CONTINUED) BY MR. KRATKA   118
13       VOIR DIRE EXAMINATION BY MR. NICHOLS           142
         DIRECT EXAMINATION (CONTINUED) BY MR. KRATKA   143
14       CROSS EXAMINATION BY MR. NICHOLS               191

15

16

17

18

19

20

21

22

23

24

25


                Gayle Dye, CSR, RDR, CRR - 713.250.5582
```

```
                              PROCEEDINGS
                           February 13, 2014
              THE COURT:  Okay.  You're up, Counsel.
              MR. NICHOLAS:  Your Honor, before we start, I would
   just like to say that, because of the length of the various
   witnesses so far, we may have to take one of our witnesses out
   of turn which we just talked to counsel about.
              THE COURT:  I have no problem with it unless they have
   a problem.
         (The witness, JEFFREY KOVACS, called on behalf of the
   Plaintiff, was previously sworn.)
                         REDIRECT EXAMINATION
                            (continued)
   BY MR. NICHOLAS:
   Q    Good morning, Mr. Kovacs.
   A    Good morning.
   Q    Mr. Kovacs, yesterday you testified about the TCEQ
   investigations that are done for reportable emission events.
                 Do you recall that?
   A    Yes, sir, I do.
   Q    And I believe that your testimony was that TCEQ always
   investigates a reportable emissions event?
   A    Yes, sir, that's correct.
   Q    Now, TCEQ does not always investigate recordable emission
   events, correct?
```

10:05:43 — line 5
10:05:59 — line 15
10:06:11 — line 20
10:06:29 — line 25

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Kovacs - Redirect/Nicholas

1  **A**    There is a different review for recordable events than

2  there is for reportable events.

3  **Q**    My question was -- well, you don't send the recordable --

4  you don't send the recordable information to TCEQ, correct?

10:06:46  5  **A**    Yes, sir, that is correct.

6  **Q**    All right.  And TCEQ -- when TCEQ investigates the complex

7  for these reportable emissions, they do not always send an

8  investigator out to your complex, correct?

9  **A**    Yes, sir, that is correct.

10:07:04  10  **Q**    Sometimes TCEQ phones in the investigation, correct?

11  **A**    Sometimes the investigation is done via phone and e-mail

12  and letters.

13  **Q**    Sometimes the investigation is just done by phone, right?

14  **A**    I'd have to look at a particular instance.  I can't think

10:07:34  15  of an instance where there was just a single phone conversation

16  related to a reportable event.

17          MR. NICHOLAS:  Could we have Exhibit 20W put on the --

18  BY MR. NICHOLAS:

19  **Q**    Mr. Kovacs, do you recall testifying about a pinhole leak

10:08:01  20  yesterday when you were discussing -- when you were having

21  discussions Mr. Nichols?

22  **A**    Yes, sir, I do.

23  **Q**    And you talked about this photograph from one of the

24  emission events, correct?

10:08:19  25          Do you recall that?

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1  **A**    Yes, sir, I do.

2          MR. NICHOLAS:  Okay.  Do you know what emission event

3  it is?

4          MS. MARY ROCK:  No.  159900.

10:08:20  5          MR. NICHOLAS:  Oh, all right.

6  BY MR. NICHOLAS:

7  **Q**    So this -- this photograph relates to Emission Event 15 --

8          MS. MARY ROCK:  -- 9900.

9  BY MR. NICHOLAS:

10:08:40  10  **Q**    -- 159900.  Do you recall that?

11  **A**    Yes, sir, I do.

12  **Q**    All right.  Now, there's a pinhole leak here.

13          Do you see that?

14  **A**    Yes, sir, I do.

10:08:46  15  **Q**    All right.  587 pounds of emissions came out of that

16  pinhole?  587 pounds came out of that pinhole?

17  **A**    Yes, sir, that's correct.

18  **Q**    And the -- and those were 587 pounds of flammable emissions

19  came out of that pinhole?

10:09:05  20  **A**    587 pounds of hydrocarbons, yes, sir.

21  **Q**    And the 587 pounds -- well, hydrocarbons are flammable,

22  right?

23  **A**    Yes, sir.

24  **Q**    So 587 pounds of flammable emissions came out of that

10:09:21  25  pinhole?

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Kovacs - Redirect/Nicholas

1   A    Yes, sir.

2   Q    Okay.

3           MR. NICHOLAS:  Can we go to the first page of the

4   report?

10:09:31   5   BY MR. NICHOLAS:

6   Q    All right.  Now, this is a PowerPoint that Exxon produced,

7   correct?

8   A    Yes, sir, that's correct.

9   Q    And this PowerPoint is -- was for its own internal purposes

10:09:54  10  or was this for the purposes of this lawsuit?

11  A    This was an internal purpose.

12  Q    And this is a -- this was a root cause analysis that Exxon

13  performed on Emissions Event 159900?

14  A    Yes, sir, that's correct.

10:10:11  15  Q    And actually, before we get into this, there was a question

16  yesterday about whether the emissions from that pinhole leak

17  were -- were at ground level.  In fact, those were 50 feet up;

18  is that right?  The emissions?

19  A    I believe they were on a -- the pipe is on an elevated

10:10:32  20  platform.  Yes, sir, I think that's correct.

21  Q    And the elevated platform is about 50 feet above the

22  ground; is that right?

23  A    I don't know the height, but I believe that's correct.

24  Q    All right.  Now -- okay.  Do we have the date here?  Yes.

10:10:50  25  All right.  So this is a December 19, 2011, root cause analysis

Kovacs - Redirect/Nicholas

1   of that pinhole leak that we just saw, right?

2   A     Yes, sir, that's correct.

3   Q     And is it standard operating procedure for Exxon to make

4   PowerPoints in response to emission events?

10:11:08   5   A     It depends on the event, on the site, and on the way the

6   investigation summary is communicated or documented.

7   Q     Was this document given to TCEQ?

8   A     I do not know.

9   Q     Is it standard operating procedure to give a root cause --

10:11:27   10   an internal root cause analysis to TCEQ?

11   A     What I would say is all information asked for at TCEQ

12   during the time of their investigation would be provided.  If

13   this investigation happened after the TCEQ investigation, well,

14   then it wouldn't be possible to provide it because it didn't

10:11:48   15   exist at the time.

16   Q     So after the investigation is concluded and Exxon gets more

17   information on the root cause of an emission event, you don't

18   give it to TCEQ?

19   A     No, sir, that's not what I said.  What I said was I don't

10:11:58   20   know when the TCEQ investigation was conducted relative to this

21   one.

22   Q     Well, let me go back.  See -- well, this says up here

23   "ExxonMobil Proprietary."  What does that mean?

24   A     It means that it contains information that would be

10:12:14   25   proprietary, potentially proprietary to our operations.

Kovacs - Redirect/Nicholas

1  Q    All right.  But, now --

2  A    But that would not preclude us from sharing it with the

3  TCEQ.

4  Q    Okay.  Now, again can you recall any instance where Exxon

10:12:29  5  shared a proprietary root cause analysis PowerPoint with TCEQ?

6  A    Yes.  I can't think of a specific -- a specific instance;

7  but as part of my responsibility as the environmental supervisor

8  for release reporting, we do provide them, if confidential,

9  information under privilege stamp or confidential stamp so that

10:12:53  10  they can review those investigations.

11  Q    And you actually give them the PowerPoints?

12  A    Yes, sir.

13  Q    Okay.  But you don't know whether this PowerPoint was given

14  to them?

10:13:00  15  A    That's correct.

16  Q    All right.

17        MR. NICHOLAS:  Can we go to the investigation report.

18  BY MR. NICHOLAS:

19  Q    All right.  Now this is the investigation report from that

10:13:27  20  event.

21        MR. NICHOLAS:  And this is -- can you tell me what

22  page it is on?  This is still within DX20W; is that right?

23        MS. MARY ROCK:  Uh-huh.

24  BY MR. NICHOLAS:

10:13:48  25  Q    All right.  And we're on 174841 and what does the

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Kovacs - Redirect/Nicholas

1   investigation report say?  Can you read that out loud.

2   **A**    "Exxon was unable to determine why this spot had corroded."

3   **Q**    Okay.  But in fact, you had determined why that spot had

4   corroded, correct?

5   **A**    I think that sentence is consistent with our incident

6   investigation.

7   **Q**    Well, actually, didn't you -- didn't you tell the Court

8   yesterday that it turned out that the -- there was a coating

9   problem and that's why the spot had corroded?

10  **A**    No.  I think what the investigation report said was that

11  there was a coating that was applied appropriately but the

12  coating failed and there was no indication as to why that

13  protective coating failed.

14  **Q**    That's what you're saying that says?

15  **A**    Yes, sir.

16  **Q**    Okay.  Now, Mr. Kovacs, is smoking allowed at the process

17  units at the Baytown Complex?

18              MR. NICHOLS:  Your Honor, I'll object to relevance.

19              THE COURT:  What's the relevance?

20              MR. NICHOLAS:  I'm going to go to ignition sources.

21              MR. NICHOLAS:  Your Honor, we're here for an emissions

22  events analysis under the Clean Air Act.  There's no relevance

23  to asking about protocols with respect to smoking at the Baytown

24  Complex.

25              MR. NICHOLAS:  I'm leading up to a discussion of a

Gayle Dye, CSR, RDR, CRR - 713.250.5582

10:14:06 (line 5)
10:14:18 (line 10)
10:14:34 (line 15)
10:14:59 (line 20)
10:15:13 (line 25)

Kovacs - Redirect/Nicholas

1   specific incident that Mr. Nichols --

2           THE COURT:  What kind of smoking?  People smoking?

3           MR. NICHOLAS:  Cigarettes, yeah.

4           THE COURT:  Sustain the objection.

10:15:23   5           MR. NICHOLAS:  All right.

6   BY MR. NICHOLAS:

7   **Q**    Now, there are flammable gasses on site at the Baytown

8   Complex, correct?

9   **A**    Yes, sir.

10:15:34  10   **Q**    And the complex takes certain precautions to prevent

11   ignition of those flammable gasses on site, correct?

12   **A**    Yes, sir.

13   **Q**    And could you just tell the Court what -- what types of

14   prevention measures the complex takes to prevent ignition of the

10:15:56  15   flammable sources?

16   **A**    Ignition sources are not allowed in process areas.

17   Potential ignition sources are not allowed in process areas.

18   **Q**    And could you please just tell the Court what -- what are

19   some of the potential ignition sources that are not allowed in

10:16:16  20   the process areas in the Baytown Complex?

21   **A**    Vehicles, anything that has a potential ignition source.

22   So for example, our -- our personnel will carry pagers.  The

23   pagers are required to be intrinsically safe, which means that

24   they do not have the potential as an ignition -- as a -- as a

10:16:41  25   source.

Kovacs - Redirect/Nicholas

1  Q    And a car is not allowed in because, if you turn the car

2  on, that's an ignition possibility?

3  A    An automobile in itself is not a potential ignition source.

4  So -- but it is a -- it is a precaution to keep vehicles out of

10:17:08  5  operating areas.

6  Q    Now, there's a lot of discussion yesterday about a

7  smoldering board.  Do you recall?

8  A    Yes, sir.

9  Q    A smoldering board is a potential ignition source, correct?

10:17:21  10  A    Yes, sir.

11  Q    You're concerned about a smoldering board in the Baytown

12  Complex, correct?

13  A    Yes, sir.  To -- yes, sir.

14  Q    And you're concerned about a smoldering board in the

10:17:45  15  Baytown Complex because it's a potential ignition source,

16  correct?

17       MR. NICHOLS:  Your Honor, again, I'll object to

18  relevance.  It has nothing to do with the air emission claims

19  that the Plaintiffs are making in the case.

10:17:58  20       THE COURT:  Overruled.

21       THE WITNESS:  A smoldering board is a potential

22  ignition source, yes, sir.

23  BY MR. NICHOLAS:

24  Q    You're concerned about a smoldering board because it's a

10:18:18  25  potential ignition source, correct?

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Kovacs - Redirect/Nicholas

1           MR. NICHOLS:  Your Honor, the question has been asked

2  and answered.

3           THE COURT:  Sustained.

4  BY MR. NICHOLAS:

10:18:26  5  **Q**   Now if a gas -- flammable gas is ignited at the

6  petrochemical -- at the Baytown Complex, that could cause

7  additional problems, correct?

8  **A**   I think we're starting to have a safety discussion that's

9  getting outside of my area of expertise.

10:18:45  10           MR. NICHOLS:  Also object to relevance, your Honor.

11           THE COURT:  Well, he said it's outside of his area.

12  BY MR. NICHOLAS:

13  **Q**   Now, just as you're concerned about a smoldering board

14  being an ignition source at the Baytown Complex, can we agree

10:19:01  15  that community members in Baytown should be concerned about a

16  smoldering board at the Baytown Complex?

17           MR. NICHOLS:  Objection, your Honor.  Calling for

18  complete speculation on behalf of this witness about what

19  community members would be -- would be concerned about.

10:19:17  20           THE COURT:  Read the question back.  I just want one

21  portion that I'm looking for.

22     (The last question was read.)

23           THE COURT:  Sustain the objection.

24  BY MR. NICHOLAS:

10:19:53  25  **Q**   As far as you're concerned, should there ever be a

Kovacs - Redirect/Nicholas

1   smoldering board on site at the Baytown Complex?

2           MR. NICHOLS:  Your Honor, the question has been asked

3   and answered.  It's repetitive.

4           THE COURT:  Overruled.

10:20:03   5           THE WITNESS:  Could you repeat the question, please.

6           MR. NICHOLAS:  Could you read --

7           THE COURT:  All right.  Now, wait a second.  We got to

8   start moving this along.  Okay.

9                   You need to answer right away.

10:20:11  10                   And make your questions more pointed.  Okay.

11   You're entitled to go into this area, but too much delay on each

12   side.  Let's move it along.  Ask it again, sir.

13           MR. NICHOLAS:  Can you repeat the question.

14     (The last question was read.)

10:20:39  15           THE WITNESS:  Our goal is to prevent --

16           THE COURT:  Yes or no.  Or if you can't answer it yes

17   or no, state it, that you can't answer yes or no.

18           THE WITNESS:  I can't answer that question yes or no.

19   BY MR. NICHOLAS:

10:20:48  20   Q    As far as you're concerned, should there ever be a fire at

21   the Baytown Complex?

22   A    I can't answer that question as a yes or no.

23   Q    All right.  We also talked about hurricanes yesterday.

24   A    Yes, sir.

10:20:58  25   Q    And you had, with Mr. Nichols, gone through some of the

Kovacs - Redirect/Nicholas

```
          1   disaster proclamation from the governor.  Do you recall that?

          2   A    Yes, sir, I do.

          3   Q    And you read out --

          4        THE COURT:  Is that from the governor?

10:21:14  5        MR. NICHOLAS:  Yes.

          6        THE COURT:  The one from the governor?

          7        MR. NICHOLAS:  Yes.

          8   BY MR. NICHOLAS:

          9   Q    And you read it or, I guess, it was shown on the screen,

10:21:22 10   correct?

         11   A    Yes, sir.

         12   Q    Now, before this lawsuit, had you ever seen that -- that

         13   proclamation?

         14   A    Yes, sir.

10:21:27 15   Q    You did?

         16   A    Yes, sir.

         17   Q    As part of your job, right?

         18   A    Yes, sir.

         19   Q    All right.  And as a matter of fact, he showed you two

10:21:34 20   documents relating to the governor's proclamation, correct?

         21   A    Yes, sir.

         22   Q    But there were more, weren't there?  Were there more

         23   documents relating to the Hurricane Ike disaster proclamation?

         24   A    I do not recall.

10:21:55 25   Q    You would have read it as part of your job, though.  It's
```

Kovacs - Redirect/Nicholas

1    in the environmental section, right?

2              MR. NICHOLS:  Your Honor, read -- read what?  I'll

3    object.

4              THE COURT:  Any addendums or additional documents

10:22:09  5    attached to the two ordered by the governor.  That's what he's

6    asking about.  Were there any, did he read them?

7              THE WITNESS:  So there may have been more, but my

8    responsibility as the environmental supervisor was not to worry

9    about the disaster.

10:22:25  10              THE COURT:  Hold it.  Hold it.  Yes or no?  If you

11    can't -- we understand that there may be more that you may not

12    be aware of.  But if it's an answer yes or no, yes or no or you

13    can't answer it yes or no.

14                   By the way, "Can't answer it yes or no" is not

10:22:38  15    evading the question.  I understand that.  Sometimes the jury

16    doesn't.  But I understand that.  The precise wording you

17    disagree with, so you can't answer it yes or no.

18              THE WITNESS:  Yes, your Honor.

19              THE COURT:  Is that your position on that last

10:22:49  20    question?  Now you want that read back.  All right.  Me, too.

21              THE WITNESS:  No -- the answer -- it's not a yes-or-no

22    question.  I can answer that, your Honor.

23              MR. NICHOLS:  Can I have the ELMO activated, please?

24              THE COURT:  Sure.

10:23:05  25    //

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Kovacs - Redirect/Nicholas

1  BY MR. NICHOLAS:

2  **Q**    All right.  This is Plaintiffs' Exhibit 578.

3           THE COURT:  I think the projector has to turn on

4  eventually.

10:23:18  5      (Discussion off the record.)

6  BY MR. NICHOLAS:

7  **Q**    All right.  This is Plaintiffs' Exhibit 578.  It is the

8  "Regulatory Guidance in Response to Hurricane Ike from the

9  Executive Director of the Texas Commission on Environmental

10:23:30  10  Quality," colon, "Air."

11           Sir, have you ever read this document?

12  **A**    I do not recall.

13  **Q**    All right.  Let's take a look at the third page of

14  Plaintiffs' Exhibit 578.  I want you to read the highlighted

10:23:48  15  portions out loud.

16  **A**    "What should I do if I need to temporarily exceed maximum

17  allowable emission rates or temporarily increase production,

18  capacity or throughput stated in my authorization?"

19           "In no event shall authorized regulated entities

10:24:08  20  create conditions of air pollution or exceed national ambient

21  air quality standards."

22  **Q**    All right.  And you recall that air pollution is defined in

23  the Texas statute, correct?  Didn't we go over that?

24  **A**    Yes, sir, we did.

10:24:21  25  **Q**    All right.  And this is the definition of air pollution.

Kovacs - Recross/Nichols

1   And could you just read that out loud?

2   A     Yes, sir.

3               "Number 3:  Air pollution means the presence in

4   the atmosphere of one or more air contaminants or combination of

10:24:33   5   air contaminants in such concentration and of such duration

6   that, 'A,' are or may tend to be injurious to or to adversely

7   affect human health or welfare, animal life, vegetation or

8   property or, 'B,' interfere with the normal use or enjoyment of

9   animal life, vegetation or property."

10:24:58   10   Q     Thank you.

11               MR. NICHOLAS:  No further questions.

12               MR. NICHOLS:  Just very briefly, your Honor.

13               Could we switch over to our side of the computer,

14   sir?

10:25:07   15               I want you to put up Slides -- these are Slides

16   1002, in evidence.

17         (Discussion off the record.)

18                       RECROSS EXAMINATION

19   BY MR. NICHOLS:

10:25:54   20   Q     We're looking at 1002 exhibit and this was an exhibit, I

21   believe, that Mr. Nicholas showed you late yesterday, correct?

22   A     Yes, sir, I do recall that.

23   Q     And he started asking you some questions about improvement

24   trends, based on this slide.  Do you recall that?

10:26:09   25   A     Yes, sir, I do.

Kovacs - Recross/Nichols

1   Q     So do you recall when it was that the Plaintiffs in this

2   case provided notice that they intended to sue the ExxonMobil

3   Defendants in this citizen suit?

4   A     Yes, sir.  It was late November, 2009.

10:26:26   5   Q     So in terms of this trend line that the Court can see,

6   we're about halfway through the trend line as to when the

7   Plaintiffs provided notice, correct?

8   A     Yes, sir, that's correct.

9   Q     And then Mr. Nicholas started asking questions about -- I

10:26:41   10   think, about the percentage of improvement that had occurred

11   between 2005 and that time versus what's happened after?

12   A     Yes, sir, that's correct.

13   Q     So just tell the Court, in your experience, working out

14   there since 2005, had the Baytown Complex made significant

10:27:00   15   improvement with respect to the number of reportable events

16   complex-wide between 2005 and the time that Plaintiffs in this

17   case first provided notice of their intent to sue?

18   A     Yes.  From 2005 all the way up through the end of 2009,

19   there was significant improvement.

10:27:21   20   Q     And had that improvement continued since that notice was

21   received?

22   A     Yes, sir.  And that trend line continues on a relatively

23   linear basis.

24   Q     In your experience, out there working every day, boots on

10:27:32   25   the ground, Baytown Complex from 2009 forward, from where you

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Kovacs - Recross/Nichols

1    sit, Mr. Kovacs, is that continued improvement a result of the

2    Plaintiffs telling ExxonMobil Defendants that they're going to

3    get sued?

4    **A**    No, sir, it is not.

10:27:45    5    **Q**    What is it attributable to?

6    **A**    Our environmental business plans and our corporate policies

7    that drive continuous improvement year over year.

8    **Q**    Now, you were also asked certain questions by Mr. Nicholas

9    about penalties and whether -- you know, if you got fined

10:28:02    10   $37,500 for a report being late, whether you would -- that would

11   eliminate it.  If -- if someone were to give you a $37,500 fine

12   if that would stop reports from being late ever in the future?

13   **A**    I recall that, yes, sir.

14   **Q**    Mr. Kovacs, is it abundantly clear to everybody in this

10:28:20    15   courtroom that you have a difficult time with -- the kind of

16   person you are, with your education and training, that you are

17   not perfect?

18   **A**    Yes, sir.  I think that's obvious.

19   **Q**    And is -- is -- does that personal feeling that you have --

10:28:37    20   just describe to the Court, in your own words, how that relates

21   to the continuous improvement culture that you've talked about.

22   **A**    Well, put simply, the motivation to continue to improve

23   isn't related to the size of the fine.  The motivation to

24   continue to improve is based on our corporate business plans and

10:28:57    25   our corporate -- corporate policies and our desire to get

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Kovacs - Recross/Nichols

1    better.

2    **Q**    Now, are you telling this Court -- as hard as it is for you

3    to admit this, are you telling the Court that the ExxonMobil

4    Baytown Complex will be perfect in its compliance with respect

10:29:21    5    to filing reports, that every human being will be perfect in the

6    future?

7    **A**    I accept that we will not be.

8    **Q**    Now, with respect to other questions that you were asked

9    late yesterday, as the Judge just said, sometimes you can't

10:29:39    10    answer questions yes or no based on the wording of the question.

11    Did you hear the Court --

12    **A**    Yes, sir, I did.

13    **Q**    -- tell you that?

14            Now with respect, there were certain questions

10:29:49    15    asked last night when Mr. Nicholas was asking you questions

16    about, you know, don't you want clean air, don't you want to

17    breath clean air, all that kind of stuff, you couldn't answer

18    certain of those questions yes or no.

19    **A**    I recall that, yes, sir.

10:30:02    20    **Q**    So explain to the Court, in your own words, not restricting

21    you to a yes-or-no answer, why you can't answer those types of

22    questions in a case like this yes or no.

23            MR. NICHOLAS:  Objection.  He's not refer --

24    Mr. Nichols is not referring to any specific questions.

10:30:19    25            THE COURT:  I understand that.  I'll let him do it on

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Kovacs - Recross/Nichols

1    a general policy matter.  I understand.  Thank you.

2              THE WITNESS:  So yesterday afternoon, I was asked

3    questions about air quality and there was an underlying

4    assumption in there that -- that didn't allow for a yes-or-no

10:30:31   5    answer?

6    BY MR. NICHOLS:

7    Q    What was the underlying assumption?

8    A    The underlying assumption was that there was -- there was

9    no standard applied, that the only appropriate standard would be

10:30:43  10    no air emissions.

11   Q    No -- no pollutants in the air?

12   A    Correct.

13   Q    And is that a standard, in terms of your background and

14   experience, that you feel comfortable saying that air that has

10:31:00  15    no pollutants is the only standard available?

16   A    No.  My standard would be what the agency's standard is.

17   Standard of air quality that is protective of human health and

18   the environment.

19   Q    Now, you were asked certain questions about the -- this

10:31:20  20    morning about the hurricane events, correct?

21   A    Yes, sir.

22   Q    And you were asked to review a very specific part of

23   Exhibit 578.

24             MR. NICHOLS:  And could we actually ask you guys to

10:31:29  25    put that up because I think the copy we got from you is not what

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Kovacs - Recross/Nichols

1   was shown to the Court.

2            MS. MARY ROCK:  We have a copy right here.

3            MR. NICHOLS:  So if we look at the -- your Honor, if I

4   could have the --

10:31:55  5            THE COURT:  We got it.

6   BY MR. NICHOLS:

7   **Q**   So you were asked to look at specific language.  "What

8   should I do if I need to temporarily exceed maximum allowable

9   emission rates?"

10:32:07  10  **A**   Yes, sir.

11  **Q**   This last part, it doesn't relate, right?  You weren't

12  temporarily increasing your production, capacity or throughput

13  during Hurricane Ike, right?

14  **A**   Yes, sir, that is correct.  That would not have applied to

10:32:20  15  our situation.

16  **Q**   You shut it down, right?

17  **A**   Yes, sir.

18  **Q**   All right.  So "If the exceedance is directly related to

19  disaster prevention or response, no prior approval is

10:32:30  20  necessary."

21            Is that what that provided?

22  **A**   Yes, sir, that's what that says.

23  **Q**   Is that consistent with your understanding of how

24  regulatory authorities acted during Hurricane Ike?

10:32:41  25  **A**   Yes, sir, it is.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Kovacs - Recross/Nichols

1    Q    "The owner or operator shall keep records of the activity,

2    including the amount and times of emissions, and shall submit

3    those records as soon as practicable to the TCEQ regional office

4    that serves the county in which the facility is located."

10:32:58    5                    Did I read that correctly?

6    A    Yes, sir, you did.

7    Q    And did the Baytown Complex keep records of the activities

8    that were engaged in during Hurricane Ike?

9    A    Yes, sir, we did.

10:33:09    10    Q    Did the Baytown Complex submit those records as soon as

11    practicable to the TCEQ regional office, the Houston regional

12    office, that serves Harris County in which the Baytown Complex

13    is located?

14    A    Yes, sir, we did.

10:33:25    15    Q    And -- and what happened as a result of your submitting

16    those records?  Did the TCEQ take any kind of administrative or

17    enforcement action in response to you-all doing what you needed

18    to do to shut that facility down in the wake of that large

19    storm?

10:33:46    20    A    No, sir, they did not.

21    Q    And so you under -- you understand that what the Plaintiffs

22    are doing now is coming back behind what the TCEQ did during the

23    storm and are now asking for a penalty that the TCEQ did not

24    seek for the reasons we've discussed?

10:34:08    25                    MR. NICHOLAS:  Objection.  Leading.


Gayle Dye, CSR, RDR, CRR - 713.250.5582

Kovacs - Recross/Nichols

1          THE COURT:  Overruled.

2          THE WITNESS:  Yes, sir I understand that.

3   BY MR. NICHOLS:

4   **Q**    And just to make sure the record is clear, in terms of

10:34:20   5   witnesses that the Court may be hearing from shortly, with

6   respect to those incident reports that are -- that are out

7   there, have those been submitted in discovery to the Plaintiffs?

8   **A**    Yes, sir, they have.

9   **Q**    So have the Plaintiffs and their experts had access to

10:34:39  10   those detailed root cause analyses?

11   **A**    Yes, sir, they have.

12   **Q**    And do those root cause analyses set forth the detailed

13   investigations, the internal investigations, that demonstrate

14   not only root cause but the process by which the Baytown Complex

10:34:56  15   gets to the root cause of incidents?

16   **A**    Yes, sir, they do.

17          MR. NICHOLS:  Pass the witness.

18          MR. NICHOLAS:  No further questions.

19          THE COURT:  You may step down.  You're excused.

10:35:42  20   You're free to leave.  You may remain in the courtroom if you

21   like, but you're free to leave.

22          MR. NICHOLS:  Your Honor, the only thing I'll say,

23   there's always a possibility he will be recalled.  So out of an

24   abundance of caution, we're going to actually keep him under the

10:35:52  25   rule.

Kovacs - Recross/Nichols

1          THE COURT:  It has to be on something that was not --

2          MR. NICHOLS:  Yes, sir.

3          THE COURT:  -- was not covered.

4          MR. NICHOLS:  Yes, sir.

10:35:56   5          THE COURT:  All right.

6               Remain under the rule then.

7               Before I forget, as I mentioned, I guess, last

8   week, on Friday we begin at 11:30 in the morning, okay?  Fridays

9   we begin at 11:30 in the morning.

10:36:07   10              Also, let me ask The plaintiff this -- and I'm

11  sure -- I'm pretty sure I know it; but the burden of proof,

12  what's the burden of proof that you have to prove each element

13  of your request by?  Is it -- it's by a preponderance of the

14  evidence, I would assume.

10:36:24   15          MR. NICHOLAS:  Yes, I believe so, your Honor, although

16  it's a strict liability statute.

17          MR. NICHOLS:  That doesn't affect the burden of proof.

18          THE COURT:  Okay.  What -- all right.  Proof of the

19  underlying -- of the underlying causes.  In other words, let's

10:36:36   20  say, on strict liability or whatever, you got to show some

21  facts, right?  You got to show something that now fits into

22  that?

23          MR. NICHOLAS:  Correct.

24          THE COURT:  Okay.

10:36:44   25          MR. NICHOLAS:  Correct.  And of course, we're doing

Kovacs - Recross/Nichols

1    that by -- with the records.

2              THE COURT:  Again, the question is you agree burden of

3    proof is a -- I have a hybrid case -- this is a -- a hybrid --

4              MR. NICHOLAS:  Oh, no.  This is a -- this is a -- it's

10:36:59  5    a preponderance of the evidence and a strict liability case

6    except for whatever affirmative defenses.

7              THE COURT:  That's what I got next; but as far as

8    you're concerned, I just want to make sure that there's no, you

9    know, clear and convincing or whatever sneaking in there to

10:37:14  10    certain elements.

11              MR. NICHOLAS:  Right.  The traditional -- it's the

12    same burden --

13              THE COURT:  You can't say it's a run-of-the-mill civil

14    case, but I understand.

10:37:22  15              MR. NICHOLAS:  It is a preponderance of the evidence

16    except for the burden shifts on things like the hurricanes, the

17    affirmative defenses.  That's not our burden.

18              THE COURT:  On the affirmative defenses, burden of

19    proof is?

10:37:33  20              MR. NICHOLS:  Preponderance of the evidence, Judge.

21              THE COURT:  Just want to make that clear because

22    sometimes in these technical statutes, looks like punitive

23    damages or whatever, it rises just a click up.

24                   All right, call your next witness.

10:37:50  25              MR. KRATKA:  Plaintiffs call Keith Bowers.

Bowers - Direct/Kratka

1                    And your Honor, for this witness, there will be a

2    number of exhibits in Notebooks 18 and 19.  It may be easier --

3                    THE COURT:  Okay.  I'll pull them as soon as --

4                    You've already been sworn, sir; is that correct?

10:38:18   5    Have you been sworn?

6                    THE WITNESS:  No, sir.

7                    THE COURT:  All right.  Raise your right hand to be

8    sworn, sir.

9            (The witness, **KEITH EVANS BOWERS**, called on behalf of the

10:38:23  10   Plaintiffs, was sworn.)

11                   THE COURT:  Go right ahead.

12                   MR. KRATKA:  Thank you.

13                              DIRECT EXAMINATION

14   BY MR. KRATKA:

10:38:33  15   **Q**    State your name for the record, please.

16   **A**    My name is Keith, middle initial E. for Evans, last name

17   Bowers, B-o-w-e-r-s.

18   **Q**    And Mr. Bowers, have you been retained by the Plaintiffs in

19   this case to provide expert testimony?

10:38:48  20   **A**    I have.

21   **Q**    And are you being paid by the Plaintiffs for your work in

22   this case?

23   **A**    I have.

24   **Q**    And what is the hourly rate you're being paid?

10:38:55  25   **A**    It's $100 per hour.

Bowers - Direct/Kratka

1    Q    And are you an engineer?

2    A    I am.

3    Q    What type of engineer are you?

4    A    My degree is in chemical engineering.  That has been one of

10:39:03    5    the major areas of my practice.

6    Q    And have you also practiced as a process engineer?

7    A    I have, yes.

8    Q    I'm just going to give you a copy of Plaintiffs'

9    Exhibit 432, which is your curriculum vitae.

10:39:32    10             Mr. Bowers, I'm going to give you, also, a copy

11    of Notebooks 18 and 19.

12             THE COURT:  Again, what was the number for the CV?

13             MR. KRATKA:  Plaintiffs' Exhibit 432.

14             THE COURT:  Give me one second.

10:39:47    15             MR. KRATKA:  Yes, that's in 19.

16             THE COURT:  Okay.  Got it.

17    BY MR. KRATKA:

18    Q    And this is -- is this a current version of your CV?

19    A    No, sir.  It does not include my expert witness in a trial

10:40:09    20    against British Petroleum --

21    Q    Okay.

22    A    -- in Texas City.

23    Q    All right.  We'll get to that and I'll ask you about

24    that --

10:40:14    25             THE COURT:  Where was that case?  What court?  State

Bowers - Direct/Kratka

1   or Federal?

2                THE WITNESS:  Galveston.

3                THE COURT:  Galveston?  State or Federal?

4                THE WITNESS:  State.

10:40:21  5        THE COURT:  State court?

6                THE WITNESS:  Yes, it was.

7                THE COURT:  Okay.

8   BY MR. KRATKA:

9   **Q**    And this CV was attached as Exhibit 2 to your supplemental

10:40:31  10  expert report in this case?

11  **A**    Yes, sir.

12  **Q**    And you said you hold a degree in chemical engineering.

13  From what college did you earn the degree?

14  **A**    That McNeese State University in Lake Charles, Louisiana.

10:40:45  15       THE COURT:  Having spent time at Fort Polk, I'm well

16  familiar with Lake Charles, Louisiana.  That was -- that was a

17  couple steps up from Leesville, even though you went south.

18  BY MR. KRATKA:

19  **Q**    And what did -- what year did you receive your degree?

10:40:58  20  **A**    1969.

21               THE COURT:  All right.  Hang on a second.  Off the

22  record.

23       (Discussion off the record.)

24  BY MR. KRATKA:

10:41:36  25  **Q**    And can you just describe for the Court, briefly, what

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Direct/Kratka

1  chemical engineering covers.

2  **A**    Chemical engineering is concerned with, if you will, the

3  chemistry -- I hate to use the same word.  But what goes on

4  inside the pipes in a refinery or chemical plant.  We determine

10:41:54  5  how much of what constituent and component is supposed to be

6  there and not supposed to be there.

7  **Q**    And your -- and in your career work, you stated that you

8  actually practice as a process engineer.  How is that -- how

9  does that differ, if at all?

10:42:12  10  **A**    Well, a process engineer is, if you will, a subpart of the

11  general field of chemical engineering.  It's like a thoracic

12  surgeon and a surgeon.  It's related specifically to calculating

13  the flow rates, pressures, and temperatures inside the pipes of

14  a process unit -- a facility that makes something.

10:42:31  15  **Q**    So is chemical engineering focused on a specific real world

16  situation?

17  **A**    It is.

18  **Q**    And did you take any post-graduate courses in engineering

19  or related fields?

10:42:41  20  **A**    Yes, sir, I did.

21  **Q**    And what post-graduate courses did you take?

22  **A**    They were advanced courses in heat transfer, momentum

23  transfer, and mass transfer.

24  **Q**    And are those courses related to -- have any relation to

10:42:55  25  the operation of chemical plants or refineries?

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Direct/Kratka

1  A    Yes, sir.  In these -- in these courses you're taught

2  advanced techniques, post-graduate level, of calculating

3  chemical reactions, viscosities, pressure drop, the rate of flow

4  through a membrane.

10:43:14  5  Q    And after completing your education, did you work as an

6  engineer?

7  A    Yes, sir.

8  Q    Your CV says, on page 1, that you have over -- I believe

9  it's on page 1, yes -- that you have over 50 years of experience

10:43:31  10  in the hydrocarbons industries --

11  A    Yes, sir.

12  Q    -- is that correct?

13  A    Yes, sir.

14  Q    And what did the hydrocarbons industries include?

10:43:37  15  A    Hydrocarbons industries includes everything from expiration

16  for hydrocarbons, liquid hydrocarbons, generally, liquid or

17  gas -- it's natural gas, oil.  I have some experience with coal,

18  exploration for it, processing and I guess that's about it.

19  Q    Does it cover the refining of those?

10:43:57  20  A    Oh, yes, sir.  That's one of the core subjects there.

21  Q    Okay.

22  A    There are more chemical engineers employed in refining than

23  in any other area.

24  Q    And you co-wrote a text book on petroleum refining?

10:44:11  25  A    I did.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Direct/Kratka

1    Q    When was that published?

2    A    I don't know.  Let me think.  Several years ago.  Published

3    in March of 1920, it was published on a CD ROM.

4    Q    In March of?

10:44:22  5         THE COURT:  1920?

6    BY MR. KRATKA:

7    Q    1920, maybe that was --

8    A    No.  No.  March of 2000.  I'm not that old, not that old.

9    Q    And who was it published by?

10:44:31  10   A    It was published by the American Institute of Chemical

11   Engineers.

12   Q    And who was the target audience of this textbook?

13   A    It was chemical engineers that were working in the

14   hydrocarbons industry.  And also, non-engineers would learn a

10:44:47  15   lot from it, as well.

16   Q    And --

17        THE COURT:  Some light reading?

18        THE WITNESS:  Oh yes, sir.  It had some history of the

19   industry and, you know, pictures and --

10:44:54  20        THE COURT:  History book, too, huh?

21        THE WITNESS:  Yes, sir.

22   BY MR. KRATKA:

23   Q    Was it -- was it also about the actual process of petroleum

24   refining?

10:45:01  25   A    Yes, sir.  It described in general terms, in layman's

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Direct/Kratka

1  language, if you will, what goes on in each of the process units

2  in a refinery.

3  Q    Okay.  And now, are you currently retired as a practicing

4  engineer?

10:45:12  5  A    Well, I try to be.  Yes, sir.

6  Q    And since when was your putative retirement?

7  A    Oh, goodness.  I'm trying to remember.  It's been five or

8  six years now.  Time passes when you get old.

9  Q    And have you done any consulting work since you retired?

10:45:31  10  A    Yes, sir, I have.

11  Q    And has any of your consulting work been for refineries?

12  A    No, sir.  It's been mostly against refineries.  Well, I

13  take that back.  There's some for refineries, yes.  A small

14  amount.  A small amount of consulting for refineries.

10:45:45  15  Q    And have you done any consulting work on emission or safety

16  issues at refineries or chemical plants?

17  A    I have.

18  Q    And do you do anything to keep current with developments in

19  the hydrocarbons industry since your retirement?

10:45:59  20  A    Yes, sir.  I read, extensively, the literature of the

21  field.

22  Q    And have you been a member of any --

23        MR. KRATKA:  Strike that.

24  BY MR. KRATKA:

10:46:09  25  Q    When you were a practicing engineer, did you hold an

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Direct/Kratka

1  engineering certificate?

2  **A**    No, sir, I did not.  I elected not to become a registered

3  engineering for liability reasons.

4  **Q**    Did you -- were you a member of any professional

10:46:22  5  engineering organizations?

6  **A**    Yes, sir, I was.

7  **Q**    Can you describe which ones?

8  **A**    Well, I was active in the American Institute of Chemical

9  Engineers on both a national level and a local level.  The

10:46:36  10  Houston chapter was, by far, the largest in the world.

11  **Q**    Were you also a member of the Project Management Institute?

12  **A**    Yes, sir.  I was one of the early adopters of that

13  technology, that body of knowledge.

14  **Q**    And could you describe what the Project Management

10:46:51  15  Institute is?

16  **A**    The PMI, as it's known, was formed to formalize and provide

17  a curriculum, if you will, of what are the basic skills that a

18  project manager should hold and be knowledgeable in.  This

19  includes budgeting, scheduling, personnel, contract matters,

10:47:13  20  negotiation.  The whole field of -- and it wasn't specific to

21  refining.  It covered all industries, like software development.

22  It was the basic fundamental techniques of being a project

23  manager.

24  **Q**    Okay.  And before going into more detail on your specific

10:47:29  25  experience within the hydrocarbons industry, I want to just

Bowers - Direct/Kratka

1    first ask you a few very basic questions to sketch out the

2    general subject matter area of your opinions in this case so

3    that the course -- so that the Court can assess the relevance of

4    your work experience to what you've done here.

10:47:46  5  **A**    May I add something, sir?

6  **Q**    No.  I'll -- I'll get -- I'll cover that.

7  **A**    This goes back to a further -- an earlier question I didn't

8    answer correctly.

9  **Q**    Which question was it that you didn't --

10:47:55  10  **A**    Did I work for refineries?  And I think I stated, no, I

11    worked against them; and that's not true.

12  **Q**    Can you give a --

13  **A**    I -- I worked as an expert witness in a legal action that

14    was against something that happened in the refinery.  So I

10:48:11  15    focused on the facts and not the company.

16  **Q**    So you did not consider yourself to be in an adverse

17    position to the refinery?

18  **A**    No, sir.  No, sir.

19  **Q**    Okay.  Thank you for clarifying.

10:48:23  20                Now, the Plaintiffs for this case hired you to

21    evaluate emission events that have occurred at the Baytown

22    Complex, correct?

23  **A**    Correct.

24  **Q**    And as an engineer, how would you describe your

10:48:35  25    understanding of what an emission event is?

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Voir Dire/Nichols

1    A    An emission event as -- you know, the law defines it; but I

2    look at it as something that's not supposed to be there, that

3    got loose.  Put it in layman's language, it escaped.

4    Q    Something -- you mean something that --

10:48:51    5    A    Something that was harmful in one way or another led to the

6    pollution called smog.  It led to harm to people, the quality of

7    life.

8              MR. NICHOLS:  Judge --

9              THE COURT:  Yes, sir.

10:49:02    10              MR. NICHOLS:  -- may I take the witness on voir dire?

11              THE COURT:  Go on.

12                        VOIR DIRE EXAMINATION

13    BY MR. NICHOLS:

14    Q    Mr. Bowers, you are not a toxicologist, correct?

10:49:11    15    A    That's correct, Mr. Nichols.

16    Q    You are not an air dispersion modeler, correct?

17    A    Correct.

18    Q    And so with respect to your views of what is or is not

19    harmful, you are not an expert here to present testimony about

10:49:31    20    whether particular emission events involved in this case caused

21    any harm to human health and the environment, correct?  That's

22    not your --

23    A    That's a long question.  Could you shorten it, please?

24    Q    Sure.

10:49:43    25              Your area of expertise is not in the area of

Bowers - Direct/Kratka

1  whether particular amounts of emissions caused harm to human

2  health or environment, correct?

3          MR. KRATKA:  Your Honor, we would agree that

4  Mr. Bowers is not being put forward as a toxicologist or a

10:49:58  5  medical expert to talk about health effects of particular

6  pollutants.  That's correct.

7          MR. NICHOLS:  Well, then I would move to strike

8  whatever testimony he just gave about emissions being harmful.

9  That was what caused me to get to my feet.

10:50:10  10         THE COURT:  All right.  It's sustained to that extent.

11  I understand.

12         MR. NICHOLS:  Great.

13                  DIRECT EXAMINATION

14                    (continued)

10:50:14  15 BY MR. KRATKA:

16 Q    So in other words, you're saying an emission event involves

17 the escape of liquids or gasses contained -- that should be

18 contained at a refinery or chemical plant?

19 A    Correct.

10:50:23  20 Q    And in the industry or even in proper parlance, are

21 emission events sometimes referred to as "upsets"?

22 A    An upset can cause an emission.  An upset in and of itself

23 doesn't.

24 Q    So is the upset the act of something going wrong?

10:50:45  25 A    Yes.

Bowers - Direct/Kratka

1   Q    And then the emission event would be any actual air

2   emissions associated with the upset?

3   A    Correct.

4   Q    Okay.  And again, without getting into what your actual

10:50:55  5   opinions are yet, were you asked to evaluate the causes of

6   emission events at the Baytown Complex?

7   A    Yes.

8   Q    And were you also asked to evaluate whether emission events

9   at the Baytown Complex could have been prevented?

10:51:08  10   A    Yes.

11  Q    And were you also asked to calculate an estimate of the

12  cost of any such measures that could have been taken to prevent

13  emission events at the Baytown Complex?

14  A    Yes.

10:51:18  15  Q    Okay.  So with that understanding of the scope of your

16  opinion, let me ask you some questions now about your -- your

17  work experience.

18          Have you had -- right now I'm going to use the --

19  in this couple of questions, I'm going do use the term "hands-on

10:51:37  20  experience."  And by that, I mean did you actually perform tasks

21  yourself as opposed to supervising someone else's performance of

22  them.

23          Do you understand that?

24  A    Yes, sir.

10:51:46  25  Q    Have you had hands-on experience in actually running and

Bowers - Direct/Kratka

1  operating process units that are used in oil refineries and

2  petrochemical plants?

3  **A**   I have.

4  **Q**   And is your hands-on experience limited to just one or two

10:52:01  5  types of refining units or is it broader than that?

6  **A**   It's one or two units, sir.

7  **Q**   Just one or two units?

8  **A**   Yes.

9  **Q**   Well, how many years of this type of hands-on experience

10:52:10  10  have you had working at oil refineries?

11  **A**   I'd say, in total, less than two; less than 24 months, but

12  more than 12.  And that's so broad, I -- I really don't --

13         THE COURT:  I didn't understand the question, please.

14  BY MR. KRATKA:

10:52:24  15  **Q**   Okay.  How many years have you worked as a -- doing

16  hands-on --

17  **A**   Doing --

18         THE COURT:  Hold it.  Hold it.

19  BY MR. KRATKA:

10:52:31  20  **Q**   For how long did you have hands-on experience working on

21  process units at a refinery?

22         THE COURT:  You mean before -- while he was in active

23  practice?  You're including after retirement but still giving

24  opinions.

10:52:45  25         MR. KRATKA:  Including his actual career.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Direct/Kratka

1          THE COURT:  Okay.

2          THE WITNESS:  I'm going to limit my time estimate to

3   actual when I would tweak the knobs or direct an operator to

4   turn the knob.  Early in my career at Texaco, I would direct

10:52:59   5   operators to turn knobs as we were performing tests on them.

6   Later in my career, I was responsible for development of new

7   technology, and I would physically turn the knobs --

8   BY MR. KRATKA:

9   **Q**    I see.

10:53:10   10   **A**    -- under the supervision of a refiner's operators, with

11   their permission.

12   **Q**    Okay.  And so this -- this Texaco refinery, where was that

13   located?

14   **A**    This is Port Arthur, Texas.

10:53:22   15   **Q**    And overall, how long did you work at the Texaco

16   Port Arthur refinery?

17   **A**    A little over seven years.

18   **Q**    That was at -- towards the beginning of your career?

19   **A**    Yes, sir.

10:53:31   20   **Q**    And did your work at Texaco involve environmental

21   compliance?

22   **A**    Early in the -- yes, it did.

23   **Q**    And that work sometimes involved hands-on experience at

24   particular units?

10:53:41   25   **A**    Yes, it did.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Direct/Kratka

1  Q    And generally, what other types of work did you do during

2  those seven years at the Texaco Port Arthur refinery?

3  A    One thing that was interesting was to put together a

4  comprehensive piping diagram in the refinery to show where

10:53:58  5  things went and didn't go, because there was only knowledge in

6  the old pumpers as they call it.  They didn't have it.  And it

7  was eye-opening.

8         And I also, for instance, managed the quality

9  control for military jet fuel, JP-4 and JP-5 and airline

10:54:20  10  industry standard, Jet A, they called it.

11  Q    During your seven years at the Port Arthur refinery, did

12  your work take you to all parts of the refinery?

13  A    Yes, it did.

14  Q    So do you -- did you have a familiarity with all the

10:54:39  15  various process and operating units at that refinery?

16  A    Yes.  I had familiarity and, in many cases, hands-on

17  operation experience, supervisory experience for more units than

18  exist at Exxon, in total.

19  Q    So you had both -- you're saying you had both hands-on and

10:54:57  20  supervisory experience --

21  A    Yes.

22  Q    -- at many units?

23  A    Yes.  I was involved in making specialty products, if you

24  will, many for the Air Force and NASA.

10:55:07  25  Q    And have you had experience in performing maintenance at

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Direct/Kratka

1  oil refineries and chemical plants?

2  **A**    I didn't turn wrenches.  I didn't do it, but I observed

3  what was going on.  As a process engineer, it was kind of -- I

4  owned the unit.

10:55:22  5  **Q**    To use Mr. Kovacs's phrase, you felt you "owned" those

6  units?

7  **A**    Yes, sir.

8  **Q**    Okay.  And at which facilities did you gain experience in

9  what goes into maintenance at refineries and chemical plants?

10:55:39  10  **A**    I'd spend a lot of time -- a lot of time in the processes

11  used in lube oil manufacturing, some of which were low

12  temperature, some of which were high-pressure hydrogenation, and

13  a lot of time in our hydrocracker, which was a somewhat

14  problematic unit.

10:55:57  15  **Q**    And a hydrocracker is one of the units that was discussed

16  yesterday on the virtual plant tour by Mr. Kovacs?

17  **A**    Yes, it was.

18  **Q**    Have you ever designed or consulted on designing a

19  preventive maintenance program on any part of a refinery or

10:56:13  20  chemical plant?

21  **A**    Yes.  I was a part of the team that worked on the

22  hydrocracker.

23  **Q**    That was at the Texaco unit?

24  **A**    Yes, sir.

10:56:18  25  **Q**    Did you also work on maintenance issues at the lube oil

Bowers - Direct/Kratka

1  unit for Texaco?

2  **A**    Yes, sir.  They were extremely complicated, mechanically.

3  **Q**    And you worked on maintenance for those units?

4  **A**    Yes, sir.

10:56:31  5  **Q**    And did you ever work on -- did you -- you worked at the

6  Chevron Richmond refinery in California, correct?

7  **A**    I worked there as an employee of Bechtel and a consultant

8  to Chevron at the same time, yes.

9  **Q**    And during that consulting experience at Chevron Richmond,

10:56:48  10  did you have any involvement in designing preventive maintenance

11  programs for any part of that plant?

12  **A**    Yes.  For a hydrocracking complex that included 17 new

13  units.

14  **Q**    And did you do -- did you also work at the Shell Martinez

10:57:02  15  plant in California?

16  **A**    Yes, I did.

17  **Q**    And at the Shell Martinez refinery, did you -- well, did

18  you have any involvement in preventive maintenance at that

19  facility?

10:57:11  20  **A**    No, not that facility.

21  **Q**    Okay.  Have you ever developed operating plans for any part

22  of a refinery or chemical plant?

23  **A**    Yes, sir.

24  **Q**    Did you do any -- develop operating plans while you were at

10:57:23  25  the Texas Port Arthur facility?

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Direct/Kratka

1    **A**    I did.

2    **Q**    Do you recall which facilities you developed operating

3    plans for?

4    **A**    It was, again, for the hydrocracker to which I referred

10:57:35   5    earlier and associated diesel hydrotreater.  They're both new

6    units which I helped design.

7    **Q**    And did you -- did you -- you also worked at a -- or

8    consulted at a plant in Venezuela?

9    **A**    Yes, I did.

10:57:47   10    **Q**    What type of plant was that?

11    **A**    It was a conventional fuels refinery that was looking -- or

12    evaluating, installing a lube oil manufacturing complex for

13    hydrocracking and associated facilities.

14    **Q**    And was developing operating plans any part of that work?

10:58:05   15    **A**    Yes, sir.  It was estimating how many people it would take

16    to operate it and maintain it.

17    **Q**    And while you worked for Ethyl Corporation, did you ever

18    get involved in preventive -- I'm sorry, developing operating

19    plans for any part of the facility?

10:58:21   20    **A**    It -- it -- with Ethyl it was more reviewing operating

21    plans there to improve them.

22    **Q**    So you reviewed and improved operating plans for -- what

23    kind of facility was that?

24    **A**    Well, they make tetraethyl lead, and the ones for --

10:58:37   25    tetraethyl -- TEL, tetraethyl lead.  That's lead antiknock

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Direct/Kratka

1  compound.  That's the Ethyl Corporation.  And also in the vinyl

2  chloride manufacturing facility.

3  Q    And those are both chemical plants?

4  A    Yes, sir.

10:58:49   5  Q    And in your work at the -- you worked at the Ashland

6  Chemical facility as well, correct?

7  A    That's in Louisiana, Plaquemines.

8  Q    And you -- did you develop operating plans for the furnaces

9  at that plant?

10:59:03  10  A    I was more in the -- I was the project manager associated

11  with the -- I was responsible for a major revamp and expansion

12  of that large reformer.

13  Q    Okay.  And have you ever served in a managerial capacity at

14  a refinery or chemical plant?

10:59:18  15        THE COURT:  Any division or the whole plant?

16  BY MR. KRATKA:

17  Q    Of any division?

18  A    I was the manager for a project to develop a new technology

19  for desulfurizing diesel fuel.

10:59:32  20  Q    Where was that?

21  A    That was in Valero's refinery in Krotz Springs, Louisiana.

22  Q    And do you know what the term "process design" means in the

23  context of oil refineries and chemical plants?

24  A    It has many meanings, but could you be more specific.

10:59:47  25  Q    Well, let me ask you to define what -- if you would just

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Direct/Kratka

1   give the Court a general idea of what -- what is involved in

2   process design.

3   **A**      Process design is calculating and presenting, in legible

4   format, the rules of how to accomplish something.  To turn a

11:00:10   5   crude oil into jet fuel, there's calculating all the process

6   conditions and treatments necessary to accomplish that.

7   **Q**      For a particular unit that's --

8   **A**      For a particular unit.

9   **Q**      Okay.  And what level of detail is entailed in performing

11:00:26   10   the process design of units or equipment for a refinery or

11   chemical plant?

12   **A**      The level of detail goes down to, perhaps, one-thousandth

13   of one percent accuracy in a material balance, calculating what

14   goes in and what comes out in the various streams, calculating

11:00:48   15   the trace contaminants that would be in a byproduct or waste

16   stream, as well as calculating the quality of the products that

17   you were intending to produce.

18   **Q**      And does process design for refineries and chemical plants

19   involve elements relating to the containment of liquids or

11:01:05   20   gasses?

21   **A**      Yes, it does.

22   **Q**      Is loss of containment -- and I think you testified earlier

23   that loss of containment is what happens during an emission

24   event?

11:01:18   25   **A**      Yes.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Direct/Kratka

1  **Q**    So does process design include designing units or equipment

2  to avoid emission events?

3  **A**    Correct.

4  **Q**    And can you just explain for the Court why it is that

11:01:32  5  process design at such facilities does entail ensuring the

6  containment of liquids and gasses?

7  **A**    A refinery, by design and by nature, processes huge amounts

8  of hydrocarbons, most of which are highly flammable, easy to

9  burn or they're toxic, well known as being fatal, lethal in some

11:02:00  10  cases.

11          MR. NICHOLS:  Your Honor, again, I'm going to object

12  to this witness wandering off into this area which we've already

13  established through voir dire he's not qualified to testify.

14          THE COURT:  Overruled.  We'll go question by question.

11:02:11  15          THE WITNESS:  For instance, hydrogen sulfide is

16  classified as a lethal gas.

17  BY MR. KRATKA:

18  **Q**    Well, aside from the particular -- getting to the

19  particular elements, your testimony is that there's a reason

11:02:21  20  that these gasses must be -- and liquids must be contained.

21  **A**    Yes.

22          THE COURT:  Yes or no?  That was a yes?

23          THE WITNESS:  Yes.

24          THE COURT:  Now we got to go down step by step because

11:02:30  25  I understand the objection.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Direct/Kratka

                              Go on.

2  BY MR. KRATKA:

3  Q    Now, Mr. Bowers, have you yourself ever performed process

4  design work for a refinery or a chemical plant?

11:02:38  5  A    Yes.

6  Q    And what are some of the types of process units that you

7  yourself have performed process design work for?

8  A    If I may just go down the list.

9  Q    Sure.

11:02:48  10  A    Crude distillation units, desalting units which remove the

11  salt and water from the crude oil, and then it would be

12  catalytic cracking units, catalytic hydro-processing, catalytic

13  hydrocracking, delayed coking, thermal cracking, alkylation,

14  caustic treating --

11:03:15  15            THE COURT:  Caustic what?

16            THE WITNESS:  Treating.

17            THE COURT:  Okay.

18            THE WITNESS:  -- acid treating, clay treating, solvent

19  extraction, and asphalt manufacture.

11:03:30  20  BY MR. KRATKA:

21  Q    You may have mentioned this:  Have you ever done design

22  work for propylene fractionation?

23  A    Yes.

24  Q    And have you actually ever done process design for more

11:03:42  25  than just a particular unit but for an entire plant?

Bowers - Direct/Kratka

1  A     Yes.

2  Q     Can you describe which plants those are for?

3  A     Well, there have been several, but let me just mention one

4  significant one that's in Richmond, California, for Chevron.  It

11:03:56  5  was the Richmond lube oil project as it was called.  I earlier

6  mentioned it had 17 process units, major process units.  Some of

7  the world's largest high-pressure hydrocrackers at approximately

8  3300 pounds-per-square-inch pressure.  And I was responsible for

9  the process design for all that facility.

11:04:18  10  Q     And did you also do process design for a chemical -- an

11  olefins plant in Thailand?

12  A     Yes.

13  Q     And did you do process design for a BFGoodrich ethylene

14  plant?

11:04:31  15  A     Yes.

16  Q     Now, let me ask you a few questions about your familiarity

17  with certain specific types of equipment that are found at the

18  Baytown plant and have been named and identified by Exxon in

19  emission events that are at issue in this case.

11:04:50  20            Are you familiar with the design and operation of

21  refinery and chemical plant flares?

22  A     Yes.

23  Q     Are you familiar with the design and operation and

24  maintenance needs of sulfur recovery units?

11:05:02  25  A     I am.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Direct/Kratka

1  Q     And can you just for the Court -- and maybe we went through

2  this yesterday.  But so very briefly describe the purpose of a

3  sulfur recovery unit at a refinery.

4  A     In a refinery situation, the SRU --

11:05:14   5          THE COURT:  What's an SRU?

6          THE WITNESS:  SRU is a sulfur recovery unit, your

7  Honor.  I apologize.

8                In that unit, you burn part of the H2S to SO2.

9  BY MR. KRATKA:

11:05:27  10  Q     H2S is hydrogen sulfide?

11  A     Hydrogen sulfide.  And then the SO2 reacts with the

12  remainder of the hydrogen sulfide to form elemental sulfur and

13  water or steam because of high temperature.

14  Q     And SO2 is sulfur dioxide?

11:05:44  15  A     Sulfur dioxide.  And the resulting effluence is liquid

16  sulfur and water vapor.  It will have trace amounts of hydrogen

17  sulfide remaining and that is further recovered in a tail gas

18  treating unit.

19  Q     And the point is to remove the sulfur from the finished

11:06:02  20  product?

21  A     The point is to take the hydrogen sulfide and turn it

22  completely into a salable product, sulfur.

23  Q     And are you familiar with the design, operation, and

24  maintenance needs of oil and chemical storage tanks?

11:06:16  25  A     I am.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Direct/Kratka

1  Q    Are you familiar with the design, operation, and

2  maintenance needs of compressors?

3  A    I am.

4  Q    And again, just briefly, what is a compressor?

11:06:25  5  A    A compressor is a mechanical device analogous to a tire

6  pump, which many people used to use.  It takes a gas at a low

7  pressure and boosts it to a higher pressure by squeezing it.

8  Q    And I imagine compressors at refineries are somewhat bigger

9  than tire pumps?

11:06:44  10  A    Yes, sir.

11  Q    Are there different types of compressors found at

12  refineries and chemical plants?

13  A    There are.

14  Q    Can you, just briefly, describe the types?

11:06:53  15  A    The two main types of compressors would be centrifugal,

16  which are rotating and use the centrifugal force in compressing

17  the molecules.  The other is reciprocating compressor, which is

18  a piston inside a cylinder.  Those are the two main types.

19  Q    And are you familiar with the operation, design, and

11:07:12  20  maintenance needs of both types of compressors?

21  A    I am.

22  Q    And why are compressors used at refineries and chemical

23  plants?  What overall goal do they serve?

24  A    Compressors -- excuse me.  They're used to take a gas at a

11:07:30  25  low or intermediate pressure, lower, and raise it to a

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Direct/Kratka

1   higher pressure for a subsequent use or reuse.

2   **Q**    And are you familiar with the design and maintenance needs

3   of pipes and piping at refineries and chemical plants?

4   **A**    Yes, I am.

11:07:50   5   **Q**    And are you familiar with the types of seals used at

6   refineries and chemical plants?

7   **A**    In a general nature.  I'm not a metallurgist.

8   **Q**    Are you familiar with the maintenance needs of seals?

9   **A**    Yes.

11:08:03   10   **Q**    And are you familiar with the types of valves used at

11   refineries and chemical plants?

12   **A**    In a general nature, valves can be extremely specific for

13   the service.

14   **Q**    But in general, are you familiar with the maintenance needs

11:08:16   15   of valves at these facilities?

16   **A**    Yes, sir.

17   **Q**    Can pipes, seals and valves be subject to leaks?

18   **A**    Yes.

19   **Q**    And do you have experience in leak detection or leak

11:08:27   20   prevention?

21   **A**    It is somewhat dated now.  We didn't have laser detectors.

22   But yes, we had sniffers.

23   **Q**    What is a sniffer?

24   **A**    It's a device that --

11:08:39   25             THE COURT:  It's not a person that goes around, right?

Bowers - Direct/Kratka

1          THE WITNESS:  Well, that was the early days.  Then we

2    went to modern technology which was a portable device which

3    would -- you'd just squeeze a rubber bulb and it would suck in

4    some of the vapor and it would give an indicator of whether

11:08:56  5    there were hydrocarbons there.  It was used early to detect was

6    it safe to go into the environment.  And then they became more

7    specific.

8    BY MR. KRATKA:

9    Q    Do you have a general familiarity with the more modern

11:09:06  10   laser techniques?

11   A    Yes, sir, just a general familiarity.

12   Q    And do you have experience in estimating or calculating the

13   amount of pollutants released from a gas leak?

14   A    Yes.

11:09:22  15   Q    Are you familiar with the types of electrical components

16   used at refineries and chemical plants?

17   A    Of a general nature.

18   Q    And are you familiar with their maintenance needs?

19   A    Somewhat, generally.

11:09:32  20   Q    Are you familiar with the types of instrumentation used at

21   refineries and chemical plants?

22   A    Yes.

23   Q    And are you familiar with their maintenance needs?

24   A    In a general nature, not specific to a given instrument.

11:09:44  25   Q    Now, have you ever been involved in calculating the capital

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Direct/Kratka

1    costs of equipment or even of entire units at a refinery or

2    chemical plant?

3    **A**    I have.

4    **Q**    Let me break that up into two pieces.  Have you ever been

11:09:58   5    involved in calculating the capital costs of particular

6    equipment at a refinery or chemical plant?

7    **A**    I have.

8    **Q**    And have you been involved in calculating the capital costs

9    of entire units?

11:10:11   10    **A**    Yes.

11    **Q**    Okay.  And have you ever been involved in creating a budget

12    for the capital costs of equipment at refineries or chemical

13    plants?

14    **A**    I have.

11:10:20   15    **Q**    Have you ever been involved in calculating the operating

16    and maintenance costs at refineries and chemical plants?

17    **A**    I have.

18    **Q**    And have you ever been involved in creating budgets for

19    operation and maintenance costs at refineries or chemical

11:10:34   20    plants?

21    **A**    I have.

22    **Q**    Now, you mentioned earlier that you had done some work

23    designing an olefins plant.  Did your work on that project

24    involve calculation of capital costs?

11:10:46   25    **A**    Yes.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Direct/Kratka

1  **Q**     And how did you go about calculating the anticipated

2  capital cost of that project?

3  **A**     I worked from what we call historical costs, what it's

4  taken in the past to accomplish this at a given location.  And

11:11:02  5  then you determine the difference in construction costs between

6  the reference location and the proposed location.  And then you

7  adjust for the size and complexity of the two units.  I mean,

8  there are different olefins plants, like gas feed and liquid

9  feed.

11:11:20  10  **Q**     And did these calculations also involve determining what

11  the operating and maintenance costs would be for that facility?

12  **A**     Yes.

13  **Q**     And how did you go about calculating the operation and

14  maintenance costs for that facility?

11:11:34  15  **A**     The operating costs and maintenance costs, first, we use

16  historical numbers from the old units; evaluated the labor costs

17  in the new area if it was a specific unit involved.  Oftentimes,

18  it was a prospective design for some -- a developer, if you

19  will, a refinery and we worked operating and maintenance costs

11:12:01  20  as a percent of the capital costs.

21  **Q**     And did your client rely on your cost estimates for both

22  capital costs and operation and maintenance costs in this

23  project?

24  **A**     Yes, sir.  Often their banks that were financing the unit

11:12:17  25  demanded an outside opinion such as ours.

Bowers - Direct/Kratka

1  Q    And have you done similar work for other facilities during

2  your career?

3  A    Yes, sir, for numerous.

4  Q    And was it the same type of work that you just described?

11:12:27  5  A    Yes, sir.

6  Q    And for each of these projects, your calculations of

7  capital costs, operation and maintenance costs were relied on by

8  your clients?

9  A    Yes, sir.  A significant one is for the nation of Algeria.

11:12:42  10  I was responsible for developing and calculating the entire

11  hydrocarbon development plan from the beginning of 1979 through

12  2010 and the number of refineries that would be needed, the

13  types of refineries, LNG plants, pipelines.

14            THE COURT:  LNG?

11:13:06  15            THE WITNESS:  Liquified natural gas, sir.

16                 So it was -- the entire development plan was

17  programmed year by year with both capital costs and maintenance

18  and operating costs, both in terms of local dollars and hard

19  currencies.  And the -- and which was important to -- in that

11:13:24  20  location to say how much hard foreign currency would they need.

21  And that project was non-recourse financed.

22  BY MR. KRATKA:

23  Q    And what is non-recoursed financing?

24  A    It means the banks look only to the rev -- the revenue

11:13:36  25  generated by the project and not to the owners or anybody else.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Direct/Kratka

1          THE COURT:  Who made the loan?

2          THE WITNESS:  It was a consortium of European banks.

3  BY MR. KRATKA:

4  Q    And you also testified earlier about your work on a

11:13:52  5  feasibility study for the lube oil production facility in

6  Venezuela?

7  A    Yes, sir.

8  Q    Did that study involve any economic analysis?

9  A    Yes, sir, it did.

11:13:59  10  Q    Did it involve calculation of capital costs or O&M costs?

11  A    Yes, sir.

12  Q    Both of them?

13  A    Both.

14  Q    And in your work at the Texaco Port Arthur refinery,

11:14:08  15  towards the beginning of your career, did you have any

16  involvement there in calculating or budgeting O&M costs,

17  operations and maintenance costs?

18  A    At a more cursory level.  It was, I call it, preliminary

19  capital costs and operating costs, budget-type stuff, initial

11:14:22  20  budget.

21  Q    So you were involved in creating initial budgets there?

22  A    Yes, sir.  How many operators, how many -- what was -- what

23  was the maintenance cost going to be, the operating cost,

24  depending on the source of fuel and electricity.

11:14:35  25  Q    So you were down there in the weeds with numbers of

Bowers - Direct/Kratka

1  workers, their labor costs, particular types of equipment and

2  their costs?

3  **A**    Yes, sir.

4  **Q**    And before this case, had you ever performed any economic

11:14:51  5  analysis for any part of Exxon's Baytown facility?

6  **A**    Years ago, for the Department of Energy, I evaluated their

7  coal liquefaction.  And it was a hydrogenated liquefaction

8  plant.  And this was for the Department of Energy project under

9  Jimmy Carter, Project Independence.

11:15:11  10  **Q**    And you mentioned earlier that you had been hired as an

11  expert witness in connection with lawsuits.  Have you ever been

12  hired to be an expert witness on the specific subject of

13  emission events at a refinery or chemical plant?

14  **A**    Yes.

11:15:27  15  **Q**    Did you work on the Shell Deer Park case that's been

16  referred to earlier in this trial?

17  **A**    I did.

18         THE COURT:  Which one was that?  Was the agreed order?

19  The agreed order?

11:15:37  20         MR. KRATKA:  Yes, Environment Texas and Sierra Club

21  versus Shell Oil Company.

22         THE WITNESS:  Yes.

23  BY MR. KRATKA:

24  **Q**    And in that case, did you testify or did you just perform

11:15:46  25  consulting work?

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Direct/Kratka

1    A    I performed consulting work.

2    Q    And for that case, did you review documents from Shell?

3    A    Yes, sir.

4    Q    And were -- did you review documents about the causes of

11:15:57  5  emission events?

6    A    I did.

7    Q    And did you review documents or consult analyses about

8    measures to prevent emission events?

9    A    I did.

11:16:04  10  Q    And did you also serve as an expert witness in the Chevron

11   Phillips Chemical case brought by Sierra Club and Environment

12   Texas?

13   A    Yes, I did.

14   Q    And again, in that case, did you -- did you just do

11:16:18  15  consulting work?

16   A    Yes, sir, just consulting.

17   Q    And again, did you review documents regarding emission

18   events?

19   A    Yes, I did.

11:16:26  20  Q    And you consulted regarding the prevention of emission

21   events at that facility?

22   A    Yes, sir.

23   Q    Have you ever testified in court on the causes of an

24   emission event at a refinery?

11:16:37  25  A    I have.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Direct/Kratka

1   Q    And was that the BP Texas City case you mentioned earlier?

2   A    Yes, sir.

3   Q    Did the judge in that case find that you were qualified to

4   testify as an expert witness on that subject?

11:16:48   5   A    He did.

6   Q    And prior to this case, have you ever been retained as an

7   expert witness to calculate capital or operating and maintenance

8   costs of an entire refinery or chemical plant?

9   A    I have.

11:17:02   10   Q    And can you describe which -- what -- what those -- where

11   those cases were and what they were about?

12   A    I was retained by Shell, through my employer Bechtel, to

13   calculate the profitability of the refineries that they had in

14   Los Angeles.  It's -- generally, it's lumped together as the

11:17:23   15   El Segundo refinery but there are two locations separated by

16   Sun.  And my -- my task was to take the economic value of the

17   existing plant and locate it in a new single plant and then

18   estimate the capital and operating costs of that new facility.

19   Q    And did the -- was that in two separate cases?

11:17:51   20   A    Yes, sir.  It was done twice.

21   Q    So you testified twice?

22   A    Yes.

23   Q    And did the judge or judges in those two cases find that

24   you were qualified to testify on an -- as an expert witness on

11:18:00   25   that subject?

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Direct/Kratka

1   **A**    Yes.

2   **Q**    Now, let me ask you some questions about the types of

3   evidence you looked at in order to arrive at your opinion for

4   this case, specifically, the Exxon Baytown-related information.

11:18:19   5              First of all, are you familiar with the term

6   "reportable emission event"?

7   **A**    I am.

8   **Q**    And are you familiar with the State of Texas Electronic

9   Environmental Reporting System, whose acronym is STEERS?

11:18:34   10   **A**    Yes.

11   **Q**    And did you -- in working on this case, have you reviewed

12   STEERS reports from the Exxon -- from Exxon relating to

13   reportable emission events at the Baytown Complex?

14   **A**    Yes.

11:18:45   15   **Q**    And do these STEERS reports include Exxon's own

16   descriptions of the cause of the event and corrective actions

17   taken?

18   **A**    Yes.

19   **Q**    And you reviewed those descriptions?

11:18:54   20   **A**    Yes.

21   **Q**    Did you also review TCEQ investigation reports regarding

22   these reportable emission events at the Baytown Complex?

23   **A**    Yes.

24   **Q**    And did the TCEQ investigation reports, as well, contain

11:19:13   25   information about causes of emission events and corrective

Bowers - Direct/Kratka

1    actions?

2  **A**    Yes.

3  **Q**    And you reviewed those investigation reports?

4  **A**    Yes.

11:19:19   5  **Q**    Did you review any other documents produced by Exxon in

6    this case that contain Exxon's own analysis of reportable

7    emission events?

8  **A**    I believe there were a couple of the root cause analysis

9    included in the documents that I was furnished.

11:19:39  10  **Q**    And did the reportable emission events that you analyzed

11    all fall within the time period of October, 2005, through

12    September of 2013?

13  **A**    Yes.

14  **Q**    Now, another set of materials I want to ask you about has

11:19:53  15    to do with the non-reportable emission events or recordable

16    emission events.

17  **A**    That's recordable with a "C"?

18  **Q**    Yes.

19  **A**    Okay.

11:20:01  20  **Q**    And just so we're all on the same page, although we've done

21    it many times, the recordable emission events are the ones not

22    publicly reported under the STEERS system.

23          Do you understand that?

24  **A**    I understand that.

11:20:15  25  **Q**    And did you review spreadsheets containing information

Bowers - Direct/Kratka

1   about non-recordable emission events that occur at the Baytown

2   Complex?

3   **A**     Yes.

4   **Q**     And did those spreadsheets also contain information about

11:20:28  5   causes, locations, and corrective actions of each event?

6   **A**     Yes.

7   **Q**     And you reviewed -- did you review spreadsheets of

8   non-recordable events for each of the three plants, the

9   refinery, chemical plant, and olefins plant?

11:20:42  10  **A**     Yes.

11  **Q**     And did the non-recordable events that you reviewed

12  information about also take place between October, 2005, and

13  September, 2013?

14  **A**     Yes.

11:20:55  15  **Q**     And did you also review -- are you familiar with the term

16  "deviation report"?

17  **A**     Yes.

18  **Q**     And those are -- those reports contain information on

19  compliance with Title V permits?

11:21:07  20  **A**     Yes.

21  **Q**     And did you review deviation reports for the Baytown

22  Complex that were submitted by Exxon to the TCEQ?

23  **A**     I did.

24  **Q**     And did the deviation reports you reviewed pertain to the

11:21:21  25  period of October, 2005, through 2013?

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Direct/Kratka

1   **A**    Yes.

2   **Q**    Now, in addition to docket -- in addition to these

3   documents that related to specific emission events or

4   deviations, I want to ask you about more general information you

11:21:40   5   may have reviewed about -- in relation to this case.

6                    Did you review any deposition testimony of Exxon

7   employees regarding maintenance programs at the Baytown Complex?

8   **A**    Yes.

9   **Q**    And did you review any operating manuals or guidelines for

11:21:56   10   specific units or types of equipment at the Baytown Complex?

11   **A**    Yes.

12   **Q**    And did you review annual summaries of maintenance budgets

13   and capital maintenance projects for the three plants at the

14   Baytown Complex?

11:22:10   15   **A**    The budgets were for capital expenditures.  Maintenance

16   included everything related to maintenance and then IRS

17   regulation capital expenditures.

18   **Q**    And you reviewed both types of documents?

19   **A**    Yes.

11:22:28   20   **Q**    Can you -- this may be difficult.  Can you estimate

21   approximately how many pages of documents Plaintiffs' counsel

22   gave you to review in the case?

23                    MR. KRATKA:  Let the record reflect that the witness

24   is extending his arm.

11:22:50   25                    THE WITNESS:  Perhaps 20,000.

Bowers - Direct/Kratka

1   BY MR. KRATKA:

2   Q    20,000 pages?  Do you know how much --

3         THE COURT:  I'm aware of it.  I got a bunch of them

4   right underneath the bench.  He's got one on a small disk.  I

11:22:57   5   got a lot of books here, too.

6              Go on.

7   BY MR. KRATKA:

8   Q    Do you know how much time you spent reviewing these

9   documents in this case?

11:23:05  10   A    The total to date is about 850 hours, maybe a little more.

11   I have to -- I haven't counted it all yet.

12   Q    I'm sure we'll hear a final total.

13   A    You'll get billed.

14   Q    Yeah.  In addition to reviewing documents, did you also

11:23:27  15   visit the Baytown Complex in person as part of the site

16   inspection arranged by the parties in this case?

17   A    Yes.  I participated in a very carefully scripted

18   three-hour tour.

19   Q    All right.  Well, how long -- you said it was a three-

11:23:36  20   walk-through?

21   A    Yes.

22   Q    And what parts of the complex did you inspect, if you

23   recall?

24   A    I really don't recall completely because it was a -- we

11:23:47  25   went by the fluid coker, or flexicoker.  We went into the

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Direct/Kratka

1  control room of that unit.  And I may have to beg -- I don't

2  remember specifically.

3  Q    Yeah.  Yeah.  It's been a couple of years.

4  A    It's been a couple of years.

11:24:04  5  Q    Did you review -- did you visit Booster Station 4, if you

6  recall?

7  A    We did, we visited Booster Station 4.

8  Q    And did we visit a flare unit?

9  A    Yes, one of the flares.

11:24:15  10  Q    And was any part of the walk-through at the chemical plant?

11  A    We drove by the chemical plant.

12  Q    And was the -- did you go -- was the olefins plant off

13  limits at that time?

14  A    Olefins plant was -- we were not allowed because major

11:24:33  15  maintenance was ongoing.  A turn-around they called it.

16  Q    And have you asked Plaintiffs' counsel to try to include

17  particular parts of the complex on the inspection tour?

18  A    I did.

19  Q    And were you able to -- was your request based on documents

11:24:52  20  you had already reviewed for the case?

21  A    It was.

22  Q    Was it to -- so it was to follow up on questions or

23  concerns that you had developed from the review of documents?

24  A    I wanted to see physically what -- with my own eyes so I

11:25:05  25  could make a better judgment and assessment of what was going

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Direct/Kratka

1    on.

2    **Q**    And was the olefins plant one of the areas that you wanted

3    to see with your own eyes?

4    **A**    Yes.

11:25:15    5    **Q**    And you were not granted access to that plant?

6    **A**    No, sir.

7    **Q**    Were you able to ask questions of Exxon employees during

8    the site visit?

9    **A**    I was able -- allowed to ask questions to Exxon's counsel

11:25:29    10    who then asked questions.

11    **Q**    Okay.  And were you allowed to take pictures during the

12    site inspection?

13    **A**    I was not.  I, again, was able to ask Exxon's counsel to

14    have the pictures taken.

11:25:44    15    **Q**    And the pictures that were taken were ultimately included

16    as an exhibit to or an attachment to your expert opinion in this

17    case?

18    **A**    Yes.

19    **Q**    All right.  And we'll get to those.  All right.

11:26:01    20            MR. KRATKA:  At this point, your Honor, Plaintiffs

21    offer Mr. Bowers as an expert in refinery and chemical plant

22    operations, maintenance, design, and economic planning.

23            MR. NICHOLS:  Your Honor, that is not the procedure

24    that's used.  You don't prequalify.  He asks questions --

11:26:17    25            THE COURT:  In other words, you keep going until you

1   hear an objection.  Go ahead.

2           MR. KRATKA:  That's fine.

3           THE COURT:  I know some state courts, as you travel

4   around the country, you need to tender the witness.  But in most

11:26:28  5   federal courts, you can just go ahead.  Got his background; and

6   as long as you keep, I guess, his testimony within the

7   parameters, you can keep testifying.

8           MR. KRATKA:  Fair enough.

9           THE WITNESS:  May I ask for a potty break.  I'm a

11:26:44  10  survivor of cancer, prostate cancer.

11          THE COURT:  Absolutely.  Absolutely.

12              Let me stop the clock.  Okay.  It's 11:27.  We'll

13  see you back, ready to resume at 20 minutes to 12:00.

14      (Court recessed at 11:27 a.m.)

11:44:47  15      (Court resumed at 11:44 a.m.)

16  BY MR. KRATKA:

17  **Q**   Mr. Bowers, so you mentioned earlier that you were asked to

18  determine or analyze the causes of emission events, why these

19  emission events have been happening.

11:45:24  20              Did you write reports summarizing the basis for

21  your opinions in this case?

22  **A**   I did.

23  **Q**   Let me show you, actually, if you could turn -- I think it

24  would be in the first notebook, 18, exhibits -- take a look at

11:45:39  25  Plaintiffs' Exhibit 427.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Direct/Kratka

1            Is that your initial report that was prepared in

2  this case?

3  **A**    It appears to be, yes, sir.

4  **Q**    And then Exhibit 428, is that the rebuttal report to the

11:46:00   5  expert report of Christopher Buehler that you prepared for this

6  case?

7  **A**    Yes, sir.

8  **Q**    And then, if you -- hang on one second, sir.

9            And then, if you would, look at Plaintiffs'

11:46:23  10  Exhibit 430.  Is this the corrected version of the supplemental

11  expert report that you submitted just before trial?

12  **A**    Yes, sir.

13            MR. KRATKA:  Now, your Honor, there are -- you can see

14  there's a large number of exhibits to the supplemental report.

11:46:48  15            THE COURT:  That's correct.  It goes on, looks like,

16  for about two inches.

17            MR. KRATKA:  Right.  And so, to make it much easier to

18  pull out and look at a particular one, we've pulled them out

19  separately and that's the second notebook, 19, which will

11:47:02  20  have -- as I walk the witness through some of the exhibits, it

21  will be easier to find them in Notebook 19; and I'll -- so we

22  submitted them as separate exhibits.

23            THE COURT:  Okay.

24            MR. NICHOLS:  And your Honor, just for the record,

11:47:15  25  with respect to the --

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Direct/Kratka

1           THE COURT:  Not Exhibit 19, book 19.

2           MR. KRATKA:  Yes.  Yes, binder 19.

3           MR. NICHOLS:  -- with respect to the expert reports,

4    our position is consistent with what we discussed before we

11:47:25   5    begin the trial which is that, as you know, we have a number of

6    objections to their expert opinions, they have a number of

7    objection to ours.  We believe the Court can take all this

8    matter under advisement as it would in doing a Daubert

9    challenge.

11:47:42   10          And so, on that basis, on an equal footing, each

11   side, we are not objecting to the Court receiving these into the

12   record.

13          THE COURT:  Is that agreed?

14          MR. KRATKA:  Yes.

11:47:51   15          THE COURT:  Okay, thank you.

16          MR. KRATKA:  Thank you for clarifying that,

17   Mr. Nichols.

18   BY MR. KRATKA:

19   **Q**   Now, let's look at what originally was Exhibit 3 to your

11:48:05   20   revised supplemental report.  We pulled that out as Plaintiffs'

21   Exhibit 431, which will be in the next notebook, the binder 19.

22   **A**   Yes, sir.

23   **Q**   And can you tell the Court what this table represents?

24   **A**   This table represents a summation of both recordable, which

11:48:42   25   are the small ones, and reportable, which are STEERS reports

Bowers - Direct/Kratka

1    events, emission events, for the period of years with which this

2    trial is concerned; starts in 2005 and goes through mid-year

3    2013.

4    BY MR. KRATKA:

11:48:58    5    Q    And did you request the monthly and annual numbers of

6    emission events in this table from Plaintiffs' counsel?

7    A    I did.  Plaintiffs' counsel, their aides did a wonderful

8    job of taking inches -- or feet of -- I don't want to call -- it

9    was data but not information.

11:49:17    10   Q    And did you supervise the creation of this table?

11   A    I did.

12   Q    You specified the information you wanted and the format you

13   wanted it in?

14   A    Yes.

11:49:26    15   Q    And so the Court has seen these numbers before.  This

16   particular table does include the STEERS events that were

17   covered by the EPA consent decree that the Court has ultimately

18   removed from the case?

19   A    Yes, this is everything.

11:49:48    20   Q    This is everything, okay.  And just -- let me turn to --

21        MR. KRATKA:  Sorry, strike that.

22   BY MR. KRATKA:

23   Q    Just so we get it for the record, all emission events

24   included, what is the grand total of recordable emission events

11:50:11    25   during the period of time covered by this lawsuit?

Bowers - Direct/Kratka

1  A    3,742.

2  Q    I believe you may have -- I'm sorry, I may have misspoken.

3  But that -- those are the number of recordables?

4  A    Recordables.

11:50:22  5  Q    Okay.  And how many reportable emission events?

6  A    Reportables were total 352.

7  Q    And the grand total is over 4,000?

8  A    Yes, sir.  4,094 is what we came up with.

9  Q    And those -- do you know whether that averages out to more

11:50:41  10  or less than one emission event for every day during the past

11  eight years?

12  A    It's about that.  I think it's not quite three every two

13  days, but it's more than one.

14  Q    So more than one emission event every day?

11:50:53  15  A    Every day.

16  Q    And did you do -- did you look at the trends in numbers of

17  emission events over the course of this period?

18  A    Yes.  That's one of the primary things engineers look at,

19  is it getting better, getting worse.

11:51:10  20  Q    All right.  Let me turn your -- yours and the Court's

21  attention to -- let me see what page this is, the first chart

22  after 3-8 of the exhibit.

23  A    I have it.

24  Q    Can you describe the trends that you see in this for the

11:51:50  25  Court, the trends that are shown in this data?

Bowers - Direct/Kratka

1  **A**    These show the trends -- the annual trends for the

2  complex-wide.  The top bar represents the recordable emission

3  events, those that are not available to the public.  And the

4  lower line shows that of the STEERS-type events, if you will.

11:52:11  5          The non-public emission events show a slight

6  increase over the period in time, not a decrease, and the

7  STEERS-type events show a slight decrease, significantly

8  different than that presented earlier.

9  **Q**    So taking into account the recordable emission events, you

11:52:35  10  don't see any decrease over time?

11  **A**    No, sir.  There's no decrease.  If anything, it's an

12  increase.

13  **Q**    And did you also do this analysis for each plant?

14  **A**    We did, yes.

11:52:46  15  **Q**    Let me turn to the next page in the exhibit which is the

16  annual number of emission events at the refinery.  And can

17  you --

18          MR. NICHOLS:  Mr. Kratka, what page number is that?

19          MR. KRATKA:  It doesn't have a page number.  It's

11:53:01  20  Figure 2 in this exhibit.

21          THE WITNESS:  I don't see any significant trend in --

22  in recordable.  It didn't decrease or increase.  It's within the

23  range of random error, I would guess you'd say, a slight

24  decrease in reportable emissions, the number of events, you

11:53:13  25  know.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Direct/Kratka

1  BY MR. KRATKA:

2  **Q**    And then looking at Figure 3 in this exhibit, would you

3  describe what the data shows for emission events at the chemical

4  plant.

11:53:27    5  **A**    The chemical plant shows good results beginning in the year

6  2010.  They significantly reduced, by 50 percent or more, the

7  smaller events that we call the recordable, with a "C"; and the

8  number of reportable events also is on a downward trend.

9  They're very low.

11:53:50   10  **Q**    So you do see improvement at the chemical plant?

11  **A**    Yes.

12  **Q**    And primarily, that occurred after 2010?

13  **A**    Yes, sir.  They did something in 2010.  And I wasn't able

14  to pin it down as to what was the cause other than, perhaps, one

11:54:04   15  of the problematic polymer lines.  They fixed it or found out

16  what was wrong with it.

17  **Q**    And finally, let's look at Figure 4 of this Plaintiffs'

18  Exhibit 431.  And can you describe what you see in terms of

19  trends in emission events at the olefins plant?

11:54:24   20  **A**    I see a very disturbing trend, disturbing from an

21  engineering and process design and plant management perspective.

22  An increase in the recordable, with a "C," events while the

23  reportable events remained more or less constant.

24  **Q**    So no significant decrease, in fact -- no significant

11:54:48   25  decrease in reportable STEERS events?

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Direct/Kratka

1    **A**    No, sir.

2    **Q**    And an increase in recordable events?

3    **A**    Yes, sir.  And most people call those "near misses."

4    **Q**    Okay.  What do you mean by near misses?

11:55:07    5    **A**    Once a hydrocarbon escapes confinement, you're much at risk

6    for luck:  Does it catch fire or not?  Does it dissipate and not

7    find a source of ignition?  Does it self-ignite?  It depends on

8    the event, where it took place, time, things that you have no

9    control over, except from a general design viewpoint, which,

11:55:40    10    Exxon, by the way, has good safety designs; but something is

11    wrong when you see this tremendous increase in leaks.

12    **Q**    Now, maybe this is -- you've anticipated my next question;

13    but if non-reportable emission events usually involve smaller

14    releases of pollution, why did you spend time reviewing them at

11:56:00    15    all?

16    **A**    If I may paraphrase something from Heinz Bloch who is a

17    former Exxon machinery expert, well known in the industry, has

18    published, probably, hundreds of articles on how to improve

19    reliability, he calls them "warning events."

11:56:23    20    **Q**    Warning events?

21    **A**    Yes.  Because unless corrected, it is all but certain a

22    major event will follow.

23    **Q**    Is it possible for -- well, let me go into that a little

24    more.  Does the sheer number -- are you saying that the sheer

11:56:39    25    number of recordable emission events is itself some kind of

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Direct/Kratka

1   warning sign?

2   **A**      Yes.

3   **Q**      Why is that?

4   **A**      You don't know ahead of time if it's going to be small.  A

11:56:50   5   pipe or a vessel develops a leak, I can't tell you that it's

6   going to be a small leak next time, it's going to be a pinhole.

7   The example we were shown with the pinhole in the tubing, I look

8   at that and say the whole pipe was on -- on the very verge of

9   drastic complete failure.  Fortunate that an operator walked by

11:57:13  10   it before it blew apart.

11   **Q**      And when you say you don't know how serious an event is

12   going to be, are you talking only about the amount of emissions

13   or some other safety risk?

14              MR. NICHOLS:  Your Honor, object to relevance.  We're

11:57:27  15   not here on -- to try the safety risk associated with any of

16   these.  This is about emission events and their impact for the

17   purposes of the Clean Air Act.

18              MR. KRATKA:  Your Honor, if I could respond:  The

19   Clean Air Act and Exxon's permits regulate the emissions of air

11:57:42  20   pollutants for a number of reasons.  Some of the reasons are

21   because particular constituents may have toxicological effects.

22              Other reasons is that the escape of these gasses

23   contain fire and explosion risks, safety risks.  And both, in

24   several places in the complaint that was filed in this case and

11:57:59  25   in some of the testimony you heard from the Plaintiffs' members,

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Direct/Kratka

1   safety risks from -- physical safety risks from fires or

2   explosions are among the concerns that the people who live near

3   the plant have, along with exposure to the toxicological impacts

4   of the pollutants themselves.

11:58:23   5   MR. NICHOLS:  This man has no basis of reading

6   somebody's mind in the community.  But, your Honor, if they want

7   to go into safety issues at the Baytown Complex, I'll handle it

8   in cross examination.

9   THE COURT:  Okay.

11:58:31   10   MR. NICHOLS:  I'll withdraw my objection.

11   THE COURT:  Withdraw the objection.

12   BY MR. KRATKA:

13   Q   Let me follow up on the second part of what I was going to

14   ask which is is the likelihood of something serious happening --

11:58:53   15   whether it's quantity of pollutants or other safety impacts, is

16   the likelihood of such a thing in any way affected by the sheer

17   number of times that an -- that emission events occur?

18   MR. NICHOLS:  I'm going to object to speculation on

19   that, your Honor.

11:59:12   20   MR. KRATKA:  I'm asking for his engineering opinion on

21   that.  He's an engineer.  He's here as an expert.

22   MR. NICHOLS:  He's asking him to predict the future

23   based on any particular event, whether it would result in

24   something else.

11:59:23   25   THE COURT:  Overruled.

Bowers - Direct/Kratka

1            THE WITNESS:  This is not a yes-or-no answer because

2   it involves judgment, which I have many years of record of

3   making good judgments.

4            The increase in the number of loss-of-containment

11:59:42   5   issues raises concern about the overall level of integrity of

6   the plant.  Is it corroding away?  Is it falling apart?  Are

7   these indicators of bigger problems to come?

8            From the information available to me, I can't

9   answer that because I don't have all of Exxon's root cause

12:00:08  10   analysis which, obviously, they didn't do for all the minor

11   events.  You know, one and half a day, they'd have the whole

12   plant busy doing these.

13            It begs the question and, lacking definitive

14   analysis of each of these myself, I cannot say definitely, yes,

12:00:31  15   it's going to lead to more.  But I say it's quite probable based

16   on the history I have of 50 years in the industry.  You get more

17   leaks, you're going to have a big one.  They -- they missed --

18   dodged a real big one with 500 gallons of LPG blowing out into

19   the air.  That's equivalent to about 20 pounds of TNT.

12:00:52  20   BY MR. KRATKA:

21   Q    All right.  Well, we'll get into more of the details of

22   your analysis.

23            Just along the lines of the seriousness issue, in

24   preparing your report, did you review a study by the Chemical

12:01:01  25   Safety Board?

1  **A**    Yes.

2              THE COURT:  A review of what?

3              MR. KRATKA:  Pardon?

4              THE COURT:  A review of what by the Chemical Safety

12:01:15  5  Board?

6              MR. KRATKA:  Yes.  I'm going to --

7              THE COURT:  You know, what do -- what do they review?

8  Is that a publication or --

9              MR. KRATKA:  I'm about to ask that.  I phrased the

12:01:21  10  question poorly.

11  BY MR. KRATKA:

12  **Q**    Did you -- were there -- did the chemical safety -- first

13  of all, what is the Chemical Safety Board?

14  **A**    It's a group of experts assembled by the government.  These

12:01:31  15  are primarily non-government experts in the field and they're

16  assembled under the Process Safety Management law to evaluate

17  incidents in the hydrocarbon processing and chemical industry.

18  When they have a fire, an accident, they may be called -- like

19  an accident investigation board for the airlines.

12:01:55  20  **Q**    And did you review a Chemical Safety Board report relating

21  to the Richmond refinery in California?

22  **A**    I did.

23  **Q**    And if you turn to --

24              MR. KRATKA:  And your Honor, I'm not introducing this

12:02:06  25  into evidence but this is -- I'm having Mr. Bowers refer to it

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Direct/Kratka

1  because this is one of the documents he relied upon in coming up

2  with an opinion.

3  BY MR. KRATKA:

4  **Q**    A copy of that report is in the notebook as Plaintiffs'

12:02:19   5  Exhibit 448.  Can you describe for the Court what this incident

6  at the Chevron refinery involved.

7  **A**    Turned right to it.

8            In this case, a line operating at high

9  temperature and moderate pressure from the crude distillation

12:02:46  10  unit, the line broke open and it spilled, if you will, a large

11  amount of flammable hydrocarbon, equivalent to, I guess, around

12  diesel fuel or fuel oil; sprayed it out in the air and it was

13  quite hot.

14            And it caught fire and it made a big, big fire

12:03:09  15  and a lot of smoke.  And a lot of people in the area some

16  distance away -- now this refinery is not close to everything,

17  it's kind of separated.  Anyway, a lot of people went to the

18  hospital.

19  **Q**    Did -- was that described in the chemical safety report?

12:03:25  20  **A**    It was described in the safety report as what were the

21  consequences and what was the root cause.

22  **Q**    And would this instance be an example of what you're

23  talking about by the -- as kind of a worst-case example of what

24  can happen in an emissions event?

12:03:41  25            THE COURT:  Hold it a second.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Direct/Kratka

1          MR. NICHOLS:  Objection to relevance.  We're not here

2    to try Richmond, California's refinery.

3          THE COURT:  Sustained.  All right.

4    BY MR. KRATKA:

12:03:50    5    Q    Let me ask you whether any emission events at the Baytown

6    Complex that you reviewed had aspects similar to the causes of

7    the -- as described in the report of this incident at the

8    Chevron Richmond refinery?

9          MR. NICHOLS:  Same objection, your Honor.  We're not

12:04:01   10   here to try a comparative causation or comparative analysis of

11   events at Richmond, California, versus Baytown.

12         MR. KRATKA:  Your Honor, I think it goes to if

13   Mr. Bowers is -- finds --

14         THE COURT:  Well, is it part of your -- excuse me for

12:04:14   15   interrupting.  But is it your cause of action that this is a

16   dangerous operation out there or is it just pollutants in the

17   air, which is important enough?

18         MR. KRATKA:  The pollutants in the air are certainly

19   important enough, but the safety aspects of the air -- the air

12:04:33   20   emissions violations which involves, again, not just toxicology

21   but also flammability and explosiveness.  Both -- but those are

22   both reasons why these pollutants are regulated and the impacts

23   of having Clean Air Act violations involves, for the people who

24   live near the plant and the people that work at the plant, not

12:04:56   25   just potential toxicological impacts but potential physical

Bowers - Direct/Kratka

1    safety impacts.

2          MR. NICHOLS:  If Mr. Bowers were here as a Baytown

3    resident and wanting to talk about his subjective views of risks

4    at the plant or what he perceives to be, but that's not it.  So

12:05:12    5    this is, in essence, an effort to substitute Mr. Bowers'

6    professed engineering judgments for a lack of proof that would

7    be relevant, arguably, to standing.  This man's --

8          THE COURT:  All right.  I want to hear more for a

9    second.

12:05:33    10          MR. NICHOLS:  Yes.

11          THE COURT:  He also mentioned the -- his perception

12    from -- I guess he was on site but looking at all the tables

13    that he thinks that that whole plant out there is having, what

14    is it, corrosion problems or -- I forget what term --

12:05:46    15              What term did you use?

16          THE WITNESS:  It was corroding away.

17          THE COURT:  It's corroding away.

18          MR. NICHOLS:  If he wants to testify to those kinds of

19    opinions, that's not the issue.  The issue is trying to use

12:05:55    20    hyperbole to describe a situation that does not exist at

21    Baytown.

22          THE COURT:  What about the gravamen or the basis of

23    their theory getting to trial?  Does it include some testimony

24    as the dangers out there as far as physical dangers, explosions,

12:06:13    25    or whatever.

Bowers - Direct/Kratka

1    MR. NICHOLS:  Not from a witness like this, your
2 Honor.  If they had somebody in the community that was a member
3 of one of the Plaintiff groups that could show some evidence of
4 a threatened injury, a real evidence of threatened injury as to
12:06:29    5 that member, they would be entitled to present that evidence.
6    THE COURT:  Because Mr. Bowers says he's not sure of
7 anything like that.
8    MR. NICHOLS:  That's exactly right, your Honor.  And
9 that's the other basis of my objection is this is pure
12:06:43   10 speculation.  When -- I'll just preview the Court.  It's a
11 non-jury trial.  You know, if I ask this man sitting up here
12 whether he's aware of anything along the lines of what happened
13 at the Chevron facility out there in California ever having
14 occurred at ExxonMobil's complex during the time period at issue
12:07:03   15 in this suit, I'm fairly comfortable that this man will tell me
16 no.
17    THE COURT:  What about the precursors that he's
18 concerned with?
19    MR. NICHOLS:  That, your Honor, goes to this man's
12:07:13   20 personal view.  It is not relevant to the issue of standing for
21 members.
22    THE COURT:  Well, personal view or professional view?
23    MR. NICHOLS:  It's his personal, professional view.
24 But it's still not relevant to any issue in the case.
12:07:26   25    THE COURT:  Why not?  What are they suing for?

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Direct/Kratka

1              MR. NICHOLS:  Because they're suing for air

2    emissions -- a set of air emissions that occurred through

3    recordable events and reportable events.

4              THE COURT:  All right.

12:07:37   5              MR. NICHOLS:  If this man wants to testify about those

6    and his view of the root cause of those and, as Mr. Kratka said

7    earlier, that he was hired to investigate the causes of those

8    and try to link those up back to their root causes, I'm not

9    objecting to him testifying in those areas.

12:07:55   10              We would -- this is their time.  I guess the

11   Court ultimately can decide that they can use their time how

12   they want.

13              THE COURT:  Well, you need to get it in the record

14   what your concern is.

12:08:04   15              MR. NICHOLS:  But that's my concern is that we

16   shouldn't be spending time talking about issues at other plants

17   that have nothing to do with the actual history of the Baytown

18   facility.

19              THE COURT:  Okay.

12:08:13   20              MR. KRATKA:  May I respond?

21              THE COURT:  Go on.

22              MR. KRATKA:  I've got three areas:  Number one,

23   Mr. Nichols says corrosion throughout the plant, that's

24   irrelevant.  Mr. Nichols himself argued that until the

12:08:25   25   Plaintiffs -- not that we necessarily agree with this but he

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Direct/Kratka

1  argued that, unless the Plaintiffs can show an underlying cause

2  that has not been addressed, we can't maintain our suit for

3  numerous different events.

4          Mr. Bowers is -- if his opinion is that there is

12:08:43  5  evidence of corrosion throughout the plant that leads to --

6  that's a common uncorrected cause of numerous emission events,

7  that goes directly to what Mr. Nichols asked for.  Can I --

8          MR. NICHOLS:  And I'm not objecting to that part of

9  it.  What I'm objecting to is talking about the Chevron

12:08:59  10  refinery.

11          MR. KRATKA:  Well, you did -- you did object.  That

12  was the first thing you said when you had some objection to him

13  talking about corrosion.

14          THE COURT:  All right, last point?

12:09:06  15          MR. KRATKA:  I've got two more points.

16          THE COURT:  You said you had three.

17          MR. KRATKA:  Right.  That was one.  I have two to go.

18          THE COURT:  Go on.

19          MR. KRATKA:  Sorry.  I apologize, your Honor.

12:09:13  20          THE COURT:  Go on.

21          MR. KRATKA:  Secondly, the reasonableness of the

22  members' concern.  Ms. Aguirre, for example, testified that when

23  she hears air raid sirens going off at the plant, when there is

24  no information out there; Mr. Cottar testified that when he

12:09:30  25  sees, you know, large flaring events and what he perceived to be

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Direct/Kratka

1   people fleeing the plant, they have concerns about physical

2   safety.

3           THE COURT:  But are we here to address those concerns?

4           MR. KRATKA:  Yes.

12:09:41   5           THE COURT:  Yes.

6           MR. KRATKA:  You're right.  So let me answer this in

7   two parts.  One is Mr. Bowers' testimony is relevant to -- his

8   expert opinion as to the reasonableness of the residents'

9   concerns for safety, and the residents' concern for safety was

12:09:56   10  laid out right in our complaint in the case.

11           THE COURT:  All right.  Don't worry about it.

12               What's your third point?

13           MR. KRATKA:  Third point is that Mr. Nichols is saying

14  that any information from other plants is irrelevant.

12:10:06   15  Mr. Kovacs testified that it's important to share information

16  not just within the Baytown Complex but within different

17  facilities because each facility can learn from experiences of

18  the others --

19           THE COURT:  All right.

12:10:18   20           MR. KRATKA:  -- so an experience somewhere else -- and

21  I'm about to ask him whether he found conditions at the Chevron

22  plant in that incident that he found similar issues here.

23           THE COURT:  I'm going to mention it to you:  It's your

24  time.  It's your witness.  I understand the objections, and

12:10:32   25  they're on the record.  When it comes time to decide, I'm going

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Direct/Kratka

1  to go back to the complaint and I'm going to track that.  But as

2  a matter of --

3           MR. KRATKA:  I'll just point out --

4           THE COURT:  Overrule the objection.

12:10:45  5           MR. KRATKA:  Okay.  And I'll just point out for the

6  record that the references I was going to cite to the complaint

7  where we raised concern about explosions is paragraphs 5 and 84

8  of the complaint.

9           THE COURT:  Yeah.

12:10:57  10  BY MR. KRATKA:

11  Q    So Mr. Bowers, in your review of emission events at the

12  Baytown Complex, did you find any that had causes that were

13  similar to the cause of the event described in the Chemical

14  Safety Board report with respect to the Richmond refinery?

12:11:15  15  A    Yes.

16  Q    If -- can you describe which two events those were and what

17  the similar cause was.

18  A    Well, one of the events -- I don't remember the number --

19  concerned a hot rundown line from a distillation tower going to

12:11:32  20  a heat exchanger.  And the line failed from hot internal

21  corrosion.  It was a service that, obviously, previously had not

22  been considered corrosive or it would have been built with a

23  corrosion-resistant alloy per Exxon's standards.

24           And the probable cause is, over the years, Exxon

12:12:02  25  has, by choice, chosen to use heavier and more sour crudes --

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Direct/Kratka

1    they have more sulfur in them -- and they built additional

2    hydrotreating facilities and sulfur plants to remove that.

3                    And so -- and there's another one.  I'm trying to

4    remember where it is, but it's -- it's very similar.

12:12:21  5    **Q**    If it would refresh your recollection to refer to Page 13

6    of your supplemental report, which is -- Exhibit 430, I think,

7    is the supplemental report.  You got it?

8    **A**    Yes, sir.  There's two.  They're very similar.  One was on

9    the catalytic light ends unit, and that unit -- the light

12:12:55  10   products, typically, have a significant amount of sulfur and

11   other corrosive elements in it and the line failed.  And it's

12   obvious that it was from internal corrosion, was so stated.

13                   It -- it's very hard, if not impossible, to

14   determine the condition of hot piping while it's in service.  It

12:13:20  15   is -- as a matter of fact, the Chemical Safety Board so states

16   in their opinions.  While it's in operation, any -- anything you

17   do is more or less meaningless.

18                   Similar incident on the cat cracker rundown line.

19   The product that is not normally corrosive corroded away the

12:13:42  20   pipe.

21   **Q**    And so the underlying similarity between the Chevron

22   Richmond event and these events at Baytown are the changing

23   character --

24   **A**    Changing conditions --

12:13:50  25   **Q**    -- of the products in the pipes?

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Direct/Kratka

1    **A**    Yes.  And this is a -- a fact of refining life today.

2    **Q**    All right.  Let me ask you some questions about -- we are

3    dealing with a large -- the Court is dealing and you are dealing

4    with a very large number of emission events.  So let me ask you

12:14:09   5    some questions about how you went about analyzing these events.

6              Did you do anything initially to get an overall

7    sense of the many emission events you were asked to analyze?

8    **A**    Yes.

9    **Q**    What did you do?

12:14:22   10    **A**    I read.  I read a lot.

11    **Q**    STEERS reports?

12    **A**    STEERS reports.  There are deviation reports.  There are --

13    everything I had available.  I read fast and I put in several

14    hours at a time.

12:14:38   15    **Q**    And after getting a sense of the overall picture, did you

16    select any events for deeper analysis?

17    **A**    I did.

18    **Q**    And did the analysis of specific individual events enable

19    you to reach any conclusions about the causes of those events

12:14:54   20    and whether they were preventible?

21    **A**    Yes.

22    **Q**    And then, in addition to the in-depth analysis of

23    individual events, did you also look for patterns or common

24    factors in the occurrence of emission events at the complex?

12:15:07   25    **A**    I did.

1   **Q**   And why did you look for patterns?

2   **A**   Patterns are generally pretty predictive.  If a pattern is

3   ongoing, it will keep going until you do something to stop it.

4   You have to stop the root cause, interrupt it.

12:15:25  5   **Q**   And did you, in fact, find patterns among the emission

6   events that had occurred at the Baytown Complex?

7   **A**   I did.

8   **Q**   And are those patterns reflected in Exhibits 4 through 15

9   of Exhibit 430, your revised supplemental report?

12:15:40  10   **A**   Yes, they are.

11       MR. KRATKA:  And, your Honor, I just, again, for ease

12   of reference, those exhibits have been excerpted separately as

13   Plaintiffs' Exhibit 433 through 444.  And in referring to them,

14   I'll go by those separate exhibit numbers.

12:15:58  15       THE COURT:  All right.

16   BY MR. KRATKA:

17   **Q**   Are some of these -- I'm going to ask you some questions

18   about how you compiled these tables showing patterns.

19       MR. NICHOLS:  Your Honor, may I take the witness on

12:16:13  20   voir dire.

21       THE COURT:  Yes, go on.

22             VOIR DIRE EXAMINATION

23   BY MR. NICHOLS:

24   **Q**   Mr. Kratka asked you a question, Mr. Bowers, about "you

12:16:19  25   compiled."

                      1          It's true, is it not, that these charts,

                      2   beginning with Exhibit 433, were compiled by someone at the

                      3   National Environmental Law Center and given to you for review?

                      4          MR. KRATKA:  Your Honor, I was about to go through a

12:16:37          5   series of questions establishing exactly how --

                      6          THE COURT:  All right.  Lay some predicate.  Why don't

                      7   we see -- we'll see what the predicate is.

                      8          MR. KRATKA:  Okay.

                      9                      DIRECT EXAMINATION

12:16:43         10                          (continued)

                    11   BY MR. KRATKA:

                    12   **Q**    First of all, Mr. Bowers, whose idea was it to compile

                    13   these tables?

                    14   **A**    It was mine.

12:16:52         15   **Q**    Did you personally assemble these tables by yourself?

                    16   **A**    No, I did not.

                    17   **Q**    Who did the actual labor of compiling them?

                    18   **A**    The employees at NELC and their staff, at my direction.

                    19   **Q**    Why didn't you compile these tables yourself?

12:17:04         20   **A**    It's extremely time consuming and my arthritic hands are

                    21   not as fast on the keyboard.

                    22   **Q**    Was the Plaintiffs' legal team that worked on compiling

                    23   these tables, were they operating under your direction?

                    24   **A**    They were.

12:17:19         25   **Q**    And who decided on which categories or how to categorize

Bowers - Direct/Kratka

1  emission events?

2  **A**    I identified the categories I wanted these sorted into.

3  **Q**    And was the information that was used to assign an

4  emissions event to a particular unit -- for example, at the

12:17:35  5  refinery, was the information used to assign an emission event

6  to a unit in some of these tables based on Exxon's own

7  description of the unit or did that come from somewhere else?

8         THE COURT:  Hold it.  Their own description of the

9  unit relative to this event?

12:17:51  10         MR. KRATKA:  Yes.

11  BY MR. KRATKA:

12  **Q**    In other words, if Exxon itself, in its STEERS Report,

13  identified an event as occurring at the flexicoker unit, was

14  that the basis on which you directed the legal staff to assign

12:18:04  15  that event?

16  **A**    Yes.  When I wanted to, you know, list them by unit, that's

17  what we had, was only Exxon's definition or descriptor of where

18  the event took place.

19  **Q**    And so you directed Plaintiffs' legal staff to use Exxon's

12:18:19  20  own descriptors?

21  **A**    Yes, sir.  That's what we had.  We had Excel spreadsheets

22  furnished to us by Exxon under discovery.

23  **Q**    And similarly, for tables in which you assigned events to a

24  particular common type of equipment, did you direct the legal

12:18:36  25  staff to use Exxon's own description of the type of equipment

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Direct/Kratka

1  involved?

2  **A**    Yes.

3  **Q**    And similarly, when you attempted to assign emission events

4  to a particular cause, did you direct Plaintiffs' legal staff to

12:18:50  5  assign events based on Exxon's own description of the cause?

6  **A**    Yes.

7  **Q**    And these descriptions from Exxon were contained in

8  documents generated by Exxon itself?

9  **A**    I don't know.  They were supplied by Exxon.

12:19:06  10  **Q**    Were they -- did they come from -- basically, from STEERS

11  reports and the non --

12  **A**    From STEERS reports and under discovery.

13  **Q**    -- and the non-reportable emission events spreadsheets?

14  **A**    Yes, sir.

12:19:17  15  **Q**    And you had already testified that you yourself had

16  personally reviewed Exxon STEERS Reports and non-reportable

17  spreadsheets, right?

18  **A**    Yes.

19  **Q**    And once these initial versions of these tables were

12:19:32  20  compiled, did you review the tables for accuracy?

21  **A**    I did.

22  **Q**    And did you, in fact, satisfy yourself that these tables

23  were sufficiently accurate?

24  **A**    Yes.  Once there were a few errors we had corrected.

12:19:47  25         MR. KRATKA:  Proceed?

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Direct/Kratka

1                MR. NICHOLS:  I don't know.  Is there some need for me

2   to --

3                THE COURT:  I was looking to --

4                MR. KRATKA:  You had an objection.

12:19:53  5                THE COURT:  Are you ready for him to proceed?

6                MR. NICHOLS:  Your Honor, I think the issues that I've

7   got, I'll be able to handle on cross examination.

8                THE COURT:  Okay, thank you.

9                   Go right ahead.  Thank you.

12:20:14  10  BY MR. KRATKA:

11  Q    Now, as you've just gone through, some of these tables

12  you've compiled assign emission events based on -- or

13  categorized emission events based on which unit they occurred

14  at, right?

12:20:25  15  A    Yes.

16  Q    Why did you decide to categorize emission events according

17  to where they occurred?

18  A    I wanted to examine, if you will, determine were there

19  patterns?  Was a particular unit troublesome?  Was it a bad

12:20:41  20  actor or was it unrelated events?

21  Q    And does categorizing events by unit, determining what -- a

22  unit might be a bad actor, does that -- can that provide any

23  information about the causes of events or the preventability of

24  events?

12:21:00  25  A    Yes.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Direct/Kratka

1  Q    And are some of your tables organized according to the type

2  of equipment involved?

3  A    Yes.  Yes.

4  Q    And again, why would you categorize emission events by the

12:21:11  5  recurring type of equipment involved?

6  A    Again, I'm looking for patterns.  Was a particular type of

7  equipment unreliable?

8  Q    And does the same answer apply to why you categorized --

9  you made another cut and categorized emission events by the

12:21:23  10  stated cause of the event?

11  A    Yes.

12  Q    Now, you -- did you hear Mr. -- were you in court yesterday

13  when Mr. Kovacs testified about using information about the

14  cause of one event, one emission event to create shared learning

12:21:39  15  to prevent other events?

16  A    I heard that.

17  Q    Did you agree with that approach?

18  A    Yes.

19  Q    And is that approach consistent with the way you yourself

12:21:48  20  approach the question of looking for common causes and the

21  potential prevention of emission events at the Baytown Complex?

22  A    Yes.

23  Q    Now, right now, I'm just -- again, for the Court's

24  information and ability to assess the more detailed analysis

12:22:14  25  that will come later, right now, I just want to get a brief

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Direct/Kratka

1    statement of your overall conclusions that you've drawn from

2    your work in this case.

3              THE COURT:  Why don't we do this:  Remind me what

4    exhibit is Mr. Bowers' resume.

12:22:27  5              MR. KRATKA:  432, I believe.

6              THE COURT:  Okay, thank you.

7              MR. KRATKA:  No, no, that's wrong.  Yep, it's right.

8    432.

9              THE COURT:  432.  Yeah, got it.  Okay.

12:22:43  10   BY MR. KRATKA:

11   Q    Now, Mr. Bowers, based on your analysis of the emission

12   events at the Baytown Complex, did you, in fact, determine that

13   there were common factors or common causes among emission

14   events?

12:22:56  15   A    Yes.

16   Q    And some of those common factors and causes are reflected

17   in these tables that we've just been discussing?

18   A    Yes.

19   Q    And did this analysis enable you to form an opinion about

12:23:08  20   whether or not Exxon could have prevented emission events that

21   occurred at the Baytown Complex?

22   A    Yes, sir.

23   Q    And in summary, what did you conclude -- what did you

24   conclude about whether Exxon could have prevented the emission

12:23:22  25   events that occurred at the Baytown Complex going back to

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Direct/Kratka

1    October of 2005?

2    **A**    In my own words, corrosion is not an instantaneous failure.

3    It takes place over months, years, sometimes hours, but in --

4    but not in this refinery.  It's detectable and it is

12:23:46    5    completely -- a leak from corrosion is completely preventible.

6    It takes effort.  It takes diligent inspection.  And when

7    corrosion is found, one has to take care of the root cause or it

8    will continue.

9    **Q**    Did you form any opinion as to whether better preventive

12:24:07    10    maintenance could have prevented any past emission events at the

11    Baytown Complex?

12    **A**    Yes.

13    **Q**    Briefly, what did you conclude?

14            THE COURT:  All right.  So, before I forget,

12:24:16    15    corrosion, you feel, is the primary reason for these events or

16    is the reason for the events subject to this lawsuit?

17            THE WITNESS:  Yes, sir.

18            THE COURT:  Okay, thank you.

19            And what was -- now, where do you go next,

12:24:28    20    corrosion and maintenance?

21            MR. KRATKA:  Well, now, I'm asking -- yes, whether --

22    and, your Honor, we'll get into -- yeah, if Mr. Bowers -- I

23    guess you'll see -- nevermind.

24            Strike that.

12:24:35    25            We'll get into the full scope of Mr. Bowers'

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Direct/Kratka

1  opinion.  But he has identified corrosion as the major problem.

2         THE COURT:  He's giving me his opinion now, right?

3         MR. KRATKA:  Yes.

4  BY MR. KRATKA:

12:24:46  5  Q    And briefly, what did you conclude about whether preventive

6  maintenance could have prevented any of the emission events that

7  have occurred at the Baytown Complex since 2005?

8  A    Exxon at Baytown practices a form of maintenance that was

9  originally developed in the airline industry.  It's called

12:25:06  10  "predictive maintenance," I believe that's the name for it.  And

11  it consists, in their -- their facility, as they describe it, of

12  two parts.  One is measuring the performance of a piece of

13  equipment and predicting how much longer it will run before it

14  has to be taken down for -- well, before something serious

12:25:34  15  happens.

16         THE COURT:  Again, how do you phrase this maintenance?

17  Not preventative.  There was another term you used.

18         THE WITNESS:  Predictive.

19         THE COURT:  Predictive.

12:25:44  20         THE WITNESS:  When you measure the vibration in a --

21  in a compressor, for instance, or you listen for a rod knock,

22  you know, knock-knock-knock, and you evaluate the condition of

23  that equipment and say, "It's good for another thousand hours,

24  doesn't need anything now."

12:25:56  25         And the other kind is actual preventive

Bowers - Direct/Kratka

1   maintenance:  when you change the oil in a gear box on a regular

2   basis, every three months, with the goal of preventing wear and

3   failure.  While one form says, "Don't do anything to it, run it

4   until just before it breaks" --

12:26:18    5            THE COURT:  That's preventive maintenance?

6            THE WITNESS:  Preventive maintenance says, "We're

7   going to change the oil."

8                 Predictive maintenance says, "Hey, it's running

9   good, don't do anything."

12:26:30   10                 And it appears Exxon has excellent operations in

11  terms of how long between turn-arounds.  They run the longest

12  between turn-arounds of anybody in the world.

13  BY MR. KRATKA:

14  **Q**    And what is a turn-around?

12:26:43   15  **A**    It's when you take the plant down for overall, general

16  maintenance all over the place, fix everything you can or

17  everything you need to before it will run to the next

18  turn-around.

19            THE COURT:  By the way, keep in mind, if anybody needs

12:26:56   20  a break any time, we'll take a break.  We're going to keep

21  going.  Anybody need a break, let me know.

22            THE WITNESS:  Yes, sir.

23            THE COURT:  It happens in every case.  So no problem.

24            THE WITNESS:  Thank you.

12:27:05   25            THE COURT:  I tell my jurors the same thing.  So I

Bowers - Direct/Kratka

1    plan to go to 1:05, unless I hear otherwise.  We'll take five

2    minutes and still go on to that time.

3              THE WITNESS:  Thank you, your Honor.

4              THE COURT:  Thank you.

12:27:20    5  BY MR. KRATKA:

6    **Q**    Briefly -- go ahead.

7    **A**    The difficulty with the maintenance as practiced at Exxon

8    is that a significant number of pieces of equipment fail in

9    service and this usually leads to an emissions event.  This is

12:27:39  10  an excellent way to minimize overall maintenance costs; that you

11   use up the facility, use up that compress -- all that

12   compressor's life before I do anything to it because I'm going

13   to change all the -- all the parts inside there anyways.

14              I personally and professionally feel that's

12:28:03  15  risky.  Because, as Mr. Heinz Bloch so clearly says, every time

16   you have an incident where there's a loss of containment,

17   you're -- you're -- you're lighting the match and things can

18   happen beyond your expectations and things happen -- do happen

19   that are unforeseen and you have a major catastrophe.

12:28:28  20  **Q**    And so in the --

21              THE COURT:  Well, even with preventive maintenance and

22   predicted maintenance, there can always be things that go wrong,

23   correct?

24              THE WITNESS:  Well, stuff happens.

12:28:35  25              THE COURT:  Yeah.

Bowers - Direct/Kratka

1          THE WITNESS:  Unexpected stuff.

2   BY MR. KRATKA:

3   Q    Well, let me ask a followup on that specific point.

4          Did you form any opinion as to whether design

12:28:45   5   changes or other capital improvements could have prevented any

6   emissions at the plant even in a situation where there might --

7   where something might have broken?  Were there design changes

8   that could have been done that would prevent any emissions from

9   occurring from those type of unavoidable --

12:28:55   10  A    Yes.

11  Q    -- truly unavoidable --

12          THE COURT:  I'm going to stop for a second because I

13  got a question.  All right?

14              Mr. Nichols --

12:29:08   15      MR. NICHOLS:  Yes, sir.

16          THE COURT:  -- is it your position that Exxon does

17  preventative maintenance and predictive maintenance?

18          MR. NICHOLS:  Yes, sir.

19          THE COURT:  That's all.  Thank you.  I just wanted to

12:29:17   20  know where the line is drawn.  Okay.

21              Yes, sir.

22          MR. KRATKA:  Could you read back that last question,

23  please.

24          THE COURT:  Not my question.

12:29:23   25      MR. KRATKA:  Second to the last question.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Voir Dire/Nichols

1       (The requested question was read.)

2           MR. KRATKA:  You know what, it was a poorly worded

3    question.  I'm going to rephrase it.

4           THE COURT:  Okay.

12:29:59  5           MR. KRATKA:  I don't really want to hear it read back

6    to me.

7    BY MR. KRATKA:

8    **Q**   Mr. Bowers, did you form any opinion as to whether design

9    changes or other types of capital improvements at the complex

12:30:06 10   could have prevented emissions from emission events?

11   **A**   I did.

12   **Q**   I'm -- okay.  We will get to those in detail in due time.

13           You've been talking about leaks and corrosion

14   already, so let's go straight to Plaintiffs' Exhibit 436.

12:30:48 15           THE COURT:  Okay.  436 has over a hundred pages it

16   looks like, correct?

17           MR. KRATKA:  Yeah, that's -- exactly, your Honor.

18           MR. NICHOLS:  May I take the witness on voir dire?

19           THE COURT:  Yes, sir.

12:30:55 20                   VOIR DIRE EXAMINATION

21   BY MR. NICHOLS:

22   **Q**   Mr. Bowers, is it your position that each and every event

23   that's listed in here --

24           THE COURT:  In what?

12:31:01 25   //


                Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Direct/Kratka

1  BY MR. NICHOLS:

2  Q    -- in Exhibit 436 was caused by corrosion?

3  A    No.

4  Q    Okay.

5                    DIRECT EXAMINATION

6                      (continued)

7  BY MR. KRATKA:

8  Q    Mr. Bowers, can you describe what Exhibit 436 is.

9  A    Exhibit 436 tabulates the emission events classified by

10 Exxon as a leak, a loss of containment.

11 Q    An emission either from a leak or from an event that was

12 caused by a leak?

13 A    Yes.  A leak happened, the stuff got out.

14 Q    And just -- before we get into the substance of your

15 opinion about leaks and corrosion and all the rest, can we just

16 first take a look at the number of events included --

17 categorized by Exxon as leaks?

18           Can you read for the Court exactly how many

19 leak-related emission events there have been in the past eight

20 years.

21 A    The tabulation says there's 1,758 unintended emissions

22 caused by leaks as defined by and tabulated by Exxon.

23 Q    And as we can see, there are literally a hundred pages of

24 individual -- lists of individual events caused by leaks?

25 A    Yes.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Voir Dire/Nichols - Direct/Kratka

1  Q    And on the first page of this Exhibit 436, Page 7-1, did
2  you direct a graph to be created showing the number of leaks?
3  A    Yes, I did.  I told the analyst to -- to graph this for me.
4  I told the analyst who was manipulating the spreadsheet to
5  construct a graph.
6            MR. NICHOLS:  And can I ask another question on voir
7  dire, Judge?
8                      VOIR DIRE EXAMINATION
9  BY MR. NICHOLS:
10 Q    Who is the analyst that you're talking about?
11 A    An employee of NELC.  What's the name?
12 Q    Yes, sir.
13 A    It's Ms. Mary Rock.
14 Q    Okay.
15            MR. KRATKA:  And Mary Rock is a paralegal, seated at
16 counsel's table.
17                      DIRECT EXAMINATION
18                         (continued)
19 BY MR. KRATKA:
20 Q    And this graph shows how many leak-related emission events
21 occurred by month?
22 A    Yes.  That was what I asked her to do.
23 Q    And can you describe for the Court any conclusions you draw
24 about the frequency of leak-related emission events?
25            MR. NICHOLS:  May I ask another question on voir dire?

Bowers - Direct/Kratka

1          THE COURT:  No, sir.  Let's move it along.

2          THE WITNESS:  The evidence indicates the number of

3  leaks is increasing with time, roughly doubled.

4  BY MR. KRATKA:

12:33:42  5  **Q**    Doubled from the beginning of the --

6  **A**    Yes.

7  **Q**    -- period covered by the lawsuit to 2013?

8  **A**    May I add a qualifier?

9  **Q**    Sure.

12:33:51  10  **A**    I am not personally aware of whether or not Exxon's method

11  for determining leaks has become more sensitive with time.  The

12  information does not show how a leak was detected.

13  **Q**    All right.  And if we turn to the next page, the second

14  page of the exhibit, there's a bar graph.

12:34:23  15          Can you explain for the Court what this bar graph

16  shows.

17  **A**    This -- this bar graph shows the number of hours in the

18  period versus the number of hours that were involved in leaks as

19  reported by Exxon, how many hours was there something leaking.

12:34:46  20  In many cases there are more than one leak happening

21  simultaneously --

22  **Q**    So with --

23  **A**    -- in one place.

24  **Q**    So with more than one leak happening simultaneously, the

12:34:55  25  total duration of leaking pollutants totals more hours than the

Bowers - Direct/Kratka

1    actual number of hours from 2005 to 2013?

2    **A**    As shown by their data.

3    **Q**    This is drawn from the "Duration" column of Exxon's own

4    emissions event reports?

12:35:12    5    **A**    Yes, sir.

6                THE COURT:  All right.  What's the impact of that, in

7    your opinion?

8                THE WITNESS:  To me?

9                THE COURT:  Yes, sir.  What impact is that?

12:35:23    10                THE WITNESS:  It tells me there's more than one leak

11    going on all the time.

12                THE COURT:  Okay.  That's what I thought.

13                Go on.

14    BY MR. KRATKA:

12:35:31    15    **Q**    Now, let's talk about why you decided to use leaks as a

16    single category for categorizing emission events.

17                Do you consider leaks important from an

18    engineering standpoint?

19    **A**    Yes.

12:35:43    20    **Q**    Why is that?

21    **A**    They're not supposed to happen.

22    **Q**    Why is that?

23    **A**    It represents a failure of containment.  Everything about

24    the design of a refinery and its construction is intended to

12:35:58    25    contain the hydrocarbons or other material within a solid

1  barrier, steel, usually, not just flying around.

2  Q    And are leaks important in your --

3        MR. KRATKA:  Well, strike that.

4  BY MR. KRATKA:

12:36:21  5  Q    Is -- does the presence of a leak of hydrocarbons create

6  any safety issues?

7  A    Yes.

8  Q    And why is that?

9        MR. NICHOLS:  Your Honor, same objection as before.

12:36:34  10       THE COURT:  Overruled.

11       THE WITNESS:  Having a hydrocarbon exposed to air

12  gives you two of the elements necessary for a fire or explosion.

13  All you need left is a source of ignition.  And in a refinery,

14  often, the metal surface is hot enough to cause the hydrocarbon

12:36:53  15  to ignite.

16  BY MR. KRATKA:

17  Q    Can static electricity also be an ignition source?

18  A    It can.

19  Q    Can a piece of smoldering wood be an ignition source?

12:37:05  20  A    Yes.

21  Q    What types of equipment at the Baytown Complex can leak?

22  A    Any rotating equipment that's not hermetically sealed.

23  Q    And rotating equipment would be a compressor?

24  A    Compressors, pumps.  There are a few other small types but,

12:37:23  25  basically, pumps and compressors, which have seals at the shaft

Bowers - Direct/Kratka

1   to keep the stuff from leaking out.  You got pipes, you have

2   flanges where the pipes are -- are joined with a gasket at

3   connection.  You have any connection to the pipe.

4              Sometimes instruments are screwed into a -- a

12:37:41  5   fitting, although those are very, very limited in number.  You

6   can have leaks develop, like, say, inside heat exchanger tubes,

7   leaks to the other fluid or leaks to cooling water which then

8   goes to the air.

9   **Q**    And what have -- based on your analysis of emission events

12:38:04  10  at the Baytown Complex, what are some of the causes given by

11  Exxon for the various leaks from pipes and other equipment, if

12  you just generally recall?

13  **A**    In many -- in many cases, it's not specified in their -- in

14  their report.

12:38:24  15            THE COURT:  What -- does it just say "leaks"?

16            THE WITNESS:  It just says "leak."

17              And leak from -- if it's a leak from a flange,

18  it's a failure of either the bolts or the gasket on the flange.

19  If it's a leak in a pipe, it's from corrosion, either external

12:38:38  20  corrosion or internal corrosion.  Occasionally --

21            THE COURT:  By "internal corrosion," you mean inside

22  whatever is passing through it or from the structure of the --

23  of the metal itself?

24            THE WITNESS:  What's passing through it --

12:38:50  25            THE COURT:  Causing --

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Direct/Kratka

1                  THE WITNESS:  -- causes a corrosive condition.
2                  THE COURT:  Versus outside corrosion.
3                  THE WITNESS:  Outside, it's moisture gets in
4    underneath the insulation or pipe, and it just rusts it away.
12:39:00   5                  THE COURT:  Go on.
6    BY MR. KRATKA:
7    Q    So, can corrosion come from the outside?
8    A    Yes.
9    Q    And can corrosion come from the inside?
12:39:07   10   A    Yes.
11   Q    Can vibration cause leaks?
12   A    Yes.
13   Q    How does that happen?
14   A    Metal is subject to fatigue.  Repeated flexing of the metal
12:39:19   15   will eventually cause it to get brittle and cracks to form.  And
16   as it keeps flexing it, the cracks get bigger and eventually
17   they break.
18   Q    Can temperature changes cause leaks?
19   A    Yes.
12:39:31   20   Q    How does that work?
21   A    There's two mechanisms.  One is at bolted connections,
22   whether it's a manway or a flange, cycling of temperature will
23   cause the bolts to stretch and the gasket to compress.  You keep
24   cycling it and if there's not enough strength in the bolts, it
12:39:50   25   will eventually leak.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Direct/Kratka

1  Q    And what factors determine how long it would take for

2  corrosion to cause, say, a pinhole leak in a pipe?

3  A    The time to failure depends on the thickness of the

4  material, how thick is the pipe wall; the corrosive environment,

12:40:09  5  what is causing -- the chemical causing the corrosion; how

6  concentrated it is and how hot it is.

7  Q    And you've already testified that at a refinery or chemical

8  plant corrosion takes place over some length of time?

9  A    Typically, it's over some period of years.

12:40:29  10  Q    And did you find any instances in which Exxon reported that

11  leaks were caused by corrosion at the complex?

12  A    Yes, sir.

13  Q    And did you find any instances in which Exxon reported that

14  leaks were caused by metal fatigue at the complex?

12:40:44  15  A    Yes.

16  Q    Did you find any instances in which Exxon reported that

17  leaks were caused by temperature changes?

18  A    I don't recall specifically.  I just don't recall without

19  going back over it.

12:40:57  20  Q    All right.  Have you drawn any conclusions as to whether

21  leaks that were caused by corrosion or vibrations or metal

22  fatigue were sudden occurrences?

23  A    I didn't find any that were sudden, meaning in less than

24  one day it started and finished.

12:41:15  25  Q    Can there be visible warning signs of corrosion?

1    **A**    Yes.

2    **Q**    What are the visible warning signs?

3    **A**    You can see rust on the exterior of a pipe if you look at

4    it.

12:41:26    5           THE COURT:  What if it's covered by insulation?

6           THE WITNESS:  That's the ubiquitous corrosion under

7    insulation which is a problem throughout the industry now,

8    because these units are old.  They're 30 years old, 40 years

9    old, 20 years old.

12:41:40    10          THE COURT:  So what do they have to do?  How do you

11   determine corrosion underneath insulation?

12          THE WITNESS:  You take the insulation off and look.

13          THE COURT:  So you do that -- have to do that -- of

14   course, they state, if I remember, they have what -- about

12:41:51    15   thousand miles of pipes going in there, and let's assume a good

16   number of that has insulation.  So in other words, the

17   corrective measure would mean take all the insulation off, check

18   it, and put it back on?

19          THE WITNESS:  (Indicated yes.)

12:42:07    20          THE COURT:  Okay.

21          THE WITNESS:  Yes, sir.

22   BY MR. KRATKA:

23   **Q**    Can there be detectible warning signs of vibrations?

24   **A**    Yes.

12:42:13    25   **Q**    And what would those signs be?

Bowers - Direct/Kratka

1  **A**    You put your hand on it or you measure it with a

2  instrument.  A routine practice in many refineries, the one I

3  learned from Texaco, when you have an unit down for any reason,

4  all these small connections, bleeders and vents, they had

12:42:30  5  trained inspectors that whopped each one of them with a

6  three-pound blacksmith's hammer and listened to it.  And it

7  should give a -- a clear ring.

8  **Q**    Like a bell?

9  **A**    Like a bell.  And if it's muted and muddy, that means

12:42:44  10  there's something wrong.  It's no longer solid.

11        THE COURT:  But you have to get under the insulation

12  to do that.

13        THE WITNESS:  Well, the connections are sticking out.

14        THE COURT:  Oh, the -- all right.  Connections.

12:42:52  15        THE WITNESS:  And an uninsulated pipe, just bang on

16  the pipe.  "Hey, did it have a good ring or not?"  If it didn't,

17  why not.  And this was a very effective tool.  I know we

18  replaced that with technology.  We use ultrasound detectors,

19  only they -- but they only check the spot where you have the

12:43:08  20  measurement -- instrument, that little spot, quarter-inch, may

21  not be representative of what's really going on.

22  BY MR. KRATKA:

23  **Q**    And so if you're checking with an ultrasonic piece of

24  equipment, you need to do many checks?

12:43:20  25  **A**    Yes.  And that raises your odds of finding a corrosion pit.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Direct/Kratka

1   **Q**    And do you need to look in spots that are more likely to

2   suffer corrosion?

3   **A**    Yes.

4   **Q**    Do you know how old these -- we talked about thousands of

12:43:35   5   miles of piping at the complex.  Do you know how old the piping

6   systems at the Baytown Complex are?

7   **A**    I do not have personal knowledge.  I can only speculate.

8   **Q**    I don't want you to speculate.

9          Is the Baytown Complex a -- would you consider it

12:43:51   10   to be a newer refinery or an older refinery?

11   **A**    Very old.

12   **Q**    And do you know whether or not Exxon has replaced much of

13   its piping?

14   **A**    I do not know.

12:44:06   15   **Q**    Do you know how many -- well, we heard yesterday there are

16   a million valves at the Baytown Complex, which raises the

17   question -- and your Honor asked it.  There's thousands of miles

18   of piping, there's a million valves.  Is it even possible to

19   prevent leaks on that much piping, that many valves and other

12:44:28   20   types of equipment?

21   **A**    Absolutely, yes.

22   **Q**    What does it take or what would it take?

23   **A**    Diligent inspection.

24   **Q**    Would it take manpower?

12:44:40   25   **A**    It takes manpower.

Bowers - Direct/Kratka

1           THE COURT:  Take a lot of manpower, wouldn't it?

2           THE WITNESS:  Not that many --

3           THE COURT:  How about the --

4           THE WITNESS:  -- going around all the time.

12:44:46   5           THE COURT:  Well, you know the size of that facility

6    out there.  How long would it take, do you think, till it was in

7    shape -- all the items that you suggested that ought to be done?

8           THE WITNESS:  Well, my original estimate was that

9    they're under-spending by, you know, a lot of money, 90 million

12:45:00  10   or more a year.

11           THE COURT:  Under-spending?

12           THE WITNESS:  Under-spending.  And that would give you

13   900 people walking around checking.  And that's a lot.  That's a

14   lot.  You know, you would check some pipes --

12:45:15  15           THE COURT:  All right.  So you're suggesting that or

16   is it that's how much it would take to do it, that 90 million

17   and 900 people?

18           THE WITNESS:  My opinion is it's -- they're

19   under-spending by at least that much.

12:45:25  20           THE COURT:  Okay.

21           THE WITNESS:  That's -- which is what is one of the

22   major contributors to these small leaks that are growing in

23   numbers and will eventually likely lead to major releases.

24           THE COURT:  You were here before.  They had said they

12:45:38  25   have, including contractors, over 5,000 folks out there.  So

1  they need, you say, based upon the productivity of that -- that

2  operation, they need about 900 more constantly going around

3  checking?

4          THE WITNESS:  Yes, at least that.

12:45:54  5          THE COURT:  Okay.

6          MR. KRATKA:  And, your Honor, we'll get into just how

7  we calculated that number.

8          THE COURT:  Sure.

9  BY MR. KRATKA:

12:46:03  10  Q   Now based on the records you've reviewed for the case, have

11  you determined whether Exxon has done everything it could to

12  prevent some or all of these 1,758 emission events caused by

13  leaks?

14  A   They have not.

12:46:20  15  Q   Based on your review of the evidence, the results, has

16  Exxon performed sufficiently frequent inspections on these pipes

17  and valves and other components?

18          MR. NICHOLS:  Your Honor, may I ask a question on voir

19  dire?

12:46:34  20          THE COURT:  All right.  Go on.

21                  VOIR DIRE EXAMINATION

22  BY MR. NICHOLS:

23  Q   Mr. Bowers, are you familiar with the inspection protocol

24  that's in place at the Baytown Complex?

12:46:40  25  A   I am.  I'm not intimately familiar with it.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Direct/Kratka

1   **Q**    Have you seen any documentation concerning that protocol?

2   **A**    I have.

3   **Q**    How many people are out there working on inspections of

4   pipe?

12:46:51   5   **A**    I don't know.

6   **Q**    Do you know how frequently they go out and check pieces of

7   pipe?

8   **A**    For some I know it's every 20 years as stated by policy.

9           THE COURT:  You can get to that in cross examination.

12:47:05   10          MR. NICHOLS:  Yes, sir.

11          THE COURT:  Go on, Keep going.

12                      DIRECT EXAMINATION

13                         (continued)

14   BY MR. KRATKA:

12:47:07   15   **Q**    Mr. Bowers, getting right to Mr. Nichols' point, Exxon

16   provided an answer to an interrogatory in this case where they

17   say they performed over 200,000 inspections in the year 2011.

18          Do you know whether Exxon has performed the type

19   of inspections in the right places that you were describing a

12:47:28   20   moment ago?

21   **A**    Could you define what you mean by "right."

22   **Q**    Well, I asked you about, for example, ultrasonic thickness

23   inspections for pipes.  And you answered that you need to do a

24   lot of --

12:47:41   25          THE COURT:  Did he say thickness or just the condition

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Direct/Kratka

1  of the pipe with ultra sound, it covered about a quarter of an

2  inch?  That would -- that'd be what?  The condition of the pipe?

3  Or what was your --

4  BY MR. KRATKA:

12:47:51  5  **Q**    Does the ultrasonic inspection measure the thickness of the

6  pipe -- of the pipe wall?

7  **A**    That's -- it's generally interpreted as that.  It gives you

8  a reflection off of where the sound metal surface is.  There may

9  be corrosion underneath it coming on top of it.  It will measure

12:48:08  10  to the bottom of the pit if you go from the outside in.  But you

11  have to be in contact with the outside surface.  And if it's

12  hot, hot surface, you're wasting your time.

13  **Q**    Let me ask you this a little more generally:  Does Exxon's

14  assertion, statement, that it performed over 200,000 inspections

12:48:27  15  in a single year, does that affect your conclusion that you just

16  stated that they have not done enough to detect and prevent

17  leaks?

18  **A**    If they had done enough, there would not be leaks.  200,000

19  inspections, you figure each person can do one an hour and

12:48:45  20  there's 2,000 hours in an employee's year, that means they had a

21  hundred people working on inspections.  That's at a very low

22  productivity rate of one an hour.

23  **Q**    Well, when you visited the Baytown Complex for a site

24  inspection, the one we talked about in February of 2012, did you

12:49:03  25  form any impressions during that site inspection regarding the

Bowers - Direct/Kratka

1  physical appearance of the plant?

2  **A**   Yes, I did.

3  **Q**   Did you see any rusting equipment during your visit?

4  **A**   Yes.

12:49:14  5  **Q**   Was there rust visible on pipes?

6  **A**   Yes.

7  **Q**   Was there rust visible on tanks?

8  **A**   Yes.

9  **Q**   Was there rust visible on any other type of surfaces?

12:49:24  10  **A**   Yes.

11  **Q**   Can you describe what other types of surfaces were rusting.

12  **A**   I was particularly puzzled when I saw several reactors in

13  the -- and obviously, a catalytic unit that had temperature

14  sensitive paint on it.  These are internally insulated to

12:49:43  15  protect the steel from the high temperatures inside.  The steel

16  gets hot, it weakens.  The high-temperature sensitive paint was

17  almost obliterated by a coat of heavy external rust.

18            And I presume the units were still in operation

19  because they weren't blocked off and tagged off and rendered

12:50:07  20  inoperable as required by OSHA.  So these reactors were,

21  obviously, still in service but the temperature-sensitive paint

22  was gone.  And that paint is there so that if you have an

23  internal failure of the insulation, the metal gets hot and the

24  stuff turns from green to black and says "You got a hot spot

12:50:25  25  here.  You better shut this thing down and fix it before it

Bowers - Direct/Kratka

1  blows out."

2  Q    All right.  Were you able to draw any conclusions regarding

3  emission events just from the physical appearance of the plant

4  as you saw it?

12:50:37   5  A    I did.

6  Q    What conclusion did you draw?

7  A    I noticed on several instances the antifreeze protection on

8  the flare knockout drums was not working.

9           THE COURT:  What does that mean?

12:50:54   10          THE WITNESS:  It means that -- there's almost always

11  water in the bottom of a flare knockout drum.  And you put steam

12  tracing on the piping and insulation so that, as water or liquid

13  builds up, you can pump it out.  In this case, hey, bare pipe;

14  the insulation had been knocked off, it was gone years ago.

12:51:12   15  They weren't maintaining their heat tracing.

16  BY MR. KRATKA:

17  Q    Did you see any evidence of water penetration on any of the

18  pipes you inspected?

19  A    Yes.  Water penetrating through the outer metal jacket into

12:51:26   20  the pipe.

21  Q    And how could you tell that that's what you were seeing?

22  A    Well, I see extensive rusting on the bottom of the

23  insulation jacket.  I see rusting on the metal screws.  Those

24  are stainless steel screws with rust coming out.

12:51:40   25  Q    And what was the condition of the painted surfaces of the

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Direct/Kratka

1  equipment that you inspected, other than that one that you just

2  mentioned?

3  **A**    Generally, there wasn't any paint left.  Heavy corrosion on

4  structural steel.

12:51:54  5  **Q**    Let me show you -- your Honor and Mr. Bowers, if you could

6  refer to Plaintiffs' Exhibit 445 which consists of pictures that

7  were taken during the site inspection.

8            THE COURT:  By who?

9            MR. KRATKA:  These were -- Mr. Bowers testified that

12:52:08  10  he had requested pictures to be taken and they were taken by an

11  Exxon employee.

12  BY MR. KRATKA:

13  **Q**    And if you could, turn your attention to the second-to-last

14  picture in the exhibit, which is Bate's Stamped 56372 by Exxon.

12:52:44  15  **A**    Yes.

16  **Q**    Okay.  Do you recall where this picture was taken?

17  **A**    Yes.  That was taken at the infamous Booster Station 4.

18  **Q**    Is this a pipe that we're looking at in the picture?

19  **A**    It is.

12:52:58  20  **Q**    And what are those circles on the pipes?

21  **A**    I was told those circles are where they take ultrasonic

22  inspections.  Every time they take one, they take it at the same

23  place to see if there's been a change.

24  **Q**    And is this one of the pipes that you considered to be

12:53:14  25  rusted?

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Direct/Kratka

1    **A**    It has light external rust.  I very carefully look at where

2    it's sitting on the concrete there, how heavy is the rust under

3    it.  I would be suspicious until it was proven that it wasn't

4    rusting.

12:53:31    5    **Q**    And could you -- so, those circles represent the places at

6    which ultrasonic thickness inspections were taken?

7    **A**    As told by Exxon.

8    **Q**    Okay.  And based on the location of those circles, those

9    chalked circles, can you tell whether these inspections were

12:53:46    10    performed in the right places?

11    **A**    In my opinion, they were not.

12    **Q**    Why is that?

13    **A**    I would expect any corrosion to be on the bottom of the

14    pipe where any water would be accumulating, rather than -- now,

12:53:58    15    they're correct in if it was an erosive surface that had solids

16    in it or high-velocity flow in the hydroprocessing surface where

17    you would be concerned about eroding off the protective film.

18    But this is not a high velocity pipe.  You would -- it's not an

19    erosive surface.

12:54:19    20                     And so, I would expect, based on my experience,

21    the corrosion to be on the bottom of the pipe.  I would look at

22    it up by that concrete place which cools it.  It would tend to

23    create condensation where it's touching the concrete.  That's

24    where I would expect to find corrosion.

12:54:37    25    **Q**    If you flip to the next page of the exhibit, the last page,

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Direct/Kratka

1    Bate's Stamped 56373, is this another example of a pipe with

2    inspection -- chalk inspection circles on it?

3    **A**    Yes, sir.

4    **Q**    And do you know what piece of equipment this is?

12:54:55    5    **A**    That's the same pipe and it shows the inspection surfaces

6    were on the side of the pipe.

7    **Q**    And again, is this the place that you believe is an

8    inappropriate spot to -- for ultrasonic inspections to take

9    place?

12:55:12    10    **A**    It doesn't hurt to take them there but it's not going to

11    tell you if there's corrosion.  The corrosion will be on the

12    bottom of the pipe in almost all cases.  Almost all.  And your

13    experience should tell you if you have some on some other place

14    and then you would really worry.

12:55:31    15    **Q**    Now, you mentioned before that Exxon goes longer than any

16    other company between turn-arounds at its refineries and

17    chemical plants?

18    **A**    Yes, sir.

19    **Q**    Do you know how long Exxon goes between shutting down

12:55:53    20    entire units for turn-arounds at the Baytown Complex?

21    **A**    Not for every unit, but for some as long as ten years.

22    **Q**    And in your opinion or based on your experience, is the

23    frequency of turn-arounds related in any way to the

24    effectiveness of the preventive maintenance programs?

12:56:06    25    **A**    Absolutely.

1  Q    How is it related?

2  A    As I say, they practice reliability-centered maintenance

3  which has the two components:  change the oil in the gear box to

4  prevent wear or listen to it and "Is it doing okay?" and "Do I

12:56:23  5  need to take it out of service?"

6          The longer you go between cold inspection, take

7  the cover off and look at it, the higher the possibility of

8  catastrophic failure.  You're listening to it once a month,

9  every three months, what if a gear falls tomorrow and starts

12:56:49  10  chewing itself up.  So it's -- it's just -- parts wear.  Moving

11  parts wear, no matter what you do.  Unless you have an air

12  bearing -- well, even those wear.  They just wear.

13  Q    Would more frequent turn-arounds be of any use in

14  preventing leaks?

12:57:12  15  A    If there was more inspection done, yes.  It would probably

16  preclude some of the sudden failures that have happened,

17  suddenly apparently failures.  I bring to your attention the

18  series of failures of the heat exchangers in the olefins plant,

19  the feed effluent exchangers.  They seem to fail every couple of

12:57:37  20  years according to the records.

21  Q    This is from Baytown's --

22  A    Yes, Baytown olefins plant.  And they keep failing and

23  there's a series of these exchangers and banks.  I think there's

24  three or four bays of them, no valves between them.  No way to

12:57:52  25  shut them down, shut them off and isolate them.  And the

Bowers - Direct/Kratka

1  metallurgy of the tubes that fail due to corrosion, process side

2  corrosion, haven't been changed.

3  Q    What's the significance of the point that you just made

4  that there are no valves between banks of exchangers?

12:58:09  5  A    They're not able to isolate a failed exchanger and repair

6  it without shutting the unit down.

7  Q    So the design of that unit would require the entire unit to

8  shut down in order to change out a single defective piece?

9  A    Yes.

12:58:25  10  Q    And are there units that do have valves that allow smaller

11  sections to be isolated?

12  A    Yes.

13  Q    And would such a design change enable a unit to avoid

14  shutdowns?

12:58:43  15  A    Yes.

16  Q    And do shutdowns and restarts, typically, involve greater

17  emissions than normal operation?

18  A    Yes.

19  Q    So would better design in that situation be a way to avoid

12:58:55  20  emissions from emission events?

21       MR. NICHOLS:  Your Honor, we're just -- he's just

22  leading.  He's been doing it --

23       THE COURT:  Sustained.

24       THE WITNESS:  Well, in this particular --

12:59:06  25  //

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Direct/Kratka

1  BY MR. KRATKA:

2  Q    Well, no.  Let me reask the question.

3            Is there any relationship between the design of

4  these heat exchange units at the olefins plant and the emission

12:59:16  5  of pollutants during emission events?

6  A    Yes.

7  Q    What is the relationship?

8  A    When they're unable to determine, to isolate the exchangers

9  from the process, they have -- they know it's coming from a

12:59:31  10  bunch of them because it's coming out of the cooling tower.  And

11  they ran for over a month with a major leak there, emissions.

12  And it's a miracle the cooling tower didn't catch fire and blow

13  up.

14            MR. NICHOLS:  Your Honor, I'm going to object to the

12:59:45  15  speculation and move to strike that answer.

16            THE COURT:  Sustained.  It's struck.

17  BY MR. KRATKA:

18  Q    Mr. Bowers, is there underground piping at the Baytown

19  Complex?

12:59:54  20  A    There is.

21  Q    And is there any relationship between the location of

22  piping underground and the ability to perform leak detection?

23  A    Yes.

24  Q    What is the relationship?

01:00:03  25  A    It's very hard.  You cannot perform external inspection on

Bowers - Direct/Kratka

1    it without excavating it.  And I believe it is just coming to

2    the available internal inspection tools that can be used on

3    piping.

4    **Q**    Did you identify any emission events at the Baytown Complex

01:00:21  5    that were associated with leaks in underground piping?

6    **A**    I did.

7    **Q**    And are those outlined on Page 14 of your supplemental

8    report?  That would be Exhibit 430.

9    **A**    It's not 14.

01:00:39  10    **Q**    14 or 15.  I may have the page wrong.

11              THE COURT:  430, you say?

12              MR. KRATKA:  Yeah, Exhibit 430.

13              THE COURT:  It's in that book.  It's in volume, what

14    is it, 18.

01:01:04  15              MR. KRATKA:  Your Honor, let me come back to that.

16              THE COURT:  No, it's not.

17              MR. KRATKA:  Yeah.  I may have the -- I may have the

18    wrong cite there.  I'll come back to that after the break.

19    BY MR. KRATKA:

01:01:19  20    **Q**    In your opinion, Mr. Bowers, would reducing the amount of

21    underground piping at the Baytown Complex have any impact on the

22    number of emission events associated with piping leaks?

23    **A**    Yes, sir.

24    **Q**    And what impact would it have?

01:01:35  25    **A**    It would reduce it.

Bowers - Direct/Kratka

```
 1            MR. KRATKA:  Actually, your Honor, this may be a good
 2   breaking point.
 3            THE COURT:  All right.  Hang on one second.
 4            All right.  We'll see you all back here at 2:15.
 5       (Court recessed at 1:02 p.m.)
 6       (Court resumed at 2:20 p.m.)
 7            THE COURT:  Go right ahead, sir.
 8   BY MR. KRATKA:
 9   Q    Mr. Bowers, I just want to go back to a couple of points
10   that were raised before the lunch break.
11            Do you recall when the Court asked you whether
12   you considered corrosion to be the primary cause of emission
13   events at the Baytown Complex?
14   A    Yes, sir.
15            MR. NICHOLS:  Your Honor, I'll object.  The Court will
16   know what the Court asked.
17            THE COURT:  I forget.  It was interesting at the time.
18   Let's assume that's what I said.
19            MR. KRATKA:  This is introductory.  I just wanted to
20   know if you recalled your question.
21   BY MR. KRATKA:
22   Q    When you answered that question, Mr. Bowers, did you intend
23   to say that corrosion is the primary cause of all emission
24   events at the complex?
25   A    No.
```

01:02:00 — line 5
02:20:59 — line 10
02:21:09 — line 15
02:21:21 — line 20
02:21:32 — line 25

Bowers - Direct/Kratka

1  Q    What emission events were you referring to as being --

2  having corrosion as a systemic cause?

3  A    Those in the category of leaks.

4  Q    And staying even within the category of leaks, did you also

02:21:49  5  find any evidence of any other systemic causes of leaks at the

6  Baytown Complex?

7  A    Yes.

8  Q    And we talked about vibration and metal fatigue.  Are those

9  the types of things you're referring to?

02:22:01  10  A    Yes.

11  Q    And we know there are lots of leak-related emission events.

12  There were 1758 leak-related events identified at Exxon but

13  that's not even half the total of the 4,000 emission events that

14  occurred --

02:22:16  15        MR. NICHOLS:  That's not only leading, that's the

16  lawyer testifying.

17        THE COURT:  Sustained.

18  BY MR. KRATKA:

19  Q    For the remaining number of emission events at the Baytown

02:22:25  20  Complex, other than leak-related events, did you find other

21  common underlying causes of those events?

22  A    Yes.

23  Q    And are those causes outlined in the various exhibits to

24  your supplemental report?

02:22:36  25  A    Yes.  They were covered in my supplemental report and the

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Direct/Kratka

1    exhibits thereto.

2           THE COURT:  Pull that mike in, sir, just a little bit.

3           THE WITNESS:  Thank you, sir.

4    BY MR. KRATKA:

02:22:46   5    **Q**    Now, you also testified earlier that Exxon does not know

6    what the consequences of an emissions event will be before it

7    happens.

8                  Do you recall that?

9    **A**    I'm not sure I said it exactly that way.  I say no one

02:23:02   10   knows, not just Exxon.  You can't walk around saying, "It's

11   gonna leak there.  It's going to be a small leak."

12   **Q**    So just as an engineering matter, that is --

13   **A**    This is an engineering matter.  It's not possible to

14   predict in advance that a given leak is going to remain small or

02:23:17   15   start small.

16          THE COURT:  Can you pull that mike in a little more?

17          THE WITNESS:  I apologize, sir.

18          THE COURT:  I know.  You're a little lower today.  So

19   am I.  The chair doesn't move, you can't pull it in.

02:23:27   20          THE WITNESS:  No, I know.  I've noticed that, sir.

21   You can't steal it.

22   BY MR. KRATKA:

23   **Q**    Now, you're here testifying as an expert so I'm going to

24   ask you a hypothetical question:  All else being equal, if the

02:23:39   25   overall frequency of emission events -- so now we're just

Bowers - Direct/Kratka

1    talking about the frequency with which emission events occur.

2    All else being equal, if the frequency of emission events is

3    reduced, would that likely have any impact on the probability of

4    a large emission event occurring?

02:23:57    5              MR. NICHOLS:  Objection, your Honor.  That's pure

6    speculation unless there's some foundation that can be shown for

7    it, some scientific foundation for some type -- some of that

8    type of analysis.

9              THE COURT:  Hang on.

02:24:10   10              See if you can rephrase it.

11   BY MR. KRATKA:

12   Q    Does the frequency with which an emissions event occurs, in

13   other words the -- well, let me rephrase that.

14              MR. NICHOLS:  Your Honor, I'll have no object -- if he

02:24:31   15   wants to refer to see treatise or something where the principle

16   would be evident, then I have -- I'll have no objection.

17              THE COURT:  Gotcha.

18              MR. NICHOLS:  The question as phrased was --

19              MR. KRATKA:  I'll move on.

02:24:53   20   BY MR. KRATKA:

21   Q    Now, in your testimony just before the lunch break, you

22   were describing an emission event involving a heat exchanger at

23   the olefins plant.  Do you recall that?

24   A    Yes.

02:25:02   25   Q    And if you take a look at Page 13 of your initial report,

Bowers - Direct/Kratka

1    Plaintiffs' Exhibit 427 --

2    **A**    What page, sir?

3    **Q**    Page 13 of your initial report, Plaintiffs' Exhibit 427.

4    Yeah.  There's a large paragraph number 4 there.  I just want to

02:25:39    5    identify the particular event you were describing.

6              Is this event -- STEERS Number 68364, is that the

7    event you were referring to earlier?

8    **A**    Yes.  Yes, that's the one.

9    **Q**    Thank you.

02:25:58    10             Now, turn to page -- excuse me.

11             Turn to Exhibit 438, Plaintiffs' Exhibit 438.

12   **A**    Yes, sir.

13   **Q**    Can you tell the Court what -- this is one of the tables

14   attached to your supplemental report?

02:26:31    15   **A**    Yes.

16   **Q**    And can you explain to the Court what this table is.

17   **A**    Well, the -- the chart shows the frequency of the

18   occurrence of fires by Exxon's classification.  How many fires

19   were there?

02:26:48    20   **Q**    You mean emission events involving fires?

21   **A**    Yes.  Yes, emission events involving fires, including

22   smoldering board.

23   **Q**    And how many emission events has Exxon reported at the

24   Baytown Complex that involved fires?

02:27:03    25   **A**    353 were classified by them as fires.

1  Q    Now, have you drawn any conclusions regarding the number of

2  emission events at the Baytown Complex involving fires?

3  A    That's an awful lot.  In my seven years at Texaco, we had

4  probably -- well, this is not really apples and apples.  If the

02:27:28  5  fire department had to leave their work to report to a fire

6  twice a month, that was a lot.  That was a lot and they

7  responded to everything that was more than throw a bucket of

8  sand on it.

9  Q    And how many fires per month are shown on your chart there,

02:27:48  10  on Exhibit 438, first page?

11  A    I'm trying to remember how many per month it is, but it's a

12  lot.  353 in how many months?  That would be ten a month.

13  Q    If you refer -- I think if you refer to Page 1 of the

14  exhibit, there's a chart showing the number of fires in a month.

02:28:13  15  Is it on your version?

16  A    I don't see that in here.  Okay.  Yes, there's a graph

17  there.

18  Q    I'm sorry.  I said chart.  I should have said graph.

19          And that shows as many as 11 fires per month?

02:28:32  20  A    Yes.  I think elsewhere I've written something like 3.58.

21  Q    On an average?

22  A    On an average.  And it's gone up year by year.

23  Q    And is the -- again, what is the significance of having

24  fires burning at a refinery or a chemical plant?

02:28:54  25  A    The second commandment in refining is thou shalt not have

Bowers - Direct/Kratka

1  fires.  The first one is thou shalt not have leaks.  Because

2  without a leak, you can't have a fire.  And a fire is extremely

3  uncontrollable and unpredictable.  It could be a small fire that

4  starts small and very rapidly grow to a very large

02:29:20  5  conflagration, I mean, in a matter of seconds.

6  **Q**    So as a matter of good engineering practice, should there

7  be as few fires as possible?

8  **A**    That is correct.

9  **Q**    Turn to -- now to your Plaintiffs' Exhibit 437, which is

02:29:36  10  Exhibit 8 to your supplemental report.

11  **A**    Yes, sir.

12  **Q**    And can you tell the judge what this exhibit contains?

13  **A**    This exhibit lists the emission events involving

14  compressors.

02:30:06  15  **Q**    And do you recall --

16            THE COURT:  What period of time?

17            THE WITNESS:  This involves from 2005, from the start

18  of the -- to the end.

19            THE COURT:  To what?

02:30:13  20            THE WITNESS:  September of 2013, if I would remember.

21            THE COURT:  Okay.

22            MR. KRATKA:  Yeah, looks like the top line of the

23  exhibit describes the time period covered.

24            THE COURT:  All right.

02:30:25  25  //

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Direct/Kratka

1  BY MR. KRATKA:

2  Q    And how many emission events involving compressors occurred

3  over that time period at the Baytown Complex?

4  A    316 were classified as compressor-related by Exxon,

02:30:39  5  precip -- it was caused by something in the compressor failing.

6  Q    Now, what significance do compressor trip -- what is a --

7  first of all, what is a compressor trip?

8  A    The -- the term "trip" means it's an automatic shutdown.

9  Could be caused by electrical or mechanical or exceeding

02:31:00  10  pressure or temperature and it's been set in the control system.

11  It turns the electricity on and off.  So a -- it's a -- if you

12  reach this limit, shut it off.

13  Q    Is that a safety measure?

14  A    Yes.  It is an equipment and safety measure.

02:31:18  15  Q    And what significance do compressor trips or other types of

16  compressor failures have at a refinery or chemical plant?

17  A    Essentially, all the time when a compressor on a process

18  unit trips or shuts down unexpectedly, it leads to flaring

19  because the unit is hot.  It is pressurized.  You've been moving

02:31:38  20  gas from a low pressure to a high pressure and all of a sudden

21  you can't do it.

22         THE COURT:  Well, does every compressor have a flare?

23  Because we're told -- we've been told -- how many are out there,

24  24?  Something like that?

02:31:47  25         THE WITNESS:  Yes.

Bowers - Direct/Kratka

1              MR. KRATKA:  145 -- 26 flares at the complex and I
2      think we were told yesterday 145 compressors.
3      BY MR. KRATKA:
4      **Q**     Did you hear that, Mr. Bowers?
02:31:56   5      **A**     I don't remember that number, but it's --
6              THE COURT:  So 145 compressors, is that the number?
7      Anybody?
8              MR. NICHOLS:  I believe -- I believe it was.  We'll go
9      back to the --
02:32:03  10              MR. ALEXANDER:  146, your Honor.
11              THE COURT:  And if there are 300-some-odd violations,
12      that's about what?  Average about two a year per compressor?
13              THE WITNESS:  Yes, sir.
14              THE COURT:  About how many years -- what's the exact
02:32:19  15      year span --
16              MR. KRATKA:  About eight -- just about eight.
17              MR. NICHOLS:  About eight.
18              THE COURT:  Eight years.  Okay.  So a little more than
19      that.
02:32:25  20              Go on.
21              THE WITNESS:  And -- and you asked the question
22      where -- is every compressor connected to a flare?  It is
23      through the flare relief piping on the unit, yes.
24              THE COURT:  All right.
02:32:34  25      //

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Direct/Kratka

1  BY MR. KRATKA:

2  Q    There may be one -- more than one compressor associated

3  with a particular flare?

4  A    Yes.  There may be more than one compressor on every unit

02:32:42  5  that has compressors.

6  Q    Okay.  And why did you decide to use compressors, that type

7  of equipment, as a common factor among emission events at the

8  Baytown Complex?

9  A    Because there were a lot of them in -- caused by that

02:33:00  10  category of equipment and it's one on which Exxon touts its

11  expertise in increasing the reliability thereof.

12  Q    And by increasing reliability, you mean increasing the --

13  increasing the amount of time that they can run before being

14  shut down for repairs or other work?

02:33:18  15  A    Decreasing the frequency with which they have to be shut

16  down prematurely through their planned maintenance.

17  Q    Aren't there many different types of things that can cause

18  a compressor to trip or fail?

19  A    Yes.

02:33:37  20  Q    Can compressors trip for reasons unrelated to the

21  compressor itself?

22  A    Yes.

23  Q    Given that, why did you think it made sense to use

24  compressors as a category for examining the causes of emission

02:33:53  25  events?

Bowers - Direct/Kratka

1  A    In reading the paperwork that Exxon provided, I found that

2  the majority of the compressor trips was not contained within

3  the compressor, the mechanical -- direct mechanicals, but the

4  axillaries, the lube oil systems, the seal oil systems, the

02:34:19  5  power supply to it, all the stuff that's essential to keeping

6  the heart beating.  And it indicates to me that that stuff was

7  wearing out before the plant turn-arounds.  The predictive

8  maintenance was not catching or evaluating the ancillary

9  equipment conditions.

02:34:42  10  Q    So looking at the compressors led you to a deeper level of

11  analysis?

12  A    Yes, sir.

13  Q    And were you able to draw any conclusions regarding

14  preventive maintenance and compressors by analyzing

02:34:59  15  compressor-related emission events?  I apologize you may have

16  just answered that question.

17  A    Yes.

18         THE COURT:  "Yes," what?

19         THE WITNESS:  Yes, it drove me to the conclusion they

02:35:07  20  were not being maintained frequently enough and not looked at

21  deep enough under their predictive maintenance program.

22  BY MR. KRATKA:

23  Q    Now, the Court asked you about the relationship between

24  compressors and flares.  What is the significance of -- are you

02:35:26  25  familiar with --

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Direct/Kratka

1          MR. KRATKA:  Well, strike that.

2    BY MR. KRATKA:

3    Q    Are you familiar with the term "flare gas recovery

4    capacity"?

02:35:33   5    A    Yes.

6    Q    What does that term mean?

7    A    It is used to quantify the ability to recover the gas that

8    a unit may put into the flare system for disposal for

9    emergency -- emergency conditions or bleeding down for a

02:35:53   10   shutdown.  This compressor sucks it out of that, essentially,

11   atmospheric pressure pipe that leads to the flare and recovers

12   it back into the refinery for use as fuel gas or --

13   Q    So does having flare gas recovery capacity enable a plant

14   to avoid flaring?

02:36:14   15          THE COURT:  Hold it.  State the question again.

16   BY MR. KRATKA:

17   Q    Does having sufficient flare gas recovery capacity enable a

18   plant to avoid or reduce flaring events?

19   A    Yes.

02:36:28   20   Q    And what role do compressors play in flare gas recovery

21   capacity?

22   A    They are the prime piece of equipment that takes the low

23   pressure gas in the flare header system and boosts it to a

24   higher pressure where it can be reused in the refinery.

02:36:46   25   Q    And I note that in your initial report in this case --

Bowers - Direct/Kratka

1   which was from March, 2012; is that right?

2   **A**   I believe that's correct, yes.

3   **Q**   -- did you offer a specific recommendation regarding

4   flare gas -- additional flare gas recovery compressors at the

02:37:05   5   Baytown Complex?

6   **A**   I did.

7   **Q**   And basically, what did you recommend?

8   **A**   I recommended that they install two additional flare gas

9   recovery compressors at the best location in their system so

02:37:16   10   that if one of the compressors was out of service for

11   maintenance or failure, they still would have enough capacity to

12   prevent most flaring.

13            THE COURT:  So just add two to the whole complex?

14            THE WITNESS:  I believe that was what I recommended,

02:37:35   15   sir.  It was -- they have a couple that are not too reliable and

16   that leads to -- it was literally hundreds of times when the

17   flaring would have been eliminated completely.

18            THE COURT:  So no flame at all going out to the

19   community?

02:37:50   20            THE WITNESS:  Correct.

21   BY MR. KRATKA:

22   **Q**   Let me show you a document that we received shortly before

23   trial, actually, from Exxon.  This is Plaintiffs' Exhibit 605.

24            MR. KRATKA:  Pull out another --

02:38:34   25            THE COURT:  I got one.  I'm looking at it up here or

Gayle Dye, CSR, RDR, CRR - 713.250.5582

```
 1  you can put it on the --

 2          MR. KRATKA:  I'll put it on the -- yes.

 3  BY MR. KRATKA:

 4  Q    Now this is a document produced by Exxon in discovery, as

 5  you can see from the Bate's number at the bottom right of the

 6  page.  And have you seen this document before, Mr. Bowers?

 7  A    I have not.  Not to my knowledge.  It doesn't look

 8  familiar.

 9          MR. NICHOLS:  Your Honor, may I take the witness on

10  voir dire.

11                   VOIR DIRE EXAMINATION

12  BY MR. NICHOLS:

13  Q    Is there a date that appears at the top of the page?

14  A    It says 5-10-12, but that doesn't mean that I got it then.

15  Q    I -- I --

16          MR. KRATKA:  You know what, I'm mixing this up with

17  another document.

18          MR. NICHOLS:  Okay.

19          MR. KRATKA:  This was produced -- you're absolutely

20  right, Mr. Nichols.  This was produced -- I don't think it was

21  produced to us on this date, but this document was produced

22  earlier.

23          THE COURT:  All right.  What is it?

24  //

25  //
```

Bowers - Direct/Kratka

1                      DIRECT EXAMINATION

2                        (continued)

3  BY MR. KRATKA:

4  **Q**    You haven't seen it, Mr. Bowers?

02:39:43    5  **A**    I don't recall it.

6  **Q**    All right.  I'm going to -- I'm going to take this back,

7  then, and ask another question.

8                        Did you estimate the capital cost of installing

9  those two additional compressor installations that you

02:40:14   10  recommend?

11  **A**    I did.  I provided, in my report, an, I think, order of

12  magnitude estimate of the cost.

13                  THE COURT:  What -- what was it?

14                  THE WITNESS:  I'll have to look and see, your Honor.

02:40:25   15  BY MR. KRATKA:

16  **Q**    I believe it's on Page 20 of your initial report which is

17  Exhibit 427.

18  **A**    I stated in that report in the range of $50 million.

19                  MR. NICHOLS:  50?

02:40:56   20                  THE COURT:  50 million?

21                  THE WITNESS:  50 million.

22                  THE COURT:  For the two compressors?

23                  THE WITNESS:  Two compressors, including the power

24  stations and all the piping.

02:41:01   25                  THE COURT:  Do they have to have their own power

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Direct/Kratka

1    stations?

2              THE WITNESS:  No, it's -- it's transformer.  You got

3    to run an electric -- an extension cord to them.  These would be

4    3- to 400 horsepower compressors or however they need to be.

02:41:14    5              THE COURT:  So 25 million each?

6              THE WITNESS:  Yes, sir.  And that should be more than

7    adequate.

8    BY MR. KRATKA:

9    **Q**    Are you familiar with a -- with what an operator simulator

02:41:33    10   is in terms of --

11   **A**    Yes.

12   **Q**    And what is -- what is a simulator?

13   **A**    An operator simulator, in this context, is a computer

14   program that faithfully replicates how the plant behaves or

02:41:49    15   would behave in either a steady state or a transient operation.

16             THE COURT:  What does that mean?

17             THE WITNESS:  It means it models what happens.  It

18   shows you what happens to this vessel, this pressure, this

19   limit.

02:42:00    20   BY MR. KRATKA:

21   **Q**    Is it analogous to a, say, flight simulator for an airline

22   pilot?

23   **A**    Very similar to a flight simulator.

24             THE COURT:  Well, you used a computer.  Does a

02:42:08    25   computer run -- do you sit in a room or is it just on a screen?

Bowers - Direct/Kratka

1          THE WITNESS:  It replicates what reality is, what you

2   have in the -- in the operating room.  It's supposed to show all

3   the consoles, all the circuits, all the pumps; and it's supposed

4   to faithfully replicate, as if the -- as if you were connected

02:42:25   5   to the plant.

6          THE COURT:  Is it fully operated by keyboard?  Or do

7   you actually go out and punch things or do you turn knobs?

8          THE WITNESS:  In the real --

9          THE COURT:  In the simulator.

02:42:33   10          THE WITNESS:  In the real world, if you're required to

11   punch a button or turn a knob, the simulator should have the

12   same requirements.

13          THE COURT:  Okay.

14   BY MR. KRATKA:

02:42:43   15   Q    And we heard yesterday that the -- in an enforcement order,

16   the Texas Commission on Environmental Quality required Exxon to

17   install simulators at the -- for operators at the olefins plant.

18          Now, can simulators play any role in preventing

19   emission events?

02:43:04   20   A    Yes.

21   Q    And do they do that by preventing human error or reducing

22   the likelihood of human error?

23   A    They reduce human -- the likelihood -- it helps train the

24   operators on how to better operate the plant, both in normal

02:43:19   25   conditions and when things go wrong.

Bowers - Direct/Kratka

1          THE COURT:  Mr. Kratka, you say that the state agency

2     ordered a new compressor somewhere?

3          MR. KRATKA:  Not a compressor, a simulator -- one of

4     these simulators to be put in at the olefins plant.

02:43:34   5          THE COURT:  Was that put in?

6          MR. KRATKA:  I don't know whether it's actually been

7     put in yet.

8     BY MR. KRATKA:

9     Q     In fact, my question to Mr. Bowers is.  This order came out

02:43:44   10    in the year 2012.  Are simulators a new type of technology in

11    the olefins production industry?

12    A     No, sir.

13    Q     How long have they been around?

14    A     A couple of decades.

02:43:58   15         THE COURT:  What do they cost?  Ballpark.

16         THE WITNESS:  20 million, 30 million.  They're not

17    inexpensive.  It's a lot of work.

18         THE COURT:  Okay.  So the state agency did order that

19    one.  Did they ever produce -- was it ever put online?

02:44:15   20         MR. KRATKA:  That will be a question for an Exxon

21    employee.

22         THE COURT:  Was it put online?

23         MR. ALEXANDER:  Yes, sir, your Honor.

24         THE WITNESS:  Okay.  Good.  Thank you.

02:44:22   25    //

Bowers - Direct/Kratka

1    BY MR. KRATKA:

2    **Q**    Since this technology has been around for 20 years, such a

3    simulator could have been voluntarily put in place by Exxon

4    years earlier, right?

02:44:30    5                MR. NICHOLS:  Objection.  He's speculating.

6                THE COURT:  Sustained.

7    BY MR. KRATKA:

8    **Q**    Was there -- was there any -- was there --

9                THE COURT:  Wait a second.  I guess they could have if

02:44:36    10   it was around.

11   BY MR. KRATKA:

12   **Q**    -- was there any technological barrier to Exxon having

13   installed the simulator or simulators earlier?

14   **A**    None.

02:44:46    15   **Q**    Thank you.

16                Let me turn to another one of the tables attached

17   to your revised supplemental report.

18                THE COURT:  By the way, you stated that you went

19   through about 20,000 documents, correct?

02:44:56    20                THE WITNESS:  Yes, sir.

21                THE COURT:  Okay.

22   BY MR. KRATKA:

23   **Q**    Plaintiffs' Exhibit 439.  In this exhibit, did you

24   categorize emission events by mechanical -- by the type of

02:45:16    25   mechanical failure involved?

1    A    Yes.

2    Q    And can you just maybe quickly run down the list of the

3    types of categories that were created of mechanic -- of repeated

4    mechanical failures?

02:45:26    5    A    There were electrical failures, flange failures.  Furnaces,

6    gasket leaks, seals on pumps, valves, and I called it others.

7    Q    Miscellaneous?

8    A    Miscellaneous.

9    Q    And in all --

02:45:46    10         THE COURT:  It states here 283 valve failures.

11    There's some testimony that they have maybe a million valves out

12    there.  How do you bring that down by -- as you stated before,

13    by inspections, more intensive inspections?

14         THE WITNESS:  More intensive inspection and

02:46:04    15    maintenance.

16    BY MR. KRATKA:

17    Q    And those 283 valve failures, that was just at the

18    refinery, correct?

19    A    Yes.

02:46:10    20    Q    And there were also additional valve failures at the

21    olefins plant?

22    A    Yes.

23    Q    Another 122?

24    A    Yes.

02:46:18    25    Q    And another 107 valve failures at the chemical plant?

Bowers - Direct/Kratka

1  **A**    Yes.

2  **Q**    Now, we've been talking a little bit -- maybe more than a

3  little bit in this case -- about acts of God.  Weather events

4  are often described as acts of God.

02:46:43  5            Can emission events caused by weather such as

6  cold weather be -- are they unforeseeable or can they be

7  prevented?

8  **A**    Well, they can be prevented.

9  **Q**    How can cold weather-related emission events be prevented?

02:46:56  10  **A**    Exxon's own design standards -- is that me?

11            Exxon's own design standards require the plant to

12  be built and maintained such that it can operate at any of the

13  climatic conditions found at the site location.  Now, a cold

14  weather event is something that predictably happens.  It's not

02:47:18  15  every year it gets to seven degrees or twelve degrees but it's

16  every decade at least.  And so it would be part of the required

17  design of the Baytown facility.

18  **Q**    And in Plaintiffs' Exhibit 444, on another one of your

19  supplemental report tables, do you list the emission events that

02:47:42  20  were caused by -- that Exxon attributed to cold weather as the

21  cause?

22  **A**    Yes, sir.

23  **Q**    How many of those were there?

24  **A**    There were 21.  21 identified.

02:47:58  25  **Q**    And the -- in your opinion, with proper measures --

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Direct/Kratka

 1   planning measures taken, could those emission events have been

 2   avoided?

 3   **A**     Yes.   They had -- if there was heat tracing or freeze

 4   prevention designed, it should be operational before freezing

 5   conditions happen in the winter.

 6              THE COURT:  What do you think, cost-wise, that it

 7   would be to the -- to the whole plant out there to get

 8   everything up to what you think it ought to be?

 9              THE WITNESS:  In terms of freeze protection?

10              THE COURT:  No, everything.  In other words, you're

11   identifying a number of different things.  I'm not cutting you

12   off, certainly go through it.

13              THE WITNESS:  No, sir.

14              THE COURT:  How much would Exxon have to expend to get

15   it up to speed?

16              THE WITNESS:  This is in total.

17              THE COURT:  That's correct.

18   BY MR. KRATKA:

19   **Q**     Can we -- should we break it down?  We have it broken down.

20              THE COURT:  All right.  Tell me.  You tell me what's

21   the gross amount.  It's your -- the Plaintiffs' position is how

22   much?

23              MR. KRATKA:  The Plaintiffs' position, Mr. Bowers has

24   already told you about operation and maintenance costs --

25              THE COURT:  Exactly.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Direct/Kratka

1          MR. KRATKA:  -- 90 million dollar -- 90 million dollar

2    annual increase.

3          THE COURT:  Right.

4          MR. KRATKA:  And he's identified several capital

02:49:03    5    improved -- design improvements.  One would be the two

6    compressors that he talked about that cost 50 million.

7          THE COURT:  50 million.  Another 20 for a simulator.

8    Well, what's the total?  Give me a ballpark.

9          MR. KRATKA:  I'm just -- I'm -- he also recommended an

02:49:19   10    additional sulfur recovery unit and associated equipment.  I'm

11    just --

12          THE WITNESS:  I think that was around 200.

13          THE COURT:  200 million?

14          MR. KRATKA:  Let me see.  I think --

02:49:29   15          THE WITNESS:  About a billion dollars.

16          THE COURT:  About a billion?

17          THE WITNESS:  About a billion.  Not spent at once.

18          THE COURT:  There is testimony that this -- that this

19    refinery initially was built -- what is it?  In 1909, I think,

02:49:38   20    construction started on it.

21          THE WITNESS:  It's got some years on it.

22       (Discussion off the record.)

23          THE COURT:  I have a ballpark figure.  That's all

24    right.

02:49:56   25                Go back to your sequence.

1  BY MR. KRATKA:

2  **Q**    Now, there's been a lot of discussion specifically about

3  hurricanes.  In your estimation, can emissions from a full plant

4  startup after a hurricane be minimized beyond what Exxon has

02:50:21  5  done in this case?

6  **A**    Yes.

7  **Q**    And how would that be done?

8  **A**    Well, starting up a complete plant without emissions, it's

9  careful planning and sequencing to start up of the different

02:50:35  10  units so they don't cause emissions to the atmosphere.

11          THE COURT:  How long was the shutdown from Hurricane

12  Ike?  Do you remember how many days?

13          MR. KRATKA:  The length of the shutdown?

14          THE COURT:  Yeah.

02:50:45  15          THE WITNESS:  A little over two weeks, if I remember

16  right.

17          MR. NICHOLS:  That's, basically, right.  It was,

18  basically, from --

19          THE COURT:  Two weeks to get it back online?

02:50:53  20          MR. NICHOLS:  Hurricane Ike was -- made landfall on

21  September 13, 2008, your Honor.  So it was during a time period

22  of early September through early October.

23          MR. ALEXANDER:  About three weeks, your Honor.

24          THE COURT:  All right.  Thank you.

02:51:05  25  //

Bowers - Direct/Kratka

1   BY MR. KRATKA:

2   **Q**   Now, another breakdown that you did of emission events, as

3   you testified earlier, was to categorize them by unit, correct?

4   **A**   Yes.

02:51:24   5   **Q**   And --

6   **A**   I didn't categorize, they did.  I just assembled the table.

7   **Q**   They did.  But could you -- you identified particular units

8   where you considered there to be an unusual number of emission

9   events; is that fair to say?

02:51:36   10   **A**   They stood out above the crowd.

11           MR. KRATKA:  And I'm just -- I'm not going to go

12   through all of these, your Honor, because there are more than, I

13   think, any of us have the patience to go through.  But --

14           THE COURT:  Well, that's what I do for a living.  You

02:51:49   15   guys are on the meter.

16           MR. KRATKA:  Sure.  Well, that's right.

17           THE COURT:  As well as my timer.

18           MR. KRATKA:  Forget about patience, I'm thinking about

19   the timer.  Let me -- well, let me pull out a few examples.  But

02:52:01   20   as we said, these are all contained in the exhibits to

21   Mr. Bowers' revised supplemental report which is Plaintiffs'

22   Exhibit 430.

23   BY MR. KRATKA:

24   **Q**   If you turn to Plaintiffs' Exhibit 433, which covers units

02:52:16   25   at the refinery, and this is Exhibit 4 of your report, so the

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Direct/Kratka

1    pages are numbered 4-1, 4-2.  If you would, turn to page 4-15 of

2    this exhibit -- I'm sorry, 4-17 of this exhibit.

3    **A**    I'm there.

4    **Q**    All right.  And now, this part of the -- you go through a

02:53:04   5    number of different units at the refinery and totaled up the

6    events that occurred at each one, correct?

7    **A**    Yes, sir.  We looked at every unit.

8    **Q**    And certain of them were included in this table?

9    **A**    Yes.

02:53:17   10   **Q**    And now, on this page, we're looking at -- specifically at

11   the flexicoker unit which we've heard some discussion about.

12   **A**    Yes.

13   **Q**    And how many emission events occurred just at the

14   flexicoker unit during the period covered by this lawsuit?

02:53:34   15   **A**    113.

16   **Q**    And how many of those were STEERS events?

17            THE COURT:  It says right here 23.

18            THE WITNESS:  23.  I'm just getting old.

19            THE COURT:  I got -- probably got years on you.

02:53:52   20            THE WITNESS:  I think you do, your Honor, you were

21   here when Myron Love was here.

22            THE COURT:  Oh, state court.

23            THE WITNESS:  Yeah.  He married my wife and I 25 years

24   ago in June.

02:54:02   25   //

Gayle Dye, CSR, RDR, CRR - 713.250.5582

BY MR. KRATKA:

Q     Congratulations.

           Meanwhile, back to flexicokers.  What -- very
briefly, what is a flexicoker?

02:54:11   A     Let's see if I can do it simply.  A flexicoker is a unit
that takes a heavy hydrocarbon, such as tar or very heavy oil,
and uses small particles of coke, like small BBs, very small
BBs, circulating.  You spray the heavy oil onto the circulating
bed of the small particles where it cracks.

02:54:37         THE COURT:  You mean the molecular structure cracks?

           THE WITNESS:  Yes, sir.  It destroys it from the heat.
These are thousands degrees and this stuff is finer than sand.
It's 20 to 50 microns.  They're little beads of -- beads of
coke.  And we lay down another layer on it and then we circulate
02:54:53   through gravity and a lift pipe a portion of that total amount
into a regenerator where we burn off that extra layer of coke.

           THE COURT:  Into the air or --

           THE WITNESS:  No.

           THE COURT:  It's captured?

02:55:10         THE WITNESS:  It's captured and goes to -- then goes
to either a gasifier where -- where you convert it to carbon
monoxide, water and steam.  You make useful energy out of it.
You recover the energy value in it.  CO emissions will be
abnormal.  It's a mechanically-complicated unit and it's very
02:55:37   temperamental process-wise.  But it does an effective job.

                        Bowers - Direct/Kratka

 1   Flexicoker -- there's a fluid coker which produces, as a

 2   product, the real fine coke.  And a flexicoker turns all that

 3   coke product into fuel gas.

 4   BY MR. KRATKA:

02:55:54  5   Q    And do you consider 113 emission events over eight years to

 6   be a normal number of emission events at such a unit?

 7            MR. NICHOLS:  Your Honor, can we have a frame of

 8   reference.  Normal as to what?

 9   BY MR. KRATKA:

02:56:08  10   Q    Is it -- would you expect there to be any proper -- for a

11   properly operated and maintained flexicoker unit, would you

12   expect there to be 113 emission events there over eight years?

13            MR. NICHOLS:  Same objection, your Honor.  In the

14   abstract, there's no frame of reference for the Court.  But if

02:56:28  15   the Court understands, then I'll withdraw the objection.

16            THE COURT:  I don't know if I understand it, but I'm

17   going to -- I'll overrule the objection.  Let's see what he

18   says.

19                 Go ahead and answer.

02:56:35  20            THE WITNESS:  Well, for that flexicoker, in its

21   present condition, that's probably okay.

22   BY MR. KRATKA:

23   Q    Why is that?

24   A    Well, it's not in very good condition.

02:56:43  25            THE COURT:  Now, the next thing is what happens if it

                Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Direct/Kratka

1    was in good condition?  What would the --

2          THE WITNESS:  There are operators that have much lower

3    rate of emission events from those units.

4    BY MR. KRATKA:

02:56:53   5    Q    At other refineries?

6    A    Yes, some Exxon.

7    Q    And was the flexicoker unit one of those that you visually

8    expected or took a look at?

9    A    Yes.  We went by the flexicoker, walked by it.

02:57:07   10   Q    What was your impression from the visual view of it?

11   A    It's not good.

12   Q    In what way?

13   A    The waste heat boiler, the steel shell was cracked all

14   over.  It was -- I'd say there was a crack in the steel shell

02:57:26   15   that was being repaired by a welder and there was no more than

16   three feet between any two cracks.  And that ran in all

17   directions on that entire wall of the furnace that was visible.

18   Q    And how large is that shell?

19   A    20 feet high by 40 feet long.

02:57:47   20   Q    And there were cracks every three feet?

21   A    Yes, sir.

22   Q    As far as you could tell?

23   A    Crisscrossing every which ways.

24   Q    What conclusion do you draw from that situation?

02:57:57   25   A    Something was wrong.  What caused the cracking?  Frequent

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Direct/Kratka

1   start up and shut down because of something and just thermal

2   expansion and it hadn't been replaced.  I would have replaced

3   the whole sheet steel because it, obviously, was very severely

4   heat stressed and badly damaged.  And a weld repair, you know,

02:58:22   5   that's not even a decent band-aid on a situation like that.

6   Q    All right.  Let's turn to page 4-1 of this exhibit.  We're

7   still at the refinery and this part of the exhibit deals with

8   what you earlier termed the infamous Booster Station 4.

9            Can you explain to the Court why you gave it that

02:58:45   10   description.

11   A    Booster Station 4.  That function of flare gas recovery

12   seemed to be very unreliable.  It was failing for one reason or

13   another.  Belts were breaking right after they were put on.

14   Compressors failed after they were overhauled, power supply

02:59:10   15   failure -- the list goes on and on.  It just seemed to be

16   extremely unreliable.

17   Q    And you say in your table here that there were 49 emission

18   events?

19   A    That's direct emission events.  That's not compressor

02:59:22   20   failures.  There is a spare compressor there, but there were 49

21   times that we identified where neither were working.

22   Q    That's when neither of the two compressors --

23   A    Yes.  Yes.

24   Q    And you viewed Booster Station 4 personally?

02:59:40   25   A    Yes, sir.  Yes.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Direct/Kratka

1    **Q**    And did you notice anything of concern there during your

2    visit?

3    **A**    Yes.

4    **Q**    What did you notice that was -- that concerned you?

02:59:57    5    **A**    It was very old.  There was -- it was just in poor repair.

6    **Q**    Did you notice any odor when you were there?

7    **A**    There was a slight odor of hydrocarbon leaking from the rod

8    seals as a (indicating ) and so it -- there was definitely

9    leaking some hydrocarbon gas.  Minor amount, I would call it, at

03:00:22    10    that moment in time.

11    **Q**    Now, again, there -- you've gone through each of the three

12    plants, the chemical plant, the olefins plant, and the refinery,

13    and gone through assembled tables like these for the numerous

14    units of each one, correct?

03:00:39    15    **A**    Yes, sir.

16    **Q**    Okay.  I'm not going to walk you through each of those, but

17    I do want to direct your attention to a specific emissions event

18    that has been discussed earlier in this trial.  I'm going to

19    hand you Plaintiffs' Exhibit 2A, which is the -- one of the

03:00:57    20    stipulated tables.

21            MR. KRATKA:  It might be easier to put it on the

22    screen.

23    BY MR. KRATKA:

24    **Q**    So directing your attention to -- this is STEERS number

03:01:47    25    120401 on Page 51 of Plaintiffs' Exhibit 2C.  And this emission

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Direct/Kratka

1    event occurred on February 21, 2009.

2                    Do you see that?

3    **A**    Yes.

4    **Q**    And this event occurred at the Hydrocracking Unit 1?

03:02:08    5    **A**    Yes.

6    **Q**    And the cause of this emission event, can you just read

7    that for the Court, if you're able to.

8    **A**    It says, "The valve leaked into the atmospheric drums, D401

9    and D902."

03:02:29    10                    And those are at Booster Station 4, if I remember

11    right.

12    **Q**    All right.

13    **A**    I can't swear to that, but I think that's where they are.

14    **Q**    And what I specifically want to ask you about is the

03:02:44    15    pollutants released during this event would include propane and

16    hydrogen sulfide?

17    **A**    That, as identified by Exxon, yes.

18    **Q**    Is it surprising to see both propane and hydrogen sulfide

19    released in the same event?

03:03:00    20    **A**    No, sir.  That's to be expected unless they have been

21    previously separated.  Propane and hydrogen sulfide have --

22    propylene -- have the same boiling point.  They boil at the same

23    temperature.  So propane, slash, propylene and hydrogen sulfide

24    are double first cousins, brother and sister.  Their molecular

03:03:21    25    weight is such that they distill at the same time.  And you have

1  to chemically separate them.  You can't separate them by

2  distillation.

3  Q    So you would actually expect to see if one is released from

4  an event like that --

03:03:35  5  A    In that area of the refinery from the cat cracking units,

6  oh, absolutely.  Any hydrocarbons produced by the cat cracker

7  are going to be full of sulfur.  So, yes.

8  Q    And do you expect those compounds to be released together?

9  A    Yes.

03:03:51  10  Q    Okay.  Now, Mr. Bowers, you've said that you've reviewed

11  deviation reports in your preparation of your opinion in this

12  case, the Title V deviation reports.

13              Do you consider it important or not important, as

14  an engineer, that a refinery or a chemical plant perform

03:04:09  15  regulatory-required inspections in a timely manner?

16  A    I have two ways to answer that.  One concerns physical

17  operation at the refinery.  30 days late on a report is not

18  going to cause something to blow up.  However, the practice of

19  not following those requirements indicates lax operations which

03:04:45  20  will lead to bad things happening.  That's been well shown many

21  times.  So I consider it a big deal.

22  Q    And is your opinion the same with regard to compliance with

23  reporting and monitoring requirements of these plants?

24  A    Yes, sir.  It's a requirement of their permit.  They should

03:05:05  25  do it.

Bowers - Direct/Kratka

1    Q    Do you consider it good practice for a refinery to allow

2  open-ended lines to persist?

3    A    No.

4    Q    Why not?

03:05:12  5    A    Well, for one thing, it's a violation of their permits.

6    Q    But as an engineer?

7    A    As an engineer, I don't like them because valves will

8  sometimes leak.  And if you leave a line open long enough, a

9  wasp or something is going to crawl into it and make a nest.  Or

03:05:34  10  in this case, out there they've shown that a bird will nest in

11  it and cause corrosion and failure.

12    Q    Literally a bird?

13    A    Yes.  A bird nest.

14    Q    Okay.

03:05:44  15    A    We have wrens that get into the dryer ducts in Bellaire.

16  You know, open the flap door and get in.

17    Q    All right.  Now, Mr. Bowers, we've gone at length through

18  your analysis of various causes of emission events and types of

19  equipment involved in emission events and units involved in

03:06:03  20  emission events.

21              Are you able to reach a conclusion as to whether

22  emission events at the Baytown Complex have arisen from the same

23  inadequately-corrected sources of trouble?

24    A    Yes.  They are repetitive, same root cause.  It may have a

03:06:19  25  different punctuation mark, but it's the same root cause.

Bowers - Direct/Kratka

1    That's the inadequate maintenance.

2    **Q**    And Mr. Bowers, are you aware that there's a Texas

3    regulation that provides an affirmative defense to penalties for

4    certain unauthorized emissions resulting from emission events?

03:06:39  5    **A**    Yes, sir.

6    **Q**    Have you read that regulation?

7    **A**    I have.

8    **Q**    This is a copy of Texas Administrative Code -- 30 Texas

9    Administrative Code, 101.222.  I think we may have seen this

03:07:20  10   before but is this the affirmative defense regulation that

11   you've seen?

12   **A**    It appears to be.

13   **Q**    And we heard from Mr. Kovacs that there are -- yesterday

14   that there are 11 different criteria under the affirmative

03:07:38  15   defense regulation?

16   **A**    That is my understanding.

17   **Q**    And do you know whether or not the regulation requires that

18   each and every one of these criteria must be met in order for

19   the affirmative defense to apply?

03:07:48  20            THE COURT:  Each of them or all of them, you mean?

21            THE WITNESS:  Simultaneously, at the time the event

22   happened, they have to all be positive.  Yes.  Yes.  Yes.  Yes.

23   Yes.  Yes.

24   **Q**    And do you have -- do you consider yourself to have the

03:08:03  25   expertise to assess any of these affirmative defense criteria?

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Direct/Kratka

1    **A**    Yes.

2    **Q**    So, for example, the second criteria is whether the

3    emission event was -- whether "the unauthorized emissions were

4    caused by sudden, unavoidable breakdown of equipment or process,

03:08:25    5    beyond the control of the owner or operator?"

6                        Is that something you feel you have the expertise

7    to assess?

8    **A**    Yes, sir.

9    **Q**    And Number 3 is "the unauthorized emission did not stem

03:08:35   10    from any activity or event that could have been foreseen and

11    avoided or planned for and could not have been avoided by better

12    operation and maintenance practices or technically feasible

13    design consistent with good engineering practice."

14   **A**    Yes, sir.

03:08:50   15   **Q**    And you're capable of assessing that?

16   **A**    Yes, sir.

17   **Q**    And there are several other criteria in this list that

18   you've reviewed as -- in your -- and applied your professional

19   judgment as an engineer?

03:09:01   20   **A**    I have.

21   **Q**    Now, are you aware that Exxon is asserting that

22   approximately 100 of the emission events at issue in this case

23   should qualify for the affirmative defense?

24   **A**    I haven't counted them, but that's a -- sounds about right.

03:09:18   25   They checked the "yes" box on every one, if I remember right.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Direct/Kratka

```
 1  Q    And you reviewed the reports of Exxon's expert, Christopher
 2  Buehler, relating to the affirmative defense of these events?
 3  A    Yes.
 4  Q    And you've actually issued a rebuttal report to Mr. Buehler
 5  and that's Plaintiffs' Exhibit --
 6              THE COURT:  It's in the file also?
 7              MR. KRATKA:  Yes.
 8              THE WITNESS:  Yes, sir.
 9  BY MR. KRATKA:
10  Q    -- 428?
11              Now, there's a lot of events during the --
12              MR. KRATKA:  Well, strike that.
13  BY MR. KRATKA:
14  Q    Now, did you attempt to determine for yourself whether --
15  for the affirmative defense criteria that you do have the
16  expertise to analyze, did you attempt to determine whether each
17  of those criteria for each event was met?
18  A    Yes.
19  Q    And in addition to the rebuttal report that you provided,
20  did you also create a summary table of your determined -- of
21  your determinations with respect to each of these events?
22  A    I believe I did.
23              MR. KRATKA:  And again, your Honor, rather than go
24  through every event, I'm going to show him the summary table
25  that was created.
```

03:09:33
03:09:41
03:09:47
03:10:06
03:10:24

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1  BY MR. KRATKA:

2  Q    And ask you a few questions about it to establish what it

3  is and how it was created.  So if you turn to Plaintiffs'

4  Exhibit 446.

03:10:53  5  A    Yes.

6  Q    And this report is entitled "Summary of Conclusions

7  Regarding Affirmative Defense Criteria and Baytown STEERS

8  Events."

9           THE COURT:  I'm looking across the top.  There's just

03:11:22  10  six -- six entries there.  Is it multiple -- you going for the

11  other --

12  BY MR. KRATKA:

13  Q    Mr. Bowers, could you just -- were those the six -- you'd

14  just analyzed six of those eleven criteria?

03:11:35  15  A    Yes.

16  Q    And those are the six across the top?

17  A    Yes.

18  Q    And is this summary based on voluminous documents

19  produced -- your analysis of voluminous documents produced by

03:11:47  20  Exxon in this case?

21  A    Yes, sir.

22  Q    And you're familiar -- obviously, you're familiar with the

23  underlying documents on which this chart is based?

24  A    Yes.

03:11:52  25  Q    And does this chart contain the conclusions you've drawn

Bowers - Direct/Kratka

1    from those documents?

2  A    Yes.

3  Q    And did you create this chart yourself or did you supervise

4  its creation?

03:12:03    5  A    I supervised its creation.

6  Q    And that was Plaintiffs' legal staff?

7  A    That was Plaintiffs' legal staff.  We discussed at length

8  how to do this.

9  Q    And did you check its accuracy --

03:12:14   10  A    I did.

11  Q    -- during the process?

12  A    Yes.

13  Q    And does this chart accurately summarize your conclusions

14  regarding the application of those six criteria that you looked

03:12:26   15  at to the Exxon emission events?

16  A    Yes.

17  Q    So just -- again, rather than go exhaustively through it,

18  we can look at a couple of examples.  The very first entry here,

19  STEERS Number 66872.

03:12:49   20             THE COURT:  Again, where is it?

21             MR. KRATKA:  Very top left.

22             THE COURT:  The first one?

23             MR. KRATKA:  Yes.

24             THE COURT:  72.

03:12:58   25             MR. KRATKA:  Yeah.

Bowers - Direct/Kratka

1          THE COURT:  Go right ahead.

2   BY MR. KRATKA:

3   Q    And what was your conclusion as to whether

4   Section 101.222(b)(2) was complied with?  In other words,

03:13:08   5   whether a sudden, unavoid -- whether the event arose from a

6   sudden, unavoidable breakdown beyond the control of the

7   operator?

8   A    Exxon documentation showed that it was a leak caused by

9   corrosion --

03:13:22   10   Q    And that --

11   A    -- which is not sudden.

12   Q    And the information on corrosion you obtained from

13   documents provided to Christopher Buehler?

14   A    That is correct.

03:13:32   15   Q    And did you also determine that this event didn't meet

16   the --

17   A    It was a -- it was a pattern of frequent problems over

18   there at infamous Booster Station 4.

19   Q    Right.  So you found that the event, in fact, was part of a

03:13:56   20   frequent or recurring pattern?

21   A    Yes.

22   Q    In support of that, you referred to the table in your

23   supplemental report dealing with --

24          THE COURT:  Now, let me ask you this:  Going across

03:14:04   25   the top, is this the defense that they had or this is the one

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Direct/Kratka

1   that he's paraphrasing to get over what the defense is?

2              MR. KRATKA:  They claim that they complied with each

3   of the 11 criteria.  It's --

4              THE COURT:  Okay.  For instance, what's the first

03:14:20  5   criteria as a defense, that the event was not a sudden

6   unavoidable breakdown?

7              MR. KRATKA:  Well, that --

8              THE COURT:  Or is that his paraphrasing of it?

9   BY MR. KRATKA:

03:14:31  10   Q    No.  That -- that is the -- in quotation marks -- sorry,

11   yeah, the part that's in quotation marks a "sudden, unavoidable

12   breakdown beyond the control of the operator," that is the

13   condition that someone --

14              THE COURT:  Okay.

03:14:48  15              MR. KRATKA:  -- must prove --

16              THE COURT:  So the capital letter is his position.

17              MR. KRATKA:  Correct.

18              THE COURT:  Got it.

19              MR. KRATKA:  So whenever --

03:14:52  20              THE COURT:  But the -- but the regulation is in

21   quotes.

22              MR. KRATKA:  Correct.

23              THE COURT:  That would be a defense, a sudden

24   unavoidable breakdown.

03:14:59  25              MR. KRATKA:  Correct.  So if you go down the table --

Bowers - Direct/Kratka

1           THE COURT:  Yeah.

2           MR. KRATKA:  -- whenever he found for a particular

3    event that that particular criteria was not met, you'll see a

4    notation to a column.

03:15:07  5    BY MR. KRATKA:

6    **Q**    And that's the same for each of the criteria you evaluated?

7    **A**    Yes, sir.

8    **Q**    And overall, so there's about 100 events on that list.

9           Have you reached a conclusion as to whether Exxon

03:15:27 10   actually qualified for the affirmative defense for all 101 of

11   those events?

12   **A**   Yes.  Shown in this -- in this table, there are specific

13   instances where they failed to qualify for a consideration for

14   an affirmative defense.

03:15:47 15          THE COURT:  Now, remind me, wasn't there some

16   testimony in the case saying that most people just put that

17   affirmative defense "yes" in that box?

18          MR. KRATKA:  Correct.

19          THE COURT:  As just a matter -- I'm not -- I don't

03:15:57 20   want to put words in anybody's -- as a matter of course,

21   whenever you see these, from many companies, they always will

22   list -- they list it, they confess to it, so to speak; but they

23   say affirmative defense to this yes.  If not, remind me, there's

24   just --

03:16:15 25          MR. KRATKA:  There was testimony that Exxon may have

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1    done that.

2              MR. NICHOLS:  And to put this in context, Judge, these

3    are the events for which TCEQ determined that the affirmative

4    defense applied.  That's what he's -- I think that's what he's

03:16:26   5    addressing.

6              THE COURT:  These are the ones where they -- where the

7    agency said it applies but your expert is saying really they

8    shouldn't have done that.  There wasn't enough in the records to

9    show that it was, in fact, a violation.

03:16:39  10             MR. NICHOLS:  Correct.

11             THE COURT:  Okay.

12             MR. KRATKA:  Each area of his disagreement with the

13   agency, your Honor.

14             THE COURT:  Okay.  Thank you.  That helps.

03:16:49  15             MR. KRATKA:  And again, the Plaintiffs' position,

16   without the jury here, is that even when the affirmative defense

17   to a penalty does apply, it's only a defense to penalties.  It

18   is not a defense to liability.

19             THE COURT:  Okay.  I see.

03:16:59  20   BY MR. KRATKA:

21   Q    Now, Mr. Bowers, the Bay -- as we saw yesterday the Baytown

22   complex is very large, correct?

23   A    Yes.

24   Q    Do you know how the size of the Baytown refinery compares

03:17:19  25   to other refineries?

Bowers - Direct/Kratka

1    **A**    It is perhaps larger than all but a couple.

2            THE COURT:  In the United States?

3            THE WITNESS:  In the United States, yes.

4    BY MR. KRATKA:

03:17:26   5    **Q**    And is that true of the entire complex?

6    **A**    Yes, includes the entire complex.

7    **Q**    Now, this is an important question:  Does the sheer size of

8    the Baytown complex, the number of valves, the miles of piping,

9    the number of different units, does simply the sheer size of the

03:17:47  10   Baytown Complex, prevent Exxon from performing preventive

11   maintenance or system upgrades that would be sufficient to avoid

12   emission events?

13           MR. NICHOLS:  Your Honor, I'll object to the question.

14   No one has claimed that the size of the plant eliminates

03:18:06  15   preventive maintenance for --

16           THE COURT:  I understand it.  I understand your

17   position.  Overrule the objection.  I understand your position.

18   I'll allow him to answer.  Relative to size.

19           THE WITNESS:  The size and pieces of equipment, the

03:18:16  20   number of equipment does not, inherently, preclude the facility

21   from being maintained in an appropriate fashion.

22              The size is -- you just -- it needs more people.

23   You add people according to the number of pieces of equipment to

24   have it maintained.

03:18:37  25   **Q**    So whether a plant has ten valves or ten thousand valves or

Bowers - Direct/Kratka

1   a million valves, they can be maintained properly?

2   **A**    A valve is a valve is a valve.

3   **Q**    And do you know how the complexity of the Baytown refinery

4   and the two chemical plants compared to other facilities?

03:18:59   5   **A**    It's probably the top one or two in terms of complexity.

6   The products go from one unit to another to be made into a

7   different product.

8   **Q**    Is there anything about the complexity of the Baytown

9   Complex that would prevent Exxon from performing the types of

03:19:15   10   preventive maintenance or other system upgrades that would be

11   sufficient to avoid emission events?

12           MR. NICHOLS:  Same objection, your Honor; but you

13   understand our position.

14           THE COURT:  Okay.  Thank you.

03:19:16   15           MR. KRATKA:  I'll just repeat the question for the --

16           THE COURT:  Overruled, for the record.

17           MR. KRATKA:  I'm repeating the question for the court

18   reporter.

19   BY MR. KRATKA:

03:19:28   20   **Q**    Does the complexity of the Baytown Complex prevent Exxon --

21   I'm sorry.

22               Is there anything about the complexity of the

23   Baytown Complex that would prevent Exxon from performing

24   preventive maintenance or system upgrades that would be

03:19:43   25   sufficient to avoid emission events?

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Direct/Kratka

1  **A**      There is nothing inherent in the plant interconnection or

2  complexity, the number of processes that connect -- there's

3  nothing in that that would preclude proper maintenance reducing

4  the number of events.  There's nothing there that says that

03:20:00  5  we're going to have emissions.  Nothing there.

6  **Q**      And again, you talked about the age of the refinery.  Can

7  the age of the refinery -- is the age of the refinery an

8  impediment to performing the types of preventive maintenance and

9  other upgrades and operation needed to prevent -- that would be

03:20:19  10  sufficient to prevent emission events?

11  **A**      Age is not an excuse.  It can be maintained, should be

12  maintained, and must be maintained in a leak-tight condition.

13  **Q**      Now, Mr. Bowers, doesn't every refinery sometimes have

14  emission events?

03:20:39  15  **A**      Unfortunately, yes.

16  **Q**      And have the facilities you yourself worked at experienced

17  emission events?

18  **A**      Yes.

19  **Q**      Even while you worked there?

03:20:48  20  **A**      Yes.

21  **Q**      So then let me ask you the bottom line question:  From an

22  engineering standpoint, have there been too many emission events

23  at the Baytown Complex?

24  **A**      In my opinion, yes.

03:21:00  25  **Q**      In your opinion, could Exxon have done more to prevent or

1    cut down on the large number of emission events at the complex?

2    **A**    The description of events itself says yes.  Leaks can be

3    prevented.

4    **Q**    So even going forward, is it your opinion that Exxon can

03:21:18    5    still do more than it's doing now to prevent or cut down on

6    emission events?

7    **A**    Yes.

8    **Q**    Now, are you saying that absolutely every single one of the

9    4,000 emission events in this case could have been prevented?

03:21:36    10    **A**    Yes.

11    **Q**    From an engineering standpoint, can the Baytown Complex get

12    closer than it is now to a no emissions event status?

13    **A**    Yes.

14    **Q**    Now, are you aware of any refineries or chemical plants

03:21:54    15    that have, in fact, achieved a better record regarding emission

16    events than Baytown, taking into account the size of this

17    facility?

18        MR. NICHOLS:  I'll object, your Honor.  I'm not sure

19    of anything that was in any expert disclosure that relates to

03:22:08    20    any of this, any opinion like that, unless we want to talk about

21    Shell Deer Park or Chevron Phillips.

22        MR. KRATKA:  I'll withdraw that question, your Honor.

23    BY MR. KRATKA:

24    **Q**    Now, you talked a little bit about Exxon's preventive

03:22:30    25    maintenance program, correct?

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1  **A**    Yes.

2  **Q**    Are you familiar with every single aspect of Exxon's

3  maintenance program?

4  **A**    No.

03:22:37  5  **Q**    And have you read all of Exxon's work practice guidelines

6  and design standards?

7  **A**    No.

8  **Q**    So if you're not familiar with all of the internal details

9  of Exxon's maintenance and operations, how can you give an

03:22:47  10  opinion regarding deficiencies and preventive maintenance at the

11  Baytown Complex?

12  **A**    I only look at the results that they obtained.  If you have

13  a leak due to corrosion or fatigue, you didn't inspect it often

14  enough.  You didn't inspect it properly.  It's not something

03:23:08  15  that happened instantly.

16  **Q**    Now, let's get to the Court's question about how much it

17  would take to improve things to a degree that you considered to

18  be sufficient.  And you already talked about additional labor

19  costs that would be required?

03:23:26  20  **A**    Yes.

21  **Q**    Would the $90 million a year figure that you came up with,

22  would that also include additional equipment or material costs?

23  **A**    Yes.

24  **Q**    And these types of costs are typically described as

03:23:41  25  operation and maintenance costs?

Bowers - Direct/Kratka

1  A    Yes.

2  Q    Now, did you attempt to determine -- in coming up with that

3  $90 million figure, did you go emission event by emission event

4  for every 4,000 events to determine the specific way in which

03:24:01  5  each individual event could have been prevented?

6  A    No.

7  Q    Why not?

8  A    It's just too voluminous and misleading results can be

9  found that way.

03:24:11  10  Q    Did you take a global approach, instead, to estimating what

11  it would have cost to significantly reduce the occurrence of

12  emission events?

13  A    I did.

14  Q    And is a global-type approach to estimating operating and

03:24:21  15  maintenance costs something that you've done in your

16  professional work?

17  A    Yes, numerous times.

18  Q    And those are projects that you described earlier in your

19  testimony?

03:24:28  20  A    Yes, some of those were described.

21  Q    At the time you wrote your initial report, did you know how

22  much Exxon was actually spending on maintenance-related budget

23  items?

24  A    No, I did not.

03:24:40  25  Q    Did you attempt to determine what Exxon was spending on

Bowers - Direct/Kratka

1  maintenance on your own?

2  **A**    I did not ask anyone how much Exxon was spending.  I

3  calculated what I believe would be an appropriate amount.

4  **Q**    And how did you calculate that?

03:24:54  5  **A**    I estimated the replacement cost of the facility in a

6  depreciated status.

7  **Q**    And you said you've already given expert testimony -- you

8  previously testified as an expert on replacement cost of

9  facilities?

03:25:06  10  **A**    Yes.  And I used an industry standard, two and half to

11  three percent of replacement cost for a Gulf Coast plant

12  refinery as an appropriate level of maintenance expenditures.

13  **Q**    So is that an industry standard for this area of the

14  country?

03:25:21  15  **A**    Acceptable to the financial institutions that finance these

16  projects.

17  **Q**    And how much did you estimate the replacement cost of the

18  facility to be?

19  **A**    I -- I estimated it at $18 billion.  And that's -- it's on

03:25:33  20  the very low side of today's costs.

21            THE COURT:  What was that for.

22            THE WITNESS:  That's replacing the complex in total.

23            THE COURT:  In total.  You also stated in one of the

24  questions I had about $1 billion to bring it up to par, so to

03:25:49  25  speak?

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Direct/Kratka

1              THE WITNESS:  Yes, sir.

2              THE COURT:  But it's -- how many billions were it to

3    take for a new --

4              THE WITNESS:  30.

03:25:55    5              THE COURT:  Okay.  30 billion for a whole new

6    operation?

7              THE WITNESS:  Yes.

8    BY MR. KRATKA:

9    **Q**    But in terms of calculating the replacement cost, you

03:26:02   10    estimated that at $18 billion?

11   **A**    18 billion.

12   **Q**    And then you took a percentage of that as --

13             THE COURT:  18 billion for -- again, remind me of the

14   exact wording.

03:26:11   15             THE WITNESS:  That's depreciated, as-it-sits value.

16             THE COURT:  Now?

17             THE WITNESS:  Yes.

18             THE COURT:  But it would take 30 billion to replace it

19   all?

03:26:19   20             THE WITNESS:  Yes.

21             THE COURT:  But 18 billion as valued now with the

22   depreciation scale?

23             THE WITNESS:  Yeah.

24             THE COURT:  Thank you.

03:26:25   25   //

1  BY MR. KRATKA:

2  **Q**    And then you used that $18 billion to come up with your own

3  ballpark estimate of what the complex was spending on its

4  maintenance budget?

03:26:36  5  **A**    I did.

6  **Q**    And what percentage did you end up using?

7  **A**    I believe it was two percent.

8  **Q**    Three percent?

9  **A**    Two percent or three percent.  I'd have to go back and

03:26:44  10  look.  Probably three percent because it's old and it's in a

11  hostile climate.

12  **Q**    So you took into account the age and the location and used

13  three percent as --

14  **A**    Yes.

03:26:54  15  **Q**    All right.  And that three percent of 18 billion dollars is

16  540 --

17  **A**    540 million.

18  **Q**    And then, after you wrote your initial report which

19  contained this $540 million estimate of what Exxon was probably

03:27:09  20  spending on maintenance, did Exxon eventually produce its actual

21  maintenance budgets for the three plants?

22  **A**    It did.

23  **Q**    And did you have a chance to review that budget

24  information?

03:27:18  25  **A**    I did.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Direct/Kratka

1  Q    And if you turn to Plaintiffs' Exhibit 451.

2         THE COURT:  That 540 million, that's per year; is that

3  correct, sir?

4         THE WITNESS:  Yes, sir.

03:27:33  5         THE COURT:  Okay.

6     (Discussion off the record.)

7  BY MR. KRATKA:

8  Q    And so looking at Exxon's actual maintenance budgets which

9  are in Plaintiffs' Exhibit 451 for the years 2005 through

03:28:37  10  2013 -- well, let's look at 2005 through 2012.

11         Does the actual spending on maintenance roughly

12  approximate the amount you calculated on your own?

13  A    Yes, sir.  It's within ten percent.  It's an extremely good

14  fit.

03:28:55  15  Q    Now, how did you go about estimating how much additional

16  spending beyond the 540 million -- roughly 540, 570 million a

17  year that Exxon had been spending on maintenance, how did you go

18  about estimating how much additional spending on preventive

19  maintenance was required?

03:29:24  20  A    That's -- that's where judgment comes into it.  And I said,

21  well, how many more people running around inspecting things will

22  it take to find all of these leaks.  And working from what are

23  they spending, how many more.  And I figured it would be -- at

24  least half of that expense would be for material and half of it

03:29:49  25  for labor.  And I used an oil and labor rate, about, I think, it

Bowers - Direct/Kratka

1  was $85 an hour which is probably high because they had most of

2  their work done contract but I don't know how much an hour they

3  spend for their contract labor.

4           And so I said 900 people at that average rate is

03:30:14   5  somewhere around 50 percent of the total amount.  The rest of it

6  is going to be material.  And added them together came up to $90

7  million.  And it's a crude estimate I admit.  You can't go, you

8  know, line item by line item and get there.

9  Q    And did this maintenance budget, the additional maintenance

03:30:31  10  budget that you came up with, include more than leak detection?

11  A    Yes.  It includes all kinds of general maintenance.  Just

12  do more of it.  Inspect and, you know, grease the valves, do --

13  do stuff that needs to be done.

14  Q    And have you done this type of calculation before?

03:30:48  15  A    I have.

16  Q    For what facilities have you done this?

17  A    I did it for Shell Deer Park.  I've done it for Texaco.  I

18  did it for Shell on the West Coast.

19  Q    And those were in your professional --

03:31:00  20  A    Yes.

21  Q    -- consulting work?

22  A    Professional consulting work, yes, sir.

23  Q    And were those estimates relied upon and used by the --

24  your clients?

03:31:09  25  A    Yes.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Direct/Kratka

1  Q     Now let's look at Exxon's maintenance budget, again,

2  Exhibit 451.  And look at the year 2013.

3              What was Exxon's total maintenance spending in

4  that year?

03:31:40  5  A     $706 million.

6  Q     And that's -- is that significantly higher than the six,

7  seven preceding years?

8  A     Yes, sir.

9  Q     Do you know why the maintenance budget was higher in 2013?

03:31:52  10  A     I have no idea.  I really don't.

11  Q     Okay.  Now, did you also review budgetary information from

12  Exxon that provided more detailed breakdowns of spending on

13  maintenance-related capital projects?

14  A     I did, yes.

03:32:06  15  Q     And then, this --

16              MR. KRATKA:  Your Honor, this is the document that we

17  received much more recently.  So I'm going to mark it as an

18  exhibit, provide it to counsel.

19              THE COURT:  Give it a number, please.

03:32:20  20              MR. KRATKA:  It'll be Plaintiffs' Exhibit 614.

21              THE COURT:  Any objection?

22              MR. NICHOLS:  Not if it's something we provided,

23  Judge.  I'll just take a look at it.

24              We produced this, Judge, that's fine.

03:32:34  25              THE COURT:  Okay.  614's admitted.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Direct/Kratka

1                          Yeah, why don't you hand it to one of my

2    clerks.

3                          Don't forget, I keep saying keep track of these

4    exhibits.  I mean, one person on each side needs to keep track

03:32:51  5  of the exhibits.

6                  MR. KRATKA:  Someone more organized than myself.

7                  THE COURT:  Well, me, too.

8    BY MR. KRATKA:

9    Q    Mr. Bowers, is this the budgetary information that you had

03:33:08  10  reviewed?

11   A    Yes, this is the recent stuff.

12   Q    And did you draw any conclusions from reviewing this data?

13   A    Unfortunately, I did.

14   Q    What conclusion did you draw?

03:33:20  15  A    Very small amount of capital investment.  Very, very small,

16   in peyok (phonetic spelling.)

17                  THE REPORTER:  I'm sorry?

18                  MR. NICHOLS:  Do what?

19                  THE COURT:  What was that?

20   BY MR. KRATKA:

21   Q    What was that?

22   A    It's de minimis.

23                  THE COURT:  De minimis?

24                  THE WITNESS:  Yes.  It's so small -- that the amount

03:33:32  25  of capital expenditures is astonishingly small for a facility of

Bowers - Direct/Kratka

1  that size.

2          THE COURT:  So in other words, the new equipment.

3          THE WITNESS:  Yes, sir.  This is something that IRS

4  says it extends or improves the value of the product -- of a

03:33:46  5  plant.  It's just trivial.  Trivial.

6  BY MR. KRATKA:

7  Q    Is it your estimation that the amount that Exxon is

8  spending on capital upgrades at the facility is sufficient to

9  keep it in good working order?

03:34:04  10  A    No, sir.

11  Q    Now, you already talked about the one particular capital

12  project regarding two additional flare gas recovery compressors

13  at a cost of -- your estimated cost of $50 million.

14          Can you describe your other recommendation for a

03:34:24  15  capital project.

16          MR. KRATKA:  And your Honor, in terms of what

17  Plaintiffs will be relying on in terms of the amount of money

18  that should have spent to achieve compliance with the -- our

19  economist will be relying on the $90 million figure, operation

03:34:44  20  and maintenance under-spending, the $50 million compressor

21  upgrade, and this next capital project.

22  BY MR. KRATKA:

23  Q    Go ahead.

24  A    The main expenditure was for an additional sulfur recovery

03:34:57  25  unit and tail gas treating unit.

Bowers - Direct/Kratka

1          THE COURT:  Where is that in this?

2          MR. KRATKA:  That would be in Mr. Bowers' initial

3    report.

4          THE COURT:  Oh, his initial report.

03:35:07   5          MR. KRATKA:  Yes.  Which is Page 19 of Plaintiffs'

6    Exhibit 427.

7          THE COURT:  Is it listed on here as far as capital

8    improvements?

9          MR. KRATKA:  This is something that Mr. Bowers is

03:35:17  10   suggesting.  It's not something that Exxon has done.

11          THE COURT:  Okay.  This is what he suggests?

12          MR. KRATKA:  That -- no, I'm sorry.  No, that --

13   that's --

14          THE COURT:  I'm looking at 614.

03:35:24  15          MR. KRATKA:  614 are the various capital projects that

16   Exxon has actually done for the last eight years or so.

17              And now Mr. Bowers is suggesting that there is an

18   additional upgrade that should be made that is not on there and

19   he's saying had -- we'll get him to say -- the testimony we'll

03:35:44  20   go into is had they done it --

21          THE COURT:  How much money they saved.

22          MR. KRATKA:  How much money they saved and, in his

23   opinion, it would be a project that could have avoided some of

24   these past emissions, could have been in compliance.

03:35:52  25   //

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Direct/Kratka

1  BY MR. KRATKA:

2  **Q**    Mr. Bowers, could you describe what the project is that

3  you're suggesting regarding sulfur recovery units.

4  **A**    Yes.  I would suggest they install an addition line or

03:36:13  5  train, if you want to call it that, a full-capacity sulfur

6  recovery unit of 400 tons per day and an appropriately-size tail

7  gas treating unit to handle the emissions from that sulfur

8  plant.  This would give them the ability to maintain operations

9  without affecting anything in the event one sulfur plant was

03:36:33  10  down for heavy maintenance and another tripped for some -- some

11  reason.

12  **Q**    And is it your opinion that that project could have

13  resulted in avoiding emission events that occurred?

14  **A**    Yes.

03:36:47  15  **Q**    And do you have an -- can you estimate or do you know how

16  many emission events could have been avoided?

17  **A**    I don't recall the number, no, I don't.  But there were

18  several large -- the problem is it's a very large emission of

19  very hazardous material and it stinks up the air pretty bad.

03:37:11  20  And the changes in operations to reduce their production of

21  hydrogen sulfide take quite a bit of time to work.

22  **Q**    Let me show you Plaintiffs' Exhibit 607.  This is a

23  document that was produced in discovery by Exxon and it's Bate's

24  Number 166167.  Can you read the title of this chart?

03:37:45  25  **A**    Yes.  It's total emissions of all types of pollutants from

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1    sour gas flaring emission events and scheduled maintenance

2    shutdown and startup events that possible -- in this suit that

3    possibly could have been prevented if an additional spare sulfur

4    unit had been installed and operational at the time of the

03:38:12    5    event.

6    **Q**    So an additional spare sulfur unit, that's what you're

7    recommending?

8    **A**    Yes, sir.

9    **Q**    And this chart goes through emission events that were

03:38:21    10    listed in the Plaintiffs' complaint?

11    **A**    Yes.

12    **Q**    And for each event, does it provide a start date?

13    **A**    Yes, it does.

14    **Q**    And the STEERS number of the event?

03:38:33    15    **A**    Yes, it does.

16    **Q**    And the total emissions that possibly would have been

17    prevented as that -- your recover -- had your sulfur recovery

18    unit been in place?

19    **A**    Yes.

03:38:41    20    **Q**    And what is the total amount of emissions that would have

21    been prevented?

22    **A**    86,700 pounds of emissions.

23    **Q**    And they also convert that into tons?

24    **A**    Yes.

03:38:54    25    **Q**    And this is an exhibit prepared -- or this is a chart

Bowers - Direct/Kratka

1    prepared by Exxon, correct?

2    **A**    Yes.  It's 44 tons of primarily hydrogen sulfide.

3    **Q**    And that's just from events that occurred from 2005 to

4    2010, correct?

03:39:09    5    **A**    Yes.

6    **Q**    What was -- what would be the useful life of a sulfur

7    recovery unit?

8    **A**    It's greater than 25 years.

9    **Q**    So, going forward, such a unit could prevent emissions from

03:39:28    10    numerous additional emission events, correct, if they occurred?

11    **A**    It's a double suspender situation and appropriate.

12    **Q**    What do you mean by "a double suspender"?

13    **A**    By law they have to have a full capacity sulfur unit hot

14    and ready to go.  If they have two sulfur units, they have to

03:39:51    15    have a third.  So if one of them drops offline, drops dead, they

16    can switch the valve and put it in operation.

17    **Q**    So this is redundant capacity?

18    **A**    This is redundant capacity.

19    **Q**    And does this address the idea that even if breakdowns and

03:40:06    20    accidents are unavoidable, are you saying that emissions from

21    those accidents could, nonetheless, be prevented?

22    **A**    Yes.

23    **Q**    So as you said very earlier in your definition of an

24    emissions event, a breakdown doesn't have to -- a breakdown may

03:40:18    25    occur --

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Direct/Kratka

1   **A**   Yes.

2   **Q**   -- but a breakdown, an upset, doesn't always have to result

3   in air emissions?

4   **A**   Correct.

03:40:25   5   **Q**   And so this type of capital project is designed -- even if

6   all events are not avoidable, this the project you're proposing

7   would avoid emissions in the event of an unavoidable event?

8              THE COURT:  Hold on second.

9              MR. NICHOLS:  Pure leading, your Honor.

03:40:40   10             THE COURT:  Sustained.

11             THE WITNESS:  It was my intent to --

12   BY MR. KRATKA:

13   **Q**   My questions were overruled.

14             What was the cost of this -- what would be the

03:40:50   15   cost of this sulfur recovery unit?

16   **A**   My estimate, it would be in excess of a hundred million

17   dollars, probably 150, maybe, on the max side, depending on how

18   much urban renewal was included.

19   **Q**   But in your report, you estimated on the low end a hundred

03:41:13   20   million dollars?

21   **A**   Hundred million dollars.

22   **Q**   And that's capital costs?

23   **A**   That's capital.

24   **Q**   Okay.

03:41:18   25             MR. KRATKA:  That's all I have, your Honor.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Cross/Nichols

1          THE COURT:  Okay.  Let's take a break at this time.
2    We'll get back in at five minutes to 4:00.  Five to 4:00.
3          (Court recessed at 3:41 p.m.)
4          (Court resumed at 4:00 o'clock p.m.)
04:00:33   5          THE COURT:  Go right ahead.
6                          CROSS EXAMINATION
7    BY MR. NICHOLS:
8    **Q**    Good afternoon, Mr. Bowers.
9    **A**    Yes.
04:00:37  10    **Q**    Good afternoon.
11    **A**    Good afternoon.
12          THE COURT:  Pull that mike in, sir.
13    BY MR. NICHOLS:
14    **Q**    Mr. Bowers, during the course of this trial, we've been
04:00:46  15    pretty good about trying to educate the Court about how everyone
16    who is involved in testifying in the case got involved in the
17    lawsuit.  So I want to kind of put a little more flesh on the
18    bones with you, if I might.
19               Is that all right?
04:01:00  20    **A**    It's your time, Counsel.
21    **Q**    So the Court knows, you were hired by the National
22    Environmental Law Center, correct?
23    **A**    Yes.
24    **Q**    You were hired by the National Environmental Law Center
04:01:19  25    pursuant to a retention agreement that you signed in

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Cross/Nichols

1    mid-November of 2009, correct?

2    **A**    I don't recall that exact date but that seems about right.

3    If you show it to me, I'll let you know if it's the right one.

4    **Q**    Yes, sir.  Do you recall, generally, that your work in the

04:01:38    5    case -- your substantive work, the work for which you billed in

6    the case, began in February of 2012?

7    **A**    Is that a question?

8    **Q**    I thought it was.  I can ask the question again.

9            Do you recall that your substantive work in the

04:02:00    10    case, the work for which you billed, pursuant to what Mr. Kratka

11    told you was or talked about was the billing arrangement, that

12    your substantive work in the case began in February of 2012?

13    **A**    I don't recall, sir.  If you show me my invoice, I could

14    say.

04:02:16    15    **Q**    So your invoice would reflect the first time that you did

16    work in the case for which you billed, correct?

17    **A**    Correct.

18    **Q**    Okay.

19    **A**    That's a long time ago for an old man.

04:02:28    20    **Q**    And Mr. Bowers, as the Court said, if any time today you

21    need to take a break, you know, you just let the Court know and

22    I'm sure he'll accommodate you.

23            MR. NICHOLS:  Could I have the extra copies of the

24    retention letter, please.

04:02:57    25    //

Bowers - Cross/Nichols

1  BY MR. NICHOLS:

2  Q    Mr. Bowers, I'm going to hand you what we've marked as

3  Defendant's Exhibit 523 and ask if you can recognize that as

4  being the retention letter by which you were retained for this

04:03:14  5  case.

6  A    It appears to be that.

7  Q    And just to give the Court a frame of reference, you had

8  been retained by the National Environmental Law Center on two

9  prior cases, correct?

04:03:28  10  A    Yes.

11  Q    A case involving the Shell Deer Park refinery, correct?

12  A    Correct.

13  Q    And a case involving the Chevron Phillips or C. P. Chem

14  facility out on I-10 near Mont Belvieu, correct?

04:03:44  15  A    Yes.

16  Q    Okay.  And so -- and just to give the Court a little more

17  reference, the way that you got hooked up with the National

18  Environmental Law Center was through your association with a

19  group called GHASP, later Air Alliance, correct?

04:04:00  20            THE COURT:  What?

21            MR. NICHOLS:  GHASP, G-A -- G-H-A-S-P, or Air

22  Alliance, correct?

23            THE WITNESS:  No.

24  BY MR. NICHOLS:

04:04:14  25  Q    Mr. Bowers, you worked with a group called GHASP,

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Cross/Nichols

1  G-H-A-S-P, before you were retained by the National

2  Environmental Law Center, correct?

3  **A**    I did volunteer work with that group.

4  **Q**    Yes, sir.  As a technical advisor?

04:04:32  5         THE COURT:  What does that mean?  What group?  What's

6  the letters?

7  BY MR. NICHOLS:

8  **Q**  What does it stand for?  You tell the Court.

9  **A**    I don't recall.  It's greater Houston area.

04:04:41  10  **Q**    Galveston Houston Alliance for Smog Prevention.

11              Does that ring any bells?

12  **A**    That sounds right.

13  **Q**    Okay.  So, you worked with this group.  It is an

14  environmental advocacy group, correct?

04:04:55  15  **A**    That's your words, sir, not mine.

16  **Q**    As a matter of fact, I asked you about that and you agreed

17  that it's an environmental advocacy group, correct?

18  **A**    I don't recall that answer.

19         THE COURT:  All right.  Show him.

04:05:02  20         MR. NICHOLS:  Okay.

21  BY MR. NICHOLS:

22  **Q**    So, with respect to this GHASP group, later became Air

23  Alliance, correct?

24  **A**    I'm not familiar with the Air Alliance transition.

04:05:14  25  **Q**    Okay.  You worked with this group called GHASP and you

Bowers - Cross/Nichols

1  understand -- what were you doing from a technical advisor

2  standpoint?

3  **A**    I was consulting with a former associate, Bob Levy, who is

4  active there, in flares.

04:05:25  5  **Q**    Okay.  And what was Mr. Levy working on with respect to

6  flares through the GHASP group?

7  **A**    They were undertaking a study to evaluate flare destruction

8  efficiency.

9  **Q**    Sure.  And the group was advocating for a change in the way

04:05:54  10  that flare efficiency would be calculated, correct?

11  **A**    I know not of that.

12  **Q**    With respect to your work for GHASP, you then came to be

13  retained by the National Environmental Law Center, correct?

14  **A**    The two have nothing to do with each other.

04:06:13  15  **Q**    Okay.  Let me show you what we've marked as Exhibit 523.

16  Let me put it up on the screen so the Court can see.

17                This is a letter dated November 12, 2009,

18  correct?

19  **A**    Yes.

04:06:42  20  **Q**    And the letter says that "The National Environmental Law

21  Center would like to retain you to assist in a Clean Air Act

22  enforcement case brought by Environment Texas and Sierra Club

23  against ExxonMobil Corporation and ExxonMobil Chemical Company

24  regarding violations at the Baytown refinery and chemical plant

04:07:04  25  complex," correct?

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1    A    That's what it says.

2    Q    "The initial work will be for case evaluation and

3    settlement support with expert report preparation and expert

4    witness testimony possible should the litigation proceed."

04:07:18    5              Did I read that correctly?

6    A    You read well.

7    Q    And so you were -- and you agreed to this, correct?

8    A    I signed the agreement, yes.

9    Q    So you agreed to be retained to assist the National

04:07:31    10   Environmental Law Center in this lawsuit and, should the

11   litigation proceed past any possible settlement, you would write

12   a report and provide expert witness testimony, correct?

13   A    I can agree to that.

14   Q    And this sets out the hourly rate that you talked about as

04:07:52    15   being $100 an hour, correct?

16   A    Yes.

17   Q    And specifically, you agreed to keep contemporaneous

18   records describing the nature of the work you perform on the

19   case and the amount of time spent on each task, correct?

04:08:06    20   A    Yes.

21   Q    And so if we were to go to your actual time records, we

22   would see when it was that you began substantive work on the

23   case, correct?

24   A    Yes.

04:08:18    25   Q    Okay.  Mr. Bowers, I'm going to hand you now what we marked

Bowers - Cross/Nichols

1  as Defendants' Exhibit 524.

2            Do you recognize Exhibit 524 as being the time

3  records that you produced in conjunction with your deposition

4  given in this case?

04:09:02   5  **A**    Yes.

6  **Q**    And you would -- would you agree with me that these

7  records, Exhibit 524, reflect what I said earlier:  that your

8  work in the case, your substantive work began in February of

9  2012?

04:09:20   10  **A**    So indicated here.

11  **Q**    So in other words, you were retained in November of 2009

12  but you did not initiate your substantive work in the case until

13  February of 2012, correct?

14  **A**    That -- that appears to be what happened.

04:09:34   15  **Q**    And as you went through with Mr. Kratka at great detail

16  earlier, could you please tell the Court how soon it was after

17  you started your substantive work in February of 2012 that you

18  produced your initial report in this case.

19  **A**    Would you show me the date of that initial report, please.

04:10:11   20  **Q**    Sure.

21            You don't still have it?  I thought you had all

22  your binders up there with all your reports.

23  **A**    I had the stuff produced --

24  **Q**    Okay.

04:10:17   25  **A**    -- by Plaintiffs.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Cross/Nichols

1  Q    So you don't have the binders before you that you were

2  using in your testimony earlier?

3  A    That's what I said.

4  Q    Okay.  Let me show you, then, what's been marked previously

04:10:41  5  as Plaintiffs' Exhibit 427 and ask if this is a copy -- another

6  copy besides the one you were looking at just a few minutes

7  ago -- of your initial report in the case.

8  A    I'm looking for the signature page, sir.

9  Q    I think if you look at the last page.

04:11:25  10  A    Let me look -- I was looking at the back of it.  This was

11  March the 16th, 2012, is the date I signed it and submitted it.

12  Q    Mr. Bowers, let me make it easy.  I'm going to hand you a

13  binder which is similar to the one you had earlier.

14         MR. NICHOLS:  This is Plaintiffs' Exhibit Binder 18,

04:11:46  15  your Honor.

16  BY MR. NICHOLS:

17  Q    You see that I've given you a copy of 427 right here,

18  Mr. Bowers?

19  A    Yes, sir.

04:11:56  20  Q    The report is dated March the 15th of 2012, correct?

21  A    Correct.

22  Q    And by looking at your time records that you kept, we know

23  that you began your substantive work in the case approximately

24  one month earlier, correct?

04:12:13  25  A    Correct.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Cross/Nichols

1  Q    And if we added up the number of hours that are listed on
2  Exhibit 524, Mr. Bowers, do we come up with -- I think you said
3  earlier your estimate is 850 hours -- would we come up with 850
4  hours before you produced your initial report in the case?
04:12:39  5  A    No.
6  Q    I'm not going to have you check my math, Mr. Bowers, but
7  does it sound reasonable that, instead of 850 hours, that you
8  spent less than 160 hours before you produced your initial
9  report in the case?
04:12:55  10  A    That's possible, yes.
11  Q    Now, let's look back at Exhibit 528.  Do you still have
12  that in front of you?  I put up Defendants' Exhibit 524 and you
13  can follow along on the screen.
14          Mr. Bowers, do you remember that in your
04:13:23  15  retention letter with the National Environmental Law Center you
16  agreed that you would document all of the work that you did in
17  connection with your work in the case?
18          THE COURT:  What year is this that we're looking at?
19          MR. NICHOLS:  This is 2012, your Honor.
04:13:42  20  BY MR. NICHOLS:
21  Q    You remember that in your retention letter you said that
22  you would document your work?
23  A    Yes.
24  Q    Okay.  So the Court will have this record to look at it for
04:13:52  25  itself, but you'll agree with me that the items that are listed

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Cross/Nichols

1  in terms of your work on the entries that predate the creation

2  of your initial report are, number one, review STEERS reports,

3  correct?

4  **A**    Yes.

04:14:13  5  **Q**    Take the Exxon Baytown Complex tour which occurred,

6  according to your records, on the 29th of February of 2012?

7             THE COURT:  Wait, say that again.

8             MR. NICHOLS:  Yes, sir.

9             THE COURT:  Is it 28th or 29th?  The tour looks like

04:14:36  10  it went on the 28th.

11  BY MR. NICHOLS:

12  **Q**    So the Court knows -- so the February 28th, 2012, would be

13  the complex tour, right?  Correct, Mr. Bowers?

14  **A**    Yes, that's what it says.

04:14:49  15  **Q**    And then you would have undertaken some additional activity

16  the following day to review your site visit notes on February

17  29th, correct?

18  **A**    Yes.

19  **Q**    You would have written up your observations from the site

04:15:03  20  visit on the 1st of March, correct?

21  **A**    And?  Yes.

22  **Q**    And then all the way down through March 15th or March 16th

23  when you actually signed the report, the activity that you have

24  listed is either reviewing STEERS reports or revising your

04:15:23  25  opinion, correct?

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Cross/Nichols

1    **A**    Correct.

2    **Q**    Mr. Bowers, Mr. Kratka outlined for the Court, I believe,

3    earlier, the things that the National Environmental Law Center

4    itself asked you to do in the case.

04:15:44    5                    Do you recall that?  Mr. Kratka asking you about

6    that?

7    **A**    Do you have a specific item?  Perhaps I could address that.

8    **Q**    Yes, sir.  Do you recall that, among the things that

9    Mr. Kratka outlined for the Court that he asked you to do on

04:15:59   10    behalf of the National Environmental Law Center is to look at

11    the causes of emission events at the Baytown refinery, correct?

12    **A**    Yes.

13    **Q**    He asked you to look at causes of emissions events, 4,000

14    of them, correct?

04:16:18   15    **A**    That's the number that eventually came out after Exxon

16    finally disclosed everything.

17    **Q**    Mr. Bowers, before you did your first report in March of

18    2012, you had access to STEERS reports, correct?

19    **A**    Yes.

04:16:35   20    **Q**    Those STEERS reports contained some of the emissions events

21    that are still at issue in the case, of course, letting go of

22    the ones that the Court has already dismissed, correct?

23    **A**    And your point?

24    **Q**    I'm asking did you review STEERS reports relating to

04:16:54   25    emission events that were involved in this case before you did

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Cross/Nichols

1  your report?

2  A   Yes.

3  Q   And what Mr. Kratka did was he asked you to analyze the

4  cause of those events, correct?

04:17:08  5  A   Not at that time.

6  Q   Would you please turn to the first page of your report,

7  your initial report which is Exhibit 427.

8      THE COURT:  427?

9      MR. NICHOLS:  Yes, sir.

04:17:44  10  BY MR. NICHOLS:

11  Q   Mr. Bowers, you wrote in your initial report what the

12  Plaintiffs -- what the National Environmental Law Center asked

13  you to do before you prepared your report, correct?

14  A   Yes.

04:17:58  15  Q   And so if we look at that, the Court's already got a copy

16  in front of it.  I'll put my copy up on the screen.

17      Numero Uno, the first thing they asked, "I have

18  been asked by Plaintiffs" -- and you understand by "Plaintiffs,"

19  you're referring there to the National Environmental Law Center

04:18:16  20  or its agencies or entities it's working for, the Sierra Club or

21  Environment Texas, correct?  That's who is being referred to

22  there as "Plaintiffs," correct?

23  A   Yes.

24  Q   So the very first thing that they asked you to do in

04:18:36  25  looking at these STEERS reports, "Is there evidence of common

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Cross/Nichols

1    causes underlying emission events at the Baytown Complex,"

2    correct?  These are your words, Mr. Bowers, they're not mine.

3         THE COURT:  It says "In preparing my opinion, I've

4    been asked by Plaintiffs to consider these questions."   That

04:19:00    5    was number one.

6         THE WITNESS:  Yes.

7    BY MR. NICHOLS:

8    Q    Now, Mr. Bowers, in terms of your profession, just to kind

9    of get us up to speed of where you are, you've been retired for

04:19:13    10   a number of years, correct?

11   A    Yes.

12   Q    And at one time, you worked for Bechtel.  I think you

13   retired from them in around 2002.  Does that sound about right?

14   A    That sounds about right.  I'd have to refer to the

04:19:25    15   documents.

16   Q    Okay.  And so, even after your retirement, Mr. Bowers, you

17   were putting yourself out to the public as being someone who

18   "conducted detailed review of emission incidents and identified

19   root causes."

04:19:55    20        Does that language sound familiar?

21   A    I do not recall that specific language.  Perhaps you could

22   show me where it is.

23   Q    All right.

24        THE COURT:  What are we looking at now?

04:20:17    25        MR. NICHOLS:  I'm going to mark Exhibit 525,

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Cross/Nichols

1   your Honor.

2   BY MR. NICHOLS:

3   **Q**   Mr. Bowers, I'm going to hand you what we've marked as

4   Exhibit 525.  And I'll represent to you that this is a LinkedIn

04:20:41  5   page that I myself printed out.  If you look at the top, it has

6   a date of February the 11th of 2014.

7                   Do you see that?

8   **A**   I do.

9   **Q**   It lists Keith Bowers, correct?

04:20:59  10  **A**   Yes.

11  **Q**   It lists Keith Bowers as what, sir?  Would you please read

12  how Keith Bowers is held out on the LinkedIn page?

13  **A**   "Consultant, expert witness on operations for emissions

14  reductions."

04:21:23  15  **Q**   That's not all is it, sir?

16  **A**   That's the title, the first line.

17  **Q**   Yes, sir.  But the first line goes on a little bit further,

18  right?  That's not the entire first line?

19  **A**   Are you referring to the first paragraph after the --

04:21:36  20            THE COURT:  All right.  Just put it down.  Let's get

21  it moving.

22                   Go on.

23  BY MR. NICHOLS:

24  **Q**   So Keith Bowers is listed as "Consultant, expert witness on

04:21:44  25  operations for emissions reduction at National Environmental Law

Bowers - Cross/Nichols

 1    Center," correct?

 2              THE COURT:  Isn't that what it says?  You got the

 3    light -- your pointer.

 4              THE WITNESS:  Yes.

04:22:01  5              THE COURT:  No, Mr. Nichols.

 6              MR. NICHOLS:  Yes, sir, I do.  Let's get it on there

 7    and show it to the witness.  Now, move it down a little bit.

 8    Right up top.

 9                   That's what you're referring to, correct?

04:22:14 10                   Let's see if we can get that focused, it's out of

11    focus.  Zoom it in or out and see if we can -- there you go.

12    Okay.

13              THE WITNESS:  Yes.

14    BY MR. NICHOLS:

04:22:25 15    Q    And then, if you go down further, there's a listing as to

16    what this means, "Consultant and expert witness on operations

17    for emissions reduction, National Environmental Law Center,"

18    correct?

19    A    Yes.

04:22:41 20    Q    And it says, "January, 2009, to the present, five years,

21    two months."

22                   Correct?

23    A    Yes.

24    Q    And then it has a description of what it is that this

04:22:55 25    person does, this Keith Bowers does.  It says, "Review and

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Cross/Nichols

1  participate in strategy, development, detailed review of

2  emissions incidents and identify root causes for them and

3  identify prudent practice of," quote, "best in industry," close

4  quote, "performers in refining and petrochemicals."

04:23:19  5       Correct?

6  **A**    Yes.

7  **Q**    So this language, "identify root causes for emissions

8  incidents," the concept of a root cause is not a foreign concept

9  to you, is it, sir?

04:23:35  10      Is the concept of root cause something that you

11  have worked with over the course of your career?

12  **A**    It is.

13  **Q**    And just before we finish this, you see here that it lists

14  you as an associate for GHASP, this Galveston Houston Alliance

04:23:51  15  for Smog Prevention that we talked about earlier, correct?

16  **A**    Correct.

17  **Q**    And then, at the very bottom, just to make sure that we're

18  talking about the same guy, this is the indication of a senior

19  process engineer at Bechtel; is that right?

04:24:09  20  **A**    Yes.

21  **Q**    Now you have worked around people who have conducted root

22  cause investigations, correct, during the course of your career?

23  **A**    Yes.

24  **Q**    Mr. Bowers, if, in the course of your career, somebody asks

04:24:36  25  you to derive the root cause of a breakdown of a compressor and

Bowers - Cross/Nichols

1  you came back to that person and said, "The root cause of that

2  incident is a compressor," do you think the person that would

3  have given you the assignment would be very happy with you?

4  **A**    I can't presume what that person was and what the intent of

04:25:03  5  your question is.

6  **Q**    The intent of my question, Mr. Bowers, is, tell the Court,

7  when you're dealing with compressors, just give the Court an

8  idea of the number of components that are associated with any

9  given compressor system.

04:25:21  10  **A**    It would range from maybe 50 to several hundred --

11  **Q**    Several?

12  **A**    -- hundred, depending on the complexity of the compressor.

13  **Q**    Yes, sir.  And just so the Court understands, I think what

14  you're telling the Court is that you looked not only at the

04:25:39  15  compressor itself but also all of the other operations of the

16  refinery that feed into the compressor in making your compressor

17  list, correct?

18  **A**    No, sir.

19  **Q**    So I thought you told me that the compressors, from your

04:25:53  20  perspective at the Baytown Complex, were working pretty well but

21  it was the things around the compressor that you had some issue

22  with, correct?

23  **A**    No.  I said the rotating equipment of the compressor case

24  itself contained in that was working pretty good.

04:26:12  25  **Q**    Okay.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Cross/Nichols

1  **A**    It's the stuff that kept it running, like the fuel pump,

2  the oil pump, the generator.

3  **Q**    Right.  So what I want you to do is broaden your mind a

4  little bit.  So when we're talking about --

04:26:25   5  **A**    Why ask me why I should broaden my mind a little bit?

6  **Q**    I think the answer is obvious to everybody, Mr. Bowers, but

7  let me just ask you:  If we were to take into account all of

8  that equipment that is lumped together in one of those charts

9  that Ms. Rock put together and you reviewed, how many components

04:26:48  10  are we talking about in terms of a compressor system?

11           In other words, if we were to look at each and

12  every one of those line items that are included in those charts

13  that are put together where things are lumped under compressor,

14  how many different components would be included if we were to

04:27:10  15  look at each and every one of those line items?

16  **A**    I can't answer that question because it depends totally on

17  the compressor and its installation.

18  **Q**    Yes, sir.  You understand -- you were in court yesterday, I

19  believe, when Jeff Kovacs was testifying, correct?

04:27:30  20  **A**    I was sitting as an observer for some of the time, yes.

21  **Q**    And were you actually sitting here when Jeff Kovacs went

22  through that report, I believe it was on Exhibit 20W, that was

23  also shown earlier today, the one dealing with the pinhole leak

24  under the insulation?  The 18-page -- were you here, Mr. Bowers?

04:27:58  25           MR. KRATKA:  Objection.  Give the witness a second to

Bowers - Cross/Nichols

1  answer.  He's thinking about your question.

2            THE COURT:  Were you here at that time, sir?

3            THE WITNESS:  Yes, sir, I was.

4            THE COURT:  Okay.

04:28:07  5  BY MR. NICHOLS:

6  **Q**    So you saw a very detailed, 18-page root cause

7  investigation, right?

8  **A**    Yes.

9  **Q**    You saw a very detailed analysis, not only of root cause,

04:28:15  10  but corrective actions, correct?

11  **A**    Yes.

12  **Q**    And that is a type of analysis that when you're actually

13  working at a plant to that level of complexity, that level of

14  detail, that you go to in determining root cause, correct?

04:28:36  15  **A**    That is what is used at Exxon.

16  **Q**    Yes.

17  **A**    That is, apparently, their standard.

18  **Q**    Yes.

19  **A**    But I would add that they missed the cause.

04:28:47  20  **Q**    Okay.  All right.  We'll get back to that, Mr. Bowers.

21            I'm talking to you about the concept of doing a

22  root cause investigation.

23  **A**    That is Exxon's concept of a root cause investigation.

24  **Q**    Right.  And your content of a root cause investigation -- I

04:29:01  25  just want to understand where you're coming from and for the

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Cross/Nichols

1  Court to understand.  Your concept of a root cause investigation

2  is to say if we had a breakdown due to human error, due to one

3  of hundreds of components on any particular piece of compressor

4  equipment caused by whatever source that I can put that all in a

04:29:26   5  list that's called compressor and say all those events had the

6  same root cause?

7          MR. KRATKA:  Objection, your Honor.  Completely

8  mischaracterizes and misstates his testimony, the way he used --

9  by starting with compressors and moved on to associated causes.

04:29:42  10          THE COURT:  Overruled.

11          Answer the question.  It's cross examination.

12          THE WITNESS:  Would you please repeat the question.

13          MR. NICHOLS:  I will try my best.

14          THE COURT:  Make it simple.  Break it down.

04:29:49  15  BY MR. NICHOLS:

16  Q    So we've got ExxonMobil's way of determining root cause

17  which we've determined from the example, 20W?

18          THE COURT:  Go on.

19  BY MR. NICHOLS:

04:30:01  20  Q    Is the method -- Keith Bowers' method of determining root

21  cause to take any event involving any component of a compressor,

22  involving any type of myriad human errors, involving any one of

23  a number of sources for the breakdown and to put it on a list

24  called compressor and say that all of those events have the same

04:30:29  25  root cause?

          Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Cross/Nichols

1          Is that the Keith Bowers' method?

2    **A**    You put the label on something that has been totally

3    mischaracterized, sir, by you.

4    **Q**    Okay.  Let's break it down then.

04:30:45   5          One of the issues that you talked about first, I

6    think, one of your common cause issues concerned leaks, correct?

7    **A**    I prepared a table from Exxon information that lumped all

8    things that Exxon called leaks --

9    **Q**    Yes.  And --

04:31:04   10   **A**    -- into a common table.

11   **Q**    And to be more precise and more fair to everybody, you

12   asked Ms. Rock at the National Environmental Law Center to put

13   together a list of events that had the word "leak" somewhere in

14   a report that Exxon had produced, correct?

04:31:20   15   **A**    For that specific event.

16   **Q**    Yes, sir.  So in other words, if Exxon had produced a

17   report on an emissions event that had the word "leak" in it,

18   your direction to Ms. Rock was "Put that on the list," right?

19   **A**    To include it in the list because that's what Exxon had

04:31:42   20   called it.

21   **Q**    Yes, sir.  And so if we look at that list that you had

22   Ms. Rock prepare -- and by the way, I think you told me that, at

23   the time of your deposition, you had adopted certain tables that

24   had been made by Ms. Rock, correct?

04:32:05   25          MR. KRATKA:  Objection to the term "adopted."

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Cross/Nichols

1          THE COURT:  I can't hear you, sir.

2          MR. KRATKA:  Objection --

3          THE COURT:  To what?

4          MR. KRATKA:  -- to the term "adopted."

04:32:13  5          THE COURT:  All right.  Rephrase it.

6  BY MR. NICHOLS:

7  **Q**    When you produced that initial report that we just looked

8  at one month after you started doing some work, you had certain

9  what you considered to be common cause tables attached to that

04:32:28  10  initial report, correct?

11  **A**    I don't recall.  I'll have to -- you'll have to show me the

12  document.

13  **Q**    Mr. Bowers, I'm going to mark as Defendants' Exhibit 526 a

14  complete copy of your initial report in the case?

04:34:05  15          THE COURT:  Don't we have it in here?  Isn't that that

16  whole volume, basically?  18, something like that, isn't that

17  what -- isn't that in here?  Is that the same report?

18          MR. KRATKA:  It should be.

19          MR. NICHOLS:  I don't believe that they marked the

04:34:22  20  entire report, Judge.

21          THE COURT:  430, yeah.  430 is up here.

22          MR. NICHOLS:  But they don't have the attachments on

23  there, I don't believe, your Honor.  Let me check.

24          MR. KRATKA:  430?  Which one are you looking at?

04:34:36  25          MR. NICHOLS:  I do not believe they have the initial

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Cross/Nichols

1    report.

2            MR. KRATKA:  Your Honor, in the Plaintiffs' exhibit

3    binder, Mr. Bowers' -- the text of Mr. Bowers' initial report

4    was produced as an exhibit.

04:34:54  5            THE COURT:  I can't -- speak up a little bit.

6            MR. KRATKA:  I'm losing my voice.

7            THE COURT:  I know.  Me, too.  But go on.

8            MR. KRATKA:  The text of his initial report is Exhibit

9    427.  The attachments to that initial report are not included

04:35:09  10   because they've been superseded by the attachments in the

11   revised report.

12           THE COURT:  Well, it's a revised supplemental opinion

13   which is 430.

14           MR. KRATKA:  Yes.  Yes.  And that contains his

04:35:21  15   complete --

16           THE COURT:  Is that -- is that what we're going on?

17           MR. KRATKA:  I don't know.

18           THE COURT:  Okay.  You're looking at a prior one to

19   that?

04:35:26  20           MR. NICHOLS:  I'm looking at the report that he

21   produced on March 15th of 2012, which I don't think they've

22   introduced, your Honor.

23           THE COURT:  The one in here, in the book, is January

24   15, 2013?

04:35:36  25           MR. KRATKA:  Yes.  That is the current report but we

Gayle Dye, CSR, RDR, CRR - 713.250.5582

 1  also introduced the text of the initial report which is 427.

 2  It's about 20 pages long.

 3               THE COURT:  Yeah.  Okay.

 4               MR. KRATKA:  We did not include the original tables

04:35:51  5  attached to that report because those tables have been updated

 6  and superseded by the revised report.

 7               THE COURT:  Okay.  Okay.

 8               MR. NICHOLS:  So what I've marked, your Honor, as 526,

 9  is the initial report with the initial attachments in the case.

04:36:01 10               THE COURT:  Okay.

11  BY MR. NICHOLS:

12  **Q**    And Mr. Bowers, if you look through --

13               THE COURT:  Hold it.  Any objection?

14               MR. KRATKA:  Well, yeah.  The objection is that the

04:36:14 15  report itself is still being put forward as Mr. Bowers' opinion

16  but we're no longer relying on any of those attachments because

17  they're -- they've been superseded by different --

18               THE COURT:  This comes in in litigation very often.

19  Say, Let me look at your original complaint.  And the objection

04:36:29 20  comes, Well, we're now on the fourth amended complaint.

21                    So to that extent, I'm going to allow -- allow

22  him to talk about it, understanding that it has been superseded.

23                    But for whatever cross examination purposes.

24  What number is that?

04:36:42 25               MR. NICHOLS:  That is Exhibit 526, your Honor.

Bowers - Cross/Nichols

1          THE COURT:  Are you offering that?

2          MR. NICHOLS:  I am.

3          THE COURT:  All right.  I'm going to allow it in and

4  just for the purposes of the cross examination.

04:36:50  5  BY MR. NICHOLS:

6  **Q**    So Mr. Bowers, would you look at your initial report from

7  March 15th, 2012, and confirm for us that that initial report

8  had lists of events that you attributed to common causes?

9          THE COURT:  Common causes?

04:37:11  10          MR. NICHOLS:  That's the question, your Honor.

11          THE COURT:  Why don't you point him to the page if you

12  have to.

13  BY MR. NICHOLS:

14  **Q**    Mr. Bowers, would you agree that as Attachment C to your

04:37:42  15  report that was produced in March 15th of 2012, you included a

16  table entitled "Booster Station 4 at the Refinery," correct?

17  **A**    I still don't see -- can I see where -- yes.

18  **Q**    That you included a list of flexicoker units at the

19  refinery similar to the one that you showed the Court earlier

04:38:13  20  today?

21  **A**    Yes.

22  **Q**    You included one entitled "Fluid Catalytic Cracking Unit 2

23  at the Refinery" similar to the one that you showed the Court

24  today, correct?

04:38:28  25  **A**    Yes.

Bowers - Cross/Nichols

1    Q    "Fluid Cracker Unit Number 3 at the Refinery," similar to

2    the one you showed the Court today, correct?

3    A    Yes.

4    Q    "Catalytic Light Ends Unit at the Refinery" similar to what

04:38:47   5    you showed the Court today, correct?

6    A    Yes.  Are we going to go through these page by page by

7    page?  It's your time.

8    Q    And then we're going to go to Attachment E.  You attached

9    an Attachment E to your report, your March 15, 2012, report,

04:39:10   10   correct?

11   A    Yes.

12   Q    Attached to Attachment E is a list entitled what, sir?

13   A    "Compressor Failure."

14   Q    Yes, sir.  And attached to Attachment E, you have a list

04:39:26   15   entitled "Regenerators," correct?

16   A    Yes.

17   Q    "Mechanical Failures," correct?  And if we go back further

18   enough --

19          MR. KRATKA:  Your Honor, I'm going to assert the

04:39:38   20   continuing objection to the fact that these have all been

21   superseded.

22          THE COURT:  Well, I'm assuming he'll link up

23   something.  Okay.

24   BY MR. NICHOLS:

04:39:46   25   Q    And you have a chart entitled "Leaks," correct?

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1    **A**    Yes.

2    **Q**    Similar to the one that you talked to the Court about

3    earlier today, correct?

4    **A**    I would have to compare them --

04:40:01   5    **Q**    Yes, sir.

6    **A**    -- page by page.

7    **Q**    They are similar to the extent that, in each of these

8    charts that you put forward on March 15th of 2012, you put forth

9    charts that had lists of events that you said had common causes,

04:40:21   10    correct?

11    **A**    That was the label on it, yes.

12    **Q**    Yes, sir.  And as to these charts that Ms. Rock prepared,

13    you told me in your deposition that, as of the time that report

14    was finalized, that you checked some entries but not all of

04:40:43   15    them, correct?

16    **A**    Correct.

17    **Q**    Now, what I want to do, Mr. Bowers, is go through some of

18    the charts that Mr. Kratka walked you through earlier today.

19            THE COURT:  Now, are these attached to his final

04:40:59   20    report or is this the original report or what?

21            MR. NICHOLS:  Yes, sir.  And we can go back --

22            THE COURT:  As to what?

23            MR. NICHOLS:  -- as we need to.

24            THE COURT:  Both?

04:41:05   25            MR. NICHOLS:  No.  I'm looking now at Exhibit 436,

1  your Honor, which is the updated leaks chart.  In other words,

2  Mr. Bowers had a leaks list in his initial report and, as I

3  understand it, 436 is the one that he has updated.

4           THE COURT:  With the graph?

04:41:26  5           MR. NICHOLS:  Yes, sir.

6           THE COURT:  All right.

7           THE WITNESS:  I don't seem to have that here.  Could

8  you please provide me a copy of it.

9           THE COURT:  436.

04:41:37  10           MR. NICHOLS:  Yes, 436.

11           THE COURT:  Well, it's a Plaintiffs' exhibit.  You got

12  a copy of it for him.

13                Somebody?

14  BY MR. NICHOLS:

04:42:21  15  Q    And this is the chart that you went through briefly with

16  Mr. Kratka called, at the top -- you see I'm now looking at page

17  7-3, Mr. Bowers?  It has a title "Common Cause:  Leaks."

18                Correct?

19  A    It appears to be the same.

04:42:46  20  Q    Okay.  So this is the type of list that you have put

21  together for purposes -- or I'm sorry, Ms. Rock has put together

22  and you've reviewed for purposes of the case that attempt to

23  group, in your professional judgment, events that result from

24  the same root cause, correct?

04:43:11  25  A    No.  You say "root cause."  "Root cause" definition by

Bowers - Cross/Nichols

 1  Exxon is totally different than root cause analysis on my part

 2  for this case.

 3  Q    Okay.  So let's figure out exactly, for the Court's

 4  benefit, what definition of root cause we're using.

04:43:30   5             People out in the field, Mr. Bowers, not people

 6  in lawsuits, people in the field, men and women working at these

 7  plants every day, when they want to get to the root cause of an

 8  event, what do they do?

 9             MR. KRATKA:  Objection.  I'm not sure who you're

04:43:50  10  expecting him to describe.

11             MR. NICHOLS:  He's --

12             MR. KRATKA:  You're asking him to describe what Exxon

13  does.

14             THE COURT:  Overrule the objection.

04:43:59  15             MR. NICHOLS:  The man's been -- I'm sorry.

16             THE WITNESS:  Would you please state the question

17  again?

18  BY MR. NICHOLS:

19  Q    Yes.  If a man or a woman who is a technical person, a

04:44:11  20  process technician at a plant, is asked to evaluate an event and

21  get to the root cause of what happened, what are they going to

22  do?

23             THE COURT:  You mean where do they start or what?

24             MR. NICHOLS:  Yeah.  Sure.

04:44:26  25  //

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Cross/Nichols

1   BY MR. NICHOLS:

2   **Q**   Where do they start?  What do they do?

3   **A**   I can't answer that question.

4   **Q**   Have you ever been involved in a root cause analysis at a

04:44:35   5   facility?

6   **A**   I've been involved in many --

7   **Q**   So give the Court --

8   **A**   -- in numerous facilities and the depth of investigation

9   varies depending on what you're hunting for.

04:44:46   10   **Q**   Sure.  If you're trying to figure out what caused an event

11   and try to avoid it from happening again, are you going to stop

12   at the level of just saying it's a compressor event?

13   **A**   That may be quite appropriate for the particular

14   investigation.

04:45:01   15   **Q**   So are you suggesting to the Court that, in the normal

16   practice of a refinery that if there is a failure of equipment

17   involved on a compressor system, that it is adequate for

18   somebody to come back and say, "Hey, it was a compressor"?

19          MR. KRATKA:  Objection.  It's mischaracterizing his

04:45:31   20   testimony and there's no specific incident for him to evaluate.

21          THE COURT:  He said he'll link it up.  So overrule the

22   objection.

23          THE WITNESS:  Would you please restate the question?

24   BY MR. NICHOLS:

04:45:43   25   **Q**   Yes, sir.

Bowers - Cross/Nichols

1           If you are working at a plant and there is a

2    failure involving a piece of equipment associated with a

3    compressor, in your professional judgment would it ever be

4    appropriate for somebody to come back and say as the root cause

04:46:05   5    it was a compressor?

6    **A**    Yes.  If that's what he had been asked to do.  He had not

7    been asked to specify the particular piece of tiny equipment

8    inside the compressor, such as the root of blade 23 in wheel 7

9    developed a fatigue crack.

04:46:27  10    **Q**    Yes, sir, but --

11    **A**    It was the compressor that failed.

12    **Q**    Yes, sir.  But use your example.  If you really wanted to

13    drill down and figure out what caused that particular issue, you

14    would have to drill down to that level of detail that you just

04:46:41  15    mentioned, correct?

16    **A**    To determine the cause of the failure of blade 7 in wheel 5

17    at the root, probably.

18    **Q**    Yes, sir.  And in order to --

19    **A**    If I were interested in that level of detail.

04:46:52  20    **Q**    Yes, sir.  You understand that in this case, we should be

21    -- we are interested in details.  Do you understand that?

22    **A**    I do not understand your persistence in saying, well, which

23    specific piece, nut, bolt, washer, or whatever, failed?

24    **Q**    Okay.

04:47:10  25    **A**    I look at it as a process engineer.  The system failed.

Bowers - Cross/Nichols

1   Q    Okay.

2   A    The compressor system failed.

3   Q    Okay.  So whenever a compressor system fails in any shape,

4   form, or fashion, whether it's somebody hitting the wrong switch

04:47:25   5   or a piece of equipment fails, a component fails, a

6   manufacturing defect occurs, by golly, it doesn't matter to

7   Keith Bowers, that's a common cause, right?

8            MR. KRATKA:  Objection.  That's not a question.

9            THE COURT:  Overruled.

04:47:39   10           THE WITNESS:  From the perspective of my assignment,

11   it was did it cause or not cause an emission event.

12   BY MR. NICHOLS:

13   Q    Yes, sir.  So let's just make sure to ratchet this down for

14   the Court.  We're looking at Exhibit 2 -- 436.

04:48:00   15           Talk -- the very first entry is a recordable,

16   it's got a Bate's number, process unit is sour water unit.  This

17   is -- says, "Flaring due to T-853 safety leak."

18           Mr. Bowers, what was the cause of that leak?

19   A    I have no idea.  And from my perspective, it does not

04:48:22   20   matter.  It leaked, caused an emission event.

21   Q    So if I were to take the time to go through with you all of

22   these charts that you've put before the Court as emanating, as

23   issues, events that occurred due to a common cause, if I were to

24   take the time to go through every line item, your answer would

04:48:44   25   be the same?  If I asked you what was the cause of this event,

Bowers - Cross/Nichols

 1  you would tell me, "For purposes of my analysis, it doesn't

 2  matter, correct"?

 3  **A**    Not necessarily, sir.  If you would care to go through them

 4  line by line, I will give you my best answer; but I cannot take

04:49:00  5  a general broad statement like that and agree with it.

 6  **Q**    Well, you would agree with me that nowhere in your work in

 7  the case have you drilled down to that level of detail on any

 8  particular event, correct?

 9  **A**    No, not correct.

04:49:14  10  **Q**    Okay.  So give us a list, Mr. Bowers, because we're trying

 11  to keep some lists of events that -- where we get that level of

 12  detail.  Give me a list of events on which you did a detailed

 13  analysis of the event, beyond having Ms. Rock look at various

 14  reports and including in a chart any that had the word "leak" in

04:49:46  15  it.

 16  **A**    Is that a question, sir?

 17  **Q**    Yes, sir.  I'm asking you to give us -- so we can address

 18  specific events, give me a list of events that you have, in

 19  fact, analyzed for root cause rather than lists of events

04:50:08  20  prepared by Ms. Rock under the instructions put together a list

 21  everything that has the word "leak" in it.

 22          MR. KRATKA:  Objection.  Compound question.

 23          THE COURT:  Sustained.

 24  BY MR. NICHOLS:

04:50:25  25  **Q**    Early on in your testimony with Mr. Kratka, Mr. Bowers, you

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Cross/Nichols

1   mentioned that Mr. Kratka actually asked you about that root

2   cause analysis that Exxon had done that you saw the example of

3   and you said -- I believe you said that you had been -- you had

4   received a couple of those root cause analyses from Exxon,

04:50:47  5   correct?

6   **A**   I think I said that.  I think -- I -- I'm not sure if

7   that's the exact wording, but something of that nature.

8   **Q**   Okay.  So can you give me that couple.  So which two events

9   did you receive the root cause analysis on?

04:51:05  10         MR. KRATKA:  Objection.  Your Honor, Mr. Nichols is

11   asking Mr. Bowers to reproduce from memory the in-depth analyses

12   of specific events that he outlined in three different reports.

13   If he has a question about a specific analysis of any of those

14   events, he should point them out and ask him about it.

04:51:22  15         THE COURT:  Are you, Mr. Nichols, inquiring as to, you

16   know, the general reporting; that if it's a compressor, there

17   was no details within that and that should be the root cause

18   analysis in the trade -- in the trade and business that this man

19   is in?

04:51:35  20         MR. NICHOLS:  That --

21         THE COURT:  That in order to do it, you need to get

22   down to another level?

23         MR. NICHOLS:  Yes, sir.  And that --

24         THE COURT:  Rather than just say that what's the

04:51:42  25   matter, what happened to this:  The compressor failed?

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Cross/Nichols

                    MR. NICHOLS:  Yes, sir.  That's the point.  And the

second point is that I'm asking him if he can identify for me if

he ever went beyond that.  That's where this whole -- he said --

                    THE COURT:  If he ever went beyond that.

04:51:56        MR. NICHOLS:  If he ever went beyond that and, if so,

give me those events.

                    MR. KRATKA:  And my objection is that those specific

detailed in-depth analyses are included in all three reports

that he's provided.  So they're right there.  They're in the

04:52:12  record.  If you have a question about any of those in-depth

analyses that he wrote up and gave you, ask him about it rather

than have him recite from memory STEERS numbers for days.

                    MR. NICHOLS:  Well, I think we're supposed to address

the Court rather than counsel, but --

04:52:29        THE COURT:  Go on.

                    MR. KRATKA:  I apologize.

                    MR. NICHOLS:  I think the Court can understand my

question.  He can do it or he can't.

                    THE COURT:  Well, he said he has on some instances.

04:52:39            Is that correct?

                    THE WITNESS:  That is correct, Your Honor.

                    THE COURT:  Okay.  But you can't find them offhand

right now.

                    THE WITNESS:  I do recall one from memory because it

04:52:45  was unusual.

1  BY MR. NICHOLS:

2  Q    Yes, sir.

3            THE COURT:  Why don't you talk about that one.

4            MR. NICHOLS:  Yes, sir.

04:52:48   5            THE COURT:  What -- what was that about?

6            THE WITNESS:  That had to do with the thermal wells in

7  a processing unit -- hydroprocessing thermal wells in an

8  exchanger train that were of the inappropriate alloy.  And

9  detailed analysis by Exxon showed, through metallurgical

04:53:01  10  analysis, the intergranular -- intergranular means between the

11  grains -- corrosion of that alloy and then went on to recommend

12  immediate replacement of those said thermal wells and also share

13  that information with other Exxon refineries.

14  BY MR. NICHOLS:

04:53:22  15  Q    Sure.  And so do you recall a general date of this

16  particular event?

17  A    Sometime in this century.  If you wish to be more specific,

18  I would have to review the -- and see where this -- I remember

19  the technical details of this one because they were provided and

04:53:40  20  it was a personal interest.

21  Q    So and did you discuss this particular incident in one of

22  your reports?

23  A    Yes.

24  Q    Okay.  So I'm going to give you access and you have access

04:53:50  25  right in front of you to your supplemental opinion dated

Bowers - Cross/Nichols

1   November 22, 2013.  Would it be in that report?

2   **A**      I don't recall.

3   **Q**      Okay.  Let me show you in that binder where it is.

4   **A**      And by the way, I think that was a good piece of work by

04:54:14   5   Exxon, that particular one.

6   **Q**      So what you're telling the Court is you -- was that one of

7   those examples where you had the root cause analysis?

8   **A**      Yes.

9   **Q**      And so, after reviewing the actual root analysis, your

04:54:27   10   conclusion was that Exxon did a good job?

11   **A**      They did a good job of finding out what happened.

12   **Q**      Okay.

13   **A**      They did a poor job of selecting the alloy originally.

14   **Q**      Okay.  I've put before you, Mr. Bowers, Exhibit 430 which

04:54:44   15   is your revised supplemental opinion dated January 15, 2013.

16               And can you identify for me in that report, look

17   through there and see if you can find the date of that

18   particular incident that you were talking about.

19               THE COURT:  Okay.  Anybody know what the date is?

04:55:01   20   Anybody?

21               Staff?

22               Lawyers?

23               Anybody?

24               MR. ALEXANDER:  Your Honor, it's January 6th, 2011.

04:55:10   25               THE COURT:  January 6th, 2011.  Oh, wait.  Hold it.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1  Hold it.  You know, that's the defense talking.

2            Do you agree with that?  I'll look it up.  Where

3  can I find it?

4            MR. ALEXANDER:  We can get you the STEERS -- it will

04:55:25  5  take me a minute.  I can pull up that STEERS file, your Honor.

6            THE COURT:  Please.

7            MR. NICHOLAS:  What exhibit are you looking at?

8            MR. ALEXANDER:  I don't -- the exhibit number, I don't

9  have handy.

04:55:35  10            THE COURT:  You can do it by STEERS number.  So look

11  it up.

12            MR. ALEXANDER:  Okay.

13            THE COURT:  Please.

14  BY MR. NICHOLS:

04:55:37  15  **Q**    So we've got that one incident.  And this involved an

16  incident at what unit, sir?

17  **A**    It was a catalytic hydroprocessing unit.  I don't remember

18  which one.  It's apparent the feedstock had changed from the

19  designed conditions.

04:55:51  20            THE COURT:  The what, the feedstock?

21            THE WITNESS:  The feedstock.  What they were feeding

22  in to process was different than what the unit was originally

23  designed for.

24  BY MR. NICHOLS:

04:56:00  25  **Q**    And so in that particular instance, you went beyond the

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Cross/Nichols

1    categorization of -- first of all, would this have fallen in one

2    of the summary charts that you --

3  **A**    Yes.

4  **Q**    -- did in the case?

04:56:10    5            What summary chart would it have fallen under?

6  **A**    Leaks.  It leaked.

7  **Q**    And so we can actually look at then --

8            THE COURT:  You know something, you find it.  It's now

9    4:57.  This will be our short break.  We'll get back in at 5:05.

04:56:33  10   We'll get -- we'll get it and we'll move on.  Okay.  See you

11   back in about eight minutes.

12            (Court recessed at 4:56 p.m.)

13            (Court resumed at 5:07 p.m.)

14            THE COURT:  All right.  Go right ahead, please.

05:08:01  15   BY MR. NICHOLS:

16  **Q**    Mr. Bowers, we're referring now to Exhibit 436 which is the

17   list that you provided the Court -- or Ms. Rock wrote that you

18   reviewed, 436, "Common Cause:  Leaks."

19            And I think we've tracked down the one that you

05:08:17  20   may have been referring to.  If you want to look at the screen

21   or you can look at your book, it's 7-42.  That's the page.

22            THE COURT:  All right.  Point it out.  Which one is in

23   there?

24   BY MR. NICHOLS:

05:08:38  25  **Q**    See, I'm referring to an event that is listed at 1/6/2011,

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Cross/Nichols

1  correct?

2  **A**    Yes, that's the one.  When I said I reviewed STEERS, I --

3  that's the entire file, all the findings, correspondence,

4  everything.

05:09:04  5  **Q**    Yes.  And so, you referred to this as earlier as being the

6  cat --

7  **A**    I think I said a hydroprocessing unit --

8  **Q**    Right.  So this --

9  **A**    -- from memory.

05:09:17  10  **Q**    Right.  And that corresponds -- this entry corresponds to

11  what you were referring to, correct?

12  **A**    Yes, sir.  This is a hydroprocessing unit, a naptha

13  hydroprocessing unit.

14  **Q**    So this is one of the events that is listed in your "Common

05:09:34  15  Cause:  Leak" table for which you actually reviewed a root cause

16  analysis done by Exxon and came to the expert conclusion that

17  they did a good job of determining the root cause, correct?

18  **A**    As I said in my side bar, yes.

19  **Q**    Okay.

05:09:50  20  **A**    They did a thorough job of determining the root cause or

21  the failure, which turned out to be the wrong material was

22  installed.

23  **Q**    Sure.  And was corrective action taken with respect to

24  that?

05:10:02  25  **A**    It was documented that it was to be taken.  Was it taken, I

Bowers - Cross/Nichols

1  have no idea.

2  **Q**    Okay.  So -- and with respect to any other events that you

3  analyzed, specifically, above and beyond looking at a listing in

4  one of these common cause tables, would each and every one of

05:10:25  5  those events be discussed in the text of one of your reports?

6  **A**    Not necessarily.

7  **Q**    Okay.  And so that's exactly why I need to ask the

8  questions I'm asking, which is:  Please give us a list of the

9  events that you would have analyzed specifically by going beyond

05:10:48  10  the mere listing in the Mary Rock tables.

11  **A**    Well, let me ask you if you would provide me a list of the

12  STEERS events which included the Exxon root cause analysis.

13  **Q**    Sir, is there anything, any work product that you produced

14  in the case, where either the Court or myself can go to?  A list

05:11:13  15  prepared by Keith Bowers that says, "I reviewed these events in

16  detail," beyond just having them listed on one of Mary Rock's

17  tables?

18            MR. KRATKA:  Are you asking him to go through his

19  report?

05:11:30  20            THE COURT:  No.  No.  He's asking -- let's take it

21  question by question.

22            THE WITNESS:  I have not produced a list of such

23  events.

24  BY MR. NICHOLS:

05:11:36  25  **Q**    Okay.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Cross/Nichols

```
 1              THE COURT:  Okay.  Next question.
 2   BY MR. NICHOLS:
 3   Q     And so from memory, we've identified the January 26, 2011.
 4              Can you please identify any others for us that
 5   you reviewed in depth beyond this one?
 6   A     Only by reviewing the STEERS events or perhaps one in my
 7   report mentions it.  I believe the exchanger leak on the olefins
 8   plant included some more in-depth analysis.
 9   Q     Okay.  And so that would have been a leak that occurred at
10   the olefins plant?
11   A     Yes, sir.  If it was included in the STEERS event
12   documentation, I read it.
13   Q     Okay.  And is there anywhere that the Court would have or
14   that we would have -- every document that you reviewed in the
15   case, have you listed by Bate's number in one of your reports?
16              In other words, have you listed the Bate's number
17   range, the document number range of all the documents you
18   reviewed in the case?
19   A     I don't know.
20   Q     Okay.
21   A     I'll have to ask.  I don't know the entire range of Bate's
22   document numbers.
23   Q     Sir, what I'm asking you is for the Court's -- you said to
24   the Court, generally, that you reviewed -- what -- about 20,000
25   documents or 20,000 pages of documents or --
```

05:11:47
05:12:07
05:12:20
05:12:36
05:12:51

Bowers - Cross/Nichols

1  **A**    A big, long list.  As I said, 20,000, 40,000.  The pile is

2  high.

3            MR. KRATKA:  And, your Honor, in our expert

4  disclosures, we provided the Bate's ranges of all the documents

05:13:05  5  that Mr. Bowers reviewed.

6            THE COURT:  Go on.

7  BY MR. NICHOLS:

8  **Q**    Okay.  So with respect to these charts, Mr. Bowers, I want

9  to go through just one more -- one or two more with you.  You

05:13:33  10  had a chart that lists "Common Causes:  Fires."  And if you want

11  to look at your book, it's 438, Plaintiffs' Exhibit 438.

12  **A**    Is that Page 9-1?

13  **Q**    Yes, sir.  We can start there.  So what you've done in this

14  chart, Mr. Bowers, is you asked Ms. Rock to put together a

05:14:01  15  list -- just like for leaks -- put together a list of every

16  entry, in either a recordable entry or a STEERS Report, where

17  the word "fire" is mentioned.  Is that how it worked?

18  **A**    It is where Exxon characterized the event as "fire" or

19  "unplanned combustion."

05:14:23  20  **Q**    Okay.  So the key words were "fire" or "unplanned

21  combustion"?

22  **A**    Those were the discriminators used.

23  **Q**    Okay.  And so let's look at a few of these.  On the first

24  page you got four recordable events, correct?  Right?

05:14:41  25  **A**    Yes.  That's clearly shown.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Cross/Nichols

1    Q    And the duration of these events is shown in the far

2    right-hand column, correct?

3    A    Yes.  That's from the STEERS event.

4    Q    So this one, this recordable event involves a furnace fire

05:14:57    5    that lasted 1.43 hours, correct?

6    A    That's what it says.

7    Q    So, what was -- so just as with the other analysis, so what

8    was the root cause of this furnace fire that caused these

9    emissions to the atmosphere?

05:15:14    10    A    The tube was old and ruptured from creep stress.

11    Q    So it was a tube failure?

12    A    Yes, in this case.

13    Q    Next, flexicoker, date is November the 16th of 2005.

14    A    Oh, the infamous smoking board.

05:15:38    15    Q    The duration is .33 hours, correct?

16    A    Well, this is a different one.  Yes, go ahead.

17    Q    The duration is what?

18    A    20 minutes.

19    Q    A third of an hour.  Okay.  So what is the root cause?

05:15:52    20    What was the root cause of that second item listed there?

21    A    Was not listed in the documentation, but I presume it was a

22    board was put up against a piece of hot pipe.  It says,

23    "scaffolding board," and they -- they're not going to catch fire

24    sitting in the air.

05:16:12    25    Q    Right.  So let's just take those first two entries as

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Cross/Nichols

1  examples.  First entry was a tube failure?

2  **A**    This is one of the heating tubes inside the -- has the

3  process fluid inside it under high pressure --

4  **Q**    Right.

05:16:24  5  **A**    -- fire on the outside.  And the tube ruptured due to creep

6  stress --

7  **Q**    And so --

8  **A**    -- they ran it too long.  It was too old.

9  **Q**    Okay.  So it was a piece of equipment that failed, correct?

05:16:35  10  **A**    Yes.

11  **Q**    Okay.  The second example is caused by somebody putting a

12  board up against a hot piece of metal?

13  **A**    Presumably.  It was not identified any further than that.

14  But reason and rationality says board on scaffolds don't catch

05:16:54  15  fire.

16  **Q**    So the placement of that board against the hot piece of

17  metal, you would characterize that as being a human error,

18  correct?  That's something -- somebody shouldn't have done that,

19  if that's what happened, right?

05:17:08  20  **A**    That goes without saying.

21  **Q**    Sure.  The board didn't just leap over and touch the metal,

22  right?

23  **A**    I wasn't there to witness the event.  I can't say how it

24  got in contact with it.

05:17:18  25  **Q**    So just to make sure that the Court understands exactly

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Cross/Nichols

1  what's in these charts, that is an example of two different

2  events that you have put together on a chart that has at the top

3  the word "common cause," correct?

4  A    Yes.

05:17:39  5  Q    Okay.  And if we look at your -- back at your report which

6  has been marked as Plaintiffs' Exhibit 427 --

7  A    Where will I find it?  These are your books, I think.

8  Q    Here I'll help you.

9  A    It's exhibit what?  It's not here.  Unless it's earlier.

05:18:14  10  428?  Yeah.  It's going to be right there.

11  Q    Yes, sir.  See, each of these has --

12  A    Boy, we killed a lot of trees.

13  Q    So Exhibit 427, again, is the -- that's the initial report

14  that you would have created in -- on March 15th of 2012,

05:18:52  15  correct?

16  A    Yes.

17  Q    And so -- just so that -- to ratchet this down for the

18  Court, on the very first page, as of March 15th of 2012, which

19  was -- we agree was roughly 30 days after you started your

05:19:11  20  substantive work in the case --

21  A    Well, let me correct that:  30 days after I started

22  billing.

23  Q    Yes, sir.  It says, "TCEQ documents I reviewed of numerous,

24  common, or recurrent causes of emission events."

05:19:26  25                      Correct?

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1  A    Yes.

2  Q    "These included numerous leaks in pipes, seals, other types

3  and loss of containment, compressor trips, electrical failures,

4  shutdowns, releases, control valve failures, other equipment

05:19:43  5  failures due to cold weather and particular process units."

6             Correct?

7  A    So stated in there, so written.

8  Q    You mentioned that you began billing for work in February

9  of 2012.  Were you -- were you working for free before that?

05:20:01  10  A    Yes.

11  Q    Okay.  So how many hours did you work for free before that

12  time?

13  A    I didn't count.  It was several weeks --

14  Q    Okay.

05:20:08  15  A    -- and then I realized this was going to be a big damn

16  deal.

17  Q    By the way, you also mentioned that you have about 850

18  hours in the case?

19  A    Billable hours, yes, sir.

05:20:19  20  Q    Have you tracked those hours?

21  A    More or less.

22  Q    Do you have records of those hours?

23  A    Different level of records.

24  Q    Do you have -- how much time have you billed to the

05:20:28  25  Plaintiffs in this case?

Bowers - Cross/Nichols

1  **A**    I have not yet billed.

2  **Q**    So you have not billed any amount of work to the Plaintiffs

3  in the case?

4  **A**    That is correct.  I have not invoiced them yet.

05:20:44  5  **Q**    You have not sent an invoice to the National Environmental

6  Law Center for any work that you've done in the case?

7  **A**    I think that's what I just said.

8  **Q**    Okay.  Why not?

9  **A**    That's none of your business.  None of the Court's

05:20:59  10  business.  That's my business.

11  **Q**    I -- I guess it's up to the Court to figure out.  Why

12  haven't you sent a bill to the National Environmental Law Center

13  for your work?

14  **A**    We're getting into a personal tax area and I'd ask the

05:21:21  15  Court's forbearance.  I'd be happy to tell the Court in private.

16           THE COURT:  Do you want to move on or do you want to

17  force it?

18           MR. NICHOLS:  I'll -- I'll move on, your Honor.

19           THE COURT:  Okay.

05:21:35  20  BY MR. NICHOLS:

21  **Q**    Now, with respect to this report that was done on

22  March 16th, 2012, after you had spent the amount of time that

23  we've talked about, you made certain statements, did you not,

24  Mr. Bowers, about the Baytown Complex?

05:21:54  25  **A**    Can you show me the statement, please.

Bowers - Cross/Nichols

1  Q    Yes, sir.  Do you remember saying that "Folks out at the

2  Baytown Complex are playing Russian roulette with the facility"?

3  A    Would you please show me the document where that's said.

4  Q    Well, let's just start -- start where we can start.  So

05:22:12  5  Page 9, under Sub-header 3.4.

6  A    Of?  Of?

7  Q    Of your report which is March 15, 2012, 427, under the tab

8  in the notebook that's in front of you.

9  A    And the reference again, please.  I forgot.

05:22:33  10  Q    Page 9, Section 3.4.

11          And what you did in your report that you did 30

12  days after you started billing for your time in the case, you

13  made a conclusion, did you not, Mr. Bowers, that "Exxon

14  management has not put a priority on preventing upset events and

05:23:10  15  unauthorized air emissions."

16          Is that what you said?

17  A    Could you show me specifically where.

18  Q    Right underneath the first -- the header right there, 3.4.

19          THE COURT:  "It is my conclusion" --

05:23:22  20          THE WITNESS:  Yes, sir.  Yes, sir, that's true.

21  BY MR. NICHOLS:

22  Q    And you made that statement based on seeing numbers, right,

23  looking at numbers of events?

24          MR. KRATKA:  Objection.  Mischaracterizes his

05:23:37  25  testimony.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

         1         THE COURT:  Overruled.

         2         THE WITNESS:  I based that opinion on looking at the

         3    voluminous records, the vast numbers of events and the types of

         4    events documented in the STEERS reports and the files associated

05:23:50 5    therewith.

         6    BY MR. NICHOLS:

         7    Q    Yes, sir.  And so, you based your conclusion that you put

         8    in that report based on an interview of STEERS reports, correct?

         9         MR. KRATKA:  Objection.  Misstates the answers --

05:24:05 10   misstates the facts.

        11         THE COURT:  Overruled.  If he disagrees, I'll allow

        12   him to do it.

        13   A    I looked at a lot more than just the STEERS reports.  I

        14   looked at the files, complete files, for each event.

05:24:15 15   BY MR. NICHOLS:

        16   Q    I hate to go back on you, Mr. Bowers.

        17         Do you recall that we looked at Defendants'

        18   Exhibit 524 earlier?  Do you remember looking at this record of

        19   your --

05:24:26 20   A    Yes.

        21   Q    -- the work that you did?

        22         And remember how we very carefully went through

        23   this record and indicated that the things that you did before

        24   you produced your report was review STEERS Reports and also

05:24:41 25   visit the ExxonMobil Baytown Complex, correct?

                    Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Cross/Nichols

1   **A**    Yes.  And I would remind Counsel that this was prepared for

2   billing of documents -- billing document for NELC.

3   **Q**    Yes, sir.

4   **A**    Not as testimony.

05:24:55  5   **Q**    Yes, sir.  But the point is, Mr. Bowers, you received data

6   and information over time in this case, correct?

7   **A**    Oh, yes.

8   **Q**    And so you're not suggesting to the Court that you reviewed

9   20,000 or 40,000 pages of documents before you issued your

05:25:19  10   March 15th, 2012, report, are you?

11   **A**    I am not.  We have just received some in the last month.

12   **Q**    So just --

13   **A**    Just received some in the last six months.

14   **Q**    Give the Court the estimate of the number of the percentage

05:25:34  15   of that volume of documents that you had reviewed as of the time

16   that you produced a report in which you said, among other

17   things, "Exxon management has not put a priority on preventing

18   upset events and unauthorized air emissions."

19              THE COURT:  That was the 2012 report?

05:25:54  20              MR. NICHOLS:  Yes, sir.

21              THE COURT:  Of the witness?

22              MR. NICHOLS:  Yes, sir.

23              THE COURT:  Okay.

24              THE WITNESS:  It's several thousand pages; but more

05:26:05  25   than that, I really can't --

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Cross/Nichols

1    BY MR. NICHOLS:

2    **Q**    And then you said -- and then I asked you if it was based

3    on the numbers.  Let's keep going.

4                    "Based on the numerous" -- right, that's your

05:26:14    5    word -- "and unending litany of emission events and reinforced

6    by the physical appearance of the plant, it appears that Exxon's

7    approach to running the Baytown Complex has become one of 'run

8    it till it breaks' and minimizing preemptive maintenance."

9                    Is that what you said in that March 15, 2012,

05:26:38    10    report?

11    **A**    Yes.  And that's my opinion based on the facts.

12    **Q**    Okay.  And you made that based on what you had reviewed as

13    of March 15, 2012, right?  Now --

14    **A**    And it also included a visit to the plant, of course.

05:26:48    15    **Q**    Yes, sir.  And we're going to talk about that next.

16                    So when you went to the plant, Mr. Bowers, you

17    went to various locations within the plant, correct?

18    **A**    Yes.

19    **Q**    You went to the safety orientation area in the visitor's

05:27:05    20    center, correct?

21    **A**    Yes.

22    **Q**    Went through a safety organization -- safety orientation at

23    that location, correct?

24    **A**    Yes.

05:27:12    25    **Q**    You first went out to locations in the refinery, correct?

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Cross/Nichols

1  **A**    I believe that's correct, yes, sir.

2  **Q**    And you mentioned earlier to Mr. Kratka that you went to

3  the flexicoker unit.

4  **A**    Yes.

05:27:31  5  **Q**    At the refinery?

6  **A**    Yes.

7  **Q**    Mr. Bowers, isn't it true that when you went out on the

8  grounds of the Baytown refinery at the flexicoker unit, upon

9  entering that unit you made the comment that the area "smells

05:27:56  10  good"?

11  **A**    I did.  That was a true statement --

12  **Q**    And that --

13  **A**    -- at that time.

14  **Q**    And that was meant as a compliment, correct?

05:28:08  15  **A**    It was meant as an observation.

16  **Q**    Yes, sir.  Because smelling good to a guy who works -- has

17  worked at a refinery --

18  **A**    You're presuming to know what I meant?

19  **Q**    I'll ask you to explain to the Court exactly what you did

05:28:25  20  mean when you told the people on the ground at that facility

21  that it smelled good.

22          MR. KRATKA:  Objection.  Asked and answered.

23          THE COURT:  Overruled.

24          MR. KRATKA:  Are you asking -- restate -- ask your

05:28:40  25  question that you want an answer to, please.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Cross/Nichols

1  BY MR. NICHOLS:

2  **Q**    Tell the Court when you were out walking the refinery and

3  when you made the observation face-to-face to the people out

4  there as opposed to what's written in some report that the

05:28:52  5  refinery smelled good, what were you talking about?

6  **A**    The comment was meant to import that there was no odor of

7  mercaptan or hydrogen sulfide, both of which are difficult to

8  contain and easy to detect by nose.

9  **Q**    When you're out at the flexicoker unit, Mr. Bowers, isn't

05:29:19  10  it true that when you pointed to the side of a boiler that you

11  said -- told the folks there on the ground that that -- that the

12  boiler showed signs of weld repair and "That's good.  It shows

13  it's getting looked at and inspected"?

14                Correct?

05:29:37  15  **A**    That is correct.

16  **Q**    You went out to the flare stack, Flare Stack 25, and

17  analyzer house, correct?

18  **A**    Correct.

19  **Q**    And at the flexicoker unit flare stack, you told the folks

05:30:00  20  on that tour that this was "A very nice analyzer shack."

21                Correct?

22  **A**    Correct.

23  **Q**    And that "ExxonMobil has good standards?"

24                Correct?

05:30:12  25  **A**    I don't recall that.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Cross/Nichols

1  Q     Okay.

2  A     I do recall asking the question of the lag time between

3  sample point and analysis and I never received an answer.

4  Q     You went to the maintenance shop at the refinery, correct?

05:30:33  5  A     It was called a maintenance shop.  It certainly was not the

6  maintenance shop.  It was a small area, nothing going on.

7  Q     And at the maintenance shop, you learned that a number of

8  the -- a certain number of the -- a certain amount of the

9  equipment is sent out to third-party facilities for repair,

05:30:53  10  correct?

11  A     Yes.

12  Q     And you made the comment that "lots of outside shops in

13  Houston do excellent work."

14                  Correct?

05:30:59  15             MR. KRATKA:  Your Honor, if --

16             THE COURT:  Yes, sir.

17             MR. KRATKA:  If Mr. Nichols is taking stray comments

18  out of context, if there's a document that contains all of your

19  records of Mr. Bowers' comments, statements, I think we're

05:31:12  20  entitled to see it.  Or the witness should be able to see it to

21  be able to put it in context.

22             MR. NICHOLS:  I am asking him if he made these

23  statements, Judge.  It's cross examination.

24             THE COURT:  Overrule the objection.  Overruled.

05:31:22  25  //

Bowers - Cross/Nichols

1  BY MR. NICHOLS:

2  **Q**    Do you recall making that statement?

3  **A**    Yes.  It's a factual statement.

4  **Q**    And just to clean up one thing a little bit, you were

05:31:33  5  asked -- you were talking about the age of the facility at the

6  refinery and the refinery operations date back to when?  When

7  was that refinery -- any portion of the refinery first built?

8  **A**    I didn't provide that information --

9  **Q**    Okay.  So you did --

05:31:47  10  **A**    -- I think his Honor did.

11  **Q**    Okay.  So do you know when the refinery was first built?

12  **A**    Only from what his Honor stated.

13  **Q**    Okay.  Did you try to find out?  I mean, you made some

14  comments about the age of the facility, correct?  As part of

05:32:06  15  your analysis, right?

16  **A**    General comments but not specifying the age.

17  **Q**    So --

18  **A**    The -- if I will take the Judge at his word, which, I

19  believe, was 1909; and that's consistent with my knowledge of

05:32:18  20  the oil industry at that period.

21  **Q**    So -- but you made comments about certain of the facilities

22  being old, correct?

23  **A**    Oh, yes.

24  **Q**    So did you make any effort to figure out when it was that

05:32:28  25  these facilities were first installed?

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Cross/Nichols

1  A    Only for certain things.

2  Q    Now, just to make sure that we're all clear, you're not

3  suggesting that all of the equipment that operates in the

4  refinery is all the original equipment, that is, that everything

05:32:43  5  that's running out there is the stuff that was installed from

6  day one, correct?

7  A    I made no such comment or assertion.

8  Q    You know that there are parts of that refinery facility

9  that were installed as recently as 2010, correct?

05:32:58  10  A    I didn't see any, but I'll take your word for it.

11  Q    And that's what you would expect.  There are a number of

12  petrochemical facilities that have been in operation a long

13  time.  But what happens is that equipment gets replaced,

14  correct?

05:33:15  15  A    That's the normal pattern.  But, strikingly, I don't find

16  that in your capital investment plans.

17  Q    So you don't know whether ExxonMobil has installed

18  additional equipment or new equipment out at the refinery since

19  it first started?

05:33:31  20          MR. KRATKA:  Objection.  Misstatement.

21          THE COURT:  Sustained.

22  BY MR. NICHOLS:

23  Q    Do you know what equipment has been installed by ExxonMobil

24  at the refinery since that refinery first went into operation?

05:33:42  25  A    No, I do not have that information at hand.  I would be

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Cross/Nichols

1    happy to review Exxon's capital investment.

2  **Q**    Continuing with your site tour, do you recall, Mr. Bowers,

3    that you also did a tour of the chemical plant, correct?

4  **A**    That's not true.

05:34:14  5  **Q**    You were in a van.  I believe I was in the van with you and

6    we drove --

7  **A**    Past it.

8  **Q**    -- past a chemical plant, correct?

9  **A**    Yes, sir.

05:34:24  10  **Q**    And in fact, there were certain photographs that were taken

11    during that tour, correct?

12  **A**    I'd have to refer to the photographs because it was --

13            THE COURT:  Well, there were photographs --

14            THE WITNESS:  Yeah.

05:34:35  15            THE COURT:  -- taken during the tour because we saw

16    some of them.

17            THE WITNESS:  Yes.  And in this case --

18            THE COURT:  But I thought you said it was an Exxon

19    photographer and you asked for certain photos.

05:34:45  20            THE WITNESS:  That is -- I asked their attorney,

21    right, to ask for photos.

22  BY MR. NICHOLS:

23  **Q**    And there were photographs taken?

24  **A**    Yes.  I believe we looked at the loop reactor for the

05:34:53  25    polypropylene.  I think those were the plants -- one of those

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Cross/Nichols

1    was Plant Number 8 which was very -- the yo-yo unit.

2    **Q**    And did you make the comment as we were all driving by the

3    polypropylene unit that, quote, "I don't recall any events from

4    polypropylene."

05:35:08    5                    Correct?

6    **A**    I said that statement.  Later found it to be totally

7    inaccurate.

8    **Q**    And then you also said that, quote, "ExxonMobil does a

9    great job at polypropylene manufacturing, better than anyone

05:35:20    10   else."

11                    Right?

12   **A**    I don't recall that statement at all and I don't think it's

13   true.  They are one of the leaders.

14   **Q**    Do you recall that in the van during the tour, Mr. Bowers,

05:35:38    15   that you pointed out an olefins plant flare in the distance and

16   said "Industry has a furnace run time of 'X' but ExxonMobil has

17   a run time of 2X and everyone is trying to figure out why"?

18   **A**    Your point?

19   **Q**    Did you say that?

05:35:58    20   **A**    Yes.  It is a known fact.

21   **Q**    Did you say in the van during the tour, quote, "ExxonMobil

22   invented the cat cracker"?

23   **A**    I think I said they were one of the inventors.  The three

24   other companies developed it at a simultaneous time.

05:36:25    25   **Q**    And finally, Mr. Bowers, during a close-out meeting from

Bowers - Cross/Nichols

1    the tour, did you tell folks assembled there that the, quote,

2    "housekeeping was excellent," close quote, at the complex?

3              MR. KRATKA:  Objection, Judge.

4              THE COURT:  What?

05:36:43    5              MR. KRATKA:  Objection.  Relevance.

6              THE COURT:  Overruled.

7              THE WITNESS:  I made that statement and then I added

8    the comment behind it, "Of course, we had a torrential rain

9    three days ago to clean everything up."

05:36:56   10   BY MR. NICHOLS:

11   **Q**    And did you say that the housekeeping was, quote, "very

12   commendable," close quote?

13   **A**    I did.

14   **Q**    Okay.  Now with respect to some of the other things you

05:37:05   15   talked about today, you talked to the Court about corrosion

16   under insulation, correct?

17   **A**    I mentioned it, yes.

18   **Q**    Okay.  Mr. Bowers, do you know how it is that facilities

19   under API standards inspect pipe that is under corrosion -- I'm

05:37:30   20   sorry, that is -- Mr. Bowers, do you understand how it is that

21   petrochemical facilities and refineries inspect pipe that is

22   under insulation?

23   **A**    I can't answer that question yes or no because it depends

24   on the facility and the installation and the type of service.

05:37:55   25   **Q**    Is the only way to inspect pipe that is under insulation

Bowers - Cross/Nichols

1    stripping away all the insulation and checking every portion of

2    that pipe?

3    **A**    No.  It's the only foolproof way.

4    **Q**    How do the men and women at ExxonMobil inspect pipe under

05:38:16    5    insulation?  What protocol do they use?  What procedure do they

6    use?  How many people are doing it?

7              MR. KRATKA:  Objection.  Multiple questions.

8              THE COURT:  Sustained.

9    BY MR. NICHOLS:

05:38:28    10    **Q**    Let's start with one:  What's the protocol at the

11    ExxonMobil Baytown Complex for inspecting pipe that is under

12    insulation?

13    **A**    I do not know.

14    **Q**    How many people at the ExxonMobil Baytown Complex are

05:38:42    15    involved in inspecting pipe under insulation?

16    **A**    I don't know.

17    **Q**    What types of tools are used by the people at the

18    ExxonMobil Baytown Complex, men and women, to inspect pipe under

19    insulation?

05:38:58    20    **A**    Again, I do not have that knowledge.

21    **Q**    Now, another thing you talked about with the Court was rust

22    on the surface of metal.  Do you recall that?

23    **A**    Yes.

24    **Q**    And I believe you said in your report somewhere that visual

05:39:16    25    appearance of equipment is not necessarily an indicator of its

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Cross/Nichols

1  condition; is that correct?

2  **A**   That's a true statement.

3  **Q**   Okay.  And so that -- to give it to an analogy that I can

4  understand:  There is a bridge that my family and I cross out in

05:39:41  5  West Austin almost every day that has rust on the structural

6  steel of the bridge.  Have you seen bridges like that?

7  **A**   I'm not a qualified bridge inspector, sir.

8  **Q**   Have you ever seen a bridge with rust on it?

9  **A**   Well, yes.  The bridge over the Mississippi River in

05:40:00  10  Morgan City.

11  **Q**   And would you agree with me, Mr. Bowers, that rust on the

12  surface of equipment that is out in the field is not necessarily

13  an indication of it being deficient?

14  **A**   I believe I stated that, as a general matter, it depends on

05:40:25  15  the details.

16  **Q**   Now, Mr. Bowers, I'm going to ask you about, in connection

17  with corrosion and pipes and pipe inspection, are there

18  standards that are put out in the industry for the inspection

19  and selection of material for piping in refineries and

05:40:57  20  petrochemical installations?

21  **A**   That's a multiple question, sir.  Would you please break it

22  up.

23  **Q**   Is there an organization that produces standards for

24  inspection of metal piping and metal vessels in industrial

05:41:16  25  facilities in the United States of America?

Bowers - Cross/Nichols

1  **A**    That, again, is a multiple question, sir.  Would you please

2  -- piping and vessels are different.

3  **Q**    Is there an organization in the United States of America

4  that produces standards on material selection and inspection of

05:41:38  5  vessels at industrial facilities?

6  **A**    That, again, is two separate areas.

7        THE COURT:  All right.  Answer -- pick one and answer

8  it.

9        THE WITNESS:  The American Petroleum Institute

05:41:50  10  Publishes recommendations.  They do not --

11        THE COURT:  API?

12        THE WITNESS:  API.  They do not carry the force of a

13  standard.  There is no agency that publishes a standard to which

14  the refinery or chemical plant must conform.

05:42:04  15  BY MR. NICHOLS:

16  **Q**    Okay.

17  **A**    The American Society of Mechanical Engineers publishes

18  recommendations on which material is suitable for which service.

19  **Q**    Okay.  So the API sets out what you would consider to be

05:42:22  20  recommendations on best practices with respect to the inspection

21  of vessels at an industrial facility, correct?

22  **A**    No, sir.

23  **Q**    Okay.  You're going to agree that API puts out

24  recommendations with respect to inspection of vessels and

05:42:41  25  industrial facilities?

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Cross/Nichols

1   **A**    No, sir.  API puts out recommendations for length of

2   probable inspection for piping and only some vessels and some

3   tanks.

4   **Q**    Okay.  And so API publishes those standards -- I'm sorry,

05:43:03   5   publishes those recommendations, correct?

6   **A**    Yes.

7   **Q**    And industrial facilities around the United States look to

8   those recommendations, correct?

9   **A**    They consider them to be a starting point only.

05:43:19   10   **Q**    Have you looked at those standards -- I'm sorry, looked at

11   those recommendations before?

12   **A**    I have.

13   **Q**    Mr. Bowers, I want to make sure that the Court has a

14   complete list of the types of categorizations of events that

05:43:53   15   you've produced in the case.

16           MR. NICHOLS:  Can we put up the slide, please.

17           THE COURT:  Hang on just a second.

18   BY MR. NICHOLS:

19   **Q**    Mr. Bowers, what we've done is we put up a list on the

05:44:16   20   board and I want you to confirm for me, using your report if you

21   need to, that these are various lists -- the titles of various

22   lists of so-called common causes that you have produced to the

23   Court in this case.

24   **A**    Yes, sir.

05:44:31   25           MR. KRATKA:  Objection.  This is a list from his

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Cross/Nichols

1  initial report that we explained --

2          THE COURT:  I understand that.

3               Is there one -- Mr. Nichols, is that in the

4  current report?

05:44:41  5          MR. NICHOLS:  Well, that's what I want to figure out

6  for the Court because I want the Court to know exactly what this

7  man is saying in terms of what he considers to be common causes.

8          THE COURT:  Well, I'm not looking at that.  Your point

9  is that he said this at one time and then changed it in his

05:44:56  10  supplemental report.

11          MR. NICHOLS:  That's part of it.

12          THE COURT:  Okay.  Is that in the supplemental report

13  or the -- the amend -- I guess we were talking.  Hang on a

14  second.  What do you call the one that he filed, the last one --

05:45:06  15  what's the last?

16          MR. KRATKA:  Exhibit 430.

17          THE COURT:  It's what?

18          MR. KRATKA:  Exhibit 430.

19          THE COURT:  And what do they call that?

05:45:13  20          MR. KRATKA:  The revised supplemental report.

21          THE COURT:  Revised supplemental report.  Okay.  Now,

22  what is the purpose for going to the first report?  What are

23  you -- I think I know where you're going.

24          MR. NICHOLS:  Yes, sir.

05:45:25  25          THE COURT:  You're talking -- and again, I'm not

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Cross/Nichols

1  putting words in your mouth, but I just want to -- the purpose

2  is to show what he said originally and then he changed it.

3          MR. NICHOLS:  Yes, sir.  That's one purpose.

4          THE COURT:  What's the other purpose?

05:45:36  5          MR. NICHOLS:  The other purpose is to make sure the

6  Court understands exactly what he is currently relying on as his

7  group of common causes.

8          THE COURT:  Well, I don't follow that second point.  I

9  see your first point, in effect, that, for whatever weight is

05:45:51  10  given, that it was in one report and not in the next.

11          MR. NICHOLS:  Yes.

12          THE COURT:  But what was that second point?

13          MR. NICHOLS:  The second point is that I want to make

14  sure that we got a list -- a precise list of what this man is

05:46:00  15  saying he's presenting to the Court as being a list of common

16  causes.

17          THE COURT:  All right.  Hang on one second.  It's the

18  supplemental because we know in federal -- in pleadings, state

19  and federal, okay, supplemental means adds on to it, amended.

05:46:13  20  First amended complaint supersedes the first.  This is

21  supplemental.

22              So you're saying the last report is 2013, that's

23  supplemental to the first one?

24          MR. KRATKA:  Yes.  The --

05:46:24  25          THE COURT:  Yes.  Is that correct?

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Cross/Nichols

1           MR. KRATKA:  It's partly correct.  The text of each

2   report in written form explains his opinions and his

3   methodologies.

4           THE COURT:  Which one?  Which report?

05:46:38  5           MR. KRATKA:  Both.  The supplemental report was an

6   add-on to the first.

7           THE COURT:  Okay.  But this is still viable.

8           MR. KRATKA:  But those -- but the attachments where he

9   has lists of events, he did not have the ability to categorize

05:46:53 10   the recordable events, for example, the -- back when he was --

11           THE COURT:  No.  I'm talking about, basically,

12   supplemental is in addition to the first report.

13           MR. KRATKA:  For the -- in terms of these lists and

14   tables and causes, the supplemental report superseded the

05:47:05 15   original list.  It's revised and updated and that is --

16           THE COURT:  So he has a list in the supplemental like

17   this but has different elements?

18           MR. KRATKA:  Minor.  But it's -- and we went through

19   them, your Honor.

05:47:15 20           THE COURT:  I understand.

21           MR. NICHOLS:  So I think I can clear it up real quick,

22   Your Honor.  I'm looking at --

23           THE COURT:  What I would like to know is what -- you

24   know, you're showing one that Mr. Kratka said, as far as the

05:47:26 25   list goes, it was updated and changed.  Okay?

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Cross/Nichols

1              MR. NICHOLS:  The underlying lists were changed, your

2       Honor, but the nature of the charts did not change.  In other

3       words --

4              THE COURT:  All right.  Then go ahead.  Yes, sir.  Go

05:47:38  5     right ahead.

6              MR. NICHOLS:  Yes, sir.

7       BY MR. NICHOLS:

8       Q    So what I want you to do, Mr. Bowers, is to look at your

9       report --

05:47:52  10            THE COURT:  Which one?

11             MR. NICHOLS:  430.

12      BY MR. NICHOLS:

13      Q    -- and, first of all, Exhibit 430 is entitled "Revised

14      Supplemental Opinion of Keith Bowers," correct?

05:48:02  15    A    Yes.

16      Q    So if we look at that and we look at the second page --

17             THE COURT:  And that's the January, 2013, correct?

18             MR. NICHOLS:  Yes, sir.

19             THE COURT:  Okay.

05:48:10  20    BY MR. NICHOLS:

21      Q    So on the second page, you have a list of what you say are

22      corrections made to the tables attached to your supplemental

23      opinion from earlier.

24             THE COURT:  Where?  I'm looking at what page?

05:48:24  25            MR. NICHOLS:  It's on page -- the first page.

Bowers - Cross/Nichols

1           THE COURT:  What numerical page at the bottom?

2           MR. NICHOLS:  It doesn't have one.  It's like an intro

3  page.

4           THE COURT:  Okay.  I am looking at it.  Now, what

05:48:32   5  am -- what am I looking at?  Which paragraph?

6  BY MR. NICHOLS:

7  **Q**    So you're looking at the third paragraph and you see,

8  Mr. Bowers, that you have listed there a table regarding leaks,

9  correct?

05:48:42  10           THE COURT:  Where?  I don't see it.  Show it to me on

11  what you're looking at.

12           MR. NICHOLS:  Yes, sir.

13           THE COURT:  That's the third paragraph?

14           MR. NICHOLS:  Yes, sir.

05:48:55  15           THE COURT:  Where it says Exhibit 7?

16           MR. NICHOLS:  Yes, sir.

17           THE COURT:  All right.  Got it.  I'm looking at it.

18  Now, what are we looking at?

19  BY MR. NICHOLS:

05:49:04  20  **Q**    It's Exhibit 7 regarding emission events caused by leaks,

21  correct?

22           THE COURT:  Got it.

23           THE WITNESS:  Yes.

24  BY MR. NICHOLS:

05:49:06  25  **Q**    We got leaks up on our chart, right?

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Cross/Nichols

1  **A**    Yes.

2  **Q**    Exhibit 8, emission events involving compressors.  We got

3  compressors on our chart, correct?

4  **A**    Yes.

05:49:16    5  **Q**    Emission events involving fires.  We got fires on our

6  chart, correct?

7  **A**    Yes.

8  **Q**    Exhibit 10, mechanical failures, correct?

9  **A**    Yes.

05:49:24   10  **Q**    We got mechanical failures on our chart.

11              11, instrument failures.  We got those on our

12  chart, correct?

13  **A**    Yes.

14  **Q**    Exhibit 12, tanks.  We got those on our chart as well,

05:49:37   15  correct?

16  **A**    Yes.

17  **Q**    Plugged lines.  We got those on our chart as well?

18  **A**    Yes.

19          THE COURT:  Where's plugged line -- I see it.  Okay.

05:49:47   20  BY MR. NICHOLS:

21  **Q**    Power supply failures.  We got those on our chart?

22  **A**    Yes.

23  **Q**    Cold weather events?

24  **A**    Yes.

05:49:54   25          THE COURT:  I don't see it.


Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Cross/Nichols

1          MR. NICHOLS:  I don't see cold weather events on our

2    chart.

3          THE COURT:  All right, go on.  The largest pollutant

4    release.

05:50:04  5    BY MR. NICHOLS:

6    **Q**    So, in your initial report, Mr. Bowers, you also had a

7    category called "Lightning Strikes," correct?

8                Do you remember doing that?

9    **A**    That's been so long ago, I'd have to refer to the report.

05:50:19 10    **Q**    Yes, sir.  And I've got it in front of you, if you want to

11    look at that.  We're looking at Exhibit 526.

12    **A**    I believe there were some instances caused by lightning

13    strikes.

14    **Q**    Right.  And my point is:  Are you no longer including those

05:50:35 15    as a common cause chart?

16    **A**    Correct.

17    **Q**    So, we can strike that one off the list.  You had one that

18    was listed "Startup, Shutdown, and Maintenance."

19                Is that a chart that, likewise, you're not

05:50:52 20    including as a common cause?

21    **A**    Correct.

22    **Q**    So, we can strike that one off the list.  You had one

23    called "Safety Valve Problems," correct?

24    **A**    Yes.

05:51:00 25    **Q**    And you're striking that one off the list, as well?

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Cross/Nichols

1  A    Yes.

2         MR. KRATKA:  Objection.  I think we went over in

3  testimony that safety valves were included in the updated

4  mechanical failures.

05:51:10  5  BY MR. NICHOLS:

6  Q    Okay.  So what you're telling the Court is that, initially,

7  you had a chart that broke out safety valves but now you've

8  lumped that into mechanical failures?

9         MR. KRATKA:  Again, objection.  Misstates the

05:51:23  10  testimony.

11         THE COURT:  Overruled.  What is the deal then?  Ask

12  the witness.

13  BY MR. NICHOLS:

14  Q    Sure.  What's the deal?  What happened to the safety valve

05:51:29  15  issues that you pointed out in your initial report?  Are they

16  still in one of these tables or not?

17  A    They are.

18  Q    Where are they lumped together?

19  A    Mechanical.

05:51:32  20  Q    So, basically --

21  A    Some may be in leaks, as well, depending on --

22         THE COURT:  So, it's still in -- still in the

23  ballpark, right?

24         THE WITNESS:  Yes, sir.

05:51:38  25         THE COURT:  Okay.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1  BY MR. NICHOLS:

2  Q    Okay.  And then with respect to oxygen supply failures, did

3  you have a chart on that initially?

4  A    Initially, yes.

05:51:47  5  Q    And did you drop that one, as well?

6  A    We did.

7  Q    Okay.  Steam supply failures?

8  A    We initially had that and it has been dropped.

9  Q    Okay.  So we've dropped -- we've put safety valves into

05:52:02  10  other categories.

11  A    Yes.

12  Q    We dropped startup, shutdown, and maintenance.  We dropped

13  lightning strikes.  We dropped power supply failures?

14  A    No, it's there.  I think lightning is included in power

05:52:14  15  supply failures.

16  Q    Okay.  So, instead of referring these specifically as

17  lightning strikes, you just put them in the category of power

18  supply failure?

19  A    Yeah, power failure.

05:52:24  20  Q    Okay.  So in other words, power supply failures, when the

21  Court looks at it, that will include power supply failures that

22  were caused by lightning, as well as other different types of

23  causes?

24  A    I think there were a couple of failures caused by

05:52:34  25  lightning.  There was one case where a component failed sometime

Bowers - Cross/Nichols

1  after the lightning strike.  So is it caused by lightning or

2  caused by a failure?

3  **Q**    You don't know?

4  **A**    I don't know.  It's one or the other.  Did lightning

05:52:50  5  contribute to the power supply -- the failure of that

6  electrical?

7  **Q**    But my question to you now is with the reorganization of

8  these charts, you now have a chart that's entitled "Power Supply

9  Failures" that includes some events that were caused by

05:53:04  10  lightning as well as other power supply failures that were

11  caused by, for example, a shutdown of a power grid, correct?

12  **A**    Yes.

13  **Q**    Okay.  Tank failures, do you still have one of those?

14  **A**    I'll have to look.  I think you -- you had a limited number

05:53:14  15  of tank failures.

16  **Q**    So, are you still relying on tank failures as being a

17  common cause?

18         MR. KRATKA:  Go back to the list.  It's right on

19  there.  You just went over it a minute ago.

05:53:35  20         THE WITNESS:  Yes

21  BY MR. NICHOLS:

22  **Q**    Okay.

23  **A**    Exhibit 12.

24  **Q**    We talked about boiler failures, correct?

05:53:36  25  **A**    Yes.

Bowers - Cross/Nichols

```
 1  Q    That's on the list?
 2  A    Yes.
 3  Q    Fires is on the list, right?
 4  A    Yes.
 5  Q    Electrical failures, is that on the list?
 6            MR. KRATKA:  Objection.  Asked and answered.
 7            THE COURT:  Overruled.
 8  BY MR. NICHOLS:
 9  Q    Plugged lines, is that on the list still?
10            MR. KRATKA:  Objection.  Asked and answered.
11            THE COURT:  Overruled.
12            THE WITNESS:  Yes.  It's Exhibit 13.
13  BY MR. NICHOLS:
14  A    Instrument failures on the list?
15            Leaks on the list?
16            Mechanical failures on the list?
17            Regenerators on the list, correct?
18  A    No.
19  Q    No?  Regenerators are off the list now?
20  A    They're included in mechanical failure or leaks or whatever
21  is appropriate.
22  Q    So what you --
23  A    It's not a common piece of equipment.
24  Q    Sure.  What you initially broke out among three different
25  things for your own report, you consolidated under this label
```

05:53:41     5
05:53:54    10
05:53:56    15
05:54:05    20
05:54:16    25

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Cross/Nichols

1   "Mechanical Failures," correct?

2   A   Yes.

3   Q   Okay.  And then compressors, we still have a list of those

4   for you, right?

05:54:27   5   A   Yes.

6   Q   Mr. Bowers, I want to talk to you for a minute about your

7   opinions on maintenance spending and capital expenditures.  I

8   believe you told the Court earlier that the way that you derived

9   at the amount of additional maintenance expenditure that you

05:55:02   10   thought was appropriate is that you did what you used to do as a

11   project engineer and calculated the number of people that would

12   be involved and the amount of equipment that would be involved

13   and material and came up with a budget, correct?

14   A   Yes.

05:55:21   15   Q   Let's look.  Do you still have your March 15, 2012, report

16   in front of you?

17   A   Excuse me while I get some water.  My throat is quite

18   irritated.

19       (Discussion off the record.)

05:55:49   20       THE COURT:  You got about ten more minutes.

21       MR. NICHOLS:  Yes, sir.  I'll be done within ten

22   minutes.

23       THE COURT:  That's all right.  No.  When you reach a

24   stopping point, let me know.

05:56:00   25       MR. NICHOLS:  No.  I will be done in ten minutes,

Gayle Dye, CSR, RDR, CRR - 713.250.5582

```
 1   within ten minutes.
 2            THE WITNESS:  If there's a question, will you please
 3   repeat it.
 4   BY MR. NICHOLS:
 5   Q    Yes, sir.
 6            So what you told the Court just a little earlier
 7   ago today is that to come up with this $90 million figure that
 8   you told the Court about is that you came up with a budget for a
 9   number of personnel and material that would be required to put
10   some additional people out in the field to inspect for leaks,
11   correct?
12   A    Yes.  I used my best judgment.
13   Q    Okay.  So Mr. Bowers, it's actually true -- well, let me
14   ask you this question:  Have you produced a budget of the type
15   that you would have produced back when you were project manager?
16            Have you generated a budget like the one that you
17   would have given to those banks that loaned the money on that
18   project you were telling the Court about earlier to come up with
19   that 90 million?
20   A    Are you referring to did I do it for this case?
21   Q    Yes, sir.
22   A    Oh, no, sir.  The ones for the banks would be much more
23   detailed.
24            THE COURT:  How many people do you say was necessary
25   for that 90 million?
```

1          THE WITNESS:  It's -- it's approximately 900 people.

2          THE COURT:  About 900.  All right.

3          THE WITNESS:  Yes.

4    BY MR. NICHOLS:

05:57:18   5    Q    So what you're telling the Court is you arrived at the $90

6    million figure by looking from the bottom up at 900 people, as

7    well as additional material expenditure, correct?

8    A    Correct.

9    Q    Okay.  Let's actually look at your report from March 15th,

05:57:34  10   2006, and you should still have that in front of you.  That's

11   the -- you got it in two places.  And I'll give it to you.

12          I'll give you back Defendants' Exhibit 526.  And

13   I'll ask you to look at Page 18.

14          MR. NICHOLS:  Your Honor, could I have the overhead?

05:58:31  15   I think it would be faster if I just did that.

16   BY MR. NICHOLS:

17   Q    This is the -- you calculated that 90 million as part of

18   your initial report, correct?

19   A    Yes, sir.

05:58:40  20   Q    And so here's where you say that Exxon should be devoting

21   540 million per year towards maintenance-related activities and

22   materials.  And that's the three percent of the 18 billion you

23   talked to the Court about, correct?

24   A    Correct.

05:58:56  25   Q    Now, you put out this number, the 540 million per year --

Bowers - Cross/Nichols

1    A    Excuse me, sir.

2    Q    Yes, sir.

3    A    Would you rephrase what you just said.  I think it was

4    inaccurate.

05:59:04    5    Q    In your report from March 15th of 2012, you put in that

6    Exxon should be devoting roughly $540 million per year towards

7    maintenance-related activities and materials, correct?

8    A    That is correct.

9    Q    And that figure you derived, in the way you described for

05:59:24    10    the Court earlier, as being three percent of 18 billion or the

11    current value of the plant, right?

12    A    Yes.

13    Q    So what you said is, using your best engineering judgment,

14    without even knowing how much ExxonMobil was actually spending

05:59:42    15    on maintenance, based on your best engineering judgment, that

16    ExxonMobil should be spending roughly 540 million a year on

17    maintenance, correct?

18    A    Correct.

19    Q    After you wrote this number down, you found out how much

06:00:03    20    ExxonMobil was spending on maintenance per year, correct?

21    A    Yes.

22    Q    And it turns out, Mr. Bowers, that ExxonMobil was paying as

23    much or more in maintenance-related activities and materials

24    than the $540 million per year figure that you put in your

06:00:24    25    report, correct?

Bowers - Cross/Nichols

1  **A**    Yes.  If you also notice, I made a qualification there
2  that's very important.
3  **Q**    Yes, sir.  And we're going to talk about that because it
4  relates to the second part.
06:00:39  5          What you just told the Court earlier today is,
6  "Hey, I made a bottom-up estimate of additional capital
7  expenditure that needs to be made.  I looked at 900 people.  I
8  looked at materials to be required and I came up with that
9  figure."
06:00:58  10          And now that you've read your report, you know
11  that's not accurate.  That's not the way that you calculated
12  that figure, correct?
13          MR. KRATKA:  Objection.  Misstates the testimony.
14          THE COURT:  Overruled.
06:01:07  15  BY MR. NICHOLS:
16  **Q**    That is not the way, Mr. Bowers -- what you told the Court
17  earlier in terms of looking at 900 people and materials is not
18  the way you came up with that $90 million, correct?
19  **A**    The two intersect.
06:01:19  20  **Q**    Sir, look at your report.
21  **A**    Yes.  I see what you're saying, sir.
22  **Q**    You see -- you understand what I'm saying.
23  **A**    I understand what you're saying.
24  **Q**    You calculated the 90 million not based on 900 people out
06:01:29  25  there looking for pipe, you calculated based on an additional --

Bowers - Cross/Nichols

1  **A**     Half a percent.

2  **Q**     -- you think half a percent deficiency of replacement cost,

3  right?

4  **A**     Yes.

06:01:49  5  **Q**     And your -- the way you calculated that number is that,

6  basically, based on your review of the STEERS reports and data

7  and the day that you spent out at the Baytown refinery, that

8  based on that, you made the judgment -- your own judgment that,

9  whatever they're spending, it's got to be .5 percent less than

06:02:14  10  -- of the replacement cost than what they should be spending,

11  right?

12  **A**     At least.

13  **Q**     Mr. Bowers, it is your position in this lawsuit that --

14  with respect to each and every one of the roughly 4,000 emission

06:02:51  15  events that you say you've looked at that each and every one of

16  those emission events could have been prevented, correct?

17  **A**     Do you want a theoretical answer or a practical answer?

18  **Q**     I think we're dealing in the practical world.  So, why

19  don't you give me a practical answer first?

06:03:17  20  **A**     In my opinion, based on my review of the evidence, Exxon is

21  not prepared to eliminate all of those events.

22  **Q**     That is not my question, Mr. Bowers.

23  **A**     As they operate, they cannot achieve zero events.

24  **Q**     I -- my question to you was you told the Court earlier

06:03:33  25  every emissions event at ExxonMobil could have been prevented,

Bowers - Cross/Nichols

1    correct?

2    **A**    Correct.

3    **Q**    And you -- that is your opinion.  Sitting here today, you

4    are staking your professional judgment on that statement,

06:03:45    5    correct?

6    **A**    Yes.

7    **Q**    And at the same time, you've told the Court -- and I

8    believe I'm getting this right -- that all refineries have

9    emissions events, even ones that you worked at, correct?

06:04:17    10    **A**    Correct.

11    **Q**    And finally -- I hope I'm not running over the Court's time

12    limit.  This is my last subject and I'll wrap it up.

13                    You showed the Court some trend lines, early on

14    in your testimony, as far as the number of recordable events and

06:04:31    15    the number of reportable events and the emissions, correct?

16    **A**    Yes.

17    **Q**    Have you reviewed the trend charts that ExxonMobil has put

18    into evidence in this case as Defendants' Exhibit 2003?

19    **A**    I have not.  I just saw them yesterday for the first time.

06:04:51    20    **Q**    Well, let me just ask you, in general, Mr. Bowers, did you

21    put together those trend line charts yourself?

22    **A**    They were put together for me under my instructions.

23    **Q**    Yes, sir.  And did your instructions include, "Look at the

24    publicly available data concerning reportable events"?

06:05:09    25    **A**    Yes.  That's what we have.  Plus we also have recordable

Bowers - Cross/Nichols

1  events that are not publicly available but were disclosed to us

2  by Exxon recently.

3  **Q**    Yes, sir.  So in other words, when you're trying to show a

4  trend line of the trend for the number of reportable events, you

06:05:29  5  would rely on the publicly available STEERS data, correct?

6  **A**    If one limits it to reportable events, that's all we have.

7  **Q**    You have a trend line --

8  **A**    Yes.

9  **Q**    -- that deals with that, correct?

06:05:41  10                  You showed the Court earlier -- this is one of

11  your charts, right?  Company -- "Complex-Wide Annual Number of

12  Emission Events," the red line?

13  **A**    Yes.

14  **Q**    Right?

06:05:53  15  **A**    Right.

16  **Q**    And would you agree with me that that trend line shows a

17  decrease over time in the number of reportable emission events

18  at the Baytown Complex?

19  **A**    I believe I so stated at the time.  It's a slight decrease.

06:06:09  20  **Q**    Now, a slight decrease -- do you know what the percentage

21  decrease is if you go from, roughly, 100 on that chart down to

22  close to the zero line?  What's that percentage?

23  **A**    I haven't done the calculation.

24  **Q**    Do you know that that calculation, if you produce it, is

06:06:27  25  something on the order of magnitude of 95 percent?

Bowers - Cross/Nichols

1          MR. KRATKA:  Objection.  I believe that misstates the

2     previous charts.

3          THE COURT:  All right.  I'm not going to make a

4     decision on that.  Allow him to ask the question.

06:06:44  5     BY MR. NICHOLS:

6     Q     Do you -- have you -- so you haven't calculated the

7     percentage in reduction at the Baytown Complex on reportable

8     events over that time period, correct?

9     A     From mid-2006 to 2012.

06:06:53  10    Q     You have not -- you have not --

11    A     And as all statisticians will tell you --

12    Q     Yes, sir.

13    A     -- statistics lie.  I look at the general shape in the form

14    of engineering judgment a valid way to analyze data that has

06:07:13  15    noise in it, what is the general trend.  It is decreasing with

16    time.

17    Q     Yes, sir.

18    A     That's what we want.

19    Q     Yes, sir.  That's what you want --

06:07:23  20    A     How steep was the decline depends on whether you include

21    the outlier year.

22    Q     Yes, sir.  But what you --

23          THE COURT:  The outlier year being what, the hurricane

24    year?

06:07:32  25          THE WITNESS:  Yes.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Cross/Nichols

1              THE COURT:  All right.

2    BY MR. NICHOLS:

3    **Q**    So what you want, though -- what you want at a facility is

4    a trend line that's going down in terms of the number of

06:07:43    5    reportable events.

6    **A**    Absolutely.

7    **Q**    Now, did you ask anyone, Mr. Bowers, to look not only at

8    the number of reportable emission events -- and you'll agree

9    with me the Court is going to have all this stuff with him.  You

06:07:51    10   understand that a recordable emissions event, if it involves .01

11   of a pound of a pollutant, that it's recorded, correct?

12   **A**    It may be.

13   **Q**    So we're looking --

14   **A**    If it's required to be recorded --

06:08:10    15   **Q**    Sure.

16   **A**    -- I have confidence that Exxon would follow the rules.

17   **Q**    Yes.  Because, as we all know, heaven help us all, we got a

18   lot of records in this case, right?  Exxon keeps a lot of

19   records on everything, right?

06:08:32    20   **A**    No.  I don't concede that.

21   **Q**    Okay.  So -- but with respect to the number of recordable

22   emission events, you'll agree with me that, if you drill down,

23   you're dealing with events that could involve as little as .01

24   pounds of a pollutant, correct --

06:08:45    25   **A**    Correct.  And it could be 20,000 pounds as a recordable

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Cross/Nichols

1    event.

2    **Q**    -- depending on what the TCEQ sets as the reportable

3    quantity for a particular event, correct?

4    **A**    If an emission event falls below TCEQ's threshold for

06:09:07    5    reporting, it's classified as recordable.

6    **Q**    And do you remember that when we looked at -- the Court can

7    do this on its own.  But remember, we looked at the list of

8    fires that you got events on there that last -- that have

9    duration of down to .02 hours?  You know that, don't you?  You

06:09:29   10    have recordable events on your fires table that go down to .02

11    hours in duration, correct?

12    **A**    Yes.  If it was --

13    **Q**    What is -- what --

14    **A**    -- qualified, recorded, and classified by Exxon as a fire,

06:09:44   15    it is on that chart.

16    **Q**    Right.  So what is .02 of an hour?  How much -- how many

17    minutes is that?

18            Just to make sure Mr. Kratka knows where I'm

19    going, let's look at the chart itself.

06:10:02   20    **A**    A couple of minutes.

21    **Q**    A couple of minutes?

22            MR. NICHOLS:  So I'm looking at the fire chart, your

23    Honor.

24            THE COURT:  Okay.

06:10:11   25            MR. NICHOLS:  It says, "Recordable event" --

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Cross/Nichols

1          THE COURT:  What exhibit?

2          MR. NICHOLS:  This is Exhibit Number 438.

3          THE COURT:  Whose exhibit?

4          MR. NICHOLS:  It's the Plaintiffs'.  It's one of

06:10:16   5   Mr. Bowers' and Ms. Rock's charts.

6   BY MR. NICHOLS:

7   Q    So "Recordable Event:  Mechanical, Emissions to the

8   Atmosphere Due to a Small Fire at the Receptacle from Extension

9   Cords."

06:10:27   10          Right?

11   A    Yes.

12   Q    What was the root cause of this particular event, do you

13   know?

14   A    Yes.  It was an electrical cord used in an inappropriate

06:10:40   15   service when it was in poor condition.

16   Q    Okay.  So you --

17   A    It should not have been used.

18   Q    So you would consider that to be a human error To use that

19   extension cord?

06:10:50   20   A    It's possible that it had something that you couldn't see,

21   the fault.

22   Q    Sure.  Maybe it was just a faulty extension cord, right?

23   A    Could be.  Or a faulty outlet.

24   Q    So what was the root cause of that, do you know, the true

06:11:00   25   root cause?

Bowers - Cross/Nichols

1                But, the point was -- you see --

2    **A**    Exxon classified it as a fire.

3    **Q**    Yeah.  I think we got that picture.

4                So -- but at the end of the day -- at the end of

06:11:10    5    the column, we have a duration listed of .02 hours, correct?

6    **A**    Yes.

7    **Q**    And how many minutes?  Just a couple of minutes?

8    **A**    Yes.

9    **Q**    So --

06:11:21    10    **A**    It started smoking, you unplug it.  Why did it happen?

11    **Q**    Yes.  And the point, Mr. Bowers, is that ExxonMobil, the

12    men and women there recorded that, right?

13    **A**    Yes.

14    **Q**    They record everything.  Are you aware of anything that's

06:11:37    15    happened out there that involves any amount of emission that has

16    not been recorded somewhere, even if it lasts for a minute or

17    two minutes?

18    **A**    I commend them on that.  I believe the testimony yesterday

19    said they record it as this so they can document it and take

06:11:54    20    action to prevent it from happening again.

21    **Q**    Absolutely.

22                MR. NICHOLS:  That's all I've got.

23                THE WITNESS:  I think that's great.

24    BY MR. NICHOLS:

06:12:00    25    **Q**    Good.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Bowers - Cross/Nichols

1          MR. NICHOLS:  That's all I've got.

2          THE COURT:  Do you want to follow up a bit?  How much

3   time do you have to follow up?

4          MR. KRATKA:  I think it would be better to recess

06:12:08   5   until tomorrow for me.  We may not be much more.

6          THE COURT:  Pardon me?

7          MR. KRATKA:  We better recess until tomorrow, given

8   the hour.

9          THE COURT:  Everybody agree?  Okay.  All right.  Then

06:12:18  10   give me a moment or so and I'll get this all done.  I've got a

11   couple of things to do.  Don't go away.  I want to get your

12   time.

13      (Court recessed for the day at 6:12 p.m.)

14

15

16              C E R T I F I C A T E

17

18      I certify that the foregoing is a correct transcript

19   from the record of proceedings in the above-entitled matter, to

20   the best of my ability.

21

22  By: /s/ Gayle L. Dye                    04-17-2014

23          Gayle L. Dye, CSR, RDR, CRR        Date

24

25