UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ENVIRONMENT TEXAS CITIZEN LOBBY, INC., et al., | § § § | |
| Plaintiffs, | § § | |
| v. | § § | Civil Action No. H-10-4969 |
| EXXON MOBIL CORPORATION, et al., | § § § | |
| Defendants. | § § | |

**[PROPOSED] SECOND REVISED AND SUPPLEMENTAL
FINDINGS OF FACT AND CONCLUSIONS OF LAW[1]**

On February 10, 2014, this Court commenced a non-jury trial in the above-entitled matter. During the course of the thirteen-day proceeding, the Court received evidence and heard sworn testimony.[2] On December 17, 2014, having considered the evidence, testimony, and oral arguments presented during the trial,

---

[1] As explained further below, the Fifth Circuit vacated the Court's prior judgment as expressed in the Revised Findings of Fact and Conclusions of Law entered by this Court on April 26, 2017. However, in vacating the Court's prior judgment, the Fifth Circuit remanded the case "for the limited purpose of allowing the district court to make additional findings on traceability and the Act of God defense," and that "[t]he case will then be returned to this panel." *Env't Tex. Citizen Lobby, Inc. v. ExxonMobil Corp.*, 968 F.3d 357, 375 (5th Cir. 2020) ("*ETCL II*"). Because the Court's prior judgment was vacated in whole and not in part, where the Court's prior findings were undisturbed or upheld by the Fifth Circuit, the Court reincorporates those prior findings into these Second Revised and Supplemental Findings of Fact and Conclusions of Law.

[2] The parties submitted 1,148 exhibits that spanned thousands of pages and 25 witnesses testified.

along with post-trial submissions and the applicable law,[3] the Court entered its initial findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).  The judgment was appealed.  The Fifth Circuit vacated the Court's judgment and remanded the case for the determination of a new judgment as consistent with the Circuit's opinion.  The Court entered revised findings of fact and conclusions of law on April 26, 2017, along with a revised judgment.  The revised judgment was appealed.  The Fifth Circuit vacated the Court's revised judgment and remanded the case for the "limited purpose of allowing the district court to make additional findings on traceability and the Act of God defense." *Env't Tex. Citizen Lobby, Inc. v. ExxonMobil Corp.*, 968 F.3d 357, 375 (5th Cir. 2020).  Accordingly, the Court issues the following revised and supplemental findings of fact and conclusions of law, as consistent with the instructions on remand from the Fifth Circuit following the vacatur of the Court's revised judgment.  Any finding of fact that should be construed as a conclusion of law is hereby adopted as such.  Any conclusion of law that should be construed as a finding of fact is hereby adopted as such.

---

[3] The post-trial submissions considered by the Court include the plaintiffs' and the defendants' original proposed findings of fact and conclusions of law, which are 455 pages and 361 pages in length, respectively.  On remand, the Court considered the parties further revised proposed findings of fact and conclusions of law, and where relevant, the parties original proposed finding of fact and conclusions of law and those submitted by the parties in the first remand of the case to this Court.

## I. BACKGROUND

On December 13, 2010, Plaintiffs Environment Texas Citizen Lobby, Inc. ("Environment Texas") and Sierra Club ("Sierra Club") (collectively, "Plaintiffs") brought suit under the citizen suit provision of the federal Clean Air Act (the "CAA"), 42 U.S.C. § 7604, against Defendants Exxon Mobil Corporation, ExxonMobil Chemical Company, and ExxonMobil Refining and Supply Company (collectively, "Exxon").   The case concerns Exxon's operation of a refinery, olefins plant, and chemical plant located in Baytown, Texas (the "Complex"), which is a suburb of Houston and within Harris County.   Plaintiffs sought a declaratory judgment, penalties, injunctive relief, and appointment of a special master for events at the Complex involving unauthorized air emissions or deviations from one of the Complex's air permits, during a period spanning from October 14, 2005, to September 3, 2013.

On December 17, 2014, the Court issued its initial findings of fact and conclusions of law.   Plaintiffs appealed the decision to the Fifth Circuit.   On May 27, 2016, the Fifth Circuit issued an opinion vacating the Court's judgment and remanding for assessment of penalties based on the violations actionable as consistent with its opinion.[4]   The Court ordered the parties to submit revised proposed findings of fact and conclusions of law consistent with the scope of

---

[4] *Env't Tex. Citizen Lobby, Inc. v. ExxonMobil Corp.*, 824 F.3d 507 (5th Cir. 2016) ("*ETCL I*").

3

remand from the Fifth Circuit.  Having considered the Fifth Circuit's opinion, the parties' revised proposals and responses thereto, the Court revised its findings of fact and conclusions of law as set forth in Revised Findings of Fact and Conclusions of Law, entered April 26, 2017, and a judgment on the amount of penalties to be assessed.

Exxon appealed from the judgment.  On July 29, 2020, the Fifth Circuit issued an opinion vacating the Court's judgment and remanding for "additional findings on the traceability and the Act of God defense."[5]  On August 5, 2020, the Court ordered the parties to submit revised proposed findings of fact and conclusions of law on the subjects of the matters remanded for further findings by this Court.  The parties submitted their proposals on October 5, 2020.

Having considered the Fifth Circuit's opinion and the parties' revised proposals and responses thereto, the Court revises and supplements its prior findings and conclusions, as follows, on the traceability element regarding Plaintiffs' standing to bring their claims and Exxon's Act of God defense.  The Court also revises those prior findings and conclusions that are affected by the Court's revised and supplemented findings and conclusions on the two matters remanded to the Court for further consideration; and its judgment on the amount of penalties to be assessed.  The below revised and supplemental findings and

_____

[5] *ETCL II*, 968 F.3d at 357 at 375.  On August 3, 2020, the Fifth Circuit issued its revised opinion, containing what appear to the Court to be purely technical and non-substantive changes.

4

conclusions amend and supplement the Court's Revised Findings of Fact and Conclusions of Law entered on April 26, 2017 (Document No. 257).  To the extent the below revised and supplemental findings do not replace or supplement the Court's Revised Findings of Fact and Conclusions of Law entered on April 26, 2017, the Court's prior findings and conclusions remain fully in effect.

## II.      REVISED AND SUPPLEMENTAL CONCLUSIONS OF LAW

### A.    *Revised and Supplemental Findings and Conclusions Related to Application of Standing Principles in CAA Cases*

The Court retracts its prior findings and conclusions related to the law related to general standing principles (as set forth in Section III(A) "Standing," paragraphs 1-2, of the Revised Findings of Fact and Conclusions of Law) and replaces those prior findings and conclusions with the following:

### A.    Standing

1A.   "Congress granted 'any person' the right to sue under the Clean Air Act. 42 U.S.C. § 7604(a).  But that does not mean that any person can always bring such a suit," because Article III of the Constitution "requires that the plaintiff have standing."  *ETCL II*, 968 F.3d at 364 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).  Citizens suing under an "environmental statute[], must meet the [Article III] standing requirement in their own right."  *Id.* (citing *Friends of the Earth v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000)).

1B.    In this case, Plaintiffs are associations rather than individuals, but the standing analysis remains the same.  An organization "has standing to bring suit on behalf of its members when: (1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members."  *Texans United for a Safe Econ. Educ. Fund v. Crown Cent. Petroleum Corp.*, 207 F.3d 789, 792 (5th Cir. 2000); *accord Laidlaw*, 528 U.S. at 180-81.  Only the first requirement remains at issue in this case.    Thus, Plaintiffs must establish that individual members of their associations have standing to sue "in their own right" for the violations for which they seek civil penalties.  *See Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009).

2A.    Plaintiffs must make this showing of standing for each violation they raise.  *See ETCL II*, 968 F.3d at 365 (recognizing that "it must generally be true that a plaintiff needs standing for each violation for which it seeks a penalty").  Although Plaintiffs previously argued "there is not a separate standing inquiry for each *violation* asserted as part of [their] claim," *id*., the Circuit's most recent opinion "refutes this position."  *Id*.

2B.    As confirmed by the Fifth Circuit in its most recent opinion, standing "is not dispensed in gross."  *See also Town of Chester, N.Y. v. Laroe Estates*, 137

6

S. Ct. 1645, 1650 (2017) (quoting *Davis v. FEC*, 554 U.S. 724, 734 (2008), and *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996)); *accord In re Gee*, 941 F.3d 153, 160 (5th Cir. 2019) (quoting *Lewis*, 518 U.S. at 346-47).   This principle applies with full force in environmental penalty cases.   *Laidlaw*, 528 U.S. at 185 (quoting *Lewis*, 518 U.S. at 358 n.6).

2C.   In its latest decision, the Fifth Circuit observed that "Clean Air Act penalties are tied to violations."   *ETCL II*, 968 F.3d at 365 (citing 42 U.S.C. § 7604(a)(1) and *Env't Tex. Citizen Lobby, Inc. v. ExxonMobil Corp.*, 824 F.3d 507, 518-19 (5th Cir. 2016) ("*ETCL I*") (requiring a CAA citizen suit to be based on repeated violations of the same CAA requirement)).   The Fifth Circuit also held that as a matter of standing principles, "one injury does not entitle a litigant to right other wrongs that did not injure it."   *ETCL II*, 968 F.3d at 365 (citations omitted).   Accordingly, a Clean Air Act "plaintiff needs standing for each violation for which it seeks a penalty."   *Id.* at 366.   To meet their burden of showing that that individual members of their associations have standing to sue in their own right for the violations for which they seek penalties, Plaintiffs were required to offer evidence from their members to "prove standing for each violation in support of their claims."   *Id.* at 367.

2D.   This "irreducible constitutional minimum of standing contains three elements." *Lujan*, 504 U.S. at 560; *see ETCL II*, 968 F.3d at 364.  As explained by the Supreme Court, the three elements are linked.

2E.   "First, the plaintiff must have suffered an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized, . . . and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'" *Lujan*, 504 U.S. at 560 (quoted citations omitted).   "The relevant showing . . . is not injury to the environment but injury to the plaintiff." *Laidlaw*, 528 U.S. at 181.

2F.   "Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be 'fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] . . . independent action.'" *Lujan*, 504 U.S. at 560.  In other words, (a) there must be a "causal connection" between *the* Article III injury in fact – *the* "actual," "concrete and particularized" harm to the alleged "invasion of a legally protected interest" – and the challenged conduct; and (b) that harm may not be the result of "independent action." *Id.* at 560-61.

2G.   "Third, it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Id.* at 561.

2H.   In sum, traceability and redressability must be tied to "***the*** injury" that satisfies Article III.  Thus, the Court must conduct a "separate standing inquiry for

each *violation*." *ETCL II*, 968 F.3d at 365 (emphasis in original). The Fifth Circuit has squarely rejected Plaintiffs' suggestion that standing can be determined by this Court "en masse" or "in gross" with respect to various classes of violations, or violations grouped by Plaintiffs in tables according to the counts in Plaintiffs' complaint. *Id*.

2I.     Plaintiffs bore "the burden of establishing these [standing] elements." *Lujan*, 504 U.S. at 561. "Because this case was tried, Plaintiffs needed to prove standing by a preponderance of the evidence." *ETCL II*, 968 F.3d at 367 (citing *Lujan*, 504 U.S. at 561). Plaintiffs adduced their evidence according to how they perceived at the time of trial—incorrectly according to the Fifth Circuit—standing doctrines apply to CAA citizen suits. If the Plaintiffs failed to present competent evidence establishing that a member's injury was "traceable" to each violation at the Complex for which they sought recovery, then as a matter of law Plaintiffs did not establish standing with respect to that violation. *Friends of the Earth, Inc. v. Crown Cent. Petroleum Corp.*, 95 F.3d 358, 362 (5th Cir. 1996).

2J.     Such proof of standing as to individual violations, as made clear by the recent Fifth Circuit opinion and Supreme Court authority, had to be more than speculation about an injury traced to those individual violations. The Fifth Circuit recently emphasized the Supreme Court's warning that "[u]nadorned speculation will not suffice to invoke the federal judicial power." *In re Gee*, 941 F.3d at 164

(quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 44 (1976)).   As elaborated in *Gee*, "Article III requires more than theoretical possibilities." *Id.* at 164.   In accordance with that warning, the Fifth Circuit's most recent decision in this case emphasized that "[t]raceability . . . requires something more than conjecture." *ETCL II*, 968 F.3d at 368.   When a contention that injury is "fairly traceable" to an environmental violation is "little more than surmise, . . . the requirements of Article III are not met." *Friends of the Earth*, 95 F.3d at 361.   As the Supreme Court has stated, a "speculative chain of possibilities does not establish that injury . . . is fairly traceable to" a defendant's wrongful conduct. *Clapper v. Amnesty Int'l*, 568 U.S. 398, 414 (2013).   It is under these legal requirements—establishing traceability of injury as to individual violations in a manner that is not speculative or theoretical—that the Court has re-evaluated Plaintiffs' right to seek citizen suit recovery with respect to Deviations, Recordable Events, and Reportable Events at the vast Complex (as described by the Court in previous findings) over an eight-year time span.

2K.   The Court finds these general principles to be decisive in this case. The Court has endeavored to apply the guidance provided by Fifth Circuit's most recent decision to the evidence presented by Plaintiffs at trial—mindful that proof of traceability "requires something more than conjecture." *ETCL II*, 968 F.3d at 368.

10

**B.**     ***Revised and Supplemental Findings and Conclusions Related to Traceability Element of Standing Analysis***

The Court retracts its prior findings and conclusions related to the traceability element of Plaintiffs' standing to bring their claims (as set forth in Section III(A)(b), paragraphs 5-6, of the Revised Findings of Fact and Conclusions of Law), and replaces those prior findings and conclusions with the following:

**b.**     ***Traceability***

5A.   One of the limited purposes of the Fifth Circuit's remand was to permit this Court to make "additional findings on traceability." *ETCL II*, 968 F.3d at 375.  According to the Fifth Circuit's opinion, the "crux" of the traceability issue "is whether the injuries these individuals suffered are traceable to the violations" claimed by Plaintiffs. *Id.* at 368.  In other words, as noted previously, proof of traceability requires evidence that ***the*** injuries that a standing member claims to have suffered have the requisite "fairly traceable" causal connection to one or more claimed violations.  To repeat the critical words of the Fifth Circuit's majority opinion in this case:  "one injury does not entitle a litigant to right other wrongs that did not injure it." *Id.* at 365.

5B.   In outlining the traceability criteria that guides this Court's mandate on remand, the Fifth Circuit explained that traceability "requires something more than conjecture but less than certainty." *Id.* at 368.  To illustrate this point, the Fifth Circuit gave two hypothetical statements a standing member might make:

11

"The Exxon complex in Baytown emits pollutants, and I live in Baytown"; and "I was outside the Baytown complex on November 15, between 1:00 and 5:00 pm, at which time hydrogen sulfide was emitted, and I recall my throat feeling sore even though it did not feel sore earlier in the day." *Id.* As the Fifth Circuit explained, the first hypothetical statement amounts to conjecture and thus would *not* prove traceability under the Fifth Circuit's guidance, while the second statement would exceed the level of proof necessary to establish the traceability requirement. The type of evidence necessary to establish traceability lies somewhere between the two hypothetical statements. The most recent Fifth Circuit opinion left it to this Court to determine, as a factual matter, which violations "caused or contributed to the kinds of injuries alleged by the plaintiffs.'" *Id.* (quoting *Sierra Club, Lone Star Chapter v. Cedar Point Oil Co.*, 73 F.3d 546, 557 (5th Cir. 1996)).

5C.   With the exception of proof of traceability of injury on five events resulting in 40 days of violations, Plaintiffs chose to attempt to establish standing on the basis of testimony and evidence that is too closely akin to the Fifth Circuit's first hypothetical statement—"The Exxon complex in Baytown emits pollutants, and I live in Baytown"—to support a finding that an injury can be fairly traced to the violations they raised. This hypothetical statement is particularly applicable in the context of the Complex, because the Complex and other industrial facilities in Baytown emit air pollutants as part of permitted operations and unauthorized

12

emissions due to upset events.  As a result, evidence about living in or visiting areas near the Complex, much less Baytown in general; smelling odors in Baytown; or seeing haze, smoke, or flares at or around the Complex or in Baytown is insufficient to meet a standard that mandates standing be determined, on a non-speculative basis, with respect to each violation.  Any finding of traceability of injury based on such evidence alone would amount to mere conjecture and run afoul of the Fifth Circuit's explicit guidance.  As the Court previously found, for each year at issue in this case, "unauthorized emissions were a very small percentage of total emissions and an even smaller percentage of the annual emissions limits.  For example, in 2012, of the total VOCs emitted, only 54.9 tons were unauthorized, which is only 1.9% of the Complex's total VOC emissions that year and only 0.7% of the annual VOC emissions limit."[6]  Authorized emissions involve flaring, smoke, haze, and pollutants, some of which have odors.  Under the standing principles as articulated by the Fifth Circuit, Plaintiffs were required to trace their observational or other injuries to *violations*, not to the Complex's operations generally or the Baytown environment generally.  Testimony about observing smoke or flares in and around the Complex and smelling odors in the Baytown environment generally is not enough to establish that a standing member sustained an observational or other injury that can be fairly traced to a violation at

---

[6]*Revised Findings of Fact and Conclusions of Law*, Document No. 257 at 21.

the Complex.   Accordingly, as a factual matter, Plaintiffs failed to establish traceability of injury for the vast majority of the alleged violations in this case.

6A.   As the Court has previously found,[7] Plaintiffs' standing member Dianne Aguirre Dominguez reported suffering allergy symptoms growing up in Baytown, but "she cannot correlate any of these symptoms to specific Events or Deviations at issue in this case."   She testified that on visits since 2006, "she has seen flares, smoke, and a brownish haze over the [Baytown] Complex," but that she also "understands some flaring is a normal, permitted part of the operation of the Complex, and she does not know of a time when she observed unpermitted flaring."   She testified that she enjoys running outdoors, but when she is visiting Baytown, she refrains from doing so.   This testimony, according to the Fifth Circuit's most recent opinion, establishes that Dominguez suffered Article III injuries.  *ETCL II*, 968 F.3d at 368.   However, on the issue of traceability of injury, the Fifth Circuit left it to this Court to determine as a factual matter whether her testimony or other evidence allows the Court to fairly trace any of the flaring, smoke, or brownish haze she testified as having seen in the area of the Complex to violations.   As the Court has found based on the evidence at trial, permitted operations at the Complex produce flaring and smoke, and authorized emissions from the Complex and from the many other industrial facilities in Baytown and its

---

[7]*Revised Findings of Fact and Conclusions of Law*, Document No. 257 at 22-24.

surrounding areas can cause haze.[8]  The Court cannot find that this testimony or other evidence connects Dominguez's Article III injuries to any violation.  To do so would be to base findings of traceability of injury on conjecture, especially in light of the Court's findings regarding permitted emissions and the existence of many other industrial facilities in the Baytown community.

6B.   As the Court has previously found,[9] Plaintiffs' standing member Marilyn Kingman testified that she did not live in Baytown but sometimes went near the Complex.  She has smelled odors that she attributes to the Complex and has seen flaring at the Complex.  As this Court has previously found:  "However, she does not claim to have any physical ailments or health conditions that she attributes to anything happening at the Complex.  Also, she was not able to correlate any of her experiences or concerns to specific Events or Deviations at issue in this case."  As indicated above with respect to Dominguez's testimony, Kingman's testimony does not fairly trace the odors she smelled or flaring to violations at the Complex, as opposed to operations at any of the many other industrial facilities in Baytown and its surrounding area, or to permitted operations at the Complex.  Again, this testimony, according to the Fifth Circuit, establishes

---

[8] For the Court's findings related to these issues, *see Revised Findings of Fact and Conclusions of Law*, Document No. 257 at 91-92 n.256 (reaffirming in their entirety the Court's earlier findings 47 and 48 of the Court's *Findings of Fact and Conclusions of Law*, Document No. 225).

[9] *Id*. at 24-25.

that Kingman (like Dominguez) suffered Article III injuries.  *ETCL II*, 968 F.3d at 368.  However, the Court cannot find that this testimony connects those injuries to any violation.  To do so would be to base findings of traceability of injury on conjecture, especially in light of the Court's findings regarding permitted emissions and the existence of many other industrial facilities in the Baytown community.

6C.   As the Court has previously found,[10] Plaintiffs' standing member Richard Shae Cottar lived a quarter mile from the Complex beginning in April 2010 and in September 2012 moved approximately two miles from the Complex. When living closer to the Complex, he testified that he saw or heard certain flaring events, smelled odors, and got headaches.  He testified that his asthma symptoms improved after he moved further away from the Complex.   As this Court has previously found:  "He does not want to breathe unauthorized emissions, and his concerns about air quality would be lessened if Exxon were to reduce its unauthorized emissions.   However, he understands that certain emissions and flaring are allowed by permits. In total, he was able to credibly correlate three flaring events he observed to specific Events or Deviations" in this case.  Those three events all occurred at the Complex's Olefins Plant and were reported by Exxon to TCEQ under STEERS numbers 157283, 159900, and 168810.  Under the

---

[10] *Id*. at 25-26.

evidence as presented at trial, only conjecture could connect his injuries to any violation for purposes of the traceability analysis other than the violations associated with these three events.  Cottar testified to other instances of smelling odors or seeing flaring, but that testimony did not allow the Court as a factual matter to fairly trace these claimed injuries to violations at the Complex.  As with other standing member testimony about smelling odors or seeing flares, this testimony does not fairly trace an injury to a violation at the Complex, because odors and flares are an ordinary and permitted byproduct of industrial operations, not only of the Complex but also of other industrial facilities in Baytown and surrounding areas.

6D.   As the Court has previously found,[11] Plaintiffs' standing member Sharon Sprayberry lived about one mile from the Complex from 2004 until June 2012.  She testified that she heard and saw flares and saw haze over the Complex, and smelled odors from the Complex.  As the Court found previously:  "She understands not all flares involve unauthorized emissions because some flares and emissions are authorized by permit.  In total, she was able to credibly correlate two events she observed to Events or Deviations."  Those events occurred at the Complex's Olefins Plant, and were reported by Exxon to TCEQ under STEERS numbers 122984 and 150177.  Under the evidence as presented at trial, only

---

[11] *Id.* at 27-28.

conjecture could connect her injuries to any violation for purposes of the traceability analysis other than the violations associated with these two events. As with Cottar, Sprayberry testified to other instances of smelling odors or seeing flaring, but that testimony did not allow the Court as a factual matter to fairly trace these claimed injuries to violations at the Complex. Again, as with other standing member testimony about smelling odors, seeing smoke, or seeing flares, this testimony does not fairly trace an injury to a violation, because odors, smoke, haze, and flares are an ordinary and permitted byproduct of industrial operations, not only of the Complex but also of other industrial facilities in Baytown and surrounding areas.

6E.     The Court finds that Plaintiffs proved traceability of injury as a factual matter through a combination of standing member testimony and evidence from the Complex's own records for the three flaring events correlated by Cottar and the two events correlated by Sprayberry. These five events involved the forty (40) days of violations listed on the attached Appendix A. On this factual record, the Court cannot find other violations "cause[d] or contribute[d] to the kinds of injuries alleged by the plaintiffs," *ETCL II*, 968 F.3d at 368-69 (citing *Cedar Point*, 73 F.3d at 557), because "one injury does not entitle a litigant to right other wrongs that did not injure it," *id.* at 365.

6F.    To be clear, the Court recognizes—as the Fifth Circuit opinion indicates—the possibility that the Plaintiffs might have been able to establish traceability of injury for a greater number of violations.  This Court can only make findings based on the record adduced at trial.  "Because this case was tried, Plaintiffs needed to prove standing by a preponderance of the evidence," *id.* at 367, and they had the burden to do so "for each violation in support of their claims," *id.*, with "something more than conjecture," *id.* at 368.  Instead of presenting a disciplined standing case based on credible evidence, the Plaintiffs chose to rely in large part, with the exceptions noted above, on the records of Reportable Events and Recordable Events maintained by the Complex.  These records contain no proof of how these events and their associated claimed violations could have or did impact the standing members.  The Court's foregoing findings identify the only evidence in this record that meets the Fifth Circuit's traceability test with respect to the injuries-in-fact shown at trial.

6G.    With respect to the remaining violations, Plaintiffs did not adduce sufficient credible, non-speculative evidence on which the Court can find traceability of injury.  Plaintiffs attempt—in light of the recent Fifth Circuit opinion—to argue that they met their burden of proof on traceability for violations that were not correlated by standing member testimony through (1) tables of claimed violations, which contain data collected and recorded by Exxon; (2)

19

testimony and documentation, including from their retained expert Dr. Edward Brooks, as to the potential human health and odor impacts of various pollutants involved in the violations; and (3) court decisions from other jurisdictions discussing the facts of matters unrelated to this case. This combination of tables of claimed violations; testimony and documentation regarding the possible health impacts of pollutants and the ability of pollutants to create odors under certain exposure scenarios; and case law cited by the Plaintiffs in their proposed findings on remand does not represent sufficient evidence to establish traceability of injury.[12]   The Court finds this to be the case with respect to each remaining category of claimed violations:  Deviations, Recordable Events, and Reportable Events.  Plaintiffs did not adduce evidence sufficient to support a finding by this Court that *any particular* Deviation, Recordable Event, or Reportable Event— other than the five events and corresponding 40 days of violations—could have or did cause an injury-in-fact to one of their standing members.  Other than with respect to these 40 days of violations, Plaintiffs did not produce evidence to establish that the flaring and smoke Plaintiffs' standing members claimed to have seen or smelled was the result of violations, as opposed to permitted activity at the Complex or activity occurring at some other facility in the Baytown area.  Nothing in this trial record supports tracing any other Deviation, Recordable Event, or

---

[12] Of course, court decisions from other matters are not evidence at all.

Reportable Event to such a justiciable injury-in-fact.   Indeed, as determined previously by the Court in findings that were undisturbed on appeal, the "Complex is one of the largest and most complex industrial sites in the United States. Specifically, it is the largest petroleum and petrochemical complex in the United States.   It sits on approximately 3,400 acres, with a circumference of approximately 13.6 miles."[13]   Plaintiffs' tables, which recategorize Exxon's data about Deviations, Recordable Events, and Reportable Events that occurred somewhere inside the enormous Complex during an eight-year period, do not prove traceability of an injury to one of Plaintiffs' standing members.   The massive size of the Complex alone, as a factual matter, undercuts Plaintiffs' position that they met their burden to prove traceability of injury for all claimed violations captured in Exxon's internal records—including those noted as involving flaring, smoke, or haze.

6H.   More particularly, none of the Plaintiffs' standing members provided any evidence that would help to support a finding of traceability of injury as to any Deviations, and Plaintiffs did not otherwise satisfy their burden of proof on traceability of injury with respect to any such Deviations.   The Court must determine whether it has jurisdiction to address a claim before it addresses its merit, or lack of merit.   As addressed elsewhere in the Court's revised findings, the

---

[13] *Revised Findings of Fact and Conclusions of Law*, Document No. 257 at 6.

evidence adduced by Plaintiffs with respect to each such Deviation was limited to evidence that Exxon made a record of an *indication* of noncompliance—not *actual* noncompliance—with a term or condition of the permit.[14]   For purposes of determining whether the Court has jurisdiction to address Deviations as claimed CAA violations—which Plaintiffs failed to prove were violations—the Court finds that the Deviations raised by Plaintiffs are replete with reported circumstances that did not involve *any* emission of a pollutant, according to Plaintiffs' own tables upon which they rely, and do not include any evidence that any standing member could have ever perceived, seen, or otherwise experienced the effects of an indication of non-compliance.   The Deviations raised by Plaintiffs as actionable violations include such items as:

- "Final record of reportable emissions event was not created within a two-week period";

- A "PI-7 form for BTCP piping connected to TKQ401 was not submitted within the 10 days following installation";

- "Recordkeeping practices of HAP content in Loading Racks";

- "Monthly engine fuel usage record for April was not completed";

- "Late 15-day written stack test notification to TCEQ";

---

[14] *Revised Findings of Fact and Conclusions of Law*, Document No. 257 at 67-68 (referring to *Plaintiffs' Exhibits* 7A-7E, 599-603, and 15).

- "In July 2006, we discovered that EPA was not copied on semi-annual QQQ report";[15]

- "TCEQ alleges new piping fugitive components placed into NH3 service under PBR 30 TAC 106.262 (sent to TCEP on 5/19/06) should have been authorized differently";

- "Failed to submit Final RATA test results to agency within 60 day period";

- "Three emissions events reported later than the 24 hour reporting requirement";[16]

- "Semi-annual Subpart U Polymers Resin MACT report inadvertently submitted late to the agency";[17] and

- "Dust Collector (DCS3-7-7) spare filter parts were out of stock during the most recent inventory."[18]

Even when Plaintiffs' tables include an identified "pollutant" in a column in the table for a particular Deviation, those tables do not contain any evidence of the amount of a pollutant actually involved, much less evidence from which the Court could trace any claimed injury for standing purposes.   For example, a record

---

[15] *Plaintiffs' Exhibit* 7A at rows 31, 32, 33, 41, 87, 94.

[16] *Plaintiffs' Exhibit* 7B at rows 6, 25, 40.

[17] *Plaintiffs' Exhibit* 7D at row 7.

[18] *Plaintiffs' Exhibit* 7E at row 16.

indicating a Deviation involved "[t]race H2S emissions associated with tanks need registration" does not provide the Court with sufficient evidence about how, if ever, trace hydrogen sulfide emissions from tanks located at some unspecified location within the Complex could ever be traced to a claimed injury for purposes of CAA standing.   As another example, many of the Deviations involved documentation of "open-ended lines," without any evidence of what amount of pollutants, if any, were emitted from the lines.[19]  As another example, even though Plaintiffs' table lists "pollutants" implicated in a Deviation report as "NOx, CO," the indication of noncompliance was "[r]ental diesel engines/air compressors were not initially tested or quarterly tested.  No monthly records of fuel usage kept."[20] This record appears to address an indication that testing requirements were not met, not that any emissions occurred to which Plaintiffs could trace an injury for standing purposes.   Thus, Plaintiffs' capturing of data from deviation reports maintained at the Complex into a table, and then asserting each entry as an actionable violation, fails to account for the burden placed on them as CAA citizen suit plaintiffs to trace any injury to asserted CAA violations.

6I.    With respect to violations alleged by Plaintiffs related to Recordable and Reportable Events, Plaintiffs failed to present any evidence establishing

---

[19] *E.g.*, *Plaintiffs' Exhibit* 7E.

[20] *Plaintiffs' Exhibit* 7B at row 59.

traceability of a cognizable injury to standing members, other than with respect to the five events testified to by Cottar and Sprayberry.  As with their proof on Deviations, Plaintiffs did not satisfy their burden of proof on traceability of injury merely by creating and introducing into evidence the tables regarding Recordable and Reportable Events in Plaintiffs' Exhibits 1A-1B, 2C-2F, 3, 4, and 5.[21]   The Fifth Circuit's recent opinion indicated that for purposes of determining whether Plaintiffs had established traceability of injury, the Court could focus in part on remand on "violation[s] that could cause or contribute to flaring, smoke, or haze." *ETCL II*, 968 F.3d at 371.  To the extent Plaintiffs' testimony regarding injuries-in-fact included testimony about seeing flaring, smoke, or haze, the Court has credited that testimony as evidence of traceability for the violations to which that flaring, smoke, or haze can be fairly connected.  However, standing member testimony about seeing or perceiving flaring, smoke, or haze at or around the Complex, or in Baytown generally, does not fairly trace that activity to violations.  As stated repeatedly by the Court in its prior and these findings, flaring, smoke, and haze result from standard permitted operations, not just at the Complex but also at other of the many industrial facilities operating in Baytown.  Plaintiffs were not required to prove causation of an injury in a CAA citizen suit as they would in a tort suit, but they were required to make some showing from which the Court could fairly

---

[21] Plaintiffs' Exhibits 2A and 2B are not included here because the reportable emissions events in them are the same as the reportable emissions event in Plaintiffs' Exhibits 1A and 1B.

conclude the flaring, smoke, haze, or odors the standing members experienced emanated from a violation at the Complex over which they sued. Other than with respect to the 40 days of violations, Plaintiffs did not make such a showing.

6J.    That Plaintiffs' evidence was factually closely akin to the Fifth Circuit's hypothetical "[t]he Exxon complex in Baytown emits pollutants, and I live in Baytown" is evident from the Court's examination of Plaintiffs' tables of re-categorized data from Exxon's records and reports. On the face of those tables, there are numerous examples in which the data fail to indicate that a violation from either a Recordable Event or Reportable Event could have caused or contributed to flaring, smoke, or haze that could be fairly traced to a standing member injury. For example, the Fifth Circuit's recent opinion pointed out that the violations for which Plaintiffs seek to recover as citizen suit plaintiffs include those related to "accidents as minor as *smoke* caused by plugging in an extension cord and a *fire* in a cigarette butt can that lasted one minute. Both accidents lasted '0.0 hours' and emitted 0.01 pounds of carbon monoxide and 0.01 pounds of nitrous oxide." *ETCL II*, 968 F.3d at 366-67 (emphasis added). Plaintiffs have now, in reaction to the Fifth Circuit's recent opinion, omitted from their revised tables (Exhibits PX 588, PX 592, and PX 594) the extension-cord and cigarette-butt incidents called out by the Fifth Circuit—notwithstanding the fact that, according to the Exxon data captured in Plaintiffs' tables, both involved smoke. They have also omitted from

26

their revised tables claimed actionable violations that resulted in the emissions of less than the arbitrary amount of one pound of a pollutant. However, as an example, numerous Recordable Events that involved flaring remain in Plaintiffs' revised tables because they violated permit limits of zero, as listed in those tables ("zero-emission standards"). As noted above, the Court finds that the Plaintiffs' tables are not sufficient to demonstrate that Plaintiffs' members were injured by flaring, smoke, or haze mentioned in those tables. As the Fifth Circuit instructed, "Plaintiffs must demonstrate the existence of a 'specific geographic or other causative nexus' such that the violation could have affected their members." *Id.* at 370. For the "small-magnitude emissions events that constituted violations only because Exxon's permits established zero-emissions standards . . . the district court must decide whether evidence shows that the emitted pollutants could have reached beyond the Exxon complex into the offsite areas of Baytown where Plaintiffs' members lived and recreated." *Id.*

6K.   Plaintiffs have failed to demonstrate, as the Fifth Circuit opinion requires, a geographic or causative nexus between the violation and injuries to Plaintiffs' standing members for all of the Recordable Events involving flaring, smoke, or haze.[22] The Fifth Circuit stated that "[f]or any violation that could cause or contribute to flaring, smoke, or haze, the district court's findings have

---

[22] *See Plaintiffs' Revised Exhibit* 588.

27

established traceability. The district court need only decide which violations fall within this category." *Id.* at 371. The Court does not read the Fifth Circuit's decision as meaning that if a violation involves *any* indications of flaring, smoke, or haze in the Complex data—as with the extension-cord and cigarette-butt incidents—that fact alone establishes traceability of injury. Plaintiffs' tables that recategorize Exxon's data include indications that for various emissions events, one of Exxon's on-site employees saw or perceived smoke or haze, or the routing of pollutants to flares. These indications by Exxon on-site personnel do not address the question of whether any such event involving flaring, smoke, or haze was or could have been perceived, observed, or otherwise experienced by one of Plaintiffs' standing members. As the Fifth Circuit specified in its opinion, the central issue for traceability of injury remains the Court's factual determination of "whether evidence shows that the emitted pollutants could have reached beyond the Exxon complex into the offsite areas of Baytown where Plaintiffs' members lived and recreated." *Id*. at 370. The Fifth Circuit stated in its opinion that Plaintiffs' view of the legal standard for traceability of injury was "too loose[]," and stated that Exxon's view of the legal standard for establishing traceability of injury was too restrictive. *Id*. at 368. As the Fifth Circuit explained, "traceability requires less of a causal connection than tort law." *Id*. But this Court must confine its standing analysis to the facts contained in the record. Developing and adducing

28

such evidence of standing under the less exacting traceability standard described by the Fifth Circuit is an achievable task, but only if the facts in the record support it.  For example, a citizen suit plaintiff can adduce evidence that a pollutant emitted during a violation did reach a standing member through that standing member's testimony.  Alternatively, to satisfy the "geographic reach" requirement, a citizen suit plaintiff could adduce evidence that a pollutant emitted during a violation did or could have dispersed into offsite areas where standing members live and recreate in sufficient quantities to cause human health impacts or odors, such as evidence provided by air dispersion modeling and toxicology analysis.  *E.g.,* *Texans United*, 207 F.3d at 792-93.  In this case, Plaintiffs made the conscious decision to try their case "too loosely," *ETCL II*, 968 F.3d at 368, as it related to standing, and chose not to develop or adduce such evidence of the geographic reach of pollutants associated with violations.

6L.    As further examples, a number of flaring events in Plaintiffs' Exhibits PX 588, PX 592, and PX 594 resulted in minimal emissions but were nevertheless Recordable Events because they caused exceedance of zero-emissions standards.[23] With respect to these violations, there is insufficient evidence of offsite impact. Plaintiffs did not adduce evidence that their standing members perceived any

---

[23] *See Plaintiffs' Revised Exhibit* 588 at rows 399-400, 455, 458, 824-25, 1196, 2067, 4505, and 5183 (showing examples of small-magnitude Recordable Events involving flaring).

injury from any of the violations associated with Recordable Events that involved flaring.  Indeed, even in situations in which Plaintiffs' standing members testified to seeing flaring at the Complex, Plaintiffs did not tie standing members' perceived injury from a flaring event to any of the Recordable Events in Plaintiffs' tables.  As the Court has found,[24] flaring is common in the Baytown area, and because much flaring is permitted, not all flaring that occurs at the Complex amounts to a violation.  Certainly, a person who lives near a refinery or chemical facility does not have standing to bring a CAA claim merely on the basis that the individual witnessed flaring coming from such a facility, as the flaring might be authorized, and thus not a violation.  A CAA plaintiff must, as the Fifth Circuit has made clear, establish traceability of injury for *each* alleged violation.  *See ETCL II*, 968 F.3d at 365 ("[O]ne injury does not entitle a litigant to right other wrongs that did not injure it.").  In sum, Plaintiffs have failed to adduce evidence to prove traceability of injury for any of the violations associated with the Recordable Events in Plaintiffs' tables, including those violations that involved flaring.

6M.   In addition, the distinction the TCEQ makes between Recordable Events and Reportable Events demonstrates the agency's position that emissions from Recordable Events are less serious and less potentially harmful to human

---

[24] *Findings of Fact and Conclusions of Law*, Document No. 225 at 70; *Revised Findings of Fact and Conclusions of Law*, Document No. 257 at 91 n.256 (reaffirming original finding, which was undisturbed on appeal).

health and the environment than emissions from Reportable Events.[25]   The evidence presented at trial supports the TCEQ's position that Recordable Events, by their classification, pose less of a potential threat to human health or the environment than Reportable Events.  Most of the Recordable Events involved short durations and modest amounts of total emissions—especially when compared to emissions during normal operations and emissions authorized by Complex permits.[26]  Of the 3,735 Recordable Events, 43 percent were a half-hour or less in duration, 62 percent were two hours or less in duration, 73 percent were five hours or less in duration, 82 percent were 12 hours or less in duration, and 89 percent were 24 hours or less in duration.[27]   Furthermore, the evidence at trial indicated that 58 percent of the Recordable Events had total emissions of 20 pounds or less, 80 percent had total emissions of 100 pounds or less, 87 percent had total emissions of 200 pounds or less, and 93 percent had total emissions of 500 pounds or less.[28]

6N.   In an effort to establish traceability of injury with respect to Recordable Events, Plaintiffs have attempted to recast a significant number of

---

[25] *Trial Transcript* at 12-164:11-23.

[26] *Defendants' Exhibits* 1007A-1008; *Trial Transcript* at 10:214:9-215:19.

[27] *Defendants' Exhibit* 1007A at 1; *Plaintiffs' Exhibits* 1B, 2D, and 2F.

[28] *Defendants' Exhibit* 1007A at 2; *Plaintiffs' Exhibits* 1B, 2D, and 2F.

Recordable Events—even though they were never reported as Reportable Events—as having "had to be reported under Texas regulations." *ETCL II*, 968 F.3d at 371. This effort on remand to recharacterize Recordable Events as Reportable Events is an about-face that is not supported by the record.  Plaintiffs did not take the position at trial, much less prove, that any of the Recordable Events was misclassified by Exxon at the time the event was recorded.  For a violation to meet the "had to be reported under Texas regulations" traceability criterion, the violation must have been caused by a "reportable emissions event," which is an emissions event for which Exxon was required to submit a report through STEERS pursuant to 30 TEX. ADMIN. CODE § 101.201(a).  A "reportable emissions event" is defined an "emissions event that in any 24-hour period, results in an unauthorized emission from any emissions point equal to or in excess of the reportable quantity." 30 TEX. ADMIN. CODE § 101.1(88).  Therefore, for an emissions event to be a *reportable* emissions event, the unauthorized emissions over a 24-hour period for at least one pollutant emitted during the emissions event must equal or exceed its reportable quantity ("RQ") as defined in 30 TEX. ADMIN. CODE § 101.1(89).  A pollutant's "unauthorized emissions" are its emissions that are in excess of that pollutant's emissions limit established in Exxon's permit.  *Id*. § 101.1(108).  The evidence adduced at trial established that the only emissions events that are in fact reportable emissions events are those the Court refers to in its findings as Reportable

32

Events.[29]  These 241 Reportable Events are identified with a five-digit or six-digit "tracking number" in Plaintiffs' Exhibits 3, 5, and 7 to their proposed findings of fact and conclusions of law on the current remand.  None of the emissions events in Plaintiffs' Exhibits 4, 6, and 8 to their proposed findings are reportable emissions events.

6O.   In their about-face on remand, Plaintiffs incorrectly identified violations they list in Exhibits 4, 6, and 8 as meeting the criterion of "had to be reported" because they incorrectly include each violation for which the number in the "Emissions" column (Column H of each table) exceeded the alleged RQ of the pollutant listed in the "Air Contaminant" column (Column G of each table).  There are multiple issues with respect to Plaintiffs' suggested approach.  First, the Plaintiffs have inserted RQs into the revised tables on remand for which they adduced no testimony or other evidence at trial.  Under applicable regulations, RQs are determined based on a complex definition that is dependent in part on variables, including whether an emission involved a mixture of air contaminant compounds and whether particular air monitoring equipment was being used.  30 TEX. ADMIN. CODE § 101.1(89)(a), (b), (d).  Second, Plaintiffs suggest using an incorrect methodology for factually identifying events that needed to be reported under Texas regulations.  To be accurate, the correct method would have been to

---

[29] *Revised Findings of Fact and Conclusions of Law*, Document No. 257 at 9.

identify violations for which the total number in the "Emissions" column (Column H of each table)—or if the corresponding emissions event's duration was longer than 24 hours, the average emissions from Column H over each 24-hour period of the event—exceeded a relevant permit limit by *at least the pollutant's RQ* over the duration of the event or a 24-hour period within the event. *Id*. §§ 101.1(88), 101.1(108). Such a proper identification could be made by multiplying the "Permit Limit" (Column I) (which is on an hourly basis) by the number of hours of the event's total duration or by 24, as applicable, and then comparing that applicable permit limit to the emissions. In any event, the Plaintiffs' post-trial efforts to re-cast many of the Recordable Events as involving emissions that "had to be reported under Texas regulations" is unavailing, as the Plaintiffs did not present any evidence supporting this position at trial.

6P.   The Court concludes that Plaintiffs did not establish that any of the violations, other than those correlated by standing member testimony, did or could have resulted in actionable impacts beyond the Complex into the offsite areas of Baytown where Plaintiffs' members lived and recreated. Plaintiffs called one expert to testify as to the potential health effects of pollutants involved in various Complex emissions events: Dr. Richard Brooks. Brooks presented general testimony as to the potential health effect of certain air pollutants and testified as to the nature and various characteristics of pollutants reported as having been emitted

34

as a result of certain emissions events.   Although Brooks presented general testimony as to the potential health effects and odor impacts of certain pollutants, Brooks provided no credible evidence suggesting, much less establishing, that any violations associated with any Recordable Event—or, for that matter, associated with any Reportable Event—actually resulted in concentrations of pollutants that had or could have had an adverse impact on human health (such as allergy or respiratory symptoms) or odor impacts on the environment outside the Complex in general, much less on any member of Plaintiffs' organizations specifically.[30]   As the Court has previously found, although Plaintiffs' evidence of potential health effects provides some support of a potential risk of harm to human health (such as allergy or respiratory symptoms), this evidence of potential risk of harm is too tenuous and general to rise above mere speculation of "across the fence," *ETCL II*, 968 F.3d at 371, offsite impact from individual violations.[31]

6Q.   Exxon, by contrast, and despite the fact that it had no burden of proof on this issue, presented credible, unrebutted evidence from two expert witnesses establishing that none of the violations associated with the 3,735 Recordable Events caused or contributed to any actual or potential adverse impact on human

---

[30] *Trial Transcript* at 7:10-194; *Plaintiffs' Exhibits* 476-478.

[31] *Revised Findings of Fact and Conclusions of Law*, Document No. 257 at 91 n.256 (incorporating and explicitly restating this finding about the speculative nature of Plaintiffs' evidence of potential harm).

health or the environment. Exxon's evidence in this regard was presented through David Cabe and Dr. Lucy Fraiser. Cabe was an environmental engineer and air pollution consultant with a master's degree in environmental health engineering.[32] Fraiser has a Ph.D. in toxicology.[33] Cabe determined the maximum off-site ground-level concentrations of the air pollutants emitted during each of the 3,735 Recordable Events using air dispersion modeling, and Fraiser analyzed the toxicological impact of those concentrations.[34] Air dispersion modeling is a mathematical simulation of how pollutants disperse in the atmosphere.[35] It is used to predict the dispersion and off-site ground-level concentrations due to emissions of an air pollutant, such as occurred during each Recordable Event.[36] The air dispersion models used by Cabe and Randy Parmley, another of Exxon's experts, were developed by EPA.[37] Ambient air monitoring data collected from the vicinity of the Complex were also analyzed by Cabe and Fraiser.[38]

---

[32] *Trial Transcript* at 8:109:13-110:6.

[33] *Trial Transcript* at 9:41:6-10.

[34] *Trial Transcript* at 8-124: 12-18; 9-50:2-17.

[35] *Trial Transcript* at 6-131:14-20.

[36] *Trial Transcript* at 6-132:25 to 133:12, 135:24-137:16.

[37] *Trial Transcript* at 6-135:16-23; *Defendants' Exhibit* 187 at 5.

[38] *Trial Transcript* at 8-172:20 to 174:20; 8-180:3 to 181:17; 9-140:18 to 141-14; *Defendants' Exhibit* 165 at 7.

6R.    Fraiser compared the maximum off-site ground-level concentrations of the air pollutants emitted during each of the Recordable Events and the ambient air monitoring data to National Ambient Air Quality Standards ("NAAQS")[39] for the criteria pollutants or the air comparison values ("ACVs") the TCEQ has developed for the non-criteria pollutants.[40]   The NAAQS are promulgated by EPA to protect public health and welfare.  42 U.S.C. § 7409(b); 40 C.F.R. § 50.2(b).[41] They set maximum ambient ground-level concentration levels for the six criteria pollutants, including sulfur dioxide ($SO_2$), nitrogen oxides ($NO_x$), and particulate matter (PM)—pollutants the Plaintiffs claim can be odorous and/or the cause of respiratory or allergy-like symptoms.[42]    The NAAQS are very conservative, "allowing an adequate margin of safety" to "protect the public health."  42 U.S.C. § 7409(b)(1).  ACVs are not standards, but instead are screening levels.  ACVs are set below the levels that could cause known health risks; ground-level concentrations of pollutants below ACV levels are not expected to endanger public

---

[39] *Trial Transcript* at 8-127:5-19; 8-132:2-11; 8-158: 4-18; 8-185:20 to 8-187:23; 9-30:25 to 9-31:13.  The experts called by Exxon modeled the 3,735 recordable events and all of the reportable events except those 75 events for which Exxon paid penalties to regulatory authorities and those 11 events that were excused by Governor Perry's Hurricane Ike Proclamation.  *See Defendants' Exhibit* 225.

[40] *Trial Transcript* at 8-128:14 to 8-129:20; 9-62:12 to 63:11; 9:72-8 to 74:6; *Defendants' Exhibit* 165 at 6-8.

[41] *Defendants' Exhibit* 165 at 9-10; *Defendants' Exhibit* 195 at 15-16.

[42] *Trial Transcript* at 8-126:8-21.

health or the environment.[43]   In addition, a ground-level concentration of an air pollutant that exceeds the corresponding ACV does not mean that human health or the environment has been or may be harmed; it simply means that a toxicological evaluation of the potential impact of the ground-level concentration of the air pollutant on human health or the environment is warranted.[44]   Thus, NAAQS and ACVs provide conservative and reliable benchmarks for analysis of the impact, if any, of the emissions of air pollutants during each of the Recordable Events.

6S.   The evaluation of each of the 3,735 Recordable Events[45] by the experts called by Exxon established that *none* of these events involved emissions of a criteria air pollutant that caused or contributed to an exceedance of the pollutant's NAAQS.[46]   Those evaluations also established that for 3,605 of the 3,735 events, the maximum offsite ground-level concentrations of the non-criteria air pollutants involved in the event also did not exceed the air pollutants' ACVs.[47] With respect to the 130 Recordable Events for which the maximum offsite ground-

---

[43] *Trial Transcript* at 8-182:9-24.

[44] *Trial Transcript* at 8-127:23 to 131:3; 9-54:3 to 61:14; 9-154:6-25; *Defendants' Exhibit* 195 at 7-10, 16; *Defendants' Exhibit* 196 at 5-6; *Defendants' Exhibit* 418.

[45] *Defendants' Exhibits* 165, 196-97; *Trial Transcript* at 8-124:12 to 125:8, 9-50:25 to 9-52:22.

[46] *Defendants' Exhibits* 166-67, 196-97; *Trial Transcript* at 8-127:10-16, 9-31:9-13.

[47] *Defendants' Exhibits* 166-67, 196-97, 532; *Trial Transcript* at 8-133:9 to 8-152:13; 9-31:9 to 9:33:25.

level concentration of at least one non-criteria air pollutant was predicted to have exceeded its ACV, further toxicological analysis by Fraiser established that the emissions resulting from those events did not cause or contribute to a condition of air pollution or harm public health or the environment.[48]   None of Plaintiffs' witnesses rebutted this testimony and scientific analysis.   Taken as a whole, the expert testimony and scientific analyses established that none of the violations associated with any of the Recordable Events had any actual or potential impact on human health or the environment, and thus could not be fairly traced to injuries to Plaintiffs' members due to odors or exposure to pollutants that can, under sufficient concentrations, cause respiratory or allergy-like symptoms.   This evidence established, in the words of the most recent Fifth Circuit opinion in this case, that "[i]t is possible—particularly given the size of the Exxon complex (3,400 acres)—that pollutants emitted in a small quantity could have dissipated before leaving Exxon grounds." *ETCL II*, 968 F.3d at 370.   This evidence of lack of actual or potential impact on human health or the environment outside the Complex fenceline reinforces the absence of evidence on which the Court could fairly trace the claimed injuries of Plaintiffs' standing members to violations associated with Recordable Events over which Plaintiffs sought to bring CAA citizen suit claims.

---

[48] *Defendants' Exhibits* 195-97; *Trial Transcript* at 9-86:3-89:7.

6T.    Likewise, Plaintiffs failed to sustain their burden of proof on traceability with respect to claimed violations associated with Reportable Events, based on their tables of Exxon data alone.  As with the Recordable Events, there are numerous examples of how Plaintiffs' tables alone do not demonstrate traceability between violations associated with a particular Reportable Event and Plaintiffs' claimed injuries.  Specifically, Plaintiffs failed to establish—with the exception of the 40 days of violations found by the Court to be actionable—that any indications of flaring, smoke, or haze as noted in Exxon's records, by its on-site personnel in connection with documenting emissions events, were observed, perceived, or otherwise experienced by any standing members.   In addition, Plaintiffs failed to establish how the emitted pollutants in a number of the Reportable Events they allege as violations did cross or could have crossed the Complex fenceline in sufficient quantities to have an adverse impact on the health of Plaintiffs' standing members or the environment in which they lived or which they visited.  For the violations associated with all of the Reportable Events except those for which Exxon paid a penalty or that were caused by Hurricane Ike, Exxon's retained experts conducted the same type of air dispersion modeling and toxicological analyses of the results of the modeling as they conducted with respect to Recordable Events.   As the testimony of these experts elicited at trial demonstrates, such modeling and toxicological analysis established that none of

the pollutants emitted during any of those 153 Reportable Events could have crossed the Complex fenceline in sufficient quantities to cause cognizable injuries to standing members.[49]   For those 153 Reportable Events, such expert testimony demonstrated that none of these events involved emissions of a criteria air pollutant that caused or contributed to an exceedance of the pollutant's NAAQS.[50] This testimony also established that the maximum offsite ground-level concentrations of the non-criteria air pollutants involved in 139 of the events did not exceed the corresponding air comparison values ("ACVs").[51]   Fraiser testified that the TCEQ Effects Screening Level is based on an odor threshold,[52] and also on mild respiratory effects.[53]   With respect to the other 14 Reportable Events for which the maximum offsite ground-level concentration of at least one non-criteria air pollutant was predicted to have exceeded its ACV, further toxicological analysis by Fraiser established that the emissions resulting from those events did not cause or contribute to a condition of air pollution or harm public health or the

---

[49] *Trial Transcript* at 6-162:6-168:2; 8-123:15.

[50] *Trial Transcript* at 8-127:5-19.

[51] *Trial Transcript* at 9-35:8-15.

[52] *Trial Transcript* at 9-89:15-9-90:13.

[53] *Trial Transcript* at 9-114:18-21.

environment.[54]  Plaintiffs did not present evidence to undermine or question this toxicological analysis.

6U.    For purposes of demonstrating the point, the following are examples of Reportable Events for which Plaintiffs failed to carry their burden to show traceability of injury to a standing member from claimed violations.

6V.    Plaintiffs sought to recover for claimed violations associated with a Reportable Event that occurred on November 1, 2006 (STEERS #83379).[55]  The event occurred during routine maintenance at the Baytown Refinery, when an operator inadvertently closed the fuel gas valve on Boiler A instead of Boiler C, causing Boiler A to shut down.[56]  Regenerator fuel gas was partially re-routed into the atmosphere through a wet gas scrubber stack bypass.  The releases exceeded several non-zero and zero permit emission limits.  However, Plaintiffs failed to demonstrate that the releases could have contributed to or did contribute to any standing member injuries.  A dispersion modeling analysis concluded "the maximum off-site concentrations for the modeled pollutants resulting from" this emissions event "were well below the appropriate National Ambient Air Quality Standards (NAAQS), TCEQ State Property Line standard, and TCEQ Effects

---

[54] *Defendants' Exhibits* 195-97; *Trial Transcript* at 9-86:3-89:7.

[55] *Plaintiffs' Exhibit* 2A at rows 141-46.

[56] *Defendants' Exhibit* 30I, *TCEQ Investigation Report* at 3.

Screening Levels (ESL) routinely considered acceptable by TCEQ for all averaging periods."[57]

6W.   Similarly, Plaintiffs sought to bring a claim for violations associated with a Reportable Event that began on May 31, 2006 at the Baytown Refinery (STEERS #76531).[58]  This event occurred when a technician opened a water valve to drain water to the refinery process water sewer system but failed to close the water valve.[59]  Heavy rainfall caused pollutants to be released into the refinery's storm water canal, and the pollutants were eventually released into the atmosphere through evaporation.   A dispersion modeling analysis concluded that "the maximum off-site concentrations for the modeled pollutants resulting from [this event] were well below the appropriate TCEQ" ESL, and that the impacts from this event were "well within the levels considered harmless for public health and welfare by the TCEQ."[60]

6X.   Similarly, Plaintiffs sought to recover for claimed violations associated with a Reportable Event that involved emissions from a wet gas

---

[57] *Defendants' Exhibit* 30I, *Dispersion Modeling Report* at 1.

[58] *Plaintiffs' Exhibit* 2A at rows 118-19.

[59] *Defendants' Exhibit* 30E, *TCEQ Investigation Report* at 2.

[60] *Defendants' Exhibit* 30E, *Dispersion Modeling Report* at 1, 5.

scrubber at the Baytown Refinery on October 14, 2005 (STEERS #66438).[61]  This event occurred when a failure of the Fluid Catalytic Cracking Unit #3 Boiler resulted in the routing of emissions to the wet gas scrubber bypass.[62]  A dispersion modeling report concluded that "the emissions from [this] event . . . were predicted to be far below any applicable federal or state standards or guidelines even though conservative modeling was used."[63]  The dispersion modeling report also stated that "the maximum off-site concentrations for all averaging periods for the modeled pollutants . . . were below the appropriate [NAAQS], the TCEQ Regulation II Standard, and [ESL] routinely considered acceptable by TCEQ."[64]

6Y.   As a final example, Plaintiffs sought to bring a citizen suit claim for claimed violations associated with a Reportable Event that occurred at the Baytown Chemical Plant on March 14, 2012 (STEERS #166006).[65]  This emissions event occurred when an operator was replacing a safety valve and "failed to fully close the inlet and outlet block valves," resulting in emission of

---

[61] *Plaintiffs' Exhibit* 2A at rows 3-8.

[62] *Defendants' Exhibit* 30A, *Dispersion Modeling Report* at 1.

[63] *Id.* at 4.

[64] *Id.* at 1.

[65] *Plaintiffs' Exhibit* 2E at row 199.

"hydrocarbons" during a thirty-two-minute period. [66]   A TCEQ report concluded that there were no documented impacts on human health and the environment from this event.

6Z.    The Fifth Circuit has specified that Plaintiffs bore the burden to prove traceability of injury for each violation.   *ETCL II*, 968 F.3d at 367.   Just as the Court has found that it is not required to go through Exxon's expert reports introduced at trial to determine whether state law affirmative defense criteria were met for specific Reportable Events, and for the reasons stated by the Fifth Circuit, the Court is not required to "ferret out" evidence supporting traceability of injury as to specific violations.   *Id.* at 374.   Plaintiffs chose, for strategic reasons, to present their case at trial by relying principally on the data reported or recorded by Exxon, and taking the position that Plaintiffs had standing to raise a CAA citizen suit claim for every incident that Exxon reported or recorded as a Deviation, Recordable Event, or Reportable Event.   The Fifth Circuit "refute[d] that position," *id*. at 365, and squarely held that the responsibility for adducing evidence proving traceability for each violation rested solely with Plaintiffs.   *Id.* at 367.

6AA. That requirement to adduce evidence cannot be satisfied, as Plaintiffs attempt to do in their proposed findings and conclusions on remand, by citing court decisions in other lawsuits.   For example, in support of a proposed finding that all

---

[66] *Defendants' Exhibit* 31D, *TCEQ Investigation Report* at 2.

"opacity violations involve smoke,"[67] Plaintiffs cite not to evidence but instead to a district court decision from the Eastern District of Oklahoma, *Martin v. Weyerhaeuser Company*, 616 F. Supp 2d 1210, 1213 (E.D. Ok. 2007).[68]  The page from the Oklahoma district court's order that Plaintiffs cite summarizes testimony from an expert witness in that case who testified that "opacity is determined from the color of the smoke emanating from the smoke stack."   *Id.* at 1213. *Weyerhaeuser* was an employment law retaliation case in which a former timber company employee alleged retaliation in connection with the former employee's reporting of environmental violations.  *Id.* at 211-13.  The expert's testimony was related to the burning of tree bark.   *Id.* at 213.   This expert testimony as characterized by another court in another matter related to tree-bark burning does not provide factual support for a position that traceability of injury was proved "in gross" for all claimed violations at the Complex that involved opacity.

6BB.  As another example, Plaintiffs attempt to provide evidentiary support for a proposed finding that "particulate matter violations involve smoke" by citing a district court decision from the Southern District of Texas in an unrelated matter, *Garcia v. BRK Brands Inc.*, 266 F. Supp. 2d 566 (S.D. Tex. 2003).[69]  *Garcia* was a

---

[67] *Plaintiffs' Proposed Findings of Fact and Conclusions of Law on Limited Remand* ¶ 6G.

[68] *Id.*

[69] *Id.*

products liability case that dealt with the failure of a company's product to detect smoke in time to save the decedent's life. *Id.* at 567-68. The lone reference upon which Plaintiffs rely is the district court's summation of the facts in that case, including a statement that a space heater "produce[d] a large amount of incomplete combustion by-products including carbon monoxide and particular matter (soot and smoke)." *Id.* at 568. This products liability case offers no support for Plaintiffs' proposed factual finding that all violations at the Complex, documented by Exxon personnel as involving particulate matter, resulted in smoke.

6CC. As yet another example, Plaintiffs attempt to provide factual support for a requested finding that "[g]round-level ozone, or 'smog,' is visible haze"[70] by citing an unreported case from the Eastern District of California, *Association of Irritated Residents v. C & R Vanderham Dairy*, No. 1:05-cv-01593, 2007 WL 2815038 (E.D. Cal. Sept. 25, 2017). The district court's order in that case concluded that "[o]zone pollution harms [plaintiff member's] aesthetic interest because on most summer days, ozone haze obscures the view of the Sierra Nevada, Coastal Range, and Sierra Madre mountains from his home." *Id.* at *15. This finding by another court about facts in an unrelated matter does not represent evidence from which this Court could determine traceability of injury from claimed violations at the Complex. To the extent that Plaintiffs also attempt to tie

---

[70] *Id.* ¶ 6H.

this court finding in another case to Brooks's testimony in this case that ground-level ozone is "a component of urban smog,"[71] this effort falls short as well.  Dr. Brooks did not testify that visible haze equates to ground-level ozone.  Earlier in his testimony, Dr. Brooks testified that "[o]zone is formed from sunlight, oxides, and nitrogen certain organic compounds . . . and probably formaldehyde and nitrous acid.  It's a very complicated air quality chemistry that goes on."[72]  Dr. Brooks went on to testify on cross-examination that "a lot of things go into making ozone," including automobile emissions.[73]

6DD. Finally, Plaintiffs attempt to support a proposed factual finding that "[p]articulate matter and opacity violations also cause or contribute to haze"[74] by citing not to evidence in this case but instead to *Yazzie v. United States Environmental Protection Agency*, 851 F.3d 960, 965 (9th Cir. 2017), and *Sierra Club v. Union Electric Company*, No. 4:14-cv-00408, 2014 WL 5783032, at *5 (E.D. Mo. Nov. 6, 2014).  Citations to factual findings from other matters, as opposed to evidence in the case, do not support a finding of traceability of injury from particular violations for which Plaintiffs seek recovery.

---

[71] *Trial Transcript* at 7-147:19.

[72] *Trial Transcript* at 7-143:17-20.

[73] *Id.* at 7-189:12-25.

[74] *Plaintiffs' Proposed Findings of Fact and Conclusions of Law on Limited Remand* ¶ 6H.

48

6EE.  The absence of factual record support on traceability of injury to individual violations, other than with respect to the 40 days of violation, is likewise revealed in Plaintiffs' efforts on remand to distinguish between violations in their tables that in light of the Fifth Circuit decision did cause or could have contributed to standing member injury.   In their proposed findings on remand, Plaintiffs request that the Court omit from the tally of actionable violations involving flaring, smoke, or haze any violation that resulted in the emission of one pound or less of a pollutant.[75]  Plaintiffs cite nothing in the record to support a finding by this Court that violations that involved the emission of less than one pound of a pollutant are *per se* not traceable to any injury, but violations that involved the emission of more than one pound are *per se* traceable to an injury.   There is no record evidence supporting such an arbitrary distinction.   Plaintiffs fail to explain how the one-pound threshold does anything to establish that (1) flaring, smoke, or haze associated with the event could be perceived by one of Plaintiffs' members outside the 3400-acre Complex or (2) the emissions from the event did or could have resulted in conditions that gave rise to an odor or respiratory or allergy-like symptoms outside the Complex.   The Court can envision a hypothetical situation in which a violation (such as a release from a pipe) occurred close to the Baytown fenceline, and a single pound of pollutant from that violation had an offsite impact.

---

[75] *Id.* ¶ 6D.

The Court can also envision a different hypothetical in which a violation occurs in the center of the miles-wide Complex and involves more than one pound of pollutant emissions, and the emissions have *no* offsite impact.  The Court cannot make factual findings on hypotheticals; it must do so on proof.  Efforts to set an arbitrary amount of one pound of emissions as a proxy for actual proof establishing traceability have an insufficient evidentiary basis in the record before the Court.

6FF.  This proposed omission of violations that involved less than one pound of emissions from Plaintiffs' tables underscores the fact that Plaintiffs are unable to carry their burden to prove traceability for each violation.  To this end, Plaintiffs fail to prove traceability for other small-magnitude violations that resulted in minimal emissions, even if those emissions exceeded one pound.  For example, there are numerous violations stemming from Recordable Events in Plaintiffs' tables that involved flaring and resulted in the emission of more than one pound but nevertheless a small amount of a pollutant. Examples of such violations from Plaintiffs' Revised Exhibit PX 588 (Recordable Events at the Refinery) include: (1) an event that occurred on September 23, 2011, resulting in the release of 2.45 pounds of 2MButene from Flare 11; (2) an event that occurred on March 26, 2006, resulting in the release of 1.49 pounds of benzene from Flare 17; (3) an event that occurred on July 15, 2006, resulting in the release of 3.17 pounds of benzene from Flare 14; and (4) an event that occurred on January 18,

2008, resulting in the emission of 6.50 pounds of butane (iso) from Flare 4.[76] Nothing in the record supports Plaintiffs' proposition that they have established traceability for these violations, but not for the violations that resulted in the emission of less than one pound of pollutant.   Guided by the Fifth Circuit's instructions, the Court has already found that Plaintiffs must adduce evidence from the record in this case to prove traceability for *each* violation underlying their CAA claims, and the abandonment of violations involving *less* than one pound of pollutants does not substitute for the absence of evidence of traceability of injury as to violations involving *more* than one pound.

## C.      *Revised and Supplemental Findings and Conclusions Related to Act of God Defense*

The Court retracts its prior findings and conclusions related to the Act of God defense (as set forth in Section III(D) "Affirmative Defenses," paragraphs 50-51, of the Revised Findings of Fact and Conclusions of Law), and replaces those prior findings and conclusions with the following:

### *l.      Hurricane Ike Defenses*

50A.  Based on the Court's traceability findings, the Act of God defense is moot because none of the days of violations listed on Appendix A implicate that defense.

---

[76] *Plaintiffs' Revised Exhibit* 588 at rows 31, 59, 68, and 239.

50B.  Alternatively, to the extent it is material, the Court makes the following findings on the defense.  Prior to Hurricane Ike's landfall, the Governor of Texas issued a declaration of a state of disaster including the following proclamation:  "As provided in Section 418.016, all rules and regulations that may inhibit or prevent prompt response to [the threat of the hurricane] are suspended for the duration of the state of disaster."[77]  The proclamation applied from September 7, 2008 through November 6, 2008.[78]  On September 15, 2008, the TCEQ issued guidance regarding the proclamation, stating that no prior approval was needed for any exceedance of an emissions limit that was directly related to hurricane response.[79]  Prior to hurricane landfall, the Complex was shut down.[80]  After the hurricane passed, the Complex resumed operations.[81]

50C.  Hurricane Ike was an "Act of God" within the meaning of the defense against a finding of liability in the Texas Clean Air Act for a violation, as first incorporated in the Texas state implementation plan ("SIP") as approved by the EPA.  40 C.F.R. § 52.2270(e).  In remanding for findings on the Act of God

---

[77] *Defendants' Exhibit* 225; *Trial Transcript* 3-2:2-21.

[78] *Trial Transcript* at 3-209:6-14.

[79] *Plaintiffs' Exhibit* 587 at 3; *Trial Transcript* at 4-24:7 to 26:2.

[80] *Trial Transcript* at 3-206:4-7, 3-209:3-51.

[81] *Trial Transcript* at 3-209:16.

defense, the Fifth Circuit made clear that, contrary to Plaintiffs' contention, Texas's SIP *does* incorporate an Act of God defense.  *See ETCL II*, 968 F.3d at 373 ("The Texas SIP—the governing federal law under the Clean Air Act—thus incorporates an Act of God defense.").  Section 7.261 of the Texas Water Code— the Texas SIP's current statutory home—states:

> If a person can establish that an event that would otherwise be a violation of a statute within the commission's jurisdiction or a rule adopted or an order or a permit issued under such a statute was caused solely by an act of God . . . or other catastrophe, the event is not a violation of that statute, rule, order, or permit.

Tex. Water Code § 7.251.  As to whether Hurricane Ike constituted an "Act of God," the Fifth Circuit has, on a number of occasions, observed that a hurricane fits within the meaning of an "Act of God."  *See, e.g.*, *Petition of U.S.*, 425 F.2d 991 (5th Cir. 1970) (describing Hurricane Betsy as an "extraordinary, unforeseeable, and catastrophic" Act of God); *Simmons v. Berglin*, 401 Fed. Appx. 903, 906 (5th Cir. 2010) (per curiam) (leaving undisturbed the district court's conclusion that Hurricane Katrina was an Act of God); *Complaint & Petition of Int'l Marine Dev. Corp.*, 463 F.2d 238, 239 (5th Cir. 1972) (per curiam) (concluding that Hurricane Camille was an Act of God); *In re Marine Leasing Servs.*, 471 F.2d 255, 256-57 (5th Cir. 1973) (per curiam) (affirming the district court's conclusion that Hurricane Betsy was an Act of God).  Additionally, Plaintiffs previously, in another matter in the Southern District of Texas, took the

position in a consent decree that a hurricane would be a force majeure Act of God.[82]   In light of the Governor's declaration ahead of Hurricane Ike, the well-documented devastation in the public record the hurricane left in its wake, and Plaintiffs' own prior admission, Hurricane Ike was an Act of God for purposes of the Texas SIP.

50D.   The Complex's actions in direct response to Hurricane Ike were necessary, reasonable, and prudent under the circumstances.   Exxon presented evidence at trial establishing that necessary precautionary measures were undertaken at the Complex in anticipation of the impending arrival of Hurricane Ike.   Jeffrey Kovacs, an Exxon employee who worked in the environmental section of the Safety, Security, Health, and Environment Department at the Baytown Refinery, testified that the Complex initiated a shutdown in the advent of Hurricane Ike that resulted in emissions events.[83]   Kovacs testified that shutting down the plant "was the safest thing to do from a safety and environmental perspective in advance of the hurricane."[84]   Because Hurricane Ike's arrival was imminent, Kovacs testified that the complex had to be shut down "promptly."[85]

---

[82] *Defendants' Exhibit* 393; *Trial Transcript* at 2-185:2-15.

[83] *Trial Transcript* at 3-206:4-7.

[84] *Trial Transcript* at 3-207:6-8

[85] *Trial Transcript* at 3-209:3-5.

This evidence of the need for the shutdown in the face of an imminently arriving hurricane was uncontroverted at trial; indeed, Plaintiffs did not attempt to prove, much less offer credible evidence to establish, that the shutdown was somehow unnecessary or premature. Plaintiffs' attempts to discount Exxon's actions on the basis they occurred *before* the arrival of Hurricane Ike are of no consequence to the Act of God defense's applicability. Evidence at trial illustrated that the Complex shutdown was necessary to ameliorate environmental and safety risks.[86] Indeed, Kovacs testified that shutting down the plant was required because the eye of Hurricane Ike eventually passed directly over the Complex.[87] Waiting until the hurricane's eye was over the complex to take any responsive action—as the Plaintiffs suggest in their proposed findings should have been done—would have been irresponsible. The time for Exxon to act was prior to Hurricane Ike's arrival, and, as Kovacs testified, Exxon's response was appropriate.[88]

50E. There were ten Reportable Events and resulting violations at issue in this suit that occurred directly as a result of the shutdown of the Complex in preparation for and response to the hurricane, as identified in Defendants' Exhibits 21-23. Each of these ten Reportable Events (STEERS: 113885, 113887, 114755,

---

[86] *Trial Transcript* at 3-207:6-8

[87] *Trial Transcript* at 3-207:12.

[88] *Trial Transcript* at 3-209:3-5.

114601, 113886, 114911, 114736, 114665, 114463, and 114372) and resulting violations were excluded from any enforcement action under the Governor's proclamation, the related TCEQ guidance, and the "Act of God" defense incorporated into the Texas SIP. The Act of God defense precludes a finding or conclusion that any of these ten Reportable Events and resulting violations were a violation of an emissions standard or limitation set forth in a Title V permit. Accordingly, the Court finds that Plaintiffs' CAA claims based on any of the ten reportable events listed above are subject to the Act of God defense.

51.     The exclusion of these ten Reportable Events from the calculation of the number of days of violations results in the Court's conclusion that if Plaintiffs had standing to bring a CAA claim for each of the violations found by the Court in its Revised Findings of Fact and Conclusions of Law—which, as indicated in these revised and supplemental findings and conclusions on remand, Plaintiffs do not— the Court's calculations of "days of violation" for Counts I, II, and III would be reduced as follows:

- Count I:   reduced from 10,583 days of violations to 10,517 days of violations;

- Count II:  reduced from 5,709 days of violations to 5,578 days of violations; and

- Count III:  reduced from 18 days of violations to 16 days of violations.[89]

**D.      *Revised Findings and Conclusions Related to Penalties Based on Revised and Supplemental Findings on Standing, Traceability, and the Act of God Defense***

The Court retracts its prior findings and conclusions related to penalty determination (as set forth in Section III(D) "Penalties," paragraphs 56–58, of the Revised Findings of Fact and Conclusions of Law), and replaces those prior findings and conclusions with the following:

**D.      *Penalties***

56.    As the Court has found in its Revised Findings of Fact and Conclusions of Law, Plaintiffs put at issue in the case at trial 241 Reportable Events, 3,375 Recordable Events, and 901 Deviations.[90]  The Court previously found that 16,386 days of violations associated with these Reportable Events, Recordable Events, and Deviations were supported by the evidence.  However, after applying the Fifth Circuit's most recent guidance with respect to traceability of injury and the Act of God defense, the Court has found on this further remand and analysis that Plaintiffs have standing as citizen suit plaintiffs to raise claims only as to a fraction of the violations associated with the Events and Deviations

---

[89] The Court also revises accordingly its prior findings and conclusions regarding the number of violations with respect to Count I (Document No. 257, pages 50-51); Count II (Document No. 257, pages 57-61); and Count III (Document No. 257, pages 62-63).

[90] *Revised Findings of Fact and Conclusions of Law*, Document No. 257 at 8-9.

raised by the Plaintiffs in this matter—specifically, 40 days of violations based on five events.  In the alternative, the Court has also found on remand that a number of the violations raised by Plaintiffs are not actionable due to the applicability of the Act of God defense.  The Court will exercise its discretion to conduct a revised penalty assessment with respect to that fraction of overall violations asserted in the case by Plaintiffs for which Plaintiffs have proven they have standing to bring claims under the CAA, and/or as to which Exxon does not have an Act of God defense to liability.

57.   With respect to a citizens' suit (under 42 U.S.C. § 7604(a)), the penalty provision of the CAA provides in pertinent part as follows:

> In determining the amount of any penalty to be assessed under this section or section 7604(a) of this title, the . . . court, . . ., shall take into consideration (in addition to such other factors as justice may require) the size of the business, the economic impact of the penalty on the business, the violator's full compliance history and good faith efforts to comply, the duration of the violation as established by any credible evidence (including evidence other than the applicable test method), payment by the violator of penalties previously assessed for the same violation, the economic benefit of noncompliance, and the seriousness of the violation.

42 U.S.C. § 7413(e).  The language of this penalty provision makes clear that an assessment of "any appropriate civil penalties" under section 7604(a) must proceed on a "violation-by-violation" basis.  The CAA requires calculation of a daily penalty "for *each* violation" and "each day of violation."  42 U.S.C. § 7413(b), 7413(e)(2) (emphasis added).  Section 7413(e) likewise requires consideration of

"the duration of *the* violation, paid penalties "assessed for *the same* violation," and "the seriousness of *the* violation." *Id.* § 7413(e)(1) (emphasis added). Similarly, the "benefit of noncompliance" factor must proceed violation-by-violation, because it "require[s] some showing that delayed expenditures [on pollution control] would be 'necessary to correct' the violations at issue in the suit," *ETCL I*, 824 F.3d at 530, which means violations for which Plaintiffs have established standing. *ETCL II*, 968 F.3d at 365-66.

58.   The Court is not required to assess a penalty for violations.  42 U.S.C. § 7413(e)(2) ("A penalty *may* be assessed for each day of violation." (emphasis added)); *Luminant Generation Co. v. EPA*, 714 F.3d 841, 852 (5th Cir. 2013) ("[T]he penalty assessment criteria . . . are considered by the courts . . . in determining *whether or not* to assess a civil penalty for violations and, if so, the amount." (emphasis added)); *see also* 42 U.S.C. § 7413(e)(1) ("In determining the amount of *any* penalty to be assessed . . . ." (emphasis added)); *Envt'l Conservation Org. v. City of Dall.*, 529 F.3d 519, 530 (5th Cir. 2008) ("[E]ven in the event of a successful citizen suit, the district court is not bound to impose the maximum penalty afforded under the statute."). Rather, the amount of any penalty, the analysis of the factors, and the process of weighing the factors are "'highly discretionary' with the trial court." *Cedar Point*, 73 F.3d at 576 (quoting *Tull v.*

*U.S.*, 481 U.S. 412, 427 (1987), and *U.S. ex rel. Adm'r of E.P.A. v. CITGO Petroleum Corp.*, 723 F.3d 547, 551 (5th Cir. 2013)).

**E.    Revised Findings and Conclusions on the Duration of the Violation Factor Based on Revised and Supplemental Findings on Standing, Traceability, and the Act of God Defense**

The Court retracts its prior findings and conclusions related to the duration of the violation factor applied to CAA penalty determination (as set forth in Section III(D)(c) "Duration of the Violation," paragraphs 62-64, of the Revised Findings of Fact and Conclusions of Law), and replaces those prior findings and conclusions with the following:

### c.    Duration of the Violation

62.    As the Fifth Circuit explained in *ETCL I*, 824 F.3d at 531, the CAA requires courts assessing appropriate civil penalties to consider "the duration of *the violation* as established by any credible evidence." 42 U.S.C. § 7413(e)(1) (emphasis added by the Fifth Circuit). In considering the Court's initial conclusions on this factor, the Fifth Circuit held that the Court erred "by viewing long and short "violations as effectively offsetting each other." *ETCL I*, 824 F.3d at 531. It further held that the Court "should have considered whether any violation, standing alone, was sufficiently long to justify imposition of a penalty." *Id.* at 532.

60

63.    The Court has considered the length of each of the actionable violations for which the Plaintiffs have established traceability of injury.  Of the violations associated with the five events for which Plaintiffs have established traceability of injury:

- There were seven (7) violations associated with STEERS 122984, each lasting 22 hours, or less than one day each.[91]

- There were seventeen (17) violations associated with STEERS 150177, each lasting 114.78 hours, or less than five days each.[92]

- There were six (6) violations associated with STEERS 157283, each lasting 3.9 hours.[93]

- There was one (1) violation associated with STEERS 159900, lasting 1.33 hours.[94]

- There were eight (8) violations associated with STEERS 168810, each lasting 6 hours.[95]

---

[91] *Plaintiffs' Exhibit* 2C at rows 235-40; *Plaintiffs' Exhibit* 3 at row 6.

[92] *Plaintiffs' Exhibit* 2C at rows 316-328; *Plaintiffs' Exhibit* 3 at row 8; *Plaintiffs' Exhibit* 4 at rows 36-38.

[93] *Plaintiffs' Exhibit* 2C at rows 339-44.

[94] *Id*. at row 15990.

[95] *Id*. at rows 364-71.

Only one of these events lasted more than a day, and some lasted far less than 24 hours.  And as the Court has found, the record demonstrates that Exxon personnel timely responded in a responsible manner to emissions events, regardless of their duration and whether or not they were associated with actionable violations.

64.    Plaintiffs did not adduce evidence indicating that any actionable violation, standing alone, was of sufficient duration to weigh in favor of imposing a penalty.

## F.    *Revised Findings and Conclusions on the Payment by the Violator of Penalties Previously Assessed for the Same Violation Based on Revised and Supplemental Findings on Standing, Traceability, and the Act of God Defense*

The Court retracts its prior findings and conclusions related to the payment by a violator of penalties previously assessed for the same violation factor applied to CAA penalty determination (as set forth in Section III(D)(d) "Payment by the Violator of Penalties Previously Assessed for the Same Violation," paragraph 65, of the Revised Findings of Fact and Conclusions of Law), and replaces those prior findings and conclusions with the following:

### d.    *Payment by the Violator of Penalties Previously Assessed for the Same Violation*

65.    Exxon has paid $35,000.00 in monetary penalties for the violations for which Plaintiffs have established standing, to either the TCEQ or Harris County.[96]

---

[96] *Supra* § II.8; *Defendants' Exhibits* 32, 33Q, 33Y, and 490.

Accordingly, to the extent the Court determined to assess any penalty associated with the 40 days of violations associated with the five events for which Plaintiffs have establish standing, $35,000.00 would need to be deducted from any penalty otherwise warranted.[97]

### G.   *Revised Findings and Conclusions on the Economic Benefit of Non-Compliance Factor Based on Revised and Supplemental Findings on Standing, Traceability, and the Act of God Defense*

The Court retracts its prior findings and conclusions related to the economic benefit of noncompliance factor applied to CAA penalty determinations (as set forth in Section III(D)(e) "Economic Benefit of Noncompliance," paragraphs 66-71, of the Revised Findings of Fact and Conclusions of Law), and replaces those prior findings and conclusions with the following:

### e.   *Economic Benefit of Noncompliance*

66.   Applying this consideration in light of the Court's revised findings and conclusions on remand with respect to the traceability of injury factor, the Court concludes that Plaintiffs' showing of economic benefit through the testimony of Plaintiffs' expert Jonathan Shefftz—is irrelevant to the Court's determination of an appropriate penalty in this case.  Plaintiffs did not prove any "economic benefit of noncompliance" that is attributable to a failure to avoid any

---

[97] Plaintiffs contended on initial remand this amount should be reduced given the Court's finding on Count VII; however, as this issue was not appealed or part of the Fifth Circuit's instructions on initial remand, the Court will not revisit the issue.

of the violations for which the Court finds they established tracing.  Plaintiffs did not prove any delayed expenditures that would have been necessary to correct any of the violations for which Plaintiffs have established standing.  Additionally, the 40 days of violations found by the Court result in a potential statutory range of penalty that falls far below what Shefftz testified to as "benefit of noncompliance." With $35,000 being the benchmark per violation used by the Court previously to develop the upper end of the penalty range,[98] the penalty range for 40 days of violation would be from $0 to $1,365,000 ($1,400,000 less the $35,000 paid by Exxon in penalties to regulators on the events associated with these days of violations).  *See, e.g.*, *PIRG v. Powell Duffryn Terminals, Inc.*, 720 F. Supp. 1158, 1163 (D.N.J. 1989) (awarding less than the maximum penalty under the Clean Water Act for violations of a permit, even though the court found that the benefit of the defendant's non-compliance under any proposed theory was "far in excess of the statutory maximum [penalty]"), *aff'd in part, rev'd in part sub nom. Pub. Interest Grp. of N.J., Inc. v. Powell Duffryn Terminals Inc.*, 913 F.2d 64, 81 (7th Cir. 1990).

---

[98] *Revised Findings of Fact and Conclusions of Law*, Document No. 257 at 94 n.261.

**H.** ***Revised Findings and Conclusions on the Seriousness Factor Based on Revised and Supplemental Findings on Standing, Traceability, and the Act of God Defense***

The Court retracts its prior findings and conclusions related to the seriousness factor (as set forth in Section III(D)(f) "Seriousness," paragraph 73, of the Revised Findings of Fact and Conclusions of Law), and replaces those prior findings and conclusions with the following:

**f.** ***Seriousness***

72A.   In its decision on the initial appeal of this matter, the Fifth Circuit cited decisions of two other circuits:  *Pound v. Airosol Co.*, 498 F.3d 1089 (10th Cir. 2007), and *Powell Duffryn Terminals, Inc.*, 913 F.2d at 64.  *ETCL I*, 824 F.3d at 532.  The Court has considered these authorities in reconsidering the seriousness factor as directed by the Fifth Circuit.

72B.   In *Pound*, the defendant had sold an ozone-depleting product in violation of the CAA, but declined to assess any civil penalty.  With respect to the seriousness factor, the Tenth Circuit noted that the district court's conclusion that a lack of serious violations warranted mitigating any penalty was "not supported by any findings of fact."  *Pound*, 498 F.3d at 1099.  "Particularly important" to the Tenth Circuit was "the fact that Congress had explicitly banned the substances contained in the non-compliant product."  *Id.*  Unlike the critical facts in *Pound*,

Congress has not banned pollutant emissions from refinery, chemical plant, or olefins plant operations; such emissions are in fact expected and permitted.

72C.   Unlike in *Powell*, Plaintiffs have not presented any evidence that there were a "large number of gross exceedances" with respect to violations for which Plaintiffs have established standing, through traceability of injury.  913 F.2d at 79. Moreover, unlike in *Powell*, the evidence showed that the TCEQ will not establish permit limits for emissions from emissions events, because such events are by definition unplanned and unpredictable.  This is the case even though the TCEQ and EPA understand that not all process breakdowns and resulting emissions events can be prevented, and thus recognize that there will be emissions from emissions events at any facility.  It is as a result of this lack of permit limits for emissions from emissions events that the emissions of each air pollutant from each emissions source due to a process breakdown—irrespective of quantity— represents a departure from permit limits.

72D.   The Tenth Circuit in *Pound* interpreted this conclusion in *Powell* to mean that a violation can be serious enough to support a district court in imposing a penalty "if [the district court] finds there is a risk or a potential risk of environmental harm, even absent proof of deleterious effect."  *Pound*, 498 F.3d 1099.   In this case, Plaintiffs presented evidence solely of the potential health effects caused by the types of pollutants emitted during the emissions events at

issue.[99]   Of course, the potential for health effects from particular emissions of these pollutants depends on the magnitude of their ground-level concentration and the duration of public exposure to those ground-level concentrations.[100]   As detailed above, the record evidence in this case does not support a finding that the emissions resulting from violations had such potential.

72E.  Having considered the seriousness of the violations in light of the entire evidentiary record in this case and without offsetting more serious violations against less serious violations based on emissions alone, the Court finds and concludes that the violations for which Plaintiffs have established standing were sufficiently serious to justify an assessment of an amount of penalty by the Court.

## I.  *Revised Findings and Conclusions on Balancing the Penalty Factors Based on Revised and Supplemental Findings on Standing, Traceability, and the Act of God Defense*

The Court retracts its prior findings and conclusions related to the balancing of the factors to be applied in CAA penalty determination (as set forth in Section III(D)(f) "Balancing the Factors," paragraphs 75, 77, and 78 of the Revised Findings of Fact and Conclusions of Law), and replaces those prior findings and conclusions with the following:

---

[99] *Plaintiffs' Exhibits* 476, 540; *Trial Transcript* at 7-89:25 to 7-91, 9-161:24 to 9-162:8.

[100] *See, e.g.*, *Plaintiffs' Exhibit* 476 at 50-51; *Plaintiffs' Exhibit* 539 at 25, 27-29; *Trial Transcript* at 7-90:11-16, 7:91:20 to 92:9.

### g. *Balancing the Factors*

75A.  The Court declined to address the "justice so requires" factor on remand from the Fifth Circuit's initial decision.[101]  Exxon does contend that the Court should consider the "other factors" language of the civil penalty statute and argues that penalties should not be assessed if they would chill regulatory enforcement efforts.[102]  In its first post-trial pleading, Exxon relied on the policy considerations addressed by the Supreme Court in *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc.*, 484 U.S. 49, 61 (1987), as they related to penalties that might be based on the Agreed Order of February 22, 2012.[103]  In a revised proposal filed at the Court's request, Exxon continued to quote the reasoning in *Gwaltney* as an asserted basis on which the Court could decline to assess penalties.[104]

75B.  Congress first authorized the imposition of civil penalties in citizens' suits in the 1990 amendments to the CAA.  *See* S. Rep. 101-228, 101ST Cong., 1st

---

[101] *Revised Findings of Fact and Conclusions of Law*, Document No. 257 at 93 n.260.

[102] *Defendants' Proposed Findings of Fact and Conclusions of Law*, Document No. 216 at 329, 331-32, 350-54; *Defendants' Revised Proposed Findings of Fact and Conclusions of Law*, Document No. 224 at 58, 67-69.

[103] *Defendants' Proposed Findings of Fact and Conclusions of Law*, Document No. 216 at 331-32.  The Agreed Order is described in the Court's prior findings.  *Findings of Fact and Conclusions of Law*, Document No. 225 at 13-15; *Revised Findings of Fact and Conclusions of Law*, Document No. 257 at 15-17.

[104] *Defendants' Revised Proposed Findings of Fact and Conclusions of Law*, Document No. 224 at 69.

Sess. 1989, 1990 U.S.C.C.A.N. 3385, 3756.  In doing so, Congress noted that assessment of penalties should serve the goals of "deterrence, restitution, and retribution."  *Id.*  The Court therefore considers other factors that justice requires from the perspective of these goals.

75C.  In determining whether to adjust its penalty award—as the recent Fifth Circuit decision instructed this Court to do—the Court has considered the impact that any civil penalty would have on public enforcement of the CAA.  In this context, an observation by the Supreme Court in the *Gwaltney* decision provides some key guidance:

> Suppose that the Administrator identified a violator of the Act and issued a compliance order under § 309(a).  Suppose further that the Administrator agreed not to assess or otherwise seek civil penalties on the condition that the violator take some extreme corrective action, such as to install particularly effective but expensive machinery, that it otherwise would not be obliged to take.  If citizens could file suit, months or years later, in order to seek the civil penalties that the Administrator chose to forgo, then the Administrator's discretion to enforce the Act in the public interest would be curtailed considerably.  The same might be said of the discretion of state enforcement authorities.

484 U.S. at 60-61; *accord Piney Run Pres. Ass'n v. County Comm'rs of Carroll Cty.*, 523 F.3d 453, 459-60 (4th Cir. 2008) (quoting *Gwaltney*, 484 U.S. at 61); *Ellis v. Gallatin Steel Co.*, 390 F.3d 461, 475 (6th Cir. 2004) (quoting *Gwaltney*, 484 U.S. at 60-61); *see Envt'l Conservation Org.*, 529 F.3d at 531 (quoting *Gwaltney*, 484 U.S. at 61).  As a court of appeals has observed, regulated entities

will be "disinclined to resolve disputes by such relatively informal agreements if additional civil penalties may then be imposed in pending citizen suits." *Comfort Lake Ass'n, Inc. v. Dresel Contracting, Inc.*, 138 F.3d 351, 357 (8th Cir. 1998).

75D.  As a factual matter, the four improvement projects negotiated into the 2012 Agreed Order fit the *Gwaltney* hypothetical precisely.  If the Court were to assess civil penalties on the basis of those projects, a regulated entity would be deterred from offering the same benefit in future negotiations with the TCEQ.  As a result, a valuable tool of TCEQ enforcement would be removed in the future, and the public would never again receive the benefit of voluntary improvement projects to reduce emissions as a replacement for payment of monetary civil penalties, which are paid into the U.S. Treasury.  Accordingly, even if some economic benefit of noncompliance could be associated with the timing of the four improvement projects Exxon voluntarily committed to in the 2012 Agreed Order, the Court finds that assessing civil penalties against Exxon for that benefit would disserve the public interest.  The Court so finds because such penalties would have the effect of impacting TCEQ's discretion to enter into resolutions such as the 2012 Agreed Order.  Regulated entities would be disinclined to enter into such orders for fear they could form the basis of a request for civil penalties in future citizen suits.  The Court finds that an assessment of citizen suit penalties under these circumstances would have the perverse effect of affecting TCEQ's discretion

70

to effectuate the reduction of emissions through orders with regulated entities such as the 2012 Agreed Order.

75E.  The *Gwaltney* principle does not stand as an absolute bar to the imposition of penalties, but the Court concludes in the exercise of sound discretion that it would not be in the interest of justice and thus not appropriate to assess any civil penalty based on any aspect of the four improvement projects in the Agreed Order in light of the limited number of violations for which the Plaintiffs have proven they have standing to bring citizen suit claims, because doing so would frustrate the goals of the civil penalty provisions of the CAA.

77A.  In *Tull*, the Supreme Court analyzed the civil penalty provisions of the Clean Water Act, which require considerations of factors much like those of the CAA.  481 U.S. at 412.  *Tull* concluded that such "highly discretionary calculations that take into account multiple factors are necessary in order to set civil penalties." *Id.* at 427.  And the Supreme Court observed that "[t]hese are the kinds of calculations traditionally performed by judges," namely trial judges.  *Id.*  The Court must therefore exercise its discretion and experience as a trial judge in weighing the various penalty factors in this case.  As with any decision to impose any form of legally authorized penalty, that discretion must be exercised in light of the goals of deterrence, restitution, and retribution.

77B.   The most important factors revealed by the evidence in this case are Exxon's history of compliance and the demonstration of good faith over time by its personnel and managers, not only in complying with the CAA but also embarking on hundreds of millions of dollars in voluntary efforts to improve its environmental performance and thus reduce even permitted emissions at the Complex.   The Court's unchallenged findings concerning this history—including the Exxon's efforts to comply with regulations in a context where perfect compliance cannot be achieved but also in installing equipment and instituting measures to reduce even permitted emissions at the Complex—outweigh any other factor.

77C.   The compliance record weighs heavily against assessing any penalty to serve any deterrence goal.   To the contrary, imposing any penalty on Exxon could well discourage regulated entities from seeking to evaluate and institute measures to reduce overall emissions at their industrial facilities.   Similarly, given Exxon's good faith in improving environmental performance at the Complex, there is no retribution purpose in assessing any CAA civil penalty.

78.    The Court has carefully re-evaluated the evidence in the trial record in light of the Fifth Circuit's remand for purposes of making additional findings on the traceability of injury element of standing and the Act of God defense.   In light of the reduction in the number of actionable violations following that reconsideration on remand, the Court has reconsidered its application of the

various statutory civil penalty factors in accordance with the directions of the Fifth Circuit.  Following that reconsideration on remand, including the consideration of other factors required in the interests of justice, and the careful exercise of discretion in weighing those factors under the evidence, the Court concludes that assessment of a penalty in the lower end of the statutory range associated with the 40 days of violations would be appropriate.   Again, with $35,000 being the benchmark per violation used by the Court previously to develop the upper end of the penalty range,[105] the penalty range for 40 days of violation would be from $0 to $1,365,000 ($1,400,000 less the $35,000 paid by Exxon in penalties to regulators on the events associated with these days of violations).

## J.      *Revised Findings and Conclusions on Attorneys' Fees Based on Revised and Supplemental Findings on Standing, Traceability, the Act of God Defense, and Penalties*

The Court retracts its prior findings and conclusions related to attorneys' fees (as set forth in Section III(G), paragraph 84, and replaces those prior findings and conclusions with the following:

## G.      *Attorneys' Fees*

84.      Plaintiffs request an award of attorneys' fees, expert witness fees, and costs pursuant to 42 U.S.C. § 7604(d).  Given the Court's findings on the limited number of actionable violations in light of the traceability element of standing, and

---

[105] *Revised Findings of Fact and Conclusions of Law*, Document No. 257 at 94 n.261.

a comparison of the number of actionable violations against the thousands of violations raised by the Plaintiffs in the litigation through trial and multiple appeals, the Court finds that Plaintiffs have not substantially prevailed.

**K.** ***Revised Conclusion Based on Revised and Supplemental Findings on Standing, Traceability, the Act of God Defense, Penalties, and Attorneys' Fees***

The Court modifies the conclusion in the Revised Findings of Fact and Conclusions of Law as follows:

IV.   CONCLUSION

Based on the foregoing, the Court hereby

**ORDERS** that Plaintiff Environment Texas Citizen Lobby, Inc. and Sierra Club's request in this case for a declaratory judgment, injunctive relief, and appointment of a special master are **DENIED**.  Penalties against Defendants are assessed **IN THE AMOUNT OF $**_____.  Further, the Court

**ORDERS** that the parties' respective requests for attorneys' fees and costs are **DENIED**.

. . .

Other than as set forth in these revised and supplemental findings, the Court confirms, maintains, and incorporates into its revised judgment the findings and conclusions set forth in the Court's Revised Findings of Fact and Conclusions of Law (Document No. 257).

The Court will issue a separate revised Final Judgment.

_____
DAVID HITTNER
United States District Judge